# Exhibit L

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| Kelly Roberts, Individually and as Parent and Natural Guardian of C.L., a Minor,<br><br>Plaintiff,<br><br>v.<br><br>GlaxoSmithKline LLC,<br><br>Defendant. | **COMPLAINT**<br><br>**JURY DEMAND ENDORSED HEREON** |

## COMPLAINT AND JURY DEMAND

Plaintiff Kelly Roberts individually and on behalf of her son, C.L., a minor, ("Plaintiff"), by and through undersigned counsel hereby submits this Complaint and Jury Demand against GlaxoSmithKline LLC d/b/a GlaxoSmithKline ("GSK" or "Defendant") for compensatory damages, punitive damages, equitable relief, and such other relief deemed just and proper arising from the injuries to C.L. as a result of her prenatal exposures to the prescription drug Zofran® (ondansetron). In support of this Complaint, Plaintiff alleges the following:

## INTRODUCTION

1. Zofran is a powerful drug developed by GSK to treat nausea associated with chemotherapy or radiation treatments in cancer patients.

2. In 1991, the U.S. Food and Drug Administration ("FDA") approved Zofran for that indication and for that indication alone.

3. Although the only FDA approval for this drug was for seriously ill patients, GSK marketed Zofran "off label" since at least January 1998 as an established safe and effective treatment for the very common side effect of a normal pregnancy - pregnancy-related nausea and vomiting - otherwise known as "morning sickness." GSK further marketed Zofran during this

time as a "wonder drug" for pregnant women, despite having knowledge that GSK had never once undertaken a single study establishing that this powerful drug was safe or effective for pregnant mothers and their growing children *in utero*. Unlike another anti-nausea prescription drug available on the market – which is FDA-approved in the United States for treating morning sickness in pregnant women – GSK never conducted a single clinical trial establishing the safety and efficacy of Zofran for treating pregnant women before GSK marketed Zofran for the treatment of pregnant women. GSK, in fact, excluded pregnant women from its clinical trials used to support its application for FDA approval of Zofran. In short, GSK simply chose not to study Zofran in pregnant women or seek FDA approval to market the drug for treatment during pregnancy. GSK avoided conducting these studies and buried any internal analyses of Zofran's teratogenic potential because they would have hampered its marketing of Zofran and decreased profits by linking the drug to serious birth defects. GSK's conduct was tantamount to using expectant mothers and their unborn children as human guinea pigs.

4.     As a result of GSK's nationwide fraudulent marketing campaign, Zofran was placed into the hands of unsuspecting pregnant women and in the 2000s became the number one most prescribed drug for treating morning sickness in the United States. These women ingested the drug because they innocently believed that Zofran was an appropriate drug for use in their circumstance. When they ingested the drug, these pregnant women had no way of knowing that Zofran had never been studied in pregnant women, much less shown to be a safe and effective treatment for pregnancy-related nausea. Zofran would never have become the most prescribed morning sickness drug in the United States, and Plaintiff would never have taken it, if GSK had not misleadingly marketed the drug as a safe and efficacious treatment for morning sickness.

5.     By contrast, GSK knew that Zofran was unsafe for ingestion by expectant mothers. In the 1980s, GSK conducted animal studies which revealed evidence of toxicity, intrauterine deaths and malformations in offspring, and further showed that Zofran's active ingredient transferred through the placental barrier of pregnant mammals to fetuses. A later study conducted in humans confirmed that ingested Zofran readily crossed the human placenta barrier and exposed fetuses to substantial concentrations. GSK did not disclose this material information to pregnant women or their physicians.

2

6. In 1992, GSK began receiving mounting evidence of reports of birth defects associated with Zofran. GSK had received at least 32 such reports by 2000, and has received more than 200 such reports to date, including reports of the same congenital anomalies suffered by C.L. GSK never disclosed these reports to pregnant women or their physicians. In addition, scientists have conducted large-scale epidemiological and mechanistic studies that have demonstrated an elevated risk of developing Zofran-induced birth defects such as those suffered in this case. GSK has not disclosed this material information to pregnant women or their physicians. Instead, GSK sales representatives specifically marketed and promoted Zofran as a morning sickness drug since at least January 1998.

7. In 2012, GSK pled guilty to criminal charges brought by the United States Department of Justice arising from the company's "off-label" promotion of its drugs for uses never approved by the FDA. In exchange for GSK's full performance of its criminal plea agreement with the United States and for certain other promises exchanged between GSK and the United States, the United States agreed not to prosecute GSK criminally for conduct relating to "GSK's sales, marketing and promotion of . . . Zofran between January 1998 and December 2004." (*See*, Plea Agreement between United States and GSK, June 27, 2012, p. 6, available at: http://www.justice.gov/sites/default/files/opa/legacy/2012/07/02/plea-agreement.pdf.)

8. Around the same time, however, GSK entered civil settlements with United States that included more than $1 billion in payments to the federal government for its illegal marketing of various drugs, including Zofran specifically.

9. GSK's civil settlement agreement with the United States reports GSK's settlement of claims that GSK:

> **(a) "promoted the sale and use of Zofran for a variety of conditions other than those for which its use was approved as safe and effective by the FDA (including hyperemesis and pregnancy-related nausea)"**
>
> **(b) "made and/or disseminated unsubstantiated and false representations about the safety and efficacy of Zofran concerning the uses described in subsection (a) [hyperemesis and pregnancy-related nausea]"**
>
> **(c) "offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Zofran**"

3

(*See* Civil Off-Label Settlement Agreement, July 2, 2012, p. 5, available at: http://www.justice.gov/sites/default/files/opa/legacy/2012/07/02/off-label-agreement.pdf.)

10.     GSK's conduct has caused devastating, irreversible, and life-long consequences and suffering to innocent newborns and their families, like Plaintiff, Kelly Roberts, and her minor child, C.L.

11.     In 2005, Plaintiff conceived her son, C.L., and was prescribed and ingested Zofran during her first trimester of pregnancy.

12.     On April 12, 2006, C.L. was born with a cleft lip with cleft palate.

13.     C.L. was exposed to Zofran *in utero* during the periods when his lips and palate were forming and susceptible to developmental insult.

14.     Now at just nine years of age, C.L. has been through eight surgeries and countless visits with various physicians and specialists.  He has had four lip/palate repair surgeries, a tonsillectomy, a pharyngoloplasty, an abbe flap surgery, and a bilateral aveolar bone graft (ABG) surgery.  He has also endured additional surgical procedures to treat his ongoing ear pain and drainage related to his CL/P.  His physicians anticipate he will need additional surgeries in the near future.  He has had difficulty eating, speaking, and sleeping throughout much of his young life.  His birth defects have impaired his development and his enjoyment of a normal life at home and at school.

15.     C.L. has no family history of cleft lip or cleft palate.  Plaintiff has two (2) other children who were born without any birth defects after full-term pregnancies during which she did not ingest any Zofran.

16.     Had Plaintiff known the truth about Zofran's unreasonable risk of harm, long concealed by GSK, she would never have taken Zofran, and her child would never had been injured as described herein.

