1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4   IN RE:  ZOFRAN (Ondansetron)      )  MDL No. 15-02657-FDS
    PRODUCTS LIABILITY LITIGATION     )
5                                     )
                                      )
6                                     )
                                      )
7                                     )
                                      )
8                                     )

9

10  BEFORE:  THE MAGISTRATE JUDGE JUDITH G. DEIN

11

12                        STATUS CONFERENCE

13

14

         John Joseph Moakley United States Courthouse
15                     Courtroom No. 15
                       1 Courthouse Way
16                     Boston, MA 02210

17

                       December 7, 2017
18                        3:13 p.m.

19

20

21

22

23                 Valerie A. O'Hara, FCRR, RPR
                      Official Court Reporter
24       John Joseph Moakley United States Courthouse
                  1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                 E-mail: vaohara@gmail.com

APPEARANCES:

For The Plaintiffs:

        Pogust, Braslow & Millrood, LLC, by MICHAEL G. DALY, ESQ.,
161 Washington Street, Suite 1520, Eight Tower Building,
Conshokocken, Pennsylvania 19428;

        Janet, Jenner & Suggs, LLC, ROBERT K. JENNER, ESQ.,
31 St. James Avenue, Suite 365, Boston, Massachusetts 02116;

For the Defendant:

        Shook, Hardy & Bacon LLP, by JENNIFER M. STEVENSON,
ATTORNEY, and JENNIFER STONECIPHER HILL, ATTORNEY, 2555 Grand
Boulevard, Kansas City, Missouri 64108;

        Donnelly, Conroy & Gelhaar, LLP, by GEORGE W. VIEN, ESQ.,
Suite 1600, 260 Franklin Street Boston, Massachusetts 02110;

<u>PROCEEDINGS</u>

1

2          THE CLERK:  United States District Court is now in

3    session on the December 7th, 2017 in the matter of In Re:

4    Zofran litigation, Multi-District Litigation Case

5    Number 15-02657.

6          Could counsel please identify themselves for the

7    record.

8          MR. JENNER:  If the Court please, good afternoon, your

9    Honor, Robert Jenner, co-counsel for the plaintiffs.

10:32AM 10        MR. DALY:  Good afternoon, your Honor, Mike Daly,

11   co-counsel for the plaintiffs.

12         MS. HILL:  Good afternoon, your Honor, Jennifer Hill

13   for GSK.

14         MS. STEVENSON:  And, good afternoon, your Honor,

15   Jennifer Stevenson for GSK.

16         MR. VIEN:  Good afternoon, your Honor, George Vien for

17   GSK.

18         THE COURT:  All right.  So we have the plaintiffs'

19   motions.  How do you want to begin?

10:32AM 20        MR. JENNER:  That's fine, your Honor, we'll start with

21   Mr. Daly, who will begin on --

22         MR. DALY:  The DOJ custodial issue, your Honor, if

23   that's all right.

24         Good afternoon, your Honor.  On October 24th, 2017,

25   your Honor ruled that plaintiffs were entitled to all of the

documents related to GSK's sales training, market research, market studies and general marketing and sales spanning the time frame that was envisioned by plaintiffs' complaint from 1991 through 2015.

And it seems, your Honor, the reason we're here today is that GSK's taking advantage of the fact that that time frame, 1991 through 2015, wasn't written explicitly in the paragraph of your Honor's order that discussed how the parties would go about selecting and producing custodial files.

What that means, your Honor, is that there's a GSK employee who counsel knows and GSK knows worked at GSK on Zofran from 1991 through 2015 but who also happened to have a few files or records pop up in the DOJ investigation.

GSK is instructing counsel that we're not allowed to see that custodian's records as they pertain to Zofran from before 1998 or after 2004 or 2006, and I know there was some discussion, your Honor, as to where the DOJ file actually ends.

And, your Honor, this is directly contrary to my colleague's arguments from September, that, obviously, predicated the October, 24, 2017 order, where we stood up and explained to your Honor that we have plaintiffs in this case who were born to mothers who ingested Zofran well 1998.  We have plaintiffs in this case whose mothers ingested Zofran well after 2004.

Plaintiffs filed complaints, master complaints in this

1    action, that allege misconduct from really the time Zofran came

2    to the market until the time it was transferred over to

3    Novartis in 2015, and your Honor may have seen our amended

4    complaints for both brand and generic cases that plaintiffs

5    filed in November which allege that same conduct and actually

6    add about 130 paragraphs of content that counsel has been able

7    to derive from reviewing the DOJ file, about 38 additional

8    pages, so there's no question, your Honor, that plaintiffs'

9    claims still envision activity from the entire time that GSK

10:36AM 10   handled Zofran, from the time it was brought onto the market to

11   the time it transferred over to Novartis.

12        And just for some historical context, your Honor,

13   because some of these arguments may sound familiar, this was

14   one of the things discussed in the September hearing.  GSK has

15   also represented to this Court before, if your Honor would

16   recall because we had this particular motion, where GSK

17   informed the Court that plaintiffs shouldn't even get the DOJ

18   file because there's nothing relevant in it.  There's nothing

19   that would help plaintiffs substantiate their case against GSK.

10:36AM 20   Now, GSK's telling the Court all you get is the DOJ

21   file, you don't get to see something from before or something

22   after it even if we know that there was a particular custodian

23   or a particular witness or employee who worked on Zofran in the

24   mid-'90s, who worked on Zofran after the investigation

25   concluded.

1      Your Honor, we already know that the first assertion

2    turned out to be false.  We got the DOJ file, we reviewed it,

3    all 1.3 million pages.  The result of that is us being able to

4    amend the complaint to include those additional paragraphs, the

5    130 or so that I just mentioned.

6      And we know the latter to be false because we know

7    that there are witnesses that happen to have had Zofran

8    responsibilities before '98 and after 2004.  For example, your

9    Honor, and this is really the most incredible part, plaintiffs

10:37AM 10    are actually experiencing realtime prejudice as we speak

11    because in Gainesville, Florida, our colleagues are taking the

12    deposition of GSK former employee Chris Aytug.  Chris Aytug was

13    very much involved in the GSK-Zofran marketing effort.

14    Chris Aytug is actually referenced by name in our amended

15    complaint, and personally I reviewed the DOJ file.  There

16    probably aren't many attorneys that have seen more of the DOJ

17    file than I have, and Chris Aytug is all over the DOJ file.

18      We received the C.V. for Chris Aytug, and in her own

19    C.V., it says from 1993 to 1995, Chris Aytug was responsible

10:39AM 20    for market research for Zofran; from 1996 to 1998, Chris Aytug

21    was a sales representative for Zofran.  We brought this --

22    excuse me, we brought this to GSK's attention.

23      Obviously Chris Aytug has some responsibility for

24    Zofran beyond the DOJ time period, can we please get the full

25    custodial file, we're going to be taking her deposition today?

1   This conversation started a week or so ago, maybe sooner.  I

2   know we didn't get the C.V. until I believe the end of last

3   week, and GSK came back and said no, you're not entitled to

4   that, Judge Dein already ruled on that, you don't get to see

5   files or records from custodians who may have been swept up

6   into the DOJ investigation.

7          We redirected them to the C.V. that they showed us.

8   The C.V. says she had market research responsibilities for

9   Zofran 1993 to 1995.  If your Honor has read our amended

10  complaint, you'll know that we allege through a series of

11  paragraphs the substantial market research that was done and

12  how that ultimately led to this co-promotion scheme and this

13  strategy to actually promote Zofran off-label directly to

14  Ob.Gyns and emergency room physicians, so we never got the

15  files.

16         Our colleagues are taking the deposition of Chris

17  Aytug right now with probably only two of the six years,

18  information from two of the six years that Chris Aytug worked

19  on Zofran.  We've informed GSK, if you're not going to give us

20  these files, we have to, you know, make a motion to keep the

21  deposition open because there may be some more files out there.

22  We may have to come back and ask her questions.

23         THE COURT:  So identify for me what you have and what

24  you're seeking.

25         MR. DALY:  Sure.  I can distill it into the simple

1    issue, your Honor.  There are a number of custodians who were

2    produced by GSK to the DOJ during the investigation because

3    something they did was somehow suspicious of off-label conduct,

4    and GSK thought to provide it.

