**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| | ) | |
| **IN RE: ZOFRAN (ONDANSETRON)** | ) | **MDL No. 1:15-md-2657-FDS** |
| **PRODUCTS LIABILITY LITIGATION** | ) | |
| | ) | |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | REDACTED |
| | ) | |
| **ALL CASES** | ) | |
| | ) | |

**PLAINTIFFS' MOTION TO ADMIT THEIR GENERAL CAUSATION EXPERT**
**TESTIMONY AND SUPPORTING MEMORANDUM**

## Table of Contents

I.    INTRODUCTION ....................................................................................................1

II.   LEGAL STANDARD .............................................................................................3

  A.  The First Circuit's Application of the *Daubert* Factors. ......................................4

  B.  Epidemiologic Studies Are Not Required for Admissibility. ................................5

  C.  Statistical Significance Is Not a Scientific or Legal Requirement. .......................7

  D.  Evidence of Mechanism of Action Is Important. ..................................................9

  E.  Animal Studies Contribute Important Evidence Supporting Causation.................10

  F.  *Daubert* Does Not Preclude Experts' Reliance on Evidence That is Not Peer-Reviewed or Published. ..............................................................................................................11

III.  CONSIDERATIONS FOR INVESTIGATING THE CAUSES OF BIRTH DEFECTS .......12

  A.  Wilson's Principles ............................................................................................15

  B.  Bradford Hill Criteria ........................................................................................18

  C.  Shepard's Criteria ..............................................................................................19

  D.  ICH Guidelines ..................................................................................................20

IV.   CAUSAL INFERENCE IN SCIENCE AND THE LAW ......................................21

  A.  Causal Inference Is a Matter of Judgment...........................................................22

  B.  Both Epidemiologic and Toxicologic Studies Have Value for Causal Inference. ..................22

     1.  Live Animal Studies ......................................................................................23

     2.  Whole Embryo Culture Testing .....................................................................24

  C.  A Causal Inference Requires Examining the Totality of the Evidence..................25

V.    BASIC PRINCIPLES OF EPIDEMIOLOGY ......................................................26

  A.  Epidemiology Relies Largely on Observational Studies.......................................27

  B.  Study Results are Evaluated for the Existence of an Observed Association..........27

  C.  The Relationship Between Relative Risk and Causation ......................................28

  D.  Study Results are Evaluated for the Role of Chance. ..........................................29

     1.  Confidence Intervals Provide the Probable Range of Risk Estimates. ............30

     2.  A Study's Power Reflects the Likelihood of an Association Being Statistically Significant. ..........................................................................................................31

     3.  Studies Can Be Limited by Conceptual Problems and Flawed Definitions. ....32

  E.  Confounding as a Source of Error in Epidemiologic Studies. ..............................32

VI.   PLAINTIFFS' GENERAL CAUSATION EXPERTS ...........................................33

  A.  Dr. Ra-id Abdulla..............................................................................................33

B.   Dr. Bengt Danielsson ....................................................................................................34

C.   Dr. Michael Levin ........................................................................................................35

D.   Dr. Carol Louik ............................................................................................................36

E.   Dr. Thomas Sadler.......................................................................................................38

VII.   MULTIPLE LINES OF EVIDENCE SUPPORT GENERAL CAUSATION HERE............39

A.   *Line of Evidence 1*: Zofran Rapidly Crosses the Placental Barrier and Exposes the Human Embryo in At Least the Same Concentrations as the Mother During the Most Critical Period of Embryonic Development.................................................................................................................39

B.   *Line of Evidence 2*: General Causation of Congenital Heart Defects and Orofacial Clefts Is Supported by Multiple Human Epidemiologic Studies...................................................................42

1.   Multiple Human Epidemiologic Studies, Published in the Peer-Reviewed Medical Literature, Found that Zofran Is Associated with Statistically Significant Increased Risks of Septal Heart Defects..............................................................................................................43

2.   Four Studies Find Increased Risks of Septal and Other Heart Defects. .........................43

3.   Multiple Human Epidemiological Studies, Published in the Peer-Reviewed Medical Literature, Found that Zofran is Associated with Statistically Significant Increased Risks of Cleft Palate. ...................................................................................................................49

4.   No Reliable Conclusions Can Be Drawn About the Risk of Specific Birth Defects from Studies that Were Neither Designed Nor Powered to Assess the Risk of Specific Defects. .....51

5.   Zofran Studies that Focus on "Major Birth Defects" Can Mask Associations with Specific Birth Defects. ...................................................................................................56

6.   Multiple Epidemiological Studies Are Not Required for Each of the Numerous Types of Heart Defects and Orofacial Clefts. ...........................................................................57

C.   *Line of Evidence 3*: The Zofran Animal Teratology Studies That Achieved Meaningful Embryonic Exposure Revealed the Same and Substantially Similar Teratogenic Effects as Reported in Published Epidemiology Studies for Zofran. .........................................................59

1.   Studies That Dosed Too Low To Achieve Human Exposure Concentrations Do Not Undermine a Causal Inference That Zofran Can Cause Birth Defects. ...................................61

2.   Studies That Dosed High Enough to Meet or Slightly Exceed Human Exposure for a Short Time Provide Evidence of Zofran's Ability to Cause Birth Defects...............................62

3.   The Findings of Increased Malformations and Deaths in the Zofran-Treated Groups Are Biologically Significant for Causal Inference in Humans. .......................................................64

4.   GSK's Anticipated Arguments That the Zofran-Induced Malformations and Embryonic Deaths Were Due to Chance and Maternal Toxicity Are Invalid. ............................................66

D.   *Line of Evidence 4*:  Embryonic Bradycardia Is a Known Human and Animal Teratogen; It Can Cause All Forms of Structural Cardiovascular and Orofacial Defects Deriving from the First Branchial Arch. ..............................................................................................................70

E.   *Line of Evidence 5*:  Zofran Can Cause Embryonic Bradycardia via hERG Blockade at All Doses and Forms of Administration that GSK Recommended in the Drug Label. ......................73

F.   *Line of Evidence 6*: Other Drugs with the Same hERG Blockade Mechanism Are Known to Cause Congenital Heart Defects and Orofacial Clefts in Humans.................................................82

G.   *Line of Evidence 7*: Evidence from Transgenic Animals Supports the Critical Role of hERG in Embryonic Development. .......................................................................................................83

VIII.   CONCLUSION ........................................................................................................................84

# I.     INTRODUCTION

Plaintiffs will assist the jury in this litigation with the presentation of five scientific expert witnesses on causation, each of whom is extremely well qualified and relies on respected and well-recognized scientific principles, based upon reliable methodologies. The scientific and medical evidence they rely on supports general causation.  Plaintiffs therefore move for admission of this general causation expert testimony and respectfully present an overview of the medical and scientific evidence supporting general causation, along with the guiding *Daubert* jurisprudence of this Circuit.

The relevant experts are recognized experts in the fields of pediatric cardiology and obstetrics and gynecology (Dr. Ra-id Abdulla), teratology/pharmacology and drug safety (Dr. Bengt Danielsson), biological mechanisms of embryologic development (Dr. Michael Levin), birth defects epidemiology (Dr. Carol Louik), and teratology, embryology, and developmental biology (Dr. T.W. Sadler).  In addition to their unquestionable credentials and expertise, they each have published in the peer-reviewed literature on subjects pertinent to the general causation issues in this case.  Two of the above experts (Drs. Louik and Danielsson) have published peer-reviewed, human epidemiologic studies specifically concerning Zofran and the birth defects alleged by Plaintiffs.  Dr. Danielsson has published his evaluation of both animal and human data identifying Zofran's teratogenic mechanism in a peer-reviewed publication.  All of Plaintiffs' experts followed a rigorous methodology in assessing the evidence, indeed, the same methodology that they and their peers use in their professional work outside of this litigation.

In this memorandum, Plaintiffs: (1) set forth the legal standards in the First Circuit pertaining to general causation and *Daubert*; (2) explain the basic principles and considerations relevant to causal inference both generally and in the field of teratology; (3) summarize the

expertise and methods used by Plaintiffs' general causation experts; and (4) summarize the multiple lines of evidence supporting general causation.

With respect to the multiple lines of evidence supporting general causation, Plaintiffs believe that this Court must be shown an overview of the evidence on which Plaintiffs rely, before ruling on *Daubert* motions.  That is the objective of this memorandum.  The multiple lines of evidence supporting the conclusion that Zofran can cause certain birth defects are compelling.  Notwithstanding, Plaintiffs expect that GlaxoSmithKline ("GSK") will challenge each of Plaintiffs' five experts, their conclusions, and the science upon which they rely, in piecemeal fashion.  By so doing, this Court will be presented an incomplete picture.  When Plaintiffs' experts general causation opinions are assessed based on the applicable legal standards, an accurate application of the scientific principles of causal inference, and with an appreciation of the substantial supportive scientific and medical evidence, it should be clear that the expert causation opinions and the evidence on which they are based are more than sufficient to pass *Daubert's* standard.  This evidence should be considered by juries in the upcoming trials.

A primary source of authority for this brief is the *Reference Manual on Scientific Evidence,* published by the Federal Judicial Center.[1] Plaintiffs refer to the *Reference Manual* (in addition to case law) throughout this brief because the *Reference Manual* is designed to assist judges on science issues, including *Daubert.*  Plaintiffs also cite extensively throughout this brief to GSK's experts (Drs. Baldwin, Kass, Kimmel, Obican, Roth, Shaw, York, and Scialli), to show where they, in fact, are in agreement with Plaintiffs' experts.

---

[1] Stephen G. Breyer et al., Federal Judicial Center, *Reference Manual on Scientific Evidence*, (3d ed. 2011) (hereafter cited as *Ref. Man.*). The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States, with the mission to "further the development and adoption of improved judicial administration in the courts of the United States." *Id. See* www.fjc.gov.

## II.     LEGAL STANDARD

The Federal Rules of Evidence favor the admission of evidence, including expert opinion

testimony. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988); *see also* Fed. R. Evid.

402.  Federal Rule of Evidence 702 sets the standard for admitting expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the
>     trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. P. 702.  As with any admissible evidence, expert testimony must also be relevant.  Fed.

R. Evid. 401.  Upon finding relevance, a court must preliminarily assess "whether the reasoning or

methodology underlying the testimony is scientifically valid and of whether that reasoning or

methodology properly can be applied to the facts in issue."  *Daubert v. Merrell Dow Pharm., Inc.*,

509 U.S. 579, 592–93 (1993). An expert's "methodology must also have a valid scientific

connection to the pertinent inquiry—that is, a proper 'fit' with the facts of the case."  *In re*

*Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 41–42 (1st Cir. 2013).

The "requisite review for reliability includes consideration of several factors," including: (1)

whether an expert's theory or technique can and has been tested; (2) the error rate of such a

technique; (3) whether a such theory or technique has been published or peer reviewed; and (4) the

theory or technique's acceptance in the scientific community.  *Ruiz-Troche v. Pepsi Cola of P.R.*

*Bottling Co.*, 161 F.3d 77, 80–81 (1st Cir. 1998) (reviewing *Daubert* factors for reliability).

The Advisory Committee to the Federal Rules of Evidence added five factors to the "non-

exhaustive" list of *Daubert* reliability factors in 2000: (5) whether experts have developed their

opinions expressly for purposes of testifying; (6) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (7) whether the expert has adequately accounted for obvious alternative explanations; (8) whether the expert is taking as much care as in his regular professional work outside his paid litigation consulting; and (9) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

### A.    THE FIRST CIRCUIT'S APPLICATION OF THE *DAUBERT* FACTORS.

In the First Circuit, "no single factor disposes of a reliability inquiry." *Ruiz-Troche*, 161 F.3d at 85. Instead, the First Circuit has embraced the "weight of the evidence" methodology used by general causation experts in products liability cases. *See, e.g.*, *Milward v. Acuity Specialty Prods. Grp.*, *Inc.,* 639 F.3d 11, 27 (1st Cir. 2011). The weight of the evidence approach "involves a mode of logical reasoning often described as 'inference to the best explanation' . . . . " *Id.* at 27. The First Circuit recognizes that reasonable scientists may come to different opinions. *Id.* at 18.

"*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." *Ruiz-Troche*, 161 F.3d at 85; *Maga v. Hennessy Indus., Inc.*, 2014 WL 10051399, at *9 (D. Mass. Dec. 1, 2014) (Saylor, J.) (same). "It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Ruiz-Troche*, 161 F.3d at 85. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Given the nature of this reliability inquiry, "the question of admissibility must be tied to the facts of a particular case." *Beaudette v. Louisville Ladder, Inc.,* 462 F.3d 22, 25–26 (1st Cir. 2006).

In *Milward*, the plaintiffs' expert toxicologist opined that exposure to benzene is generally capable of causing Acute Promyelocytic Leukemia (APL) based on a weight of the evidence

4

analysis. 639 F.3d at 13. The district court excluded the expert's testimony. *Id.* In reversing, the First Circuit held that "the court's exclusion of the testimony was based on *its* evaluation of the weight of the evidence, which should be the province of the jury, and on its misperception of the methodology and analysis that provided the basis for Dr. Smith's opinion." *Id*. at 20. (emphasis added). The Court of Appeals noted that "[t]here is an important difference between what is *unreliable* support and what a trier of fact may conclude is *insufficient* support for an expert's conclusion." *Id.* So long as an expert's scientific testimony rests upon "good grounds based on what is known," *Daubert,* 509 U.S. at 590, it should be tested by the adversarial process, rather than excluded for fear that jurors will be unable to handle the scientific complexities. *Id.* at 596. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the appropriate means of attacking admissible evidence. *Id.*

The First Circuit held that the "district court erred in reasoning that because no one line of evidence supported a reliable inference of causation, an inference of causation based on the totality of the evidence was unreliable." 639 F.3d at 13. "The court treated the separate evidentiary components of Dr. Smith's analysis atomistically, as though his ultimate opinion was *independently* supported by each." *Id.* Instead, the "sum of his testimony was that a weighing of the Hill factors, including biological plausibility, supported the inference that the association between benzene exposure and APL is genuine and causal." *Id.* at 26. By repeatedly challenging the factual premises of the expert's opinion and taking sides on questions that were then the focus of extensive scientific research and debate—and on which reasonable scientists could clearly disagree—the district court overstepped its role as gatekeeper. *Id.* at 22.

## B.   EPIDEMIOLOGIC STUDIES ARE NOT REQUIRED FOR ADMISSIBILITY.

As detailed below, Plaintiffs' experts rely on multiple, peer-reviewed, and published human

epidemiologic[2] studies that found Zofran exposure is associated with statistically significant increased risks of the specific birth defects alleged by Plaintiffs.  However, Plaintiffs expect that GSK will claim that more such studies are required.  In the First Circuit, epidemiologic studies are not required at all: "Epidemiologic studies, while considered to be 'powerful evidence of causation,' are not required to prove causation in a pharmaceutical personal injury case." *In re Neurontin Mktg., Sales Practices, & Prod. Liab. Litig.*, 612 F. Supp. 2d 116, 132 (D. Mass. 2009).

In *Milward, supra*, the First Circuit stated: "the absence of peer-reviewed epidemiological studies does not, as defendants contend, make it 'almost impossible' for Dr. Smith's opinion to be admissible."  *Id.* at 24.  "Epidemiological studies are not *per se* required as a condition of admissibility regardless of context." *Id; accord In re Meridia Prod. Liab. Litig.*, 328 F. Supp. 2d 791, 801 (N.D. Ohio 2004), *aff'd sub nom. Meridia Prod. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861 (6th Cir. 2006) ("Ultimately, no court has held that epidemiological evidence is necessary to establish general causation when other methods of proof are available.").

In *Allen v. Martin Surfacing*, this Court noted that "the lack of epidemiological evidence" does not tip the balance away from admissibility for an expert opinion. 263 F.R.D. 47, 60 (D. Mass. 2009) (Saylor, J.).  In *Allen*, while there were no epidemiologic studies to support the opinions of plaintiff's expert neurotoxicologist, Dr. Marcia Ratner, that linked the progression of ALS and exposure to toluene, there also were no epidemiologic studies that contradicted her opinions.  *Id.* This Court recognized the limitations of evaluating causation of a rare condition through epidemiologic studies alone, as the courts in *Milward* and *In Re Neurontin* did.  *Id.* (discussing Dr. Ratner's opinion regarding the limited resources available for research into ALS ).

Notwithstanding this well-established precedent, and the multiple, peer-reviewed, published

---

[2] Plaintiffs use the terms "epidemiologic study" and "epidemiological study" in this brief interchangeably. Both terms are used in the *Reference Manual*, and in the case law.

studies showing elevated risks that are statistically significant and support general causation, Plaintiffs expect that GSK will argue that many more epidemiologic studies are required.  As discussed *infra,* this argument should be rejected as contrary to legal and scientific requirements.

#### C. STATISTICAL SIGNIFICANCE IS NOT A SCIENTIFIC OR LEGAL REQUIREMENT.

In addition to the multiple human epidemiologic studies with statistically significant results, Plaintiffs' experts also consider as part of their consideration of the totality of evidence in their causation analysis, studies finding increased risks which do not meet the technical threshold of statistical significance.  GSK has argued that unless a result is statistically significant, it should be disregarded in a causal assessment.  This is not a reliable methodological view, it is not the view of experts in epidemiology, including GSK's own epidemiology experts, and it is not how informed courts have approached statistical significance.  Scientifically, it relates to the weight of the evidence.  Legally, it also relates to weight, not admissibility.

In essence, statistical significance is an estimate of the likelihood that the study's results were due to chance. "[T]he finding of an increased risk should not be ignored simply because it did not reach statistical significance, especially when the observed association with an increase in risk is repeated in different studies. Results that are not statistically significant may be compatible with substantial effects."[3] Notably, GSK's epidemiology expert Dr. Kimmel agrees.   Kimmel Dep. at 214:23–216:9.  Statistical significance does not signify the importance of the study to clinicians, "nor does it tell you about the biological mechanisms."  Shaw Dep. at 46:22–47:19; *see also id.* at 92:16–93:13. Statistical significance is not the same as scientific significance. *Id.* at 244:2–11. Epidemiologic studies of rare injuries may never be sufficiently powered to achieve statistical

---

[3] A. Berard, et al., Field studies versus database studies on the risks and benefits of medication use during pregnancy: Distinct pieces of the same puzzle, *Reprod. Toxicol.* 60 (2016) 123–128 at 126 (hereinafter, Berard 2016).

significance, and thus they are not a requirement for establishing causation. *See, e.g.*, *Milward*, 639 F.3d at 24 (noting the impracticality of conducting epidemiologic studies where, to obtain statistically significant results, hundreds of thousands of subjects, the same number of controls, and millions of dollars in funding would be required).

