UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE : ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br>All Actions | MDL No. 1:15-md-2657-FDS |

**GLAXOSMITHKLINE LLC'S OPPOSITION TO APRIL ZAMBELLI-WEINER, PH.D.'S MOTION FOR PROTECTIVE ORDER**

The Court has already considered and denied a request for a protective order to prevent or limit the deposition of Dr. April Zambelli-Weiner, author of a recently published study relating to the use of Zofran and birth defects. Dr. Zambelli-Weiner presents herself as neutral researcher with "no involvement in the litigation in any capacity" (Mtn. at 6), but publicly available information and Plaintiffs' counsel's conflicting statements belie her characterization. Dr. Zambelli-Weiner is no stranger to this litigation, having received funding and "work product" from Plaintiffs' counsel. Her justifications in seeking a protective order are inapposite and overstated. In truth, the deposition and documents requested by GSK would not impose an undue burden and are critical to understanding the ever-evolving story of Dr. Zambelli-Weiner's financial arrangement with Plaintiffs' counsel and its effect on what Plaintiffs will portray as a key study for them in this litigation. The "chilling effect" on academic research that Dr. Zambelli-Weiner laments is inapplicable here, where she has chosen to be involved with Plaintiffs' counsel in this litigation and has received and disclosed receiving funds from them. The motion for protective order should be denied in its entirety, just as it was in December.

1

**FACTUAL BACKGROUND**

On November 12, 2018, GSK issued a subpoena seeking the deposition of Dr. Zambelli-Weiner, along with certain documents relating to her recent ondansetron study, published in *Reproductive Toxicology* ("the Study").[1] The deposition was originally noticed for December 21, 2018. Plaintiffs moved for a protective order on November 26, which was argued and denied on December 7 (Doc. 1243). Following the denial of the first motion for protective order, GSK conferred with Dr. Zambelli-Weiner's counsel and arrived at a mutually convenient date for her deposition—January 23, near her office in Westminster, Maryland. Two weeks before the agreed-upon date, she filed the present motion for protective order.

Dr. Zambelli-Weiner's study is uniquely different from the many other studies addressing ondansetron use in pregnancy for at least three separate reasons. First and foremost, the authors included a Conflict of Interest statement acknowledging that TTi Health Research & Economics, the company owned by Dr. Zambelli-Weiner, received funds from plaintiff law firms involved in this litigation. *See* Zambelli-Weiner A, Via C, Yuen M, Weiner DJ, Kirby RS. First trimester ondansetron exposure and risk of structural birth defects. *Reprod Toxicol* 2019;83:14-20 at 19, attached as Ex. A. Second, the data reported in the Study raise substantial questions about the Study's results and reliability, as acknowledged even by Plaintiffs' own epidemiologist, Dr. Louik.[2] And third, Plaintiffs' experts rely on this study as a critical piece of epidemiological evidence that purportedly explains, or may explain, the lack of associations observed in other studies.[3] Significantly, although Dr. Zambelli-Weiner states in her affidavit that she has "not been

---

[1] GSK also issued a subpoena for Dr. Russell Kirby, one of the other named authors of the study.
[2] *See, e.g.*, Louik Dep. at 295-300 (admitting that the rate of birth defects among the controls is higher than expected, that the orofacial cleft categories are "not standard" and "don't mean anything to [her]", and that she "had a lot of problems" with the Study), excerpt attached as Ex. B.
[3] *See, e.g.*, Danielsson Dep. at 53:23-56:5, excerpt attached as Ex. C; Louik Report at 35-36, excerpt attached as Ex. D.

2

retained as an expert witness by any party in this case and [has] no direct factual information about the litigation," in October 2015, she participated in a presentation about this very litigation at a conference called "Mass Torts Made Perfect" in Las Vegas with Elizabeth Graham and Robert Jenner, lead counsel for Plaintiffs:






**ZOFRAN LITIGATION UPDATE**

The national Zofran Lawsuit concerns the use of the prescription drug Zofran and the growing body of evidence linking this drug to an increased risk of birth defects. The lawsuit alleges that the manufacturer of Zofran knew of this severe side effect, but failed to properly inform the United States government and healthcare providers that Zofran could cause significant potential issues, and that the drug required additional testing and research before it should have been widely marketed and prescribed to patients who had better alternative treatments.

