# EXHIBIT J

1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2


3
     IN RE:  ZOFRAN (Ondansetron)     )  MDL No. 15-02657-FDS
4    PRODUCTS LIABILITY LITIGATION    )
                                      )
5                                     )
                                      )
6                                     )
                                      )
7                                     )
                                      )
8


9
     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11                       <u>HEARING</u>

12


13
          John Joseph Moakley United States Courthouse
14                    Courtroom No. 2
                      1 Courthouse Way
15                    Boston, MA 02210

16
                     December 7, 2018
17                     11:30 a.m.

18

19

20

21

22

23         Valerie A. O'Hara, FCRR, RPR
              Official Court Reporter
24   John Joseph Moakley United States Courthouse
              1 Courthouse Way, Room 3204
25                 Boston, MA 02210
              E-mail: vaohara@gmail.com

1   APPEARANCES VIA TELEPHONE:

2   For The Plaintiffs:

3       Pogust, Braslow & Millrood, LLC, by TOBIAS MILLROOD, ESQ.,
    161 Washington Street, Suite 1520, Eight Tower Building,
4   Conshokocken, Pennsylvania 19428;

5       Jenner Law, by, ROBERT K. JENNER, ESQ., 1829 Reisterstown
    Road, Suite 350, Baltimore, Maryland 21208;
6
        Hausfeld, by STEVEN B. ROTMAN, ESQ.,
7   1700 K Street, NW, Suite 650, Washington, D.C. 20006;

8   For the Defendant:

9       Shook, Hardy & Bacon LLP, by JENNIFER M. STEVENSON,
    ATTORNEY, and JENNIFER STONECIPHER HILL, ATTORNEY, 2555 Grand
10  Boulevard, Kansas City, Missouri 64108.

11      Phillips Lytle LLP, by THOMAS J. SHEEHAN, ESQ.,
    125 Main Street, Buffalo, NY 14203.
12

13
    NUMEROUS OTHER COUNSEL APPEARING TELEPHONICALLY
14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  Thank you.  Please be seated.

3     Court is now in session in the matter of In Re:  Zofran,

4     Civil Action Number 15-02657.

5          Would counsel please identify themselves for the

6     record.

7          MR. MILLROOD:  Good morning, your Honor, Tobi Millrood

8     for the plaintiffs.

9          MR. JENNER:  Good morning, your Honor, Rob Jenner for

11:31AM 10    the plaintiffs.

11         THE COURT:  Good morning.

12         MR. ROTMAN:  Steve Rotman for plaintiffs.

13         THE COURT:  Good morning.

14         MS. HILL:  Good morning, your Honor, this is

15    Jennifer Hill for GSK.

16         MS. STEVENSON:  Good morning, your Honor, this is

17    Jennifer Stevenson for GSK.

18         THE COURT:  Good morning.

19         MR. SHAHEEN:  Good morning, your Honor, this is

11:32AM 20   Tom Sheehan for GSK.

21         THE COURT:  All right.  Good morning.  This is a

22    hearing on I think two motions, two issues anyway.  All counsel

23    are appearing by telephone.  Please take care to identify

24    yourself by name if I haven't called on you by name so we can

25    keep track of all of you.  I don't know if there's a logical

1    order to the two motions or not, but unless the parties have a

2    different view, why don't I start with GSK's motion for leave

3    to reopen the deposition of Dr. Louik.

4         MS. HILL:  Yes.  Thank you, your Honor, this is

5    Jennifer Hill.  We appreciate the Court's time again to hear

6    this motion.  It is a very important issue.  Our motion for

7    leave makes two requests.  First, we've asked for leave to

8    reopen the deposition of plaintiffs' expert, Carol Louik, and

9    we've also asked the Court for a temporary pause on the Daubert

11:33AM 10    briefing to allow that deposition to occur.

11         Your Honor, as the Court knows, the parties and the

12    Court have put a significant amount of effort and time into the

13    litigation to get it through to this point, and now that we're

14    here, we do want to make sure that we are able to make the

15    arguments that we need to on our Daubert motions, and we want

16    to make sure that we have the discovery that we think is

17    necessary to make those motions.

18         And so as to our request to reopen the deposition of

19    Dr. Louik, there are really two series of events that have kind

11:33AM 20    of brought us to where we are now, and the first, I think most

21    significantly is the recent publication and also the

22    plaintiffs' expert's reliance on a new study that was published

23    by Dr. Zambelli-Weiner and Dr. Kirby and others.

24         So when Dr. Louik was deposed on October 18th, the

25    study was only available as an abstract and in a poster

1    presentation.  Dr. Louik was questioned about the information

2    that was available at the time, and her answers in her

3    deposition really reflect the limited nature of the information

4    that was in the abstract and the poster.

5          For example, she testified that she had to make

6    certain inferences about information that the authors may have

7    had on confounding factors.  That information wasn't present in

8    the text of the abstract.  She had to -- she testified that she

9    had to make certain presumptions because the information in the

11:34AM 10   abstract and the poster was limited.  She specifically said

11   that she had a lot of problems with this abstract.

12         Then about a week and a half after Dr. Louik's

13   deposition, the study was published in full, and when the study

14   was published in full, it came out, it was 26 pages.  It

15   included a lot more information than about the three pages that

16   we had available at the time of Dr. Louik's deposition and at

17   the time her report was drafted.

18         For example, your Honor, there's a table in the

19   published version, Table 1.  It's new.  It provides certain

11:35AM 20   base line characteristics of women in the study, and that was

21   not available in the abstract or the poster.  There's certain

22   additional information about how certain defects were

23   categorized that wasn't available previously.

24         So then after her deposition on November 12th,

25   Dr. Louik issued a short supplemental report saying that she

1   had now reviewed the study and she had tested that her opinions

2   were unchanged, but, most importantly, she did not provide any

3   insight into her review of the data or a draft or how it

4   addressed the concerns that she had and that she expressed at

5   her deposition.

6          So we filed this motion on November 26th, but even

7   since then, your Honor, things have not stopped shifting.  Just

8   on Wednesday, for example, three other experts for the

9   plaintiff served supplemental reliance lists also claiming to

11:36AM 10   have now reviewed this newly published study, and, your Honor,

11   the plaintiffs would have this Court believe that this

12   published study is just another version of the same information

13   and that it's just one more study in the body of literature,

14   but that is really not a fair characterization.

15          The truth is that the plaintiffs will undoubtedly

16   spend another key study for their experts.  It is really the

17   only second study that's published in full to find an

18   association with certain defects, and that's really important

19   because as a very basic matter, consistent and replicated

11:37AM 20   studies are essential to show even an association between an

21   exposure and an outcome, and without the study, the plaintiffs'

22   experts could not do so, they could not point to high quality

23   epidemiology studies that even get beyond that first hurdle as

24   to septal defects, and so now based on everything that has

25   transpired in these past few weeks, all of the science points

1    to the plaintiffs being prepared to use this as this study, a

2    study that they presumably funded to fill this gap in their

3    proof, and Dr. Louik has considered it.

4            She appears to be prepared to rely on it for her

5    opinion, and so just in fairness, we should have an opportunity

6    to ask her about it and ask about her review of the study.

7            Now, what the plaintiffs truly believe, as they said

8    in their opposition brief, that the abstract and the poster

9    contained the relevant information, and if they're prepared to

11:38AM 10    stand on that abstract and the poster and withdraw their

11    reliance on the published version of the study, then we can

12    gladly move forward based on the information that was available

13    before the study's publication and based on Dr. Louik's

14    testimony as to the abstract.