17.     Plaintiff brings claims for compensatory damages, punitive damages, as well as equitable relief in an effort to ensure that similarly situated mothers-to-be are fully informed about the risks, benefits and alternatives attending drugs marketed for use in pregnant women, and such other relief deemed just and proper arising from injuries and birth defects as a result of exposure to Zofran.

4

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because GSK is a citizen of a state other than the state in which Plaintiff is a citizen.

19.     Venue in this judicial district is proper under 28 U.S.C. § 1391 inasmuch as a substantial part of the events or omissions giving rise to the claims occurred in this district.

20.     At all times herein mentioned, GSK conducted, and continues to conduct, a substantial amount of business activity and has committed a tort, in whole or in part, in this judicial district.  GSK is registered to conduct business in this district, with a Resident Agent located in Ohio, and engaged in interstate commerce when it advertised, promoted, supplied, and sold pharmaceutical products, including Zofran, to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public, deriving substantial revenue in this district.  Although GSK's plan to misleadingly market Zofran for pregnancy was devised outside of the State of Ohio, it was executed nationwide, including in this district and State.

## PARTIES

21.     Plaintiff, Kelly Roberts, is a citizen of the United States.  She is the mother and natural guardian of C.L.  Plaintiff and C.L. reside together in Uniontown, Stark County, Ohio.

22.     GSK is a limited liability company organized under the laws of the State of Delaware.  GSK's sole member is GlaxoSmithKline Holdings, Inc., which is a Delaware corporation, and which has identified its principal place of business in Wilmington, Delaware.

23.     GSK is the successor in interest to Glaxo, Inc. and Glaxo Wellcome Inc.  Glaxo, Inc. was the sponsor of the original New Drug Application ("NDA") for Zofran.  Glaxo, Inc., through its division Cerenex Pharmaceuticals, authored the original package insert and labeling for Zofran, including warnings and precautions attendant to its use.  Glaxo Wellcome Inc. sponsored additional NDAs for Zofran, monitored and evaluated post-market adverse event reports arising from Zofran, and authored product labeling for Zofran.  The term GSK used herein refers to GSK, its predecessors Glaxo, Inc. and Glaxo Wellcome Inc., and other GSK

predecessors and/or affiliates that discovery reveals were involved in the testing, development, manufacture, marketing, sale and/or distribution of Zofran.

24.     At all relevant times, GSK conducted business in the State of Ohio and has derived substantial revenue from products, including Zofran, sold in the State of Ohio.

## FACTUAL ALLEGATIONS

25.     Zofran is a prescription drug indicated for the prevention of chemotherapy-induced nausea and vomiting, radiation therapy-induced nausea and vomiting and post-operative nausea and/or vomiting:

> **INDICATIONS AND USAGE**
> 1. Prevention of nausea and vomiting associated with highly emetogenic **cancer chemotherapy**, including cisplatin ≥ 50 mg/m2.
> 2. Prevention of nausea and vomiting associated with initial and repeat courses of moderately emetogenic **cancer chemotherapy**.
> 3. Prevention of nausea and vomiting associated with **radiotherapy** in patients receiving either total body irradiation, single high-dose fraction to the abdomen, or daily fractions to the abdomen.
> 4. Prevention of **postoperative nausea and/or vomiting**.

(GSK, Zofran Prescribing Information, Sept. 2014, available at: http://www.accessdata.fda.gov/drugsatfda_docs/label/2014/020007s046lbl.pdf (emphasis added).)

26.     The medical term for nausea and vomiting is emesis, and drugs that prevent or treat nausea and vomiting are called anti-emetics.

27.     Zofran is part of a class of anti-emetics called selective serotonin 5HT3 receptor antagonists.  The active ingredient in Zofran is ondansetron hydrochloride, which is a potent and selective antagonist at the 5-hydroxytryptamine receptor type 3 (5-HT3).

28.     Although 5-hydroxytryptamine (5HT) occurs in most tissues of the human body, Zofran is believed to block the effect of serotonin at the 5HT3 receptors located along vagal afferents in the gastrointestinal tract and at the receptors located in the area postrema of the central nervous system (the structure in the brain that controls vomiting).  Put differently, Zofran antagonizes, or inhibits, the body's serotonin activity, which triggers nausea and vomiting.

29.     Zofran was the first 5HT3 receptor antagonist approved for marketing in the United States.   Other drugs in the class of 5HT3 receptor antagonist include Kytril®

(granisetron) (FDA-approved 1994), Anzemet® (dolasetron) (FDA-approved 1997), and Aloxi®
(palonosetron) (FDA-approved 2003).

30.     Zofran is available as an injection (2 mg/mL), a premixed injection (32 mg/50ml
and 4 mg/50 ml), oral tablets (4 mg, 8 mg and 24 mg); orally disintegrating tablets (4 mg and 8
mg) and an oral solution (4 mg/5 mL).

31.     More specifically, GSK has obtained FDA approval for the following formations
of Zofran:

      a.  NDA 20-007 – Zofran Injection (FDA approved January 4, 1991)

      b.  NDA 20-103 – Zofran Tablets (FDA approved December 31, 1992)

      c.  NDA 20-403 – Zofran  Premixed Injection (FDA approved January 31, 1995)

      d.  NDA 20-605 – Zofran Oral Solution (FDA approved January 24, 1997)

      e.  NDA 20-781 – Zofran (a/k/a Zofran-Zydis) Orally Disintegrating Tablets (FDA
         approved January 27, 1999)

32.     The FDA has never approved Zofran for the treatment of morning sickness or any
other condition in pregnant women.

33.     In order for GSK to market Zofran lawfully for the treatment of morning sickness
in pregnant women, it would have been required to first adequately test the drug (including
performing appropriate clinical studies) and formally submit to the FDA evidence demonstrating
that the drug is safe and effective for treatment of morning sickness.

34.     A team of the FDA's physicians, statisticians, chemists, pharmacologists,
microbiologists and other scientists would then have an opportunity to: (a) review the company's
data and evidence supporting its request for approval to market the drug; and (b) determine
whether to approve the company's request to market the drug in the manner requested.  Without
first obtaining approval to market a drug for the treatment of pregnant women, a pharmaceutical
company may not legally market its drug for that purpose.

35.     GSK has not performed any clinical studies of Zofran use in pregnant women.
GSK, however, had the resources and know-how to perform such studies, and such studies were
performed to support another prescription drug that, unlike Zofran, is FDA-approved for the
treatment of morning sickness.

7

36.    GSK also has not submitted to the FDA any data demonstrating the safety or efficacy of Zofran for treating morning sickness in pregnant women.  Instead, GSK has illegally circumvented the FDA-approval process by marketing Zofran for the treatment of morning sickness in pregnant women without applying for the FDA's approval to market Zofran to treat that condition or any other condition in pregnant women.  This practice is known as "off-label" promotion, and in this case it constitutes fraudulent marketing.

37.    At all relevant times, GSK was in the business of and did design, research, manufacture, test, package, label, advertise, promote, market, sell and distribute Zofran.