5          We received all of those files from GSK, at least we

6    believe we did, earlier on.  Since JUMP, we have been telling

7    GSK, you know, we're going to take the depositions of these

8    people some day, and we see on their C.V.s, we see on their

9    public LinkedIn profiles that they were working at GSK on

10:42AM 10    Zofran for much longer than this '98 to 2004 time frame, we're

11    going to need the full custodial files for them, just like

12    you've produced the full custodial files other deponents that

13    we've already taken the deposition of, and now it's come

14    basically we're at this issue now where GSK doesn't seem to

15    think that they have to give us the full custodial files for

16    witnesses simply because those witnesses were included in some

17    part in the DOJ investigation.

18          THE COURT:  So did you identify these people as

19    custodians whose records you wanted searched?

10:43AM 20          MR. DALY:  So the way this worked, after your Honor's

21    order, we sent a list to DOJ --

22          MR. JENNER:  To GSK.

23          MR. DALY:  To GSK, we want the custodial files for

24    these employees or particular employees, they said it was too

25    much, too many, and we said okay, we shortened it, and there is

1    a list, it was Exhibit A to plaintiffs' motion, I forget the

2    exact number, maybe around 90 or so, maybe a little over 100

3    that remain, and the representation from GSK has been for any

4    of those people, because they're all involved in the DOJ

5    investigation, we are not giving you anything that predates

6    1998 and postdates 2004 or 2006, whichever it is, because I

7    know there's some confusion there, and we're experiencing --

8    you know, Chris Aytug is one example, and it's happening right

9    now, so it's a compelling example, but the reality is, your

10:44AM 10   Honor, we're taking another deposition next week, and that's

11   Denise Shirrell, and the same situation, we are told that we

12   will not get the custodial file, the full custodial file for

13   Denise Shirrell.

14          And, your Honor, I have, and I can hand up to you, if

15   you'd like, we have the LinkedIn profile from Ms. Shirrell that

16   shows she had substantial involvement from 2006 to 2009, the

17   time period which wasn't anticipated at all by the DOJ

18   investigation.  In fact, she had a role in the company's

19   strategy on how to interact with the generics that were going

11:34AM 20   to come onto the market in 2007.

21          And your Honor knows, this is an issue that is a hot

22   issue in our case.  We're in the middle of briefing this brand

23   liability issue.

24          Ms. Shirrell was the lead Zofran, I think one of the

25   product leads for Zofran in 2005 and 2006.  She's an integral

1       witness, still working with Zofran in the time period that

2       covers our complaint and our allegations, and we're not allowed

3       to see documents on her, we're not allowed to get the full

4       custodial file.

5               Presumably, your Honor, if Ms. Shirrell hadn't been

6       swept up into the DOJ investigation, then GSK would be

7       producing her entire custodial file for the time she worked

8       there because I've taken depositions in this case, and I've

9       gotten the full custodial file for some of the science or

11:35AM 10      regulatory, excuse me, regulatory witnesses, so they're making

11      this distinction that isn't at all clear in your Honor's order,

12      and, in fact, it flies in the face of the scheduling order that

13      we're actually working off of in your case, the order entered

14      by Judge Saylor, which doesn't put any time restrictions on the

15      discovery that we get.

16              The Phase IV discovery that we're supposed to be in

17      now is open-ended to include all of the sales and marketing

18      data that we're entitled to, and your Honor didn't put any time

19      restrictions on her order of October 24th, 2017, so it seems

11:36AM 20      GSK is reading some time restrictions into it, and we're

21      actually being prejudiced as we speak, and we'll be prejudiced

22      again next week and forever how many weeks this goes until we

23      get the full custodial files for the witnesses that we've

24      deemed relevant to the Zofran sales and marketing strategy, and

25      that your Honor is what plaintiffs are requesting.

1          THE COURT:  Let me understand from GSK what the issue

2     is.

3          MS. HILL:  Thank you, your Honor.  This is really just

4     one example of plaintiffs essentially trying to relitigate an

5     issue that we were in front of you for several hours back in

6     September.

7          In their motion to compel relating to Phase IV

8     discovery, the plaintiffs wanted basically to expand the

9     custodial files that were produced as part of the Department of

11:38AM 10     Justice collection of production.

11          Your Honor, this issue was extensively briefed in

12     August, and we discussed the time frames that were applicable

13     to the DOJ production at length, your Honor.  When we were here

14     in September, plaintiffs sought basically two categories of

15     custodial file documents.  They wanted documents that were

16     outside of the time period that was captured by the DOJ, and

17     they also wanted documents from custodians who were not

18     included in GSK's production, and we went back and forth, and

19     we talked about the time frame that was applicable.

11:39AM 20          Mr. Millrood expressed the plaintiffs' position that

21     the DOJ production shouldn't be a ceiling.  Mr. French was here

22     to explain his declaration in great detail.  He explained the

23     years that were collected as part of the DOJ production, the

24     reason that those years were targeted in that production, the

25     reasons why it would not be proportional to require GSK to go

1    back and redo those custodial file productions.

2         We also then discussed the many special sets of

3    marketing and Phase IV-related documents that we were providing

4    without time limitations.  That was intended to address

5    specific issues relating to marketing that might go beyond that

6    DOJ time period.

7         Your Honor, at that hearing, the result of that very

8    lengthy discussion was that the Court instructed the plaintiffs

9    to identify whether there were appropriately additional

11:40AM 10    custodians that were not captured in GSK's productions.

11    Mr. Millrood was here, and he had a list that he put up on the

12    screen with certain names in red, and he said these names

13    aren't included.

14         Your Honor instructed the plaintiffs to come to us

15    with the names that were in red, the names that were missing

16    and identify whether there were any other names that were

17    missing, and we were instructed to go back and discuss that set

18    of custodians.

19         The plaintiffs are here basically to undo what the

11:40AM 20    Court ruled at the last hearing.  After extensive briefing and

21    hours of argument, your Honor --

22         THE COURT:  So for these additional custodians, I just

23    had to re-listen to the hours of argument, did you reach an

24    agreement as to the time frame for the search?

25         MS. HILL:  Your Honor, the custodians that are

1    identified by plaintiff, what happened was they -- after the

2    hearing in September, the plaintiffs identified the 14 that

3    they wanted, they identified a few more that were not included,

4    and they asked us to confirm that we were reproducing all 231

5    custodians that were listed in Mr. French's declaration that

6    were included in the DOJ production.

7         They came back and said, respectfully, that is beyond

8    what the Court instructed us to do.  The Court in reaching

9    that, in reaching that conclusion, your Honor recognized that

11:42AM 10   by having the DOJ production produced to the plaintiffs here,

11   they were necessarily getting a bigger role than they otherwise

12   would have, and the point was to give plaintiffs a big picture

13   of what was happening.

14        And what the plaintiffs did, they took the list of all

15   231 custodians that were included in the DOJ production, they

16   took off the individual sales representatives and healthcare

17   specialists who can function in the same way, they took off a

18   couple of attorneys who were on that list, and then they said,

19   well, we want you to reproduce all of these custodians.

11:43AM 20        And the problem with that and the reason that it's not

21   proportional is because to do that, to just expand the date

22   that the custodial files cover would require recollecting and

23   rereviewing the entire file because as was explained in

24   Mr. French's declaration, there's no automatic way to

25   reduplicate documents that were already collected and produced

1    that the plaintiffs already have, so that process, what the

2    plaintiffs are asking us to do is to essentially go back to the

3    drawing board, start from scratch and produce the entire file,

4    to review and produce the entire file for the 92 witnesses that

5    are on their list, which, again, is not narrowed down in any

6    logical or substantive way, they just took off the sales

7    representatives, your Honor.

8            MR. DALY:  Your Honor, I have your Honor's order, if

9    you'd like me to pass it up.

11:44AM 10            THE COURT:  I have it.

11            MR. DALY:  You have it.  So the operative paragraph,

12    your Honor, is paragraph 2.  I've read the entire transcript

13    from this hearing, and I have this order before me, and at no

14    time does it say that the Court came to a conclusion that

15    plaintiffs aren't entitled to records related to custodians'

16    involvement with Zofran, the sales of Zofran, the marketing of

17    Zofran that predates 1998 or postdates 2004.

18            THE COURT:  The way I remember it, and I could be

19    wrong, that there were subject matter productions that were not

11:45AM 20    limited to time, and to the extent that these custodians were

21    involved in the marketing and sales, those were not limited to

22    time, so they should be picked up in those, and that the other

23    specific custodians, most of which had been produced in some

24    form already, my order was not to go back and redo those, to

25    expand the time on that.  That's my memory of where we all

1    ended up.  I could reread this.  This is not as specific as the

2    conversation.  Obviously, at this point, when I wrote the

3    order, I thought we had agreed on things that apparently we

4    hadn't agreed on.