Because well-powered epidemiology studies of drug-induced birth defects usually require many hundreds or thousands of babies to be born with birth defects, and because birth defects are rare events, leading teratologists have rejected the requirement of multiple consistent epidemiology as a *sine qua non* to causal inference, viewing such a requirement, as inappropriate, scientifically and otherwise.[4]  Indeed, a study of seventeen teratogenic agents identified from 1952 through 2008 reported only one drug for which epidemiology was listed as the sole method of initial detection of teratogenicity in humans.[5]

But GSK does not share the view of leading teratologists.  Having chosen to not study Zofran to determine its teratogenicity before targeting tens of thousands of OB/GYNs caring for pregnant women with morning sickness, GSK now argues that Plaintiffs cannot meet their burden of proof on general causation without multiple epidemiologic studies on each specific birth defect. GSK is asserting that there are dozens of heart defects, so GSK is demanding over 50 additional epidemiologic studies focusing on these very rare heart (and orofacial) defects.

The case law is consistent with the above scientific principles.  In *Milward, supra,* the First Circuit stated: "the rarity of [the disease] and difficulties of data collection in the United States ma[d]e it very difficult to perform an epidemiological study of the causes of [the disease] that would yield statistically significant results."  639 F.3d at 24.  Plaintiffs' expert there offered that to

---

[4] J. Friedman, In Bed with the Devil: Recognizing Human Teratogenic Exposures, Doi: 10.1002/bdr2.1134 (Wiley Online Library), Presented as the Robert L. Brent Lecture, 57th Annual Meeting of the Teratology Society (2017) (hereinafter, Friedman 2017); *see also* Dr. Danielsson Dep. at 145–46.

[5]  J. Friedman, ABCDXXX: The Obscenity of Postmarketing Surveillance for Teratogenic Effects, *Birth Defects Research* (Part A) 94:670-76 (2012) (hereinafter, Friedman 2012).

obtain statistically significant results, "one would need hundreds of thousands of highly exposed workers, the same number of controls, and millions of dollars in funding." *Id.* In *In Re Neurontin Marketing., Sales Practices, and Products Liability Litigation*, the district court rejected the defendant's argument that the plaintiffs' general causation testimony was inadmissible because the plaintiffs "lack scientific evidence demonstrating a statistically significant association between Neurontin and suicide-related events." 612 F. Supp. 2d at 124. The district court acknowledged the rarity of the alleged adverse event of suicide, which in turn caused epidemiologic studies on the association between the drug and suicide to "lack the statistical power needed for definitive conclusions." *Id.*[6] *Accord In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 794 (3d Cir. 2017) (rejecting defendant's argument that the existence of a statistically significant replicated result is a threshold issue before an expert can conduct the Bradford–Hill analysis).

### D.    EVIDENCE OF MECHANISM OF ACTION IS IMPORTANT.

Although Plaintiffs are not required to prove mechanism of action (how a drug causes a disease or injury), such evidence, where available, can be very important. In this case, as detailed below, the evidence of mechanism of action is quite compelling. In *Allen*, this Court highlighted that, "most significantly," Dr. Ratner had a biologically plausible theory for linking the progression of ALS and exposure to toluene. *Id.*; *see also Polaino v. Bayer Corp.,* 122 F.Supp.2d 63, 70 (D. Mass. 2000) (stating that part of the standard protocol in reaching a conclusion about causation in cases involving toxic exposure is determining whether "the disease can be related to chemical exposure by a *biologically plausible* theory") (*Ref, Man. on Scientific Evid.* 201 (1994)).

The defendant in *Allen* contended Dr. Ratner's opinion was unreliable because there were no peer-reviewed studies that supported her theory and because her opinion was vague about the

---

[6]  Another reason for the lack of statistically significant studies was that the adverse events to Neurontin stemmed from off-label use.

specific quantity of toluene and duration of exposure that would cause ALS in a person.  263 F.R.D. at 60.  This Court found that most of defendant's criticisms of Dr. Ratner's testimony went to the weight and credibility of her opinion, not its admissibility.  *Id.*; *see also Preferred Mut. Ins. Co. v. Barros Co., Inc.*, 2018 WL 3977122, at *7 (D. Mass. Aug. 20, 2018) (Saylor, J.) (observing that questions about the factual underpinnings of an expert's opinion often go to the weight of the testimony, not its admissibility).  Further, the defendant's expert witness did not testify as to any unsoundness in Dr. Ratner's data or methodology.  *Allen*, 263 F.R.D. at 60; *see also Correa v. Cruisers*, 298 F.3d 13, 26 (1st Cir. 2002) ("Acceptance of the methodology by the other party's expert may give additional credence to the reliability of the proffered testimony.").  Because the defendant had not provided evidence to show that her underlying methodology was inherently unreliable, Dr. Smith was not excluded from testifying.  *Allen*, 263 F.R.D. at 60. "Of course, both sets of experts cannot be right; one is necessarily wrong. But it does not follow that one methodology is necessarily unscientific, at least within the meaning of Rule 702. Trained scientists, using scientific methods, often disagree." *Zeolla v. Ford Motor Co.*, 2013 WL 308968, at *10 (D. Mass. Jan. 24, 2013) (Saylor, J.).

### E.   ANIMAL STUDIES CONTRIBUTE IMPORTANT EVIDENCE SUPPORTING CAUSATION.

In this case, Plaintiffs' experts' opinions are supported by substantial human and animal studies, and the animal studies are consistent with the human epidemiologic studies.  Animal studies contribute important evidence on causation, especially in cases involving birth defects.  In cases like *Milward*, *Allen*, and *In re Neurontin*, where epidemiological studies are insufficiently powered to show statistical significance given the rare nature of the injuries, experts turned to other sources to evaluate causation, including animal studies. *See, e.g.*, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1337 (11th Cir. 2010) (observing that conducting clinical trial studies would be unethical, but in the absence of such studies, other evidence such as animal studies becomes that much more important);

*In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 186 (S.D.N.Y. 2009) (noting that animal

studies served as "pieces of the scientific puzzle that contribute to the reliability of the experts'

opinions" on general causation in humans).  In *In re Paoli Railroad Yard PCB Litigation*, the Third

Circuit Court of Appeals stated:

> While other cases have held that animal studies are inadmissible, these cases are for
> the most part distinguishable because most involved the exclusion of animal studies
> in the face of *extensive* epidemiological data that failed to support causation, because
> none involved studies on animals particularly similar to humans in the way they react
> to the chemical in question….

35 F.3d 717, 780 (3d Cir. 1994).  *See also Johnson v. Arkema, Inc.*, 685 F.3d 452, 463 (5th Cir.

2012); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 842–43 (9th Cir. 2001) ("Difficulties with

extrapolation might render the animal studies unreliable under *Daubert;* however, such a

determination must be made on problems inherent to the studies themselves, not a general

apprehension at inter-species and inter-dosage extrapolation.").

### F.     *DAUBERT* DOES NOT PRECLUDE EXPERTS' RELIANCE ON EVIDENCE THAT IS NOT PEER-REVIEWED OR PUBLISHED.

In this case, as noted above, the Plaintiffs' experts' opinions are supported by substantial

peer-reviewed and published scientific and medical evidence; however, the totality of the evidence

also includes some evidence that has appeared as a published abstract and has not appeared as a full

peer-reviewed, published manuscript.  The law does not dictate that experts must limit themselves

to evidence that has been peer-reviewed and published.  "[P]eer reviewed scientific literature may

be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be

in the literature."  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *see also Daubert*, 509 U.S.

at 593.  Where relevant risk information from studies has not been "subjected to normal scientific

scrutiny through peer review and publication," that does not mean that testimony based on such

information should not be considered. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1056 (9th

Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003); *see Ruiz–Troche,* 161 F.3d at 85; *Wendell v. GSK,* 858 F.3d 1227, 1235 (9th Cir. 2017). Again, such a consideration goes to weight, not admissibility.

## III.    CONSIDERATIONS FOR INVESTIGATING THE CAUSES OF BIRTH DEFECTS

GSK's own expert testified that every birth defect has a cause.  Baldwin Dep. at 84:6–8. Teratology is the study of those causes.   Teratologists aim to prevent children from harm by exposures during pregnancy.   The only way teratologists can ever determine that an exposure is teratogenic in humans is to recognize that the exposure has caused birth defects in children.  The challenge of teratology, then, is to identify when an exposure can cause birth defects as efficiently as possible.  Baldwin Dep. at 63:2–64:12.

An essential element is that the exposure must pass the placental barrier (and in this case this element has been established for more than a decade).[7]  The "majority of medicinal products or chemical substances used by a pregnant woman could have effects on the fetus either before the placenta is fully developed or subsequently, if they can cross the placenta at least to some extent." Baldwin Dep. at 46:11–20.

Although many birth defects have been reported to be of unknown cause, that is not because the cause cannot be determined.  Most pregnancy exposures have not been adequately studied for teratogenicity.[8]  A 2012 study concluded that available information was not sufficient to determine the teratogenic risk associated with treatment during pregnancy with almost 98% of 172 prescription medications approved by the U.S. Food and Drug Administration (FDA) between 2000

---

[7] REDACTED

[8] Friedman 2017.

and 2010.[9]  The average time it has taken the teratology community to determine whether treatment of a pregnant woman posed a teratogenic risk was 27 years for 403 prescription drug treatments approved by the FDA since 1980. *Id*.

The teratogenic risks of drug exposures have been difficult to study through epidemiology because birth defects are uncommon,[10] most studies are "under-powered" (explained *infra*), and not even the most potent teratogen causes a birth defect with every exposure.  Baldwin Dep. at 88:22–89:9.  In addition, the very large studies that are needed to study very rare injuries are expensive.

Zofran causes cardiovascular and orofacial defects.[11]  Although they are among the most common birth defects, they are rare.  The CDC estimates that cleft palate occurs in 1 out of 1,574 births.[12]  In addition, estimates of the incidences of cardiovascular defects are shown below in a schematic from GSK's pediatric cardiologist, Dr. Baldwin.

---

[9] Friedman 2012.

[10] For example, the rules governing medicinal products in the European Union (Sept. 2009) classify an adverse event as rare when it occurs in less than 1 per 1000 drug exposures and require pharmaceutical companies to use standardized terms when disclosing adverse reactions with drugs, including: "Very common ($\geq$1/10); common ($\geq$1/100 to <1/10); uncommon ($\geq$1/1,000 to <1/100); rare ($\geq$1/10,000 to <1/1000); very rare (<1/10,000)."  GSK's expert Dr. York also used an incidence of greater than 1/1,000 to classify a birth defect as "rare."  York Dep. at 155:12–19; 156:18–157:2.

[11] Structural cardiovascular defects and orofacial defects are types of malformations.  A malformation is a "permanent structural deviation that generally is incompatible with or severely detrimental to normal postnatal development or survival." ICH S5 (R3) at 29.  A structural heart defect is a defect in the actual structures that comprise a heart.  Baldwin Dep. 88:14-21.  The examples of orofacial clefts are cleft palate and cleft lip.  Sadler Dep. at 26:19–27:6.

[12] CDC, Data & Statistics, *https://www.cdc.gov/ncbddd/birthdefects/data.html* (last visited Nov. 20, 2018).



**Fig. 3 Types of Congenital Heart Defects**

(estimated incidence per 1,000 live births indicated in parentheses)

Baldwin Rep. at 8.  As noted, most are much less than 1 per 1,000 and none are more than 4 per 1,000.

As noted, epidemiologic studies can fail to detect an association between a drug and a birth defect because they are insufficiently powered to do so.  Baldwin Dep. at 89:10–17.  As Plaintiffs' birth defect epidemiology expert testified, "the prevalence of isolated cleft palate is about .06 percent. And so . . . you'd need a huge number of women to have enough outcomes to begin to assess an exposure . . . . "  Louik Dep. at 375:19–25.

Recognizing the limitations of epidemiology in the context of birth defects research, scientists have adopted a weight of evidence approach that considers epidemiologic data when available as one of several relevant categories of information:  "Determining whether an exposure is teratogenic in humans requires an evaluation of all available studies of the effects of that exposure during pregnancy, judgment of the quality and relevance of each study to the question at hand and

synthesis of these data into a coherent assessment that is consistent with current scientific understanding of the exposure and embryonic development."[13]   Scientists considering whether a drug is capable of causing birth defects are informed by human embryology, teratology, pharmacology, obstetrics and epidemiology.  Baldwin Dep. at 87: 4–12.  The weight of evidence methodology employed by the experts in this case have been informed by "Wilson's Principles" and several sets of overlapping considerations and guidelines, which are discussed below.

   A.   WILSON'S PRINCIPLES

   In 1973, Dr. James G. Wilson, Co-Founder of the Teratology Society in the United States, identified general principles of teratology to be used as a useful starting point for assessing teratogenic risks.   Application of Wilson's Principles are satisfied by the evidence supporting general causation in this case:   *Principle One*: "Susceptibility to teratogenesis depends on the genotype of the conceptus and the manner in which this interacts with adverse environmental factors."   This principle addresses the observation that with similar teratogenic exposures, the absence, presence, and severity of malformations varies.   This variability is due to the unique genetic composition of each individual and how it interacts with the environmental agent. Two important propositions stem from this principle.  First, no teratogen has been identified that causes birth defects with every exposure.  Baldwin Dep. 88:22–89:9.  Second, patient-specific factors such as genetic susceptibility, low potassium levels (hypokalemia), increased body temperature, varying body acidity and variations in metabolism can increase the individual's susceptibility of developing a birth defect at drug concentrations achieved from the manufacturer's recommended dose of the drug.  Danielsson Rep. at 9.

   *Principle Two*: "Susceptibility to teratogenesis varies with the developmental stage at the time of exposure to an adverse influence." There are critical periods of susceptibility to agents and

---

[13] Friedman 2017.

organ systems affected by these agents.  This principle describes the observation that an exposure to a teratogen can produce different malformations depending on when the exposure occurs during development.  Cardiovascular defects and orofacial clefts can be induced during a long period (corresponding to around week 4 to week 10 of human pregnancy).  Sadler Dep. at 129:22–25; Danielsson Dep. at 370:8–371:8.[14]

**Dose, Duration, Timing:** The Heart and Palate Are Formed in the First Trimester



*Principle Three*: "Teratogenic agents act in specific ways on developing cells and tissues to initiate sequences of abnormal developmental events."  This indicates that teratogens impact cells, tissues, and organs in specific ways (mechanisms of action) to disrupt embryonic development.  For Zofran, the mechanism for its causing birth defects is heart rhythm disturbance leading to a blood flow / hemodynamics disruptions that interfere with normal organogenesis.  There is no dispute that

---

[14] Gestational age commonly refers to the age of the embryo or fetus calculated from the start of the last menstrual period (LMP), i.e., before the baby was conceived.  Embryonic or fetal age refers to the age of the embryo or fetus starting with the exact date when the sperm fertilized the egg.  The date of conception is generally two weeks after the start of the last menstrual period.  The term "embryo" refers to a developing conceptus from implantation through the eighth week of pregnancy. Beginning with the 9th week, the conceptus is referred to as a "fetus" until birth.

16

Zofran interferes with normal heart rhythm.  This is because Zofran interferes with the "hERG," or potassium channels, also known as the IKr channels.  Dr. Danielsson has studied and published more than anyone in the world on the effects of hERG channel interference on development.

*Principle Four*: "There are four manifestations of deviant development (Death, Malformation, Growth Retardation and Functional Defect)." This statement describes the severity of deviant development that can be categorized into four specific categorical outcomes.  Sadler Dep. at 247:3–12; Scialli Dep. at 302:11–19; Baldwin Dep. at 87:13–22.  As will be discussed below, increased incidences of embryonic deaths and malformations consistent with those seen in Zofran epidemiology studies and with other hERG blocking drugs were observed in the Zofran animal teratology studies that achieved meaningful exposure in the embryo to Zofran.

*Principle Five*: "The access of adverse environmental influences to developing tissues depends on the nature of the influence."  Several factors affect the ability of a teratogen to impact a developing conceptus, such as the physical nature of the agent itself, the route and degree of maternal exposure, the rate of placental transfer and systemic absorption, and the nature of the maternal and embryonic/fetal genotypes.  Zofran has been demonstrated to cross the placental barrier in humans and to disrupt embryonic heart rhythm at concentrations observed in women of childbearing potential in all approved forms of administration and doses in the drug labeling.

*Principle Six*: "Manifestations of deviant development increase in frequency and degree as dosage increases from the No Observable Adverse Effect Level (NOAEL) to a dose producing 100 % Lethality (LD100)." This principle describes the dose response. Low doses may exert no or very little toxicity or teratogenicity, while higher doses are expected to increase the incidence and severity of the observed malformations and embryofetal death.  The highest dose of Zofran has been withdrawn from the market due to its tendency to disrupt heart rhythm in adults.  In addition, in the

animal teratology studies that reported Zofran exposures similar to those reported in human pregnancy, increased incidences of malformations and embryonic deaths were observed relative to the concurrent, untreated controls. Increasing the doses so that the Zofran concentration was appropriately higher than reported in human pregnancy, as internationally accepted regulatory guidelines state, would most likely have induced massive embryonic death similar to other potent hERG blocking drugs. Finally, data and video on the whole embryo culture presented in the Danielsson, Webster & Ritchie 2018 paper unequivocally shows a dose-responsive increase in the drug's disturbance of embryonic heart rhythm. Consequently, Wilson's Principles support the teratogenicity of Zofran in this case. Danielsson Rep. at 32; Sadler Rep. at 4-5.

## B.    BRADFORD HILL CRITERIA

To assist in determining whether a causal inference is appropriate, Sir Austin Bradford Hill suggested various factors for potential consideration.[15] The Hill factors include: (1) existence of a temporal relationship; (2) strength of the association; (3) dose–response relationship; (4) replication of the findings; (5) biological plausibility (coherence with existing knowledge); (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge.[16] *Ref. Man.* at 600. These guidelines are "employed only after a study finds an association to determine whether that association reflects a true causal relationship." *Ref. Man.* at 598–99. The Bradford Hill guidelines are also met in this case. Louik Rep. 37–40.

Dr. Hill's factors do not form an exhaustive list of criteria or a set of boxes to be checked to draw a causal inference. The Hill guidelines were proposed as a tool for scientists to consider when faced with a question regarding causation. "There is no formula or algorithm that can be used to

---

[15] Austin Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965).
[16] For the full explanation of each factor as provided in the *Reference Manual on Scientific Evidence*, see *Ref. Man* at 601-606.

assess whether a causal inference is appropriate based on these guidelines.  One or more factors may be absent even when a true causal relationship exists." *Ref. Man.* at 600.  GSK's expert Dr. Shaw agrees. Shaw Dep. at 124:2–22.

In birth defects research, to the extent that the Bradford Hill criteria have been construed to require epidemiologic evidence notwithstanding strong evidence of the mechanism of how a chemical agent can cause birth defects, they have been criticized by leaders in the teratology community.  For example, in 2017, the U.S. Teratology Society invited Dr. Jan Friedman of the University of British Columbia to present the esteemed Robert L. Brent Lecture to the organization and publish his presentation in the journal *Birth Defects Research*.  In his publication, Dr. Friedman observed that "the Bradford Hill criteria are rarely, if ever, used in human birth defects research because they assume the availability of multiple high-quality epidemiology studies, and most pregnancy exposures have *not* been adequately assessed by such studies."[17]  In the case of Zofran, for years there were calls for more study of birth defects risks, which GSK to this day ignored. Nevertheless, there are now sufficient epidemiologic studies for consideration under the Bradford Hill guidelines.