Thursday, October 15th, 2015

*See* Printout from https://webarchive.org/web/20150801085059/http://mtmp.com/session/zofran-litigation-update, Ex. E (highlighting added).

## ARGUMENT

**I.    Dr. Zambelli-Weiner's Financial Dealings with Plaintiffs' Counsel, and the Impact Thereof, Is a Critical Topic for Discovery.**

Dr. Zambelli-Weiner's financial relationship with Plaintiffs' counsel in this litigation and her prior involvement in a litigation conference relating to Zofran set her apart from a truly disinterested academic and necessitate the requested discovery. In her motion, Dr. Zambelli-Weiner is portrayed as a researcher "who does not have a dog in the fight" (Mtn. at 6), but the facts that have surfaced so far suggest otherwise. Her participation in the Mass Torts Made Perfect conference in 2015 appears to have been only the beginning. While Dr. Zambelli-Weiner's motion asserts that she "has no involvement in the litigation in any capacity" (Mtn. at 6), Plaintiffs have indicated otherwise. They have described her research company (TTi) as their "consultant," and they acknowledged that they shared their own "work product" regarding the Study with TTi in 2018, before the Study was published in full. *See* Pls.' Resp. to GSK's Mtn. to Compel at 3 (Doc. 1165).[4] Further, Dr. Zambelli-Weiner provided unpublished information about her study abstract directly to Plaintiffs' expert epidemiologist, Dr. Carol Louik. *See* Ex. 74 to Louik Dep., attached as Ex. F.

Plaintiffs appear poised to present Dr. Zambelli-Weiner's study as key to establishing causation. Not surprisingly, four of Plaintiffs' experts have now served supplemental reports

---

[4] Curiously, when GSK requested that Plaintiffs produce communications between Plaintiffs' attorneys and the authors of Dr. Zambelli-Weiner's study, not including communications with retained experts, Plaintiffs indicated that they had no such communications. *See* Pls.' Obj. and Resp. to GSK's Requests for Prod. Of Expert-Related Documents, No. 5, attached as Ex. G. However, based on documents since produced by Dr. Zambelli-Weiner, GSK later learned that counsel for Plaintiffs, Thomas Ayala, had in fact corresponded with Dr. Zambelli-Weiner about her study in February 2018. *See* Dr. Zambelli-Weiner's Response to GSK's Deposition Notice, attached as Ex. H.

noting their review of the Study. Discovery on Dr. Zambelli-Weiner's financial dealings and prior relationship with Plaintiffs' counsel, and the impact thereof on the study design, execution, and reporting, is relevant and necessary to a central issue in this litigation—whether sufficient reliable scientific evidence exists to support Plaintiffs' burden of proving causation. The apparently conflicting information that has surfaced regarding Dr. Zambelli-Weiner's role only underscores the necessity of GSK's requested discovery.

In similar circumstances, courts have permitted discovery on third-party scientists. For example, in *Kellington v. Bayer Healthcare Pharmaceuticals, Inc.*, the defendant sought documents and fact deposition testimony from the author of a journal article relevant to the product at issue who was previously engaged by the plaintiff. No. 5:14-cv-2, 2016 WL 5349801, *1 (W.D. Va. Sept. 23, 2016). Over the plaintiff's opposition, the court permitted the discovery, finding it "significant that plaintiff's other causation experts all rely on the . . . article," which was "important and central to the crucial and disputed issue of causation in the case." *Id.* at *2; *see also Retractable Techs., Inc. v. Int'l Healthcare Worker Safety Cir.*, No. 3:11-mc-28, 2011 WL 355548, *3-4 (W.D. Va. Aug. 11, 2011) (compelling compliance with subpoena served on healthcare research group that received funding from defendant in case where question was raised concerning propriety of collaboration between group, defendant, and defendant's attorneys).