15            But if they're not willing to commit to withdrawing

16    their reliance on the published version of the study, then,

17    your Honor, that tells you exactly what you need to know about

18    how they view the study.

19            Now, plaintiffs have suggested that there's no reason

11:38AM 20    to reopen her deposition because her opinions were not changed

21    and because their supplemental report was short, but that

22    really misses the point because even if her opinions were

23    unchanged, we're still entitled to know why and how she

24    evaluated the new study, which undoubtedly provides more

25    information about what happened without what the authors did,

1    and so plaintiffs point to the number of questions that counsel

2    asked and the number of pages of her deposition that was

3    devoted to this particular abstract and poster, but, again,

4    that misses the point.

5         You have to look at the substance of what Dr. Louik

6    said in response to this question.  She repeatedly acknowledged

7    that there was limited information available and that she had

8    to make certain inferences, and she had to make certain

9    presumptions about what the authors may have had at their

11:39AM 10   disposal, and now I have no doubt that if we cite this

11   testimony from Dr. Louik in our Daubert briefs, plaintiffs'

12   very first response will be, "Oh, well, the new published

13   version cures all of those defects and now we've got the

14   information we need," and so we'd be left not knowing how

15   Dr. Louik actually evaluated the new information.

16        The second issue that kind of brings us to this point,

17   your Honor, is the facts that have been evolving over the past

18   few weeks since Dr. Louik's deposition relating to Dr. Buring's

19   involvement and the process by which Dr. Louik's report was

11:40AM 20   created.

21        Now, we're not here to ask the Court to cast any

22   judgment on what Dr. Louik and Dr. Buring did to create this

23   report, but suffice it to say that the information that was

24   conveyed at her deposition on October 18th has turned out at

25   the very least to be incomplete.

1          There were, in fact, nine pages of the causation

2     methodology that we learned did not come from Dr. Louik, and

3     this is really important at this stage and for Daubert motions

4     because it gets to the heart of the questions for the Court on

5     Daubert.

6          Dr. Buring defined how to establish causation in

7     Dr. Louik's report, and that was exactly Dr. Louik's role or

8     charge in preparing that report and offering those opinions,

9     and we now know that the author of that section, Dr. Buring, is

11:41AM 10     not aligned with Dr. Louik's application of that methodology,

11     and actually Dr. Buring's views on how to make certain

12     assessments is really at odds with what Dr. Louik actually did,

13     and we need the opportunity to ask Dr. Louik about that and

14     explore why she didn't apply Dr. Louik's methodology reliably

15     and as Dr. Buring had intended it to be.

16          Now, plaintiffs' counsel in their brief, they tried to

17     shift the blame, and they tried to blame GSK's counsel for

18     maybe not asking the right questions at Dr. Louik's deposition,

19     and, your Honor, I think the deposition transcript speaks for

11:41AM 20     itself, and I know plaintiffs attached that in full to their

21     papers.

22          I disagree with that characterization.  Really at the

23     heart of this is the fact that Dr. Louik was fundamentally not

24     honest, and we saw that because she issued an errata sheet

25     after her deposition correcting her story, and the story did

1   not stop changing then, but even putting all of that aside, I

2   think an important factor to remember is that the rules provide

3   a presumptive limit of seven hours for a deposition, but that's

4   not a hard and fast rule.

5          In certain situations, it should be adjusted, and here

6   at Dr. Louik's deposition, counsel used a full seven hours of

7   her deposition time.  Dr. Buring's name didn't even come up

8   until around 6:30 p.m., when there was very little, if any,

9   time left to explore that new revelation, and, your Honor, in

11:43AM 10   certain situations, and we think this is one of them, the

11   presumptive limit should be adjusted, and that's especially

12   true when you are dealing with experts who are paid to be

13   involved in the litigation and you offer wide-ranging opinions

14   often on voluminous data, and that's exactly what we have here.

15          So, your Honor, in light of the recent publication of

16   the Zambelli-Weiner, Kirby study, the increments of all of

17   Dr. Louik's report, we believe that a targeted deposition is

18   appropriate in this situation, and we'd ask the Court to grant

19   leave on that point.

11:43AM 20          THE COURT:  Let me ask two questions.

21          MS. HILL:  I could go on.  This also relates to the

22   overall schedule for Daubert briefs, and I would say we fully

23   recognize the need to keep this litigation progressing.  We

24   thought really long and hard about whether we could press

25   forward with briefing despite all of these issues with

1    Dr. Louik's opinion, and after really careful consideration, we

2    don't believe that it is possible to move forward under these

3    circumstances until we get some more information from

4    Dr. Louik, and we believe that this adjustment to the schedule

5    is necessary.

6         As I mentioned, the plaintiffs are really poised to

7    hold this Zambelli-Weiner, Kirby study up as really a key study

8    to support their claims.  It's going to be these studies that

9    their experts will use to try to demonstrate replicated results

11:44AM 10    for septal defects, which they otherwise did not have, so

11    without the study, Dr. Louik can't really even get the very

12    basic hurdles of establishing causation, and this is really

13    important in the context of our Daubert briefs, not just for

14    Dr. Louik but for all of their experts because all of their

15    experts, several of their experts have expressed their reliance

16    on Dr. Louik's opinion of epidemiology.

17         We also considered whether we could address the issue

18    with supplemental briefs, whether we could keep the schedule

19    and file supplemental briefs as we get additional information

11:45AM 20    from Dr. Louik, but the problem, your Honor, that we're facing

21    there is that if we cite testimony from their experts relating

22    to the limitations of the abstract or poster, plaintiffs' first

23    response will be that all of the shortcomings are cured with

24    the publication, so we'd be really left in an impossible

25    situation, and all of this has really been compounded just

1    Wednesday when three other of their experts or supplemental

2    reliance lists also stating their reliance on the study, so

3    plaintiffs' experts' opinions have really continued to shift in

4    the past few weeks, even in the past few days, and we've been

5    left trying to scramble to make adjustments with their opinions

6    that have not -- that we expected really to have a fair

7    understanding of weeks ago before these motions were said to be

8    filed, and in their brief, your Honor, plaintiffs say that

9    science is always moving forward, and I agree with that, but we

11:46AM 10    wouldn't be here if this is the tenth study saying the same

11    thing.

12         It would certainly be ideal if all of the facts were

13    static before schedules were set, but that's unfortunately not

14    the case, and it hasn't been the situation here.  Litigation

15    really doesn't happen in a vacuum, and we're just here to ask

16    the Court to make an appropriate adjustment to the schedule to

17    account for these real world developments.

18         THE COURT:  I have two questions.  The first is does

19    the defense anticipate that there would be live expert

11:47AM 20    testimony at the Daubert hearing or do you expect it will be

21    done on the papers?

22         MS. HILL:  That is a good question, your Honor, and we

23    would like to have some discussions with plaintiffs' counsel

24    about how exactly Daubert hearings would be conducted, but we

25    do think that live testimony, at least to some extent, would be

1    appropriate.

2         THE COURT:  Because wouldn't that provide effectively

3    an opportunity to cross-examine an expert on this very topic

4    without the need for a deposition?  In other words, wouldn't

5    that give an opportunity for any of these issues to be explored

6    with any of the experts?

7         MS. HILL:  Sure, your Honor.  It really goes to the

8    substance of the motions that we need to file and what our

9    arguments are going to be before we even get to the hearing.