### GSK's Knowledge That Zofran Presents an Unreasonable Risk of Harm to Babies Who Are Exposed to It During Pregnancy
#### Preclinical Studies

38.    Since at least the 1980s, when GSK received the results of the preclinical studies that it submitted in support of Zofran's NDA 20-007, GSK has known of the risk that Zofran ingested during pregnancy in mammals crosses the placental barrier to expose the fetus to the drug.  For example, at least as early as the mid-1980s, GSK performed placental-transfer studies of Zofran in rats and rabbits, and reported that the rat and rabbit fetuses were exposed prenatally to Zofran during pregnancy.

39.    The placental transfer of Zofran during human pregnancy at concentrations high enough to cause congenital malformations has been independently confirmed and detected in every sample of fetal tissue taken in a published study involving 41 pregnant patients.  The average fetal tissue concentration of Zofran's active ingredient was 41% of the corresponding concentration in the mother's plasma.

40.    GSK reported four animal studies in support of its application for approval of NDA 20-0007: (1) Study No. R10937 I.V. Segment II teratological study of rats; (2) Study No. R10873 I.V. Segment II teratological study of rabbits; (3) Study No. R10590 Oral Segment II teratological study of rats; (4) Study No. L10649 Oral Segment II teratological study of rabbits. These preclinical teratogenicity studies in rats and rabbits were stated by the sponsor, GSK, to show no harm to the fetus, but the data also revealed clinical signs of toxicity, premature births, intrauterine fetal deaths, and impairment of ossification (incomplete bone growth).

41.     Study No. R10937 was a Segment II teratological study of pregnant rats exposed to Zofran injection solution.   Four groups of 40 pregnant rats (160 total) were reportedly administered Zofran through intravenous (I.V.) administration at doses of 0, 0.5, 1.5, and 4 mg/kg/day, respectively.   Clinical signs of toxicity that were observed in the pregnant rats included "low posture, ataxia, subdued behavior and rearing, as well as nodding and bulging eyes."  No observations were reported as teratogenic effects.

42.     Study No. R10873 was a Segment II teratological study of pregnant rabbits exposed to Zofran injection solution.   Four groups of 15 pregnant rabbits (60 total) were reportedly given Zofran doses of 0, 0.5, 1.5, and 4 mg/kg/day, respectively.   In this study, there was a reported increase in the number of intra-uterine deaths in the 4 mg/kg group versus lower-dose groups.    The study also reported maternal weight loss in the exposed groups. Developmental retardation in off-spring and fetuses were noted – namely, areas of the parietal (body cavity) were not fully ossified, and the hyoid (neck) failed to ossify completely.

43.     Study No. R10590 Oral Segment II teratological study of rats.  Four groups of 30 pregnant rats (120 total) were given Zofran orally at doses of 0, 1, 4 and 15 mg/kg/day, respectively.   Subdued behavior, labored breathing, which is a symptom of congenital heart defects, and dilated pupils were observed in the 15 mg/kg/day group.   Body weight, gestational duration and fetal examinations were reported as normal, but "slight retardation in skeletal ossification" was noted in the offspring.

44.     Study No. L10649 Oral Segment II teratological study of rabbits.  Four groups of 14-18 pregnant rabbits (56-64 total) were given Zofran orally at doses of 0, 1, 5.5 and 30 mg/kg/day.  The study reported lower maternal weight gain in all of the exposed groups, as well as premature delivery and "total litter loss," referring to fetal deaths during pregnancy in the 5.5 mg/kg/day group.   Examination of the fetuses showed "slight developmental retardation as evident by incomplete ossification or asymmetry of skeleton."

45.     Even if animal studies do not reveal evidence of harm to a prenatally exposed fetus, that result is not necessarily predictive of human response.  For example, a drug formerly prescribed to alleviate morning sickness, thalidomide, is an infamous teratogenic in humans, but animal studies involving the drug failed to demonstrate such an increased risk of birth defects in

animals. GSK conducted studies of thalidomide and its toxicity before GSK developed Zofran and before it marketed Zofran for the treatment of morning sickness in pregnant women. Moreover, since at least 1993, GSK has stated in its prescribing information for Zofran that "animal reproduction studies are not always predictive of human response." Therefore, GSK has been aware since at least when it began marketing and selling Zofran that GSK could not responsibly rely on its animal studies as a basis for promoting Zofran use in pregnant women. But that is what GSK did.

### Early Reports to GSK of Zofran-Related Birth Defects

46.     At least as early as 1992, GSK began receiving reports of birth defects associated with the use of Zofran by pregnant women.

47.     By 2000, GSK had received at least 32 reports of birth defects arising from Zofran treatment in pregnant women. These reports included congenital heart disease, dysmorphism, intrauterine death, stillbirth, kidney malformation, congenital diaphragmatic anomaly, congenital musculoskeletal anomalies, and orofacial anomalies, among others.

48.     In many instances, GSK received multiple reports in the same month, the same week and even the same day. For example, on or about September 13, 2000, GSK received three separate reports involving Zofran use and adverse events. For two of those incidents, the impact on the baby was so severe that the baby died.

49.     From 1992 to the present, GSK has received more than **200** reports of birth defects, including orofacial defects, in children who were exposed to Zofran during pregnancy.

50.     The number of events actually reported to GSK was only a small fraction of the actual incidents.

### Evidence That Zofran Can Cause Cleft Palates

51.     Since before GSK began selling Zofran, GSK has known serotonin regulates developmental processes that are critical to normal embryonic development. Impeding serotonin signaling during embryonic development can increase the risk of developmental insult to those fetal tissues that depend on uninhibited serotonin signaling, including the palate.

52.     An epidemiologic study by Marlene Anderka, et al., titled, "Medications Used to Treat Nausea and Vomiting of Pregnancy and the Risk of Selected Birth Defects," (January 1, 2013) ("Anderka Study") reports an increased risk between mothers who took ondansetron during pregnancy and an incidence of cleft palates in their children.  The purpose of the Anderka Study was to examine whether nausea and vomiting during pregnancy, and the medications prescribed to treat that nausea and vomiting, were associated with various birth defects.  Data was collected by identifying women whose infants had birth defects and interviewing the parents.  Of those who completed the interview, 821 had infants born with cleft palate.  In particular, the Anderka Study found that taking ondansetron during pregnancy doubles the odds that the child would be born with cleft palate.  The study used data from the National Birth Defects Prevention Study ("NBDPS") and excluded infants whose clefts were secondary to other defects or who had a parent or sibling with the same defect.  The study controlled for other confounding factors, including the mother's age, race-ethnicity, education, parity, smoking habits, previous miscarriages, and use of folic acid, inter alia.  The Anderka Study showed a more than two-fold increase in cleft palates for children of women who took ondansetron versus those whose mothers did not.

## GSK's Failure to Warn of the Risk of Birth Defects Associated with Prenatal Exposure to Zofran

53.     Under federal law governing GSK's drug labeling for Zofran, GSK was required to "describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur."  21 C.F.R. § 201.57(e) (emphasis added).