5        MR. DALY:  And I know your Honor doesn't like reciting

6    actual language from the transcript, so I won't do it.

7        THE COURT:  I have to go back and listen to the whole

8    thing, which I will, but we did do affidavits, we did do --

9    there was a difference between the individual production, the

11:46AM 10  individual custodians and the subject matter.

11       MR. DALY:  Your Honor, here's where it's troubling,

12   here is why I think ultimately this wasn't resolved during the

13   last hearing.  For those batches of documents that you just

14   mentioned that specifically were written into the order without

15   a time restriction, so, for example, sales training documents,

16   we have witnesses or employees in this list that was turned

17   over to GSK who were sales training managers, so essentially

18   this is saying for the sales training managers, you only get to

19   see 1998 through 2004.

11:47AM 20      Hopefully something relevant to that sales training

21   manager will show up in the sales training batches, but that's

22   not how it looks when you actually look and search these

23   documents.  For example, we know that the person being deposed

24   today, Chris Aytug, had Zofran market research responsibility

25   from 1993 to 1995.  It's on her resume'.

1          We searched some regulatory files, we've done every

2    bullion search you can imagine, and we only found a handful of

3    documents that deal with submissions, Ms. Aytug's submissions

4    to the FDA for IND and NDA related things, one memo.

5          THE COURT:  You have all of this, you do have the

6    marketing documents that you could question her about.

7          MR. DALY:  But we don't, your Honor, that's the

8    problem.  The Court Order essentially says as written the

9    marketing materials, we get 100 percent of them.  We get 1991

11:49AM 10    through 2015.  What GSK is asking your Honor to rule is that

11    for marketing witnesses, we don't get 100 percent.  Well, we

12    should because they are the same thing, and there are more

13    documents in evidence in discovery.

14          Remember, this is just what's discoverable.  There's

15    more information that turns up in a custodial file than may

16    turn up in however GSK's searching these separate batches of

17    files that are specific to sales training, specific to market

18    research.

19          Every deposition we've taken until today hasn't

11:50AM 20    involved the salesperson or a marketing person.  We've gotten

21    the full custodial file.  We've been able to actually explore

22    that person's full role in Zofran from the time they were

23    employed at GSK, and it's now --

24          THE COURT:  What was the discussion about with

25    Mr. French's affidavit?  What was the point of that

1    conversation that we had last time about the problems about not

2    being able to identify the documents that had already been

3    produced.  There was a time frame that was put on those things,

4    so what was that about?

5         MR. DALY:  The time frame that your Honor put on the

6    sales training documents and market research documents was the

7    time frame that spans our complaint, 1991 through 2015.  We're

8    not asking for more files that were produced to the DOJ.  We

9    were given the DOJ file.

11:52AM 10        THE COURT:  Well, we've had the conversation about

11   expanding the data source, we had that conversation.

12        MR. DALY:  I think the conversation, and I could be

13   wrong, but my understanding was the conversation was expanding

14   the custodians that may not have been captured by the DOJ

15   production, and we did do that because we found a few people

16   who weren't custodians in the DOJ production but whose names

17   popped up in the DOJ file, and we asked GSK to please give us

18   the custodian files for these witnesses, otherwise it just

19   doesn't really make sense, your Honor, that we know a witness

11:53AM 20   has Zofran responsibilities from 1993 to 1995, we presumed that

21   that activity would be captured in the full custodial file, but

22   we can't get it even though we're going to take her deposition

23   just because that person also had some responsibilities that

24   were swept into the DOJ investigation.

25        THE COURT:  But that is not the distinction that

1    they're making.

2        MR. DALY:  I believe it is, your Honor, because that's

3    a distinction they've made to us where we've already had

4    deponents, and we've gotten their full custodial files, and now

5    we get into the sales and marketing people, and we only get a

6    portion of them.  We only get whatever they had produced to the

7    DOJ.

8        Our case, it's not limited by what the DOJ

9    investigation was.  That's what counsel comes in and tells your

11:54AM 10   Honor and tells Judge Saylor every conference that, you know,

11   all that plaintiffs are concerned with is what was covered by

12   the DOJ.

13       THE COURT:  We had this whole conversation about

14   whether or not what the marketing took on after the DOJ

15   investigation and whether it was as extensive as it was before,

16   and, I mean, we've had all of this conversation.  Apparently, I

17   have no ability to reconstruct this now without rereading it

18   all.

19       MS. HILL:  Your Honor, if I may just respond to a

11:56AM 20   couple of points.  I think Ms. Aytug's situation is a pretty

21   decent example actually.  Her resume' indicates that she was a

22   sales rep. for the period covered by the DOJ, which indicates

23   she was a sales rep for HIV and oncology, and before that, she

24   was a market research analyst, and market research documents is

25   one of the special sets that we're looking for and we're trying

to produce without any time limitations, so Mr. Daly's suggestion that they're really missing documents that go beyond the DOJ time frame is not entirely accurate.

There are many different special set Phase IV documents that we're producing without time limitations, and we talked about that at great length the last time we were in front of you.

THE COURT: But he's telling you that he doesn't have documents. I mean, that's what he's telling me. He's saying that when you're telling me that these big searches are going to pick up everything, and he's telling me they're not picking it up, and you're telling me you can't reproduce the individual ones, and he's telling me you can, and I'm telling you I read this already and made a decision, and I don't remember in the context that I heard it. I'm frustrated.

MR. DALY: Understandable, and we apologize for that, your Honor, but the simple fact that your Honor asked for GSK to produce or we asked for GSK to produce and your Honor ordered that they produce all sales training folders, for example, from 1991 to 2015 doesn't mean that we're going to get all of the relevant documents for a witness that we know had substantial.

THE COURT: I understand, but we did a whole analysis of given the marketing changed after the DOJ investigation, whether it was worth while to do the individual searches. We

1   had that conversation.  You're telling me that the conversation

2   didn't end up with a date, and she's telling me that the

3   conversation did end up with a date, and I don't remember, so I

4   will take it under advisement, and I will reread the whole damn

5   thing.

6         MR. DALY:  Thank you, your Honor.

7         THE COURT:  So that has to do with discovery issues.

8   Go ahead.

9         MR. DALY:  Unless your Honor has a preference, the

12:02PM 10   next topic that plaintiffs wanted to address was this issue of

11   search terms.  So, your Honor, you have your October 24th, 2017

12   order right in front of you, and I think it's probably best to

13   start out with the language in the order that's specific.

14         THE COURT:  What they said in their response that

15   basically while they are objecting to, they were basically

16   running everything, so tell me where the conflict is.

17         MR. DALY:  I'm sorry, your Honor, could you repeat

18   that?  I missed that last part.

19         THE COURT:  I think in their response, they said they

12:03PM 20   don't think the search terms are appropriate, but they sort of

21   agreed to run them.  So tell me --

22         MR. DALY:  Right.

23         THE COURT:  So tell me what --

24         MR. DALY:  Let's start, your Honor, with where we left

25   off after the September hearing and the October 24th order.

1     Your Honor ordered the parties to meet and confer and discuss

2     additional search terms that plaintiffs may want.  That was,

3     you know, preceded by the plaintiffs giving GSK these

4     additional search terms that we wanted to make sure were being

5     utilized in any file searches, so we did that, we gave them

6     some search terms.

7          We spoke, GSK came back and said some of these are

8     really overly broad, so plaintiffs turned back to your Honor's

9     October 24th order, turned back to the ESI protocol that

12:04PM 10  governs all this production anyhow, and we huddled with our ESI

11    consultant.  Our ESI consultant told us, you know, the best way

12    to do this, the most efficient, the most proportional under

13    Rule 26 standards and the most common way in this type of ESI

14    discovery is by running a search term report, and, your Honor,

15    I have a search term report here for you, and plaintiffs sent

16    this to GSK as an example of how simple this could be.