## C.    SHEPARD'S CRITERIA

Scientists also apply the criteria system developed by Dr. Thomas H. Shepard (a pediatrician and scientist known as a pioneer in teratology) to assess whether an exposure and fetal adverse outcome in human pregnancy is likely to be causal.   Danielsson, Webster & Ritchie 2018; Baldwin Dep. 48:11–16; *but see* Scialli Dep. at 255:5–15 ("I don't personally rely on Shepard's").  The criteria should not be treated as a diagnostic algorithm,[18] but rather as a set of *considerations* for evaluating the available evidence; most human teratogens only fulfill some (but not all criteria).

---

[17] Friedman 2017.
[18] *Id.*

While GSK (other than its own expert Dr. Scialli, who appeared for GSK at Science Day) treats Shepard's criteria as a rigid set of requirements, Shepard's criteria are not a checklist; rather, they are but one of several frameworks for assessing causality and teratogenicity. The Shepard's criteria are:

- Proven exposure to the agent at critical time(s) in development
- Consistent findings by two or more high-quality epidemiological studies
- Careful delineation of clinical cases
- Rare environmental exposure associated with rare defect
- Teratogenicity in experimental animals
- The association should make biological sense; and
- Proof that the agent acts in an unaltered state in an experimental system

Regarding the consideration of epidemiologic data, an increased association can be identified under Shepard's criteria with only two studies, and epidemiology is not needed to infer causation in the case of rare exposures and rare defects.  Baldwin Dep. at 51:17-25.  Available epidemiologic findings should be consistent, but need not be uniform.  Zofran fulfills Shepard's criteria for teratogenicity. *E.g.*, Danielsson Rep. at 68.

### D.    ICH GUIDELINES

The International Council for Harmonization of Technical Requirements for Pharmaceuticals for Human Use (ICH) has established guidelines on developmental toxicity.[19]  The ICH guidelines were drafted by representatives of regulatory agencies in the United States (FDA),

---

[19] ICH S5(R2) 1993, updated revised version 2017 - ICH S5 (R3), Detection of Toxicity to Reproduction for Human Pharmaceuticals (current Step 2 draft version), dated 5 July 2017)*,* York Dep. Ex. 25, *available at* https://www.ich.org/products/guidelines/safety/article/safety-guidelines.html.  The term Step 2 draft means that the draft has been endorsed by the Regulatory Members of the ICH.  Thus, while the FDA has not implemented the Guidelines as a regulatory requirement, representatives of regulatory authorities from twelve nations, including the U.S. FDA, as well as representatives of the industry organization PhRMA, participated in the working group that created the guidelines.  The guidelines are routinely relied on by experts in the field of reproductive toxicology in the course of their profession.  (Danielsson Rep. at 3.)  The FDA has made it available at
https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM584413.pdf.

the European Union (EMA) and Japan (MHWA), among others, in collaboration with representatives from pharmaceutical industry organizations in these regions.   The FDA has historically adopted the ICH harmonized guidelines for reproductive toxicity studies.   York Rep. at 7, n.2.  The guidelines are internationally accepted.  Sadler Dep. at 278: 20–23, York Dep. at 18–20, REDACTED.

The ICH S5 (R3) Guidelines apply not only to designing reproductive toxicology tests but also to drawing inferences about teratogenic effects of pharmaceuticals, *i.e.*, their capability of causing birth defects, based on all relevant data – human, animal and *in vitro*.   In this regard, the accepted methodology identified by ICH, consistent with First Circuit jurisprudence, is a weight of evidence approach, followed by Plaintiffs' experts:

> All available data on the pharmaceutical and any related compounds (e.g., surrogates or class alerts), as well as information on human genetics, transgenic animals and the role of the target in reproduction should be considered in this assessment. . . . . The (projected) human exposure, comparative kinetics between species and plausible mechanism of reproductive toxicity, if available, should be considered.[20]

## IV.   CAUSAL INFERENCE IN SCIENCE AND THE LAW

"General causation" is a scientific conclusion addressing whether Zofran is capable of causing specific birth defects (here, congenital heart defects and orofacial clefts) in humans.  As this Court considers the *Daubert* motions, it is important that the Court understand the framework scientists use for causal inference.   Any assessment of general causation involves an inferential process from evidence to the causation conclusion because causation cannot be observed directly. This section summarizes basic principles relevant to drawing causal inferences from the relevant data.

---

[20] ICH S5 (R3) at 24; Danielsson, Webster, & Ritchie, Ondansetron and teratogenicity in rats: Evidence for a mechanism mediated via embryonic hERG blockade, *Reproductive Toxicology*, 81 (2018) 237–45, at 237 and n.1 (hereinafter, Danielsson, Webster & Ritchie 2018); *see also* York Dep. at 89:1–90:21.   In Danielsson, Webster and Ritchie 2018, the authors reported that "This work was supported in part by funding from attorneys representing families regarding ondansetron use in pregnancy."

## A.    CAUSAL INFERENCE IS A MATTER OF JUDGMENT.

Scientists recognize that determining causal probability should not be regarded as an experimental or epidemiological result.  Nor is it a "determination made by using an objective algorithmic methodology."  Rather, it is a "judgment" made about the totality of experimental or epidemiological data.  *Ref. Man.* at 598.

"Drawing causal inference . . . requires judgment and searching analysis based on biology, of why a factor or factors may be absent despite a causal relationship, and vice versa." *Ref. Man.* at 600.  As this judgment is a scientific determination, it can evolve "as new evidence develops" because "the scientific enterprise must always remain open to reassessing the validity of past judgments." *Ref. Man.* at 598.

## B.    BOTH EPIDEMIOLOGIC AND TOXICOLOGIC STUDIES HAVE VALUE FOR CAUSAL INFERENCE.

As it relates to Zofran, epidemiologic studies and toxicologic studies have been conducted and provide results relevant to the question of whether Zofran can cause birth defects.  These have been referenced in the Plaintiffs' experts' reports, and the main ones will be discussed in this brief.  Generally speaking, "no universal rules exist for how to interpret or reconcile" results from epidemiologic and toxicologic studies.  *Ref. Man.* at 564.  However, both must be considered: "careful assessment of the methodological validity and power of the epidemiologic evidence must be undertaken, and the quality of the toxicologic studies and the questions of interspecies extrapolation and dose–response relationship must be considered." *Ref. Man.* at 564–65.  Toxicologic studies can be the best available evidence of toxicity." *Ref. Man.* at 564.

Performing experiments that could demonstrate the causation in humans directly would be unethical.  Baldwin Dep. 185:17–186:7 and 191:9–19 and 193:23–194:4.  Therefore, as Dr. Shaw testified, "in epidemiology, we're usually relegated to observational studies.  And we have to infer

the causal nature of associations."  Shaw Dep. at 27:22–28:13.  This interpretation of observational studies "can produce legitimate disagreement among experts, and there is no mechanical procedure for resolving such differences of opinion.  *Ref. Man.* at 222.

In the context of interpreting animal teratology studies, the ICH Guidelines focus on biological significance and not statistical significance: "Any biologically meaningful difference in treated animals compared with concurrent controls should be discussed.  Statistical significance alone does not always constitute a positive signal nor does lack of statistical significance constitute a lack of effect; historical controls, biological plausibility, and reproducibility should be considered in this context."[21]

## 1.      Live Animal Studies

To determine the effect of exposure to an agent in humans, human epidemiologic observational studies have limitations that toxicology models based on live animal studies can overcome. *Ref. Man.* at 563.  Animal studies may be conducted as actual experiments with researchers exercising total control over study conditions, including agent exposure and subject participation.  *Ref. Man.* at 563. Animal studies can avoid the issue of confounding and do not have the same ethical considerations required of studies in human populations. *Ref. Man.* at 563.  "[A]nimal studies often provide useful information about pathological mechanisms and play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiologic studies." *Ref. Man.* at *563*.

Animal study findings can be extrapolated to human populations when there is a principled basis for doing so.  For example, the pharmacokinetic profile should enable an extrapolation of the

---

[21] ICH S5 (R3) at 23; FDA Guidance for Industry, Reproductive and Developmental Toxicities – Integrating Study Results to Assess Concerns, Sept. 2011, at 6–7 ("A positive signal is a biologically meaningful difference in dosed animals compared to concurrent or historical controls.") (hereinafter, FDA Guidance 2011).

results from animals to humans, and to assess the relevance of the species selected for testing. EMA Guidelines 2008, at 4.  Pharmacokinetics distinguishes between the dose given to a species (including humans) and the exposure achieved in the species considering how that species absorbs, distributes, metabolizes and eliminates the chemical.  Roth Dep. At 80:1–9; Baldwin Dep. at 247:2–13; York Dep. at 58:19–24.

According to the ICH, information on systemic exposure of pregnant animals is essential for the interpretation of study results, and thus to assess human safety.  ICH S5 (R3) Final Concept Paper (Mar. 27, 2015).  An evaluation of animal teratology studies should therefore compare animal and human pharmacodynamic effects, animal and human metabolism and disposition, animal and human pharmacologic and toxic effects, and drug exposures in animals studies in relation to the highest proposed dose in humans.  FDA Guidance 2011.

Dr. Danielsson has performed a comparison of Zofran exposures in GSK's animal teratology studies (the ones GSK referenced in the drug label, as well as the GSK Japanese studies that GSK did not reference in the label) in relation to exposures in humans.  Danielsson, Webster & Ritchie 2018 publication and Danielsson Rep. at 40.  By contrast, several of GSK's experts have offered opinions about the Zofran animal teratology results without considering the exposure information that is "essential for the interpretation of study results."  ICH 2015.

## 2.    Whole Embryo Culture Testing

In whole embryo culture (WEC) testing, REDACTED ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████  WEC is a generally accepted *in vitro* testing methodology for evaluating teratogenic mechanisms of action.  Danielsson Rep. at 12 (citing multiple studies beginning in 1996).  In 1997, for example, Dr. Danielsson showed that phenytoin, an established

human teratogen, caused a concentration dependent slowing and arrhythmia of the embryonic heart of rat embryos grown *in vitro*, and thus that the drug's effect on the embryonic heart was the main factor for initiation of phenytoin teratogenicity.[22]  In 2006, Siu *et al.* reported, "By combining the model we used to investigate placental transfer and whole embryo culture, we propose that this is the best available *in vitro* model to investigate the drug effect on an embryo and an early fetus.  This model would provide the best estimation of teratogenicity of a drug when prescribed in early human pregnancy."  The ICH S5 (R3) Guidelines confirm these propositions and encourage the use of alternative validated assays such as WEC studies: "Use of qualified alternative assays is appropriate for risk assessment under certain circumstances where they are interpreted in conjunction with *in vivo* reproductive testing." ICH S5 (R3) at 8–9; *Ref. Man.* at 647 ("In vitro . . . data for elucidating the mechanisms of toxicity are more persuasive when positive human epidemiological data or toxicological information also exists.").

## C.   A CAUSAL INFERENCE REQUIRES EXAMINING THE TOTALITY OF THE EVIDENCE.

Scientists believe that assessing causation requires considering and evaluating the evidence cumulatively and in its entirety. "Scientific inference typically requires consideration of numerous findings, which, when considered alone, may not individually prove the contention." *Ref. Man.* at 19–20. This is how science outside of the courtroom functions. As explained in the *Reference Man.* at 20:

> [M]any of the most well-respected and prestigious scientific bodies (such as the International Agency for Research on Cancer (IARC), the Institute of Medicine, the National Research Council, and the National Institute for Environmental Health Sciences) *consider all the relevant available scientific evidence, taken as a whole*, to determine which conclusion or hypothesis regarding a causal claim is best supported by the body of evidence. *In applying the scientific method, scientists do not review*

---

[22]  Danielsson, et al., *Initiation of Phenytoin Teratogenesis: Pharmacologically Induced Embryonic Bradycardia and Arrhythmia Resulting in Hypoxia and Possible Free Radical Damage at Reoxygenation*, Teratology 56:271-81, 277 (1997).

25

*each scientific study individually* for whether by itself it reliably supports the causal claim being advocated or opposed. (Emphasis added)

Causation cannot be found or refuted in the data resulting from a single study; it is rather a determination made after evaluating the totality and weight of relevant scientific evidence.  Defense expert Dr. Shaw agreed with the premise that "a single epidemiologic study viewed on its own can never be considered to either prove or disprove a causal hypothesis." Shaw Dep. at 116:23–117:10. *Accord Ref. Man.* at 604.  Despite this, citing a single epidemiology study, GSK's expert Tony Scialli, when defending another pharmaceutical manufacturer's (Janssen's) drug against a claim of a different drug's inducement of an orofacial defect, criticized the patient's expert for failing to consider alternative explanations for the defect, including "paternal cigarette smoking, maternal obesity, poor nutrition, lack of use of a multivitamin with folic acid, ***exposure to ondansetron***, exposure to prednisone, genetic causes, and unknown causes."[23]  Dr. Scialli's attestation to a reasonable degree of medical and scientific certainty that exposure to ondansetron was an alternative explanation for the patient's orofacial defect denoted his view, when representing Janssen, that Zofran was capable of causing orofacial defects.  Now that he speaks for GSK, however, he apparently holds a different view.

## V.     BASIC PRINCIPLES OF EPIDEMIOLOGY

Important *Daubert* issues in this case will implicate basic principles of epidemiology. *Daubert* motions will use terms like "relative risk," "statistical significance," "confidence intervals," "sample size," "power," "bias," "chance," "confounding," and "association." Understanding these concepts is critical to properly interpret the human epidemiologic studies, the causation evidence in this case and the *Daubert* motions.  These concepts and their implications are

---

[23] *Anderson v. Janssen Pharms., Inc.*, 2013 WL 8476501 (Pa. Com. Pl. 2013), Expert Report and Affidavit of Anthony R. Scialli, M.D. (emphasis added).

frequently misunderstood particularly in pharmaceutical litigation. To assist this Court, Plaintiffs set forth below a brief overview of basic principles of epidemiology.

### A.   EPIDEMIOLOGY RELIES LARGELY ON OBSERVATIONAL STUDIES.

Epidemiology examines the "incidence, distribution, and etiology of disease." *Ref. Man.* at 551. Researchers are ethically prevented from knowingly exposing people to an agent suspected to be harmful. Based on over a decade of medical literature, it is clear that Zofran has been viewed as a potential cause of birth defects. Therefore, the epidemiologic studies pertaining to general causation in this case are necessarily "observational." *Ref. Man.* at 555–56.

In an observational study, "the investigator identifies a group of subjects who have been exposed [to an agent] and compares their rate of disease… with that of an unexposed group." *Ref. Man.* at 556. The most common types of observational studies are cohort studies and case-control studies. *Ref. Man.* at 556. "The difference between cohort studies and case-control studies is that cohort studies measure and compare the incidence of disease in the exposed and unexposed ("control") groups, while case-control studies measure and compare the frequency of exposure in the group with the disease (the "cases") and the group without the disease (the "controls")." *Ref. Man.* at 557.

### B.   STUDY RESULTS ARE EVALUATED FOR THE EXISTENCE OF AN OBSERVED ASSOCIATION.

"An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance." *Ref. Man.* at 566. A causal relationship is one possible explanation for an observed association between an exposure and a disease.  However, a causal relationship is just one of several possible explanations for an observed association that must be considered in a search for the most likely explanation.

Expressing and interpreting the existence and magnitude of an association involves the concepts of "relative risk," and "odds ratio." *Ref. Man.* at 566. "Each of these measurements of association examines the degree to which the risk of disease increases when individuals are exposed to an agent." *Ref. Man.* at 566.

### C.   THE RELATIONSHIP BETWEEN RELATIVE RISK AND CAUSATION

The strength of the association between an agent and a disease can be expressed using the relative risk ("RR") approach. *Ref. Man.* at 566. "It is defined as the ratio of the incidence rate […] of disease in exposed individuals to the incidence rate in unexposed individuals." *Ref. Man.* at 566. For example, when the relative risk is expressed as 3.0, the exposed group is at three times the risk of disease as the unexposed group. *Ref. Man.* at 567. The "odds ratio" (OR) also quantifies the magnitude of an association. *Ref. Man.* at 568. It is similar to the relative risk and is used to approximate the relative risk in a case control study when the disease under investigation is rare. *Ref. Man.* at 568.

The higher the relative risk, the greater the likelihood that the relationship is causal. However, as long as the relative risk exceeds 1.0, there is no minimal threshold for a causal relationship. "*While strength of association is a guideline for drawing an inference of causation from an association…, there is no specified threshold required.*" *Ref. Man.* at 611, n.186.

 "If the relative risk is greater than 1.0, the risk in exposed individuals is greater than the risk in unexposed individuals.  There is a positive association between exposure and disease which could be causal." *Ref. Man.* at 567. There are a number of well-established causal relationships, where the magnitude of the risk is between 1.0 and 2.0. The magnitude of risk for passive smoking and lung cancer and between smoking and heart disease are well-known examples.

However, the lower the relative risk, the greater the need to assess the role of chance, bias, and confounding. A false or spurious association can result from three general sources: chance (or

random error), bias, and confounding. *Ref. Man.* at 572. Before a causal inference may be drawn about an association, the likely existence and impact of these sources must be considered. *Ref. Man.* at 572. Bias can lead to an invalid outcome in epidemiologic studies*,* and "may arise in the design or conduct of a study, data collection, or data analysis." *Ref. Man.* at 583.  Bias can amplify, minimize, or hide an association. *Ref. Man.* at 583.

Plaintiffs expect that GSK will attempt to divert focus to the limitations in the studies upon which Plaintiffs' experts rely. Plaintiffs expect that GSK will argue that chance, bias, and confounding cannot be excluded in the epidemiologic studies that find that Zofran is associated with an increased risk of cleft palate or septal heart defects.  However, Plaintiffs' epidemiology expert did consider these issues as part of her causal assessment methodology. ("For each study, I considered the study design and its adherence to basic epidemiologic principles, weighing the validity of each study, evaluating potential sources of bias that might influence the study results, and considering the populations to which the study results might apply." Louik Rep. at 3)

 In addition, "[i]t is important to emphasize that all studies have 'flaws' in the sense of limitations that add uncertainty about the proper interpretation of the results." *Ref Man.* at 552–53. "Most epidemiologic studies have some degree of bias that may affect the outcome." *Ref. Man.* at 583.

Because the legal standard in these cases is "preponderance of the evidence" causation, experts interpreting results of studies must assess whether or not a study's results are likely or unlikely due to chance, bias and confounding. Ruling out bias and chance *with certainty* is *not* a legal requirement.

### D.    STUDY RESULTS ARE EVALUATED FOR THE ROLE OF CHANCE.

 "Sometimes the study findings, merely by chance, do not reflect the true relationships between agent and outcome." Any study can be "subject to the play of chance."  *Ref. Man.* at 575.

When an association is observed in a study's results, epidemiologists have statistical techniques to estimate the likelihood that the association is due to chance. *Ref. Man.* at 575.

There also is a relationship between sample size and the role of chance. A study needs to have a large enough sample size (the number of study participants); "by enlarging the sample size …, researchers can … reduce the chance of random error in their results." *Ref. Man.* at 576. Statistical tests, including the calculation of *p*-values and confidence intervals, are used to evaluate the likelihood that an observed association resulted from random error.