Indeed, courts have reached similar conclusions even in the absence of *any* financial ties between the third-party researchers and a party in the litigation. *See*, *e.g.*, *In re: Bair Hugger Forced Air Warming Litig.*, No. 15-2666, 2017 WL 5230568 (D. Minn. Aug. 18, 2017) (compelling production of third-party study author's study protocols, underlying study data, and other documents); *In re NCAA Student-Athlete Name & Likeness Litig.*, No. 4:12-mc-00508, 2012 WL 4856968, at *4 (E.D. Mo. Oct. 12, 2012) (granting motion to compel production of dataset

underlying upcoming paper by third-party researcher); *In re Prempro Prods. Liab. Litig.*, No. 4:03-cv-1507 (E.D. Ark. July 13, 2009) (ordering third-party cancer research center to produce medical research data and documents); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, No. 0:14-md-02551 (W.D. Wash. Aug. 16, 2002) (compelling production of redacted medical records of study participants to allow defendant to fully evaluate whether the study appropriately accounted for potential confounders and bias) (*In re Prempro* and *In re PPA*, attached as Ex.I).

Dr. Zambelli-Weiner misses the point when she suggests that her deposition testimony is not relevant because she claims she is "not a fact witness" and has not been retained to provide opinion testimony. Her involvement with Plaintiffs' counsel prior to the publication of the Study and her role in the design, execution, and publication of the Study make her a fact witness—one that is uniquely positioned to address critical questions about the independence and reliability of the Study. In denying the motion for protective order filed by Plaintiffs, the Court squarely addressed the relevance and necessity of the requested discovery and found that the circumstances presented "a fair basis for conducting deposition inquiry" into the facts surrounding the funding and execution of the Study. *See* Transcript at 39-40 (Dec. 7, 2018), Ex. J. Accordingly, the Court permitted "a normal deposition within normal limits focused on the financial aspects, that is, what money was paid and how, what communications with counsel, direct or indirect, were made **and how that affected the study**." *Id.* at 40-41 (emphasis added). Dr. Zambelli-Weiner presents nothing to warrant any different conclusion.

## II.   Concerns of a "Chilling Effect" on Academic Research Are Inapplicable.

Case law discussing the risks of discovery of confidential information on truly disinterested and unrelated academics is distinguishable and provides no support for the protective order Dr. Zambelli-Weiner seeks. As an initial matter, Dr. Zambelli-Weiner is not just any study author. As

detailed above, she participated in a presentation for a legal conference about this litigation, received funds and "work product" from Plaintiffs' counsel prior to publication of the Study, communicated directly with Plaintiffs' counsel, provided unpublished materials to Plaintiffs' expert epidemiologist, and may have served as a consultant for Plaintiffs. Against this backdrop, concerns of a "chilling effect" on academic research are misplaced.

The cases Dr. Zambelli-Weiner relies upon are inapposite. First, she argues that *Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998), entitles her to protection. However, *Cusumano* is easily distinguishable. There, Microsoft issued third-party subpoenas for notes, tape recordings, and interview transcripts from non-party authors who were seeking to publish a book on a topic relevant to Microsoft's defense. *Id.* at 711. After the non-parties resisted, the district court denied Microsoft's motion to compel, and the First Circuit affirmed. *Id.* at 717. As part of its reasoning, the First Circuit relied on a number of factors that are not present in this case. This included noting that the authors were not the original sources of the information sought and that Microsoft could have obtained the information directly from the sources revealed in the authors' manuscript. *Id.* at 716. By contrast, GSK seeks first-hand sources attributable to Dr. Zambelli-Weiner herself and documents that she had a hand in creating. Moreover, the documents and testimony that GSK seeks are a far cry from confidential, pre-publication "investigative reporting" at issue in *Cusumano*, because (i) the Study has already been published; (ii) the Study data are de-identified; (iii) GSK is not even seeking those de-identified data, but rather only the methodological analyses of those data; and (iv) by agreement, such analyses would be produced pursuant to the existing Protective Order.