11:48AM 10   There could be some issues that are similar that we would want

11   to explore at a hearing, issues that are similar to ones that

12   we may need to cover in a supplemental deposition, but until we

13   are able to discover the facts, it's really difficult to set

14   our argument in a motion, and so we'd just like the opportunity

15   to understand, you know, what Dr. Louik's view of this

16   particular study, and, you know, to have information about how

17   her report was drafted and how her opinion was developed so

18   that we could even set out our argument in our motion papers.

19        THE COURT:  My second question, which is not

11:48AM 20   unrelated, is do you expect to have an expert report by

21   supplement or otherwise that attacks the Zambelli-Weiner study

22   in other words, that criticizes --

23        MS. HILL:  That is something that, you know, at this

24   point I will be perfectly frank, we don't have something

25   planned, but we also still need information about the study.

1    We would like to know how Dr. Louik evaluated the data.  There

2    are a lot of questions that the study presents, and so that is

3    kind of what is instigating our separate deposition request of

4    Dr. Zambelli-Weiner and Dr. Kirby.  You know, depending on what

5    we learn there, that might be appropriate, but at this time,

6    it's not something that we anticipate.

7         THE COURT:  Okay.  Who's going to respond for the

8    plaintiffs?

9         MR. MILLROOD:  Thank you, your Honor, this is

11:49AM 10   Tobi Millrood.  Thanks for hearing us by telephone this

11   morning.  I'm going to address GSK's motion today, but I do

12   want to point out that Mr. Rotman, who is on the line, defended

13   Dr. Louik's deposition and appeared at Dr. Buring's deposition,

14   and should the Court have specific questions relating to

15   anything that occurred at those depositions or the reports that

16   I can't answer, he's available for the Court.

17        Let me first say based on how GSK closed their

18   argument that I have to confess that this really feels like a

19   rope-a-dope to the scheduling.  You know, your Honor, we

11:50AM 20   appeared before you last week, and it was our impression, which

21   we argued that we should not delay the Daubert schedule, and as

22   I understood at that point in time, this was only going to

23   delay it by six days and that GSK asked for Monday, the 10th,

24   instead of Tuesday, the 4th, and I did scratch my head at that

25   point in time thinking to myself, well, that's strange, but if

1   that's what they're prepared to do with the argument on the

2   7th, even if they were to prevail, that's what we got to stick

3   with, and I really don't think that is appropriate for them to

4   now come in, having appeared before this Court last week, and

5   now say we want to revise the schedule once again and delay it

6   because now it doesn't seem like it's just a small little delay

7   of six days.

8         But, nevertheless, we don't think that's the right

9   thing necessary anyway because we don't think this motion

10  should be granted.  Simply put, GSK has not met the threshold

11  under the rules that would allow a second deposition of

12  Dr. Louik, and as even GSK acknowledges in their papers,

13  Rule 26 permits your Honor to restrict or prohibit discovery

14  when it is unreasonably cumulative or duplicative or could be

15  obtained in a less burdensome way.

16        GSK has already had two bites of the apple relating to

17  the opinions and report of plaintiffs' epidemiology expert,

18  Dr. Carol Louik, and there is no new information that would

19  permit GSK even more time with Dr. Louik than the ten and a

20  half hours they already spent with her on October 18th.

21        GSK has failed to point out new opinions or new facts

22  that would justify a deposition, so what does GSK allude to as

23  being "new" that would require this deposition?  So they

24  identify these two areas that they claim would be new areas of

25  inquiry.

1          First, they cite to the peer-reviewed published

2     article by authors Drs. Zambelli-Weiner and Kirby, and, second,

3     they say that they need to reconcile the testimony of Dr. Louik

4     and Dr. Buring, a colleague who assisted Dr. Louik on a basic

5     background section relating to *Reproductive Toxicology* in

6     Dr. Louik's report.

7          However, neither one of those two areas relate to new

8     opinions or new information that would allow GSK a third bite

9     at the apple.  Indeed, we think, your Honor, upon closer

11:52AM 10     examination, a request for a re-deposition of Dr. Louik is near

11     pretext for a way to abuse, embarrass and annoy Dr. Louik in

12     the hopes that this formidable expert will disappear from the

13     case and not threaten GSK's defense on causation, but the law

14     is clear that Judges should not hesitate to exercise control

15     over the discovery process to prevent that kind of annoyance,

16     embarrassment and impression.

17          So let me take each of the two issues that Ms. Hill

18     raised.  First, the published study from Drs. Zambelli-Weiner

19     and Dr. Kirby.  The literature is replete with articles

11:53AM 20     relating to birth defect causation, and this one in particular

21     is one of the articles relating to Zofran causing certain birth

22     defects.  GSK doesn't like the conclusion it reaches because it

23     hurts its case.

24          This is not a new study, as Ms. Hill repeatedly called

25     it.  GSK has known about the findings for many months, since

1    the publication of the abstract and poster earlier this year,

2    and GSK has known about Dr. Louik's use about the study, which

3    belies in her report, and as GSK questioned Dr. Louik for

4    nearly 100 questions covering 10 percent of her October 18th

5    deposition, there is little that they haven't covered with

6    Dr. Louik on this, and so what "new" has happened since all of

7    that?

8            Well, Dr. Louik told GSK in a November 11th supplement

9    that with the study out, her opinions are unchanged.  She's

10   reviewed it, and her opinions are unchanged.

11           Now, as we pointed out in our papers, your Honor, the

12   published study does not differ much at all from the abstract.

13   Why?  Because this abstract poster that we presented earlier

14   this year was not a typical abridged abstract.

15           As we pointed out in our papers, it contained all the

16   salient information relating to causation.  We pointed to 15

17   different pieces of information in the abstract poster in our

18   response brief.

19           So, of course, we were expecting in GSK's reply that

20   they would somehow point out where there is a difference

21   between the abstract poster and the published study, and they

22   didn't.  Why?  Because there is none.  This morning there is

23   this reference that there's a table, which they find

24   characteristic in how events are categorized, but the bottom

25   line is there is no differences between the abstract poster

1    that would relate to Dr. Louik's opinions.

2          She says her opinions are unchanged.  It would seem

3    obvious that given GSK's claim to emergent need to re-depose

4    Dr. Louik over this article that they would rush to point out

5    how much new and additional information appears in the study in

6    either of their opening or reply brief.  They haven't done so

7    because they can't, and because they can't, they have not met

8    their burden to re-depose Dr. Louik on that issue.

9          Second, the issue relating to a need to re-depose

11:55AM 10   Dr. Louik about her involvement with Dr. Buring, your Honor,

11   let me just say that this is really a "she said, she said"

12   contrived controversy drummed up by GSK as a basis to come in

13   and harass Dr. Louik.

14         What we have here is Dr. Louik said X about

15   Dr. Buring's involvement.  GSK sought and received permission

16   to then depose Dr. Buring.  Dr. Buring said why about

17   Dr. Buring's involvement?  We think that they are entirely

18   consistent.  GSK doesn't.  GSK thinks that there is a need to

19   reconcile X and Y, but that's not a basis for a re-deposition.

11:56AM 20   All GSK wants to do is march back in to Dr. Louik trying to

21   grab a gotcha moment to claim Dr. Buring said something

22   different than you, Dr. Louik, so now what do you have to say

23   for yourself?

24         Well, the time for that is trial, and GSK knows it.

25   There's absolutely no basis for re-deposition.  If that were

1    the case, we would be returning back to numerous witnesses in

2    this case, both fact and expert, whose testimony was

3    subsequently contradicted by others.