54.     GSK was also required to list adverse reactions that occurred with other drugs in the same class as Zofran.  *Id.* § 201.57(g).

55.     In the context of prescription drug labeling, "an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence."  *Id.*

56.     Federal law also required GSK to revise Zofran's labeling "**to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.**"  *Id.* § 201.57(e) (emphasis added).

57.     GSK has received hundreds of reports of birth defects associated with the non-FDA-approved use of Zofran in pregnant women.  GSK has failed, however, to disclose these severe adverse events to healthcare providers or expectant mothers, including Plaintiff and her prescribing healthcare provider.

58.     Under 21 C.F.R. § 314.70(c)(2)(i), pharmaceutical companies are (and have been) free to add or strengthen – without prior approval from the FDA – a contraindication, warning, precaution, or adverse reaction.

59.     GSK thus had the ability and obligation to add warnings, precautions and adverse reactions to the product labeling for Zofran without prior approval from the FDA.  GSK failed to do so.

60.     Under 21 C.F.R. § 201.128, "if a manufacturer knows, or has knowledge of facts that would give him notice, that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug which accords with such other uses to which the article is to be put."

61.     At least as of 1998, GSK knew well from its off-label promotion and payments to doctors, its conspicuous increase in revenue from Zofran, and its market analyses of prescription data, that physicians were prescribing Zofran off-label to treat morning sickness in pregnant women and that such usage was associated with a clinically significant risk of birth defects.

62.     GSK had the ability and obligation to state prominently in the Indications and Usage section of its drug label that there is a lack of evidence that Zofran is safe for the treatment of morning sickness in pregnant women.  GSK failed to do so, despite GSK's knowledge that (a) the safety of Zofran for use in human pregnancy has not been established, (b) there have been hundreds of reports of birth defects associated with Zofran use during pregnancy, and (c) epidemiology studies report an increased risk of birth defects in babies exposed to Zofran during pregnancy.

63.     From 1993 to the present, despite mounting evidence of the birth defect risk, GSK's prescribing information for Zofran has included the same statement concerning use of Zofran during pregnancy:

12

"**Pregnancy: Teratogenic Effects**: Pregnancy Category B. Reproduction studies have been performed in pregnant rats and rabbits at I.V. doses up to 4 mg/kg per day and have revealed no evidence of impaired fertility or harm to the fetus due to ondansetron. There are, however, no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed."

64.     By contrast, the Product Monograph for Zofran in Canada states "**the safety of ondansetron for use in human pregnancy has not been established**," and that "**the use of ondansetron in pregnancy is <u>not</u> recommended**."

65.     In the United States and in this Commonwealth specifically, GSK has at all relevant times failed to include any warning disclosing any risks of birth defects arising from Zofran use during pregnancy in Zofran's prescribing information or other product labeling.

66.     GSK's inclusion of the phrase "Pregnancy Category B" in Zofran's prescribing information refers the FDA's pregnancy categorization scheme applicable to prescription drugs in the United States.  The FDA has established five categories to indicate the potential of a drug to cause birth defects if used during pregnancy. The current system of pregnancy labeling consists of five letter-categories (A, B, C, D, and X, in order of increasing risk).

67.     GSK had the ability, and indeed was required, to update Zofran's label to reflect at best a Pregnancy Category D designation or alternatively a Category X designation for Zofran:

**Pregnancy Category D.  If there is positive evidence of human fetal risk based on adverse reaction data from investigational or marketing experience or studies in humans**, but the potential benefits from the use of the drug in pregnant women may be acceptable despite its potential risks (for example, if the drug is needed in a life-threatening situation or serious disease for which safer drugs cannot be used or are ineffective), the labeling must state: "Pregnancy Category D. See "Warnings and Precautions" section. Under the "Warnings and Precautions" section, **the labeling must state: "[drug] can cause fetal harm when administered to a pregnant woman. . . . If this drug is used during pregnancy, or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to a fetus.**"

21 C.F.R. § 201.57(f)(6)(i)(d) (emphasis added).

**Pregnancy Category X. If studies in animals or humans have demonstrated fetal abnormalities or if there is positive evidence of fetal risk based on adverse reaction reports from investigational or marketing experience, or both**, and the risk of the use of the drug in a pregnant woman clearly outweighs any possible benefit (for example, safer drugs or other forms of therapy are available), the labeling must state: "Pregnancy

13

Category X. See `Contraindications' section." Under "Contraindications," **the labeling must state: "(Name of drug ) may (can ) cause fetal harm when administered to a pregnant woman. . . . (Name of drug ) is contraindicated in women who are or may become pregnant. If this drug is used during pregnancy, or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to a fetus.**"

*Id.* § 201.57(f)(6)(i)(e) (emphasis added).

68.     Beginning at least in 1992, GSK had positive evidence of human fetal risk posed by Zofran based more than 200 reports to GSK of birth defects, as well as epidemiology studies, and placental-transfer studies reporting on Zofran's teratogenic risk.  GSK has never updated Zofran's labeling to disclose that Zofran can cause fetal harm when administered to a pregnant woman, and GSK has failed to warn of the potential hazards to a fetus arising from Zofran use during pregnancy.

69.     The FDA recently promulgated a final rule declaring that, as of June 2015, it will require pharmaceutical manufacturers to remove the current A, B, C, D, or X pregnancy categorization designation from all drug product labeling and instead summarize the risks of using a drug during pregnancy, discuss the data supporting that summary, and describe relevant information to help health care providers make prescribing decisions and counsel women about the use of drugs during pregnancy and lactation.  79 Fed. Reg. 72064 (Dec. 4, 2014).  In promulgating this rule, the FDA "determined that retaining the pregnancy categories is inconsistent with the need to accurately and consistently communicate differences in degrees of fetal risk."

70.     In summary, beginning years before Plaintiff was exposed to Zofran, GSK marketed and sold Zofran without adequate warning to healthcare providers and consumers that Zofran was causally associated with an increased risk of birth defects and that GSK had not adequately tested Zofran to support marketing and promotion it for use in pregnant women.  This rendered the warnings accompanying Zofran inadequate and defective.

71.     Plaintiff hereby demands that GSK immediately cease the wrongful conduct alleged herein for the benefit of Plaintiff and similarly situated mothers and mothers-to-be, as GSK's wrongful conduct alleged herein is continuing.  Plaintiff further demands that GSK fully and fairly comply, no later than June 2015, to remove the Pregnancy Category B designation

from its drug product labeling for Zofran and fully and accurately summarize the risks of using Zofran during pregnancy, fully and accurately describe the data supporting that summary, and fully and accurately describe the relevant information to help health care providers make informed prescribing decisions and counsel women about the risks associated with use of Zofran during pregnancy.

### GSK's Fraudulent, Off-Label Promotion of Zofran for the Treatment of Morning Sickness in Pregnant Women

72.   At all relevant times, GSK has known that the safety of Zofran for use in human pregnancy has not been established.