17         Could I approach, your Honor?

18         THE COURT:  Yes.

19         MR. DALY:  Your Honor, you see this simple one-page

12:05PM 20  document.  So what is it?  This is a search term report that

21    can be run on most, if not all, database platforms relativity,

22    which we know GSK uses.  That's what this was run on, and what

23    it tells the parties is how successful is a particular search.

24    GSK wants us to not give broad terms.  We don't want to give

25    broad terms.

1          GSK doesn't want to read and have to review for

2    potential redactions a million pages when, in fact, they can

3    review 10,000 pages that are more targeted to plaintiffs' very

4    specific requests for productions, so a search term report,

5    this takes 45 seconds to create, six clicks of the mouse.  No

6    costs are associated with it if you already have the database

7    is my understanding.

8          It will tell us what are the successful searches, and

9    these aren't searching GSK's terms, it's searching our terms,

12:06PM 10   so we went back to GSK and said instead of us going back and

11   forth however many times this is going to take, like these meet

12   and confers typically do, why don't we run a search term report

13   or you run a search term report because you have the documents

14   on the terms we're giving you, and then we can figure ought how

15   to narrow this, we can figure out which searches work.

16         So, for example, your Honor, if there is a data set

17   that has a million pages and GSK runs a search for the word,

18   "Zofran," and it comes back with 900,000 hits, well, okay, we

19   don't want that.  Obviously, that's overinclusive, it's going

12:06PM 20   to be burdensome, it's going to be costly.

21         So we try again, well, how about "pregnancy," run

22   "pregnancy."  Well, that comes back with 600,000 hits.  Okay,

23   that's still overinclusive.  There are some other things that

24   that can be involved with, so plaintiffs don't want that

25   either.  We don't want GSK to go through the time and expense,

1    and personally, your Honor, it's time and expense for us as

2    well to review those documents.

3         So we then come back with a bullion search.  It's as

4    simple as saying, you know, I equate it to *Westlaw* because I

5    don't know this world as well as I know how to search for cases

6    on *Westlaw*.  In *Westlaw*, you go in and --

7         THE COURT:  I don't want to cut you off, but they say

8    that they're willing to do the search terms with few

9    exceptions.  Where are we off?

12:08PM 10        MR. DALY:  It doesn't move the argument, your Honor.

11        THE COURT:  They said certain words are not being run.

12   And do you object to those?

13        MR. DALY:  The certain words that they won't run, yes,

14   your Honor, we object to the process because the ESI protocol,

15   which I have, your Honor, it contemplates this type of

16   production, the ESI protocol that we negotiated with GSK and

17   our ESI consultants for months on end, and it contemplates that

18   when you get into searching actual files, you're probably going

19   to need things beyond simple terms.

12:08PM 20        You're able to entertain search methodologies that

21   expand on search terms.  Search terms are a tool, your Honor,

22   they're not the most efficient tool.  GSK is a savvy company.

23   They have world class IT capabilities.  They can run the search

24   term report.  We're not asking for their own work, it's our

25   work.  We're giving them the terms.  They run a search and a

1    report, and they say, hey, these three terms that you gave us,

2    they're way overbroad.  So we say, okay, we crossed it out, and

3    we take what's left or we come back with a revised better list.

4        If you don't use the search term report, your Honor,

5    which I can't understand why you wouldn't, and I haven't seen

6    that affidavit speaking to this.  I haven't seen something from

7    their IT people, which we've seen in the past, which say we

8    can't do this or here's why we won't do this, we're just being

9    told by GSK, well, it wasn't specifically discussed before, so

12:09PM 10    we're not going to do it, but the reason it wasn't specifically

11    discussed, if I recall correctly, your Honor, is search terms

12    sort of involved in the oral argument in September as a way to

13    respond to these requests for production, so we weren't here

14    with our ESI people, we didn't contemplate this exact process

15    at that exact moment, but it is the easiest, most efficient way

16    to do it, and it is Rule 26 proportional, it will give us the

17    terms that can get targeted documents so GSK has to review less

18    documents and produce less documents, and in turn we have to

19    review less documents, so we haven't heard why they won't do

12:10PM 20    it.  We haven't heard that they can't do it.

21        THE COURT:  They're saying they're running them.

22        MR. DALY:  They're running all of the terms that we

23    give them.  That doesn't help plaintiffs.  Your Honor told

24    plaintiffs it was on us, we're on the hook to come up with the

25    search terms and to figure it out.

1      THE COURT:  Do you think it was maybe too broad?

2      MR. DALY:  That's what they told us, your Honor.

3      THE COURT:  I'm sorry, but they're responding by

4  saying they're going to run them.  Do you want them not to run

5  them, you just want the search term hits first?

6      MR. DALY:  And that results in a production, so,

7  you're right, your Honor, it's a collaborative process.  What

8  we wanted to do, to figure out exactly how this is done, get

9  our ESI people on the phone with your ESI people because my

12:11PM 10  understanding is this is commonplace.  If ESI consultants spoke

11  to the ESI people that we know they have, it could be handled

12  in a matter of minutes, hey, run a search term report so we can

13  give you the best search terms that you can run.

14      We don't know what documents they have.  We don't know

15  what data sets they're keeping or we're keeping.  We're just in

16  the blind throwing search terms at them.  This is a process

17  that narrows that, that eliminates all the waste that could

18  result from us saying, okay, use "Zofran" and them saying here

19  you go, here are a million pages of documents, go knock

12:12PM 20  yourself out.

21      We're still giving them search terms, then they run

22  this report, it generates that one page in front of you, it

23  says this term hit this many times, this many were the unique

24  hits, and if it pulls up documents that they've already

25  produced to us, well, they know how to not de-duplicate that,

1    they know how to not give us the same documents they've already

2    given us, so this is a way to be more efficient.

3           We keep on hearing about Rule 26 proportionality, and

4    this is our swing at it.  It's easier for both sides, and we

5    haven't heard that they can't do it or they won't do it,

6    they've just said that the rule doesn't say search term report,

7    the order doesn't say search term report, so you guys don't get

8    it, so, yeah, it seems like it's an offer to concede to our

9    request, but throughout the meet and confer process, this was

12:13PM 10   what we brought to GSK, can we try this search term report?

11           THE COURT:  So your concern that your requests, and it

12    may be a legitimate concern, may be too broad?

13           MR. DALY:  Of course, your Honor --

14           THE COURT:  So you want to see if what you're asking

15    for is workable in your view?

16           MR. DALY:  Of course, your Honor, because we don't

17    know what they have.  So what we did when your Honor issued the

18    order, we went back through all of the documents that we've

19    gotten so far from GSK, the attorneys that have put eyes on

12:15PM 20   them, and we tried to just guess and guess this search term

21    might pull up documents, we see this a lot, and our response

22    from GSK -- we created a list, and our response from GSK was

23    some of those are too broad, you know, come back again.

24           So this is our response and our solution to that.

25    This is supposed to be a mechanism, a search term methodology

1    that was not by name but anticipated in the ESI protocol with

2    specific language that said, you know what, when you guys come

3    to a dead-end like this, get on the phone, have a meet and

4    confer, figure out what's the best way to do this, and that's

5    what we did here, and that's our proposal.  Thank you, your

6    Honor.

7         MS. HILL:  Your Honor, I feel like plaintiffs and GSK

8    are kind of two ships passing in the night.  They sent us a

9    list of proposed search terms, your Honor.  We disagree that

12:17PM 10    they followed the instructions that you provided by inquiring

11    about particular terms, but putting that aside, they gave us a

12    list of 132 search terms that they thought were relevant.

13         We looked at their list.  We thought some of your

14    search terms we don't think are, you know, very targeted.  Some

15    of them are overly broad.  We tried to have a meet and confer.

16    Instead of meeting and conferring about the specific terms,

17    they wanted this additional report basically that tells them

18    the number of hits in our collection database vs. what they

19    have, your Honor.

12:17PM 20         THE COURT:  Why is that a problem?

21         MS. HILL:  Your Honor, it's not what the Court

22    instructed us to do.

23         THE COURT:  Why is it a problem?

24         MS. HILL:  Because it's a kind of -- it's a diversion,

25    frankly, and instead of focusing on this report about the

number of hits vs. the number of documents we produced, we said

we disagree with your terms, but we'll just go ahead and run

them, and, in fact, we already began pulling the custodial

files for the new sets, and we're already incorporating those

search terms in custodial files that we're producing right now,

and instead of --

THE COURT:  I'm sorry, but why is it a problem?  What

if he says to you, okay, I want this hit before, and it looks

like on this hit the report I gave you a word here that's just

going to generate too many documents, why doesn't it make sense

to take that step and let them look at it and say we didn't ask

for it?