*P*-values are used to determine the likelihood that the observed association occurred due to chance. *Ref. Man.* at 576. It "represents the probability that an observed positive association could result from random error even if no association were in fact present.  Thus, a *p*-value of .1 means that there is a 10% chance that values at least as large as the observed relative risk could have occurred by random error, with no association actually present in the population." *Ref. Man.* at 576. For a study's results to be deemed "statistically significant," epidemiologists have historically used a standard that the *p*-value must fall below a selected significance level (or alpha). *Ref. Man.* at 576. The typical significance level used is .05, where "the probability is 5% of observing an association at least as large as that found in the study when in truth there is no association." *Ref. Man.* at 577. "[T]he finding of an increased risk should not be ignored simply because it did not reach statistical significance, especially when the risk is repeated in different studies. Results that are not statistically significant may be compatible with substantial effects."[24]  "[A]bsence of statistical significance should not be mistaken for absence of effect."  Shaw Dep.  92:2–93:13.

### 1.    Confidence Intervals Provide the Probable Range of Risk Estimates.

When interpreting a study's results, epidemiologists consider the confidence interval. This can be important in assessing whether the results of several studies are consistent. As noted below,

---

[24] Berard 2016 at 126; *Accord Ref. Man.* at 579.

this concept is relevant to assessing the consistency of several Zofran human epidemiologic studies. A confidence interval is a range of values consistent with a study's results. "If a 95% confidence interval is specified, the range encompasses the results we would expect 95% of the time if samples for new studies were repeatedly drawn from the same population." *Ref. Man.* at 580. "[A] confidence interval … shows a range of values that are consistent at a given level of confidence with the point estimate observed in the study." Louik Dep. 111:13–23. "[T]he pure definition of a confidence interval is if you repeat the study … many times, and generate 95 percent confidence intervals, 95 percent of those confidence intervals will contain the true value…. The confidence interval gives a range over which… the true result may lie." Kimmel Dep. 219:24–220:15; *accord*, Shaw Dep. at 45:6–12. In addition, where the confidence interval for an odds ratio includes 1.0, the result does not meet the conventional definition of statistical significance.

## 2.   A Study's Power Reflects the Likelihood of an Association Being Statistically Significant.

"Statistical significance and power are inter-related concepts." Berard 2016, at 126. "[A] large enough sample of individuals must be studied if the study is to identify a relationship between exposure to an agent and disease that truly exists." *Ref. Man.* at 576. This was acknowledged by the Court in the *Neurontin* case, *supra,* in its discussion of statistical significance. "The power of a study is the probability of finding a statistically significant association of a given magnitude (if it exists) in light of the sample sizes used in the study." *Ref. Man.* at 582. A study's power should be estimated as part of its design to minimize the possibility of a falsely negative result—observing no association when a true association exists. Shaw Dep. at 79:20–81:13.[25] "The power of a study

---

[25] A Type I error occurs when a study finds an association that does not actually exist between an exposure and a disease. A Type II error occurs when a study "will be interpreted as 'negative' ...when in fact there is a true association…." *Ref. Man.* at 581-82. Reducing false-positive results (Type I errors) can lead to an increase in false-negative results (Type II errors). *Ref. Man.* at 581.

depends on several factors: the sample size; the level of alpha (or statistical significance) specified; the background incidence of disease; and the specified relative risk that the researcher would like to detect." *Ref. Man.* at 582.  As Dr. Louik testified, the rarer the outcome, the larger the study that is needed to assess the birth defect risk.  Louik Dep. at 375:18–23 (stating for rare outcome like cleft palate, a study would need "a huge number of women" exposed to Zofran).

Understanding a study's power is also relevant for extrapolating from a finding of no increased risk. "[S]tudies can have sample sizes that are insufficient to rule out increases in risk for some types of birth defects."   Shaw Dep. at 90:24–91:24; *accord*, Kimmel Dep. at 132:11–133:6. This concept is important to interpreting the results of several Zofran epidemiologic studies.

### 3.      Studies Can Be Limited by Conceptual Problems and Flawed Definitions.

Observational studies can also be subject to conceptual problems. *Ref. Man.* at 590. These can include flawed outcome definitions. *Ref. Man.* at 590. "For example, if the researcher defines the disease of interest as all birth defects, rather than a specific birth defect, there should be a scientific basis to hypothesize that the effects of the agent being investigated could be so broad. If the effect is in fact more limited, the result of this conceptualization error could be to dilute or mask any real effect that the agent might have on a specific type of birth defect." *Ref. Man.* at 590. Therefore, where a study that focuses on major birth defects, and finds no association, (as detailed below, several Zofran epidemiologic studies fall into this category) that finding should not be confused with a finding about the risk of a specific defect.

### E.      CONFOUNDING AS A SOURCE OF ERROR IN EPIDEMIOLOGIC STUDIES.

The issue of confounding may be raised by the GSK in its *Daubert* motions. "Confounding occurs when another causal factor (the confounder) confuses the relationship between the agent of interest and outcome of interest." *Ref. Man.* at 591. A confounder must meet this definition: "a

confounder is both a risk factor for the disease and a factor associated with the exposure of interest." *Ref. Man.* at 591. Having yellow-tinged finger tips is associated with smoking and lung cancer. Even though having yellow-tinged finger tips is associated with lung cancer, it obviously is not a cause of lung cancer. It fits the classic definition of a confounder because it is associated with the exposure (smoking) and the outcome (lung cancer).

There are accepted techniques for making adjustments to account for confounders. The existence of the confounders in a study are not the fault of the investigators as they "reflect the inherently 'uncontrolled' nature of exposure designations in observational studies." *Ref. Man.* at 593. "It is…necessary to keep [the] risk [of confounding] in perspective. Often the mere possibility of uncontrolled confounding is used to call into question the results of a study. […] The critical question is whether it is plausible that the findings of a given study could indeed be due to unrecognized confounders." *Ref. Man.* at 593.

## VI.    PLAINTIFFS' GENERAL CAUSATION EXPERTS

Plaintiffs have disclosed expert witnesses in various fields to assist the Court and juries with understanding general causation. Each of these experts is eminently qualified and employed a reliable methodology and reached a conclusion that is supported by substantial, reliable medical and scientific evidence of the type relied on by experts in the expert's field.

### A.    DR. RA-ID ABDULLA

Dr. Ra-id Abdulla is a physician Board Certified in both Pediatrics and Pediatric Cardiology and a Professor of Pediatrics (Pediatric Cardiology) and Obstetrics & Gynecology at Rush University in Chicago, and senior attending of Pediatric Cardiology at Rush University Medical Center. He has practiced clinical pediatric cardiology for over 25 years, determining the cause of, diagnosing, examining, and treating children with congenital heart diseases. Dr. Abdulla has specialized knowledge about the diagnosis and treatment of congenital cardiac disease and the role

of both genetics and environmental factors in the development of congenital heart disease.  His education, training and experience has also equipped him with specialized knowledge of the proper categorization, characterization and classification of congenital cardiac malformations.  Since 2000, Dr. Abdulla has been Editor-in-Chief of the international peer reviewed journal *Pediatric Cardiology*.

Dr. Abdulla considered whether ondansetron is capable of crossing the placenta and thus exposing the fetus, he evaluated Zofran's mechanism of altering heart rhythm, the impact of altering blood flow on embryonic development, and the human epidemiologic literature involving prenatal Zofran exposure and congenital heart defects in exposed infants.  After considering the totality of the clinically relevant information, he concluded that Zofran can impact the IKr channel at doses recommended in the label and can cause arrhythmia and alter blood flow and hemodynamics in the exposed embryo (a known mechanism whereby congenital heart disease is caused).  Based on the foregoing, he concluded that maternal ingestion of Zofran causes or substantially contributes to congenital cardiac defects.

### B.    DR. BENGT DANIELSSON

Dr. Bengt Danielsson is a medical doctor, pharmacologist and teratologist working in drug safety with a focus on teratology for over 40 years.  His research focus the last 25 years has been on teratogenicity from drug-induced alterations in the embryonic heart rhythm.    He has served as the Global Director of Reproductive Toxicology for one of the largest pharmaceutical companies in the world, a Scientific Director and Professor at the Swedish FDA (MPA) from 2004–2007, an expert member of European Medicine Agency (EMA) Safety Working Party (2004–2007), and as consultant (2008–2012).  His current work since 2012 has been to serve as Medical Expert in Clinical Pharmacology at the Swedish National Agency for Health and Welfare regarding the safe use of medicines in vulnerable populations, including pregnant women.  In this post, he co-authored

a peer-reviewed journal article reporting the results of a human epidemiological study on Zofran use in pregnancy using the Swedish National Registry (Dr. Danielsson was co-investigator).

Dr. Danielsson has evaluated the potential teratogenicity of ondansetron by considering the totality of the available evidence, as recommended in the ICH S5 (R2) 1993 Guidelines, updated revised version 2017 - ICH S5 (R3).  He also used criteria for integrated risk assessment based on human and animal data by Shepard (2010) in this report.  Both of these approaches were informed by Wilson's general principles.  His methodology in reaching his opinions in this litigation employed the same methods, with the same rigor as he has used in his academic and professional investigational, research, writing, and teaching work.  Dr. Danielsson performed an integrated assessment of embryofetal adverse findings with ondansetron in Glaxo's teratology studies, and, in contrast to GSK's experts, he considered exposure information in relation to human exposures. Much of his expert evaluation of ondansetron's teratogenic mechanism has been published in peer-reviewed literature.[26]  Danielsson, Webster & Ritchie 2018.

### C.    DR. MICHAEL LEVIN

Dr. Michael Levin is a molecular and developmental biologist with over 25 years' experience studying mechanisms of embryonic development. He received a Ph.D. in Genetics from the Harvard School of Medicine, specifically for his identification of the genetic mechanisms that dictate the positioning of the heart and visceral organs.  He is a Professor in the Department of Biology at Tufts University, Director of the Tufts Center for Regenerative and Developmental Biology and Director of the Allen Discovery Center at Tufts. At various institutions he teaches graduate students on the biophysics of morphogenesis, craniofacial patterning and development, and embryonic patterning. Dr. Levin's laboratory has worked on identifying novel mechanisms of

---

[26] Danielsson, Webster, & Ritchie, Ondansetron and teratogenicity in rats: Evidence for a mechanism mediated via embryonic hERG blockade, *Reproductive Toxicology*, 81 (2018) 237–45.

embryonic patterning.  He was the first scientist to study the role of ion channel activity in determining embryonic laterality.

Dr. Levin was asked to evaluate the role the molecular targets (e.g., hERG channel) of Zofran play in normal embryogenesis and the molecular mechanisms by which Zofran and similar drugs can cause structural heart and orofacial defects.  He then reviewed hundreds of peer-reviewed papers involving mechanistic pathways by which exposure to drugs or environmental exposures can alter embryologic development.   He incorporated his own research and studies involving ion channels and their impact on embryonic development, other methods that target the same kinds of pathways targeted by Zofran, and years of experience conducting mechanistic testing in many animal models.   Having considered the totality of the evidence relevant to the question posed, he formulated his opinions to a reasonable degree of scientific certainty that Zofran can cause or substantially contribute to cardiovascular and orofacial malformations through well-supported mechanisms.   Levin Rep. at 5–6.

### D.     DR. CAROL LOUIK

Dr. Carol Louik has training and experience in epidemiology.  She received her Doctor of Science in the field from Harvard School of Public Health in 1983 and was an Assistant Professor of Epidemiology at Boston University from 2001 to 2015.   Her research focuses on the environmental causes of human birth defects, investigating exposures during pregnancy that may affect the risk of fetal malformations.  Dr. Louik was one of the investigators in an important peer-reviewed and published study to evaluate the birth defect risks of taking Zofran for nausea during pregnancy.  She also has authored or co-authored 15 abstracts and 61 publications, including many papers on studies assessing risk factors for birth defects.

She relied on the epidemiologic principles that she was taught as part of the completion of her doctoral degree at the Harvard T.H. Chan School of Public Health and that she has applied

throughout her academic career at the Slone Epidemiology Center at Boston University.  As is true in all disciplines, advances in thinking and techniques have improved and expanded over time and she has remained current in her field and she has applied a widely and generally accepted methodology for evaluating the evidence regarding exposure to Zofran and the risk of specific birth defects.  In reaching her conclusions, she has considered the totality of the epidemiologic evidence.

For her methodology, Dr. Louik identified the relevant information, beginning with a review of the information regarding Zofran available through the FDA.   She then conducted a comprehensive literature review of the epidemiologic studies assessing the risk of birth defects associated with exposure to Zofran in pregnancy. Louik Rep. at 2–3, 16–37, 40–41.  She evaluated each of these studies based solely on the information in the published manuscript, abstract, or poster presentation. For each study, she "considered the study design and its adherence to basic epidemiologic principles, weighing the validity of each study, evaluating potential sources of bias that might influence the study results, and considering the populations to which the study results might apply." Louik Rep. at 3.  She also reviewed in a more limited manner literature from other disciplines that pertained to assessing biologic plausibility. Louik Rep. at 40.  Finally, to formulate her opinion, Dr. Louik considered and applied the "widely-accepted guidelines for assessing causality first laid out by Sir Austin Bradford Hill." Louik Rep. at 37–39

Dr. Louik concluded that there was consistent evidence of an association, not likely explained by chance, bias, or confounding.   After assessing the Bradford Hill guidelines, she reached her general causation opinion that Zofran was a likely cause of two specific birth defects: septal heart and cleft palate defects.  Dr. Louik's opinion is consistent with other Plaintiffs' experts' opinions that Zofran was capable of causing the broader group of injuries classified as orofacial clefts and cardiovascular defects.

E.    DR. THOMAS SADLER

Dr. Thomas Sadler is an embryologist/developmental biologist/teratologist with over 40 years' experience conducting research and teaching human embryology and the origin of birth defects with the goal of discovering the means to prevent birth defects in humans.  He is an Adjunct Professor of Pediatrics at the University of Utah, Visiting Professor of Cell Biology and Anatomy at the Quillen College of Medicine at East Tennessee State University, Senior Scholar at the Greenwood Genetics Center in Greenwood, SC and a Consultant in Embryology and Birth Defects Prevention, giving lectures and assisting states with their birth defect prevention campaigns.  Dr. Sadler has studied, conducted research and published in peer reviewed scientific journals and other sources on the mechanisms whereby receptors and ion channels regulate normal embryonic development, an issue of import in the Zofran case. Since 1985 he has been the sole author of *Langman's Medical Embryology,* a medical textbook explaining human embryology and development and the origins of birth defects and used in medical schools throughout the world.

In formulating his opinions in his expert report, Dr. Sadler considered whether Zofran is capable of causing congenital heart and orofacial abnormalities, searching for relevant medical and scientific literature that has been published regarding general causation, including epidemiologic and mechanistic studies, which is the reasonable and standard practice human embryologists and teratologists utilize to evaluate evidence of an exposure–outcome association.   He further considered the quality of the publications reviewed as he has done as Editor of the journal *Teratology*, including the research question addressed, the ability of the study to answer the question (power), biologic plausibility, and consistency of the information. After analysis of the totality of all of the information listed in his expert report and on his reference lists incorporating the methodology and analysis he has used for over 40 years in his field of teratology and embryology, informed by Wilson's General Principles of Teratology, he formulated opinions, stated

38

to a reasonable degree of scientific certainty, that exposure to Zofran during gestation at critical stages of embryogenesis can cause or substantially contribute to congenital heart defects, including septal defects, cleft palate and other orofacial anomalies. Sadler Rep. 5–6, 8, 30.

## VII.   MULTIPLE LINES OF EVIDENCE SUPPORT GENERAL CAUSATION HERE.

There are multiple lines of evidence, including human epidemiologic studies, animal studies, toxicology, and pharmacologic studies, all pointing to the conclusion that exposure to Zofran in the first trimester of pregnancy increases the risk for cardiovascular defects and orofacial clefts. "Scientific inference typically requires consideration of numerous findings, which, when considered alone, may not individually prove the contention." *Ref. Man.* at 19–20.  Here, Plaintiffs provide multiple sources of data that converge and point in the same direction. Causation is the best explanation.

### A.   *LINE OF EVIDENCE 1*: ZOFRAN RAPIDLY CROSSES THE PLACENTAL BARRIER AND EXPOSES THE HUMAN EMBRYO IN AT LEAST THE SAME CONCENTRATIONS AS THE MOTHER DURING THE MOST CRITICAL PERIOD OF EMBRYONIC DEVELOPMENT.

REDACTED

Human studies demonstrate that ondansetron readily passes through the placenta to reach the developing embryo during the first trimester of pregnancy and  the concentration of Zofran in the human embryo is highly likely to be the same, or higher, than in the mother.

Zofran is rapidly transferred across the human placenta in the first trimester, and it does so at higher embryonic tissue concentrations compared to the maternal concentrations that were observed in early pregnancy in women undergoing elective termination of pregnancy.[27] In a study by Siu in 2006, pregnant woman who chose first trimester surgical termination of pregnancy took three 8mg

---

[27] Siu, et al., Placental Transfer of Ondansetron during Early Human Pregnancy, *Clin. Pharmacokinet.* 2006 45(4):419–23 (hereinafter, Siu 2006).

oral doses of ondansetron twice the day before surgery and once 4 hours prior to elective termination surgery.  Before induction of anesthesia, maternal blood samples were taken.  At some point after the surgery, fetal parts, most commonly limbs and trunk, were sampled.  All samples were analyzed for ondansetron. Siu 2006. Ondansetron was found in all samples, providing compelling evidence that "free ondansetron readily passed through the human placenta in the first trimester."  Significantly, despite being lower than would be observed *in utero*, the amount of ondansetron in the fetal tissue samples was higher than the free ondansetron in the maternal blood plasma.  That is a plausible outcome because the "major determinant of fetal drug concentration is the maternal drug concentration."[28]

Similarly, in a study performed at Stanford University, scientists investigated maternal and newborn human exposures to Zofran to consider indirectly dosing newborns to treat neonatal abstinence syndrome (opioid withdrawal).[29]  They administered Zofran intravenously to 20 non-pregnant women of childbearing potential and 40 pregnant women late in pregnancy and measured Zofran concentrations in the mothers' blood plasma, in umbilical cord blood and in the newborns' blood plasma.  They then replicated this data using a pharmacokinetic model to show that a single I.V. administration of 4 mg of Zofran to the mothers 15 minutes before delivery "produces an exposure level in neonates (AUC0->24 h) that is similar to that in adults treated with a 4 mg oral dose twice a day."  Elkomy 2015, at 168; Figure 5.  The Elkomy study authors concluded that ondansetron "rapidly crosses the placental barrier."  Elkomy 2015, at 170.  The rapid transplacental passage of ondansetron is not surprising because ondansetron is a highly lipid-soluble drug. Elkomy 2015 at 169.  Drugs that are lipid-soluble "pass with ease" through the placental barrier.

---

[28] Garland, Pharmacology of Drug Transfer Across the Placenta, Obstetrics & Gynecology Clinics of N. Am., Vol. 25, Issue 1, Mar. 1998, at 21–42 (hereinafter, Garland 1998), at 2.