Further, the *Cusumano* court found it "noteworthy" that the targets of the subpoena were "strangers to the . . . litigation" and had "no dog in that fight." *Id.* at 717. It cannot reasonably be

said that Dr. Zambelli-Weiner is a "stranger" to this litigation or that she lacks an interest in its outcome. Put plainly, *Cusumano* provides no basis for this Court to disturb its previous denial of a protective order.

Likewise, in *In re Bextra & Celebrex*, the defendant served a subpoena on the New England Journal of Medicine for a broad category of documents relating to *all* manuscripts submitted to the journal related to Bextra and Celebrex, just by virtue of the fact that the manuscripts related to the products at issue in the litigation. 249 F.R.D. 8, 10 (D. Mass. 2008). The defendant deposed some of the study authors, and the journal produced general communications between the editors and authors, but withheld communications containing confidential, peer-review comments. *Id.* The only issue for the court's consideration was whether the journal would be required to produce the substance of those confidential communications with study authors (*see id.*), which GSK has not requested here.

Short on case law, Dr. Zambelli-Weiner attempts to create a "slippery slope" when nothing of the sort exists. She expresses concerns over publicizing confidential patient information when the Study at issue was based on her analysis of a commercial database of "existing, fully de-identified data." *See* Zambelli-Weiner A, et al. at 19. Thus, there is no risk of disseminating confidential medical information, because even Dr. Zambelli-Weiner lacked access to such information. *Cf. Cusumano*, 162 F.3d at 710 (affording protection where scholars executed non-disclosure agreements and furnished "personal assurances of confidentiality to the persons being interviewed"). Likewise, her reference to "a potential for harassment of members of the public [who] volunteer" for studies (Mtn. at 6) is beside the point, because that is not at all the type of study at issue here (where Dr. Zambelli-Weiner relied on a de-identified database, not patient

8

volunteers). Additionally, as noted above, GSK is not even asking for production of those de-identified data, and confidential documents would be subject to the existing protective order.

Dr. Zambelli-Weiner claims that a "supplier of research data" refused to provide data to her "out of fear that the study and data would be used in litigation," but that says more about her own history of creating "litigation-driven science" (*see In re Accutane Litig.*, No. 271 (MDL), 2017 WL 1362050, *19 (N.J. Super. L. Apr. 13, 2017), attached as Ex. K) than any discovery requests served by GSK.

Finally, her vague suggestion of harassment of medical researchers is also unavailing. GSK's requested discovery is relevant and narrowly tailored, and there is no basis for insinuating that GSK's counsel has been anything short of professional and courteous to her and her counsel. Dr. Zambelli-Weiner's concerns are simply unfounded.

### III. The Requested Discovery Presents No Undue Burden to Dr. Zambelli-Weiner, a Seasoned Deponent and Litigation Witness.

Dr. Zambelli-Weiner overstates the time and effort required to comply with the requested discovery. GSK does not dispute that she is a busy professional, which is why GSK conferred with her counsel to identify a mutually acceptable date and place for her deposition.[5] Despite having agreed to the date, Dr. Zambelli-Weiner now objects because it would require "many hours of preparation and testimony." Mtn. at 6. But Dr. Zambelli-Weiner is a fact witness. Because of her background, some of her testimony may resemble opinion testimony that an expert witness would provide, however, she would only be asked to testify as to what she knows.

---

[5] GSK's counsel engaged in weeks of communications with Dr. Zambelli-Weiner's counsel to make arrangements for her deposition, including addressing her concerns regarding the confidentiality of documents for production. Although she has had GSK's subpoena since November, Dr. Zambelli-Weiner waited until two weeks before her deposition to assert "undue burden."