4         GSK now has everything on Dr. Buring.  They have

5    Dr. Louik's testimony, including her errata sheet.  They have

6    Dr. Buring's testimony and produced documents.  There is

7    nothing new to provide them other than an opportunity to

8    impeach and harass on that issue.

9         I want to say a few more logistical things about any

11:57AM 10   order that might permit a re-deposition of Dr. Louik, which we

11   oppose strenuously.  First, if the standard for granting a

12   re-deposition is an expert saying I've read the posh literature

13   and my opinions are unchanged, then we are entering into what

14   could be a bottomless pit.

15        Yes, even in its reply, GSK referenced the

16   supplemental reliance list of Dr. Ra-id Abdulla and Sadler.

17   Yes, those three experts keeping up to date with relevant

18   literature on Zofran causation read new literature, six or

19   seven pieces, not just Zambelli-Weiner, but they cited to six

11:58AM 20   or seven pieces in their supplemental reliance list, and, yes,

21   they want GSK to know they read it and it doesn't change their

22   opinions.

23        If you permit a re-deposition of Dr. Louik on the

24   grounds she said she read a new study and her opinions are

25   unchanged, why would GSK then get to re-depose each three

1    experts about the literature they cite to, and where would the

2    end be?

3           Second, if GSK is permitted to re-depose Dr. Louik

4    regarding the published study of Zambelli-Weiner and Kirby,

5    then we would request it may be clear, it be made clear in the

6    order that if GSK's experts would like to rely on or testify or

7    refute that study in the future, then they must be re-deposed,

8    and if they claim they will not rely or reference it at trial

9    such that they do not need to be re-deposed, then they are

11:58AM 10   precluded from discussing the study at trial.

11          Third, and, finally, if your Honor does believe that

12   GSK has met the high burden for re-deposition, then we would

13   ask it be narrowly restricted to place length, scope and

14   penalty for failing to comply.

15          First, because of GSK's countless conduct in the Louik

16   and Buring deposition and their intent to harass these

17   witnesses, we believe it would be appropriate for the

18   deposition to take place before either Judge Dein or your

19   Honor.

11:59AM 20          Second, we believe the length should be limited to one

21   hour.

22          Third, we believe the scope of the deposition must be

23   limited to any new information in the published study that

24   wasn't in the abstract with no questioning relating to

25   Dr. Buring.

1       And, finally, if GSK pursues areas of inquiry outside

2   of that scope, it will be subject to sanctions.  We believe

3   that with the request for re-deposition, GSK is asking this

4   Court to start down a perilous path of endless and unnecessary

5   re-deposition and discovery, and we believe the rules and cases

6   interpreting the Rule 26 gives your Honor the discretion to

7   shut this down.  We ask that you do that and deny GSK's motion.

8       THE COURT:  Okay.  Thank you.  I understand the

9   issues.  I want to put that on hold for the moment and turn to

12:00PM 10   plaintiffs' motion for a protective order concerning the

11   depositions of Drs. Zambelli-Weiner and Kirby, so who's going

12   to take the lead on that for the plaintiff?  Is that yours,

13   Mr. Jenner?

14       MR. ROTMAN:  Your Honor, this is Steve Rotman.

15       THE COURT:  Steve Rotman.

16       MR. ROTMAN:  On that motion, we received last night

17   the opposition from GSK and would like to submit a reply brief,

18   which we can do rather quickly if the Court wants to set a

19   deadline for early next week.

12:01PM 20       THE COURT:  Why don't you take a shot at it.  I think

21   I'd like to try to resolve it now, but let me hear the

22   argument, and then if you want to point out to me some way in

23   which you think it's not fair and you need a further

24   opportunity, I'll hear you.

25       MR. ROTMAN:  Okay.  So the request for an opportunity

1    for a reply brief is based on the information that GSK included

2    in their brief last night that identifies areas of the Weiner

3    study that they say are suggestive of litigation-driven

4    science.

5           Specifically they refer to the fact that there's a

6    certain group of people that were administered the medication

7    through physicians or hospitals and that there's something

8    wrong with using that group, which we would like to address in

9    a reply brief because there is nothing wrong with that, and, in

12:02PM 10    fact, there is good argument for it in a more reliable way, and

11   that's documented in the medical literature, and they also make

12   a reference to the words "*a priori*" and how what they're

13   claiming what was done in the study was not consistent with

14   what had been already considered in prior studies.

15          So we would address that in a reply brief, but our

16   position on the protective order, you know, again, we didn't

17   know that was up for today, but if the Court wants to hear it,

18   I would just say we wrote in our moving papers that they have

19   known about this study since the spring, they have known about

12:03PM 20    plaintiffs' experts' reliance on the study as an abstract in

21   poster since July, and the information in the July disclosure

22   as well as in the earlier spring poster includes the disclosure

23   of the financial role of plaintiffs as well as a manufacturer

24   of Zofran, so they've known about that issue for many, many

25   months.

1          That is not a new issue with the publication, and as

2     we stated in connection with the argument that we just

3     completed on the emergency motion, the information in the

4     published paper is remarkably identical to the information in

5     the previously known abstract and poster.

6          We remind the Court that we have addressed this issue

7     to some extent on November 14th at the status conference, and

8     your Honor had comments about guidelines for how the Court was

9     thinking about the issue.

12:04PM 10          The Court seemed open to the idea of a deposition

11     limited to the issue of what were the financial aspects but

12     aversed to the idea of having depositions of scientists

13     describing that as both troublesome, a little far afield and a

14     potential for harassment of busy scientists, and so there's

15     nothing really in what GSK has presented to the Court that

16     would suggest a reason why the Court should change its view as

17     to the appropriateness of having a definition of the scientists

18     in preparing -- that were involved in one of the studies.

19          There were a large number of studies that experts on

12:05PM 20     both sides are relying on for their causation opinions.  This

21     is one of them.  Why these scientists?  Because GSK considers

22     this study to be so pivotal.

23          Again, there's a question of fairness that this is

24     going to be permitted.  Why draw the line there, and why open

25     it up for that reason?

1          The issue of the finances, there are other ways for

2     the discovery to proceed.  There can be interrogatories and

3     document requests regarding what the circumstances were, but

4     certainly if there's going to be an oral deposition, it should

5     be limited in time to this one issue of was there financial

6     support and what form did it take, keeping in mind that the

7     disclosure in the paper makes it clear that there was no

8     outside involvement in the study designed, in the data

9     collection, in the analysis and interpretation of the data or

12:07PM 10     in the writing of the manuscript.

11          Your Honor, as an officer of the Court, I will

12     represent we did not know what that paper was going to say

13     before GSK did.  We got it when they got it, when it was

14     published.  We did not see it as a draft.  We did not get an

15     opportunity to comment on it when it was a draft.  We did not

16     have any input into what it said.  Nobody asked our views on

17     how she should design the study, how the investigator should

18     design the study, what they should look for and so forth.

19          So with that, there nevertheless isn't a disclosure as

12:07PM 20     well that "as an organization, PTI," which is the name of the

21     consulting firm that one of the co-investigators is the founder

22     and president of, "they report receiving funds from plaintiff

23     law firms involved in this litigation and the manufacturer of

24     Ondansetron," so if that's the basis for allowing discovery,

25     let it be limited to that one issue, but our view is that --

1   and I don't believe the Court appreciated this when the

2   statements were made on November 14th that there not only was a

3   disclosure of this funding by plaintiffs' law firms and a

4   manufacturer of Ondansetron but an explicit statement about no

5   outside involvements in anything relating to the substance of

6   the study.