73.   But with more than six million annual pregnancies in the United States since 1991 and an estimated 70-85% incidence of pregnancy-related nausea, the absence of a prescription medication that was approved by the FDA for pregnancy-related nausea presented an extremely lucrative business opportunity for GSK to expand its sales of Zofran, which before its patent expiration in 2006 was one of the most expensive drugs available in the U.S. market. GSK seized that opportunity, but the effect of its conduct was tantamount to experimenting with the lives of unsuspecting mothers-to-be and their babies in the United States and in this Commonwealth.

74.   At least as early as January 1998, despite available evidence showing that Zofran presented an unreasonable risk of harm to babies exposed to Zofran prenatally, GSK launched a marketing scheme to promote Zofran to obstetrics and gynecology (OB/GYN) healthcare practitioners including those in this Commonwealth, among others, as a safe treatment alternative for morning sickness in pregnant women.

75.   In support of its off-label marketing efforts, at least as early as January 1998, GSK offered and paid substantial remuneration to healthcare providers and "thought leaders" to induce them to promote and prescribe Zofran to treat morning sickness.

76.   On March 9, 1999, the FDA's Division of Drug Marketing, Advertising and Communications (DDMAC) notified GSK that the FDA had become aware of GSK's promotional materials for Zofran that violated the Federal Food Drug and Cosmetic Act and its implementing regulations. The FDA reviewed the promotional material and determined that "it

15

promotes Zofran in a manner that is false or misleading because it lacks fair balance." (*See*, FDA Ltr. to Michele Hardy, Director, Advertising and Labeling Policy, GSK, Mar. 9 1999, available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatory Information/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharma ceuticalCompanies/UCM166133.pdf.)

77. GSK's promotional labeling under consideration included promotional statements relating the effectiveness of Zofran, such as "Zofran Can," "24-hour control," and other promotional messages. But the promotional labeling failed to present any information regarding the risks associated with use of Zofran.

78. In its March 9, 1999 letter, the FDA directed GSK to "**immediately cease distribution of this and other similar promotional materials for Zofran that contain the same or similar claims without balancing risk information**."

79. GSK disregarded this mandate by the FDA. For example, GSK's marketing as materials as early as 2000 in widely circulated in obstetrician and gynecology trade journals over-emphasized Zofran's "Pregnancy Category B" designation as an imprimatur of safeness for use in pregnancy on the very first page of the marketing material and without adequate risk information. This created a false impression on the part of busy healthcare practitioners that the safety of use in pregnancy has been established. GSK's materials failed to disclose any of its internal information concerning the risks of birth defects associated with Zofran treatment during pregnancy.

80. When Zofran was first approved by the FDA to treat cancer patients, GSK's Oncology Division sales force had primary responsibility for marketing and promoting the drug. Beginning in at least January 1998, GSK set out to expand its Zofran sales to obstetricians and gynecologists by promoting Zofran as an established safe and effective treatment for morning sickness. GSK's initial strategy in this regard required its sales force to create new relationships with obstetricians and gynecologists by adding them as "new accounts." While this strategy had some success, it was inefficient compared to a revised promotional strategy that would enable GSK to leverage its other Division's already established relationships with obstetricians and

gynecologists. Thus, GSK's Oncology Division began partnering with GSK's Consumer Healthcare Division to promote Zofran.

81. Specifically, in or about 2001, GSK's Oncology Division finalized a co-marketing agreement with GSK's Consumer Healthcare division under which sales representatives from GSK's Consumer Healthcare division would market Zofran to obstetricians and gynecologists. At the time GSK's Consumer Healthcare sales force already had established relationships with, and routinely called on, obstetricians and gynecologists to promote and provide samples of another GSK product, Tums, specifically for the treatment and prevention of heartburn during pregnancy. GSK's established network for promoting Tums for use in pregnancy afforded it an efficient additional conduit for promoting Zofran for use in pregnancy.

82. GSK's primary purpose in undertaking this co-marketing arrangement was to promote Zofran to obstetricians and gynecologists during GSK's Consumer Healthcare sales force's visits to obstetricians and gynecologists offices. Although some obstetricians and gynecologists performed surgeries and could order Zofran for post-operative nausea, the central focus of GSK's co-marketing effort was to promote Zofran for the much more common condition of morning sickness in pregnancy, and thus increase sales and profits.

83. GSK's Zofran sales representatives received incentive-based compensation that included an annual salary and a quarterly bonus. The bonus amount was determined by each sales representative's performance in the relevant market and whether s/he attained or exceeded quarterly sales quotas. The more Zofran sold by a GSK sales representative or prescribed by a provider in that representative's sales territory, the greater his or her compensation and other incentives would be.

84. As a result of GSK's fraudulent marketing campaign, the precise details of which are uniquely within the control of GSK, Zofran achieved blockbuster status by 2002 and became the number one most prescribed drug for treating morning sickness in the United States. In 2002, sales of Zofran in the United States totaled $1.1 billion, while global Zofran sales were approximately $1.4 billion in 2002.

85. GSK's promotion of Zofran for use in pregnancy eventually led to a federal governmental investigation. On July 2, 2012 the Department of Justice announced that GSK

17

"agreed to plead guilty and pay $3 billion to resolve its criminal and civil liability arising from the company's unlawful promotion of certain prescription drugs," which included Zofran among numerous others. (*See* DOJ Press Release, *GlaxoSmithKline to Plead Guilty and Pay $3 Billion to Resolve Fraud Allegations and Failure to Report Safety Data*, July 2, 2012, available at: http://www.justice.gov/opa/pr/glaxosmithkline-plead-guilty-and-pay-3-billion-resolve-fraud-allegations-and-failure-report.)

86.  Part of GSK's civil liability to the government included payments arising from the facts that: (a) GSK promoted Zofran and disseminated false representations about the safety and efficacy of Zofran concerning pregnancy-related nausea and hyperemesis gravidarum, a severe form of morning sickness; and (b) GSK paid and offered to pay illegal remuneration to health care professionals to induce them to promote and prescribe Zofran.

87.  GSK's 2012 civil settlement with the United States covered improper promotional conduct that was part of an overarching plan to maximize highly profitable Zofran sales without due regard to laws designed to protect patient health and safety. Another component of that plan led to a separate $150 million settlement between GSK and the United States in 2005. In or around 1993, a GSK marketing document sent to all of its sales and marketing personnel nationwide advised that they should emphasize to medical providers not only the benefits of Zofran but also the financial benefits to the providers by prescribing Zofran. Specifically, "[b]y using a 32 mg bag [of Zofran], the physician provides the most effective dose to the patient and increases his or her profit by $___ in reimbursement." GSK's marketing focus on profits improperly aimed to shift prescribers' priorities from the best interests of patients to personal profit. In this regard, GSK marketed Zofran beginning in the 1990s as "convenient" and offering "better reimbursement" to prescribers. GSK detailed this plan in a marketing document for its Zofran premixed IV bag entitled "Profit Maximization – It's in the Bag." Upon information and belief, GSK's conduct in this paragraph continued until the DOJ began investigating it in the early 2000s.