MS. HILL:  Sure, your Honor, if plaintiffs are really

interested in tailoring the terms that they proposed, there's

nothing from stopping them from running that type of report in

the 3.5 million pages of documents that we already produced.

They have plenty of documents to test these terms on

their own without trying to basically conduct discovery on

discovery and have us go back and recreate essentially our

search processes.

THE COURT:  I'm not understanding, I'm sorry, I'm not

understanding why you can tell me that you can run these search

terms to produce the documents so you have some type of

database.  You've created a field in your review to produce.

Why can't you in the same field where you actually produce can

1    you run this report?

2        MS. HILL:  Your Honor, because it's really just a

3    diversion from producing the actual document.  We're talking

4    about the --

5        THE COURT:  If it adds another 45 seconds or whatever

6    he said it did, why is that a problem?

7        MS. HILL:  Your Honor, I worry that if we go down this

8    route and allow plaintiffs to peer in GSK's collection

9    database, we'll be back in front of you when the plaintiffs

12:22PM 10  think our numbers that don't match up or that more documents

11   should have been produced that have certain hits, honestly, and

12   we're here to just kind of to go forward, get on with it, get

13   these new custodial file productions out the door as quickly as

14   we can, and we thought that by offering to use the terms that

15   the plaintiffs propose that we can kind of move the ball and

16   just get past this issue.

17       THE COURT:  I think you need to take a little bit of a

18   detour.  You need to run these hit reports on the documents

19   that they've -- on the search terms that they've provided, and

12:23PM 20  I don't want a footnote that says some are too broad.  I want

21   you to give them a hit report that say it's too broad because

22   of how many hits we run, and you can identify which terms they

23   are.

24       This is not an opportunity to broaden it again and if

25   you can't agree within that world of documents, then I'll see

1    you again, but you reserve the right to say, Judge, you

2    shouldn't have opened the door later on, I mean, you do, but it

3    seems to me that if it is as simple as this hit report, which

4    is not the first time I've heard how simple it is, I think it

5    makes sense to do that, and then based on the terms that

6    they've given you, then the plaintiffs can modify by

7    eliminating some number of terms, not by increasing the search

8    terms.

9         If you can't agree then on what should be produced,

12:26PM 10   but start the production until they say these are the words.

11        MR. JENNER:  Thank you, your Honor.  May I approach

12   with a PowerPoint?

13        THE COURT:  I don't have a PowerPoint.  Next week you

14   can come to my fancy new courtroom.

15        MR. JENNER:  Thank you, your Honor.  I look forward to

16   it, your Honor.  Your Honor, the issue before us now is whether

17   or not we can get access to three custodial files.  There are a

18   number of witnesses that we gave to them.  It's in a long list,

19   some they are giving, but for reasons that will probably come

12:28PM 20   clear in a moment, they've decided that unilaterally they are

21   not relevant or untimely.

22        The three witnesses are Fionna Peachy, whose name I

23   absolutely love, Alan Van Horn and Reid Robson.  Each of them

24   are being withheld.  I will go through each one and tell you

25   why we think that we should at least have access to their

1    custodial file.  Again, we are not talking here about

2    admissibility, we're not talking about what the jury sees,

3    we're just talking about whether or not we get to look at these

4    three particular custodians.

5         Fionna Peachy is the European therapy area director

6    for oncology and anesthesia and musculoskeletal global

7    commercial strategy group.  It's page 2, my first top slide.

8         I underline the word "global" for a reason.  She was

9    asked to compare the European sales with the U.S. sales and try

12:29PM 10    to make a distinction as to why is it that European sales are a

11    certain way as opposed to why the U.S. sales are a certain way.

12    So she is the woman that GSK goes to ask the question, why are

13    you selling more here than you're selling over here?  That's

14    her job.

15         She came back and found that the off-label use of

16    Zofran, which is what our case is about, was a key growth

17    driver in the United States, so she came back with a report,

18    the slide at the bottom of page 2, where she writes the CET,

19    the corporate executive team, have highlighted the difference

12:30PM 20    in Zofran in 2002 growth in Europe at seven and a half percent

21    versus the U.S., and she writes 28 percent, so 7 percent in

22    Europe growth but 28 percent here in the United States.

23         And so she's trying to explain, well, what is that

24    difference, and she writes again that the regulatory

25    environment limits off-label use in pregnancy-related emesis is

1    the key growth driver in the United States, in other words,

2    off-label use of people who are nauseated in pregnancy, that's

3    what explains the difference.

4         Now, the documents come back, and they're edited by

5    people here in the United States, and they write in all caps,

6    "THERE HAS BEEN NO PROMOTION OF ZOFRAN FOR ANY INDICATION OTHER

7    THAN PONV AND CINV FOR CANCER IN THE U.S.  THIS ENTIRE BULLET

8    SHOULD BE REMOVED BECAUSE THE REGULATORY ENVIRONMENT IS THE

9    SAME IN THE U.S. AS EUROPE."

12:32PM 10         Okay.  So you see what's happening here, she's being

11    asked to make the comparison.  She shows that it's off-label

12    promotion that's the big difference, it comes back, and it gets

13    edited.

14         She again on the next page, page 3, "Key levers

15    driving growth in both regions."  Ms. Peachy writes, "Increased

16    focus on OB/GYN, emergency room and plastic surgeons" that gets

17    edited here, and all of that gets edited out.

18         Page 3, the bottom slide is the same thing.  "The

19    success of the U.S. strategy can target this segment was driven

12:34PM 20    mainly by use in pregnancy-related emesis."

21         So this woman, who is in charge of making the global

22    comparison between U.S. and Europe comes in, says it's the

23    off-label production, and explains it, it comes back to the

24    United States, they edit it out.  Certainly we're going to chat

25    with the woman who edited it out.

1           Right now all we're asking for is the file of this

2    woman Fiona Peachy, the custodial file, the woman who was

3    charged with making the comparison, who did make the

4    comparison, and that's what we're asking for for this

5    particular woman.

6           THE COURT:  Are your requests limited to this study?

7    I assume she had --

8           MR. JENNER:  We want her custodial file, we want her

9    file, just like we get the custodial file from everybody else.

12:34PM 10   They're saying we don't get it, they say you don't even get

11   this woman's file.  They say it's not relevant to this

12   litigation because Ms. Peachy was not responsible for sales in

13   the U.S.  She may not responsible for sales, but she was

14   responsible for making the sales comparison between Europe and

15   the United States, and she gave the reason why, that there's a

16   four-fold or a three-fold increase in the United States.

17          Again, your Honor, we're not asking for admissibility

18   for a jury, this is a woman with very relevant information.  It

19   goes to the heart of the case.  It goes to the off-label

20   promotion, and we ask for her custodial file.  It's not that

21   tough.  The fact that they say her responsibilities were

22   specific to Europe, well, that's just not true because we see

23   she's making a Europe versus a United States comparison, very

24   relevant, so we think we should get her file.

25          The second person, your Honor, is Alan Van Horn.  Alan

1    Van Horn was the manager of the sales and marketing team for

2    Zofran.  Mr. Van Horn gave explicit instructions to GSK

3    employees that would further the off-label promotion of Zofran

4    for nausea and vomiting in pregnancy.

5           My PowerPoint was kind of pretty here, your Honor, all

6    these boxes would pop up and make sense.  But, in essence, Mr.

7    Van Horn is being reviewed by this team of employees and sales

8    personnel, who reported to Mr. Van Horn, and he was -- this is

9    going to take a second to explain.

10          When a sales rep. goes into a doctor's office, they

11   are not allowed to promote for off-label, but what they can do,

12   however, is they can respond to a request if the doctor says to

13   them, well, I've heard about nausea and vomiting and Zofran,

14   can you tell me about that, then at that point, the doctor can

15   fill out a card and then give it to the sales rep., the sales

16   rep. then mails it in or sends it in to GSK, and then they fax

17   over information to the doctor at his request.  That's legal,

18   and that can be done, but the doctor has to fill out the card

19   himself and make the affirmative overture to ask for the

20   information.