[29] Elkomy, et al., Ondansetron Pharmacokinetics in Pregnant Women and Neonates: Towards a New Treatment for Neonatal Abstinence Syndrome, *Clin. Pharmacology & Therapeutics*, Vol. 97, No. 2, Feb. 2015 (hereinafter, Elkomy 2015).

Garland 1998 at 8.

Figure 1 below from Siu 2006 and Figure 5 from Elkomy 2015 illustrate the similarity in maternal and fetal or neonatal concentrations of Zofran when the mother ingests Zofran orally or is administered the drug intravenously.



**Fig. 1.** Box plot showing ondansetron concentrations in each type of specimen. The central line in the box represents the median value, the lower and upper line the 25th and 75th percentile, respectively, whisker represents values <1.5 interquartile range (IQR) and ( ) represents values >1.5 IQR.



**Figure 5** Boxplot of model predicted $AUC_{0-24\ h}$ in adults following the oral administration of 4 mg twice a day (**A**); in neonates following the IV administration of 4 mg to the mothers 15 minutes before delivery (**B**); in neonates following the administration of oral 0.07 mg/kg (**C**); or IV 0.04 mg/kg (**D**) to neonates.

41

Figure 1 from Siu 2006 shows that the concentration of Zofran is the same, and sometimes higher, in the fetal tissue than in the mother. Similarly, Figure 5 from Elkomy 2015 shows the speed of placental transfer: the concentration of Zofran in a newborn was the same, and sometimes higher, in a newborn when the mother was administered Zofran intravenously just 15 minutes before birth.

In this regard, it is important to understand that only the free, or "unbound," concentration of ondansetron in the maternal plasma can cross the placenta. Garland 1998, at 9. REDACTED ███████████████████████████████████████████████ ██████████████████████████████ By contrast, "[w]hen drugs bind to protein, they form a large complex that that cannot cross the placenta." Garland 1998, at 9. Also, binding is a transitory phenomenon; when a drug separates from the protein to which it is bound, it becomes free again and can cross the placenta. *Id.* The percentage of a drug that it protein-bound, therefore, reflects only the amount of a drug that is bound to protein a particular moment in time. *Id.* Therefore, based on Siu 2006, because only the free concentration could pass through the human, and because all of the drug that passes through is pharmacologically active, and thus capable of inducing arrhythmia, and because the levels detected in the fetal tissue were the same as or higher than the amount of the free concentrations in the mother's plasma, the human embryo is exposed to ondansetron in at least at the same concentrations and durations as in the mother (several hours). Danielsson Rep. at 35.

**B.** **LINE OF EVIDENCE 2: GENERAL CAUSATION OF CONGENITAL HEART DEFECTS AND OROFACIAL CLEFTS IS SUPPORTED BY MULTIPLE HUMAN EPIDEMIOLOGIC STUDIES.**

Multiple human epidemiologic studies, published in the peer-reviewed medical literature, found that Zofran is associated with statistically significant increased risks of septal heart defects and cleft palate, and as detailed in the other lines of evidence, there is a well-studied mechanism to

explain why and how that occurs.  These findings are consistent with the substantial evidence, summarized herein, that Zofran is capable of causing all types of congenital heart defects and all orofacial cleft birth defects because there is a common underlying pathogenesis (*i.e.,* common mechanism) for all of these abnormalities, and because of similarities in gestational timing and embryologic tissue of origin.

1.      **Multiple Human Epidemiologic Studies, Published in the Peer-Reviewed Medical Literature, Found that Zofran Is Associated with Statistically Significant Increased Risks of Septal Heart Defects.**

There are two human epidemiologic studies, both published and peer reviewed, that found statistically significant increased risks for first trimester Zofran use and septal heart defects.  A third study (published as an abstract only, but relied on by experts in the field who have cited it in peer-reviewed medical literature publications) also reported a statistically significant more than doubling of risk for all septal defects.  A fourth study, which also was published and peer-reviewed, reported data for specific defects, reflecting a 40% increase in risk for septal defects (which due to small sample size, did not meet the threshold for statistical significance). There was one published study, that did not find an increased risk for septal defects in two arms of the study, but even that study reported results where the upper bound of the confidence intervals was above 1.0, which is consistent with an increased risk found in the other studies.

2.      **Four Studies Find Increased Risks of Septal and Other Heart Defects.**

(a)      **Danielsson, *et al.***

The first study, Danielsson, *et al.,*[30] a cohort study published in 2014, reported an adjusted relative risk[31] of 2.05 (95% CI 1.19–3.28) (a more than doubling of risk) in a Swedish population of

---

[30] Danielsson B, et al. Use of ondansetron during pregnancy and congenital malformations in the infant. *Repro. Toxicol.* 2014;50:134-7 (hereinafter, Danielsson 2014).
[31] Odds ratio or Crude Odds ratio are obtained when you are considering the effect of only one predictor variable; however, when investigators include more variables in the analysis (e.g., confounder variables) the

pregnant women and their babies. Plaintiffs' expert Dr. Bengt Danielsson was one of the study investigators. The authors concluded that "[t]he teratogenic risk with ondansetron is low but an increased risk for a cardiac septum defect is likely.   Data from the Swedish Medical Birth Register combined with the Swedish Register of Prescribed Drugs were used to identify 1349 infants born of women who had taken Zofran in the first trimester of pregnancy.

GSK's birth defects expert, Dr. Shaw, testified that the study assessed "an entire country's experience. That's a strength." Shaw Dep. 205:5–11. GSK's second epidemiology expert, Dr. Kimmel, testified, "the main strength is that it comes from the Swedish Medical Birth Registry, which is a known and validated registry." Kimmel Dep. 338:7–15. GSK's experts also described several limitations of the study as they did for every study, which Plaintiffs expect to address in separate briefing.

In fact, the risk of septal heart birth found in this study may very well be understated. The authors noted that the doubling of risk for septal defects may actually be understated (*i.e.,* "biased to the null") because Zofran exposure was based on a prescription registry, which can overstate the number of Zofran exposures when women who are prescribed the medication do not actually take it. The authors wrote "it is not known if the women who filled a prescription actually took the drug during the organogenetic period, a phenomenon which results in a bias of the risk estimate towards null."[32]  This is not mere speculation:  "Noncompliance in the use of prescribed medication may be frequent among pregnant women owing to their fear of fetotoxic side effects."[33] This is especially true with anti-nausea medication. As noted by Plaintiffs' birth defects epidemiology expert, "[b]ecause this is a drug that is typically used on an "as needed" basis, a notation of a prescription

---

results is called an "adjusted odds ratio," which takes into account the effect due to all the additional variables included in the analysis.

[32] *Id.* at 136.

[33]  Olesen, et al., Do Pregnant Women Report Use of Dispensed Medications? *Epidemiology*: Sept. 2001 – Vol. 12 - Issue 5 at 497–501.

in the medical record may not reflect actual consumption of the drug."   Louik Rep. at 35. There is reason to believe that the degree to which the results may be understated is substantial.   For example, a Danish study of medications used by pregnant women found that "[t]he overall compliance to drugs purchased within 120 days before the interview was 43% (95% confidence interval: 40–46)."[34]

### (b)   Zambelli-Weiner, et al.

The Zambelli-Weiner, *et al.*,[35] study (published in November 2018) analyzed Zofran exposure during the first trimester matched to birth defect outcomes, utilizing claims data spanning 15 years, from 2000 to 2014, based on data from a large U.S. medical claims database.   The authors stated objective was to design a study that addressed certain limitations in prior studies, specifically: "recall bias, exposure misclassification, low exposure prevalence, and small sample sizes that reduce study power…." Regarding the problem noted above (in connection with the Danielsson study) about exposure misclassification that can lead to an understatement of the risk, the Zambelli-Weiner investigators addressed that concern:

> One of the largest risks of bias to pharmacoepidemiologic studies utilizing prescription claims as a marker of exposure is that the prescription may not be representative of actual exposure. We addressed this risk of bias by setting a more stringent exposure definition where the probability of exposure is near certain: ondansetron administered in a medical or hospital setting."[36]

---

[34] *Id.*

[35]   Zambelli-Weiner A., et al. First Trimester Ondansetron Exposure and Risk of Structural Birth Defects. *Repro Toxicol* October 29, 2018 [Accepted Manuscript].   This paper was not a published and peer reviewed full paper at the time of "Science Day." It was a published "abstract." It was accepted for publication in October 2018.   In addition, as disclosed by the authors, although "there was no outside involvement in study design; in the collection, analysis and interpretation of data; in the writing of the manuscript; and in the decision to submit he manuscript for publication, [a]s an organization TTi reports receiving funds from plaintiff law firms involved in ondansetron litigation and a manufacturer of ondansetron."   April Zambelli-Weiner is one of the co-author/investigators of this study. She is the President of TTi Health Research & Economics (TTI).

[36] *Id.* at 11.

In a primary analysis,[37] the investigators focused on heart defects and orofacial clefts. In a secondary analysis[38] they focused on a number of more specific birth defects.  They found statistically significant increased risks for a number of heart defects, including a 43% increased risk for heart defects as a group, reporting an adjusted odds ratio (aOR):  aOR =1.43 (CI 95% 1.28–1.61).  For septal heart defects as a group, the study reported an adjusted odds ratio (aOR) = 1.44 (95% CI 1.28–1.62) (a 44% increase in risk), and also reported statistically significant increased risks for three specific types of septal defects, ranging from a 29% increase in risk to a more than doubling of risk:

- Atrial septal defects (ASD): aOR = 1.49 (95% CI 1.32–1.69)

- Ventricular septal defects (VSD): aOR = 1.29 (95% CI 1.03–1.61)

- Atrioventricular septal defects (AVSD): aOR = 2.71 (95% CI 1.62–4.52)

Zambelli-Weiner also found increased risks for hypoplastic left heart syndrome aOR = 2.12 (95% CI .88–5.12) (not statistically significant), and for other circulatory defects aOR = 1.75 (95% CI 1.39–2.20) (statistically significant).

While noting that the study had limitations (as is the case with all observational studies), Dr. Louik found that it also had "many strengths, including its large size, the attempt to reduce or eliminate exposure misclassification, and some effort to control confounding."  Louik Rep. at 35. The primary analysis in the Zambelli-Weiner study had over 5000 first trimester exposures to Zofran, which is 4 times the number of Zofran exposures in the Danielsson study, and many times more exposures than other studies, discussed below.  The study adjusted for potential confounders, and as noted above, a particular strength of the study was that the investigators avoided exposure

---

[37] The primary analysis focused on cardiac defects and oral-facial clefting.
[38] The secondary analysis assessed the risk for a range of specific heart and orofacial cleft birth defects.

misclassification by focusing on medically administered Zofran, where it is known that the women

actually took the medication.

(c)        <strong>Andersen, <em>et al.</em></strong>

A third human epidemiologic study, by Andersen, <em>et al.</em> reported results for heart defects in

two abstracts (one was published), and the lead investigator also presented the study at Motherisk,[39]

where the presentation was recorded.  This study, although an abstract, has been relied on by

experts in the field outside of this litigation, and has been cited repeatedly in the Zofran medical

literature.[40] The investigators reported that first trimester exposure to Zofran was associated with a

statistically significant increased (more than doubling) of risk of heart defects (aOR=2.0 (CI 95%

1.3–3.1) generally, that was broken down as follows: an increased risk of atrial septal defects

(ASD): aOR = 2.1 (CI 95% 1.3–3.6), ventricular septal defects (VSD): aOR= 2.3 (CI 95% 1.2–4.2)

and atrioventricular septal defects (AVSD): aOR =4.8 (CI 95% 1.5–15.1).

> As noted by Dr. Louik, who reviewed the Andersen presentation video:
>
> The video describes the record linkage system used to form the analytic database…. Dr. Andersen states that the odds ratios …are adjusted for potential confounding by maternal age, parity, education, year of conception, maternal smoking, and multiple births using multiple logistic regression techniques.  In addition, the video includes results of analyses to address possible confounding by indication….  The results of those do not demonstrate an increased risk for heart defects, thus strengthening the likelihood that the observed association with ondansetron is real.

Louik Supp. Rep. (Oct. 16, 2018).[41]

---

[39] Motherisk is a clinical and research program at The Hospital for Sick

children in Toronto, Ontario, Canada, established in 1985 as a teratogen information service to provide evidence-based safety information on exposures in pregnancy.  http://www.motherisk.org/women/index.jsp.

[40] Danielsson 2014, <em>supra</em>; Parker SE, et al, National Birth Defects Prevention Study. Ondansetron for treatment of nausea and vomiting of pregnancy and the risk of specific birth defects. <em>Obstet Gynecol</em> 2018 Aug; 132(2):385–394; Carstairs SD., Ondansetron Use in Pregnancy and Birth Defects: A Systematic Review. <em>Obstet. Gynecol.</em> 2016; 127(5):878–83.

[41] GSK expert Dr. Scialli has acknowledged that "unpublished data may be useful if available in sufficient detail for an evaluation and if derived from a source that is known to use reliable internal or external review standards."  Scialli, Causation in Teratology-Related Litigation, <em>Birth Defects Research</em> (Part A) 73:421–23 (2005).

47

### (d)    Pasternak, *et al.*

A fourth study, Pasternak, *et al.*[42] published in the *New England Journal of Medicine*, reported results for "major birth defects" as the primary analysis but, in a supplement, also reported data for specific defects. For ventricular septal defects, the crude hazard ratio was 1.4 (not statistically significant) as calculated by Dr. Louik.  Louik Rep. at 45 (Table); Louik Dep. at 175:17–176:3.

As noted above, epidemiologists do not disregard a study result just because the result is not statistically significant.  Kimmel Dep. at 214:23–216:9 (defense epidemiology expert), because "absence of statistical significance should not be mistaken for absence of effect," Shaw Dep. at 92:2–93:13.

### (e)    Parker, *et al.*

In contrast to the above described studies, in the published Parker study[43] the authors wrote: "For both groups of septal defects explored, ventricular septal defect and atrial septal defect secundum, there was no increased risk associated with ondansetron."  However, for both ASD and VSD the upper bound of the 95% confidence interval was greater than 1.0:  The upper bounds were 1.3 and 1.4 for VSD and 1.3 and 1.2 for ASD. Therefore, the results were also consistent with elevated risks.[44] Dr. Louik testified that while the Parker results for the Slone arm of the study "don't confirm [prior studies showing an association], [they] …[are] not inconsistent on the VSD [ventricular septal defect] side with previously reported odds ratios because the confidence interval …includes previously reported elevated odds ratios."  Louik Dep. at 227:4–228:5.  In addition, "it is

---

[42]  Pasternak B, et al. Ondansetron in pregnancy and risk of adverse fetal outcomes. *NEJM*, 2013; 368:814–23.

[43]  Parker SE, et al, National Birth Defects Prevention Study. Ondansetron for treatment of nausea and vomiting of pregnancy and the risk of specific birth defects. *Obstet Gynecol* 2018 Aug; 132(2):385–394.

[44] According to GSK's birth defect epidemiology expert Dr. Shaw: "The upper bound reflects the probability that the -- that that is where the highest … estimate would be observed with the statistical parameters that you placed around it such as 95 percent." Shaw Dep. at 45:25–46:4.

important to understand that replication and consistency do not mean that every single study will find the exact same association and magnitude of risk." Berard 2016, at 127.

Both Plaintiffs' and GSK's epidemiology experts agree that notwithstanding some limitations, this was a very good study.

### 3. Multiple Human Epidemiological Studies, Published in the Peer-Reviewed Medical Literature, Found that Zofran is Associated with Statistically Significant Increased Risks of Cleft Palate.

Two human epidemiologic studies, both published and peer reviewed, found statistically significant increased risks for first trimester Zofran use and cleft palate. A third published and peer reviewed study reported increased risks for cleft palate and also orofacial clefts generally. The results of that study did not meet the conventional definition of statistical significance.

### (a) Anderka, *et al.*

Anderka, *et al.*,[45] published in 2011 in *Birth Defects Research* (a peer reviewed journal) reported a more than doubling of risk of cleft palate, aOR= 2.37 (CI 95% 1.18–4.76). Dr. Carol Louik, a birth defects epidemiologist, and a Plaintiffs' expert witness, is one of the study investigators and co-authors. GSK's epidemiology experts Drs. Kimmel and Shaw identified a number of strengths for the Anderka study. Anderka was based on data collected in the National Birth Defects Prevention Study (NBDPS). GSK's expert Dr. Shaw testified: "[NBDPS is] the largest case-control study on birth defects that's ever been conducted in the United States… this study [was]…well-powered to look at exposures that are relatively rare, and …the analysis was done well." Shaw Dep. 211:13–212:9. *See also* Kimmel Dep. pp. 232:17–233:15 ("The identification of …birth defects, is done very well. The reviews are done very well…. They have

---

[45]   Anderka M, et al. Medications used to treat nausea and vomiting of pregnancy and the risk of selected birth defects. *Birth Def Res*. 2011; 94:22–30.

clinical geneticists who review the cases so that they can make proper criteria of isolated versus multiple defects… They have a reasonable method of exposure measurement.").

### (b)    Parker, *et al.*

The second study, Parker, *et al.*,[46] (discussed, *supra* for its findings on heart defects) published in the peer-reviewed journal, *Obstetrics and Gynecology*, reported a 60% increase in risk for cleft palate in the NBDPS arm of the study from a different timeframe used in the Anderka study. The investigators found no increased risk in the other arm of the study. The authors wrote:

> "for cleft palate, the association with ondansetron was elevated in the National Birth Defects Prevention Study but not the Birth Defects Study. Adjusted ORs were 1.6 (95% CI 1.1– 2.3) in the National Birth Defects Prevention Study and 0.5 (95% CI 0.3– 1.0) in the Birth Defects Study."

According to GSK's epidemiology expert Dr. Shaw: Parker, *et al.* "was large, used two distinct databases, investigated many birth defects groups that were well-ascertained, and controlled for potential confounders, particularly confounding by indication (including nausea severity by eliciting information on prescription antiemetic use other than ondansetron)." Shaw Rep. at 14.

### (c)    Zambelli-Weiner, *et al.*

A third published and peer reviewed study, Zambelli-Weiner (discussed *supra* at A (ii)) reported increased risks for orofacial clefts generally and for cleft palate. These results, although elevated, did not meet the conventional definition for statistical significance which the investigators attributed to small sample size. For orofacial clefts as a group, the investigators reported a 32% increase in risk: aOR =1.32 (95% CI 0.75–2.25) and the risk also was elevated for cleft palate, cleft lip, and cleft lip, with or without cleft palate:

- Cleft palate: aOR = 1.46 (95% CI 0.81–2.65).

---

[46] Parker SE, et al., National Birth Defects Prevention Study. Ondansetron for treatment of nausea and vomiting of pregnancy and the risk of specific birth defects. *Obstet Gynecol* 2018 Aug; 132(2):385–394 (hereinafter, Parker 2018).

- Cleft lip: aOR = 1.16 (95% CI 0.48–2.81).

- Cleft lip, with or without cleft palate: aOR = 1.69 (95% CI 0.84–3.40).