Her objections to the limited document requests connected with her deposition are unfounded. The only document she seeks to withhold from production is the Study's original protocol, which should describe how the (publicly available) Study was conducted. If she has concerns about information she believes relates to other studies, the Court has already entered an Order to protect the disclosure and use of confidential information. *See* MDL Order No. 13 (Doc. 242).[6] As for documents demanded in GSK's request 2(c)—to which Dr. Zambelli-Weiner objected as "vague"—GSK's counsel has offered to provide examples of the information being sought and courts have compelled the production of such data in the past. *See*, *e.g.*, Order Granting Defendants' Motion To Compel Production Of Documents Necessary To Verify the Validity and Accuracy Of A Study By Plaintiffs' Expert, Anick Berard, Ph.D., No. L-3896-14 (N.J. Sup. Ct. Dec. 17, 2015), attached as Ex. L. Finally, any "additional time and effort" needed to locate and produce responsive documents would presumably be negligible, if any, in light of the fact that she has already responded to the document requests.

**IV.     Limitations on the Scope of Her Deposition Are Unwarranted.**

The Court has already considered and declined a similar request to limit the scope of this deposition. Plaintiffs specifically advocated limiting Dr. Zambelli-Weiner's deposition to the issue of her financial relationship with them (Transcript at 37 (Dec. 7, 2018), Ex. J). While the Court acknowledged Plaintiffs' concerns, it ultimately permitted "a normal deposition within normal limits focused on the financial aspects, that is, what money was paid and how, what communications with counsel, direct or indirect, were made and how that affected the study." *Id.* at 40-41. The reason for this is sound. While Plaintiffs and Dr. Zambelli-Weiner profess that the

---

[6] Although Dr. Zambelli-Weiner claims that the Study protocol is protected by the "academic researcher's privilege," she cites no authority for this proposition. In fact, courts have refused to recognize such a privilege. *See*, *e.g.*, *Kellington,* 2016 WL 5349801 at *2 (collecting cases).

financial relationship did not influence the Study, GSK should not be required to simply accept their word on what may end up being a contested issue. *See Retractable Technologies, Inc.*, 2011 WL 3555848, at *4 (noting that a research group's claim that it was "wholly free from the influence" of the defendant was insufficient to quash a subpoena because the plaintiff "intend[ed] to contest precisely this point, and it need not take the [research group] at its word"). The restrictions Dr. Zambelli-Weiner proposes are not warranted.

## CONCLUSION

By virtue of her financial relationship and prior dealings with Plaintiffs' counsel and her role in the design, execution, and publication of the Study, upon which Plaintiffs' experts rely, Dr. Zambelli-Weiner holds critical factual information that may be crucial to GSK's ultimate ability to effectively defend against Plaintiffs' claims. The purported dangers of taking discovery on researchers due to confidentiality concerns and undue burden are non-existent and overstated, respectively. The Court should, again, deny the motion for protective order so that the deposition can proceed on the agreed-upon date.

Dated: January 15, 2019

Respectfully submitted,

*/s/ Jennifer Hill*
Madeleine M. McDonough
Jennifer M. Stevenson
Jennifer Stonecipher Hill
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
mmcdonough@shb.com
jstevenson@shb.com
jshill@shb.com
*Admitted pro hac vice*

Mark D. Seltzer (BBO # 556341)
Brain K. French (BBO # 637856)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
Telephone: 617-345-1000
Facsimile: 617-345-1300
mseltzer@nixonpeabody.com
bfrench@nixonpeabody.com

George W. Vien (BBO # 547411)
DONNELLY, CONROY & GELHAAR LLP
260 Franklin Street, Suite 1600
Boston, MA 02110
Telephone: 617-720-2880
Facsimile: 617-720-3554
gwv@dcglaw.com

Attorneys for Defendant GlaxoSmithKline LLC

## **CERTIFICATE OF SERVICE**

   I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those identified as non-registered participants.

          */s/ Jennifer Hill*
          Jennifer Hill