7        So our view is, in summary, the deposition should not

8   proceed.  They should not proceed in relation to any questions

9   about the substance of the study.  There should be no

12:09PM 10   requirement, that the subpoena for documents should not be

11   allowed.  The documents that they're asking for are not limited

12   to financial.  They're asking for literally all of the

13   documents and raw data for the study itself.

14        They're looking to investigate the study, to tear it

15   apart, to focus on it with a microscope that makes it unique

16   when we've got over a dozen other human epidemiologic studies

17   in this case, and we have numerous animal studies and other

18   types of mechanism studies that this one is going to be the

19   exception where GSK gets to put this particular study under a

12:10PM 20   microscope.

21        THE COURT:  All right.

22        MR. ROTMAN:  Your Honor, I was not expecting there

23   would be an argument on this issue, so I may have additional

24   things that I would add in a reply brief.

25        On the points about the claim in the papers filed last

1    night about this being litigation-driven, again, going back to

2    the disclosure that there was no plaintiff involvement or

3    involvement from any outsiders in the substance of the design

4    or conduct of the study, but the examples that they provide --

5    I'll give one example.  They give this example that it was

6    somehow inappropriate to focus on what's called the medical

7    administration.

8          And so if we were allowed to submit a reply brief,

9    your Honor, we would show the Court that it's documented in the

12:11PM 10   medical literature that it's a known problem in studies like

11   this that women who are prescribed the medication actually

12   don't take it in many cases.  It's often prescribed as needed

13   so that the denominator is a larger than should be denominator,

14   and it understates the actual risk in the study when you go by

15   prescription data or prescription registries and you don't know

16   whether the women actually took the medication.

17         These investigators said we have an opportunity to

18   avoid that problem.  We have enough data, over 5,000 women who

19   we know got the medication.  They were prescribed it, and they

12:12PM 20   took it because medical administration by definition means it

21   was administered by a medical -- by medical personnel, either

22   in a hospital or a doctor's office, so we know that they got

23   the drug, so we know that the denominator is not artificially

24   and incorrectly inflated, and, therefore, odd ratios, relative

25   risk that measure the strength of the association should be

1    more accurate, so what was done in this study to avoid a

2    problem that was apparent in some other studies is being used

3    by GSK as an example of something that was inappropriate or

4    litigation-driven.

5        A second thing they make reference to is the language

6    in the paper about "*a priori*" where they say that that must

7    mean that the investigators were only going to look at birth

8    defects that had already been the subject of previous studies,

9    and that is a fact that this paper looked at those plus other

12:13PM 10   defects was somehow evidence that it wasn't "*a priori*."

11       That point also is misleading because what the

12   investigators said in their paper was that they defined

13   "*a priori*" as suggested by prior studies, including animal

14   studies and expert opinions, so they considered a broader

15   spectrum of science than just case controlled studies and

16   cohort studies, and from that they concluded that there's a

17   range of injuries that should be investigated.

18       Their primary analysis was oral-facial cleft and heart

19   defects, exactly what the prior studies had looked at.  Their

12:14PM 20   secondary analysis drills down deeper and then looks at some of

21   the subcategories of heart injuries beyond the general category

22   because a heart defect can include let's say over a dozen more

23   specifically-named injuries that come under the category of

24   heart injuries.

25       So their arguments about "*a priori*" and their

1  arguments about medical administration, which are their only

2  two examples of what they're describing as evidence that this

3  was litigation-driven, and which we've addressed in a reply

4  brief, are not a justification for varying from your Honor's

5  stated view that it's troublesome to have depositions of the

6  scientists that were involved in the studies.

7          THE COURT:  Okay.

8          MR. ROTMAN:  That's the end of my comments on that,

9  your Honor.

12:15PM 10          THE COURT:  Okay.  Who's going to respond?

11          MS. HILL:  Thank you, your Honor.  This is

12  Jennifer Hill, if I could just address some of those comments.

13  First, Mr. Rotman's suggestion that, you know, reply briefing

14  is necessary to address how some of this data was cut, you

15  know, while he may want to provide some justification for what

16  the study authors did here, that's really not the issue for the

17  Court's consideration.

18          I think that's kind of the Court may not get into the

19  weeds on whether certain decisions that the study authors made

12:16PM 20  were not justified by scientific literature.  The question

21  really is whether there is good cause to issue a protective

22  order as to these deposition notices.

23          Mr. Rotman suggested and Mr. Millrood did as well that

24  GSK has known about the study for several months, had all of

25  this data.  They suggested there's nothing new here, but there

1    is, in fact, a lot that's new here.  You know, one of the

2    points that Mr. Rotman just mentioned was how the study author

3    selected certain birth defect outcomes based on expert

4    opinions.

5         Now, that particular piece was not in the poster.  The

6    poster contained no such language to suggest that the outcomes

7    were defined or selected based on expert opinions, and that's

8    just one of many factors that, you know, that raises a question

9    for us and another factor that we need to talk to Dr. Louik

12:17PM 10   about.  We would like to get additional discovery to really

11   understand how this study was, how the data was analyzed and

12   how it came about.

13        The very basic point here, your Honor, that's

14   addressed in our opposition brief is that the plaintiffs don't

15   have standing to challenge these depositions that were issued

16   to third parties.  The document requests were directed to third

17   parties.  Plaintiffs don't purport to represent the deponent.

18   They don't seem to be asserting any personal right or privilege

19   in the information.

12:17PM 20        That's never suggested in their moving papers, and

21   second, your Honor, there is simply no good cause to support a

22   protective order here.  Plaintiffs never explained how they're

23   entitled to a protective order except to suggest that these

24   depositions are just harassing in the abstract.

25        And to the extent they are trying to equate some

1    abstract concept of harassment to actual burden, they haven't

2    established how it is burdensome, and they haven't provided any

3    facts to do so, and we'd also take the position that they don't

4    have standing to assert burden on behalf of parties that they

5    don't represent.

6         As we set out in our opposition paper, your Honor, we

7    are not seeking to depose every person who ever authored a

8    study about Zofran, but the fact of this study and this

9    situation sets it apart from any of the other studies, and the

10   reason, your Honor, fundamentally at the very bottom of it is

11   that the authors acknowledge and plaintiffs do, too, that PCI,

12   the organization behind this study, received funding from

13   plaintiffs' attorneys in this litigation, and we also know

14   based on plaintiffs' counsel's prior representations to the

15   Court that they actually provided their own work product to PCI

16   about the study before it was accepted for publication.

17        And on top of that, your Honor, the lead author,

18   Dr. Zambelli-Weiner is no stranger to litigation.  She's been

19   retained as the plaintiffs' expert in other litigation.  As

20   another Court described the analysis that she offered last year

21   in another case, the Court called it litigation-driven science,

22   and she was precluded as serving as an expert in another case,

23   and so when you put that background up against the information

24   that was recently published, there are questions that we have,

25   and maybe there are justifications for how the authors cut the

1  data, whatever outcomes they selected.

2  Maybe there's some justification but the bottom line

3  is the paper itself leaves a lot of questions, and when you

4  view the paper against the fact that we know plaintiffs'

5  counsel in this litigation has provided funding to that

6  organization, the study itself identifies a potential conflict

7  of interest, and, I, frankly, shouldn't even say it has a

8  potential, they call it a conflict, and when you view all of

9  those facts together, it's really clear that this particular

12:20PM 10  study is different from any of the other studies.

11  We think that the analysis selected in this published

12  study are suspect, and while plaintiffs may disagree, and

13  perhaps the study authors have some justification that is just

14  not apparent in the report, we don't know, but we'd like to

15  find out, and that is the reason for our deposition request,

16  your Honor.