### C.L.'s Zofran Exposure and Related Injuries

88.  Plaintiff, Kelly Roberts, is the mother and natural guardian of C.L.

89.     In 2005, Plaintiff's OB/GYN prescribed her Zofran during her first trimester of pregnancy with C.L. in order to alleviate and prevent the symptoms of morning sickness. Plaintiff immediately began taking Zofran as prescribed and continued to do so for several weeks of her first trimester.

90.     C.L. was exposed to Zofran *in utero* during the periods when his lips and palate were forming.

91.     C.L. was born on April 12, 2006, at thirty-nine (39) weeks of gestation.  Per the notes of his pediatrician, C.L. was "unexpectedly diagnosed with bilateral cleft lip and complete cleft palate" at or around the time of birth.

92.     During his first three (3) months of life, C.L. had several visits with his pediatrician, a plastic surgeon, and an ear, nose, and throat doctor (ENT).  C.L. was given a palatal prosthesis, which caused him to develop thrush (a yeast infection of the mouth) that eventually resolved with frequent cleaning.

93.     On July 19, 2006, C.L. submitted to his first surgery, during which a lip repair was performed and myringotomy tubes (a.k.a. tympanostomy tubes or pressure equalizing (PE) tubes) were placed to relieve C.L.'s bilateral middle ear fluid.

94.     As of October 18, 2006, C.L. had surgical scarring over his cleft lip, and his palate remained open.

95.     On January 3, 2007, C.L. submitted to a second surgery, a bilateral closure of his anterior palate.

96.     C.L. was treated for congestion and ear drainage from approximately February to May 2007.  His pediatrician noted his cleft palate was still apparent during this time.

97.     On June 12, 2007, C.L. submitted to a bilateral cleft palate repair with vomer flap surgery.  An ear irrigation and a myringotomy with tube insertion were also performed to relieve C.L.'s ear drainage.

98.     On December 28, 2007, C.L. again went under general anesthesia for lip repair revision, ear irrigation, myringotomy with tube insertion, and nasal lesion excision.

99.     C.L. sought treatment for ear drainage on multiple occasions throughout 2008.

100.     On June 2, 2008, C.L. was evaluated by a speech pathologist, who noted he was having difficulty feeding and speaking.

101.     On November 13, 2008, C.L. had a tonsillectomy and bilateral ear exam and cleaning under anesthesia.

102.     C.L. continued experiencing ear drainage and ear pain throughout 2009. On April 15, 2009, it was noted that the drainage was "copious, thick, [and] purulent."

103.     On March 13, 2009, Plaintiff reported C.L. was still having difficulty swallowing.

104.     At C.L.'s three (3)-year checkup on April 16, 2009, it was noted that C.L. had scars from his facial surgeries and was receiving speech therapy for articulation problems.

105.     C.L. continued experiencing ear drainage throughout 2009-2010.

106.     On March 10, 2010, C.L. had yet another surgery, a pharyngoplasty.

107.     On August 6, 2010, C.L. submitted to a polysomnography (sleep study) and was diagnosed with sleep apnea.

108.     On October 6, 2010, it was noted that C.L. was still a loud snorer despite having his tonsils out. Doctors further noted that this was associated with his cleft palate repair, as there was clearly an obstructive component in his throat/nasal passage.

109.     C.L. suffered ongoing nasal and ear drainage and hearing difficulties throughout 2011-2012.

110.     On June 12, 2012, C.L. submitted to an abbe flap surgery. An abbe flap cut-down was then performed on June 26, 2012.

111.     On March 4, 2013, C.L. was still experiencing a runny nose and ear drainage.

112.     On August 7, 2013, a bilateral alveolar bone graft (ABG) surgery was performed.

113.     C.L. continued experiencing congestion, hearing problems, and issues with his ear tubes throughout 2013-2015.

114.     On March 11, 2015, C.L.'s ENT noted C.L. was soon going to have a palatal fistula repair and tooth removal and C.L.'s ear tubes could be replaced with longer-lasting tubes at that time.

115.   C.L. has no family history of cleft lip or cleft palate.  Plaintiff has two (2) other children who were born without any birth defects after full-term pregnancies during which she did not ingest any Zofran.

116.   Plaintiff was unaware of the dangerousness of Zofran or the fraudulent nature of GSK's marketing of Zofran when she took Zofran during pregnancy.

117.   Had Plaintiff and / or her prescriber(s) known of the increased risk of birth defects associated with Zofran, and had they not been misled by GSK's promoting the drug's purported safety benefits for use in pregnancy (on which they reasonably relied), Plaintiff would not have taken Zofran during pregnancy and C.L. would not have been born with congenital malformations.

118.   As a direct and proximate result of GSK's conduct, Plaintiff and C.L. have suffered and incurred harm including severe and permanent pain and suffering, mental anguish, medical expenses and other economic and noneconomic damages, and will require more constant and continuous medical monitoring and treatment than if they had not been exposed to Zofran.

119.   Plaintiff files this lawsuit within the applicable limitations period of first suspecting that GSK's wrongful conduct caused the appreciable harm sustained by her son, C.L. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful conduct that caused the injuries at an earlier time.   Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the tortious nature of the conduct causing the injuries, until a short time before filing of this action.   Additionally, Plaintiff was prevented from discovering this information sooner because GSK has misrepresented to the public and to the medical profession that Zofran is safe for use in pregnancy, and GSK has fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.  In all events, the statute of limitations is tolled for claims arising from injuries to minors.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

120.   Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

121.    GSK had a duty to exercise reasonable care, and comply with existing standards of care, in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, and/or distribution of Zofran into the stream of commerce, including a duty to ensure that the product would not cause users to suffer unreasonable, dangerous side effects.

122.    GSK failed to exercise ordinary care and failed to comply with existing standards of care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Zofran into interstate commerce in that GSK knew or should have known that using Zofran created an unreasonable risk of dangerous birth defects, as well as other severe personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

123.    GSK, its agents, servants, and/or employees, failed to exercise ordinary care and failed to comply with existing standards of care in the following acts and/or omissions:

    a.  Failing to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety risks of Zofran for treating pregnant women while promoting the use of Zofran and providing kickbacks and financial incentives to health care professionals to convince health care professionals to prescribe Zofran for pregnancy-related nausea;

    b.  Marketing Zofran for the treatment of morning sickness in pregnant women without testing it determine whether or not Zofran was safe for this use;

    c.  Designing, manufacturing, producing, promoting, formulating, creating, and/or designing Zofran without adequately and thoroughly testing it;

    d.  Selling Zofran without conducting sufficient tests to identify the dangers posed by Zofran to pregnant women;

    e.  Failing to adequately and correctly warn the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers of Zofran for pregnant women;

    f.  Failing to evaluate available data and safety information concerning Zofran use in pregnant women;

    g.  Advertising and recommending the use of Zofran without sufficient knowledge as to its dangerous propensities to cause birth defects;

    h.  Representing that Zofran was safe for treating pregnant women, when, in fact, it was and is unsafe;

    i.  Representing that Zofran was safe and efficacious for treating morning sickness and hyperemesis gravidarum when GSK was aware that neither the safety nor efficacy for such treatment has been established;

    j.  Representing that GSK's animal studies in rats and rabbits showed no harm to fetuses, when the data revealed impairment of ossification (incomplete bone growth) and other signs of toxicity;

    k.  Failing to provide adequate instructions regarding birth defects including cleft palate and cardiac malformations;

    l.  Failing to accompany Zofran with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Zofran;

    m.  Failing to include a black box warning concerning the birth defects associated with Zofran;

    n.  Failing to issue sufficiently strengthened warnings following the existence of reasonable evidence associating Zofran use with the increased risk of birth defects;

    o.  Failing to advise Plaintiff, her healthcare providers, FDA, and the medical community that neither the safety nor the efficacy of Zofran for treating pregnancy-related nausea has been established and that the risks of the using the drug for that condition outweigh any putative benefit;

    p.  Failing to advise Plaintiff, her healthcare providers, FDA, and the medical community of clinically significant adverse reactions (birth defects) associated with Zofran use during pregnancy; and

    q.  Failing to correct its misrepresentations that the safety and efficacy of Zofran for treating morning sickness had been established.