21          Mr. Van Horn for Joe Curtis, the sales rep., completed

22   12 to 15 BRCs, business reply cards, these cards without

23   doctors' knowledge after discussion with Van Horn, who

24   suggested that these business reply cards should be completed

25   for the doctors so they wouldn't have to.

1              THE COURT:  Can you get a list from the deposition

2     testimony?

3              MR. JENNER:  From the document that we have.  So Van

4     Horn was telling these people fill out the card for the doctor,

5     they don't even to know about it, and we'll send them the

6     information.  You know, it's straight out, you use whatever

7     word you want to, I have my own, but this is the guy who is

8     telling sales reps. to fill out cards without telling the

9     doctors so you can get the nausea and vomiting, the PONV

10    information to them.

11             This sales rep. writes, "Encouraged by Van Horn to

12    promote in ERs, I didn't feel encouraged to promote off-label,

13    but it did go through my mind that I would be talking about it,

14    ER with Zofran for an indication, Van Horn's expectation,

15    concerned about expectation, interpreted as Van Horn doesn't

16    like the rules."

17             I mean, I can go on and on about all the stuff that

18    this guy is instructing his sales reps. to do, instructed to

19    complete BRCs without the doctors' knowledge.  At this point,

20    all we're asking for is our ability to get this gentleman's

21    custodial file.  That's all we're asking for.  We may make a

22    decision we don't want to depose him or we do or we're at a

23    level, at a first level, we want to see his custodial file,

24    it's relevant, it's talking about off-label, very serious

25    off-label promotion, particularly instructing people to do

1   something that's not only that's off-label, it's downright

2   fraudulent by filling out cards that doctors don't even see.

3   We just want to see the file at this point, your Honor.

4           THE COURT:  So their concern about --

5           MR. JENNER:  Sure.

6           THE COURT:  -- whether or not this should be Phase V

7   discovery.

8           MR. JENNER:  If, to inch back, it went to a specific

9   doctor, and you wanted to say to Mr. Van Horn you instructed

10  your employee to go to Dr. Smith, we may want to speak to

11  Mr. Van Horn or one of his sales reps. about Dr. Smith, but

12  right now, all we are asking for is the file so we can see

13  whether or not Mr. Van Horn perhaps may be getting his

14  instruction to give the people who report to him, right,

15  off-label instructions.

16          I mean, this may be coming from higher-up, from the

17  very highest up.  Is Van Horn just sitting there in his living

18  room saying, okay, I think I'm going to go off-label all on my

19  own, or perhaps are the instructions coming from GSK, or

20  perhaps he is just doing it on his own and he's just some rogue

21  guy that's not going to have any impact.  We can make the

22  decisions once we see the documents and once we see the file,

23  we can see what the individual doctor did.

24          And perhaps, like I say, your Honor, perhaps he's the

25  guy who is sitting in his living room, who just went rogue, it

1   is not worth our time unless something maybe does come up in an

2   individual case where we can link it, then we can come back to

3   you or at least we can come back to GSK and make the link, but

4   right now we want to know if that's a general policy within the

5   company to push off-label, to have the sales reps. sign these

6   cards without the doctors' notice, is that the policy within

7   the company?

8          We certainly should have the opportunity to look at

9   his file to see whether that's so.  Again, all we're talking

10  about is access to his file, and they can't unilaterally say

11  this guy has nothing to do with this litigation or this is

12  untimely.  That's the second one.

13         The third one has to do with the gentleman named

14  Reid Robson.  He's interesting.  He was an epidemiologist

15  working in Canada, and he had contacts with the United States

16  Zofran team and prior about the pharmaco vigilance, the act of

17  monitoring adverse events to see whether or not a drug is

18  having sufficient adverse events that would rise to the level

19  of a signal that would require the company to take some active

20  steps to intervene, to research, to investigate, perhaps to

21  warn.

22         And so following the inquiry, Robson was specifically

23  added to the Zofran e-mail distributions regarding safety, and

24  we are asking for one person from this Canadian group, and the

25  reason that that is important is this, your Honor, they want to

1     say, well, Canada has nothing to do with the United States.

2          Do you remember how I said that the sales reps. would

3     go in, they would wait for the doctor typically to ask for

4     information about Zofran, they would fill out the cards, and

5     then they had what's called a fax back, that the information

6     from GSK would be faxed back to the doctor, and it's this whole

7     fax back form that we speak about at some length.

8          It's referenced in our complaint, it's referenced in

9     our papers, and it's here on page 8, the bottom frame.  It

10    says, "Zofran injection and tablets, use during pregnancy and

11    breast feeding," and so they had a fax back some information

12    that went specifically to this particular topic.

13         This fax back is citations to studies that GSK did in

14    conjunction with a Dr. Einarson, and she was with a program

15    called Motherisk, which was in Canada, so GSK is working with

16    Canadian scientists to gather data.  That data goes on the fax

17    back that is used to sell Zofran off-label to United States

18    physicians, and it's all inter-connected, so the women who are

19    having babies or problems in Canada or Japan or the United

20    States are no different.

21         In other words, studies could be run in different

22    places, but the company relied on the same science wherever

23    they were selling it, and the fax back relating to this

24    particular Canadian investigator was used specifically to

25    promote the drug to the physicians off-label, so we're

asking -- and then so Reid Robson on page 10, I should also

note, is writing e-mails to the U.S. Epidemiology Department

F. Pros, and they are communicating back and forth, and so

Robson is saying also in an unrelated, much less urgent matter,

"Does worldwide epi, for GSK, epidemiology, maintain a Zofran

pregnancy registry?  Apparently, thousands of women in the U.S.

take Zofran during pregnancy.  It appears quite efficacious,

and so we were wondering whether the company has looked at

safety in this group and whether they had considered expanding

the label."

He's raising the very questions that we're asking in

this particular case, your Honor, have you looked at all the

women who were taking Zofran and looked at their children and

done any studies and set up a pregnancy registry so we can

evaluate whether or not there's a problem with this drug.  This

is a major part of our complaint, a major part of our

allegations, did you set up a pregnancy registry?

This gentleman is raising the same issue up in Canada,

and so the point of this, again, your Honor, I'm not saying

anything is admissible or is going before a jury.  Is there

enough here for us to say this is highly relevant, enough to

the level that we get his custodial file?

Maybe there's nothing in there and we move along and

we don't ask for a single deposition after that, however,

there's a lot of smoke in this, and for that reason, we think

1    we get their deposition as well.  I'm going to stop there, and

2    I'll leave the rest for rebuttal.

3         MS. STEVENSON:  Thank you, your Honor.  With regard to

4    the individual custodians, GSK has been very reasonable in

5    agreeing to collect and produce additional custodial files when

6    those custodians relate to issues impacting Zofran in the

7    United States and when they relate to the discovery phases that

8    we are currently in.

9         Just for some background of the additional 24 files

10   that plaintiffs requested, GSK agreed to produce 20 of them,

11   and we also identified an additional individual who we believe

12   that plaintiffs had left off their list, but because of prior

13   correspondence, we thought they wanted that file, and we agreed

14   to provide it.

15        So we've only got a dispute, as Mr. Jenner mentioned,

16   about three witnesses, Alan Van Horn, Fiona Peachy and

17   Reid Robson.

18        With regard to Fiona Peachy, she was a European

19   therapy area director for the oncology, anesthesiology

20   musculoskeletal global commercial strategy group.  She did not

21   have responsibility for Zofran in the U.S., and the e-mail

22   attached to the exhibit that plaintiffs provided in support of

23   their motion actually makes that clear.

24        In fact, the e-mail from Ms. Peachy to Beth Howard,

25   who is an individual whose file we have produced who was

1    responsible for promotion and sales of Zofran in the

2    United States, and Ms. Peachy writes to Ms. Howard and says

3    that she's under pressure to finalize the Zofran versus

4    European paper, can you give me some idea of when you hope to

5    be able to confirm/revise the U.S.  paper, so Ms. Peachy is

6    reaching out to Ms. Howard in the United States who actually

7    has responsibility for these things in the United States, and

8    she's asking Ms. Howard to confirm and revise the information

9    in the paper, which Ms. Howard did, as evidenced by the

10   discussion before the Court.