### 4.    No Reliable Conclusions Can Be Drawn About the Risk of Specific Birth Defects from Studies that Were Neither Designed Nor Powered to Assess the Risk of Specific Defects.

A number of studies found no increased risk of birth defects for Zofran.  Plaintiffs anticipate that GSK may contend that Plaintiffs' experts are ignoring these studies.  Plaintiffs' birth defects epidemiology expert considered these studies and for good reason determined that they are not particularly informative regarding the general causation issues in this case.  These studies lacked "power" (*i.e.,* they were too small, primarily because there were not enough women exposed to Zofran in the first trimester) to assess the risk of specific birth defects like septal heart defects or cleft palate.

It is well recognized that low statistical power increases the probability of Type II error (false negative), *i.e.,* it reduces the probability of detecting a difference between groups (*i.e.,* a difference between birth outcomes in women taking Zofran in the first trimester and women who do not) where a difference actually exists. "The probability of committing a Type II error is a function of power…. [t]o decrease Type II error, one should increase the sample size in order to detect an effect size of interest with adequate statistical power."[47]

In the text book *Epidemiology in Medicine*, Hennekins and Buring wrote: "[I]f a study is of inadequate sample size, then a finding of no statistically significant association between exposure and disease…may well be uninformative since a true lack of association will be difficult or impossible to distinguish from a true association that cannot be detected statistically because of

---

[47]  Kaur, et al., Type I, II, and III statistical errors: A brief overview. *BIOSTAT.*  2017; 3 (2):268-270.

inadequate power."[48] Therefore, as noted in the *Reference Manual*, "when a study fails to find a statistically significant association, an important question for … a birth defect epidemiologist is whether the result tends to exonerate an agent's toxicity or whether it is just inconclusive with respect to that question. The concept of power can be helpful in evaluating whether a study's outcome is exonerative or inconclusive." *Ref. Man.* at 582.

This raises the question: what conclusions can be drawn from the under-powered Zofran studies about the absence of risk of specific defects like septal heart defects or cleft palate? The answer is that no reliable conclusions can be reached about the absence of risk for specific defects from these underpowered studies. The court need not rely on Plaintiffs' lawyers or experts on this point.  GSK's epidemiology expert Dr. Kimmel acknowledged "[i]f a study has insufficient power to detect an effect …the study cannot determine if there is or is not an association."   Kimmel Dep. at 132:11–133:6,[49] and GSK expert Dr. Shaw agreed, testifying that "studies can have sample sizes that are insufficient to rule out increases in risk … for some types of birth defects."   Shaw Dep. at 90:24–91:24. And, as noted below, the study investigators for these studies also acknowledged that their studies lacked power to assess the risk of specific birth defects.

### (a)    Pasternak, *et al*.

The above point is well-illustrated in a study by Pasternak, *et al.*,[50] published in the *New England Journal of Medicine*. The study focused on "any major birth defect," (and other non-birth defect outcomes) and found that Zofran was not associated with an increased risk of "major birth

---

[48] Hennekens C, Buring, JE. *Epidemiology in Medicine*. Boston/Toronto: Little, Brown and Company; 1987, at 264–5.

[49] Plaintiffs agree with only part of the above statement by Dr. Kimmel. If an underpowered study actually finds an association, the finding is not invalidated or diminished just because the study was underpowered. However, Plaintiffs and the medical literature agree that an under-powered study that does not find an association between an exposure and a birth defect, cannot provide assurance that a Type II error has not occurred.

[50]  Pasternak B, et al. Ondansetron in pregnancy and risk of adverse fetal outcomes. *NEJM* 2013; 368:814–23.

defects." The Pasternak investigators reported that there were only "1233 infants exposed to ondansetron in the first trimester."   Because specific birth defects are, by definition, rare as compared to "any major birth defect" and thus require a much larger number of infants exposed to Zofran to assess the risk of specific defects, the investigators acknowledged that "our study was not powered to assess the risks of individual defects; this question needs to be addressed in future, adequately powered studies."[51]   For this reason, studies like *Pasternak, et al*. cannot be used to draw conclusions about the risk of specific defects. Indeed, REDACTED ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

     **(b)**        **Colvin, *et al*., Asker, *et al.*, Ozdemerci, *et al.*, and Werler, *et al.***

There were other published studies, which like Pasternak, lacked power to detect specific defects. For example, a study by Colvin, *et al.*, included only 251 pregnant women exposed to Zofran in the first trimester. The study investigators acknowledged that "the study was too small to assess risks of individual birth defects…"[52]   In a study by Asker, *et al.*, there were just 21 women

---

[51] *Id*. at 822.

[52]   Colvin L, et al. Off-label use of ondansetron in pregnancy in Western Australia. *BioMed Res* Intl 2013:909860, at 6. Although a finding of no association in a study that lacks power prevents drawing reliable conclusions about the absence of risk of specific defects, the lack of power does not prevent such studies from finding associations with an increase in risk, and that was the case here.   As the Colvin investigators reported, even though the study lacked power to assess specific birth defect risks, the study found a six-fold increase in the risk of "obstructive defects of renal pelvis and ureter (6.2; 2.0–19.5)." *Id*.

exposed to Ondansetron in the first trimester.[53] The investigators of another study, with just 100 pregnant women exposed to Zofran, stated "our cohort was not powerful enough which forms the major limitation of our study."[54]   In a study by Werler, *et al.*, the authors noted that "despite the large case group, the study lacked statistical power to detect small …associations of rare exposures."[55]

### (c)   Einarson, *et al.*

Einarson, *et al.*,[56] used a prospective cohort design to study birth defects among Zofran users, but there were only 176 women in that study who took Zofran in the first trimester. The investigators acknowledged that the study had "small sample size" and "thousands of cases would be required to detect rare defects."[57] One published paper commented that the Einarson study "had the statistical power to rule out only a 5-fold increased risk of major malformations, and not any specific malformation"[58] (*i.e.,* the study was under-powered to detect a less extreme association, such as a doubling or tripling of risk).

REDACTED

REDACTED

---

[53] Asker C, Norstedt Wikner B, Källén B. Use of antiemetic drugs during pregnancy in Sweden.  *Eur J Clin Pharmacol* 2005; 61(12):899-906, Table 1.

[54]   Özdemirci S, et al. The safety of ondansetron and chlorpromazine for hyperemesis gravidarum in first trimester pregnancy. *Gynecol Obstet Reprod Med* 2014; 20:81-84 at 83.

[55] Werler MM, et al. Medication use in pregnancy in relation to the risk of isolated clubfoot in offspring. *Am J Epidemiol* 2014;180:86-93, at 92.

[56]   Einarson A, et al. The safety of ondansetron for nausea and vomiting of pregnancy: a prospective comparative study. *BJOG* 2004; 111:940-3.

[57] *Id.* at 942.

[58]   Koren, Treating morning sickness in the United States—changes in prescribing are needed. *Am J. OBGYN* 2014; 211 (6): 602-606, at 604.

[59] Button, et al, Power failure: why small sample size undermines the reliability of neuroscience. *Nature Reviews Neuroscience 2013*; 14: 365–376.

REDACTED

"False negatives are particularly concerning in research areas where demonstrating the absence of an effect is crucial…"[60] REDACTED

And although earlier in this litigation, GSK filed a brief touting a study by Fejzo, *et al.*,[61] because that study did not find an increased risk of birth defects with Zofran use, (Doc.  # 992 filed 4/20/18) that study also was under-powered and had other major problems.   According to GSK's birth defects epidemiologist Dr. Shaw, the Fejzo study "… has a number of limitations, including its small size and its non-rigorous methods of identifying subjects for study and eliciting exposure information from them. So, I don't consider that very informative."  Shaw Dep. 208:22–209:15.

It should be noted, however, that where an underpowered study does find an association between exposure and disease, that finding is not invalidated on account of the study's power. Shaw Dep. 159:24–164:17. Plaintiffs' birth defect epidemiology expert Dr. Carol Louik explained: "[Y]ou don't look at power, …when a study has found an association, you don't go back and say, well, it didn't have enough power to find that association that it found. It found it. It's not a question of power at that point." Louik Dep. 234:10–23.

---

[60] Vadillo, et al, Underpowered samples, false negatives, and unconscious learning. *Psychon Bull Rev*. 2016; 23: 87–102.
[61] Fejzo M, et al. Ondansetron in pregnancy and risk of adverse fetal outcomes in the United States. *Repro Toxicol* 2016;62:87–91.

### 5. Zofran Studies that Focus on "Major Birth Defects" Can Mask Associations with Specific Birth Defects.

A number of Zofran/ birth defect epidemiologic studies focused on "major malformations" or "major defects" and not specific birth defects, like cleft palate, or septal heart defects.   These cases raise two important issues:

(1) Because specific defects are by definition a subset of, and therefore, rarer than "major malformations" these major malformation studies require less power than studies designed to assess the risk of rarer specific defects.  Louik Dep. at 375:18–25.  As a result, these studies are frequently underpowered to assess the risk of specific defects.  Louik Rep. at 31.  ("[P]harmacoepidemiologic studies must consider rates of specific birth defects, which has a dramatic effect on sample size requirements, both for estimating risk and providing assurances of safety.")

 (2) Studies focusing on major malformations can "mask" the risk of specific defects. *See Ref. Man.* at 590.  When a study only assesses "major malformations" and is not designed to assess the risk of specific defects "[b]ehind this OR may be hidden a risk increase for a subgroup of malformations, e.g., cardiovascular defects."[62]

The "major malformation" studies (e.g., Pasternak, *et al.*; Einarson, *et al,* Colvin, *et al*., Ozdemirci, *et al*.,) present <u>both</u> of these concerns; *i.e.,* (1) lack of power to assess specific birth defects risks, and (2) focus on major birth defects, which can "mask" the detection of increased risk of specific defects.  As a result, if these studies do not find an association with a "major defect," certainly no reliable conclusions can be drawn from those findings about the risk of specific defects.

---

[62]   Danielsson B, et al. Use of ondansetron during pregnancy and congenital malformations in the infant. *Repro Toxicol* 2014; 50:134-7, at 136.

6.     **Multiple Epidemiological Studies Are Not Required for Each of the Numerous Types of Heart Defects and Orofacial Clefts.**

Plaintiffs anticipate that GSK will contend that because cardiovascular defects and orofacial clefts are not single disease entities, that multiple epidemiological studies are required to establish general causation for each specific alleged injury.  Dr. Baldwin's schematic lists 26 different types of heart defects on page 8 of his report, REDACTED

.  Dr. Shaw, GSK's birth defects epidemiologist, testified that "there are numerous congenital heart defects that fall within [the] larger category [of congenital heart defects]." Shaw Dep. 145:14–19.  Essentially, GSK's argument would mean that to prove general causation for orofacial clefts and for congenital heart defects, Plaintiffs would need between 50 and 100 more epidemiologic studies.  The Court should reject this argument because it runs counter to the law and to scientific standards.  *See* Section II (B), (C), Section III (B), (C), *supra*.

As noted above, scientists and courts have noted the limitations of epidemiologic studies to address rare injuries, and the real-world limitations of the need for extremely large studies to assess risks of rare outcomes, coupled with the prohibitive cost of doing studies on every specific injury related to every drug exposure. That discussion need not be repeated here, but it is worth noting that these barriers could be overcome by a pharmaceutical company like GSK with the resources and with the vested interest to understand the risks of its drugs.  For well over a decade the medical literature has reflected concerns that Zofran causes birth defects but GSK has not undertaken to meaningfully conduct or sponsor the necessary studies, yet GSK seeks to avoid liability in these cases by arguing that dozens of *additional* studies are needed for Plaintiffs to prove general causation for the alleged injuries.

Moreover, as detailed above, there is no legal requirement, and no requirement in the field of teratology or epidemiology, that general causation requires multiple epidemiologic studies for each specific injury.   That is because it is accepted in birth defects epidemiology that:

> Pooling or lumping of congenital malformation groups is an accepted methodology and is both recommended, essential, and valid when the defects being studied originate from the same embryological/developmental stages or periods. This is the case for heart defects or neural tube defects, where results for the overall organ system can be applied to specific defects present in the organ grouping.[63]

As noted by Dr. Shaw, GSK's expert in birth defects epidemiology, "lumping of birth defect types is a valid approach only if the birth defects being lumped have an underlying pathogenesis that is similar;" *i.e.,* "if there is an underlying biologic basis to lump or an underlying etiologic reason to lump." Shaw Rep. at 5; Shaw Dep. at 98:25–99:21.  Defense epidemiology expert Kimmel also agreed that the key issue is whether there are shared "embryological pathways."  Kimmel Rep. at 9.  In addition, as Dr. Louik stated (Louik Rep. at 6):

> For example, neural crest cells in the earliest stages of embryogenesis migrate to form a variety of structures, including those of the face/ears, parts of the heart, and the neural tube. Interference with the normal development of the neural crest would ha[ve] been reported to produce malformations of tissues derived from neural crest, and that phenomenon has been observed in a number of animal experiments. In fact, these patterns have also been observed for certain human teratogens.

As detailed below, the common pathogenesis is that Zofran causes heart arrhythmias in the mother and the fetus, leading to blood flow interruption, and oxygen deprivation (hypoxia).  Regular blood flow and oxygen are necessary for normal development of the cardiovascular and orofacial tissue.[64]

---

[63]   Berard 2016, at 126; *see also* B.L. Strom, S.E. Kimmel, S. Hennessy, *Pharmacoepidemiology,* 5th ed., 2012.

[64]   Graphic adapted from, Danielsson, et al., *Initiation of Phenytoin Teratogenesis: Pharmacologically Induced Embryonic Bradycardia and Arrhythmia Resulting in Hypoxia and Possible Free Radical Damage at Reoxygenation*, Teratology 56:271-81 (1997).



An appropriate approach is to create categories that reflect the embryologic tissue of origin. "Case classification may allow for infants with anatomically different, but presumed pathogenetically similar, defects to be combined to increase the power of a study." Baldwin Dep. at 98:6–99:7. Grouping structural defects by mechanistic etiology is an accepted methodology and provides a rational basis for aggregating cases. Baldwin Dep. at 91–92. In this regard, focusing on hemodynamics provides a rational basis for aggregating categories of cardiovascular defects because hemodynamics is probably the most important function of altering the structure of the heart. Baldwin Dep. at 94:1–15.

The implication of the foregoing is that there is no need for additional epidemiologic studies on every specific type of heart and orofacial birth defect. The existing science, taken as a whole, is sufficient.

C.   *LINE OF EVIDENCE 3*: THE ZOFRAN ANIMAL TERATOLOGY STUDIES THAT ACHIEVED MEANINGFUL EMBRYONIC EXPOSURE REVEALED THE SAME AND SUBSTANTIALLY SIMILAR TERATOGENIC EFFECTS AS REPORTED IN PUBLISHED EPIDEMIOLOGY STUDIES FOR ZOFRAN.

In Zofran animal teratology studies where the animals were properly exposed at or slightly above human exposures, the animals had increased incidences of malformations and deaths

compared to untreated controls. Studies that did not find evidence of teratological effects under-dosed the animals.

REDACTED

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████  GSK's experts similarly failed to consider the animal embryo's exposure. York Dep. at 71:20–72:3; Baldwin Dep. at 247:2–12; Scialli Dep. at 281:22–282:5; Roth Dep at 84:10–21 and 177:7–25; Obican Dep. 232:22–233:3.

According to the ICH, information on systemic exposure of pregnant animals is "essential for the interpretation of study results, and thus to assess human safety."[65]  An evaluation of animal teratology studies should therefore compare animal and human pharmacodynamic effects, animal and human metabolism and disposition, animal and human pharmacologic and toxic effects, and drug exposures in animals studies in relation to the highest proposed dose in humans.[66]

REDACTED

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

---

[65] ICH S5 (R3) Final Concept Paper (Mar. 27, 2015), York Dep. Ex. 27-A.
[66] FDA Guidance for Industry, Reproductive and Developmental Toxicities – Integrating Study Results to Assess Concerns (Sept. 2011), York Dep. Ex. 31.

REDACTED

REDACTED

1.     **Studies That Dosed Too Low To Achieve Human Exposure Concentrations Do Not Undermine a Causal Inference That Zofran Can Cause Birth Defects.**

REDACTED

The low dose used in an animal teratology study should generally achieve an exposure that is a low multiple (e.g., 1 to 5-fold) of the human exposure at the MRHD [maximum recommended human dose]." ICH S5 (R3) at 19.  Under the ICH guidelines for evaluating teratology studies,

therefore, REDACTED

REDACTED

REDACTED This conclusion comports with Wilson's Sixth Principle of Teratology: low doses may exert no or very little toxicity or teratogenicity, while higher doses are expected to increase the incidence and severity of the observed malformations and embryofetal death.[67]   As discussed below, the animals that were exposed at or slightly above human exposures had increased incidences of malformations and deaths compared to untreated controls.

> **2.** **Studies That Dosed High Enough to Meet or Slightly Exceed Human Exposure for a Short Time Provide Evidence of Zofran's Ability to Cause Birth Defects.**

REDACTED

REDACTED

---

[67] *See also*, *e.g.*, Obican Dep. at 2014:8-17 ("Q. If I took a gallon of water, okay, and I took an eyedropper and I put one drop of gasoline, regular gasoline in that gallon of water and I drank that gallon of water over the next three days and nothing happened to me, okay, can you assume that it's safe to drink gasoline?   MS. CANAAN: Objection.   A. I can't assume that. I can't tell you one way or the other. I'm not an expert in gasoline.").

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

### 3. The Findings of Increased Malformations and Deaths in the Zofran-Treated Groups Are Biologically Significant for Causal Inference in Humans.

REDACTED

Under the ICH Guidelines, all animal exposures under 25 times higher than the human exposure should be regarded as of potential human relevance, the risk for human relevance increases with low safety margins.  ICH S5 (R3), at 27.

REDACTED

Second, according ICH, if similar malformations (e.g. cardiovascular defects and orofacial defects) are observed in two species, knowns as "cross-species concordance," this is strong supporting evidence for teratogenicity in humans.  *Id.* at 24.  REDACTED

Third,  REDACTED

REDACTED . The ICH

guidelines direct experts to consider available data on Zofran "and any related compounds," such as

other hERG blocking drugs. ICH S5 (R3), at 24; Abdulla Dep. at 218:21–219:9. REDACTED

REDACTED

| | | |
|---|---|---|
| REDACTED | REDACTED | REDACTED |

Fourth, "[k]nowledge of the mechanism of reproductive or developmental effects identified in animal studies can help to explain differences in response between species and provide information on the human relevance of the effect." ICH S5 (R3) at 25; Sadler Dep. at 238:7–15; Friedman 2017 ("Knowledge of the mechanism of action may help to determine whether a particular exposure is likely to have caused an infant's birth defects.").

Concern for a risk in humans is increased based on an adverse finding in animals where the drug has been associated with a teratogenic mechanism of action. ICH S5 (R3), at 24. The evidence summarized below describes the likely mechanism by which Zofran causes birth defects. The key element is heart rhythm disturbance interfering with normal organ development. Zofran disturbs heart rhythm by blocking the hERG channels in human heart cells. Critically, the hERG channel is of major importance for cardiac rhythm regulation in the embryonic heart in several investigated species, including zebra fish, chickens, mice, rats and humans in embryonic development. Baldwin Dep. at 159:18–160:2.