17  There have been several other Courts that have allowed

18  discovery on third-party researchers in different situations,

19  and when there's a financial relationship between a litigant

12:21PM 20  and a researcher that should be neutral, that appears to be

21  neutral, that is one situation that can justify some limited

22  discovery.

23  And let me just address some of the limitations that

24  counsel has suggested on the discovery into the study.  The

25  question raised by plaintiffs' financial dealings go beyond

1    just the money that was exchanged between these two parties,

2    and the scope of the depositions should follow the issues that

3    are really in play here.  We need to be able to understand not

4    just how much money was paid and when.  We need to be able to

5    understand the impact of the findings on the study designed,

6    the execution and the final report, and I appreciate

7    Mr. Rotman's representations that they didn't influence it in

8    any way.

9            We shouldn't be expected to take their word for it or

12:22PM 10   take the authors at face value when they were, in fact, paid by

11   the plaintiffs' counsel, and we would like the opportunity just

12   to explore how the data was analyzed and whether there was some

13   influence, even if unintentional, and, your Honor, limiting the

14   discovery, plaintiffs have also suggested limiting discovery on

15   this topic just to written questions, and we think that that is

16   also inappropriate.

17           First, we don't even know if that would be preferable

18   to the witnesses that we've deposed.  The plaintiffs again

19   don't purport to represent them, but also it wouldn't allow us

12:22PM 20   to learn the facts that we think we need.  We wouldn't be able

21   to ask follow-up questions if we're limited to written

22   questions, and plaintiffs really, you know, at a basic level,

23   plaintiffs haven't demonstrated that GSK's requested method of

24   taking this discovery is actually burdensome, so, your Honor,

25   this is a study that's unique.

1       Again, it's not our intention, and it's not our action

2 to go and depose any third-party researcher.  You know, I will

3 also point out that plaintiffs have for their own part taken

4 discovery on third parties, including five doctors, whose only

5 involvement in the issues in this litigation were to sign a

6 comment in opposition to Mr. Reichmann's citizen petition.

7       They found it appropriate in that situation to serve

8 dozens of requests for production on those doctors, and so, you

9 know, we have isolated two researchers who have the financial

12:23PM 10 connection with plaintiffs.  They've published the study that

11 raise a number of questions.

12       At a minimum, there are a number of questions that we

13 would like to explore that we feel are necessary to

14 understanding the study, that those questions are necessary to

15 our ability to appropriately cross-examine and impeach

16 witnesses at trail, and so we think that discovery is

17 appropriate, and just as to the last point, plaintiffs have

18 made really what amounts to a threat basically to take their

19 own deposition if GSK's depositions are permitted to proceed.

12:24PM 20       Really discovery is not -- the discovery should be

21 about learning facts that each side needs to present their

22 claims and defenses.  It's not about getting back at the other

23 side for taking one too many depositions.  It's not about

24 trying to even the score, and really the fact that there's a

25 suggestion that the plaintiffs would want to follow with their

1    own discovery only comes out now.

2         That should tell you everything you need to know about

3    their motivation and about their position.  This study is

4    unique.  It presents a number of questions that haven't been

5    answered by plaintiffs' experts regardless of what plaintiffs

6    would suggest GSK knew about the study in the abstract form.  I

7    mean, the facts just don't support that.

8         I mean, Dr. Louik in her report calls the

9    Zambelli-Weiner abstract, she says, "In this brief abstract,

10   there's not enough information to understand what these

11   differences might be and how they might relate to fetal risk,"

12   so while there was some information available, the deposition

13   testimony and the report demonstrate that the information that

14   was available was limited, and plaintiffs' own experts

15   acknowledge that.

16        We just need to have a fair chance to understand the

17   study and the potential influence plaintiffs' counsel may have

18   had on the development of that study, and so we'd ask that the

19   Court permit this deposition to go forward.

20        MR. ROTMAN:  Your Honor, if I may just have a few

21   comments?

22        THE COURT:  Yes.

23        MR. ROTMAN:  This is Mr. Rotman again.

24        THE COURT:  Go ahead.

25        MR. ROTMAN:  So, the comment by Ms. Hill that there

1    are certain things that were questions where there's not enough

2    information based on the abstract that were articulated by

3    Dr. Louik in her report.  The reality is, your Honor, Dr. Louik

4    said that about published papers that she considered as well

5    because the fact is that in this environment, we are talking

6    about human epidemiology case control and cohort studies.

7            Any expert can look at any published paper on any

8    study and come up with questions that are not answered by the

9    study.  That's the definition of what the limitations are of

10   any observational study.

11           So there's questions that they can raise about the

12   Zambelli-Weiner study.  That's not unique, your Honor.  There

13   are questions that can be raised about any published study.

14   Any epidemiologist worth his or her salt can look at any

15   published study and any abstract of any study and ask questions

16   that are not answered by the manuscript, even when it's a

17   peer-reviewed and published paper, and the reason for that is

18   that the journals impose word limits, and the authors are

19   required to condense their presentation down to a certain

20   limited amount of words and tables, but those were not

21   limitations imposed on the Weiner or Kirby investigators when

22   they presented their abstract and poster, so their abstract and

23   poster, which are attached as exhibits in our submission at the

24   end of Dr. Louik's report, provide incredible amount of detail.

25           So getting back to the limitations that would be

1    appropriate if any deposition is allowed here is limited in

2    time, limited to one witness.  We believe it should be

3    Dr. Weiner because she has the relationship with PTI and

4    limited to the questions of whether plaintiffs provided

5    financial support for the study, and if the Court thinks it's

6    appropriate, whether plaintiffs influence in any way any aspect

7    of this study.

8              And, let's see, I think there was also a question

9    raised on this issue about the finances of the study.  I'm not

12:29PM 10   sure if Mr. Millrood has anything that he wants to address

11   about the question of GSK's own issues with financing and

12   influencing the science, so, Mr. Millrood, I don't know if you

13   have in mind anything you want to add there, but that's not

14   something that I have the information to address.

15             THE COURT:  Mr. Millrood.

16             MR. MILLROOD:  No, your Honor, only to say that as

17   Mr. Rotman pointed out, you know, we would have -- had we

18   replied to their response, we would have suggested to this

19   Court that for GSK to get in a cheap shot, as they repeatedly

12:30PM 20   used in their argument today of this litigation-driven science,

21   I would remind GSK and the Court that after 30 years of

22   purposely not doing any studies for science for any human

23   analysis of how Zofran could cause defects, for them to say now

24   we have to get a deposition, after 30 years after not studying

25   it, the fact that the experts went out and did it, we're going

1    to call that litigation-driven science if they are related in

2    any way to the plaintiffs, and we now need to take their

3    deposition.

4          I think that has to be considered in the way in which

5    GSK comes in with unclean hands seeking the deposition of

6    Dr. Weiner or Dr. Kirby, and I want to underscore that if there

7    is to be any deposition, we should not have this purposeful

8    interruption of two scientists where you are going to try to

9    pick them against one another, have their testimony by getting

12:31PM 10   two depositions of them and see if they parse out how they

11   might differ with one another.

12         If there's going to be any deposition permitted, it

13   should be limited to one, and if the real issue that they are

14   concerned about is the financial relationship between

15   Dr. Weiner and plaintiffs, then they can explore that in a

16   limited deposition, and that should be it.