124.    Despite the fact that GSK knew or should have known that Zofran significantly increased the risk of birth defects, GSK continued and continue to negligently and misleadingly market, manufacture, distribute and/or sell Zofran to consumers, including Plaintiff.

125.    GSK knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of GSK's failure to exercise ordinary care, as set forth above.

126. GSK's negligence was the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

127. Had Plaintiff not taken Zofran, her baby would not have suffered those injuries and damages as described herein with particularity. Had GSK marketed Zofran in a truthful and non-misleading manner, Plaintiff would never have taken Zofran.

128. As a result of the foregoing acts and omissions, C.L. was caused to suffer serious birth defects that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

129. Plaintiff also has sustained severe emotional distress and suffering as a result GSK's wrongful conduct and the injuries to her child.

130. As a result of the foregoing acts and omissions, Plaintiff requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges her child will in the future be required to obtain further medical and/or hospital care, attention, and services.

131. By reason of the foregoing, Plaintiff has been damaged by GSK's wrongful conduct.

## SECOND CAUSE OF ACTION:
### (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

132. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs, with the same force and effect as if fully set forth herein.

133. GSK is a merchant with respect to goods of the kind Plaintiff received. GSK impliedly warranted that its product was merchantable. GSK impliedly warranted that its product was fit for the particular purpose of being used safely in the treatment of pregnancy-related nausea. Plaintiff and her health care providers relied on GSK's skill, judgment and superior access to the drug's risk profile when deciding to use GSK's product.

134. GSK's product was not fit for the ordinary purpose for which such goods were used. It was defective in design and its failure to provide adequate warnings and instructions,

and was unreasonably dangerous. GSK's product was dangerous to an extent beyond the expectations of ordinary consumers with common knowledge of the product's characteristics, including Plaintiff and her medical providers.

135.    GSK breached its implied warranties because the product was not safe, not adequately packaged and labeled, did not conform to representations GSK made, and was not properly usable in its current form according to the labeling and instructions provided.

136.    As a result of the foregoing acts and omissions, C.L. has suffered serious birth defects, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

137.    As a result of the foregoing acts and omissions, C.L. requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that C.L. will in the future be required to obtain further medical and/or hospital care, attention, and services.

138.    Plaintiff also has sustained severe emotional distress and suffering as a result GSK's wrongful conduct and the injuries to her child.

139.    By reason of the foregoing, Plaintiff has been damaged by GSK's wrongful conduct.

**THIRD CAUSE OF ACTION**
**(FRAUDULENT MISREPRESENTATION)**

140.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

141.    GSK committed actual and constructive fraud.  GSK committed actual fraud by misrepresenting material facts on which Plaintiff and her healthcare providers acted.  GSK committed constructive fraud by acting contrary to legal or equitable duties, trust, or confidence upon which Plaintiff relied, and by failing to act, though it should have. GSK's conduct constitutes constructive fraud because GSK breached legal and equitable duties and violated its fiduciary relationships to patients and healthcare providers.

142.     GSK had a duty to exercise reasonable care to those whom they provided product information about Zofran and to all those relying on the information provided, including Plaintiff and her providers.

143.     GSK had a duty to exercise reasonable care to those whom they provided product information about Zofran and to all those relying on the information provided, including Plaintiff and her healthcare providers.

144.     In violations of existing standards and duties of care, GSK made misrepresentations by means including, but not limited to, advertisements, labeling, marketing, marketing persons, notices, product information and written and oral information provided to patients and medical providers.

145.     In violations of existing standards and duties of care, GSK intentionally, knowingly, falsely and fraudulently represented to the expectant mothers and the medical and healthcare community, including Plaintiff and her providers, that:

    a.  Zofran was safe and effective for treating pregnancy-related nausea;

    b.  Zofran had been adequately tested and studied in pregnant women;

    c.  Zofran use during pregnancy did not increase the risk of bearing children with birth defects; and

    d.  Zofran's "Pregnancy Category B" designation established safety and efficacy of Zofran for treating pregnancy-related nausea.

146.     The representations made by GSK were material, false and misleading.

147.     When GSK made these representations, it knew they were false.

148.     GSK made these representations with the intent of defrauding and deceiving the public in general, and the medical and healthcare community in particular, including Plaintiff and her providers, to recommend, prescribe, dispense and/or purchase Zofran to treat pregnancy-related nausea.

149.     At the time these representations were made by GSK and, at the time Plaintiff used Zofran, she was unaware of the falsity of said representations and reasonably believed them to be true.

26

150.    In reasonable reliance upon said representations, Plaintiff's prescribers were induced to prescribe Zofran to her and recommend the drug as safe for treating pregnancy-related nausea, and Plaintiff was induced to and did use Zofran to treat pregnancy-related nausea.  Had GSK not made the foregoing express and implied false statements about the product, Plaintiff would not have used the product and her medical providers would not have administered it and recommended it as safe.

151.    GSK knew that Zofran had not been sufficiently tested for pregnancy-related nausea and that it lacked adequate warnings.

152.    GSK knew or should have known that Zofran increases expectant mothers' risk of developing birth defects.

153.    As a result of the foregoing acts and omissions, C.L. was caused to suffer birth defects that are permanent and lasting in nature, as well as physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

154.    Plaintiff, Kelly Roberts, also has sustained severe emotional distress and suffering as a result GSK's wrongful conduct and the injuries to her child.

155.    As a result of the foregoing acts and omissions, Plaintiff requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that her child will in the future be required to obtain further medical and/or hospital care, attention, and services.

156.    By reason of the foregoing, Plaintiff has been damaged by GSK's wrongful conduct.

## FOURTH CAUSE OF ACTION
## (FRAUDULENT CONCEALMENT)

157.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

158.    GSK had a duty to exercise reasonable care to those whom they provided product information about Zofran and to all those relying on the information provided, including Plaintiff

and her healthcare providers. GSK had exclusive access to material information about the teratogenic risks of Zofran, and GSK knew that neither Plaintiff nor her medical providers could reasonably discover that information.