11          I also want to just very briefly correct a

12   representation I think in plaintiffs' brief about that exhibit,

13   Exhibit C.  As we noted, it is a draft summary of a comparison

14   of U.S. sales versus European sales, and plaintiffs' argument

15   before the Court and in their briefing that Ms. Peachy

16   concluded that U.S. sales outpaced European sales because of

17   off-label promotion of Zofran in the U.S. just isn't true.  In

18   fact, that exhibit refers to off-label use, which is very

19   different from off-label promotion.

20          And on top of that, you can see that Ms. Howard, who

21   actually had responsibility for these issues in the

22   United States, corrected Ms. Peachy's misunderstanding, noted

23   that the FDA does not allow any promotion in the U.S. for

24   off-label use in pregnancy-related emesis.  There has been no

25   promotion of Zofran for this indication in the U.S., and

1    similar statements appear throughout that document, on

2    Bates Page 148 and Bates Page 149.

3         THE COURT:  It seems though is one side of the

4    correspondence is relevant, I don't know why the second side is

5    not.  If the American view of this comparison is appropriate

6    for discovery, it seems to me that the person who is putting

7    the whole thing together, her files should be open as well.

8         MS. STEVENSON:  Well, I think that's a good point,

9    your Honor, and I should have mentioned that we've produced

10   files for not just individuals in the U.S. but also individuals

11   with global responsibility for sales and marketing promotion,

12   which is why this e-mail from Ms. Peachy was picked up in our

13   productions, it's already been produced, so to the extent there

14   were communications, including from Ms. Peachy to the U.S.

15   about issues impacting the U.S., those would be included in our

16   productions.

17        So I don't think, you know, requesting her entire file

18   when she was responsible for Europe, not the United States, is

19   a legitimate or a proportional request in light of the

20   production that we've already provided.

21        THE COURT:  I don't know how to word it, but the other

22   side of this equation is producing it, so something comes from

23   her file.  I don't know if there's an appropriate limitation on

24   her custodial file limited to her analysis, the information she

25   gathered about the U.S. or the information that went into this

1   report or anything like that, but I do think that it gets

2   produced.

3        MS. STEVENSON:  We could certainly collect her file

4   and look at it for information related to this comparison and

5   produce anything else that we find.  We could certainly do

6   that.  We could produce issues to the extent she's talking

7   about issues in the United States sales, we could do that.

8   What I don't want to do is sweep up a lot of documents related

9   only to Europe and produce those because I don't think any of

10  the parties here think that those are relevant, and I don't

11  think that's even what the plaintiffs want.

12       THE COURT:  I think if there's a decision that's made

13  about off-market use or information that's gathered about the

14  extent of off-market use, the awareness of the company about

15  off-market use, the effect of off-market use on sales, I think

16  those are all relevant here, so I don't quite know how to order

17  that.

18       MR. JENNER:  Look, your Honor, this is her job, and I

19  know, you know, what happens is we all go back and we order

20  this transcript and then we hear your words and we fight about

21  it.  I hear you, Judge.  We want her custodial file, just like

22  we get it for any other witness.  She's no different from any

23  other witness.  If she's talking about Wellbutrin, we don't get

24  that file.  If she's talking about some drug that we're not

25  litigating, I don't want that file, but if it has to do with

1    Zofran and her responsibilities with global Zofran, then we get

2    that information, and we'll make the decision what's relevant

3    or not.

4         As soon as you give them the entry door to make a

5    decision, it comes back super tight, and then we're back here

6    arguing over it.  We just want her custodial file.  We get it,

7    we can make a decision what goes next.

8         MS. STEVENSON:  Your Honor, I would say that the

9    difference between the custodial files that we've produced thus

08:04AM 10    far and Ms. Peachy's file is that Ms. Peachy's responsibility

11    was Europe, not the United States.

12         The files that we've produced thus far have been

13    individuals with responsibility in Europe or those with global

14    responsibilities, including the U.S., and so I think there is a

15    distinction to be made here, and there's a good reason not to

16    require production of Ms. Peachy's entire file.  We're happy to

17    look at the file for any reference to off-label if that's where

18    the Court wants to draw the line.

19         THE COURT:  I'm going to go the other way, I'm going

08:10AM 20    to order the production of the file, and you need to move for a

21    protective order if you feel that there are sections of it that

22    you think should not be produced.

23         MS. STEVENSON:  Understood, your Honor.

24         THE COURT:  So the custodial file for Ms. Peachy will

25    be produced reserving your right to move for a protective order

1    for categories of documents you don't think should be produced.

2        MS. STEVENSON:  Thank you, your Honor.  I'll move now

3    to Mr. Van Horn's file, and I think your Honor articulated

4    GSK's position on this in questioning Mr. Jenner, and that's

5    the production of his file we feel would be premature at this

6    point in time.

7        CMO-19 does the discovery on individual case special

8    issues in the next phase, which has not yet begun, that's

9    Phase V, and Mr. Van Horn was a district level sales manager.

08:13AM 10    His responsibilities were limited in scope and in region, so

11    his involvement with Zofran marketing would only touch on

12    individual issues that arise out of a region where he was

13    assigned.

14        Now, plaintiffs argue --

15        THE COURT:  Do you agree if he's active pursuant to

16    marching orders from above, then they're relevant.

17        MS. STEVENSON:  I'm just getting ready to get there,

18    your Honor, and, you know, we don't think that plaintiffs'

19    argument that he's a manager or that he might have been active

08:13AM 20    for marching orders above would entitle them to his file, and

21    that's because, 1, they have not alleged or even suggested that

22    his activities are indicative of instructions received from a

23    higher level, and the reason I think they haven't done that is

24    because we have produced files for folks who were superior to

25    him in terms of roles and responsibilities, so they have those

1    documents.

2          They know what the district managers were being told,

3    they have our marketing plans, they have sales training plans,

4    they have all of the special sets unlimited in time, and they

5    have files from individuals who were superior, to sort of on

6    the food chain, superior to Mr. Van Horn, so I do think that

7    this is an issue that ought to be denied now as premature or

8    deferred for reconsideration in Phase V.

9          It may well be that there is not an individual case

08:14AM 10   within Mr. Van Horn's territory, in this case, I think

11   plaintiffs wouldn't need his files for any reason at all, and

12   this issue would be mooted.

13         THE COURT:  I think that counsel has given me enough

14   evidence of a potential policy that this file should be

15   produced.

16         MS. STEVENSON:  Okay.  I'll move lastly, if the

17   Court's ready, to Mr. Robson.  He was an employee of GSK's

18   Canadian affiliate, so GSK Canada.  Importantly, he was not

19   responsible for Zofran in the United States where every MDL

08:16AM 20   plaintiff alleges injury, so plaintiffs' request for his file

21   is similar to their prior request for documents and

22   communications related to activities that occurred outside of

23   the United States.

24         We were here on that issue a couple different times,

25   your Honor, and you did not allow plaintiffs to have those

1    foreign files.  GSK has produced files for individuals with

2    Zofran responsibilities, including U.S. and global

3    responsibilities and including files from folks who were

4    responsible on issues related to epidemiology, which Mr. Robson

5    is, and, again, the to extent Mr. Robson had correspondence

6    with those other employees, it would have been captured in the

7    files of the individuals to whom we've already produced, and

8    the exhibit that plaintiffs attached makes that clear.

9         Mr. Robson directed the e-mail that plaintiffs

08:18AM 10   attached as Exhibit A to Sara Ephross, who was the director of

11   worldwide epidemiology at the time.  She's the person who had

12   responsibility for this issue.  We have produced her file.

13   Plaintiffs have noticed her for deposition.

14        We also think, your Honor, that plaintiffs' argument

15   regarding a pregnancy registry lacks merit.  They claim,

16   plaintiffs claim, they're interested in Mr. Robson's file

17   because he sent an e-mail asking whether GSK worldwide epi

18   maintained a Zofran pregnancy registry, but GSK has already

19   admitted in responses to request for admissions that it did not

08:19AM 20   establish a pregnancy registry for Zofran because it was not

21   necessary.

22        And as I already mentioned, GSK produced the custodial

23   file for director of worldwide epidemiology with

24   responsibilities for Zofran, and this is the same person to

25   whom Mr. Robson directed his question about whether a pregnancy

1    registry even existed.