With the hERG channel playing a critical role in rhythm regulation across species, with the animals' teratogenic effects occurring at Zofran exposure concentrations at or near the human concentrations, with the same types of defects occurring in animals and in humans, and with the same types of defects occurring with Zofran and with other hERG blocking drugs known to be teratogenic, it is difficult to conceive of a stronger case for inferring human causal probability from a review of the animal studies and human studies together.

4. **GSK's Anticipated Arguments That the Zofran-Induced Malformations and Embryonic Deaths Were Due to Chance and Maternal Toxicity Are Invalid.**

Plaintiffs anticipate that GSK will argue that chance best explains the increased incidence of a number of typical hERG malformations observed in the Zofran-treated groups. REDACTED

REDACTED This argument is invalid in several respects, beginning with the fact it evades the ICH guidelines that govern interpretation of animal studies, which state that the "interpretation of study data should rely primarily on comparison with the concurrent control group." (ICH S5 (R3) at 23; Danielsson Dep. at 222:9–15.) The concurrent controls are the best comparison group because they are the same species of animal born at the same time as the treated groups. Danielsson Dep. at 241.

Here, the Zofran-treated groups had increased malformations and deaths compared to the concurrent controls. Recognizing this unavoidable fact, GSK's experts still attempt to blame the Zofran-induced malformations on "chance" by pointing to a book chapter that reported incidences of malformations in rats from laboratories other than the laboratory that performed the study. This approach, too, contravenes the ICH guidelines, which state that "*the individual laboratory's* [i.e., the one that performed the study] recent historical control database, if available, is preferred over data compilations from *other laboratories*." ICH S5 (R3) at 23; Danielsson Dep. at 241:5–8.

REDACTED

GSK's experts' reliance on an unrelated book chapter as its ground to blame the Zofran-induced malformations on "chance" is a non-sequitur. Around 1680 a Dutch painter produced a painting of a baby with phocomelia (the most typical thalidomide-induced malformation). In the 1950s, humans prenatally exposed to thalidomide began to be born with phocomelia. Certainly the

Dutch painting could not reasonably have been relied on as an argument that the thalidomide malformations were due to "chance."   The same is true of the Zofran-induced malformations.

In all events, the book chapter relied on by GSK's experts reported large variations in specific malformations (such as ventricular septal defects) among various laboratories; in some laboratories, ventricular septal defects were not observed at all, while in some other laboratories relatively high incidences were observed.   Danielsson Dep. at 261.   The fact that an individual laboratory, at a single occasion, may have had a control group with the same incidence of ventricular septal defects does not support the conclusion that chance explains the observed exposure-dependent occurrences of ventricular septal defects in two different Zofran studies.   *Id.* Furthermore, this argument by GSK fails to account for other important factors mentioned in the ICH guidelines when evaluating fetal adverse effects, namely class alerts and available mechanistic information as discussed above.   That other potent hERG blockers induce ventricular septal defects (class affects) and that the mechanism for induction of ventricular septal defects is known for hERG blockers, make it highly unlikely that "chance" could have caused the ventricular septal defects seen in the Zofran teratology studies.[68]

---

[68] REDACTED

Plaintiffs anticipate that GSK also will argue that its animals were dosed until signs of maternal toxicity (*i.e.*, some clinical symptoms in the mother animal) were observed, and that this methodology of dosing complied with industry practices when the studies were conducted in the 1980s.  This argument misses the point.  Whether GSK's animal studies complied with its industry practices is a liability issue (that Plaintiffs contest).[69]  The point is that GSK's experts' failure to consider whether the animal embryos were exposed at all, or in what concentration or duration. This renders their conclusions about whether the observed malformations were treatment-related and relevant to human teratogenic risk inherently unreliable.  GSK's anticipated argument also ignores the fact that a low dose used in an animal study should generally achieve an exposure that is a low multiple (e.g., 1 to 5-fold) of the human exposure at the MRHD [maximum recommended human dose]."  (ICH S5 (R3) at 19.)

Here, the low doses in GSK's animal studies failed to achieve an exposure that is even equal to the human exposure, let alone 1 to 5-fold higher than it.  (Danielsson, Webster & Ritchie 2018 and Danielsson Rep. at 40.)  Indeed, the high doses in all studies but three failed to achieve an exposure equal to human exposure, and the three where exposure did exceed human exposure reported an increased incidence of teratogenic effects (death and malformations) in Zofran-treated animals compared to concurrent controls.  Under these circumstances, GSK's experts cannot reliably conclude that the GSK's animal studies constitute evidence indicating that Zofran was not teratogenic in animals, or that that animal studies support the conclusion that Zofran is not likely capable of causing birth defects in humans.

REDACTED

."

---

[69] According to ICH, "where systemic exposure cannot be achieved or only small multiples of the [human] clinical systemic exposure are achieved in the absence of maternal toxicity," a different route of administration should be considered." (ICH S5 (R3) at 16.)  Alternatively, a different species, such as a monkey, should have been used.  (Danielsson Supp. Rep. at 14.)

In addition, to the extent that GSK may point to the high incidence of embryonic death in animals given another hERG blocking drug, ibutilide, in an effort to argue that the Zofran-induced malformations are somehow insignificant, the argument is invalid.  In contrast to Zofran, much higher ibutilide doses than the human therapeutic were used in the ibutilide study. (Marks and Terry 1996) (using oral doses of 20, 40 and 80 mg/kg of ibutilide).  However, due to maternal central nervous system toxicity with Zofran, such high doses were not possible for Zofran.  Instead, only exposures in the beginning of the S-shaped teratogenicity curve could be achieved so that only a slight increase of the hERG-related fetal adverse effects could be observed.  Danielsson Rep. at 14, Figure 8.  In addition, ibutilide is a much more potent hERG blocker than Zofran.[70]  According to Polak 2009, the hERG IC50 of ibutilide is 0.028, compared with Zofran's 0.81.[71]  Higher doses of Zofran would most likely have induced deaths and the same types of malformations at a comparable rate as ibutilide.

**D.**   *LINE OF EVIDENCE 4*:  **EMBRYONIC BRADYCARDIA IS A KNOWN HUMAN AND ANIMAL TERATOGEN; IT CAN CAUSE ALL FORMS OF STRUCTURAL CARDIOVASCULAR AND OROFACIAL DEFECTS DERIVING FROM THE FIRST BRANCHIAL ARCH.**

Heart rhythm disturbances are a known and established cause of heart and orofacial birth defects.  The increased incidences of cardiovascular and orofacial defects observed in human epidemiology and in exposed animals have also been caused by embryonic arrhythmias.  To understand how a pharmaceutical drug can cause a birth defect by disrupting the embryo's heart rhythm, Plaintiffs' and GSK's experts have described the delicate process of heart formation and the implications of perturbing that process.  The process is summarized below.

---

[70] Ibutilide's intended, or on-target, effect was to block the hERG channel, whereas Zofran blocks hERG as an unintended, or off-target, side effect.

[71] Polak et al., Collation, assessment and analysis of literature *in vitro* data on hERG receptor blocking potency for subsequent modeling of drugs' cardiotoxic properties, *J. of Applied Tox.*, Nov. 5, 2008.

The heart is the first organ in the human embryo to function.  Baldwin Dep. at 125:8–11.
The proper function of the developing heart is essential for the heart to complete its formation
because the heart is the only organ that must form and function at the same time.  Baldwin Dep. at
124:25–125:4.  Proper heart rhythm and blood flow, otherwise known as hemodynamics, are
necessary for the development of each part of the heart.  Abdulla Dep. at 71:16–24.

Hemodynamic function is "important for altering the structure of the heart.  It's probably the
most important one I can think of."  Baldwin Dep. at 94:1–12.  This is understandable when
considering that the heart must function adequately while undergoing enormous "morphological
maturation," that is, structural development.  Baldwin Dep. at 126:3–8.

It follows that *disruption* of hemodynamic forces, such as by altering heart rhythm, leads to
*abnormal* cardiac development.  Baldwin Dep. at 127:15–128:18.  Transformation of the heart is an
intricate and complex process, and perturbations in these processes may result in a heart defect.
Baldwin Dep. at 133:18–25.  An alteration in blood flow is a perturbation that can lead to heart
defects that are, in essence, biomechanically[72] induced defects.  Baldwin Dep. at 141:13–142:12.

The biomechanical force created by altered heart rhythm and blood flow is a form of trauma
to the heart.  Trauma can injure any portion of the heart.  Baldwin Dep. at 167:7–14.  "It could
really lead to any congenital heart disease."  Abdulla Dep. at 71:23–24.  For example,
hemodynamic forces play a role in formation of the heart's septum, and disturbed blood flow has
been shown to lead to valvular defects in the heart.  Baldwin Dep. at 136:18–137:21, and 139:24–
140:4.  In a similar way, disturbing the heart rhythm and blood flow can lead to hypoxia or anoxia

---

[72] Biomechanics is the science concerned with the action of forces, internal or external, on the living body.
*Stedman's Medical Dictionary* (28th ed 2013).

and reperfusion injury, including in the orofacial region (e.g., cleft palate).[73]   Abdulla Dep. at 254:16–25; Sadler Dep. at 26:24–27:3.  Embryos can survive a period of anoxia (lack of oxygen), but there is a price to pay, an increased risk of birth defects.[74]

Disruptions of heart rhythm that can alter blood flow include bradycardia, or slowing of the heart, which is a type of arrhythmia (irregularity of the heartbeat).  Baldwin Dep. at 240:8–16.  "Bradycardia can alter hemodynamics during the human heart's development."  Baldwin Dep. at 175:12–15.  Bradycardia itself can be a significant arrhythmia and can cause poor cardiac output (blood flow), heart failure, and thus any heart defect.  Abdulla Dep. at 252:1–11; *id.* at 32:5–8.

Pharmaceutical drugs can induce bradycardia in an embryo beginning when its heart starts beating.  REDACTED

Drugs that induce embryonic bradycardia have been shown to induce a variety of cardiovascular defects, including absence, abnormal origin, or abnormal structure of  heart vessels, ventricular septal defects and various transpositions or malposition of vessels, as well as orofacial clefts. (Danielsson Rep. at 7).

The way in which drugs, including Zofran, can cause bradycardia or an arrhythmia in the human heart is by blocking the hERG channels that exist in cardiac cells.  The hERG channel has major importance for cardiac repolarization and rhythm regulation in the embryonic heart across

---

[73] Reperfusion injury is an injury that results after an arrhythmia that is considered to be due to oxygen-derived free radicals.  *Stedman's Medical Dictionary* (28th ed 2013).  As stated in Danielsson, Webster & Ritchie 2018, at 238, orofacial clefts can be produced by hERG blockers at exposures producing severe cardiac arrhythmia and subsequent severe hypoxia/anoxia of longer duration in the embryo.

[74] Kass Dep. at 309:16–310:3 and Ex. 19 (summarizing Webster and Abela, The Effects of Hypoxia in Development, Birth Defects Research (Part C) B1:215-228 (2007)).

species in embryonic development, including human embryos. Baldwin Dep. at 149:19–150:11. The significance of drug-induced inhibition of the hERG channel was demonstrated in a remarkable study of human embryonic stem cells at Karolinska University Hospital in Sweden, which described the hERG channel expression in the human embryo's heart cells during development.[75] The Karolinska study "describes for the first time Kr and Ks channel expression and ion currents in the human heart during embryonic development."[76]

This study demonstrated that a hERG-blocking drug produced bradycardia, as a direct consequence of prolongation of action potential duration in all tested cardiac cells derived from human embryonic stem cells.[77] Based on the Karolinska study, the authors concluded REDACTED ████████████████████████████████████████████ that the study "provides further evidence of Kr [hERG] channel block as an important mechanism for embryo lethality and malformations in animal teratology studies, and it suggests that the Kr-channel block-mediated teratogenic mechanism is of human relevance."[78]

E.   *LINE OF EVIDENCE 5*:  ZOFRAN CAN CAUSE EMBRYONIC BRADYCARDIA VIA HERG BLOCKADE AT ALL DOSES AND FORMS OF ADMINISTRATION THAT GSK RECOMMENDED IN THE DRUG LABEL.

While performing a human experiment to demonstrate with 100% certainty that Zofran can cause arrhythmia in a human embryo would be unethical, Baldwin Dep. at 185:17–186:7, the following evidence demonstrates this fact to a high degree of scientific certainty. Through the hERG channel, Zofran at recommended doses has been shown to cause arrhythmias in (1) adult and children human hearts; (2) embryonic hearts in rats; and (3) adult rabbit hearts.

---

[75] C. Danielsson, Exploration of human, rat, and rabbit embryonic cardiomyocytes suggests K-channel block as a common teratogenic mechanism, Cardiovascular Research (2013) 97, 23-32 (hereinafter, the Karolinska study).

[76] *Id.* at 31.

[77] *Id.* at 30–31.

[78] *Id.*

*First*, Zofran can cause bradycardia and other arrhythmias in the adult human heart by blocking the hERG channel.  REDACTED

REDACTED

REDACTED  Ondansetron is classified by the widely accepted resource, CredibleMeds®, as being in the highest of four cardiac arrhythmia risk categories, "clearly associated with a known risk *even when taken as recommended*" (Credible Meds)." Danielsson Rep. at 6 (emphasis added); Danielsson Dep. at 348.[79]  Zofran can cause fatal cardiac arrhythmia in humans.  (FDA Drug Safety Communication (June 19, 2012)).  The Karolinska study shows that the human embryo's heart is also susceptible to blockade of hERG channels leading to bradycardia and arrhythmia by hERG blocking drugs such as Zofran.  Karolinska study at 30 and Fig. 6.

REDACTED

REDACTED

Any of the doses recommended in the drug label can cause an arrhythmia, and the dose that will cause arrhythmia in a particular patient depends on the underlying condition of the patient taking it. Abdulla Dep. at 225:19–226:24.

Zofran causes a 50% inhibition of the potassium hERG channel at a concentration of around 0.81 μM (around 300 ng/ml) in cells expressing the hERG channel.[80]  This is known as its IC50. The IC50 concentration is, however, a very prominent block, and is not a reliable threshold for

_____

[79] REDACTED

[80] Kuryshev et al., Interactions of the 5-Hydroxytryptamine 3 Antagonist Class of Antiemetic Drugs with Human Cardiac Ion Channels, JPET 295:614–20,(2000); de Lorenzi, Block of the delayed rectifier current (Ik) by the 5-HT3 antagonists ondansetron and Granisetron in feline ventricular myocytes, Br. J. Pharmacol. (1994) 527–35.

determining the concentration at which a drug is capable of causing arrhythmia.[81]  Danielsson Supp.

Rep. at 2.   According to the Redfern 2003 paper, which was jointly authored by representatives of

several global pharmaceutical companies, including GSK, the IC50 concentration needs to be

divided by at least 30 to reach an acceptable degree of human safety regarding a drug's ability to

cause cardiac arrhythmias.  Redfern 2003, § 5.3.[82]

Applying the Redfern 2003 framework to Zofran (that is, dividing the Zofran's IC50 (235

ng/ml) by 30) shows that cardiac arrhythmia can occur in humans at therapeutic concentrations.[83]

For example, in Elkomy 2015, a single 8 mg I.V. dose of Zofran (a therapeutic dose) caused peak

concentrations of Zofran of 500 ng/ml in women of childbearing potential from a single therapeutic

dose of Zofran, reaching more than double the IC50 concentration of Zofran.  Danielsson Supp.

Rep. at 3.[84] Consistent with ondansetron's hERG-blocking ability at therapeutic concentrations,

ondansetron has been shown to be associated with life threatening cardiac arrhythmia.  In both

adults and children, fatal cases due to severe cardiac arrhythmia have been associated with

ondansetron use, especially after extensive vomiting, which can cause hypokalemia (low blood

potassium levels).  (Danielsson Rep. at 34.)   The risk for hERG blockers to cause cardiac

arrhythmia is increased in predisposed individuals, due to, *e.g.*, genetic variability in humans as well

to external conditions, especially hypokalemia. (Danielsson Supp. Rep. at 3.)

---

[81]  Redfern et al, Relationships between preclinical cardiac electrophysiology, clinical QT interval prolongation and torsade de pointes for a broad range of drugs: evidence for a provisional safety margin in drug development, *Cardiovascular Research* 58 (2003) 32-45 (hereinafter, Redfern 2003).

[82]  *See also* Danielsson, Phenytoin and phenobarbital inhibit human hERG potassium channels, *Epilepsy Research*, 55 (2003) 147–57 ("As mentioned, in vitro IC50 values from HERG data are considered to overestimate free plasma concentrations associated with QT prolongation and torsade de pointes clinically (Webster et al., 2002)").

[83]  The term "therapeutic concentrations" refers to the concentration of Zofran in the human's blood plasma when the doses recommended in GSK's product labeling are ingested or administered.   The term "therapeutic doses" refers to the doses recommended in GSK's product labeling.

[84]  For a further discussion of Zofran maternal and fetal Zofran concentration from exposure to Zofran during pregnancy, see Line of Evidence 1 above, discussing placental transfer of Zofran during human pregnancy.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

***Second***, Zofran has been shown *in vitro* to cause embryonic arrhythmia in the hearts of rat embryos at concentrations that can cause bradycardia in humans and through inhibition of the hERG channel just as it does in humans. Professors at the University of Sydney demonstrated the Zofran-induced effects through whole embryo culture (*in vitro*) in testing in a rat embryo[88] and collected videos of the most pronounced effects. In their publication, the authors demonstrated that Zofran caused "severe alterations in embryonic heart rhythm" in rats.

> ***At a concentration of 1 μM (0.37 mg/L) ondansetron caused a 10% decrease in embryonic heart rate in cultured rat embryos on GD 13. This concentration is lower than the highest ondansetron concentration (0.5 mg/L) reported in a study with 20 women [41]***. At 3 μM (19% decrease) and 6 μM (29% decrease), the effects were more pronounced and the 12 μM, caused a 43% decrease in heart rate. This can be compared to the Cmax observed in human pregnancy of 0.11 mg/L (0.3 μM) p.o [40]. up to 0.5 mg/L (1.7 μM) i.v [39]. Ondansetron is ~73% protein bound [36] suggesting 0.081 μM and 0.46 μM unbound, respectively with corresponding margins of safety of 12 and 2.2. It is likely that the concentrations inducing bradycardia; and especially irregular heartbeats in rat embryos in vitro; are much higher than the plasma concentrations of ondansetron which can induce similar effects in a human embryo exposed to ondansetron. One reason for this is that embryos are continuously gassed with 95% oxygen in vitro making it impossible for them to be hypoxic. The embryo is more susceptible to hypoxia compared to the adult heart, and is more prone to develop increases in action potential duration and cardiac arrhythmias when exposed to transient hypoxia/anoxia and reoxygenation [52–54]. In addition, there are also other external factors, not existing in cultured rat embryos which are known to further exaggerate the proarrhythmic potential of hERG blocking drugs such as low potassium levels (hypokalemia), acidosis and increased temperature (fever) [55]).