17         THE COURT:  All right.

18         MS. HILL:  Just on that point, we served notices on

19   both Dr. Zambelli-Weiner and Dr. Kirby because we think that

12:31PM 20   both of them have important information to offer, not just

21   Zambelli-Weiner being a lead author and apparently the one who

22   received the money from the plaintiffs' counsel, but Dr. Kirby

23   as well because he was involved in the actual data analysis,

24   and that's really a critical piece of this and one where there

25   are a lot of questions based on what was reported.

1   So, your Honor, we, you know, of course, the

2   deposition, any deposition would be, you know, tailored to the

3   facts that are important, but it's not just the money that

4   exchanged hands, it's the actual study and how the data was

5   analyzed and how it was reported and whether there are any

6   influences from the money into what was actually published,

7   your Honor, and that's all I'll say.

8   THE COURT:  Okay.  All right.  Let me -- I'm prepared

9   to rule here, so let me go back to the first motion concerning

12:32PM  10   Dr. Louik.  I'm going to begin by saying this is not the trial,

11   this is not even a Daubert hearing, this is discovery.  The

12   standard is not perfection or 100 percent completeness.

13   There's always more things you can ask or things that you in a

14   perfect world wish you had an opportunity to ask.

15   I am not convinced that based on balancing the burdens

16   and the benefits that reopening the deposition of Dr. Louik is

17   justified.  She indicated she relied on the abstract.  Now the

18   article has come out.  She hasn't changed her opinion.

19   Obviously, there are issues about whether she considered facts

12:33PM  20   X, Y and Z that are in the article but not the abstract, but I

21   think those can be addressed at cross-examination, or, for that

22   matter, if we have live testimony at a Daubert hearing.

23   And I think under the circumstances here, the benefit

24   is not worth the additional burden and cost and other things

25   that come with reopening the deposition, so that motion is

1    denied.

2             Obviously, if there is live testimony, some of this

3    may be fair game, and certainly it would be fair game for

4    cross-examination at the trial, at least in the abstract.

5             As to the motion for a protective order concerning

6    Dr. Zambelli-Weiner and Kirby, I think this is ripe enough for

7    resolution.  I appreciate that it came up somewhat quickly,

8    and, again, in a perfect world, there would be a greater

9    opportunity to respond, but I think on balance, it's preferable

12:34PM 10   to take it up today and get the issue resolved.

11            Normally, as I indicated at the last hearing,

12    discovery is not permitted on underlying articles or science on

13    which experts rely.  If that methodology is wrong in some way

14    or biased in some way, normally the way to attack that is

15    through the experts, but here I think this is a little

16    different.

17            I guess I start maybe where defendants do.  It's not

18    at all clear to me whether plaintiffs have standing to seek a

19    protective order under the circumstances, not representing

12:35PM 20   either witness, but putting that aside, I think here there is a

21    basis certainly for believing that the study was funded in part

22    by plaintiffs' counsel, and I think that that's a fair basis

23    for conducting deposition inquiry into that, what was paid, how

24    did that happen, how did that come about, all the circumstances

25    of that and communications with plaintiffs' counsel or with any

1    intermediate organization, and for that matter,

2    Ms. Zambelli-Weiner says that the study was also funded in part

3    by a manufacturer.

4         I think all that is fair game as well, how did that

5    come about, how much was paid and how did that happen?  All of

6    that I think is fair.  I think if the issue were on the other

7    foot, it would also be fair if a study funded entirely by GSK

8    or conducted in-house I think would be fair to give plaintiffs

9    an opportunity to understand all of that and how the financing

12:36PM 10   might have affected the study.

11        Where it gets difficult is not simply the fact that

12   the payment was made, but, you know, whether any money or any

13   communications or expectations of future financial

14   relationships or anything like that actually affected the

15   study.  That's an issue that I can't address with a bright line

16   recall.  I don't think it's fair simply to ask what money was

17   paid or for counsel to necessarily accept a yes or no answer

18   to, you know, were you affected by the money when you conducted

19   the study.

12:36PM 20        I don't think as a general proposition, again, such a

21   deposition is appropriate simply to attack the methodology or

22   to say, well, look, you picked the wrong cohort or whatever,

23   but here I think the preferable course is to have a normal

24   deposition within normal limits focused on the financial

25   aspects, that is, what money was paid and how, what

1   communications with counsel, direct or indirect, were made and

2   how that affected the study.

3        I guess I'll express my concern that I don't view this

4   as a free shot simply to go after the methodology, but, on the

5   other hand, I can't say that the methodology is completely out

6   of bounds either given what I expect the answers are going to

7   be in terms of how the study was financed.

8        As for whether both Zambelli-Weiner and Kirby need to

9   be deposed, again, I can't really answer that in the abstract.

12:38PM 10   My instinct was to say that as the lead author that one needs

11   to go no further than Zambelli-Weiner, but I think under the

12   circumstances here, I'm going to permit both depositions to go

13   forward.

14        I will, I guess, state my expectation that if

15   Dr. Kirby was in a very junior position, so to speak, to

16   Zambelli-Weiner or was executing her directions, so to speak,

17   that I would expect that that deposition would be limited in

18   time and scope because, again, the focus here is the financial

19   aspects of this and whether or not it affected the study, but

12:38PM 20   those are editorial observations.

21        Again, I'm not sure I'm in a position to make a bright

22   line rule about what is in bounds or out of bounds.  Again,

23   this is discovery.  I'm not expressing a view as to whether any

24   of this is relevant at trial or how it might affect the Daubert

25   process, all I'm saying is that at least depositions can go

1    forward under the circumstances, so I'm going to deny

2    plaintiffs' motion for a protective order on the depositions of

3    Drs. Zambelli-Weiner and Kirby.

4         At the end of the day, whether any of this affects the

5    Daubert schedule, I'm not going to express a view.  I think

6    that as new issues arise, normally the way to address that

7    would be with things like supplemental expert reports, perhaps

8    supplemental expert depositions, I don't know.  Again, I don't

9    think what I have heard so far is enough to reopen Dr. Louik's

12:39PM 10   deposition, and whether or not anything changes going forward

11   is a question for another day.

12        Defendants asked that the schedule I think be delayed

13   and that the reports be submitted on December 10th.  I'm going

14   to hold them to that for now, and we'll take everything else up

15   in due course.

16        So, bottom line, deposition of Dr. Louik, no;

17   adjusting the Daubert briefing schedule, no; depositions of

18   Zambelli-Weiner and Kirby, yes.

19        I have another issue that I want to take up, but let

12:40PM 20   me pause there and see if anyone has any need for clarification

21   or anything else on those two topics?  Mr. Millrood or

22   Mr. Rotman.

23        MR. MILLROOD:  I apologize for the background noise,

24   but let me just first ask, of course, may we have the Weiner

25   and Kirby deposition proceed on different days?  We don't have

1    to be at the same place the same day.

2         THE COURT:  Yes, I think that's fair, and I think also

3    I would expect counsel to be cooperative and realistic about

4    the fact that it's the holiday season coming up and to take

5    that into account.  Travel is difficult, people want to be with

6    their families, they have made other plans and so forth, and I

7    would expect a considerable degree of professional courtesy on

8    that score.

9         Okay.  Ms. Hill, anything from defendant's end?

12:41PM 10    MS. HILL:  Yes, your Honor, just as to Dr. Louik, your

11   Honor mentioned the possibility of questioning Dr. Louik at a

12   Daubert hearing.  I guess my question is will the Court request

13   Dr. Louik's attendance at that Daubert hearing or can

14   plaintiffs commit to making her available so that we can follow

15   up on these loose ends?