159. In violations of the existing standards and duties of care, GSK fraudulently concealed and intentionally omitted material facts in representations by means including, but not limited to advertisements, labeling, marketing, marketing persons, notices, product information and written and oral information provided to patients, medical providers, and the FDA.

160. In violations of the existing standards and duties of care, in representations to Plaintiff's healthcare providers, expectant mothers including Plaintiff and the FDA, GSK fraudulently concealed and intentionally omitted the following material facts:

    a. GSK was illegally paying and offering remuneration and promoting financial incentives to providers to encourage them to promote and prescribe Zofran;

    b. GSK had not and has not conducted any studies establishing the safety or efficacy of Zofran treatment in pregnant women;

    c. *in utero* Zofran exposure increases the risk of birth defects;

    d. independent researchers have reported in peer-reviewed literature that *in utero* Zofran exposure increases the risk of birth defects;

    e. the risks of birth defects associated with the consumption of Zofran by pregnant women were not adequately tested prior to GSK's marketing of Zofran;

    f. the safety and efficacy of Zofran for treating pregnancy-related nausea has not been established;

    g. Zofran is not safe and effective for treating pregnancy-related nausea; and

    h. GSK's internal data and information signaled an association between Zofran use during pregnancy with birth defects.

161. GSK's concealment and omissions of material facts concerning, among other things, the safety and efficacy of Zofran for pregnancy-related nausea misled physicians, hospitals and healthcare providers, and expectant mothers including Plaintiff and her providers into reliance, continued use of Zofran, and to cause them to promote, purchase, prescribe, and/or dispense Zofran.

162.    GSK knew that physicians, hospitals, healthcare providers and expectant mothers such as Plaintiff had no way to determine the truth behind GSK's concealment and material omissions of facts surrounding Zofran, as set forth herein.

163.    Plaintiff and healthcare providers reasonably relied on GSK's promotional statements concerning Zofran's asserted safety and efficacy in pregnant women, from which GSK negligently, fraudulently and/or purposefully omitted material facts.  Had GSK disclosed the material omissions about the product, Plaintiff would not have used the product and her providers would not have prescribed it and at a minimum would have communicated to Plaintiff the pregnancy risks and how to avoid them.

164.    As a result of the foregoing acts and omissions, C.L. was caused to suffer serious birth defects, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

165.    Plaintiff, Kelly Roberts, also has sustained severe emotional distress and suffering as a result GSK's wrongful conduct and the injuries to her child.

166.    As a result of the foregoing acts and omissions, Plaintiff requires and will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that her child will in the future be required to obtain further medical and/or hospital care, attention, and services.

167.    By reason of the foregoing, Plaintiff has been damaged by GSK's wrongful conduct.

## FIFTH CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)

168.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

169.    GSK had a duty to exercise reasonable care to those whom they provided product information about Zofran and to all those relying on the information provided, including Plaintiff and her healthcare providers.

170. In violation of the existing standards and duties of care, GSK materially misrepresented and omitted complete and accurate information in Zofran's labeling, advertising, marketing, sales and marketing persons, notices, oral promotional efforts, and product information concerning the nature, character, quality, safety, and proper use of their product. Specifically, these misrepresentations GSK falsely and negligently represented to the medical community and expectant mothers, including Plaintiff and her healthcare providers, include, but are not limited to the following:

    a. Zofran was safe and effective for treating pregnancy-related nausea;

    b. Zofran had been adequately tested and studied in pregnant women;

    c. Zofran use during pregnancy did not increase the risk of bearing children with birth defects; and

    d. Zofran's "Pregnancy Category B" designation established the safety and efficacy of Zofran for treating pregnancy-related nausea.

171. The representations made by GSK were, in fact, false and misleading.

172. Plaintiff and her providers reasonably relied upon GSK's expertise, skill, judgment, and knowledge and upon their express and/or implied warranties that their product was safe, efficacious, adequately tested, of merchantable quality and fit for use during pregnancy. In justifiable reliance upon these misrepresentations, Plaintiff and her providers were induced to prescribe and use GSK's product.

173. Had GSK not made express and implied false statements, or revealed all material information about Zofran, Plaintiff would not have used the product and her providers would not have prescribed it.

174. As a result of the foregoing acts and omissions, C.L. has suffered serious birth defects, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

175. As a result of the foregoing acts and omissions, C.L. requires and will require more health care and services and did incur medical, health, incidental and related expenses.

Plaintiff is informed and believes and further alleges that C.L. will in the future be required to obtain further medical and/or hospital care, attention, and services.

176.    Plaintiff, Kelly Roberts, also has sustained severe emotional distress and suffering as a result GSK's wrongful conduct and the injuries to her child.

177.    By reason of the foregoing, Plaintiff has been damaged by GSK's wrongful conduct.

## SIXTH CAUSE OF ACTION
## (LOSS OF CONSORTIUM)

178.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

179.    GSK's negligent and wrongful conduct caused physical injury to Plaintiff's minor child, C.L.

180.    As a result, Plaintiff has been deprived of services, society, companionship, comfort, love, and solace.

181.    Plaintiff seeks all damages available against GSK on account of her loss of her son's consortium.

## SEVENTH CAUSE OF ACTION
## (PUNITIVE DAMAGES)

182.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

183.    GSK's misconduct manifested a flagrant disregard of the safety of persons who might be harmed by Zofran.

184.    GSK fraudulently, and in violation of applicable regulations of the FDA, withheld from the FDA, or misrepresented to the FDA, information which GSK knew was material and relevant to the harm Plaintiff and C.L. suffered.

185.    Accordingly, GSK is liable for punitive damages under Ohio R.C. § 2307.80, and/or under the appropriate choice of law analysis for punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against GSK on each of the above-referenced claims and Causes of Action and as follows:

a) For general damages in a sum in excess of the jurisdictional minimum of this Court;

b) For medical, incidental and hospital expenses according to proof;

c) For pre-judgment and post-judgment interest as provided by law;

d) For full refund of all purchase costs of Zofran;

e) For consequential damages in excess of the jurisdictional minimum of this Court;

f) For compensatory damages in excess of the jurisdictional minimum of this Court;

g) For punitive damages;

h) For attorneys' fees, expenses and costs of this action; and

i) For such further and other relief as this Court deems necessary, just and proper.

Dated: July 16, 2015

s/Peter J. Brodhead
PETER J. BRODHEAD (0006733)
SPANGENBERG SHIBLEY & LIBER, LLP
1001 Lakeside Avenue East, Suite 1700
Cleveland, Ohio 44114
216.696.3232
216.696.3924 (fax)
pbrodhead@spanglaw.com

s/Tobias Millrood
Tobias Millrood*
T. Matthew Leckman*
Michael Daly*
Sarah Schindler*
POGUST BRASLOW & MILLROOD, LLC
Eight Tower Bridge, Suite 940
161 Washington Street
Conshohocken, PA  19428
tmillrood@pbmattorneys.com
mleckman@pbmattorneys.com
mdaly@pbmattorneys.com
sschindler@pbmattorneys.com
*pro hac vice pending

COUNSEL FOR PLAINTIFF