2            Finally, plaintiffs mentioned a study done in Canada.

3    I didn't see that in their brief.  I don't have any reason to

4    believe that Mr. Robson was involved in that study at all.  So

5    for those reasons, your Honor, we think that GSK should not

6    have to produce Mr. Robson's file.  He is a witness that had

7    responsibilities in Canada, not the U.S., and we've already

8    produced files for witnesses with global responsibilities.

9            THE COURT:  Why was he -- what's your understanding as

08:20AM 10   to why he was communicating with Ms. Ephross about this

11   off-label use and pregnancy registry?

12           MS. STEVENSON:  The e-mail says, you know, on an

13   unrelated, nonurgent topic, he just simply asked the question.

14   He doesn't even know whether or not GSK maintains a pregnancy

15   registry, so he's not a witness who's going to have significant

16   knowledge about that topic because he didn't even know one way

17   or the other whether one existed.  He directed that question to

18   Sara Ephross, who answered the question for him, and as I said

19   before whose file we produced, and that's why plaintiffs have

08:22AM 20   this document, and we've provided a deposition date for

21   Ms. Ephross.

22           MR. JENNER:  Your Honor, we have other documents,

23   we're talking about the pharmaco vigilance and pregnancy

24   registries and following up, and the answer was basically it's

25   not in our budget was the answer to a request of a $400,000

1    program saying it's not in our budget.

2         You know, counsel respectfully stands up and says,

3    well, the reason they didn't do a pregnancy registry is "It was

4    not necessary."

5         Well, you know, it's kind for counsel to stand up and

6    tell us what was and what wasn't necessary, but I certainly

7    would like to hear from the gentleman who asked where is it and

8    why are we having it done, you know, what were you told, why

9    were you told that there was no pregnancy registry?

08:23AM 10        The reason that they're communicating is because GSK

11    is a global worldwide company where studies are done in Japan,

12    they're done in Sweden, they're done in Europe, and they're

13    communicating about the results.

14        All we want right now is just his file.  If there's

15    nothing there, then we move on.  This is a relevant person with

16    relevant information going to our failure to test claims asking

17    the same questions that we're asking about why wasn't something

18    done, and the fact that he's in Canada is irrelevant because

19    the same studies that are being run in Canada are being used to

08:24AM 20    sell it here in the United States.

21        THE COURT:  I'm not prepared to open up discovery on

22    every person who sent an e-mail about --

23        MR. JENNER:  Fair enough.

24        THE COURT:  -- some inquiry about Zofran, so are we

25    done?  I mean, if we have this file, are we done with people?

1          MR. JENNER:  Well, Mr. Millrood would kill me if I

2     said yes, your Honor.

3          THE COURT:  So that's my problem, it seems to me that

4     to the extent that this is substantive, you have the other side

5     of the equation.  You have the person who would be responsible,

6     you have Ms. Ephross, you have her file, I assume?

7          MS. STEVENSON:  Yes.

8          THE COURT:  So I don't want to open this -- if this

9     isn't really part of his job responsibilities, I don't want to

08:27AM 10    open it to every person who might have an inquiry.

11         MR. JENNER:  I understand, your Honor, we're not.  We

12    took our list out from 200 to 100, and now we're talking about

13    a group of 23 or 24, and so they gave us 20.  Three are

14    important, and we're here for a reason.  We're asking for these

15    three.  We're not here for any more of the 70 other.

16         Now, I don't want to stand here and say we won't be

17    back.  That would be unfair for me to say that.  I hear you,

18    your Honor, but, you know, I said let me save something for

19    rebuttal.

08:30AM 20         I'm just going to read two sentences that Judge Saylor

21    said last time during his hearing, and he probably would be

22    upset if he heard us quoting on that from the transcript.

23    Here's the sentence, two sentences:

24         "It is an answer to me in response that three and a

25    half million documents have been produced or that 19 witnesses

1   have been deposed, that those numbers are meaningless in the

2   abstract.  You know, the question is, has the relevant

3   discovery been produced, and we aren't there yet, and it's not

4   clear to me when we're going to get there."

5       The question is is the relevant discovery being

6   produced?  We don't care how many they've produced, have they

7   produced the right stuff?  This is the right stuff.  This guy

8   is asking the right questions, going right to the failure to

9   warn case.

08:33AM 10      We're not here on 100 people.  We're being enormously

11  proportionate, and we're really being focused, and we need

12  these three, and we want these three because we're asking the

13  right questions, and we want to talk to them to find out what

14  answers were they given when they asked for pregnancy

15  registries, when they were asking for information and data

16  having to do with sales and marketing, what were they.  Given

17  if they are wrong or was not necessary, this goes right to it,

18  Judge, and we're not here on any other.

19      THE COURT:  I'm going to do the same thing, I'm going

08:34AM 20  to allow the custodial file with the right to move for a

21  protective order if you feel there's documents that shouldn't

22  be produced.

23      MS. STEVENSON:  Okay.  Thank you.

24      THE COURT:  Should I go back to the first one?

25      MR. JENNER:  Your Honor, with full knowledge, I'm

1    going to miss my flight.

2         THE COURT:  I could go back and read it.

3         MR. JENNER:  Let me wrap it up in two sentences.  The

4    DOJ file has certain periods of time for marketing.  Now we're

5    marketing witnesses who that period of time and we just want to

6    know what they said before and after.  We're not limited to

7    DOJ.

8         THE COURT:  But we did this already, that's my

9    concern.

08:36AM 10         MR. JENNER:  I understand, and if you look at the

11    order, where is the order?

12         THE COURT:  I just don't remember.

13         MS. HILL:  And there was a logical reason.

14         THE COURT:  It seems to me that I had a distinction

15    that we had all agreed upon between the bigger files and the

16    individual custodial files.

17         MR. JENNER:  If you read your order in so many

18    paragraphs, you say from the year 1991 to 2016, years 1991 to

19    2015, denied.  You know, you set it out with so many of other

08:37AM 20    ones, but for this paragraph, for whatever reason, you left it

21    open, and that's okay, but now we're here trying to figure out

22    what's the right thing to do.

23         If we get the marketing documents for that period of

24    time and the larger period of time, we shouldn't be constrained

25    to the custodial file, just to the DOJ.

```
 1                THE COURT:  But there was a reason.  There was a

 2      reason.  It had to do with all of the production.  I had

 3      affidavits in front of me, I had a lot of witnesses.  I mean,

 4      it's not -- there was just no information, and that's my

 5      concern because we did really have a lot of information about

 6      that, so I guess I'll stick with --

 7                MS. HILL:  That was my recollection as well.  I mean,

 8      we talked about it at length.  Mr. French was here to explain

 9      the burden and all of the time that went into the production

10      and the logical reason why the time frame that was captured by

11      the DOJ production was the relevant time frame and why it

12      didn't make sense and it wasn't proportional to go beyond that

13      for those custodial files that have already been produced, your

14      Honor.

15                THE COURT:  Do you have -- you've all ordered

16      transcripts, right?  If I have any trouble getting them, I

17      would ask you to --

18                MR. JENNER:  I could e-mail it to you in about three

19      minutes.

20                THE COURT:  Okay.  Send it to Mr. Quinn.

21                MR. JENNER:  Okay.

22                THE COURT:  Thank you.  So I will take that issue

23      under advisement.  Am I done with this?

24                MR. JENNER:  You are.

25                THE COURT:  You can catch a plane.
```

1          MR. JENNER:  No, only if I run.

2          MR. DALY:  We gambled anyway, your Honor.

3          THE COURT:  Anything else?

4          MR. JENNER:  We're good.

5          THE COURT:  Thank you.

6          MS. STEVENSON:  Thank you, your Honor.

7          MR. JENNER:  Thank you, your Honor.

8          (Whereupon, the hearing was adjourned at 4:28 p.m.)

9

10                    C E R T I F I C A T E

11

12    UNITED STATES DISTRICT COURT )

13    DISTRICT OF MASSACHUSETTS ) ss.

14    CITY OF BOSTON )

15

16          I do hereby certify that the foregoing transcript,

17    Pages 1 through 55 inclusive, is a correct transcript from the

18    official digital sound recording of the proceedings in

19    MDL No. 15-02657-FDS, IN RE:  ZOFRAN (Ondansetron) PRODUCTS

20    LIABILITY LITIGATION.

21          Dated this 18th day of January, 2018.

22                         s/s Valerie A. O'Hara

23          _____

24                         VALERIE A. O'HARA

25                         OFFICIAL COURT REPORTER