. . . .

---

[87] A defendant's admissions as to levels of an agent sufficient to cause a health outcome are admissible and probative evidence on the question of whether those levels pose a health danger and the company's knowledge of that danger. *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 368 (1st Cir. 2009).

[88] It would be unethical to perform such a test on a human embryo. Baldwin Dep. at 194:23–195:4.

>*These results suggest that ondansetron has the potential to cause cardiac arrhythmia in the human embryo in the same way as observed in adults and children.*

Danielsson, Webster & Ritchie 2018, at 244.  The supporting data are presented in Table 5 of the publication.  The column at the far right is added to describe the decrease in heart rate.

**Table 5.** Adverse effects of ondansetron on embryonic rhythm. Each concentration has its own control *$p < 0.05$ compared to heart rate before addition of ondansetron (from Danielsson, Webster & Ritchie 2018)

| Concentration (µM) | Number of embryos | Heart rate before (bpm±SEM) | Heart rate after (bpm±SEM) | Heart rate change (%) | Rhythm disturbance observed |
|---|---|---|---|---|---|
| 0 | 10 | 229.2±4.09 | 224.0±4.54 | -2.1 | |
| **0.5** | 10 | 232.4±3.98 | 224.4±3.18 | **-3.3** | **Bradycardia** |
| 0 | 14 | 229.7±3.60 | 224.6±3.77 | -2.1 | |
| **1** | 11 | 229.1±3.33 | 207.6±4.75 | **-9.4** | **Marked bradycardia** |
| 0 | 10 | 229.2±3.21 | 222.4±3.05 | -2.9 | |
| **3** | 12 | 227.7±2.48 | 183.0±4.32* | **-19.6** | **Pronounced bradycardia** |
| 0 | 10 | 225.6±5.31 | 220.4±4.86 | -2.1 | |
| **6** | 12 | 226.0±3.17 | 159.7±4.63* | **-29.2** | **Severe bradycardia** |
| 0 | 10 | 225.6±5.31 | 220.4±4.86 | -2.1 | |
| 12 | 11 | 224.0±3.00 | 127.6±3.83* | **-43.0** | **Very severe bradycardia TdP ventricular arrhthmia (in 16% of the embryos).** |

An internationally accepted methodology for comparing the concentrations in the *in vitro* study to human exposures is to compare "the maximum concentration tested without an adverse effect in the *in vitro* system . . . to the Cmax in humans for the determination of potential human risk . . . ."  ICH S5 (R3) at 10.  If Cmax, or maximum concentration, in humans exceeds the maximum concentration tested *in vitro* without an adverse effect, the *in vitro* results add additional weight in favor of causal inference, together with the human and animal data.  "Exposure data from

*in vivo* studies (human and animals) can be used to determine whether a positive signal identified in an alternative assay [such as WEC] presents a risk at the MRHD [maximum recommended human dose' under the clinical conditions of use of the pharmaceutical." ICH S5 (R3) at 26.

Applying the ICH S5 (R3) methodology to the Zofran WEC results, the study investigators found that ondansetron produced bradycardia (1% decrease in heart rate) in Zofran-exposed embryos compared to concurrent untreated controls at Zofran concentrations of 0.5 μM (150 ng/ml), and Zofran produced marked bradycardia (10% decrease) at 1 μM (around 300 ng/ml).[89] These concentrations are the same as in humans. For example, several studies in humans show that at concentrations of around 150 ng/ml and up to 500 ng/ml in women of childbearing potential after doses recommended in the label (8 mg oral or I.V.), that cardiac arrhythmia risk may occur, at lower exposures than that in adults and embryos with pre-existing risk factors.[90] For example, in Elkomy 2015, Zofran concentrations achieved in women of childbearing potential were 500 ng/ml, which converts to 1.7 μM, after a single 8 mg I.V. dose. According to the whole embryo culture study, this concentration can be expected to cause at least marked bradycardia in a human embryo, with a heart rate decrease at least between 9.4% and 19.6% without considering factors in the human embryo *in vivo* that enhance its risk, discussed in the next paragraph.[91] As described in Line of Evidence 1, the

---

[89] Plaintiffs anticipate that GSK will overlook these clinically relevant findings, claiming they are not "statistically" significant. Their approach contravenes the industry standards ICH S5 (R3) at 23 (Any biologically meaningful difference in treated animals compared with concurrent controls should be discussed. Statistical significance alone does not always constitute a positive signal nor does lack of statistical significance constitute a lack of effect; historical controls, biological plausibility, and reproducibility should be considered in this context."); FDA Guidance for Industry 2011 at 6-7 ("A positive signal is a biologically meaningful difference in dosed animals compared to concurrent or historical controls.").

[90] Lemon, et al., Ondansetron Exposure Changes in a Pregnant Woman, *Pharmacotherapy*, 2016 Sept. 36(9): e139-e141.

[91] The concentrations of Zofran inducing irregular heartbeats in rat embryos *in vitro* need to be much higher than the plasma concentrations of ondansetron which can induce similar effects *in vivo* in a human, rabbit, or rat embryo exposed to ondansetron. One reason for this is that embryos *in vitro* are continuously gassed with 95 % oxygen *in vitro*, making it impossible for them to be hypoxic and ROS to be generated (as a consequence of severe hypoxia followed by a period of reoxygenation). Danielsson Supp. Rep. at 8.

concentration of Zofran is highly likely to be the same, and sometimes higher, in the human embryo than in the mother.  Therefore, the Zofran WEC results support the causal inference when viewed together with the animal and human Zofran data.[92]

In view of factors that heighten the risk of bradycardia in a human embryo, the arrhythmic risk in the embryo is likely to be higher than seen in the rat embryos in the WEC study.  Danielsson, Webster & Ritchie, at 244.  For example, since the human embryonic heart is not "innervated," meaning the embryonic heart cannot increase its heart rate via the sympathetic autonomic nervous system as does the adult heart to compensate for bradycardia, the heart rate decrease in the embryo is more likely to cause bradycardia.[93]  In addition, *in vivo* data in animals indicate that the non-innervated embryonic heart is more susceptible than the adult heart to develop cardiac arrhythmia at concentrations not affecting the maternal heart.

In addition, the data presented in Table 5 above in "normal" rat embryos (without any coexisting risk factors present, such as low potassium, genetics, acidosis or fever), show that ondansetron concentrations of around 150 ng/ml and higher can likely cause bradycardia and life threatening severe TdP and thus teratogenicity due to cardiac arrhythmia in a human embryo by applying ICH S5 (R3) methodology.  This means that at a concentration of 150 ng/ml, and at even lower concentrations in embryos with co-existing risk factors, there is a risk for TdP arrhythmia and

---

[92] ICH S5 (R3) at 8 ("The information from the alternative qualified test systems [e.g., WEC studies] should be used with all available *in vivo* nonclinical and human data as part of an integrated risk assessment approach.").

[93] Danielsson, Webster & Ritchie 2008 at 245 ("In this context, it is worth noting evidence that the non-innervated rabbit embryonic heart appears to respond with arrhythmia at exposures of HERG blocking drugs that are lower than those affecting the maternal heart.  This finding implies that the embryonic heart is more susceptible to developing cardiac arrhythmia compared to the adult heart.").  Kass Rep. at 38 (acknowledging that the ventricular action potential duration in normal (wild type) rabbits is much closer to human action potential duration, and the two repolarizing potassium channels key to controlling human action potential duration, hERG and Iks channels, are expressed in the rabbit heart.").

teratogenicity.   A study in pregnant rats also shows that hypokalemia in the mother results in hypokalemia in fetal tissues,[94] another enhancing risk factor for arrhythmia.[95]

In summary, the Zofran WEC results add to the weight of the human and animal evidence supporting the conclusion that all GSK-recommended dose levels in the drug label are able to cause cardiac arrhythmia in embryos, and therefore malformations.

***Finally,*** results in isolated female rabbit hearts in the study by Frommeyer 2017 [96] showed similarities with the results in the Zofran WEC study.   Both studies showed human risk for arrhythmia at exposures that can occur after use of GSK-recommended doses.   The rabbit model is accepted to be highly predictive of risk for arrhythmia in humans.   Zofran concentrations causing QT prolongation: 1 μM = 300 ng/ml caused 17% QT prolongation in the rabbit (similar to 9.4% heartrate change in the WEC study), and 5 μM caused 43% QT prolongation in the rabbit (similar to 6 μM causing 29.2% heartrate change in the WEC study).   Concentrations up to 10 μM+ hypokalemia were required in the rabbit model (and 12 μM in the WEC study) to actually provoke torsade de pointes (TdP), a life-threatening arrhythmia.

Integrating the Frommeyer 2017 results and the WEC study results into the weight of evidence analysis strongly supports the conclusion that marked disruption of the heartbeat (greater than a 10% change in heart rate) can occur in humans at a Zofran concentration that is *lower than* the highest ondansetron concentration (500 ng/ml) reported in women of childbearing potential (Elkomy 2015).   To put this 10% or greater increase into context, one can consider that the 32 mg dose of Zofran was

---

[94] Dancis and Springer, Fetal homeostasis in maternal malnutrition: potassium and sodium deficiency in rats, *Pediatr. Res.*, 1970 Jul;4(4):345-51.

[95] The Zofran product label warns that "Ondansetron prolongs the QT interval in a dose-dependent manner" and recommends electrocardiogram monitoring in patients with electrolyte abnormalities such as hypokalemia.

[96] Frommeyer 2017, Severe Proarrhythmic Potential of the Antiemetic Agents Ondansetron and Domperidone, *Cardiovasc. Toxicol.* (Feb. 9, 2017) ("The present model has been proven to be suitable to identify the proarrhythmic risk of cardiovascular and non-cardiovascular drugs.").

withdrawn from the market because it was shown to increase the QT interval with a mean of approximately 24 milliseconds (from 408 to 432 ms; only a 6% increase in the length of the QT interval).[97] The 6% increase represented an unacceptable risk of arrhythmia—even for cancer patients.[98] This 6% increase occurred in healthy, non-pregnant adults with an average Zofran plasma concentration of 389.9 ng/mL (peaking at 432.5 ng/mL) from the 32 mg I.V. dose.

With this context, it follows with compelling force that a likely 10% or greater change in heart rate from currently available therapeutic exposures presents a higher degree of risk in a more susceptible human embryo than what led to withdrawal of the 32 mg dose from the market.

F. *LINE OF EVIDENCE 6*: OTHER DRUGS WITH THE SAME hERG BLOCKADE MECHANISM ARE KNOWN TO CAUSE CONGENITAL HEART DEFECTS AND OROFACIAL CLEFTS IN HUMANS.

Other drugs that have the same effect on heart rhythm disturbance as Zofran also cause cardiac and orofacial birth defects. This is an important and persuasive line of evidence. The ICH S5 (R3) guidelines direct experts to investigate "all available data on the pharmaceutical *and any related compounds*." ICH S5 (R3) at 24. Drugs blocking the hERG channel in the highest cardiac arrhythmia risk category according to Credible Meds, which have been thoroughly examined in at least two teratology studies have shown to be teratogenic with a similar spectrum of malformations as seen with Zofran in animals and in humans. Danielsson Rep. at 15. Only a few potent hERG blockers have been used to a large extent in pregnancy, and these substances have been reported to cause a similar pattern of malformations /or embryonic death as ondansetron.[99]

---

[97] Zuo, Integration of Modeling and Simulation to Support Changes to Ondansetron Dosing Following a Randomized, Double-Blind, Placebo-, and Active-Controlled Thorough QT Study, *J. of Clin. Pharmacology*, 54(11) 1221-20 (2014), at Table 1.

[98] Zuo 2014 at 1229 ("In conclusion, the present study in adult subjects, suggests that. . . 32 mg (direct observations) IV doses may induce clinically important QT prolongations and may represent increased risk that exceeds benefit.").

[99] The most potent of the IKr-blockers and hence the most likely to cause birth defects are cardioactive antiarrhythmics, such as ibutilide, and dofetilide, have not or have been rarely used in women of childbearing age. There do not appear to be any studies on use of these drugs in human pregnancy.

For example, the antiepileptic drug phenytoin has been used extensively in human pregnancy. Women with epilepsy often have to use antiepileptic drugs during pregnancy in order to not risk their own, or their fetus's life, in life threatening seizures. Phenytoin is an established human and animal teratogen. Baldwin Dep. at 245:14–21; Danielsson Dep. at 385:2–8. [100] The most common phenytoin-induced malformations in humans are cardiovascular and orofacial defects. Danielsson Rep. at 15. The phenytoin-induced malformations in animals have also been shown to be associated with induction of cardiac embryonic arrhythmia as demonstrated by whole embryo culture testing, as was similarly shown with Zofran. Danielsson Rep. at 23.

### G. *LINE OF EVIDENCE 7*: EVIDENCE FROM TRANSGENIC ANIMALS SUPPORTS THE CRITICAL ROLE OF hERG IN EMBRYONIC DEVELOPMENT.

According to the ICH S5 (R3) guidelines, relevant information on the teratogenic risk of a drug can be found by looking to transgenic animals and the role of the target in reproduction. ICH S5 (R3), at 24. In this case the relevant "target" is the gene known as hERG. In 2008, to investigate the role of hERG in reproduction, a group of scientists created mice that had a mutated hERG gene that resulted in a complete loss of function of the gene.[101] The authors of the study concluded that mutating the gene resulted in loss of hERG potassium channel (IKr) function in the cardiovascular system and "leads to defects in cardiac ontogeny [development]" and in "the first branchial arch," which is essential to development of the craniofacial region. Teng 2008 at 6–7. The authors observed that embryonic deaths in mice that experienced loss of function of the hERG channel (known as mERG in the case mice). They attributed these deaths to arrhythmias and bradycardia in the mice embryos' hearts. *Id.* at 6. The authors correlated their findings with studies

---

[100] Danielsson, et al., Phenytoin teratogenicity: hypoxia marker and effects on embryonic heart rhythm suggest an hERG-related mechanism. *Birth Defects Res A Clin Mol Teratol*. 2005 Mar; 73(3):146-53.

[101] Teng, GO, Zhao X, Lees-Miller JP, Quinn FR, Li P, Rancourt DE, London B, Cross JC, Duff H,J, Homozygous Missense N6292D hERG (KCNH2) Potassium Channel Mutation, *Circ. Res.* 2008; 103:1483-91.

in humans, which reported that genetic mutations of hERG in humans are associated with congenital cardiovascular anomalies, including: Tetralogy of Fallot, atrial-septal defects, and ventricular septal defects, among others. *Id.* at 2. This study adds to the animal and human data showing that the hERG potassium channel, the function of which Zofran inhibits, plays an important role in the development of the heart and craniofacial region. The study authors concluded: "Because a large number of medications inadvertently block the hERG potassium channel, these novel findings have substantial clinical relevance." *Id.* at 6.

## VIII.   CONCLUSION

There is robust scientific evidence that ondansetron can induce severe cardiac rhythm disturbances in adult humans, children, and in the human embryo, by inhibition of the hERG channel. This drug effect can cause life threatening cardiac arrhythmia in adult humans when used as recommended in the product labeling, regardless of administration form and dose. The human embryo, which reaches similar exposures of ondansetron as the mother through placental transfer, also responds with cardiac arrhythmia after *in utero* exposure to ondansetron after recommended use of ondansetron. This mechanism is known to GSK, and has been studied extensively. The teratologic effect of the drug has been demonstrated in animal studies, at concentrations seen in women of childbearing potential. The Zofran animal teratology studies that achieved exposure concentrations at or near concentrations in women of childbearing potential reported a biologically significant increase in malformations and embryonic death, with the same types of defects occurring in animals and in human epidemiologic studies. Other drugs that also disrupt heart rhythm by the same hERG blocking mechanism are known human teratogens, with similar manifestations. Interference with heart rhythm even without drugs has the same teratogenic effect.

The described mechanism is both biologically plausible and indeed a likely explanation for how Zofran causes cardiovascular and orofacial cleft birth defects. The several lines of mechanism

evidence are consistent with the human epidemiologic evidence.   Despite the limitations of epidemiology to study all specific cardiovascular and orofacial birth defect exposures in humans due to their rarity, there are consistent findings that Zofran exposure in the first trimester is associated with statistically significant increased risks of specific cardiovascular malformations and orofacial malformations.

The peer-reviewed medical literature is replete with studies that provide the causation "building blocks" described in this brief.   As noted above, on many of these causation "building blocks" GSK's experts agree with Plaintiffs' experts.   Causation is the most likely explanation to explain these multiple lines of evidence.   Coincidence, chance, and bias in the studies are highly unlikely given the consistency, convergence, and coherence of the totality of the evidence summarized above.

Well-qualified experts considered the weight of available evidence and have concluded to a reasonable degree of medical and scientific certainty that ondansetron is capable of causing cardiovascular defects and orofacial defects, both in animals and in humans, through the common hERG-mediated mechanism of teratogenicity—at all therapeutic doses in all forms of administration.

For these reasons, Plaintiffs seek an order that each of their experts meets the *Daubert* standards of the First Circuit.

Dated: December 10, 2018

Respectfully submitted,

/s/ Robert K. Jenner_____
Robert K. Jenner, Esquire (BBO No. 569381)
JENNER LAW P.C.
1829 Reisterstown Road
Suite 350
Baltimore, Maryland  21208
410-413-2155

M. Elizabeth Graham
Thomas V. Ayala
Tudor Farcas
GRANT & EISENHOFER P.A.
123 S. Justison Street
Wilmington, DE  19801
302-662-7063

Kimberly D. Barone Baden
Roger M. Young, Jr.
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
843-216-9265

Tobias L. Millrood
POGUST, BRASLOW & MILLROOD LLC
8 Tower Bridge, Suite 1520
Conshohocken, PA  19428
610-941-4204

James D. Gotz
Steven R. Rotman
HAUSFELD
One Marina Park Drive, Suite 1410
Boston, MA 02210
617-207-0600

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE: ZOFRAN (ONDANSETRON)** ) | **MDL No. 1:15-md-2657-FDS** |
| **PRODUCTS LIABILITY LITIGATION** ) | |
| ) | |
| ) | |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | |
| **ALL CASES** ) | |
| ) | |

**ORDER**

**AND NOW**, this _____ day of _____, 2018 upon consideration of Plaintiffs'
Motion to Admit Their General Causation Expert Testimony, it is hereby **ORDERED** that
Plaintiffs' Motion is **GRANTED**.

It further **ORDERED** that Plaintiffs' experts shall be permitted to testify in the form of
opinion or otherwise in accordance with Federal Rules of Evidence 702-05 and consistent with their
expert disclosures made in accordance with Federal Rule of Civil Procedure 26(a)(2),(e) and
deposition testimony.

.

**BY THE COURT**

_____

**F. Dennis Saylor, IV, U.S. District Judge**

**<u>CERTIFICATE OF SERVICE</u>**

I, Thomas V. Ayala, hereby certify that on this 10th day of December, 2018, I electronically filed the foregoing Motion to Admit Plaintiffs' General Causation Expert Testimony and Supporting Memorandum, using the CM/ECF system and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

<u>/s/ *Thomas V. Ayala*</u>
Thomas V. Ayala