16        THE COURT:  I'm making no ruling at all.  It had not

17   occurred to me before now.  I mean, sometimes I have Daubert

18   hearings with live testimony, sometimes it's lawyer argument

19   only with affidavits.  I don't know.  That's a question that's

12:42PM 20   going to need to be resolved, and if we are going to have live

21   testimony, of course, it's going to take a certain amount of

22   time and coordination, but we'll take that up in due course.

23   I'm expressing no opinion now.

24        All right.  The other issue that I have is we are

25   supposed to have a telephonic status conference for next

1      Wednesday, is that right?

2                  THE CLERK:  Yes, Wednesday, December 12th.

3                  THE COURT:  Wednesday, December 12th.

4                  MR. MILLROOD:  Yes, that's correct.

5                  THE COURT:  A senior Judge in our court, Judge Tauro,

6      passed away recently, and we have scheduled what's in effect a

7      memorial for him that afternoon.  I either need to move that

8      conference, or, alternatively, I think counsel had represented

9      that there wasn't that much to discuss.  We could perhaps

12:42PM 10  cancel it altogether, but I certainly at a minimum need to move

11     it.

12                 I don't mean to put you on the spot.  You don't have

13     to give me an answer right now, but perhaps if you could, if

14     you're not prepared to answer that question now, whether, you

15     know, we need to move it or to cancel it altogether.  If you

16     could, you know, get back to me maybe by the end of next

17     Monday.

18                 MR. MILLROOD:  Your Honor, let me short-cut at least

19     on behalf of the plaintiffs.  We do not need to move it, and

12:43PM 20  we're happy to submit, we'll confer with Ms. Hill and

21     Ms. Stevenson to the extent that anything needs to be covered

22     or updated for the Court for this Wednesday, we're happy to

23     submit it in a paper with a brief status update, but it may be

24     that we don't have anything to update in the papers, and it's

25     plaintiffs' position we don't think it needs to be moved and it

1    should be canceled altogether.

2              THE COURT:  Okay.

3              MS. HILL:  This is Jennier Hill, and I agree with

4    that.  There's nothing pressing from GSK's perspective that

5    really needs to be covered, but if the Court requests or

6    plaintiffs would like to, we are happy to work on a joint

7    report if that's necessary.

8              THE COURT:  I'll leave it up to you.  I'm not going to

9    force you to write a status report if there's nothing, you

12:44PM 10   know, significant to report.  On the other hand, it means that

11   whatever, five, six weeks or so will go by before I talk to you

12   again, which actually segues into another topic.

13             I received a series of e-mails from the MDL panel

14   about a case or two from Oregon now being part of my MDL, and

15   my question was is that the case that was scheduled for trial

16   in Oregon, or is that something entirely different?

17             Do you know the answer to that, Mr. Millrood?

18             MR. MILLROOD:  Yes, your Honor.  As I understood

19   procedurally, the plaintiffs' counsel following a tagalong

12:44PM 20   notice from GSK and a removal petition, plaintiffs' counsel

21   first had filed an opposition to the conditional transfer

22   order, but if that is not successful, they intend to file a

23   motion for remand, which I imagine will be heard by your Honor,

24   pending that, there still may be a trial if your Honor were to

25   agree with it, if not, we'll take that one step at a time, but,

1      procedurally pending right now is an opposition to the

2      conditional transfer order.

3              If that is denied by the panel and it comes to the

4      MDL, there will be a motion for remand filed by the end of

5      December before your Honor.

6              THE COURT:  Okay.  I understand the process, but it is

7      the case, that is, the Oregon case.  That wasn't clear to me.

8      Ms. Hill, do you want to weigh in on any of that?

9              MR. MILLROOD:  I'm sorry if I misunderstood that, your

12:45PM 10     Honor.

11             THE COURT:  Ms. Hill.

12             MS. HILL:  This is Jennifer Hill.  That's right, it's

13     the Brown case that was pending in Oregon state court.  It was

14     removed, and it's right now with the JP in call waiting for

15     briefing on the conditional transfer order.

16             THE COURT:  Okay.  I'll let that play out, and if it

17     winds up on my plate and there's a motion to remand, I'll take

18     that up.  All right.  Anything else you want to talk about as

19     long as I have you here?  Anything from the plaintiffs?

12:46PM 20             MR. MILLROOD:  No, thank you, your Honor.

21             MR. ROTMAN:  Your Honor, there is one thing.  I just

22     want Mr. Millrood to take a look at a message that I sent to

23     him, whether there's a need to clarify an issue, and if the

24     Court could give us 15 seconds for him to check his note.

25             THE COURT:  Okay.  Go ahead.

1     MR. MILLROOD:  Okay.  I've looked.  I don't think

2     there's anything else on our side.

3     THE COURT:  All right.  Obviously, as I think I've

4     said before, there's always a danger when I am ruling from the

5     bench that I'm going to misstate things or I'm going to confuse

6     people or leave something out, and I'm happy to clarify it

7     later if you need that clarification.  Don't be shy about it,

8     but for the moment, I'll let my ruling stand.

9     Ms. Hill or Ms. Stevenson, anything from the defense?

12:47PM 10     MS. HILL:  Thank you, your Honor.  I think that might

11     be all, but I will just call on my co-counsel, Mr. Sheehan and

12     Ms. Canaan, to see if there's any clarification that they'd

13     like.

14     MR. SHAHEEN:  Thanks, your Honor, this is Tom Sheehan.

15     Just one quick question following up on the Zambelli-Weiner and

16     Kirby depositions.  In connection with those depositions, we've

17     asked for certain materials to be produced, including some of

18     the underlying analyses and statistical procedures that were

19     performed in connection with the study.

12:47PM 20     It's unclear to me whether you're endorsing that we

21     can get those materials in connection with the depositions to

22     inquire how the study was performed and what influence the

23     funding from plaintiffs may have had on how the study was

24     performed.

25     THE COURT:  I'm neither endorsing nor condemning it

1   because I don't know what the burden is, I don't know what that

2   involves.  I mean, that's normally taken up by counsel for the

3   witness, and so I guess I'm expressing no view on it.

4          Again, I've tried to express the thought that I don't

5   want the tail to wag the dog here, but I'm not prepared in the

6   sense that the financial piece of it and possible influence on

7   the study is what really this is all about, but I'm not

8   prepared to foreclose any inquiry into the way the study was

9   conducted because I don't know where to draw that line, but I'm

12:48PM 10  going to leave things where they are for now, and if counsel

11  for the witness, either witness, files a motion for a

12  protective order, which I think under the rules would bounce

13  back to me normally now, you know, I'll take that up in due

14  course.

15         MR. SHAHEEN:  Thank you, your Honor.

16         THE COURT:  Okay.  All right.  Thank you, all, and

17  have a good holiday, all of you, and I will speak to you at

18  least in January, if not before.

19         MR. MILLROOD:  Do the same, your Honor, thank you.

12:49PM 20  MR. JENNER:  Thank you, your Honor.

21         MS. HILL:  Thank you, your Honor.

22         (Whereupon, the hearing was adjourned at 12:49 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript,

8    Pages 1 through 49 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in

10   MDL No. 15-02657-FDS, IN RE:  ZOFRAN (Ondansetron) PRODUCTS

11   LIABILITY LITIGATION and thereafter by me reduced to

12   typewriting and is a true and accurate record of the

13   proceedings.

14           Dated this 13th day of December, 2018.

15

16                       s/s Valerie A. O'Hara

17           _____

18             VALERIE A. O'HARA

19             OFFICIAL COURT REPORTER

20

21

22

23

24

25