**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| IN   RE:   ZOFRAN   (ONDANSETRON) | ) | MDL No. 1:15-md-2657-FDS |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| ALL CASES | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO GSK'S MOTION TO EXCLUDE PLAINTIFFS'**
**GENERAL CAUSATION EXPERTS UNDER FEDERAL RULE OF EVIDENCE 702**

## Table of Contents

I.    INTRODUCTION ............................................................................................................ 1

II.   LEGAL STANDARD ..................................................................................................... 6

   A.    Rule 702 and Basic Principles Under *Daubert* ...................................................... 6

   B.    The First Circuit's Application of the *Daubert* Factors. ......................................... 7

   C.    Epidemiologic Studies Are Not Required for Admissibility. .................................. 9

   D.    Where the Same Agent Can Cause All Forms of Heart Defects and Orofacial Clefts with the Same Mechanism, Multiple Epidemiological Studies Are Not Required for the Dozens of Subtypes of Those Defects. ................................................................................... 13

   E.    Statistical Significance Is Not a Legal or Scientific Requirement. ........................ 19

   F.    Evidence of Mechanism of Action Is Important for Assessing Causation. .......... 22

   G.    Animal Studies Contribute Important Evidence to Causal Inquiry. ...................... 23

III.  CONSIDERATIONS FOR INVESTIGATING THE CAUSES OF BIRTH DEFECTS ............ 23

   A.    Wilson's Principles Are a Useful Foundation to Inform Experts' Causal Inquiries in Birth Defects Research. ........................................................................................................ 28

   B.    The Bradford Hill Criteria Include Generally Applicable Considerations to Guide Causal Inquiries, but They Are Not a "Diagnostic Algorithm." .................................................. 31

   C.    Some Experts Use Shepard's Criteria to Guide Causal Inquiries in Birth Defects Research. 32

   D.    ICH Guidelines Direct Experts to Perform a Weight of Evidence Review When Considering Whether a Pharmaceutical Drug Is Capable of Causing Birth Defects. ........................... 33

IV.   CAUSAL INFERENCE IN SCIENCE AND THE LAW ..................................................... 34

   A.    Causal Inference Is a Matter of Judgment. ........................................................... 34

   B.    Both Epidemiologic and Toxicologic Studies Have Value for Causal Inference. ......... 34

   C.    Basic Principles of Epidemiology .......................................................................... 35

      1.    Epidemiology Relies Largely on Observational Studies. .................................... 35

      2.    Study Results Are Evaluated for the Existence of an Observed Association. ................... 36

      3.    Study Results Are Evaluated for Strength of Association. ................................. 36

      4.    Study Results Are Evaluated for the Role of Chance, Bias, and Confounding. ............... 37

      5.    Study Results Are Evaluated for Consistency .................................................... 38

   D.    Basic Principles for Interpretation of Animal Studies ........................................... 40

   E.    Importance of Whole Embryo Culture Testing for Assessing a Drug's Mechanism of Action. ................................................................................................................. 43

F.      Scientists Drawing a Causal Inference Routinely Apply a Weight of Evidence Approach Considering the Evidence as a Whole. ........................................................................... 45

V.     PLAINTIFFS OFFER AN INTERDISCIPLINARY TEAM OF QUALIFIED SCIENTISTS TO PRESENT THE WEIGHT OF EVIDENCE EVALUATION. ............................................................................. 46

A.      Dr. Ra-id Abdulla ............................................................................................... 46

B.      Dr. Bengt Danielsson ........................................................................................ 48

C.      Dr. Michael Levin .............................................................................................. 50

D.      Dr. Carol Louik ................................................................................................. 53

E.      Dr. Thomas Sadler ............................................................................................ 54

VI.    SEVEN LINES OF EVIDENCE SUPPORT GENERAL CAUSATION. ................................... 55

A.      *Line of Evidence 1*: Zofran Rapidly Crosses the Placental Barrier and Exposes the Human Embryo in At Least the Same Concentrations as the Mother During the Most Critical Period of Embryonic Development. ........................................................................................ 56

B.      *Line of Evidence 2*: The Zofran Animal Teratology Studies That Achieved Meaningful Embryonic Exposure Revealed the Same and Substantially Similar Teratogenic Effects as Reported in Published Epidemiology Studies for Zofran. ....................................................... 58

1.      Studies That Dosed Too Low To Achieve Human Exposure Concentrations Do Not Undermine a Causal Inference That Zofran Can Cause Birth Defects. .................................. 60

2.      Studies That Dosed High Enough to Meet or Exceed Human Exposure for a Short Time Provide Evidence of Zofran's Ability to Cause Birth Defects. ...................................... 61

3.      The Increased Malformations and Deaths in the Zofran-Treated Groups Are Biologically Significant for Causal Inference in Humans. ................................................................. 63

4.      GSK's Arguments That the Zofran-Induced Malformations and Embryonic Deaths Were Due to Chance Are Invalid. ....................................................................................... 65

C.      *Line of Evidence 3*: Embryonic Bradycardia Is a Known Human and Animal Teratogen; It Can Cause All Forms of Structural Cardiovascular and Orofacial Defects Deriving from the First Branchial Arch. ........................................................................................................... 67

D.      *Line of Evidence 4*: Zofran Can Cause Embryonic Bradycardia via hERG Blockade at All Doses and Forms of Administration that GSK Recommended in the Drug Label. ....................... 70

E.      *Line of Evidence 5*: Other Drugs with the Same hERG Blockade Mechanism Are Known to Cause Congenital Heart Defects and Orofacial Clefts in Humans. ......................................... 79

F.      *Line of Evidence 6*: Evidence from Transgenic Animals Supports the Critical Role of hERG in Embryonic Development. ............................................................................................ 80

G.      *Line of Evidence 7* - General Causation of Congenital Heart Defects and Orofacial Clefts Is Supported by Multiple Human Epidemiologic Studies. ........................................................ 82

1.    Multiple Human Epidemiologic Studies Published in the Peer-Reviewed Medical Literature Found that Zofran Is Associated with Statistically Significant Increased Risks of Septal Heart Defects.................................................................................................................85

2.    Multiple Human Epidemiological Studies Published in the Peer-Reviewed Medical Literature Found that Zofran is Associated with Statistically Significant Increased Risks of Cleft Palate........................................................................................................................................107

3.    No Reliable Conclusions Can Be Drawn About the Absence of Risk of Specific Birth Defects from Studies That Were Neither Designed nor Powered to Assess the Risk of Specific Defects...........................................................................................................................................112

VII.    GSK'S CHALLENGES TO EACH EXPERT ARE UNAVAILING. ...................................................116

A.    Dr. Abdulla .........................................................................................................................116

B.    Dr. Danielsson ...................................................................................................................121

C.    Dr. Levin .............................................................................................................................127

D.    Dr. Louik .............................................................................................................................128

E.    Dr. Sadler ...........................................................................................................................136

VIII.    CONCLUSION ...........................................................................................................................143

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
   2013 WL 6825953 (W.D. La. Dec. 20, 2013)................................................................139

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
   2014 WL 60324 (W.D. La. Jan. 7, 2014)...................................................................7, 48

*Ambrosini v. Labarraque*,
   101 F.3d 129 (D.C. Cir. 1996)...........................................................................11, 12, 13

*Anderson v. Janssen Pharms., Inc.*,
   2013 WL 8476501 (Pa. Com. Pl. 2013)................................................................5, 109

*Beaudette v. Louisville Ladder, Inc.*,
   462 F.3d 22 (1st Cir. 2006) ........................................................................................8

*Beech Aircraft Corp. v. Rainey*,
   488 U.S. 153 (1988) ....................................................................................................6

*Correa v. Cruisers*,
   298 F.3d 13 (1st Cir. 2002) ......................................................................................129

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .............................................................................................*passim*

*DeLuca by DeLuca v. Merrell Dow Pharm., Inc.*,
   791 F. Supp. 1042 (D.N.J. 1992) .............................................................................119

*In re Fosamax Prod. Liab. Litig.*,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009).........................................................................23

*Frischhertz v. SmithKline Beecham Corp.*,
   2012 WL 6697124 (E.D. La. Dec. 21, 2012) .............................................................120

*Genereux v. Am. Beryllia Corp.*,
   577 F.3d 350 (1st Cir. 2009) .....................................................................................74

*Ji v. Bose Corp.*,
   538 F. Supp. 2d 354 (D. Mass. 2008).......................................................................135

*Kiker v. SmithKline Beecham Corp.*,
   2016 WL 8189286 (S.D. Ohio Dec. 15, 2016) .....................................................28, 47

*Maga v. Hennessy Indus., Inc.*,
   2014 WL 10051399 (D. Mass. Dec. 1, 2014) (Saylor, J.) ............................................................. 7

*In re Meridia Prod. Liab. Litig.*,
   328 F. Supp. 2d 791 (N.D. Ohio 2004), *aff'd.*, 447 F.3d 861 (6th Cir. 2006) ............................. 10

*Milward v. Acuity Specialty Prod. Grp., Inc.*,
   639 F.3d 11 (1st Cir. 2011) ..................................................................................................*passim*

*Nat'l Bank of Commerce v. Dow Chem. Co.*,
   965 F. Supp. 1490 (E.D. Ark. 1996) ........................................................................................ 126

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 21 (1st Cir. 2013) ...................................................................................... 6, 11, 23, 38

*In re Neurontin Mktg. & Sales Practices Litig.*,
   612 F. Supp. 2d at 132 ..........................................................................................................*passim*

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
   MDL No. 1014, 1997 WL 230818 (E.D. Pa. May 5, 1997) .......................................................... 84

*In re Paoli Railroad Yard PCB Litigation*,
   35 F.3d 717 (3d Cir. 1994) .................................................................................................. 23, 42

*Porter v. SmithKline Beecham Corp.*,
   2015 WL 5970639 (Pa. Ct. Com. Pl. Oct. 5, 2015) ................................................................... 10

*In re PPA*,
   289 F.Supp.2d at 1243 ..........................................................................................................*passim*

*Preferred Mut. Ins. Co. v. Barros Co., Inc.*,
   2018 WL 3977122 (D. Mass. Aug. 20, 2018) (Saylor, J.) ........................................................... 22

*In re Processed Egg Prods. Antitrust Litig.*,
   2016 WL 4547207 (E.D. Pa. Aug. 31, 2016) .................................................................. 135, 136

*Raymo v. Sec'y of HHS.*,
   2014 WL 1092274 (Fed. Cl. Feb. 24, 2014) ........................................................................... 136

*Rosen v. Ciba-Geigy Corp.*,
   78 F.3d 316 (1996) ............................................................................................................... 120

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
   161 F.3d 77 (1st Cir. 1998) .............................................................................................. 6, 7, 99

*Sartor v. Ark. Nat. Gas Corp.*,
321 U.S. 620 (1944) ............................................................................................... 135

*Sutera v. Perrier Grp. of Am. Inc.*,
986 F. Supp. 655 (D. Mass. 1997) ........................................................................... 125

*Wade-Greaux v. Whitehall Labs., Inc.*,
874 F. Supp. 1441 (D.V.I.) ...................................................................................... 125

*Zeolla v. Ford Motor Co.*,
2013 WL 308968 (D. Mass. Jan. 24, 2013) (Saylor, J.) ............................................. 23

*In re Zoloft Prod. Liab. Litig.*,
176 F. Supp. 3d 483 (E.D. Pa. 2016), aff'd sub nom. 858 F.3d 787 (3d Cir. 2017) ................... 139

*In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*,
26 F. Supp. 3d 466 (E.D. Pa. 2014) .............................................................*passim*

**Other Authorities**

Fed. R. Evid. 401 ................................................................................................................ 6

Fed. R. Evid. 402 ................................................................................................................ 6

Federal Rules of Evidence 702-05 ...................................................................................... 6

## I.      INTRODUCTION

"General causation" addresses whether Zofran is capable of causing specific birth defects here, congenital heart defects and orofacial clefts in humans.  Plaintiffs' experts are world-renowned experts who will assist the juries in this litigation understand the general causation evidence.  The experts are:

- Dr. Ra-id Abdulla, M.D. a senior pediatric cardiologist at Rush University Medical Center and the Editor-in-Chief of *Pediatric Cardiology*;

- Dr. Bengt Danielsson, M.D. Ph.D, a medical doctor and clinical pharmacologist who has published more peer-reviewed literature on the topic of birth defects induced by heart rhythm disturbances in human embryos than any other expert in the world. He has served as the Global Director of Reproductive Toxicology for one of the largest pharmaceutical companies in the world, served as a Scientific Director and Professor at the Swedish FDA (MPA), and as an expert member of European Medicine Agency (EMA). Since 2012, Dr. Danielsson has served as Medical Expert in Clinical Pharmacology at the Swedish National Agency for Health and Welfare;

- Dr. Michael Levin, Ph.D. a Professor of Developmental Biology at Tufts University, and a world-leading expert on the critical role of the "hERG channel" for embryonic development;

- Dr. Carol Louik, Sc.D., a birth defects epidemiologist with over 30 years of experience at Boston University Slone Epidemiology Center; who has published peer reviewed studies on drugs (including Zofran) suspected of causing birth defects; and

- Dr. T.W. Sadler, an embryologist with over 40 years' experience teaching the origins of birth defects in humans, the former editor of the journal *Teratology*, and the author of *Langman's Medical Embryology,* a medical textbook used in medical schools throughout the world on the origins of birth defects.

Plaintiffs' experts have published widely in the peer-reviewed literature on subjects pertinent to the general causation issues in this case.  Drs. Louik and Danielsson have published peer-reviewed, human epidemiologic studies of Zofran and birth defects.  Dr. Danielsson and colleagues integrated human and animal data and explained Zofran's teratogenic mechanism in the peer-reviewed journal *Reproductive Toxicology*.

These experts have reliably applied the weight of evidence methodology, as approved in this Circuit and as followed in the scientific community, to a body of scientific and medical evidence, summarized below.  As detailed in Section II below, the First Circuit approved the weight of the evidence approach to drawing causal inferences.  The Court described it as an evaluation of the relevant data and scientific evidence, using judgment and interpretation, to draw an "inference to the best explanation."  *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 17 (1st Cir. 2011). Consistent with this description, a leading scientist summarized the weight of evidence methodology in birth defects research as follows:

> Determining whether an exposure is teratogenic in humans requires an evaluation of all available studies of the effects of that exposure during pregnancy, judgment of the quality and relevance of each study to the question at hand and synthesis of these data into a coherent assessment that is consistent with current scientific understanding of the exposure and embryonic development."[1]

A similar description of the weight of evidence approach most specific to pharmaceutical drugs and birth defects is found in internationally accepted guidelines from the International Council for Harmonization of Technical Requirements for Pharmaceuticals for Human Use (ICH). These direct experts to consider:

> All available data on the pharmaceutical and any related compounds…, as well as information on human genetics, transgenic animals and the role of the target in reproduction . . .  as well as . . . [t]he (projected) human exposure, comparative kinetics between species and plausible mechanism of reproductive toxicity. . . .[2]

---

[1] J. Friedman, In Bed with the Devil: Recognizing Human Teratogenic Exposures, Doi: 10.1002/bdr2.1134 (Wiley Online Library), Presented as the Robert L. Brent Lecture, 57th Annual Meeting of the Teratology Society (2017) (hereinafter, Friedman 2017) JA003828-3834, (Vol. 7); *see also* Dr. Danielsson Dep., p. 145–46. JA001514-15, (Vol. 3)

[2] ICH S5 (R3) Guidelines, at 24, discussed further in Section III(D) JA006185 (Vol. 12).

Here, Plaintiffs' experts have applied the weight of evidence methodology, considering, within the scope of their respective expertise, the lines of evidence included in the ICH Guidelines. As in *Milward*, the experts looked to one or more sets of established viewpoints or considerations to guide them from initial inquiry to causal inference. These are summarized in Section III below.

In *Milward*, the First Circuit instructed that "no algorithm exists" for inferring causation, "no one type of evidence must be presented before causality may be inferred," and there is no generally applicable hierarchy used to rank different types of evidence. *Milward*, 639 F.3d at 17-18. Rather, admissibility "must turn on the particular facts of the case," and "reasonable scientists may come to different judgments" about whether a causal inference is appropriate.[3]  *Id*. at 18-19.

GSK's motion to exclude pays lip service to *Milward* and then proceeds as if it does not exist. In this regard, its motion is unavailing for three main reasons. ***First***, GSK contends that there must be replicated epidemiology with statistically significant elevated risks for each of the over 70 heart and oral facial cleft birth defects. GSK urges a new legal standard, in conflict with *Milward*, that would require additional than 100 additional epidemiologic studies. GSK also seeks to disregard all other evidence by arguing that non-epidemiologic data relevant to causation cannot support a causal inference, even when all of the human, animal and other evidence is integrated. GSK's approach conflicts not only with controlling law, but also with accepted scientific principles for drawing inferences about causation, described in Section IV below. GSK also asks the Court to impose a heightened legal standard for Plaintiff's burden that ignores the scientific reality that "[a]ll

---

[3] *Id*. at 18-19.

studies have 'flaws' in the sense of limitations that add uncertainty about the proper interpretation of the results."[4]

***Second***, GSK's motion is not a challenge to Plaintiffs' experts' qualifications or methodologies but rather to the sufficiency of the evidence.  GSK contends that "too great an analytical gap" exists between the existing data and the experts' conclusions.  Plaintiffs' experts, however, rely on seven compelling lines of evidence that more than adequately show that the experts arrived at their conclusions in a scientifically sound fashion.

*Line of Evidence 1*: Zofran rapidly crosses a pregnant mother's placenta to expose the developing embryo, so when a pregnant woman receives Zofran, the human embryo is exposed to ondansetron in at least the same concentration as in the mother.  Zofran administered to other pregnant mammals has also been shown to expose the embryo.

*Line of Evidence 2*: Those animals that were exposed during pregnancy at or near the exposures of women of childbearing potential had the same and substantially similar birth defects as were reported with increased incidence in prenatally exposed humans in the positive Zofran epidemiology studies.

*Line of Evidence 3*: There is a common pathogenesis for the observed pattern of birth defects: the best explanation for the same pattern of birth defects in humans and animals is disruption of heart rhythm and blood flow during the critical periods of embryonic development.

*Line of Evidence 4*: Zofran causes heart rhythm disturbance in adult and pediatric humans due to its interference with the hERG channel at exposures levels reported with all doses recommended in Zofran's drug labeling and in all forms of administration.  The human embryonic heart also depends on the hERG channel for heart rhythm regulation, and is more susceptible to having the rhythm disturbance than the mother.

*Line of Evidence 5*: Plaintiffs' experts also looked to whether their evaluation was consistent with other scientific knowledge.  Other causes of heart rhythm disruption, whether drug induced or not, have been associated with the same birth defects seen in Zofran-exposed humans and animals.

*Line of Evidence 6*: The experts looked to the impact of genetic alterations causing a loss of function of the hERG channel.  This evidence shows that the hERG channel plays a critical role in

---

[4] *Reference Manual on Scientific Evidence* at 552–53, JA003639-40, (Vol. 7). (hereinafter, *Ref. Man.*).  This brief cites frequently to the *Reference Manual on Scientific Evidence,* published by the Federal Judicial Center.  The *Reference Manual* is designed to assist judges on science issues, including *Daubert.*

embryonic development, and loss of function of the channel has been associated with embryonic death due to birth defects.

*Line of Evidence 7*: Multiple published and peer-reviewed human epidemiologic studies detected a statistically significant elevated risk for Zofran and specific heart and orofacial birth defects. While there were other studies that did not confirm an association with an increased risk, the results were also not inconsistent with the studies finding an increased risk. The positive epidemiology studies are most consistent with all other lines of evidence.

Much of the above is not disputed. GSK's experts agree that Zofran crosses the placenta, it is a hERG blocker, it can interrupt heart rhythm, and heart rhythm disturbance can lead to birth defects. Plaintiffs cite to GSK's experts (Drs. Baldwin, Kass, Kimmel, Obican, Roth, Shaw, York, and Scialli), to show where they are in agreement with Plaintiffs' experts. In fact, Dr. Scialli, who testified for GSK during Science Day, and who now has the opinion that there is no support for general causation, prepared an expert report in another litigation stating that Zofran should be included in the differential diagnosis of an orofacial birth defect.[5]  Nevertheless, GSK challenges each line of evidence, arguing that it does not support an inference of causation. In *Milward*, the First Circuit rejected this "atomistic" approach, reasoning that the hallmark of the weight of the evidence approach is reasoning to the best explanation from the evidence viewed as a whole.

*Finally*, GSK asserts unavailing arguments for exclusion of each of Plaintiffs' experts. A review of GSK's expert reports reveals that none of them attacks any of Plaintiffs' experts' methodologies, only conclusions. Yet, GSK, under the guise of a methodological challenge, isolates pieces of evidence, relies on inapplicable law from outside this Circuit, and mischaracterizes snippets of testimony. When one of Plaintiffs' experts assigns more or less weight to a study or category of information than GSK's experts do, GSK calls it "cherry picking." All of these arguments should be rejected.

---

[5] *Anderson v. Janssen Pharms., Inc.*, 2013 WL 8476501 (Pa. Com. Pl. 2013), Expert Report and Affidavit of Anthony R. Scialli, M.D, JA000913-1006, (Vol. 2).

## II.      LEGAL STANDARD

### A.      RULE 702 AND BASIC PRINCIPLES UNDER *DAUBERT*

The Federal Rules of Evidence favor the admission of evidence, including expert opinion testimony. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988); *see also* Fed. R. Evid. 402. Federal Rule of Evidence 702 sets the standard for admitting expert testimony. As with any admissible evidence, expert testimony must also be relevant. Fed. R. Evid. 401. Upon finding relevance, a court must preliminarily assess "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 41–42 (1st Cir. 2013).

The "requisite review for reliability includes consideration of several factors," including: (1) whether an expert's theory or technique can and has been tested; (2) the error rate of such a technique; (3) whether a such theory or technique has been published or peer reviewed; and (4) the theory or technique's acceptance in the scientific community. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 80–81 (1st Cir. 1998) (reviewing *Daubert* factors for reliability). The Advisory Committee to the Federal Rules of Evidence added five factors to the "non-exhaustive" list of *Daubert* reliability factors in 2000: (5) whether experts have developed their opinions expressly for purposes of testifying; (6) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (7) whether the expert has adequately accounted for obvious alternative explanations; (8) whether the expert is taking as much care as in his regular professional work outside his paid litigation consulting; and (9) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. Fed. R. Evid. 702 Advisory Committee's Note to 2000 amendment.

GSK cites several cases that excluded expert opinions as unreliable where experts

disregarded certain data or studies.  GSK Br. at 43; 50; 82.  Plaintiffs' experts have, however, considered all of the data relevant to their respective disciplines and arrived at a reasoned judgment.[6]  As has been made clear, "an expert can and does exercise his or her judgment and if he or she gives reasons for that decision and full explanation for those choices, disagreement with those choices becomes a matter for the trier of fact." *In re Actos (Pioglitazone) Prod. Liab. Litig.*, 2014 WL 60324, at *8 (W.D. La. Jan. 7, 2014).  As discussed further below, Plaintiffs' experts have done just that. These experts "might not give the answer the Defendants desire, but that is an expert's prerogative. . . . If such an explained choice is to be considered 'cherry-picking,' . . . then Defendants' experts would likely be equally guilty, as well." *Id.* at *10.

## B.   THE FIRST CIRCUIT'S APPLICATION OF THE *DAUBERT* FACTORS.

In the First Circuit, "no single factor disposes of a reliability inquiry." *Ruiz-Troche*, *supra*, 161 F.3d at 85.  Instead, the First Circuit has embraced the "weight of the evidence" methodology used by general causation experts in products liability cases. *See, e.g.*, *Milward v. Acuity Specialty Prods. Grp., Inc.,* 639 F.3d 11, 27 (1st Cir. 2011).  The weight of the evidence approach "involves a mode of logical reasoning often described as 'inference to the best explanation' . . . ." *Id.* at 27. The First Circuit recognizes that reasonable scientists may come to different opinions. *Id*. at 18.

"*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." *Ruiz-Troche*, 161 F.3d at 85; *Maga v. Hennessy Indus., Inc.*, 2014 WL 10051399, at *9 (D. Mass. Dec. 1, 2014) (Saylor, J.) (same).  "It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Ruiz-Troche*, 161 F.3d at 85.

---

[6] After all experts produced reports and testified at deposition, two additional relevant studies were published, one by Dr. Zambelli-Weiner et al. (released Jan. 2019) and one by Dr. Huybrechts et al (released Dec. 2018).  As to each of these studies, additional discovery is expected.  Plaintiffs reserve the right for their expert witnesses to consider those studies together with the forthcoming discovery and to supplement their reports as appropriate promptly after completion of the discovery.

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "[T]he question of admissibility must be tied to the facts of a particular case." *Beaudette v. Louisville Ladder, Inc.,* 462 F.3d 22, 25–26 (1st Cir. 2006). "The court must exclude testimony that is "junk science" and rests on unreliable principles, but allow in . . . testimony that is based on "sufficient facts and data." *In re Neurontin*, 612 F. Supp. at 158.

In *Milward,* 639 F.3d at 13, the plaintiffs' expert toxicologist opined that exposure to benzene is capable of causing Acute Promyelocytic Leukemia (APL) based on a weight of the evidence analysis. In reversing the district court's exclusion of the expert, the First Circuit held that "the court's exclusion of the testimony was based on *its* evaluation of the weight of the evidence, which should be the province of the jury." *Id*. at 20. (emphasis added). The Court stated, "[t]here is an important difference between . . . *unreliable* support and what a trier of fact may conclude is *insufficient* support for an expert's conclusion." *Id.* So long as an expert's opinions rest upon "good grounds based on what is known," *Daubert,* 509 U.S. at 590, it should be tested by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the appropriate means of attacking admissible evidence." *Id* at 596.

The First Circuit held that the "district court erred in reasoning that because no one line of evidence supported a reliable inference of causation, an inference of causation based on the totality of the evidence was unreliable." *Milward*, 639 F.3d at 13. The *Milward* Court rejected the district court's treatment of "the separate evidentiary components of [the expert's] analysis atomistically, as though his ultimate opinion was *independently* supported by each." *Id.* Instead, the "sum of his testimony was that a weighing of the Hill factors, including biological plausibility, supported the inference that the association between benzene exposure and APL is genuine and causal." *Id.* at 26. By taking sides on questions that were the focus of scientific debate the district court overstepped

its role as gatekeeper. *Id.* at 22. GSK's epidemiology expert Dr. Kimmel agrees with this approach: "You have to look at the totality of the evidence." Kimmel Dep., p. 84:17-18, JA001805, (Vol. 3).

**C.      EPIDEMIOLOGIC STUDIES ARE NOT REQUIRED FOR ADMISSIBILITY.**

As detailed below, Plaintiffs' experts rely on multiple, peer-reviewed, and published human epidemiologic[7] studies that found Zofran exposure is associated with statistically significant increased risks of cleft palate and septal heart defects, which are two of the specific birth defects alleged by Plaintiffs. GSK's position that at least two studies are needed to prove general causation for each specific injury would mean that over 100 additional such studies are required because, according to GSK, there are over 70 specific heart and orofacial birth defects.[8]

GSK's argument is contrary to scientific requirements, even according to its own expert. *See* Baldwin Dep., p. 51:17-25, JA001313, (Vol.3) (two epidemiological studies are not always required to prove causation). Dr. Friedman, a leading scientist studying the causes of birth defects, similarly observed that overemphasizing epidemiology as a consideration in the "the Bradford Hill criteria" is inappropriate because such an approach incorrectly assumes the availability of multiple high-quality epidemiology studies and ignores the limitations of using epidemiology alone for a causal inquiry.[9]

The need for epidemiologic studies to prove general causation has been addressed by multiple federal courts including the First Circuit. In the First Circuit, "[e]epidemiologic studies …

---

[7] Plaintiffs use the terms "epidemiologic study" and "epidemiological study" in this brief interchangeably. Both terms are used in the *Reference Manual*, and in the case law, CITE HERE? JA003630-3676, (Vol. 7).

[8] According to GSK's Science day presentation there are approximately 78 specific types within the category of congenital heart birth defects (source:  Supplement to: Louik C, et al., First-trimester use of selective serotonin-reuptake inhibitors and the risk of birth defects. *N Engl J Med* 2007;356:2675-83), and several specific facial and oral cleft defects within the category of orofacial cleft birth defects.

[9] Friedman 2017, JA003828-3834, (Vol. 7).

are not required to prove causation in a pharmaceutical . . . case." *In re Neurontin,* 612 F. Supp. 2d at 132 (citing cases from multiple circuits). In *Milward,* the First Circuit stated: "Epidemiological studies are not *per se* required as a condition of admissibility regardless of context." *Milward,* 639 F. 3d at 24. In *Allen v. Martin Surfacing*, this Court noted that "the lack of epidemiological evidence" does not tip the balance away from admissibility for an expert opinion. 263 F.R.D. 47, 60 (D. Mass. 2009) (Saylor, J.). *Accord In re Meridia Prod. Liab. Litig.*, 328 F. Supp. 2d 791, 801 (N.D. Ohio 2004), *aff'd.*, 447 F.3d 861 (6th Cir. 2006) ("[N]o court has held that epidemiological evidence is necessary to establish general causation when other methods of proof are available.").

Because well-powered epidemiology studies of birth defects usually require many thousands of babies to be born with birth defects, leading scientists have rejected the requirement of multiple consistent epidemiology as a *sine qua non* to causal inference.[10]   A study of seventeen teratogenic drugs identified from 1952 through 2008 reported only one drug for which epidemiology was listed as the sole method of initial detection of teratogenicity in humans.[11]

But GSK does not share the view of leading scientists. Having chosen to not study Zofran to determine its teratogenicity before targeting tens of thousands of OB/GYNs caring for pregnant women with morning sickness, GSK now argues that Plaintiffs cannot meet their burden of proof on general causation without multiple additional epidemiologic studies on each specific very rare birth defect. GSK argues (at pp. 5-6) that each specific defect must be considered in epidemiological studies. But GSK acknowledges that where there is an underlying similar cause among injuries, combining birth defect types *is* in fact a reliable methodology. GSK Br. at 6. *See Porter v. SmithKline Beecham Corp.*, No. 03275, 2015 WL 5970639, at *9 (Pa. Ct. Com. Pl. Oct. 5, 2015).

---

[10] Friedman 2017 JA003828-3834, (Vol. 7)

[11] J. Friedman, ABCDXXX: The Obscenity of Postmarketing Surveillance for Teratogenic Effects, *Birth Defects Research* (Part A) 94:670-76 (2012) (hereinafter, Friedman 2012), JA003821-3827, (Vol. 7).

GSK's expert agrees that hemodynamics (the mechanism for Zofran) is a rational basis for grouping birth defects. Baldwin Dep., p. 94:1–15, JA001324, (Vol. 3). As detailed in Lines of Evidence 3 and 4, Zofran's causal mechanism is common among all the alleged injuries. Zofran disrupts heart rhythm, which affects hemodynamics, leading to cardiac and orofacial defects. Therefore, multiple epidemiologic studies for each specific defect are not required. *See also* Section II(D).

The Courts in *Milward, Allen*, and *in re Neurontin* made clear that general causation can be established even if there are no epidemiologic studies at all. Here, however, there are several studies reporting that Zofran is associated with a statistically significant increased risk of the birth defects alleged by Plaintiffs. At the same time, other studies do not detect an increased risk, but have results that are not inconsistent with those that do report an increased risk. Nevertheless, even assuming the epidemiologic studies cumulatively are inconclusive, from both a legal and scientific perspective there is no meaningful difference between there being no epidemiologic studies at all, and there being several studies that are inconclusive. Either way, Plaintiffs can establish general causation with other lines of evidence as long as the epidemiologic studies do not contradict Plaintiffs' general causation case. In *Allen*, this Court allowed proof of general causation even though "there [were] no epidemiological studies to support Dr. Ratner's theory" where there also were "no epidemiological studies that contradict any part of her theory." *Allen*, 263 F.R.D. at 60.

In this regard, and consistent with First Circuit law, the D.C. Circuit Court of Appeals authored an instructive opinion in another birth defects case called, *Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996). There, the plaintiff offered testimony from an epidemiologist and a teratologist opining, based on epidemiology and other literature, that a drug was capable of causing cleft lip and palate. The defense responded with three epidemiological studies and other articles indicating that the drug did not cause the birth defects, and noting the FDA's view, based on

unidentified information, that there was no causal relationship between the drug and the birth defects. *Id.* at 131, 137, n.10. Plaintiff's teratologist acknowledged the state of the epidemiologic evidence, but, after considering all the other data and evidence, he concluded that the drug can cause the type of birth defects suffered by plaintiff.

In *Ambrosini*, the D.C. Circuit explained that "a cause-effect relationship need not be clearly established by animal or epidemiological studies." *Id.* at 138-39 (expert testimony held admissible where "no conclusive epidemiological studies existed"). The court observed that, "while some studies suggest no causal relationship between Depo–Provera and the types of birth defects suffered by [plaintiff], others suggest a positive one." *Id.* at 138. The court contrasted the facts with a Bendectin case in which expert testimony was excluded because there was "an overwhelming body of contradictory epidemiological evidence" defined as more than twenty years of scientific studies that *unanimously* reported no increased risk. *Id.*[12] In summary, the case involved expert testimony in an area where "no conclusive epidemiological studies existed," and where there was no "overwhelming body of contradictory epidemiological evidence," *id.*, and the general causation testimony based on an integration of all lines of evidence was nevertheless admissible. *Id.* at 139. Here, Plaintiffs' experts' weight of evidence evaluation leads to the same conclusion. This approach accords with *Milward*'s holding that each line of evidence, and for that matter each individual study, should not be viewed in isolation; rather an inference of causation must be based on the totality of the evidence. 639 F.3d at 13.

---

[12] *See also Allen*, 263 F.R.D. at 60 (allowing proof of general causation under similar circumstances where "there are no epidemiological studies to support Dr. Ratner's theory, . . . and no epidemiological studies that *contradict* any part of her theory.").

**D.      WHERE THE SAME AGENT CAN CAUSE ALL FORMS OF HEART DEFECTS AND OROFACIAL CLEFTS WITH THE SAME MECHANISM, MULTIPLE EPIDEMIOLOGICAL STUDIES ARE NOT REQUIRED FOR THE DOZENS OF SUBTYPES OF THOSE DEFECTS.**

As detailed above, Plaintiffs' experts' opinions are supported by multiple (six), peer-reviewed and published human epidemiologic studies with statistically significant increased risks for cleft palate /orofacial clefts, and septal heart defects.  Ignoring First Circuit law, GSK argues that birth defects cases enjoy a unique status and that "consistent, replicated epidemiological studies showing a statistically significant increased risk that is not due to chance, bias, or confounding are required to support a reliable general causation opinion in birth defect cases." GSK Br. at 7.  GSK is asking this Court to make a *Daubert* ruling that six positive epidemiology studies should be ignored.  Because there are numerous subcategories of orofacial and heart defects, GSK suggests that over 100 additional studies should be required.[13] As noted in *Milward*, the First Circuit does not require epidemiologic studies to prove general causation in circumstances like this where the injuries are rare and difficult to study because adequate studies would need many thousands of women exposed to the drug in the first trimester.[14]  *See also Ambrosini*, 101 F.3d at 139 (observing that "the fact that [studies] didn't see an association between [the drug] and one specific defect" was inconclusive because "then you're getting down to such fine divisions that you're not going to have any statistical power").

---

[13] According to GSK's Science Day presentation, there are approximately 78 specific types within the category of congenital heart birth defects (source: Supplement to: Louik C, et al., First-trimester use of selective serotonin-reuptake inhibitors and the risk of birth defects. *N Engl J Med* 2007;356:2675-83, JA003870-3882, (Vol. 8)), and several specific facial and oral cleft defects within the category of orofacial cleft birth defects.   Dr. Shaw, GSK's birth defects epidemiologist, testified that "there are numerous congenital heart defects that fall within [the] larger category [of congenital heart defects]." Shaw Dep., p. 145:14–19, JA02929, (Vol. 5).

[14] Separately, as already addressed above, GSK argues that the existing studies are insufficient and should not count because they do not address every separate injury subcategory, because they fail to meet GSK's definition of consistency, because of claimed flaws and limitations, or because they might be due to chance. GSK Br. at 14-27.

It is a bridge too far to go from no studies are required to many dozens of studies are required. To bridge the gap between the impossible standard that GSK claims is required, and explicit First Circuit law, GSK (at p. 8) quotes snippets out of context from some of Plaintiff's experts.  GSK has mischaracterized that testimony: None of the quotations of Plaintiffs' experts address whether multiple epidemiologic studies are required to prove causation of every subcategory of specific heart and orofacial birth defect.  They have testified to just the opposite. For example, Dr. Louik testified that she "absolutely [does] not believe" there is a requirement for two replicated epidemiologic studies to reach a conclusion that an exposure can cause a specific birth defect.  Louik Dep., p. 371:3-14, JA002174, (Vol. 4).

As noted above in Sections II and III, scientists and courts have noted the limitations of epidemiologic studies to address rare injuries, and the real-world limitations of the need for extremely large studies to assess risks of rare outcomes, coupled with the prohibitive cost of doing studies on every specific injury related to every drug exposure. That discussion need not be repeated here, but it is worth noting that these barriers could be overcome by a pharmaceutical company like GSK with the resources and a vested interest to understand and inform about the risks of its drugs. For well over a decade the medical literature has reflected concerns that Zofran causes birth defects but GSK has not undertaken to meaningfully conduct or sponsor the necessary studies (the only study sponsored by GSK (Einarson) has just 176 women with first trimester Zofran exposure), yet GSK seeks to avoid liability in these cases by arguing that dozens of *additional* studies are needed for Plaintiffs to prove general causation for the alleged injuries.

As detailed above (*see* Section II (C) and (D), there is no legal requirement, and no requirement in the field of teratology or epidemiology, that general causation requires multiple

epidemiologic studies for each specific injury. That is because it is accepted in birth defects epidemiology that:

> Pooling or lumping of congenital malformation groups is an accepted methodology and is both recommended, essential, and valid when the defects being studied originate from the same embryological/developmental stages or periods. This is the case for heart defects or neural tube defects, where results for the overall organ system can be applied to specific defects present in the organ grouping.[15]

Significantly, GSK acknowledges (at p. 6) that where there is an underlying similar pathogenesis among injuries, combining birth defect types is a reliable methodology. As noted by Dr. Shaw, GSK's expert in birth defects epidemiology, "lumping of birth defect types is a valid approach only if the birth defects being lumped have an underlying pathogenesis that is similar;" *i.e.,* "if there is an underlying biologic basis to lump or an underlying etiologic reason to lump." Shaw Rept. at 5, JA001018, (Vol. 2); Shaw Dep., p. 98:25–99:21, JA002918 (Vol. 5). Defense epidemiology expert Kimmel also agrees that the key issue is whether there are shared "embryological pathways." Kimmel Rept. at 9, JA000437, (Vol. 1). GSK's expert Dr. Baldwin testified that "[c]ase classification may allow for infants with anatomically different, but presumed pathogenetically similar, defects to be combined to increase the power of a study." Baldwin Dep., p. 98:6–99:7, JA001325, (Vol. 3).

In addition, as Dr. Louik stated (Louik Rept. at 6, JA000618, (Vol.2)):

> For example, neural crest cells in the earliest stages of embryogenesis migrate to form a variety of structures, including those of the face/ears, parts of the heart, and the neural tube. Interference with the normal development of the neural crest ha[ve] been reported to produce malformations of tissues derived from neural crest, and that phenomenon has been observed in a number of animal experiments. In fact, these patterns have also been observed for certain human teratogens.

---

[15] Berard 2016, at 126, JA003505, (Vol. 7); *see also* B.L. Strom, S.E. Kimmel, S. Hennessy, *Pharmacoepidemiology,* 5th ed., 2012, at p. 367 (birth defects "should be classified on the basis of embryologic origin for a given defect").

As detailed in Line of Evidence 4, the common pathogenesis is that Zofran disrupts heart rhythm in the fetus, leading to blood flow interruption.   Regular blood flow is necessary for normal development of the cardiovascular and orofacial tissue.   Grouping structural defects by common mechanism is an accepted methodology and provides a rational basis for aggregating cases. Baldwin Dep., p. 91–92, JA001323, (Vol. 3).   Focusing on Zofran's effect on heart rhythm and blood flow provides a rational basis for aggregating cardiovascular defects because hemodynamics can alter the structure of the heart.  Baldwin Dep., p.  94:1–15, JA001324, (Vol. 3).  Given Zofran's mechanism of injury, "[i]t could really lead to any congenital heart disease."  Abdulla Dep., p. 71:23–24, JA001250, (Vol. 3).  The same is true of orofacial defects.  Danielsson Dep. at 28:11-18, JA001485, (Vol. 3); 36:25 – 27:4, JA001487, (Vol. 3).

The upshot of the foregoing is that there is no scientific need for additional epidemiologic studies on every specific type of heart and orofacial birth defect. The existing science, taken as a whole, is sufficient.  Against this backdrop of legal and scientific standards, GSK's brief (at p. 8) offers selected quotes from Plaintiffs' experts Drs. Sadler, Danielsson and Louik.

Most importantly, on the key issue—whether over 100 *additional* studies are required, <u>none</u> of the expert testimony offered by GSK for any of the three experts provides any support for GSK's claim that epidemiologic studies are required for each subcategory of heart and orofacial cleft injury.  For example, GSK quotes Dr. Danielsson as agreeing that epidemiology was required "to demonstrate human teratogenicity" (GSK Br. at 8). That is not an acknowledgement that multiple studies are needed for every specific orofacial defect or every defect in the heart.   Dr. Danielsson and Dr. Louik both testified that causation can be established without epidemiology where a common mechanism affects different defect groupings.[16]

---

[16] Discussing application of Shepard's criteria, which includes epidemiologic studies, Dr. Danielsson testified that causation could be established with "a mechanistic [effect] that show all type of defects, which

GSK also cites the testimony from Dr. Sadler regarding how different heart defects are "etiologically distinct." GSK Br. at 22-23.  GSK has once again presented an incomplete and inaccurate description of the opinions of plaintiffs' experts—and of GSK's experts too. Whether or not specific heart defects are etiologically distinct is not inconsistent with saying that the same drug exposure can cause each of the heart defects through a common mechanism.  As Dr. Sadler stated in his report (at p. 12), "ondansetron has a clearly defined mechanism of action for causing birth defects that involves producing cardiac arrhythmias resulting in abnormal heart and orofacial development."  His deposition testimony was consistent: "you have to know what the mechanism is…."  Sadler Dep., p.  59:2-10, JA002604, (Vol. 5).   "[T]he same exposure …can cause both cleft palate only and cleft lip with or without cleft palate," *id.,* and "Zofran can … cause a wide variety of cardiovascular malformations," *id.* p. 27:11-17, JA002596 (Vol. 5).

GSK also quotes Dr. Sadler for the point that epidemiology is required to distinguish a birth defect attributable to Zofran from the background rate. That is not the same as saying that multiple studies are required for every specific subcategory of birth defect.   When asked that specific question, Dr. Sadler testified that it depended on the mechanism and the timing of exposure.[17]

---

can be induced by causing arrhythmia [and] hypo-reoxygenation damage…with … hERG blockers…." Danielsson Dep., p. 30:18-22, JA001486, (Vol. 3).

Quoting, in part from her report (p. 5), Dr. Louik testified: "malformations that are produced by a drug vary according to the timing of exposure, the sensitivity of the end organ, and the mechanism of teratogenesis." Based on that, Dr. Louik testified that studying defects as a group under those circumstances would not violate epidemiologic principles "if embryologists and teratologists … are able to expand the mechanism beyond what the epidemiologists have isolated as the specific defect, then… there's no violation of principles." Louik Dep. p. 367: 5-15, JA002173, (Vol. 4).

[17] Dr. Sadler was asked "if an epidemiological study finds a statistically significant association between a medication and all cardiac defects combined, you would not, based on that finding alone, say it causes every single cardiac defect? His answer was "I think I would have to know what the mechanism is …and when the heart was affected. For example, … almost every heart defect, if you hit the heart early enough with something, that will … target certain cells, and these cells are patterned so early that you can affect a population of cells and then get a defect." Sadler Dep., p. 54:8-25, JA002603 (Vol. 5).  Dr. Sadler also testified: "I think it's very hard to find out through epidemiology studies whether you can identify a teratogen

GSK's and Plaintiffs' pediatric cardiologists agree that different structural heart defects can have a common cause, altering hemodynamics.[18] Also omitted from GSK's brief was Dr. Danielsson's testimony that requiring epidemiology for every heart defect is *not* required ("I don't think it's necessary to divide heart defects") and requiring multiple studies for each specific heart defect is both impractical and unrealistic.  Danielsson Dep., p. 283:8-22, JA001549, (Vol. 3).

GSK's assertion that multiple studies are needed for each specific defect means that the defects are extremely rare and difficult to study.  Dr. Louik testified that "as you get more and more specific in the defects, they become rarer and rarer and harder to find in the population." Louik Dep., p. 374: 12-15, JA002175, (Vol. 4). Dr. Shaw agreed. Shaw Dep., p.392:4-7.   When the outcome is rare "you'd need a huge number of women to have enough outcomes to begin to assess an exposure." Louik p. 374: 22-23; 375:19-25, JA002175, (Vol. 4).  That is the reason First Circuit case law does not impose this.

---

or not. However, another aspect of this whole thing is that we're dealing with a drug here that has a very defined mechanism of action that is very detrimental to development, and that's been well established." *Id.*, pp. 120: 25- 121:7, JA002619, (Vol. 5).

[18] Grouping structural defects by mechanistic etiology is an accepted methodology and provides a rational basis for aggregating cases. Baldwin Dep., p. 91–92, JA001323, (Vol. 3). In this regard, focusing on hemodynamics provides a reliable scientific basis for aggregating categories of orofacial and cardiovascular defects because hemodynamics is probably the most important function of altering the structure of the heart.  Baldwin Dep., p.94:1–15, JA001324, (Vol. 3); Danielsson Dep., p.144:11-13;  Abdulla Dep., pp. 72:13-21, JA001205, (Vol. 3);  74:5-9, JA001206, (Vol.3) ("I don't think that there is a particular congenital heart disease that is going to be more prevalent because of the interference with hemodynamics or prolonged QT or IKR current, that any congenital heart disease can develop").  Dr. Abdulla also testified that alterations in hemodynamics can lead to an isolated VSD and any other cardiovascular lesion (defect). *Id.*, p. 252:8-11, JA001250, (Vol. 3).  He explained that the mechanism by which Zofran can cause septal defects is also critical for proper development of other structures of the heart: "because of the mechanism [described] in my report, it's altering hemodynamics, the passage of blood flow, the alteration of the normal passage of blood flow or the function of the heart.  When it occurs early, it could … lead to any congenital heart disease.…" *Id.*, p. 71:18-25, JA001205, (Vol. 3).  Dr. Danielsson testified that "looking at organ system," *i.e.*, cardiovascular or orofacial defects, is "the most important thing," Danielsson Dep., p.144:11-13, JA001514, (Vol. 3).

**E.**    **STATISTICAL SIGNIFICANCE IS NOT A LEGAL OR SCIENTIFIC REQUIREMENT.**

In addition to the multiple human epidemiologic studies with statistically significant results, Plaintiffs' experts also consider studies finding increased risks that do not meet the technical threshold of statistical significance.  GSK argues (at pp. 9-11) that "a statistically significant association is required."  *For both cleft palate and septal heart defects, this requirement is met*.  The only issue is whether experts should disregard additional results from studies that are not statistically significant.  The courts and the scientific community have provided the same answer: findings that lack statistical significance should be considered as part of the totality of evidence.

Here, there are studies with results that are not statistically significant that are consistent with statistically significant results in other studies.  Plaintiffs' experts (and scientists in work outside of litigation) routinely consider such evidence. Indeed, GSK's position in its brief is not shared by GSK's own epidemiology experts:  "[A]bsence of statistical significance should not be mistaken for absence of effect,"   Shaw Dep., p. 92:2–93:13 JA002916, (Vol. 5). *id*., p. 76: 13-15 JA002912, (Vol. 5) ("p-value alone does not serve as a trigger for me to say yes or no…"); nor does it tell you about the biological mechanisms."  Shaw Dep. at 46:22–47:19, JA002905, (Vol. 5); *see also id.* at 92:16–93:13, JA002916, (Vol. 5). *Accord* Kimmel Dep., p. 214:23–216:9, JA00838, (Vol. 3).   Scientifically and legally, statistical significance goes to the weight.

Statistical significance (measured with P values and confidence intervals) is an estimate of the likelihood that the study's results were due to chance. *Ref. Man.* at 576, JA003651, (Vol. 7). "Thus, a *p*-value of .1 means that there is a 10% chance that values at least as large as the observed relative risk could have occurred by random error, with no association actually present in the population." *Id.*  For a study's results to be deemed "statistically significant," epidemiologists have historically used a standard that the *p*-value must fall below a selected significance level, *id.*, typically .05, where "the probability is 5% of observing an association at least as large as that found

in the study when in truth there is no association." *Id.* at 577, JA003652, (Vol.7).   Dr. Kimmel's *Textbook of Pharmacoepidemiology* (at p. 38), states that the selection of the .05 threshold for statistical significance is somewhat arbitrary:   "There is certainly no compelling reason why an alpha should be .05 . . . ."

"[T]he finding of an increased risk should not be ignored simply because it did not reach statistical significance, especially when the observed association with an increase in risk is repeated in different studies. Results that are not statistically significant may be compatible with substantial effects."[19] *Accord Ref. Man.* at 579, JA003652, (Vol. 7).   Statistical significance does not signify the importance of the study to clinicians.   As noted by one district court citing the epidemiology textbook by Dr. Kenneth Rothman, a "p value cannot provide evidence of lack of an effect." *In re PPA*, 289 F.Supp.2d at 1243 (citing Rothman, *Epidemiology, An Introduction* at 117).[20]

A concept related to statistical significance is power.   Epidemiologic studies of rare injuries may never be sufficiently powered to achieve statistical significance, and thus such studies are not a requirement for establishing causation.   *See Milward*, *supra,* 639 F.3d at 24 (noting the impracticality of conducting epidemiologic studies where, to obtain statistically significant results, hundreds of thousands of subjects, the same number of controls, and millions of dollars in funding would be required).   In *Milward*, the First Circuit stated: "the rarity of [the disease] and difficulties of data collection in the United States ma[d]e it very difficult to perform an epidemiological study

---

[19] A. Berard, et al., Field studies versus database studies on the risks and benefits of medication use during pregnancy: Distinct pieces of the same puzzle, *Reprod. Toxicol.* 60 (2016) 123–128 at 126, JA003502-3507, (Vol. 7) (hereinafter, Berard 2016).

[20] Consider the following hypothetical:  We have two studies, Study A documents a relative risk of 1.4 with a confidence interval that spans 1.1-1.7.  Study B is smaller with fewer subjects and documents a relative risk of 1.4 with a confidence interval that spans 0.9 to 1.9.  In GSK's analysis, not only are these two results inconsistent, but only Study A should be considered as contributory to an analysis of causation.  Given that both studies in this hypothetical came to the same point estimate result, 1.4, GSK's argument is unfounded.

of the causes of [the disease] that would yield statistically significant results." 639 F.3d at 24. The court in *In Re Neurontin*, 612 F. Supp. 2d at 124, held that "scientific evidence demonstrating a statistically significant association between Neurontin and suicide-related events" was not required, citing the rarity of the alleged adverse event (suicide), which caused epidemiologic studies to lack statistical power. *Id.*

"Statistical significance and power are inter-related concepts."[21] "[A] large enough sample of individuals must be studied if the study is to identify a relationship between exposure to an agent and disease that truly exists." *Ref. Man.* at 576, JA003651, (Vol. 7). "The power of a study is the probability of finding a statistically significant association of a given magnitude (if it exists) in light of the sample sizes used in the study." *Ref. Man.* at 582, JA003657, (Vol. 7).[22] As Dr. Louik testified, the rarer the birth defect, the larger the study that is needed. Louik Dep., p. 375:18–23, JA002175, (Vol. 4) (for rare outcome like cleft palate, a study would need "a huge number of women" exposed to Zofran).

Understanding a study's power is also relevant for extrapolating from a finding of no increased risk. GSK's epidemiology experts Drs. Kimmel and Shaw testified that a study with insufficient power cannot determine if there is not an association. Kimmel Dep., p. 132:11–133:6, JA001817, (Vol. 3). Indeed, Dr. Kimmel co-edited the *Textbook of Pharmacoepidemiology*, in which he states that "any specific birth defect is rare, occurring in 1 per 1,000 births" (specifically mentioning oral clefts as an example) and would need "over 20,000" women exposed to a drug during pregnancy "to *detect* a doubling of risk," and "a far larger sample size to *rule out* a doubling

---

[21] Berard 2016, at 126, JA003505, (Vol. 7).
[22] A Type I error occurs when a study finds an association that does not actually exist between an exposure and a disease. A Type II error occurs when a study "will be interpreted as 'negative' ...when in fact there is a true association…." *Ref. Man.* at 581-82, JA003656-3657, (Vol. 7). Reducing false-positive results (Type I errors) can lead to an increase in false-negative results (Type II errors). *Ref. Man.* at 581, JA003656, (Vol. 7).

of risk." *Id.* at 365-66, JA001875-1876, (Vol.3) (emphasis in original).  *Accord* Shaw Dep., p. 90:24–91:24, JA002916, (Vol. 5).  This concept, ignored in GSK's brief, is important to interpreting the results of several Zofran epidemiologic studies.  *See* Section VI(G)(3), *infra*.   As shown in Section III, Figure 3, all of the specific birth defects alleged in this case are rare; most are much less than 1 per 1,000, and none are more than 4 per 1,000.

### F.   EVIDENCE OF MECHANISM OF ACTION IS IMPORTANT FOR ASSESSING CAUSATION.

GSK muddies the water by misrepresenting the role of mechanism of action evidence in proving causation in birth defect cases and ignoring Plaintiffs' related evidence.  Although Plaintiffs are not required to prove mechanism of action (how a drug causes a disease or injury), "[w]hen biological plausibility exists, it lends credence to an inference of causality."  *Ref. Man.* at 604, JA003670, (Vol. 7).  GSK ignores all of Plaintiffs' other evidence supporting causation (including epidemiologic studies, the Karolinska human embryonic cell study, and animal studies, live and embryo culture) when it states (at p. 35) that courts have rejected expert opinions *solely or largely* based upon biological plausibility.  In *Allen*, this Court found it significant that the challenged expert had a biologically plausible basis for linking the progression of ALS to toluene.  263 F.R.D. at 59.

The defendant in *Allen* contended that Dr. Ratner's opinion was unreliable because there were no peer-reviewed studies that supported her opinion and because her opinion was vague about the specific quantity of toluene and duration of exposure that could cause ALS.  263 F.R.D. at 60. The Court observed that most of defendant's criticisms of Dr. Ratner's testimony went to the weight and credibility of her opinion, not to its admissibility.  *Id.*; *see also Preferred Mut. Ins. Co. v. Barros Co., Inc.*, 2018 WL 3977122, at *7 (D. Mass. Aug. 20, 2018) (Saylor, J.) (questions about the factual underpinnings of an expert's opinion often go to the weight of the testimony, not to its admissibility).  Because the defendant had not provided evidence to show that her underlying methodology was inherently unreliable, the expert was not excluded from testifying.  *Allen*, 263

F.R.D. at 60.  "Of course, both sets of experts cannot be right; one is necessarily wrong. But it does not follow that one methodology is necessarily unscientific, at least within the meaning of Rule 702. Trained scientists, using scientific methods, often disagree."  *Zeolla v. Ford Motor Co.*, 2013 WL 308968, at *10 (D. Mass. Jan. 24, 2013) (Saylor, J.).

### G.   ANIMAL STUDIES CONTRIBUTE IMPORTANT EVIDENCE TO CAUSAL INQUIRY.

In this case, Plaintiffs' experts' opinions are supported by substantial human and animal studies, and the animal studies are consistent with the human epidemiologic studies.  *See* Line of Evidence 2.  "[T]he toxic responses in laboratory animals are useful predictors of toxic responses in humans."  *Ref Man*. at 637.  In cases like *Milward*, *Allen*, and *In re Neurontin*, the courts recognized that where epidemiological studies are unavailable (often because they are insufficiently powered to show statistical significance given the rare nature of the injuries), experts turn to other sources to evaluate causation, including animal studies.  Courts outside of the First Circuit have taken this same approach.  *See, e.g.*, *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 186 (S.D.N.Y. 2009) (noting that animal studies served as "pieces of the scientific puzzle that contribute to the reliability of the experts' opinions" on general causation in humans).  In *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 780 (3d Cir. 1994), the Third Circuit Court of Appeals stated:

> While other cases have held that animal studies are inadmissible, these cases are for the most part distinguishable because most involved the exclusion of animal studies in the face of *extensive* epidemiological data that failed to support causation, and because none involved studies on animals particularly similar to humans in the way they react to the chemical in question….

## III.   CONSIDERATIONS FOR INVESTIGATING THE CAUSES OF BIRTH DEFECTS

GSK's own expert admits that every birth defect has a cause.  Baldwin Dep., p. 84:6–8, JA001321, (Vol. 3).  Scientists considering whether a drug is capable of causing birth defects are informed by human embryology, teratology, pharmacology, obstetrics and epidemiology.  Baldwin Dep. at 87: 4–12, JA001322, (Vol. 3).  The only way scientists can confirm that an exposure is

teratogenic in humans is to recognize that the exposure has caused birth defects in children. Scientists' challenge, then, is to identify when an exposure can cause birth defects as efficiently as possible.  Baldwin Dep., p. 63:2–64:12, JA (Vol. 3).

Many birth defects have been reported to be of unknown cause, but that is not because the cause cannot be determined.   Most pregnancy exposures have not been adequately studied for teratogenicity.[23]  A 2012 study concluded that available information was not sufficient to determine the teratogenic risk associated with treatment during pregnancy with almost 98% of 172 prescription medications approved by the U.S. Food and Drug Administration (FDA) between 2000 and 2010.[24]  The average time it has taken to determine whether treatment of a pregnant woman could cause birth defects was 27 years for 403 prescription drug treatments approved by the FDA since 1980.  *Id*.  In the case of epidemiology, the teratogenic risks of drug exposures have been difficult to study because birth defects are uncommon,[25] most studies are "under-powered," Section VI(G)(3), *infra*, and not even the most potent teratogen causes a birth defect with every exposure. Baldwin Dep., p. 88:22–89:9, JA001322, (Vol. 3).  GSK's expert acknowledged that epidemiologic studies can fail to detect an association between a drug and a birth defect because they are insufficiently powered to do so.  Baldwin Dep., p. 89:10–17, JA001322, (Vol. 3).  In addition, the very large studies that are needed to study very rare injuries are expensive and time-consuming.

---

[23] Friedman 2017, JA003828-3834, (Vol. 7).

[24] Friedman 2012, JA003821-3827, (Vol. 7)..

[25] For example, the rules governing medicinal products in the European Union (Sept. 2009) classify an adverse event as rare when it occurs in less than 1 per 1000 drug exposures and require pharmaceutical companies to use standardized terms when disclosing adverse reactions with drugs, including: "Very common ($\geq$1/10); common ($\geq$1/100 to <1/10); uncommon ($\geq$1/1,000 to <1/100); rare ($\geq$1/10,000 to <1/1000); very rare (<1/10,000)."  GSK's expert Dr. York also used an incidence of greater than 1/1,000 to classify a birth defect as "rare."  York Dep. at 155:12–19; 156:18–157:2, JA003295, (Vol. 5).

Under-powered studies that do not find the association provide false assurance of safety. *See* Section VI(G)(3).

An initial inquiry for causation is whether the exposure passes the placental barrier.[26]  The "majority of medicinal products or … used by a pregnant woman could have effects on the fetus either before the placenta is fully developed or subsequently, if they can cross the placenta at least to some extent."  Baldwin Dep., p. 46:11–20, JA, (Vol. 3).  As shown in Line of Evidence 1, Zofran crosses the placental barrier.  This has been known for more than a decade.

Another consideration is whether the teratogen is weak, modest, or extreme, because more extreme teratogens are easier to detect, require less power, and will have higher relative risks. For the most extreme teratogens like Thalidomide, their effect is more obvious and their detection is not as challenging.  According to Dr. Danielsson, Zofran "a weak to moderate teratogen." Danielsson Dep., p. 388:8-9, JA001575, (Vol. 3).  "It's not a new Thalidomide." *Id*. p. 84:12, JA001499, (Vol. 3).  Therefore, larger, more powerful studies are needed to detect the increased risk, and the reported risk increases are likely to be relatively modest, generally measured as a doubling of risk or less.  But, a weak to moderate teratogen is no less real; the Zofran risk is a "high concern." Danielsson Dep., p. 295:20, JA001552, (Vol. 3).  Even for a weak to moderate teratogen, the "consequence of birth defects is so severe." *Id*., 84:14, JA001499, (Vol. 3).

Another reason birth defects are very challenging to study with epidemiologic studies is that assessing exposure to the drug, (e.g., whether the mother actually took the drug and the timing of exposure) are all challenging to ascertain, yet reliable results depend on this information.   Unless the study can determine whether women who are prescribed Zofran actually take the drug, the

_____

REDACTED

studies will understate (or miss entirely) the increase in risk.  *See* Section VI(G)(1)(a).  Prescription data cannot be equated with actual exposure to the drug.

Plaintiffs allege that Zofran causes congenital heart and orofacial defects.[27]  Although they are among the most common birth defects, they are nevertheless rare.  *Milward, Allen and Neurontin* stressed the importance of understanding the rarity of the event and as a result, the difficulty of assessing the risk in epidemiologic studies.  Studying "a rare event . . . for purposes of causation requires a huge number of participants." *In re Neurontin*, 612 F. Supp. 2d. at 126. GSK's epidemiologist Dr. Kimmel made that same point in his textbook at p. 365.

The CDC estimates that cleft palate occurs in 1 out of 1,574 births.[28]  "The prevalence of isolated cleft palate is about .06 percent.  And so . . . you'd need a huge number of women to have enough outcomes to begin to assess an exposure . . . ."  Louik Dep., p. 375:19–25, JA002175, (Vol. 4).   In addition, estimates of the incidences of cardiovascular defects are shown below in a schematic from GSK's pediatric cardiologist, Dr. Baldwin. Baldwin Rept. at 8.  Most are much less than 1 per 1,000 and none are more than 4 per 1,000.

---

[27] Structural heart, or cardiovascular, defects and orofacial defects are types of malformations.   A malformation is a "permanent structural deviation that generally is incompatible with or severely detrimental to normal postnatal development or survival." ICH S5 (R3) at 29, JA006190,  (Vol. 12).  A structural heart defect is a defect in the actual structures that comprise a heart.  Baldwin Dep. 88:14-21, JA001322, (Vol. 3). The examples of orofacial clefts are cleft palate and cleft lip.  Sadler Dep. at 26:19–27:6, JA002596, (Vol. 5).

[28] CDC, Data & Statistics, *https://www.cdc.gov/ncbddd/birthdefects/data.html* (last visited Nov. 20, 2018), JA006295-6337, (Vol. 12).



**Fig. 3 Types of Congenital Heart Defects**

(estimated incidence per 1,000 live births indicated in parentheses)

Recognizing the limitations of epidemiology in birth defects research, scientists have adopted a weight of evidence approach that considers epidemiologic data when available as one of several relevant categories of information:  GSK advocates for a checklist of types of evidence that is "required" to reliably conclude that an agent can cause a birth defect.  But that is not the accepted view.  As Dr. Friedman explained, there is not a "diagnostic algorithm."[29]

Plaintiffs' experts have applied a weight of evidence methodology considering one or more sets of well-accepted criteria to guide their inquiries.  These criteria include "Wilson's Principles," the "Bradford Hill Criteria," "Shepard's Criteria" and the ICH S5 (R3) Guidelines, JA006158-6220, (Vol. 12).  Each is summarized below.  The criteria are not rigid requirements to be box-checked; they are considerations.  They are similar, and no one set conflicts with the others.

---

[29] Friedman 2017, JA003828-3834, (Vol. 7).

A.      **WILSON'S PRINCIPLES ARE A USEFUL FOUNDATION TO INFORM EXPERTS' CAUSAL INQUIRIES IN BIRTH DEFECTS RESEARCH.**

In 1973, Dr. James G. Wilson, Co-Founder of the Teratology Society, identified general principles of teratology to be used as a starting point for assessing teratogenic risks.   Wilson's Principles are satisfied by the evidence supporting general causation in this case:   *Principle One*: "Susceptibility to teratogenesis depends on the genotype of the conceptus and the manner in which this interacts with adverse environmental factors."   This principle addresses the observation that with similar teratogenic exposures, the absence, presence, and severity of malformations varies. This variability is due to the unique genetic composition of each individual and how it interacts with the environmental agent. Two important propositions stem from this principle.   First, no teratogen has been identified that causes birth defects with every exposure.   Baldwin Dep., p. 88:22–89:9, JA001322, (Vol. 3).   Second, as to Zofran, patient-specific factors such as low potassium levels (hypokalemia), and increased body temperature can increase the individual's susceptibility of developing a birth defect at concentrations achieved at recommended doses.   Danielsson Rept. at 9, JA000191, (Vol. 1).   Thus, it is not surprising to see some Zofran epidemiologic studies reporting increased risks while others do not detect an increase in risk.   In fact this is not uncommon in observational epidemiologic studies evaluating associations between pharmaceutical compounds and adverse outcomes.   GSK would be hard pressed to point to a teratogen in which all epidemiological studies reported a unanimously positive outcome.[30]

*Principle Two*: "Susceptibility to teratogenesis varies with the developmental stage at the time of exposure to an adverse influence." This principle describes the observation that an exposure to a teratogen can produce different malformations depending on when the exposure occurs during

---

[30] In *Kiker v. SmithKline Beecham Corp.*, 2016 WL 8189286, at *9 (S.D. Ohio Dec. 15, 2016), a judge admitted causation testimony involving GSK's drug Paxil where some epidemiology studies detected that drug's association with birth defects and others did not.  Also, the judge deemed GSK to have admitted the drug's association in a Dear Dr. letter, notwithstanding the existence of epidemiology studies that failed to detect the drug's risk.

development.  Cardiovascular defects and orofacial clefts can be induced during week 4 to week 10 of human pregnancy.  Sadler Dep., p. 129:22–25, JA002621, (Vol. 5); Danielsson Dep., p. 370:8–371:8, JA001571, (Vol.3).[31]

*Principle Three*: "Teratogenic agents act in specific ways on developing cells and tissues to initiate sequences of abnormal developmental events."  This indicates that teratogens impact cells, tissues, and organs in specific ways (mechanisms of action) to disrupt embryonic development.  For Zofran, the mechanism for its causing birth defects is heart rhythm disturbance leading to a blood flow / hemodynamics disruptions that interfere with normal organogenesis.  There is no dispute that Zofran interferes with normal heart rhythm.  This is because Zofran interferes with the "hERG," or potassium channels, also known as the IKr channels, contain in human cells.

*Principle Four*: "There are four manifestations of deviant development (Death, Malformation, Growth Retardation and Functional Defect)." This statement categorizes the severity of deviations in development, and evidence in all four categories is relevant to assessing an agent's ability to produce malformations.  Sadler Dep. at 247:3–12, JA002651, (Vol. 5); Scialli Dep., p. 302:11–19, JA002795, (Vol. 5); Baldwin Dep., p. 87:13–22, JA001322, (Vol. 3).  As will be discussed below, increased incidences of embryonic deaths and malformations consistent with those seen in Zofran epidemiology studies and with other hERG blocking drugs were observed in the Zofran animal teratology studies that achieved meaningful Zofran exposure in the embryo.

*Principle Five*: "The access of adverse environmental influences to developing tissues depends on the nature of the influence."  Several factors affect the ability of a teratogen to impact a

---

[31] Gestational age commonly refers to the age of the embryo or fetus calculated from the start of the last menstrual period (LMP), i.e., before the baby was conceived.  Embryonic or fetal age refers to the age of the embryo or fetus starting with the exact date when the sperm fertilized the egg.  The date of conception is generally two weeks after the start of the last menstrual period.  The term "embryo" refers to a developing conceptus from implantation through the eighth week of pregnancy. Beginning with the ninth week, the conceptus is referred to as a "fetus" until birth.  Scientists sometimes use "embryo" and "fetus" interchangeably.

developing conceptus, such as the physical nature of the agent itself, the route and degree of maternal exposure, the rate of placental transfer and systemic absorption, and the nature of the maternal and embryonic/fetal genotypes.   Zofran crosses the placental barrier in humans and disrupts embryonic heart rhythm at concentrations seen in women of childbearing potential in all forms of administration and doses in the drug labeling.  *See* Lines of Evidence 2 and 5.

*Principle Six*: "Manifestations of deviant development increase in frequency and degree as dosage increases from the No Observable Adverse Effect Level (NOAEL) to a dose producing 100 % Lethality (LD100)."   This principle describes the dose response. Low doses may exert no or very little toxicity or teratogenicity, while higher doses are expected to increase the incidence and severity of the observed malformations and embryofetal death.  The highest dose of Zofran has been withdrawn from the market due to its tendency to disrupt heart rhythm in adults.[32]  In addition, as discussed in Line of Evidence 2, in the animal teratology studies that reported Zofran exposures similar to those reported in human pregnancy (though not high enough to meeting the international standards for conducting studies), increased incidences of malformations and embryonic deaths were observed relative to the concurrent, untreated controls.  Increasing the doses so that the Zofran concentration was appropriately higher than reported in human pregnancy, as internationally accepted regulatory guidelines state, would most likely have induced massive embryonic death similar to other potent hERG blocking drugs.  Finally, as discussed in Line of Evidence 4, data on the whole embryo culture animal study presented in the Danielsson, Webster & Ritchie 2018 paper unequivocally shows a dose-responsive increase in the drug's disturbance of embryonic heart rhythm, namely bradycardia (slowing of the heart rate).[33]  In short, Wilson's Principles support the

---

[32] FDA Drug Safety Communication (June 29, 2012), JA006105-6107, (Vol. 12).

[33] Danielsson, Webster, & Ritchie, Ondansetron and teratogenicity in rats: Evidence for a mechanism mediated via embryonic hERG blockade, *Reproductive Toxicology*, 81 (2018) 237–45, at 237, JA003588-

teratogenicity of Zofran in this case.  Danielsson Rept. at 32, JA000214, (Vol. 1); Sadler Rept. at 4-5, JA000843-844, (Vol. 2).

**B.**    **THE BRADFORD HILL CRITERIA INCLUDE GENERALLY APPLICABLE CONSIDERATIONS TO GUIDE CAUSAL INQUIRIES, BUT THEY ARE NOT A "DIAGNOSTIC ALGORITHM."**

To assist in determining whether a causal inference is appropriate, Sir Austin Bradford Hill suggested various factors for potential consideration.[34] The Hill factors include: (1) existence of a temporal relationship; (2) strength of the association; (3) dose–response relationship; (4) replication of the findings; (5) biological plausibility (coherence with existing knowledge); (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge.[35] *Ref. Man.* at 600, JA003666, (Vol. 7).  Dr. Hill's factors do not form an exhaustive list of criteria or a set of boxes to be checked to draw a causal inference; they are a tool for scientists to use for assessing causation.  "There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines.  One or more factors may be absent even when a true causal relationship exists." *Ref. Man.* at 600, JA003666, (Vol. 7).  GSK's expert Dr. Shaw agrees. Shaw Dep., p. 124:2–22, JA002924, (Vol. 5). *See In re Neurontin*, 612 F. Supp. 2d. at 123 (Hill factors "are viewed as guidelines" and "each factor need not be fulfilled in order for a researcher to proclaim causation").

In birth defects research, to the extent that the Hill criteria have been construed to require epidemiologic evidence notwithstanding strong evidence of the mechanism of how an agent can

---

3596, (Vol. 7) and n.1 (hereinafter, Danielsson, Webster & Ritchie 2018; note: the authors reported that "This work was supported in part by funding from attorneys representing families regarding ondansetron use in pregnancy").

[34] Austin Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965) (Hereinafter Hill 1965), JA003520-3525, (Vol. 7).

[35] For a more complete explanation of each factor, *see Ref. Man* at 601-06, JA003667-3672, (Vol. 7).

cause birth defects, they have been criticized by leading scientists. For example, in 2017, the U.S. Teratology Society invited Dr. Friedman to present the esteemed Robert L. Brent Lecture to the organization and publish his presentation in the journal *Birth Defects Research*. In his publication, Dr. Friedman observed that "the Bradford Hill criteria are rarely, if ever, used in human birth defects research because they assume the availability of multiple high-quality epidemiology studies, and most pregnancy exposures have *not* been adequately assessed by such studies."[36]

### C. SOME EXPERTS USE SHEPARD'S CRITERIA TO GUIDE CAUSAL INQUIRIES IN BIRTH DEFECTS RESEARCH.

Scientists also apply the criteria developed by Dr. Thomas H. Shepard (a pediatrician, scientist, and pioneer in teratology) to assess whether an exposure and fetal adverse outcome in human pregnancy is likely to be causal. Danielsson, Webster & Ritchie 2018, JA003588-3596, (Vol. 7); Baldwin Dep., p. 48:11–16, JA001312, (Vol. 3); *but see* Scialli Dep., p. 255:5–15, JA002783, (Vol. 5) ("I don't personally rely on Shepard's"). They should not be treated as a checklist of requirements,[37] but rather as a set of *considerations* for evaluating the available evidence; most human teratogens only fulfill some (but not all criteria). The Shepard's criteria are:

- Proven exposure to the agent at critical time(s) in development
- Consistent findings by two or more high-quality epidemiological studies
- Careful delineation of clinical cases
- Rare environmental exposure associated with rare defect
- Teratogenicity in experimental animals
- The association should make biological sense; and
- Proof that the agent acts in an unaltered state in an experimental system

Regarding the consideration of epidemiologic data, an increased association can be identified under Shepard's criteria with only two studies, and epidemiology is not needed to infer

---

[36] Friedman 2017, JA003828-3834, (Vol. 7).

[37] *Id.*

causation in the case of rare exposures and rare defects.  Baldwin Dep., p. 51:17-25, JA001313, (Vol. 3).  Zofran fulfills Shepard's criteria for teratogenicity. Danielsson Rept. at 68, JA000250, (Vol. 1).

### D. ICH GUIDELINES DIRECT EXPERTS TO PERFORM A WEIGHT OF EVIDENCE REVIEW WHEN CONSIDERING WHETHER A PHARMACEUTICAL DRUG IS CAPABLE OF CAUSING BIRTH DEFECTS.

The ICH has established internationally accepted guidelines on developmental toxicity.[38] The guidelines were drafted by representatives of regulatory agencies in the United States (FDA), the European Union and Japan, among others, with representatives from pharmaceutical industry. The FDA adopted the guidelines for reproductive toxicity studies.  York Rept. at 7, JA001100, (Vol. 2), n.2, and REDACTED ███████████████████████████████████

███████████████████████████  The ICH S5 (R3) Guidelines, JA006158-6220), (Vol. 12) apply not only to designing animal reproductive toxicology tests but also to drawing inferences about a drug's potential to cause birth defects in humans, based on all relevant data: "All available data on the pharmaceutical and any related compounds…, as well as information on human genetics, transgenic animals and the role of the target in reproduction . . .  as well as . . . [t]he (projected) human exposure, comparative kinetics between species and plausible mechanism of reproductive

---

[38] ICH S5(R2) 1993, JA006131-6154 and ICH S5 (R3) 2017, JA006158-6220, (Vol. 12); Sadler Dep., p. 278: 20–23, JA002659, (Vol. 5), York Dep., p. 18–20, JA003261, (Vol. 5).  Regulatory authorities from twelve nations, including the U.S. FDA, and representatives of industry participated in the working group that created the guidelines, which are relied on by experts in the field of reproductive toxicology.  Danielsson Rept. at 3, JA000185, (Vol. 1).  FDA has not implemented the Guidelines as a regulatory requirement, but has published it on its website: https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM584413.pdf (last visited Jan. 4, 2019).

toxicity. . . .[39] The guidelines are important because they refute GSK's arguments about how to interpret animal studies and extrapolate to human relevance.

## IV.    CAUSAL INFERENCE IN SCIENCE AND THE LAW

As this Court considers the *Daubert* motions, it is important that the Court understand the framework scientists use for causal inference generally. Any assessment of general causation involves an inferential process from evidence to the causation conclusion because causation cannot be observed directly. *Ref. Man.* at 553, n.7.

### A.    CAUSAL INFERENCE IS A MATTER OF JUDGMENT.

Scientists recognize that causal probability is not a "determination made by using an objective algorithmic methodology." *Ref. Man.* at 600, JA003666, (Vol. 7). "[D]eciding whether associations are causal typically is not a matter of statistics alone, but also rests on scientific judgment." *Id.* at 222, JA003635, (Vol. 7). The *Reference Manual* emphasizes repeatedly that causal inference is a judgment. *Ref Man.* at xiv, 20, 21, 222, 553,565,591,598,599, 600. GSK's brief is silent on this essential point.

### B.    BOTH EPIDEMIOLOGIC AND TOXICOLOGIC STUDIES HAVE VALUE FOR CAUSAL INFERENCE.

Epidemiologic studies and toxicologic studies have been conducted and provide results relevant to the question of whether Zofran can cause birth defects. These have been referenced in the Plaintiffs' experts' reports, and the main ones will be discussed in this brief. Generally speaking, "no universal rules exist for how to interpret or reconcile" results from epidemiologic and toxicologic studies. *Ref. Man.* at *564*. However, both must be considered: "careful assessment of the methodological validity and power of the epidemiologic evidence must be undertaken, and the

---

[39] ICH S5 (R3) at 24, JA006185, (Vol. 12).

quality of the toxicologic studies and the questions of interspecies extrapolation and dose–response relationship must be considered." *Ref. Man.* at *564–65*.

### C. BASIC PRINCIPLES OF EPIDEMIOLOGY

Important *Daubert* issues in this case will implicate basic principles of epidemiology. *Daubert* motions will use terms like "relative risk," "statistical significance," "confidence intervals," "sample size," "power," "bias," "consistency" "chance," "confounding," and "association." Understanding these concepts is critical to properly interpreting the human epidemiologic studies, the causation evidence in this case and the *Daubert* motions. These concepts and their implications are frequently misunderstood particularly in pharmaceutical litigation. To assist this Court, below is a brief overview of basic principles of epidemiology.

#### 1. Epidemiology Relies Largely on Observational Studies.

Epidemiology examines the "incidence, distribution, and etiology of disease." *Ref. Man.* at 551. Researchers are ethically prevented from exposing people to an agent suspected to be harmful. Baldwin Dep., pp. 185:17–186:7; 191:9–19, JA001346-1347, (Vol. 3); 193:23–194:4, JA001348-1349, (Vol. 3). All of the epidemiologic studies of Zofran are thus "observational." *Ref. Man.* at 555–56, JA003641-3642, (Vol. 7).

In an observational study, "the investigator identifies a group of subjects who have been exposed [to an agent] and compares their rate of disease . . . with that of an unexposed group." *Ref. Man.* at 556, JA003642, (Vol. 7). The most common types of observational studies are cohort studies and case-control studies. *Ref. Man.* at 556, JA003642, (Vol. 7). "The difference between cohort … and case-control studies is that cohort studies measure and compare the incidence of disease in the exposed and unexposed ("control") groups, while case-control studies measure and compare the frequency of exposure in the group with the disease (the "cases") and the group without the disease (the "controls")." *Ref. Man.* at 557, JA003643, (Vol. 7).

35

2.    **Study Results Are Evaluated for the Existence of an Observed Association.**

"An association between exposure to an agent and disease exists when they occur together more frequently than one would expect by chance." *Ref. Man.* at 566, JA03644, (Vol. 7). A causal relationship is one explanation for an observed association between an exposure and a disease. However, a causal relationship is just one of several possible explanations for an observed association that must be considered in a search for the most likely explanation. Expressing and interpreting the existence and magnitude of an association involves the concepts of "relative risk," and "odds ratio." *Ref. Man.* at 566, JA03644, (Vol. 7). "Each of these measurements of association examines the degree to which the risk of disease increases when individuals are exposed to an agent." *Ref. Man.* at 566, JA03644, (Vol. 7).

3.    **Study Results Are Evaluated for Strength of Association.**

The strength of the association between an agent and a disease can be expressed using the relative risk ("RR") approach. *Ref. Man.* at 566, JA03644, (Vol. 7). "It is defined as the ratio of the incidence rate [...] of disease in exposed individuals to the incidence rate in unexposed individuals." *Ref. Man.* at 566, JA03644, (Vol. 7). For example, when the relative risk is expressed as 3.0, the exposed group is at three times the risk of disease as the unexposed group. *Ref. Man.* at 567, JA03645, (Vol. 7). The "odds ratio" (OR) also quantifies the magnitude of an association. *Ref. Man.* at 568, JA03646, (Vol. 7). It is used to approximate the relative risk in a case control study when the disease under investigation is rare. *Ref. Man.* at 568, JA03646, (Vol. 7).

As long as the relative risk exceeds 1.0, there is no minimal threshold for a causal relationship. "While strength of association is a guideline for drawing an inference of causation from an association..., there is no specified threshold required." *Ref. Man.* at 611, n.186, JA03673, (Vol. 7). "If the relative risk is greater than 1.0, the risk in exposed individuals is greater than the

risk in unexposed individuals.  There is a positive association between exposure and disease which could be causal." *Ref. Man.* at 567, JA03645, (Vol. 7).  There are a number of well-established causal relationships, where the magnitude of the risk is between 1.0 and 2.0.  The magnitude of risk for passive smoking and lung cancer and between smoking and heart disease are well-known examples.

4.    **Study Results Are Evaluated for the Role of Chance, Bias, and Confounding.**

A false or spurious association can result from three general sources: chance (or random error), bias, and confounding.  *Ref. Man.* at 572, JA03647, (Vol. 7).  Before a causal inference may be drawn about an association, the likely existence and impact of these sources must be considered. *Ref. Man.* at 572, JA03647, (Vol. 7).  Bias can lead to an invalid outcome in epidemiologic studies*,* and "may arise in the design or conduct of a study, data collection, or data analysis." *Ref. Man.* at 583.  Bias can amplify, minimize, or hide an association. *Ref. Man.* at 583.

Confounding "occurs when another causal factor (the confounder) confuses the relationship between the agent of interest and outcome of interest." Ref Man. at 591.  For a factor to be a confounder for Zofran and heart defects, it would have to be associated with both the use of Zofran and the risk of heart defects. *Id*.  "When they can be identified, confounders should be taken into account."  *Id.* at 593.

When an association is observed in a study's results, epidemiologists employ statistical techniques to estimate the likelihood that the association is due to chance. *Ref. Man.* at 575, JA03650, (Vol. 7).  Statistical tests, including the calculation of *p*-values and confidence intervals, are used to evaluate the likelihood that an observed association resulted from chance or random error.   "Sometimes the study findings, merely by chance, do not reflect the true relationships between agent and outcome." Any study can be "subject to the play of chance."  *Ref. Man.* at 575,

JA03650, (Vol. 7).  As noted by the First Circuit in *Milward, In re Neurontin,* and *Allen*, there is a relationship between sample size and the role of chance. A study needs to have enough participants (sample size); "by enlarging the sample size …, researchers can … reduce the chance of random error in their results." *Ref. Man.* at 576, JA03651, (Vol. 7).

GSK claims (at p. 1) that chance, bias, and confounding cannot be excluded in the epidemiologic studies that find that Zofran is associated with an increased risk of cleft palate or septal heart defects.  Plaintiffs' epidemiology expert considered these issues as part of her methodology: Louik Rept. at 3, 4-11, 21, 23, 24, 28, 37).  Because the legal standard in these cases is "preponderance of the evidence," ruling out bias and chance *with certainty* is *not* required and is not expected either in the practice of epidemiology or in the courtroom.

"Observational studies can produce legitimate disagreement among experts, and there is no mechanical procedure for resolving such differences of opinion. In the end, deciding whether associations are causal typically is not a matter of statistics alone, but also rests on scientific judgment," *Ref. Man*. at 222, JA03635, (Vol. 7), and requires consideration of all lines of evidence.

### 5.    Study Results Are Evaluated for Consistency

GSK uses the words "consistent," "inconsistent" or "consistency" over 100 times in its brief without defining it.  It is necessary to define the term and understand its significance in a causal assessment.  GSK is demanding perfect consistency in epidemiologic data but points to no authority to support its rigid position and fails to define what constitutes inconsistent results or how to assess consistency among different studies and in the context of multiple lines of evidence.

One of the Bradford-Hill criteria is "replication of findings."  As noted in the *Reference Manual* at p. 604, JA03670, (Vol. 7), in epidemiology, research findings are often replicated in different populations and "consistency in these findings is an important factor in making a judgment about causation."  The language here is instructive.  Consistency is labeled *an* important factor, not

a requirement.  Bradford Hill, in addressing the issue of consistency in his classic paper, stated: "different results of a different inquiry certainly cannot be held to refute the original evidence." Hill 1965. And as Dr. Kenneth Rothman wrote in his textbook *Modern Epidemiology* (3d ed. 2008) (at 27), "lack of consistency … does not rule out a causal association."[40]

In GSK's view, studies can be divided by bright line into those that are statistically significant and those that are not, and GSK implies repeatedly that non-statistically significant study results are inconsistent statistically significant ones.  Dr. Rothman's *Modern Epidemiology* textbook (at 27) rejects GSK's view.  He described as "completely fallacious" the claim that results are inconsistent "simply because some results are "statistically significant" and some are not."  He explained, "[c]onsistency is apparent only after all the relevant details of a causal mechanism are understood, which is to say very seldom."  *Id.*  Further, "even studies of exactly the same phenomena can be expected to yield different results simply because they differ in their methods and random errors."  *Id.*

This conclusion also follows from Wilson's First Principle that "Susceptibility to teratogenesis depends on the genotype of the conceptus and the manner in which this interacts with adverse environmental factors."  No teratogen has been identified that causes birth defects with every exposure.  Baldwin Dep., p. 88:22–89:9, JA001322, (Vol. 3).  And in the case of Zofran, there are individualized factors highly relevant to enhancing the causal mechanism of Zofran, such as their severity of vomiting, dehydration, rate of metabolism of Zofran, genetic susceptibility to arrhythmia, low potassium levels (hypokalemia), increased body temperature that increase the individual's susceptibility of developing a birth defect at concentrations achieved at recommended

---

[40] "*Modern Epidemiology* is used in numerous schools of public health and medicine and has been cited in peer-reviewed journals and the Federal Judiciary Center's Reference Manual on Scientific Evidence."  *In re Neurontin*, 612 F. Supp. 2d. at n.32.

doses.  Danielsson Rept. at 9, JA000191, (Vol.1). GSK's heightened standard of consistency also conflicts with Wilson's First Principle summarized in Section III(A) *supra*.

It also is important to distinguish when the results of two studies are not confirmatory and when two studies are actually inconsistent. This issue was addressed by Dr. Louik in comparing the results of the Parker study's results for heart birth defects with prior studies. *See infra*, Section VI(G)(1).  Result A detecting a risk above 1.0 may or may not be "consistent" with Result B that did not detect an increased risk; that determination cannot be made simply by comparing the numerical results.  Consistency determinations require judgment of experts and consideration of the totality of the evidence, including non-epidemiologic and mechanistic data.  For example, where the upper bound of the confidence interval in Result B is above 1.0, a positive association cannot be ruled out as the upper bound of the confidence interval represents the highest risk estimate consistent with the data in that study.  *See In re PPA*, *supra*, 289 F.Supp.2d at 1243 ("statistical reassurance as to lack of an effect would require an upper bound of a reasonable confidence interval close to the null value" (*quoting* Dr. Kenneth Rothman, author of the textbook *Epidemiology, An Introduction*.))

Another important consideration is assessing consistency is to assimilate the epidemiologic and non-epidemiologic evidence.  Particularly if the epidemiologic studies are inconclusive, it is reasonable to put more weight the positive studies if they are most consistent with the non-epidemiologic evidence.  GSK ignores these critical factors in its demand for uniformity of numerical results.

### D.    BASIC PRINCIPLES FOR INTERPRETATION OF ANIMAL STUDIES

To determine the effect of exposure to an agent in humans, human epidemiologic observational studies have limitations that toxicology models based on live animal studies can overcome. *Ref. Man. at* 563. Animal studies may be conducted as actual experiments with

researchers exercising total control over study conditions, including agent exposure and subject participation. *Ref. Man. at* 563. Animal studies can avoid the issue of confounding and do not have the same ethical considerations required of studies in human populations. *Ref. Man.* at *563.* "[A]nimal studies often provide useful information about pathological mechanisms and play a complementary role to epidemiology by assisting researchers in framing hypotheses and in developing study designs for epidemiologic studies." *Ref. Man.* at *563. See In re Neurontin*, 612 F. Supp. 2d. at 127.  REDACTED

Weir Dep. pp. 150:13-151:20, JA003117, (Vol. 5).

GSK generalizes (at p. 30) that all animal studies involving all chemical agents cannot reliably predict human causation. This is not true. Animal study findings can be extrapolated to human populations when there is a principled basis for doing so, such as where the biological pathway impacted by a drug is the same in the animal in humans, the mechanism of injury is the same, and the same types of injuries occur in humans and animals at comparable exposures. Thus, the pharmacokinetic profile of a drug in animals and humans can enable an extrapolation of the results from animals to humans.[41]   EMA Guidelines 2008, at 4, JA006341, (Vol. 12). When the animal has birth defects at exposures that approximate human exposure, "there is increased concern for reproductive . . . toxicity in humans." ICH S5 (R3) at 25, JA006186, (Vol. 12). Similarly, "Wilson['s Principles] stress[] …that mechanism is probably the most important principle, "because

---

[41] Pharmacokinetics distinguishes between the dose given to a species and the exposure achieved in the species considering how that species absorbs, distributes, metabolizes and eliminates the chemical. Roth Dep., p. 80:1–9, JA002476, (Vol. 4); Baldwin Dep., p. 247:2–13, JA001362, (Vol. 3); York Dep., p. 58:19–24, JA003271, (Vol. 5).

that help[s] us extrapolate from animals to humans."  Sadler Dep., p. 227:8-12, JA002646, (Vol. 5).[42]    All of this is why the ICH guidelines emphasize the need to integrate animal study data and mechanism of action data with human data.

According to the ICH, information on systemic exposure of pregnant animals is essential for the interpretation of study results, and thus to assess human safety.  ICH S5 (R3) Final Concept Paper (Mar. 27, 2015), JA006155-6157, (Vol. 12).  An evaluation of animal teratology studies should compare animal and human pharmacodynamic effects, animal and human metabolism, animal and human pharmacologic and toxic effects, and drug exposures in animal studies in relation to the highest proposed dose in humans.  FDA Guidance 2011, JA006108-6130, (Vol. 12); Danielsson Dep., p. 293:2-5, JA001551, (Vol. 3).  When interpreting animal teratology studies, the ICH Guidelines focus on biological significance and not statistical significance: "Any biologically meaningful difference in treated animals compared with concurrent controls should be discussed. Statistical significance alone "does not always constitute a positive signal nor does lack of statistical significance constitute a lack of effect; historical controls, biological plausibility, and reproducibility should be considered in this context."[43]

Dr. Danielsson has (1) performed a comparison of Zofran exposures in GSK's animal teratology studies (the ones GSK referenced in the drug label, as well as the GSK Japanese studies that GSK did not reference in the label) in relation to exposures in humans, and (2) demonstrated and published about Zofran's effects on rat embryonic heart, which has the same dependence on the

---

[42] *See*, *e.g.*, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (animal studies can be admissible to prove causation in humans where there are "good grounds to extrapolate from animals to humans.")

[43] ICH S5 (R3) at 23, JA006184, (Vol. 12); FDA Guidance for Industry, Reproductive and Developmental Toxicities – Integrating Study Results to Assess Concerns, Sept. 2011, at 6–7 ("A positive signal is a biologically meaningful difference in dosed animals compared to concurrent or historical controls.") (hereinafter, FDA Guidance 2011).

hERG channel for rhythm regulation as the human embryonic heart. Danielsson, Webster & Ritchie 2018; Danielsson Rept. at 40, JA000222, (Vol. 1). By contrast, several of GSK's experts have offered opinions about the Zofran animal teratology results without considering the exposure information that is "essential for the interpretation of study results," ICH 2015, JA006155-6157, (Vol. 12), and based on a flawed assessment of the Zofran concentration at which bradycardia and arrhythmia can occur in a human embryonic heart.

### E.   IMPORTANCE OF WHOLE EMBRYO CULTURE TESTING FOR ASSESSING A DRUG'S MECHANISM OF ACTION.

"Knowledge of the mechanism of reproductive . . . effects identified in animal studies can . . . provide information on the human relevance of the effect." ICH S5 (R3) 2017 at 25, JA006158-69220, (Vol. 12). Whole embryo culture (WEC) is a generally accepted animal study using embryos *in vitro* for evaluating teratogenic mechanisms of action.[44] In his report, Dr. Danielsson cited multiple such studies published in peer-reviewed literature dating back to 1996, and GSK has not challenged the methodology used to perform the study of Zofran. Danielsson Rept. at 12, JA000194, (Vol.1). In 1997, for example, Dr. Danielsson showed that phenytoin, an established human teratogen, caused a concentration-dependent slowing and arrhythmia of the embryonic heart of rat embryos grown *in vitro*, and thus that the drug's effect on the embryonic heart was the main factor for initiation of phenytoin teratogenicity.[45] In 2006, Siu *et al.* reported, "By combining the model we used to investigate placental transfer and whole embryo culture, we propose that this is

---

[44] In whole embryo culture (WEC) testing, embryos are taken from pregnant rats, and the embryo is dissected out, placed in a bottle in a medium and incubated, and it's possible to grow the embryo in a way that resembles growth that you would see *in vivo* (in a living animal) for a period of time. Newall Dep., p. 15:16–23, JA002240, (Vol. 4).

[45] Danielsson, et al., *Initiation of Phenytoin Teratogenesis: Pharmacologically Induced Embryonic Bradycardia and Arrhythmia Resulting in Hypoxia and Possible Free Radical Damage at Reoxygenation*, Teratology 56:271-81, 277 (1997), JA003566-3576, (Vol. 7).

the best available *in vitro* model to investigate the drug effect on an embryo and an early fetus.  This model would provide the best estimation of teratogenicity of a drug when prescribed in early human pregnancy."  The ICH S5 (R3) Guidelines encourage the use of WEC studies: "Use of qualified alternative assays is appropriate for risk assessment … where they are interpreted in conjunction with *in vivo* reproductive testing." ICH S5 (R3) at 8–9, JA006169-6170, (Vol. 12). *Accord Ref. Man.* at 647, JA 003676, (Vol. 7) ("In vitro . . . data for elucidating the mechanisms of toxicity are more persuasive when positive human epidemiological data or toxicological information also exists.").

Here, Zofran's mechanism of toxicity – embryonic bradycardia and arrhythmia – via blocking hERG channels is well established and has been demonstrated in an experimental model at concentrations seen in women of childbearing potential.  *See* Line of Evidence 4; Danielsson, Webster & Ritchie 2018.  An adverse finding in animals where the drug has been associated with a teratogenic mechanism of action provides evidence of human teratogenic risk especially when viewed together with other consistent evidence.  ICH S5 (R3), at 24, JA006185, (Vol. 12).

Experts should consider a drug's mechanism together with human and animal data: "integrated evaluation of all available data, including animal kinetics and possible mechanistic [data] in relation to results in epidemiological studies.  I did that because I had everything available."  Danielsson Dep., p. 293:10-17, JA001551, (Vol. 3).  GSK's suggestion (at p. 31) that animal and *in vitro* data can only generate a hypothesis is based on viewing that evidence in isolation, ignoring the seven lines of evidence, contrary to *Milward's* admonition.

 Zofran's mechanism of injury is amply supported by Zofran-specific data and GSK's expert's admission that hemodynamics, which Zofran is known to alter, is the most important mechanism of cardiac development in a human embryo.  *See* Line of Evidence 3.  Plaintiffs' experts

have applied a generally accepted methodology, based on an integration of human animal and Zofran's demonstrated (not theoretical) mechanism of action – bradycardia and arrhythmia. Plaintiffs' experts have considered data in humans and relevant animal species that rely on hERG channels for heart rhythm regulation, and bradycardia and arrhythmia have been induced in animals and humans at concentrations seen in women.  This data, when integrated with human data, supports a valid causal inference, not a mere hypothesis.  Danielsson Dep., p. 297:13-22, JA001552, (Vol. 2) ("[I]t's not only a hypothesis…it's likely that ondansetron can cause teratogenicity.").

As detailed below, with the hERG channel's critical role in rhythm regulation across species, with the animals' teratogenic effects occurring at Zofran exposure concentrations near the human concentrations, with the same types of defects occurring in animals and in humans, and with the same types of defects occurring with Zofran and other hERG blockers (drug and non-drug), a review of the Zofran animal and human studies together, is scientifically reliable, legally appropriate, and more than sufficient to support general causation opinions.

F.     SCIENTISTS DRAWING A CAUSAL INFERENCE ROUTINELY APPLY A WEIGHT OF EVIDENCE APPROACH CONSIDERING THE EVIDENCE AS A WHOLE.

In summary, assessing causation requires evaluating the evidence cumulatively and in its entirety. "Scientific inference typically requires consideration of numerous findings, which, when considered alone, may not individually prove the contention." *Ref. Man.* at 19–20, JA003632-3633, (Vol. 7). This is how science outside of the courtroom functions:

> [M]any of the most well-respected and prestigious scientific bodies . . . *consider all the relevant available scientific evidence, taken as a whole*, to determine which conclusion or hypothesis regarding a causal claim is best supported by the body of evidence. *In applying the scientific method, scientists do not review each scientific study individually* for whether by itself it reliably supports the causal claim being advocated or opposed.

*Ref. Man.* at 20, JA003633, (Vol. 7) (Emphasis added).  Causation cannot be found or refuted in the data resulting from a single study; it is a determination made after evaluating the totality and weight

of relevant scientific evidence within the realm of each scientist's expertise.  Shaw Dep., p. 116:23–117:10, JA002922, (Vol. 5). *Accord, Ref. Man.* at 604, JA003670, (Vol. 7).  Plaintiffs' experts did so here.

## V.    PLAINTIFFS OFFER AN INTERDISCIPLINARY TEAM OF QUALIFIED SCIENTISTS TO PRESENT THE WEIGHT OF EVIDENCE EVALUATION

### A.    DR. RA-ID ABDULLA

Dr. Ra-id Abdulla is a physician Board Certified in both Pediatrics and Pediatric Cardiology and a Professor of Pediatrics (Pediatric Cardiology) and Obstetrics & Gynecology at Rush University in Chicago, and senior attending of Pediatric Cardiology at Rush University Medical Center.  He has practiced clinical pediatric cardiology for over 25 years, determining the cause of, diagnosing, examining, and treating children with congenital heart diseases. Dr. Abdulla has specialized knowledge about the diagnosis and treatment of congenital cardiac disease and the role of both genetics and environmental factors in the development of congenital heart disease. He has specialized knowledge of the proper classification of congenital cardiac malformations.   Since 2000, he has been Editor-in-Chief of the international peer reviewed journal *Pediatric Cardiology*.

Dr. Abdulla considered whether ondansetron is capable of crossing the human placenta, he evaluated Zofran's mechanism of altering heart rhythm, the impact of altering blood flow on embryonic development, and the human epidemiologic literature involving prenatal Zofran exposure and congenital heart defects in exposed infants.  Abdulla Rept. at 3-4, JA000003-4, (Vol. 1).  He considered peer-reviewed literature demonstrating (1) Zofran's placental transfer in humans, (2) Zofran's impact on the IKr channel at doses recommended in the label and its ability to cause arrhythmia and alter blood flow and hemodynamics in the exposed embryo; (3) his knowledge, experience and literature establishing that altered hemodynamics is a known mechanism of

congenital heart disease; and (4) all epidemiologic studies.[46]  Based on the foregoing, he concluded

that maternal ingestion of Zofran causes or substantially contributes to congenital cardiac defects.

Dr. Abdulla considered all available epidemiology in light of the known consequences of

bradycardia and arrhythmia in inducing birth defects and offered sound reasons why demanding

unanimity of epidemiological evidence for every single heart defect is unreasonable.[47]

Dr. Abdulla made clear that his opinion was based on the weight of the evidence, and "no

one study will make your case one way or negate your opinion another way."   Abdulla Dep. at

201:25–202:3, JA001237-1238, (Vol. 3).   GSK objected similarly to Dr. Abdulla's testimony in

*Kiker v. SmithKline Beecham Corp.*, and it was appropriately overruled because, like here, Dr.

Abdulla reviewed the published peer-reviewed epidemiological literature concerning Paxil use and

birth defects, including studies that did not show an association.   2016 WL 8189286, at *9 (S.D.

Ohio Dec. 15, 2016).   The same is true here.   Dr. Abdulla discussed the available negative studies in

his expert report and noted a variety of reasons for why they did not refute the important increase in

---

[46] Dr. Abdulla did not consider animal teratology studies looking for birth defects and instead focused on human data and the mechanism of action based on human and animal data.  For example, he reviewed animal studies of Zofran showing induction of bradycardia and arrhythmia at concentrations comparable to those in women.  Abdulla Dep., p. 220:17:221-5, JA001242, (Vol. 3).  He is a clinician who does not ordinarily consider animal studies in his professional work and thus did not do so here.

[47] Abdulla Dep. at 52: 22 – 53:1, JA001200, (Vol. 3) ("[M]ost of my report is the review of the literature of epidemiology," but these "Are not in exclusion of other factors that I go on and discuss afterwards").  He went on to explain why it is unreasonable to expect epidemiology to address every single heart defect: "So looking at the literature and those that showed association is congenital heart disease in general, and the ones that always would pop up in these kind of circumstances are the more common ones. So the rare congenital heart disease, you need a population that's huge to be able to determine if there is an increased incidence in those."  Abdulla Dep., p. 72:13-21, JA001205, (Vol. 3); *id.* at 74:5-9, JA001206, (Vol. 3) ("I don't think that there is a particular congenital heart disease that is going to be more prevalent because of the interference with hemodynamics…, that any congenital heart disease can develop").  So, for example, he testified that alterations in hemodynamics can lead to an isolated VSD and any other cardiovascular lesion (defect).  Abdulla Dep., p. 252:8-11, JA001250, (Vol. 3).  He explained that the mechanism by which Zofran can cause septal defects is also critical for proper development of other structures of the heart: "because of the mechanism that I describe in my report, it's altering hemodynamics, the passage of blood flow, the alteration of the normal passage of blood flow or the function of the heart.  When it occurs early, it could really lead to any congenital heart disease.  I cannot sit here and tell you only septal defects."  Abdulla Dep. at 71:18-25, JA001205, (Vol. 3).

risk for cardiac malformations in the positive studies, such as lack of power, the rarity of the defect, and exposure misclassification.  Abdulla Rept. at 18, JA000045, (Vol. 1).  He further testified that "it never happens that all studies on one issue come to the same conclusion."  Abdulla Dep., p. 54:20-23, JA001201, (Vol. 3).  GSK's argument was rejected in another case for reasons that apply here; weighing the evidence supported by reasoning routinely applied in the expert's profession is not cherry-picking; if it were every expert would be accused of it.  *In re Actos (Pioglitazone) Prod. Liab. Litig.*, 2014 WL 60324, at *10 (W.D. La. Jan. 7, 2014).

### B.   DR. BENGT DANIELSSON

Dr. Bengt Danielsson is a medical doctor, pharmacologist and teratologist working in drug safety with a focus on teratology for over 40 years.  His research focus the last 25 years has been on teratogenicity from drug-induced alterations in the embryonic heart rhythm.    He has served as the Global Director of Reproductive Toxicology for one of the largest pharmaceutical companies in the world, a Scientific Director and Professor at the Swedish FDA (MPA) from 2004–2007, an expert member of the European Medicine Agency (EMA) Safety Working Party (2004–2007), and as consultant (2008–2012).  His current work since 2012 has been to serve as Medical Expert in Clinical Pharmacology at the Swedish National Agency for Health and Welfare regarding the safe use of medicines in vulnerable populations, including pregnant women.  In this post, he co-authored a peer-reviewed journal article reporting the results of a human epidemiological study on Zofran use in pregnancy using the Swedish National Registry (Dr. Danielsson was co-investigator).

Dr. Danielsson has evaluated the teratogenicity of ondansetron by considering the totality of the available evidence, as recommended in the ICH S5 (R2) 1993 Guidelines, JA006131-6154, (Vol. 12), updated revised version 2017 - ICH S5 (R3), JA006158-6220, (Vol. 12).  He also used criteria for integrated risk assessment based on human and animal data by Shepard (2010) in this report.  Both of these approaches were informed by Wilson's general principles.  His methodology

in reaching his opinions in this litigation employed the same methods, with the same rigor as he has

used in his academic and professional investigational, research, writing, and teaching work.   Dr.

Danielsson performed an integrated assessment of embryofetal adverse findings with ondansetron in

GSK's teratology studies, and, in contrast to GSK's experts, he considered exposure information in

relation to human exposures.   Much of his expert evaluation of ondansetron's teratogenic

mechanism has been published in peer-reviewed literature.[48]  Danielsson, Webster & Ritchie 2018,

JA003588-3596, (Vol. 7).

Dr. Danielsson considered all available epidemiological studies and all other lines of

evidence.  He aptly noted the limitations of epidemiology:

> Even in larger studies with 1,000 exposed women during the first trimester for a
> specific drug without any increased risk shown in the study, the results can only
> exclude a two or greater times increased risk for the overall incidence of
> malformations. There are also various methodological limitations in the studies
> conducted with ondansetron, and it has recently been stressed that it is very
> important that the implications of study failing to detect an increased risk not be
> over-stated and generalized when major issues of study design and data accuracy
> may be the reason that no relationship was discovered (Edlavitch 2017). . . . Taken as
> a whole, the epidemiological studies do provide evidence of an association with
> congenital orofacial cleft and structural heart defects.  However, integration of these
> studies with other important and relevant data, including results in animal teratology
> studies with ondansetron and drugs with similar pharmacological properties, together
> with kinetic and mechanistic information, provides valuable evidence in my risk
> evaluation (Shepard 2010, Friedman 2017, JA003828-3834, (Vol. 7)).

Danielsson Rept. at 4-5, JA000186-187, (Vol. 1).[49]  Recognizing epidemiology's limitations to fully

inform general causation, he also integrated the epidemiological results with all other relevant data

to arrive at his opinion.  In his deposition, Dr. Danielsson offered detailed testimony about relevant

---

[48] Danielsson, Webster, & Ritchie, Ondansetron and teratogenicity in rats: Evidence for a mechanism mediated via embryonic hERG blockade, *Reproductive Toxicology*, 81 (2018) 237–45, JA003588-3596, (Vol. 7).

[49] Dr. Danielsson's reference in the block quote to the overall incidence of all malformations combined. As noted in Dr. Kimmel's *Textbook of Pharmacoepidemiology* (2d Ed.), "any specific birth defect is rare occurring in 1 per 1,000 births" (specifically mentioning oral clefts as an example) and would need "over 20,000" women exposed to a drug during pregnancy "to *detect* a doubling of risk," and "a far larger sample size to *rule out* a doubling of risk." *Id.* at 365-66 (emphasis in original).

epidemiology studies that were available to him when he submitted his expert report.  Danielsson Dep., pp. 56:16 – 60:10, JA001492-1493, (Vol. 3); 124: 18-25, JA001509; 293:6- 294:18, JA001551-1552.  He testified about the importance of the known mechanism by which Zofran can cause orofacial and cardiovascular defects, which explains why epidemiologic studies are not required for each subtype of these defects.  Danielsson Dep., pp.  144:11-13, JA001514, (Vol. 3), 283:8-22, JA001549.

After he completed his expert report, additional epidemiologic studies were published or abstracts not easily found in the public record and cited by Glaxo's experts were made available to him.  He also considered those. The results of the additional epidemiology studies were consistent with his original conclusion that the integration of the epidemiologic results with other important and relevant data including the ondansetron animal teratology studies, kinetic and mechanistic information, and information on the role of heard and inducing birth defects supported the conclusion that Zofran is capable of causing cardiovascular and orofacial defects. Dr. Danielsson's November 2018 supplemental report makes clear that he considered all of the relevant epidemiology studies then available.

## C.  DR. MICHAEL LEVIN

Dr. Michael Levin is a molecular and developmental biologist with over 25 years' experience studying mechanisms of embryonic development.  He received a Ph.D. in Genetics from the Harvard School of Medicine, specifically for his identification of the genetic mechanisms that dictate the positioning of the heart and visceral organs.  He is a Professor in the Department of Biology at Tufts University, Director of the Tufts Center for Regenerative and Developmental Biology and Director of the Allen Discovery Center at Tufts.  At various institutions he teaches graduate students on the biophysics of morphogenesis, craniofacial patterning and development, and

embryonic patterning.  Dr. Levin was the first scientist to study the role of ion channel activity in determining embryonic laterality.

In Dr. Levin's words, "I'm here to talk about mechanism."  Levin Dep. at 60, JA001964 (Vol. 4); 75:14-18, JA001968.    The question of causation "cannot be decided exclusively by epidemiology but must include the mechanisms discovered."  Levin Rept. at 26, JA000549, (Vol. 1).   He evaluated the role the molecular target of Zofran (e.g., hERG ion channel) plays in normal embryogenesis and the molecular mechanisms by which Zofran can cause structural heart and orofacial defects.   Levin Dep. at 45:20 – 46:3, JA001960-1961, (Vol. 4).   Executing this methodology, he reviewed hundreds of peer-reviewed papers involving mechanistic pathways by which exposure to drugs or environmental exposures can alter embryologic development.  He also incorporated his own research and studies involving ion channels and their impact on embryonic development, other methods that target the same kinds of pathways targeted by Zofran, and experience conducting mechanistic testing in many animal models.  Since before receiving his Ph.D. in 1996, his research has focused on explaining the mechanisms of embryonic development and plausible biological mechanisms of injury by which drugs can injure a fetus.  Levin Rept. at 6, JA000529, (Vol. 1).  He has received funding from the American Heart Association, the National Science Foundation, and the U.S. Department of Defense among others because "they understand that our findings will drive advances in human medicine."  Levin Rept. at 26, JA000549, (Vol. 1).

Dr. Levin opined that there is a very plausible biological mechanism by which Zofran can cause the birth defects at issue: "my mechanism explanation is very simple. Zofran alters bioelectric properties by interactions with several ion channels, two of which we've discussed here. It is abundantly clear from lots of studies that when you do that in a wide variety of animals, including mammals and including humans, the outcome is birth defects. Those two facts together form a

pretty inescapable conclusion." Levin Dep. at 78:3-21, JA001969, (Vol. 4). He illustrates the mechanism graphically at page 7 of his expert report, and he cites multiple peer-reviewed papers specific to Zofran that document the drug's known interactions with ion channels, i.e., hERG channels, and he concludes that these interactions "readily explain how exposure to [Zofran] compounds can and likely does affect embryogenesis." Levin. Rept. at 8, JA000531, (Vol. 1). Contrary to GSK's suggestion (at p. 110) that Dr. Levin relied on one mouse study to support his opinion, he also relied on multiple peer-reviewed papers documenting the role that hERG channels play in embryonic face and heart development, Levin Rept. at 13, JA000536, (Vol. 1), 23, JA000546, most of which GSK failed to question him about at his deposition. As noted in his expert report, "my expertise is appropriate to explain the plausible biological mechanism of injury by which [Zofran] can injure a fetus." Levin Rept. at 25, JA000548, (Vol. 1). Levin Dep. at 36:19 – 37:12, JA001958, (Vol. 4); *id.* at 39:17-21, JA001959.

Dr. Levin's methodology, focusing on the role of the drug's molecular target in embryonic development and the consequences of impairing that target (here, hERG channels), is generally accepted and reasonably relied on by experts in the field of molecular embryology, including many peer-reviewed papers in research journals. Levin Rept. at 6, JA000529, (Vol. 1). The ICH 2017 Guidelines direct experts to consider, for example, "information on human genetics, transgenic animals and the role of the target in reproduction . . . and plausible mechanism of reproductive toxicity." ICH 2017, at p. 24, JA006158-6220, (Vol. 12). These categories of information compose the mechanism of action by which Zofran can cause birth defects. These are the categories that Dr. Levin has worked with for more than twenty years. While he certainly holds opinions on human causation, at his deposition, he testified, "I was asked to look at mechanism which is what I did." *See* Levin Dep. at 67:22-23, JA001966, (Vol. 4).

Dr. Levin is unquestionably qualified, and has set forth ample basis to testify reliably that the hERG potassium channels plays an important role in embryonic development, and that Zofran's interference with that channel is a plausible mechanism by which cardiovascular and orofacial defects can occur.  Although he holds opinions on causation, Plaintiffs will offer him at trial on the topic of biological plausibility, as that is his stated core focus.

Dr. Levin did not consider epidemiology when investigating Zofran's risk of birth defects. But Dr. Levin is a molecular and developmental biologist whose professional focus is mechanism. He explained that "there are lots of people who focus on mechanism the way that I do in the best way to catch things that are likely to be dangerous, and that if you wait for reliable and, you know, sort of uncontroversial epidemiological data, you're going to have a lot of false negatives, and you're going to have a lot of babies born with defects."  Levin Dep. at 287:24 – 288:7, JA002021, (Vol. 4).

### D.    DR. CAROL LOUIK

Dr. Carol Louik has spent her career as birth defects epidemiologist.  She co-authored an important peer-reviewed Zofran epidemiologic study, was a coinvestigator in a second Zofran study, and has been involved in a number of  studies investigating other drugs for associations with the risk of birth defects.  GSK has not challenged her qualifications as an epidemiologist.  Dr. Louik's focus was to analyze and interpret all of the pertinent epidemiologic literature, recognizing that it is only one line of evidence among several to be considered in reaching a causal inference. She also considered Dr. Danielsson's expert report and some of the mechanism literature for a limited assessment of biological plausibility.

For her expert report, Dr. Louik reviewed the totality of epidemiological data assessing the incidence of birth defects associated with exposure to Zofran in pregnancy.  Louik Rept. at 2–3, 16–37, 40–41, JA000613-672, (Vol. 2).  For each study, she "considered the study design and its

adherence to basic epidemiologic principles, weighing the validity of each study, evaluating potential sources of bias that might influence the study results, and considering the populations to which the study results might apply." Louik Rept. at 3, JA000615, (Vol. 2). Dr. Louik summarized multiple epidemiologic studies reporting statistically significant increased risks of cleft palate and septal heart defects. Although she summarized other studies that did not report increases in these defects, she observed that a causal opinion must be based on a consideration of all of the relevant lines of evidence based on human, animal and mechanistic data. Louik Rept. at p. 40-41, JA000652-653, (Vol. 2). Her observation accords with Dr. Rothman's epidemiology textbook, calling for assessing "all the relevant details of a causal mechanism" under these circumstances,[50] and with Danielsson, Webster and Ritchie 2018, JA006588-3596, (Vol. 7), who reported that "integration of all relevant data, including results in animal teratology studies with ondansetron and drugs with similar pharmacological properties, together with kinetic and mechanistic information, can provide valuable information in the risk evaluation process."[51]

E.    DR. THOMAS SADLER

Dr. Thomas Sadler is an embryologist with over 40 years' experience teaching the origins of birth defects in humans. He is an Adjunct Professor of Pediatrics at the University of Utah, a Visiting Professor of Cell Biology and Anatomy at East Tennessee State University, and a Senior Scholar at the Greenwood Genetics Center in Greenwood, SC., Dr. Sadler has published in peer-reviewed journals on ion channels' regulation normal embryonic development, an issue of import

---

[50] *Modern Epidemiology* (3d ed. 2008) (at 27).

[51] Danielsson, Webster & Ritchie 2018, at p. 237. As noted above, after expert depositions in this matter, two additional relevant studies were published, one by Dr. Zambelli-Weiner et al. (released Jan. 2019) and one by Dr. Huybrechts et al (released Dec. 2018). As to each of these studies, discovery is expected. Plaintiffs reserve the right of their experts to consider those studies together with the forthcoming discovery and to then supplement their reports as appropriate promptly after completion of the discovery.

here. Since 1985, he has been the sole author of *Langman's Medical Embryology,* a medical textbook on the origins of birth defects used in medical schools throughout the world.

Dr. Sadler considered whether Zofran is capable of causing congenital heart and orofacial abnormalities. He is one of two Plaintiffs' experts (he and Dr. Danielsson), who considered all epidemiologic, animal and mechanistic studies summarized in Lines of Evidence 1-7. He considered the quality of the publications and data reviewed as he has done as Editor of the Journal *Teratology*, including the question addressed, the ability of the study to answer the question (power), mechanism of action, and consistency of the information, informed by Wilson's General Principles of Teratology.

Dr. Sadler considered positive and negative epidemiology studies and others as part of his weight of evidence review ("I told you, there are negative studies in there and I put it in there." *See* Sadler, Dep. at 75:11 - 17,JA002608, (Vol. 5). He assigned greater weight to the positive epidemiology studies because they were replicated and were most consistent with the animal and human data concerning Zofran's effect on the embryonic heart, and all of the other lines of evidence. Sadler Rept. at 12, JA000851, (Vol. 2) ("[O[ndansetron has a clearly defined mechanism of action for causing birth defects that involves producing cardiac arrhythmias resulting in abnormal heart and orofacial development"). Dr. Sadler testified that Zofran "[has] been shown to inhibit the cardiac action potential. And it's been shown to cause arrhythmias." Sadler Dep., p. 235:15 – 20, JA002648, (Vol. 5).

## VI.    SEVEN LINES OF EVIDENCE SUPPORT GENERAL CAUSATION.

Plaintiffs believe that this Court must be presented with an overview of the evidence on which Plaintiffs rely before ruling on *Daubert* motions. That is a main objective of this brief. The multiple lines of evidence supporting the conclusion that Zofran can cause certain birth defects are compelling.

However, GSK has challenged each of Plaintiffs' five experts, their conclusions, and the science upon which they rely by challenging the evidence in a piecemeal, fragmented, and incomplete fashion.  By so doing, GSK has presented to this Court incomplete and inaccurate picture, which runs counter to the mandate of First Circuit law.  When Plaintiffs' experts' opinions are assessed based on the applicable legal standards, an accurate application of the relevant scientific principles of causal inference, and with an appreciation of the substantial supportive scientific and medical evidence, it should be clear that their opinions and the evidence on which they are based are more than sufficient to pass *Daubert's* liberal standard.  This evidence should be considered by juries in the upcoming trials.  The seven lines of evidence are summarized below, along with Plaintiffs' response to GSK's arguments about the sufficiency of that evidence.

A.  *LINE OF EVIDENCE 1*: ZOFRAN RAPIDLY CROSSES THE PLACENTAL BARRIER AND EXPOSES THE HUMAN EMBRYO IN AT LEAST THE SAME CONCENTRATIONS AS THE MOTHER DURING THE MOST CRITICAL PERIOD OF EMBRYONIC DEVELOPMENT.

REDACTED

Human studies demonstrate that Zofran  passes through the placenta to the embryo during the first trimester of pregnancy and the concentration of Zofran in the human embryo is highly likely to be the same, or higher, than in the mother.

Zofran rapidly transfers across the human placenta at higher embryonic tissue concentrations compared to the maternal concentrations.  In a study by Siu in 2006, pregnant woman who chose first trimester surgical termination of pregnancy took three 8mg oral doses of ondansetron twice the day before and once 4 hours before the surgery.  Maternal blood samples were taken pre-surgery and fetal parts were sampled post-surgery.  Zofran was found in all samples, providing compelling evidence that "free ondansetron readily passed through the human placenta in the first trimester." Siu, et al., Placental Transfer of Ondansetron during Early Human Pregnancy, *Clin. Pharmacokinet.*

2006 45(4):419–23 (hereinafter, Siu 2006), JA004074-4078, (Vol. 8). The amount of ondansetron in the fetal tissue samples was higher than the free ondansetron in the maternal blood plasma. A "major determinant of fetal drug concentration is the maternal drug concentration."[52]

Similarly, in a study performed at Stanford University, scientists investigated maternal and newborn human exposures to Zofran.[53] They administered Zofran intravenously to 20 non-pregnant women of childbearing potential and 40 pregnant women late in pregnancy and measured Zofran concentrations in the mothers' blood, in umbilical cord blood and in the newborns' blood. They found that a single I.V. administration of 4 mg of Zofran to the mothers 15 minutes before delivery produced an exposure level in neonates similar to that in adults. Elkomy 2015, at 168; Figure 5. The study authors concluded that Zofran "rapidly crosses the placental barrier," Elkomy 2015, at 170, which is not surprising because Zofran is highly lipid-soluble, Elkomy 2015 at 169, and drugs that are lipid-soluble "pass with ease" through the placental barrier. Garland 1998 at 8. Figure 1 from Siu 2006 and Figure 5 from Elkomy 2015 illustrate the similarity in maternal and fetal or neonatal concentrations of Zofran when the mother ingests Zofran orally or is administered the drug intravenously. Figure 1 from Siu 2006 shows that the concentration of Zofran is the same, and sometimes higher, in the fetal tissue than in the mother. Elkomy Figure 5 shows the speed of placental transfer: the concentration of Zofran in a newborn was the same, and sometimes higher, in a newborn when the mother was administered Zofran intravenously just 15 minutes before birth.

It is important to understand that only the free, or "unbound," concentration of ondansetron in the maternal plasma can cross the placenta. Garland 1998, at 9. The free concentration is

---

[52] Garland, Pharmacology of Drug Transfer Across the Placenta, Obstetrics & Gynecology Clinics of N. Am., Vol. 25, Issue 1, Mar. 1998, at 21–42 (hereinafter, Garland 1998), at 2, JA003734-3755, (Vol. 7).

[53] Elkomy, et al., Ondansetron Pharmacokinetics in Pregnant Women and Neonates: Towards a New Treatment for Neonatal Abstinence Syndrome, *Clin. Pharmacology & Therapeutics*, Vol. 97, No. 2, Feb. 2015 (hereinafter, Elkomy 2015), JA003620-3629, (Vol. 7).

pharmacologically active, meaning it can disrupt the embryo's heart rhythm by blocking the hERG channels. Roth Dep. at 212:8–10, JA002509, (Vol. 4). By contrast, "[w]hen drugs bind to protein, they form a large complex that that cannot cross the placenta." Garland 1998, at 9. Also, binding is a transitory phenomenon; when a drug separates from the protein to which it is bound, it becomes free again and can cross the placenta. *Id.* The percentage of a drug that it protein-bound, therefore, reflects only the amount of a drug that is bound to protein a particular moment in time. *Id.* Therefore, based on Siu 2006, because only the free concentration could pass through the human, and because all of the drug that passes through is pharmacologically active, and thus capable of inducing arrhythmia, and because the levels detected in the fetal tissue were the same as or higher than the amount of the free concentrations in the mother's plasma, the human embryo is exposed to ondansetron in at least at the same concentrations and durations as in the mother (several hours). Danielsson Rept. at 35, JA000217, (Vol. 1).

**B.** *LINE OF EVIDENCE 2*: THE ZOFRAN ANIMAL TERATOLOGY STUDIES THAT ACHIEVED MEANINGFUL EMBRYONIC EXPOSURE REVEALED THE SAME AND SUBSTANTIALLY SIMILAR TERATOGENIC EFFECTS AS REPORTED IN PUBLISHED EPIDEMIOLOGY STUDIES FOR ZOFRAN.

In Zofran animal teratology studies where the animals were properly exposed at levels relevant to human exposures, the animals had increased incidences of malformations and deaths compared to controls. Studies that did not find evidence of birth effects, under-dosed the animals.[54]

REDACTED

---

[54] As noted, pharmacokinetics distinguishes between the dose given to a species and the exposure achieved in the species considering how that species absorbs, distributes, metabolizes and eliminates the chemical. Roth Dep., p. 80:1–9; Baldwin Dep., p. 247:2–13, JA001362, (Vol. 3); York Dep., p. 58:19–24, JA003271, (Vol. 5).

REDACTED

According to the ICH, information on systemic exposure of pregnant animals is "essential for the interpretation of study results, and thus to assess human safety."[55]  An evaluation of animal teratology studies should therefore compare animal and human pharmacodynamic effects, animal and human metabolism and disposition, animal and human pharmacologic and toxic effects, and drug exposures in animal studies in relation to the highest proposed dose in humans.[56]

GSK's experts overlooked the most essential data for drawing conclusions about whether the increased incidence of malformations and deaths in the high dose groups compared to untreated controls were drug-related and relevant to human teratogenic risk.  Collecting and presenting exposure data was feasible in the 1980s when the studies were conducted, York Dep., p. 56:4–9, JA003270, (Vol. 5), and it was standard industry practice.  REDACTED

If GSK's experts had considered available exposure data relevant to the animal teratology studies, they would have seen that the vast majority of animals in the studies had lower Zofran exposures than are seen in humans.  GSK's failure to adequately dose the animals, or to select the right species, explains why most reportedly "exposed" animals in GSK's studies did not have

---

[55] ICH S5 (R3) Final Concept Paper (Mar. 27, 2015), York Dep. Ex. 27-A, JA006155-6157, (Vol. 12).

[56] FDA Guidance for Industry, Reproductive and Developmental Toxicities – Integrating Study Results to Assess Concerns (Sept. 2011), York Dep. Ex. 31, JA006108-6130, (Vol. 12).

malformations or die.   Dr. Danielsson compared animal and human Zofran exposures and demonstrated this exposure dichotomy.  Danielsson Rept. at p. 40, JA000222, (Vol. 1), Table 4 and at 42, Table 5.  He then evaluated the findings of malformations and deaths in the Zofran-treated groups compared to controls in light of the essential exposure data and informed by knowledge of typical malformations that were induced by other hERG blocking drugs.  *Id.*  His evaluation showed that the observed malformations in the Zofran-treated groups in the four Zofran teratology studies that achieved a meaningful exposure correlated well with the exposures that met or slightly exceeded the human exposure (none significantly exceeded it) and fit the pattern of malformations and deaths observed with other hERG blocking drugs.  *Id.* § 6.5.4.  A summary of the results follows.

> **1.    Studies That Dosed Too Low To Achieve Human Exposure Concentrations Do Not Undermine a Causal Inference That Zofran Can Cause Birth Defects.**

REDACTED

The low dose used in an animal teratology study should generally achieve an exposure that is a low multiple (e.g., 1 to 5-fold) of the human exposure at the MRHD [maximum recommended human dose]." ICH S5 (R3) at 19, JA006180, (Vol. 12).  Under the ICH guidelines for evaluating

---

[57] Regarding the rat I.V. studies, only AUC data is available.  Danielsson Rept. at 42, Table 5, JA00224, (Vol. 1).

teratology studies, therefore, the results of these oral studies, which did not report biologically significant increases in the incidence of malformations in Zofran-treated groups, do not permit an inference that Zofran does not cause malformations or death in the treated animals or in humans. This conclusion comports with Wilson's Sixth Principle of Teratology: low doses may exert no or very little toxicity or teratogenicity, while higher doses are expected to increase the incidence and severity of the observed malformations and embryofetal death.[58]   As discussed below, the animals that were exposed at or slightly above human exposures had increased incidences of malformations and deaths compared to untreated controls.

2.   **Studies That Dosed High Enough to Meet or Exceed Human Exposure for a Short Time Provide Evidence of Zofran's Ability to Cause Birth Defects.**

REDACTED

---

[58] *See also*, *e.g.*, Obican Dep., p. 204:8-17, JA002388, (Vol. 4) ("Q. If I took a gallon of water, okay, and I took an eyedropper and I put one drop of gasoline, regular gasoline in that gallon of water and I drank that gallon of water over the next three days and nothing happened to me, okay, can you assume that it's safe to drink gasoline?   MS. CANAAN: Objection.   A. I can't assume that. I can't tell you one way or the other. I'm not an expert in gasoline.").

REDACTED

REDACTED

REDACTED

3.    **The Increased Malformations and Deaths in the Zofran-Treated Groups Are Biologically Significant for Causal Inference in Humans.**

The evidence of teratogenicity of Zofran REDACTED

is significant for assessing human risk for several reasons.  First, the vast majority of teratogenic effects seen in Zofran treated groups occurred at exposures at or near the human exposure with a once-daily 8 mg tablet of Zofran (the recommended daily dose in the label is 8 mg three times daily).  Under ICH Guidelines S5 (R3), at 27, JA006188, (Vol. 12), all animal exposures under 25 times higher than the human exposure should be regarded as of potential human relevance, the risk for human relevance increases with low safety margins.  The teratogenic effects reported in the Zofran treated groups thus present a significant "increased concern for reproductive…toxicity in humans." *Id.* at 25, JA006186, (Vol. 12).

Second, according to ICH, if similar malformations (e.g. cardiovascular defects and orofacial defects) are observed in two mammalian species, knowns as "cross-species concordance," this is strong supporting evidence for teratogenicity in humans.  *Id.* at 24, JA006185, (Vol. 12). Multiple defects, including septal defects and cleft palate defects, were reported in the Zofran-

treated groups in the animal teratology and in the human epidemiology studies and the septal defects that were observed in human studies were observed only in animal groups with exposures similar to or slightly higher than in humans; no such defects were observed in controls with exposures lower than in humans.

Third, consistent with ICH S5 (R3) at 24, JA006185, (Vol. 12), which direct experts to consider available data on "related compounds," (such as other hERG blocking drugs), the malformations observed in the Zofran-treated groups were the same malformations reported with other hERG blocking drugs. Danielsson Rept. at 16, Table 1, JA000198, (Vol. 1). *Accord* Abdulla Dep., p. 218:21–219:9, JA001242, (Vol. 3). Dr. Danielsson's report at Table 1, illustrates the similarities.

Fourth, "[k]nowledge of the mechanism of reproductive or developmental effects identified in animal studies can help to explain differences in response between species and provide information on the human relevance of the effect." ICH S5 (R3) at 25, JA006186, (Vol. 12); Sadler Dep., p. 238:7–15, JA002649, (Vol. 5); Friedman 2017, JA003828-3834, (Vol. 7) ("Knowledge of the mechanism of action may help to determine whether a particular exposure is likely to have caused an infant's birth defects.").

Concern for a risk in humans is increased based on an adverse finding in animals where the drug has been associated with a teratogenic mechanism of action. ICH S5 (R3), at 24, JA006185, (Vol. 12). The evidence summarized in Lines of Evidence 3 and 4 describes the likely mechanism by which Zofran causes birth defects. The key element is heart rhythm disturbance interfering with normal organ development. Zofran disturbs heart rhythm by blocking the hERG channels in human heart cells and in the embryonic heart in several investigated species, including zebra fish, chickens,

mice, rats and humans in embryonic development.   Baldwin Dep., p. 159:18–160:2, JA001340, (Vol. 3).

With the hERG channel playing a critical role in rhythm regulation across species, with the animals' teratogenic effects occurring at Zofran exposure concentrations at or near the human concentrations, with the same types of defects occurring in animals and in humans, and with the same types of defects occurring with Zofran and with other hERG blocking drugs known to be teratogenic, it is difficult to conceive of a stronger case for inferring human causal probability from a review of the animal studies and human studies together.

4.    **GSK's Arguments That the Zofran-Induced Malformations and Embryonic Deaths Were Due to Chance Are Invalid.**

GSK argues (at p. 94) that chance best explains the increased incidence of a number of typical hERG malformations observed in the Zofran-treated groups, referring to them as "spontaneous malformations."   This argument is invalid in part because it conflicts with ICH guidelines governing interpretation of animal studies, which, to address the role of chance, states that the "interpretation of study data should rely primarily on comparison with the concurrent control group."   (ICH S5 (R3) at 23, JA006184, (Vol. 12); Danielsson Dep., p. 222:9–15, JA001535, (Vol. 3).)   The concurrent controls are the best comparison group because they are the same species of animal born at the same time as the treated groups.   Danielsson Dep., p. 241, JA001538, (Vol. 3).

Here, the Zofran-treated groups had increased malformations and deaths compared to the concurrent controls.   Recognizing this unavoidable fact, GSK's experts still attempt to blame the Zofran-induced malformations on "chance" by pointing to a book chapter that reported incidences of malformations in rats from laboratories other than the laboratory that performed the study.   This approach, too, contravenes the ICH guidelines, which state that "*the individual laboratory's* [i.e.,

the one that performed the study] recent historical control database, if available, is preferred over data compilations from *other laboratories*." ICH S5 (R3) at 23, JA006184, (Vol. 12); Danielsson Dep., p. 241:5–8, JA001538, (Vol. 3).  GSK's study reports failed to present historical control data for the laboratories that performed the Zofran teratology studies, and GSK has failed to produce this data in response to discovery requests.  GSK seeks to benefit from the unavailability of this information (as well as missing historical control data from the laboratories that performed the studies) by relying on data from other laboratories, which is inferior to the use of concurrent controls.

GSK's experts' reliance on an unrelated book chapter as their basis to blame the Zofran-induced malformations on "chance" is a non-sequitur.  Around 1680 a Dutch painter produced a painting of a baby with phocomelia (the most typical thalidomide-induced malformation).  In the 1950s, humans prenatally exposed to thalidomide began to be born with phocomelia.  Certainly the Dutch painting could not reasonably have been relied on as an argument that the thalidomide malformations were due to "chance."   The same is true of the Zofran-induced malformations.

Furthermore, the book chapter relied on by GSK's experts reported large variations in specific malformations (such as VSD's) among various laboratories; in some laboratories, VSD's were not observed at all, while in some other laboratories some increased incidences were observed. Danielsson Dep., p. 261, JA001543, (Vol. 3).  That an individual laboratory, on a single occasion, may have had a control group with the same incidence of VSD's does not support the conclusion that chance explains the observed exposure-dependent occurrences of VSD's in two different Zofran studies.  *Id.*  Furthermore, this argument by GSK fails to account for other important factors mentioned in the ICH guidelines when evaluating fetal adverse effects, namely class alerts and available mechanistic information as discussed above.  That other potent hERG blockers induce

VSD's (class affects) and that the mechanism for induction of VSD's is known for hERG blockers, make it highly unlikely that "chance" could have caused the VSD's seen in the Zofran teratology studies.[59]

C.   *LINE OF EVIDENCE 3*: **EMBRYONIC BRADYCARDIA IS A KNOWN HUMAN AND ANIMAL TERATOGEN; IT CAN CAUSE ALL FORMS OF STRUCTURAL CARDIOVASCULAR AND OROFACIAL DEFECTS DERIVING FROM THE FIRST BRANCHIAL ARCH.**

Heart rhythm disturbances are a known and established cause of heart and orofacial birth defects. The increased incidences of cardiovascular and orofacial defects observed in human epidemiology and in exposed animals have also been caused by embryonic arrhythmias, even when not caused by a drug. To understand how a pharmaceutical drug can cause a birth defect by disrupting the embryo's heart rhythm, Plaintiffs' and GSK's experts have described the delicate process of heart formation and the implications of perturbing that process.

The heart is the first organ in the human embryo to function. Baldwin Dep., p. 125:8–11, JA001331, (Vol. 3). The proper function of the developing heart is essential for the heart to

---

[59] GSK has also unfairly criticized Dr. Danielsson's report for including historical control data from Charles River Laboratories in the United States, the laboratory responsible for creating the species of rat used in the Zofran teratology studies. Dr. Danielsson included this data as an extra data point that was unnecessary to the conclusion that the observed malformations in the Zofran groups were due to Zofran. That conclusion is amply supported by comparison between the Zofran-treated groups and the best comparator, the concurrent control animals used in the studies. GSK's criticism goes to an irrelevant collateral issue. Regardless of whether Dr. Danielsson included historical control data from a book chapter that GSK relies on, or from the Charles River resource that Dr. Danielsson relied on, or from no historical control data at all, the conclusion is the same: it is highly unlikely that chance can explain the observed ventricular septal defects in the Zofran teratology studies. The same is true regarding GSK's criticism of Dr. Danielsson's presentation of litter data. Dr. Danielsson's method of presenting litter was exactly the same as how GSK's investigator presented the litter data in REDACTED It is a long-established methodology. *See* Baldwin Dep., p. 154:9–24 (discussing a 2001 peer-reviewed paper (Skold 2001), which presented litter data in the same way). In contrast to Dr. Danielsson's appropriate method using litter data, GSK's experts discuss the data using the fetuses as the units of measure, which results in a lower incidence of Zofran-induced defects because using the number of fetuses results in a much larger denominator than using litters. ZFN00077685. In all events, Dr. Danielsson's approach comports with the ICH guidelines and GSK's approach does not. The guidelines state that "cesarean and fetal data should be calculated for the litter as the unit of measure; study result inferences are made back to the mother, not to fetuses."

complete its formation because the heart is the only organ that must form and function at the same time. *Id.*, p. 124:25–125:4, JA001331, (Vol. 3). Proper heart rhythm and blood flow, otherwise known as hemodynamics, are necessary for the development of each part of the heart. Abdulla Dep., p. 71:16–24, JA001205, (Vol. 3).

GSK's expert agrees that hemodynamic function is "important for altering the structure of the heart. It's probably the most important one I can think of." Baldwin Dep., p. 94:1–12, JA001205, (Vol. 3). This is understandable when considering that the heart must function adequately while undergoing enormous "morphological maturation," that is, structural development. *Id.,* p. 126:3–8, JA001205, (Vol. 3).

It follows that *disruption* of hemodynamic forces, such as by altering heart rhythm, leads to *abnormal* cardiac development. Baldwin Dep., p. 127:15–128:18, JA001332, (Vol. 3). Transformation of the heart is an intricate and complex process, and perturbations in these processes can cause a heart defect. *Id.*, p. 133:18–25, JA001333, (Vol. 3). An alteration in blood flow is a perturbation that can lead to heart defects that are, in essence, biomechanically[60] induced defects. *Id.*, p. 141:13–142:12, JA001335-1336, (Vol. 3).

The biomechanical force created by altered heart rhythm and blood flow is a form of trauma to the heart. Trauma can injure any portion of the heart. Baldwin Dep., p. 167:7–14, JA001324, (Vol. 3). "It could really lead to any congenital heart disease." Abdulla Dep., p. 71:23–24, JA001342, (Vol. 3). For example, hemodynamic forces play a role in formation of the heart's septum, and disturbed blood flow has been shown to lead to valvular defects in the heart. Baldwin Dep., p. 136:18–137:21, JA001334, (Vol. 3), and 139:24–140:4, JA001335, (Vol. 3). In a similar way, disturbing the heart rhythm and blood flow can lead to hypoxia or anoxia and reperfusion

---

[60] Biomechanics is the science concerned with the action of forces, internal or external, on the living body. *Stedman's Medical Dictionary* (28th ed 2013).

injury, including in the orofacial region (e.g., cleft palate).[61]   Danielsson Rept. at 17, JA000199, (Vol. 1), Danielsson Dep. at 28:11-18, JA001485, (Vol. 3),; 36:25 – 37:4, JA001487, (Vol. 3),; Abdulla Dep. at 254:16–25, JA001251, (Vol. 3)..  Embryos can survive a period of anoxia (lack of oxygen), but there is a price to pay, an increased risk of birth defects.[62]

Disruptions of heart rhythm that can alter blood flow include bradycardia, or slowing of the heart, which is a type of arrhythmia (irregularity of the heartbeat).  Baldwin Dep., p.  240:8–16, JA001360, (Vol. 3).   "Bradycardia can alter hemodynamics during the human heart's development."  Baldwin Dep., p.  175:12–15, JA001344, (Vol. 3).  Bradycardia itself can be a significant arrhythmia and can cause poor cardiac output (blood flow), heart failure, and thus any heart defect.  Abdulla Dep., p.  252:1–11, JA001250, (Vol. 3); *id.*, p.  32:5–8, JA001195, (Vol. 3).

Pharmaceutical drugs can induce bradycardia in an embryo beginning when the heart starts beating.  As early as 2002, REDACTED

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  Drugs that induce embryonic bradycardia to induce a variety of cardiovascular defects, including absence, abnormal origin, or abnormal structure of heart vessels, ventricular septal defects and various transpositions or malposition of vessels, as well as orofacial clefts.  (Danielsson Rept. at 7, JA000189, (Vol. 1)).

---

[61] Reperfusion injury is an injury that results after an arrhythmia that is considered to be due to oxygen-derived free radicals.  *Stedman's Medical Dictionary* (28th ed 2013).  As stated in Danielsson, Webster & Ritchie 2018, at 238, JA003588-3596, (Vol. 7), orofacial clefts can be produced by hERG blockers at exposures producing severe cardiac arrhythmia and subsequent severe hypoxia/anoxia of longer duration in the embryo.

[62] Kass Dep. at 309:16–310:3, JA001711-1712, (Vol. 3) and Ex. 19 (summarizing Webster and Abela, The Effects of Hypoxia in Development, Birth Defects Research (Part C) B1:215-228 (2007), JA004124-4137, (Vol. 8)).

The way in which drugs, including Zofran, can cause bradycardia or an arrhythmia in the human heart is by blocking the hERG channels that exist in cardiac cells.  The hERG channel has major importance for cardiac repolarization and rhythm regulation in the embryonic heart across species in embryonic development, including human embryos.  Baldwin Dep., p. 149:19–150:11, JA001337-1338, (Vol. 3).   The significance of drug-induced inhibition of the hERG channel was demonstrated in a study of human embryonic stem cells at Karolinska University Hospital in Sweden, which described the hERG channel expression in the human embryo's heart cells during development.[63]   The Karolinska study is important because it "describes for the first time hERG channel expression in the heart of a human embryo."[64]

This study demonstrated that a hERG-blocking drug produced bradycardia, as a direct consequence of prolongation of action potential duration in all tested cardiac cells derived from human embryonic stem cells. *Id.* at 30–31, JA003604-3605, (Vol. 7). Based on the Karolinska study, the authors concluded, consistent with REDACTED JA003355-3419, (Vol. 6), that the study "provides further evidence of Kr [hERG] channel block as an important mechanism for embryo lethality and malformations in animal teratology studies, and it suggests that the Kr-channel block-mediated teratogenic mechanism is of human relevance." *Id.*

### D.    *Line of Evidence 4*:  Zofran Can Cause Embryonic Bradycardia via hERG Blockade at All Doses and Forms of Administration that GSK Recommended in the Drug Label.

While performing a human experiment to demonstrate with 100% certainty that Zofran can cause arrhythmia in a human embryo would be unethical, Baldwin Dep., p. 185:17–186:7,

---

[63] C. Danielsson, Exploration of human, rat, and rabbit embryonic cardiomyocytes suggests K-channel block as a common teratogenic mechanism, Cardiovascular Research (2013) 97, 23-32 (hereinafter, the Karolinska study), JA003597-3606, (Vol. 7).

[64] *Id*. at 30-31, JA003604-3605, (Vol. 7).

JA001346-1347, (Vol. 3), the following evidence demonstrates this fact to a high degree of scientific certainty.  Through the hERG channel, Zofran at recommended doses has been shown to cause arrhythmias in (1) adult and children human hearts; (2) embryonic hearts in rats; and (3) adult rabbit hearts.

*First*, Zofran can cause bradycardia and other arrhythmias in the adult human heart by blocking the hERG channel.  ████████████████████████████████

████████████████████████████████████████████████████

████ Weir Dep., pp. 415:4–14 and 419:17–20, JA003183-3184, (Vol. 5).  Ondansetron is classified by the widely accepted resource, CredibleMeds®, as being in the highest of four cardiac arrhythmia risk categories, "clearly associated with a known risk *even when taken as recommended*" (Credible Meds)."  Danielsson Rept. at 6, JA000292, (Vol.1), (emphasis added); Danielsson Dep., p. 348, JA001565, (Vol. 3).[65]  Zofran can cause fatal cardiac arrhythmia in humans.  (FDA Drug Safety Communication (June 19, 2012)).  The Karolinska study shows the human embryo's heart is susceptible to blockade of hERG channels leading to bradycardia and arrhythmia by hERG blocking drugs.  Karolinska study at 30 and Fig. 6, JA003604, (Vol. 7).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████, JA002281, (Vol. 4).  Any of the doses recommended in the drug label can cause an arrhythmia, and the dose that will cause arrhythmia in a particular patient depends on the underlying condition of the patient taking it.  Abdulla Dep., p. 225:19–226:24, JA001243-1244, (Vol. 3).  For this reason, the Zofran label recommends special monitoring of patients who have electrolyte abnormalities, such as hypokalemia, a common

condition associated with nausea and vomiting of pregnancy, among other individualized factors. JA006260.

Zofran causes a 50% inhibition of the hERG channel at a concentration of around 0.81 μM (around 235 ng/ml) in cells expressing the hERG channel (including cardiac cells).[66]  This is known as its IC50.  The IC50 concentration is, however, a very prominent block, and is not a reliable threshold for determining the concentration at which a drug is capable of causing arrhythmia.[67]  Danielsson Supp. Rept. at 2.   According to the Redfern 2003 paper, JA004020-4033, (Vol. 8), which was jointly authored by representatives of several global pharmaceutical companies, including GSK, the IC50 concentration needs to be divided by at least 30 to reach an acceptable degree of human safety regarding a drug's ability to cause cardiac arrhythmias.  Redfern 2003, § 5.3, JA004031, (Vol. 8).[68]

Applying the Redfern 2003 framework to Zofran (that is, dividing the Zofran's IC50 (235 ng/ml) by 30) shows that cardiac arrhythmia can occur in humans at therapeutic concentrations.[69]  In Elkomy 2015, a single 8 mg I.V. dose of Zofran (a therapeutic dose) caused peak concentrations

---

[66] Kuryshev et al., Interactions of the 5-Hydroxytryptamine 3 Antagonist Class of Antiemetic Drugs with Human Cardiac Ion Channels, JPET 295:614–20,(2000), JA, (Vol.7); de Lorenzi, Block of the delayed rectifier current (Ik) by the 5-HT3 antagonists ondansetron and Granisetron in feline ventricular myocytes, Br. J. Pharmacol. (1994) 527–35.

[67] Redfern et al, Relationships between preclinical cardiac electrophysiology, clinical QT interval prolongation and torsade de pointes for a broad range of drugs: evidence for a provisional safety margin in drug development, *Cardiovascular Research* 58 (2003) 32-45 (hereinafter, Redfern 2003) JA004020-4033, (Vol. 8).

[68] *See also* Danielsson, Phenytoin and phenobarbital inhibit human hERG potassium channels, *Epilepsy Research*, 55 (2003) 147–57, JA003577-3587, (Vol. 7) ("As mentioned, in vitro IC50 values from HERG data are considered to overestimate free plasma concentrations associated with QT prolongation and torsade de pointes clinically (Webster et al., 2002)").

[69] The term "therapeutic concentrations" refers to the concentration of Zofran in the human's blood plasma when the doses recommended in GSK's product labeling are ingested or administered.  The term "therapeutic doses" refers to the doses recommended in GSK's product labeling.

of Zofran of 500 ng/ml in women of childbearing potential from a single therapeutic dose of Zofran, reaching more than double the IC50 concentration of Zofran.   Danielsson Supp. Rept. at 3., JA000185, (Vol. 1)[70] Consistent with Zofran's hERG-blocking ability at therapeutic concentrations, it is associated with life threatening cardiac arrhythmia.   In adults and children, fatal cases due to severe cardiac arrhythmia have been associated with Zofran use, especially after extensive vomiting, which can cause hypokalemia (low blood potassium). Danielsson Rept. at 34, JA000216, (Vol. 1). The risk for hERG blockers to cause cardiac arrhythmia is increased in predisposed individuals, due to, *e.g*., genetic variability in humans as well to external conditions, especially hypokalemia.  Danielsson Supp. Rept. at 3 JA000185, (Vol. 1).

GSK has admitted that therapeutic concentrations that do not reach the IC50 concentration can cause cardiac arrhythmia. REDACTED

---

[70] For a further discussion of Zofran maternal and fetal Zofran concentration from exposure to Zofran during pregnancy, see Line of Evidence 1 above, discussing placental transfer of Zofran during human pregnancy.

[71] The "clinic" commonly refers to the clinical experience with the drug in humans.  ICH S5 (R3) at 18, JA006179, (Vol. 12).

REDACTED
████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  GSK's current litigation position

contradicts its earlier admissions, including Redfern 2003.[73]

      **Second**, Zofran has been shown *in vitro* to cause embryonic bradycardia in the hearts of rat

embryos at concentrations that can cause bradycardia in humans and through inhibition of the

hERG channel just as it does in humans.  Professors at the University of Sydney demonstrated the

Zofran-induced effects through whole embryo culture (*in vitro*) in testing in a rat embryo[74] and

collected videos of the most pronounced effects. In their publication, the authors demonstrated that

Zofran caused "severe alterations in embryonic heart rhythm" in rats.

> ***At a concentration of 1 µM (0.37 mg/L) ondansetron caused a 10% decrease in***
> ***embryonic heart rate in cultured rat embryos on GD 13***. ***This concentration is***
> ***lower than the highest ondansetron concentration (0.5 mg/L) reported in a study***
> ***with 20 women [41]***. At 3 µM (19% decrease) and 6 µM (29% decrease), the effects
> were more pronounced and the 12 µM, caused a 43% decrease in heart rate. This can
> be compared to the Cmax observed in human pregnancy of 0.11 mg/L (0.3 µM) p.o
> [40]. up to 0.5 mg/L (1.7 µM) i.v [39]. Ondansetron is ~73% protein bound [36]



REDACTED

---

[73] A defendant's admissions as to levels of an agent sufficient to cause a health outcome are admissible and probative evidence on the question of whether those levels pose a health danger and the company's knowledge of that danger.  *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 368 (1st Cir. 2009).

[74] It would be unethical to perform such a test on a human embryo.  Baldwin Dep., p.  194:23–195:4, JA001349, (Vol. 3).

suggesting 0.081 μM and 0.46 μM unbound, respectively with corresponding margins of safety of 12 and 2.2. It is likely that the concentrations inducing bradycardia; and especially irregular heartbeats in rat embryos in vitro; are much higher than the plasma concentrations of ondansetron which can induce similar effects in a human embryo exposed to ondansetron. One reason for this is that embryos are continuously gassed with 95% oxygen in vitro making it impossible for them to be hypoxic. The embryo is more susceptible to hypoxia compared to the adult heart, and is more prone to develop increases in action potential duration and cardiac arrhythmias when exposed to transient hypoxia/anoxia and reoxygenation [52–54]. …There are…other external factors… which are known to further exaggerate the proarrhythmic potential of hERG blocking drugs such as low potassium levels (hypokalemia), acidosis and… fever [55]).

. . . .

***These results suggest that ondansetron has the potential to cause cardiac arrhythmia in the human embryo in the same way as observed in adults and children***.

Danielsson, Webster & Ritchie 2018, at 244, JA003595, Vol. 7).

The supporting data are presented in Table 5 of the publication.  Out of 110 exposed embryos, more than half experienced some form of bradycardia.  When compared with untreated controls, the percentage decrease in heart rate was over 3% (bradycardia) in 10 embryos, over 9% (marked bradycardia) in 11 embryos, over 19% (pronounced bradycardia) in 12 embryos, over 29% (severe bradycardia) in 12 embryos, and over 40 % (very severe bradycardia) in 11 embryos.

An internationally accepted methodology for comparing the concentrations in the *in vitro* study to human exposures is to compare "the maximum concentration tested without an adverse effect in the *in vitro* system . . . to the Cmax in humans for the determination of potential human risk . . . ."  ICH S5 (R3) at 10, JA006171, (Vol. 12).  If Cmax, or maximum concentration, in humans exceeds the maximum concentration tested *in vitro* without an adverse effect, the *in vitro* results add additional weight in favor of causal inference, together with the human and animal data. "Exposure data from *in vivo* studies (human and animals) can be used to determine whether a positive signal identified in an alternative assay [such as WEC] presents a risk at the MRHD

[maximum recommended human dose' under the clinical conditions of use of the pharmaceutical." ICH S5 (R3) at 26, JA006187, (Vol. 12).

Applying the ICH S5 (R3), JA006158-6220, (Vol. 12) methodology to the Zofran WEC results, the study investigators found that ondansetron produced bradycardia in Zofran-exposed embryos compared to concurrent untreated controls at Zofran concentrations of 0.5 μM (150 ng/ml), and Zofran produced marked bradycardia (10% decrease) at 1 μM (around 300 ng/ml).[75] These concentrations are the same as in humans. For example, in Elkomy 2015, Zofran concentrations achieved in women of childbearing potential were 500 ng/ml, which converts to 1.7 μM, after a single 8 mg I.V. dose.[76] A study by deWit 1996 involving 17 women reported concentrations up to 199.6 ng/ml after an 8 mg oral dose, and data from one pregnant woman reported 109 ng/ml after an 8 mg oral dose. According to the whole embryo culture study, these concentrations can be expected to cause at least marked bradycardia in a human embryo, with a heart rate decrease at least between 9.4% and 19.6% without considering additional factors in the human embryo *in vivo* that enhance its risk, discussed in the next paragraph.[77] The Karolinska

---

[75] Plaintiffs anticipate that GSK will overlook these clinically relevant findings, claiming they are not "statistically" significant. Their approach contravenes the industry standards ICH S5 (R3) at 23, JA006184, (Vol. 12) (Any biologically meaningful difference in treated animals compared with concurrent controls should be discussed. Statistical significance alone does not always constitute a positive signal nor does lack of statistical significance constitute a lack of effect; historical controls, biological plausibility, and reproducibility should be considered in this context."); FDA Guidance for Industry 2011 at 6-7, JA006116-6117, (Vol. 12) ("A positive signal is a biologically meaningful difference in dosed animals compared to concurrent or historical controls.").

[76] Lemon, et al., Ondansetron Exposure Changes in a Pregnant Woman, *Pharmacotherapy*, 2016 Sept. 36(9): e139-e141, JA003858-3860, (Vol. 8).

[77] The concentrations of Zofran inducing irregular heartbeats in rat embryos *in vitro* need to be much higher than the plasma concentrations of ondansetron which can induce similar effects *in vivo* in a human, rabbit, or rat embryo exposed to ondansetron. One reason for this is that embryos *in vitro* are continuously gassed with 95 % oxygen *in vitro*, making it impossible for them to be hypoxic and ROS to be generated (as a consequence of severe hypoxia followed by a period of reoxygenation). Danielsson, Webster & Ritchie 2018, at p. 244.

study showed that heart rate decrease in a whole embryo rat study is manifested as bradycardia.[78] As described in Line of Evidence 2, the concentration of Zofran is highly likely to be the same, and sometimes higher, in the human embryo than in the mother.   Therefore, the Zofran WEC results support the causal inference when viewed together with the animal and human Zofran data.   ICH S5 (R3) at 8 ("information from the alternative qualified test systems [e.g., WEC studies] should be used with all available *in vivo* …data as part of an integrated risk assessment approach."). Due      to factors that heighten the risk of bradycardia in a human embryo, the arrhythmic risk in the embryo is likely to be higher than in the rat embryos in the WEC study.   Danielsson, Webster & Ritchie, at 244, JA003595, (Vol. 7).   Since the human embryonic heart is not "innervated," unlike the adult heart, the embryonic heart rate decrease in the embryo is more likely to cause bradycardia than in the adult heart.[79]

In addition, the data presented in Danielsson, Webster & Ritchie's Table 5 in "normal" rat embryos (without any coexisting risk factors present, such as low potassium, genetics, acidosis or fever), show that ondansetron concentrations of around 150 ng/ml and higher can likely cause bradycardia and life threatening severe TdP and thus teratogenicity due to cardiac arrhythmia in a human embryo by applying ICH S5 (R3) methodology.   This means that at a concentration of 150 ng/ml, and at even lower concentrations in embryos with co-existing risk factors, there is a risk for

---

[78] JA003604, Figure 6.
[79] Danielsson, Webster & Ritchie 2008 at 245 (There is "evidence that the non-innervated rabbit embryonic heart appears to respond with arrhythmia at exposures of HERG blocking drugs that are lower than those affecting the maternal heart.  This finding implies that the embryonic heart is more susceptible to developing cardiac arrhythmia compared to the adult heart.").   Kass Rept. at 38 (acknowledging that the ventricular action potential duration in normal (wild type) rabbits is much closer to human action potential duration, and the two repolarizing potassium channels key to controlling human action potential duration, hERG and Iks channels, are expressed in the rabbit heart.).

TdP arrhythmia and teratogenicity. A study in pregnant rats also shows that hypokalemia in the mother results in hypokalemia in fetal tissues,[80] another enhancing risk factor for arrhythmia.[81]

In summary, the Zofran WEC results add to the weight of the human and animal evidence supporting the conclusion that all GSK-recommended dose levels in the drug label are able to cause cardiac arrhythmia in embryos, and therefore malformations. *See* Line of Evidence 3.

*Finally*, results in isolated female rabbit hearts in the study by Frommeyer 2017, JA003708-3714, (Vol. 7) [82] showed similarities with the results in the Zofran WEC study. Both studies showed human risk for arrhythmia at exposures that can occur after use of GSK-recommended doses. The rabbit model is accepted to be highly predictive of risk for arrhythmia in humans.[83]

Integrating the Frommeyer 2017 results and the WEC study results into the weight of evidence analysis strongly supports the conclusion that marked disruption of the heartbeat (greater than a 10% change in heart rate) can occur in humans at a Zofran concentration that is *lower than* the highest ondansetron concentration (500 ng/ml) reported in women of childbearing potential (Elkomy 2015). To put this 10% or greater increase into context, one can consider that the 32 mg dose of Zofran was withdrawn from the market because it was shown in a clinical study by *Zuo et*

---

[80] Dancis and Springer, Fetal homeostasis in maternal malnutrition: potassium and sodium deficiency in rats, *Pediatr. Res.*, 1970 Jul;4(4):345-51, JA003553-3559, (Vol. 7).

[81] The Zofran product label warns that "Ondansetron prolongs the QT interval in a dose-dependent manner" and recommends electrocardiogram monitoring in patients with electrolyte abnormalities such as hypokalemia.

[82] Frommeyer 2017, Severe Proarrhythmic Potential of the Antiemetic Agents Ondansetron and Domperidone, *Cardiovasc. Toxicol.* (Feb. 9, 2017) ("The present model has been proven to be suitable to identify the proarrhythmic risk of cardiovascular and non-cardiovascular drugs."), JA003708-3714, (Vol. 7).

[83] Zofran concentrations causing QT prolongation: 1 μM = 300 ng/ml caused 17% QT prolongation in the rabbit (similar to 9.4% heartrate change in the WEC study), and 5 μM caused 43% QT prolongation in the rabbit (similar to 6 μM causing 29.2% heartrate change in the WEC study). Concentrations up to 10 μM+ hypokalemia were required in the rabbit model (and 12 μM in the WEC study) to actually provoke torsade de pointes (TdP), a life-threatening arrhythmia.

*al.* to increase the QT interval with a mean of approximately 24 milliseconds (from 408 to 432 ms; only a 6% increase in the length of the QT interval).[84]   The 6% increase represented an unacceptable risk of arrhythmia—even for non-pregnant cancer patients with an average Zofran plasma concentration of 389.9 ng/mL (peaking at 432.5 ng/mL) from the 32 mg I.V. dose (less than the highest concentrations seen in pregnant women after a single 8 mg dose.[85] .

With this context, it follows with compelling force that a likely 10% or greater change in heart rate from currently available therapeutic exposures presents a higher degree of risk in a more susceptible human embryo than what led to withdrawal of the 32 mg dose from the market.

E.   *LINE OF EVIDENCE 5*: OTHER DRUGS WITH THE SAME HERG BLOCKADE MECHANISM ARE KNOWN TO CAUSE CONGENITAL HEART DEFECTS AND OROFACIAL CLEFTS IN HUMANS.

Other drugs that have the same effect on heart rhythm disturbance as Zofran also cause cardiac and orofacial birth defects.  This is an important and persuasive line of evidence. The ICH S5 (R3) guidelines direct experts to investigate "all available data on the pharmaceutical *and any related compounds*."  ICH S5 (R3) at 24, JA006185, (Vol. 12).  Drugs blocking the hERG channel in the highest cardiac arrhythmia risk category according to Credible Meds, which have been thoroughly examined in at least two teratology studies have shown to be teratogenic with a similar spectrum of malformations as seen with Zofran in animals and in humans. Danielsson Rept. at 15, JA000197, (Vol. 1). Only a few potent hERG blockers have been used to a large extent in

---

[84] Zuo, Integration of Modeling and Simulation to Support Changes to Ondansetron Dosing Following a Randomized, Double-Blind, Placebo-, and Active-Controlled Thorough QT Study, *J. of Clin. Pharmacology*, 54(11) 1221-20 (2014), at Table 1.

[85] Zuo 2014 at 1229 ("In conclusion, the present study in adult subjects, suggests that. . . 32 mg (direct observations) IV doses may induce clinically important QT prolongations and may represent increased risk that exceeds benefit."), JA004214, (Vol. 8).

pregnancy, and these substances have been reported to cause a similar pattern of malformations /or embryonic death as ondansetron.[86]

For example, the antiepileptic drug phenytoin has been used extensively in human pregnancy. Women with epilepsy often have to use antiepileptic drugs during pregnancy in order to not risk their own, or their fetus's life, in life threatening seizures. Phenytoin is an established human and animal teratogen. Baldwin Dep., p. 245:14–21, JA001361, (Vol. 3); Danielsson Dep., p. 385:2–8, JA001574, (Vol. 3).[87] The most common phenytoin-induced malformations in humans are cardiovascular and orofacial defects. Danielsson Rept. at 15, JA000197, (Vol. 1). The phenytoin-induced malformations in animals have also been shown to be associated with induction of cardiac embryonic arrhythmia as demonstrated by whole embryo culture testing, as was similarly shown with Zofran. Danielsson Rept. at 23, JA0002052, (Vol. 1).

F.   *LINE OF EVIDENCE 6*: EVIDENCE FROM TRANSGENIC ANIMALS SUPPORTS THE CRITICAL ROLE OF hERG IN EMBRYONIC DEVELOPMENT.

According to the ICH S5 (R3), JA006158-6220, (Vol. 12) guidelines, relevant information on the teratogenic risk of a drug can be found by looking to transgenic animals and the role of the target in reproduction. ICH S5 (R3), at 24, JA006185, (Vol. 12). In this case the relevant "target" is the gene known as hERG. In 2008, to investigate the role of hERG in reproduction, a group of scientists created mice that had a mutated hERG gene that resulted in a complete loss of function of the gene.[88] The authors of the study concluded that mutating the gene resulted in loss of hERG

---

[86] The most potent of the IKr-blockers and hence the most likely to cause birth defects are cardioactive antiarrhythmics, such as ibutilide, and dofetilide, have not or have been rarely used in women of childbearing age. There do not appear to be any studies on use of these drugs in human pregnancy.

[87] Danielsson, et al., Phenytoin teratogenicity: hypoxia marker and effects on embryonic heart rhythm suggest an hERG-related mechanism. *Birth Defects Res A Clin Mol Teratol.* 2005 Mar; 73(3):146-53.

[88] Teng, Homozygous Missense N6292D hERG (KCNH2) Potassium Channel Mutation, *Circ. Res.* 2008; 103:1483-91, JA004088-4105, (Vol. 8).

potassium channel (IKr) function in the cardiovascular system and "leads to defects in cardiac ontogeny [development]" and in "the first branchial arch," which is essential to development of the craniofacial region. Teng 2008 at 6–7, JA004093-4094, (Vol. 8).

The authors observed embryonic deaths in mice that experienced loss of function of the hERG channel.  They attributed these deaths to arrhythmias and bradycardia in the mice embryos' hearts.  *Id.* at 6, JA004093.  The authors correlated their findings with studies in humans, which reported that genetic mutations of hERG in humans are associated with congenital cardiovascular anomalies, including: Tetralogy of Fallot, atrial-septal defects, and ventricular septal defects, among others.  *Id.* at 2, JA004089.  This study adds to the animal and human data showing that the hERG potassium channel, the function of which Zofran inhibits, plays an important role in the development of the heart and craniofacial region.  The study authors concluded: "[T]hese novel findings have substantial clinical relevance." *Id.* at 6, JA004093.

GSK tries to discredit the Teng study by contradicting the study authors' published conclusions from the study.  GSK speculates (at p. 110) that the cardiac and first branchial arch defects were not due to inhibition of hERG channels, they were due to creation of a new sodium channel.  The authors' conclusion, however, was that "loss of IKR [hERG] function . . . leads to defects" in the heart and first branchial arch.  Teng 2008, at p. 1, JA004088, (Vol. 8).  Then, inconsistently with its first argument, GSK asserts that the mice with birth defects had 100% block of hERG channels, which GSK interprets without support to mean that birth defects can only be induced with 100% hERG blockage.  As Line of Evidence 5 shows, however, and as GSK admitted long before this litigation, Zofran can cause bradycardia and arrhythmia at therapeutic concentrations well below IC50 (below 50% hERG block).  Teng 2008 represents yet another

category of relevant evidence under the ICH S5 (R3) guidelines that supports general causation. Levin Dep. at 150:8 – 151:3, JA001987, (Vol. 4); Levin Rept. at 13, JA000536, (Vol 1).

G.   *LINE OF EVIDENCE 7 -* GENERAL CAUSATION OF CONGENITAL HEART DEFECTS AND OROFACIAL CLEFTS IS SUPPORTED BY MULTIPLE HUMAN EPIDEMIOLOGIC STUDIES.

Multiple human epidemiologic studies, published in the peer-reviewed medical literature, found that Zofran is associated with statistically significant increased risks of septal heart defects and cleft palate, and as detailed in lines of evidence 1-6, there is a well-studied mechanism to explain why and how that occurs. Zofran is capable of causing all types of congenital heart defects and all orofacial cleft birth defects because there is a common underlying pathogenesis (*i.e.,* common mechanism) for all of these abnormalities.

GSK argues (at p. 14) that "the epidemiological data do not support a causal relationship between Zofran and cardiac or orofacial birth defects." GSK has not provided the Court with a fair summary of any of the studies. GSK's brief sets forth a misleading discussion of the relevant human epidemiologic studies and focuses only on GSK's perceived limitations of the several studies. *Id.* at 14-22. Those points are all addressed below.

GSK distorts the findings of these studies by omitting material information about them, selectively quoting from depositions, cherry-picking the results, making unwarranted assumptions, and speculating. GSK also misapplies basic principles of epidemiology and the concept of "power." A study's inadequate statistical power is relevant to understanding its failure to detect an association. An under-powered study cannot be the basis of a reliable conclusion about the absence of risk of specific birth defects. *See* Section VI(G)(3), *infra.*

Two epidemiologic studies (Danielsson and Zambelli-Weiner), both published and peer reviewed, found statistically significant increased risks for first trimester Zofran use and cardiovascular defects and septal heart defects. A third study published as an abstract only

(Andersen), but relied on by experts in the field who have cited it in peer reviewed medical literature publications, also reported a statistically significant more than doubling of risk for all septal defects.  A fourth study (Pasternak), which also was published and peer-reviewed, reported data for specific defects, reflecting a 40% increase in risk for septal defects, which due to small sample size, did not meet the threshold for statistical significance.  Two published studies (Parker and Huybrechts) did not find an increased risk for heart defects as a group, but the results in Parker for specific heart defects were mostly elevated and the upper bound of the confidence intervals were above 1.0, which is not inconsistent with the prior studies that found that Zofran was associated with an increased risk of the specific heart defects.  The just published Huybrechts study also had multiple limitations, discussed below, and in any event, for specific heart defects, the upper bound of the confidence intervals were also above 1.0.

Three epidemiologic studies (Anderka, Parker, and Huybrechts), each published and peer-reviewed, found statistically significant increased risks for first trimester Zofran use and cleft palate. A fourth published and peer reviewed study (Zambelli-Weiner) reported increased risks for cleft palate and also orofacial clefts generally. (The results of that study did not meet the conventional definition of statistical significance but were consistent with the other studies).  One arm of the Parker study did not find an association. Overall, there was general, although not perfect consistency as explained below.

Aside from the lack of merit in GSK's misleading attack on the science, GSK paints a picture of a scientific standard that bears no resemblance to reality.  In GSK's world, all science is perfect,  epidemiologic studies answer all questions, and no properly executed study has limitations. Further, by cherry-picking limitations of studies, GSK chooses to dismiss meaningful findings and ignore strengths. GSK is asking the Court to assess the science based on the false premise that

studies with limitations cannot provide evidence of a valid association and cannot be relied upon by experts. This view is contradicted by both of GSK's epidemiology experts, the Federal Judicial Center, and case law. GSK's epidemiology expert, Dr. Kimmel, acknowledged that "[a]ll research has limitations…including observational studies." Kimmel Dep., p. 191:24-192:2, JA001832, (Vol. 3). "[T]here's never been a perfect epidemiologic study." Louik Dep., p. 100: 11-12, JA002106, (Vol. 4). "[E]very observational study has its challenges." Shaw Dep., p. 30: 8-9, JA002901, (Vol. 5). "[A]ll studies have 'flaws' in the sense of limitations that add uncertainty about the proper interpretation of the results;" *Ref. Man.* at 552-53, JA003639-3640, (Vol. 7); *see also, id.*, at 583 ("Most epidemiologic studies have some degree of bias that may affect the outcome."). *Accord In re Orthopedic Bone Screw Prods. Liab. Litig.,* MDL No. 1014, 1997 WL 230818, at *8-9 (E.D. Pa. May 5, 1997) (study was deemed sufficiently reliable to be admissible despite its weaknesses, as "there is no such thing as a perfect epidemiological study.").

Performing experiments, such as a randomized clinical trial, that could demonstrate the causation in humans directly would be unethical. Baldwin Dep., pp. 185:17–186:7, JA001346-1347; 191:9–19, JA001348; 193:23–194:4, JA001348-1349, (Vol. 3). Therefore, as Dr. Shaw testified, "in epidemiology, we're usually relegated to observational studies. And we have to infer the causal nature of associations." Shaw Dep., p. 27:22–28:13, JA002900, (Vol. 5). This interpretation of observational studies "can produce legitimate disagreement among experts, and there is no mechanical procedure for resolving such differences of opinion." *Ref. Man.* at 222, JA003635, (Vol. 5). "…[D]eciding whether associations are causal typically is not a matter of statistics alone, but also rests on scientific judgment." *Id*.

Finally, GSK ignores the importance the First Circuit places on assessing the totality of all lines of evidence when assessing general causation: "The district court erred in reasoning that

because no one line of evidence supported a reliable inference of causation, an inference of causation based on the totality of the evidence was unreliable." *Milward, supra,* 639 F.3d at 23. As one court noted in pharmaceutical MDL, where the defense's approach mirrored GSK's here, "Defendants isolate these sources, rather than considering the whole." *In re PPA*, *supra*, 289 F. Supp. 2d at 1242.

1.   **Multiple Human Epidemiologic Studies Published in the Peer-Reviewed Medical Literature Found that Zofran Is Associated with Statistically Significant Increased Risks of Septal Heart Defects.**

   (a)   **Danielsson, *et al.***

The first study, Danielsson, *et al.,*[89] a cohort study published in 2014, reported an adjusted relative risk [90] of 2.05 (95% CI 1.19–3.28) (a more than doubling of risk) in a Swedish population of pregnant women and their babies. Dr. Bengt Danielsson, Plaintiffs' expert now but not then, was one of the study investigators.  The authors stated that "[t]he teratogenic risk with ondansetron is low but an increased risk for a cardiac septum defect is likely."[91]  Data from the Swedish Medical Birth Register combined with the Swedish Register of Prescribed Drugs were used to identify 1349 infants born of women who had taken Zofran in the first trimester of pregnancy.

GSK's birth defects expert, Dr. Shaw, testified that the study assessed "an entire country's experience. That's a strength." Shaw Dep. 205:5–11, JA002944, (Vol. 5). GSK's second epidemiology expert, Dr. Kimmel, testified, "the main strength is that it comes from the Swedish

---

[89] Danielsson B, et al. Use of ondansetron during pregnancy and congenital malformations in the infant. *Repro. Toxicol.* 2014;50:134-7 (hereinafter, Danielsson 2014), JA003560-3563, (Vol.7).

[90] Odds ratio or Crude Odds ratio are obtained when you are considering the effect of only one predictor variable; however, when investigators include more variables in the analysis (e.g., confounder variables) the results is called an "adjusted odds ratio," which takes into account the effect due to all the additional variables included in the analysis.

[91] Danielsson 2014 at 134, JA003560, (Vol.7).

Medical Birth Registry, which is a known and validated registry."  Kimmel Dep. 338:7–15, JA001869, (Vol. 3).

The doubling of risk of septal heart birth defects found in this study  are likely "biased to the null" because Zofran exposure was based on a prescription registry, which can overstate the number of Zofran exposures when women who are prescribed the medication do not actually take it.  The authors wrote "it is not known if the women who filled a prescription actually took the drug during the organogenetic period, a phenomenon which results in a bias of the risk estimate towards null."[92] Other experts in the field agree: "[f]illing a prescription does not mean that the medication was actually consumed, which could bias the results toward the null."[93]

This is not mere speculation: "Noncompliance in the use of prescribed medication may be frequent among pregnant women owing to their fear of fetotoxic side effects."[94] There is reason to believe that the degree to which the results may be understated is substantial.  For example, a Danish study of medications used by pregnant women found that "[t]he overall compliance to drugs purchased within 120 days before the interview was 43% (95% confidence interval: 40–46)." *Id.* This is especially true with anti-nausea medication. As noted by Dr. Louik, "[b]ecause this is a drug that is typically used on an "as needed" basis, a notation of a prescription in the medical record may not reflect actual consumption of the drug."  Louik Rept. at 35, JA000647, (Vol. 2).

The only information about the Danielsson study's findings in GSK's brief was that "[t]he authors reported a statistically significant increased risk of septal defects." GSK Br. at 16. All other

---

[92] *Id.* at 136, JA003562, (Vol. 7).

[93] Huybrechts, K. F., et al. Association of maternal first-trimester ondansetron use with cardiac malformations and oral clefts in offspring. *JAMA*. 2018;320(23):2429-2437, at 2436.

[94] Olesen, et al., Do Pregnant Women Report Use of Dispensed Medications? *Epidemiology*: Sept. 2001 – Vol. 12 - Issue 5 at 497–501, JA003891-3898, (Vol. 8).

GSK comments were about what the study did not find.  The study was published and peer-reviewed.  The study found a doubling of risk for septal defects.  GSK's epidemiology experts testified that the study had several strengths.  Experts outside of the courtroom have found the study to be sufficiently reliable that it has been cited over 45 times in the medical literature since its publication in 2014.[95]  GSK mentions none of these important facts. GSK Br. at 16.

In support of its position that the study does not provide reliable evidence of an association between Zofran use and septal defects, GSK states (at p. 16):

- "The authors reported no statistically significant association with major birth defects."
- "[T]he data showed no association with cardiac defects as a group."
- "There was no statistically significant association with septal defects generally, or VSDs and ASDs specifically."
- "There were no Zofran-exposed babies born with cleft palate."
- "There is no information in the paper as to the number of comparisons that were performed or whether each woman could contribute multiple pregnancies to the analysis."
- "There were no Zofran-exposed babies born with cleft palate, which, according to Dr. Sadler, "is not consistent with the hypothesis that Zofran increases the risk of cleft palate."

All of the above points about what the study did not find would have been known to the peer-reviewers and editors of the peer-reviewed journal that published the paper reporting the study methods and results.  And these points all would have been known to the experts in the field who have cited it in the medical literature numerous times.  None of these points about what the study did not find or did not discuss are inconsistent with the finding of a statistically significant doubling of risk of septal defects.  And none of these criticisms should prevent consideration of this study and its findings along with the other studies and lines of evidence.  Most importantly, none of these points have any bearing on a proper *Daubert* issue. They are the classic "*post facto* dissection" of a study that courts should reject.  *In re PPA, supra,* 289 F. Supp. at 1240.

---

[95] https://scholar.google.com/scholar?hl=en&as_sdt=0%2C22&q=danielsson+ondansetron+infants+oq=daniel (last visited Dec. 15, 2018).

Regarding GSK's point that "[t]here is no information in the paper as to the number of comparisons that were performed or whether each woman could contribute multiple pregnancies to the analysis," this is another example of a sleight of hand technique based on speculation and unwarranted assumptions.  There is no evidence there were multiple comparisons that were not disclosed. That the paper did not mention the number of comparisons or whether the analysis included multiple pregnancies is not evidence that the study included multiple pregnancies or performed multiple comparisons that were not disclosed.  GSK is speculating.  And even if the study had included multiple pregnancies, there is no evidence that this had any impact on the results of the study. If this was important information for understanding and interpreting the study, the peer-reviewers certainly could have asked the investigators to include this information.

GSK had an opportunity to find out if the investigators included multiple pregnancies or performed multiple undisclosed comparisons because GSK questioned Dr. Danielsson for seven hours and did not ask him a single question about either of these issues.  Although not asked about how the study addressed multiple pregnancies at his deposition, in connection with his answer to a different question, Dr. Danielsson testified that the investigators "looked at twins [because] it's …an increased risk for heart malformations if it's twins. However, there were only four twins in the study… and none of these had heart defects." Danielsson Dep., p. 102:22-103:2, JA001504, (Vol. 3).

GSK lists a number of specific birth defects for which the study did not find an association, but GSK fails to mention that the statistical power of the study is a critical factor for interpreting a study. And GSK's position is at odds with well-established principles of epidemiology concerning the limitations of underpowered studies. Although the Danielsson study was based on a Swedish pregnancy registry that captured all pregnancies in the country in the period 1998-2012, the

Danielsson study nevertheless included only 1,349 women exposed to Zofran in the first trimester.[96] The Pasternak study, *infra*, had 1,233 exposures and the investigators stated that the study did not have sufficient power to assess the risk of individual defects.

No reliable conclusions can be drawn about the absence of risk for specific defects from studies that lack power to assess the risk of specific defects:

> [I]f a study is of inadequate sample size, then a finding of no statistically significant association between exposure and disease…may well be uninformative since a true lack of association will be difficult or impossible to distinguish from a true association that cannot be detected statistically because inadequate power."[97]

GSK's defense expert Dr. Shaw agrees ("studies can have sample sizes that are insufficient to rule out increases in risk … for some types of birth defects").    Shaw Dep., p 90:24–91:24, JA002916, (Vol. 5).

An underpowered study that fails to detect an association with a specific defect (discussed above) is distinguishable from an underpowered study that actually finds a specific defect.  As Dr. Louik testified, "you don't look at power… when a study has found an association, you don't go back and say, well, it didn't have enough power to find that association that it found. It found it. It's not a question of power at that point." Louik Dep., p. 234:18-23, JA002140, (Vol. 4); pp. 374-75, JA002175.[98]    As noted in a textbook edited by GSK's expert Dr. Kimmel, "after a study is

---

[96] Danielsson B, et al., Ondansetron and teratogenicity in rats: Evidence for a mechanism mediated via embryonic hERG blockade. *Reprod Toxicol* 2018; 81:237-245.P. 135 ("We identified 1349 infants, exposed in early pregnancy for ondansetron."), JA03588-3596, (Vol. 7).

[97] Hennekens C, Buring, JE. *Epidemiology in Medicine*. Boston/Toronto: Little, Brown and Company; 1987, at 264–5, JA003806-3807, (Vol. 7).

[98] *See also* Louik Dep. at 240:8-15, JA002141, (Vol. 4) ("looking at power after the fact and saying that a study that found an association wasn't adequately powered to find that association, that's a meaningless concept. If a study finds an association, it doesn't matter whether you *pre-hoc* determine that it didn't have the power to find it. It found it."); Louik Dep. p. 236:3-9 JA002140, (Vol. 4) ("there's no reason to look back at a study that has found an association and argue that, well, it couldn't have found this association because it wasn't powered to…. There's no power argument to be made.").

completed, if a real finding was statistically significant, then the study had a sufficient sample size

to detect it, by definition."[99]

GSK's motion purportedly seeks to ensure reliable science in this litigation, yet GSK

misapplies this basic epidemiologic principle, recognized by a number of the experts who have

published studies on Zofran and birth defects. *See* Section VI(G)(3), *infra*.  GSK also used the

Einarson study with only 176 exposures to make claims that Zofran was safe when it knew that no

reliable conclusions could be drawn from such a small number of exposures.  *Id*. [100]

### (b)	Zambelli-Weiner, *et. al*.

The Zambelli-Weiner, *et al.*,[101] study (peer-reviewed and published in November 2018)

analyzed Zofran exposure during the first trimester linked to birth defect outcomes, utilizing claims

---

[99] L. Strom, S.E. Kimmel, S. Hennessy, *Pharmacoepidemiology,* 5th ed., 2012, at p. 30.

[100] GSK's point about Dr. Sadler is particularly misleading because it is based on this same mangling of the "power" issue, coupled with a misleading quotation and an important omission about the study.  GSK states (at p. 16), "[t]here were no Zofran-exposed babies born with cleft palate, which, according to Dr. Sadler, 'is not consistent with the hypothesis that Zofran increases the risk of cleft palate.'" GSK cherry-picks the data and fails to note that the study (*see* Danielsson 2014, Table 2) *did* report a case of combined cleft lip/palate. Also, the actual testimony by Dr. Sadler (Sadler Dep. p. 68:11-15, JA002606, (Vol. 5)) is revealing: "Q. And the lack of any Zofran-exposed babies with cleft palate in Danielsson is not consistent with the hypothesis that Zofran increases the risk of cleft palate, correct? A. In and of itself, that's correct."  Sadler Dep. p 68:11-15, JA002606, (Vol. 5).  The words "in and of itself" (omitted from GSK's brief) are important.  Of course, a lack of Zofran exposures with cleft palate is not "in and of itself" consistent with an increased risk. But this misses the essential point: it is not a scientifically meaningful comparison. There is no scientific validity to plucking a number out of a study without any reference to the control group, the background rate, or the statistical implications.  GSK has not and cannot point to any epidemiologic literature that validates its attempt to use a single number from a study in this manner.  Here, having only 1,349 first trimester exposures to Zofran is less than the cleft palate background rate, so none would be expected, and there is insufficient power to draw any reliable conclusions. The CDC estimates that cleft palate occurs in 1 out of 1,574 Births. CDC, Data & Statistics, https://www.cdc.gov/ncbddd/birthdefects/data.html (last visited Jan 4, 2019), JA006295-6337, (Vol 12).

[101]  Zambelli-Weiner A., et al. First Trimester Ondansetron Exposure and Risk of Structural Birth Defects. *Repro Toxicol* October 29, 2018 [Accepted Manuscript], JA004179-4205, (Vol. 8).  This paper was not a published and peer reviewed full paper at the time of "Science Day." It was a published "abstract." It was accepted for publication in October 2018.  In addition, as disclosed by the authors, although "there was no outside involvement in study design; in the collection, analysis and interpretation of data; in the writing of the manuscript; and in the decision to submit he manuscript for publication, [a]s an organization TTi reports

data spanning 15 years, from 2000 to 2014, based on data from Truven Marketscan, a large U.S. medical claims database.  The authors stated objective was to design a study that addressed certain limitations in prior studies, specifically: "recall bias, exposure misclassification, low exposure prevalence, and small sample sizes that reduce study power…." *Id*. at 11.

Regarding the problem noted above (in connection with the Danielsson study) about exposure misclassification that can lead to an understatement of the risk, the Zambelli-Weiner investigators addressed that concern:

> One of the largest risks of bias to pharmacoepidemiologic studies utilizing prescription claims as a marker of exposure is that the prescription may not be representative of actual exposure. We addressed this risk of bias by setting a more stringent exposure definition where the probability of exposure is near certain: ondansetron administered in a medical or hospital setting."

*Id.* In a primary analysis, the investigators focused on heart defects and orofacial clefts. In a secondary analysis[102] (which assessed the risk for a range of specific heart and orofacial cleft birth defects), they focused on a number of more specific birth defects.  They found statistically significant increased risks for a number of heart defects, including a 43% increased risk for heart defects as a group, reporting an adjusted odds ratio (aOR):  aOR =1.43 (CI 95% 1.28–1.61).  For septal heart defects as a group, the study reported an adjusted odds ratio (aOR) = 1.44 (95% CI 1.28–1.62) (a 44% increase in risk), and also reported statistically significant increased risks for three specific types of septal defects, ranging from a 29% increase in risk to a more than doubling of risk:

- Atrial septal defects (ASD): aOR = 1.49 (95% CI 1.32–1.69)

- Ventricular septal defects (VSD): aOR = 1.29 (95% CI 1.03–1.61)

---

receiving funds from plaintiff law firms involved in ondansetron litigation and a manufacturer of ondansetron."  April Zambelli-Weiner is one of the co-author/investigators of this study. She is the President of TTi Health Research & Economics (TTI).

[102] The secondary analysis assessed the risk for a range of specific heart and orofacial cleft birth defects.

- Atrioventricular septal defects (AVSD): aOR = 2.71 (95% CI 1.62–4.52)

Dr. Zambelli-Weiner also found increased risks for hypoplastic left heart syndrome aOR = 2.12 (95% CI .88–5.12) (not statistically significant), and for other circulatory defects aOR = 1.75 (95% CI 1.39–2.20) (statistically significant).

In contrast to the low power in prior studies, the primary analysis in the Zambelli-Weiner study had over 5,000 first trimester exposures to Zofran.  This is over 25 times the 176 Zofran exposures in the GSK-sponsored Einarson study.  The study adjusted for potential confounders, and as noted above, a strength of the study was that the investigators avoided exposure misclassification by focusing on medically administered Zofran, where it is known that the women took the medication. The authors also conducted sensitivity analyses to address potential confounders that were not available in the database.

GSK's brief (at pp. 18-19) provides this Court with none of the above detail about the study. What GSK describes has material omissions and inaccurate statements. All GSK reveals about the study's findings are contained in these three sentences:

> The study reports associations between Zofran and different categories of birth defects based on two different definitions of exposure: (i) "medical administration" and (ii) "prescription or medical administration." With respect to orofacial clefts, the authors reported no statistically significant associations. With respect to cardiac defects, the authors reported statistically significant associations only with septal defects and only when exposure was defined as "medical administration."

GSK Br. at 18-19.  GSK's quotes Dr. Louik ("I think there were a lot of problems with this study,") but fails to disclose the last half of the quoted sentence, which was "it also has some strengths, and it needs to be considered as part of the body of evidence." Louik Dep., p. 307:8-12, JA002158, (Vol. 4). She testified that "[t]his study has strengths, but it also has a number of limitations, like every other study." Louik Dep., p. 300: 16-18, JA002156, (Vol. 4). In her report, while noting that

the study had limitations, Dr. Louik stated that the study had "many strengths, including its large size, the attempt to reduce or eliminate exposure misclassification, and some effort to control confounding."  Louik Rept. at 35, JA000647, (Vol. 2).

Also quoting Dr. Louik, GSK claims that the Zambelli-Weiner study did not follow a reliable statistical methodology because the investigators did not "limit their analysis to one pregnancy per mother." GSK Br. at 18.  This is another sleight of hand because it is based on speculation, and it mischaracterizes Dr. Louik's testimony.  Dr. Louik was asked if she agreed that the investigators did not limit their analysis to one pregnancy per mother.  She did not agree. Rather, she testified that the investigators "did not indicate" whether they limited their analysis to one pregnancy per mother.  Louik Dep., p. 291:2-5, JA002154, (Vol. 4).

GSK has no basis to infer that the investigators did not limit their analysis to one pregnancy per mother simply because they did not make a statement about that in the paper. That the authors do not state that they followed an accepted methodological principle does not mean that they violated that principle as reputable epidemiologists and peer reviewers are presumably aware of the requirement of statistical independence.

In addition, GSK further selectively quotes Dr. Louik regarding this issue by failing to mention that even if the investigators had not limited their analysis to one birth per mother, this would only affect P-values and confidence intervals if the number of multiple births in the data was substantial, Louik Dep., p. 294:8-12, JA002155, (Vol. 4), and it would have no impact on the risk estimates. *Id*. at 136:24-137:3 JA002115, (Vol. 4). Notably, in another Zofran study the investigators determined that including multiple births from the same mother had negligible impact on the results.[103]

---

[103] Huybrechts, et al. Association of maternal first-trimester ondansetron use with cardiac malformations and oral clefts in offspring. *JAMA*. 2018;320(23):2429-2437.

Next in its litany of criticisms, GSK points to Dr. Louik's opinion that the study "may not be generalizable" to other women based on the high rate of birth defects in the database, including in the control group.  This is an example of GSK's misstating the facts and misapplying the science.  To clarify: Dr. Louik did not testify that the results were not generalizable—just that it was a possibility. Louik Dep., p. 307, JA002158, (Vol. 4); Louik Rept., p. 36, JA000648, (Vol. 2);. Nor did she testify that the rates of defects were higher than expected. She testified that "it would depend on what's included in this database in terms of diagnoses or how they're assessed," Louik Dep., p. 296:3-4, JA002155, (Vol. 4), and "defining the base population from which these study subjects came." *Id.* p. 307: 22-23, JA002158, (Vol. 4).    Further, GSK's focus on "higher than expected birth defect rates" reflects a misunderstanding of the nature of an administrative database study which uses diagnostic codes.[104]

---

[104] In their publication, Zambelli-Weiner note that the Truven database captures the full episode of reimbursable care for each patient during plan enrollment, including inpatient and outpatient medical care, prescription drug use and other resource utilization (p. 4). And further, cases were defined as having one or more claims with a relevant diagnosis code within 365 days of the date of birth (p. 6).  While this is customary procedure for database studies, the validity of such approach is important to consider when estimating incidence and prevalence of disease because of the potential to over- or under- estimate risk based solely on diagnosis codes. As noted in Ward, et al, Estimating disease prevalence and incidence using administrative data: some assembly required, *J Rheumatol*. 2013 August; 40(8): 1241–1243, "most methodological work in the use of administrative data to estimate disease prevalence and incidence has focused on the validity of case ascertainment in these data sources [12]. Coding errors, "rule-out" diagnoses, and limits in the number of diagnoses included in a dataset can contribute to errors in administrative data, and the accuracy may vary from data source to data source."

These issues are relevant to the estimation of absolute risk of disease or injury only.  They are completely irrelevant when the objective of the study is relative risk, as is the case in the nested case-control study conducted by Zambelli-Weiner.   The important point overlooked by GSK is this: A potential misclassification based on diagnosis codes would have the same impact on the case group as the control group. There is no reason why a misclassification would affect only women who took Zofran.  This is called "non-differential misclassification," and it is well established in epidemiology that non-differential misclassification does not invalidate the resulting relative risk estimate. In fact, it is widely known in epidemiology that the tendency of non-differential misclassification is to lower the estimate of risk towards the null, thus suggesting Zambelli-Weiner's estimates may actually be higher than presented in the publication.  The *Reference Manual* (at p. 589), JA003662, (Vol. 7) clearly addresses this:

GSK next claims (at p. 19) that Dr. Louik testified that the study lacked "critical" information of the date of conception and gestational age to ascertain first trimester exposure. Dr. Louik never described this information as critical.  Also, while agreeing that the reason this information would be relevant (to "enable the investigators to determine the first trimester of pregnancy"),  Louik Dep*., p. 290:13-17, JA002154, (Vol. 4), she did not testify that this was the only way to ascertain the first trimester of a woman's pregnancy.  *Id.* 289-90, JA002153-2154, (Vol.4).  It is clear in the manuscript that the investigators described their method for determining the first trimester.[105] GSK fails to mention this.

GSK also cites to Dr. Louik's testimony and report, stating that "[n]o clear description of medical administration is provided," that "we don't know what other characteristics these women who received Zofran for medical administration had that might influence the analysis," and that "the study lacked information on smoking; race; ethnicity; or socioeconomic status." GSK Br. at 19. GSK provides no information, however, on whether, how, or why this claimed lack of information is important to the validity or reliability of the study.

---

> In nondifferential misclassification…inaccuracies in diagnoses are independent of exposure status—in other words, the data are crude, with a great deal of random error. This is a common problem. Generally, nondifferential misclassification bias leads to a shift in the odds ratio toward one, or, in other words, toward a finding of no effect. Thus, if the errors are nondifferential, it is generally misguided to criticize an apparent association between an exposure and disease on the ground that data were inaccurately classified.  Instead, nondifferential misclassification generally underestimates the true size of the association.

[105] *Ref. Man.* at 589, JA003662, (Vol. 7).  The investigators wrote: "Exposure to ondansetron was defined as a filled prescription for ondansetron or medical administration … during first trimester….The period of first trimester exposure was defined as the period from the beginning of the estimated date of conception to the estimated end of the first trimester (91 days following the estimated conception date), specifically 287 to 147 days prior to delivery, based on an estimated conception period of 287-252 days prior to delivery for a singleton birth and 273-238 days prior to delivery for a multiple birth based on a previously published algorithm…"  Zambelli-Weiner at 5-6, JA004184-4185, (Vol.8).

Notably, GSK's brief omits that the investigators acknowledged what information was unavailable in the database they used for the study, and that they used a sensitivity analysis to address confounding. The investigators stated:

> Data were unavailable on maternal sociodemographic variables such as race, education and parity as well as lifestyle risk factors such as smoking, alcohol consumption and over the counter drug use in the pre-conception and first trimester periods. To address this, sensitivity analyses using the method of Greenland [36] were conducted to evaluate the impact of uncontrolled confounding on risk estimates. Taking smoking as an example, the strength of the relationship between smoking and the probability of both the exposure and outcome is modest and adjustment for smoking does not meaningfully alter the risk estimate…[106]

The peer-reviewers certainly would have been aware of what data were and were not available because the investigators addressed the issue in the manuscript.

Although GSK focuses on what information was not available, it is important to note that the investigators based this study on the Truven Marketscan database, "a large US administrative claims database."[107] This enabled the investigators to obtain many more exposures to Zofran than was possible in prior studies.  Multiple prior studies were severely underpowered and had far fewer exposures to Zofran, and the only study sponsored by GSK (Einarson, *et. al.*) had only 176 Zofran exposures.  However, as with all observational studies, the investigators had to work within the limits of information available to them.  But as noted in the published paper (and in the abstract), the database provided substantial information,[108] and the investigators' methodology accounted for potential confounders.[109] Indeed, numerous studies have utilized the Truven database.[110]

---

[106] Zambelli-Weiner at 13-14, JA004192-4193, (Vol. 8).

[107] Zambelli-Weiner at 4, JA004183, (Vol. 8).

[108] The investigators reported that the information available to them for the study that was available in the database "included: maternal age at birth, infant year of birth, infant gender, US region of birth, maternal medical history (obesity, diabetes mellitus, epilepsy, hypertension, cancer), and medications taken in first trimester including initiation of acid-reducing therapies, psychotropics, prescription folic acid, macrolide antibiotics, corticosteroids, and anticonvulsants. Low birth weight, multiple gestation, high risk pregnancy

With respect to GSK's point that "no clear description of medical administration is provided," the investigators defined medical administration (defining exposure to Zofran as "a filled prescription for ondansetron or medical administration of ondansetron in the medical office or hospital setting during first trimester.")[111]   The investigators further explained that the reason they used this category was because they wanted to avoid exposure misclassification, which occurs when women who are prescribed medication do not actually take it—a likely major concern with anti-nausea medication. They stated, "Because antiemetics are prescribed prophylactically to be used on an 'as needed' basis, there is significant risk of exposure misclassification in prescription data. Due to this, our primary analysis examined medical administration of ondansetron, where the risk of exposure misclassification is very low if not null."[112]   GSK's epidemiology expert's textbook also acknowledges that it is well known that one should not assume that medication prescribed is

---

diagnosis, prior preterm delivery, family history of birth defects, and diagnosis of NVP or HG were also collected, but were difficult to assess from ICD-9 codes alone, due to underutilization."

[109] Zambelli-Weiner at 7 ("Potential confounders were first identified through a review of the literature and the team's understanding of the clinical care of pregnant women and the epidemiology of birth defects. Confounding was then evaluated by adding the variable to the base exposure-outcome model and evaluating the change in the risk estimate. If the risk estimate changed by ≥10% this indicated the presence of confounding and that variable was included in the multivariate models" )(internal citations omitted).

[110] *See, e.g.*, Nasseh, et. al, The Relationship between Periodontal Interventions and Healthcare Costs and Utilization. Evidence from an Integrated Dental, Medical, and Pharmacy Commercial Claims Database, *Health Economics*, 26 (4) (2016) (study used integrated medical, pharmacy, and dental claims from Truven Health MarketScan® Research Databases; to assess whether there was an association between periodontal intervention and lower healthcare costs); Ryan, et al., Medication-wide Association Studies, *Pharmacometrics & Systems Pharmacology* (2013) 2, e76; doi:10.1038/psp.2013.52; published online 18 September 2013   (Use of Truven Marketscan data in a medication wide association study to assess medication side effects for myocardial infarction, acute liver failure, acute renal failure and upper gastrointestinal ulcer); Lip, et al., Real-world comparison of major bleeding risk among non-valvular atrial fibrillation patients initiated on apixaban, dabigatran, rivaroxaban, or warfarin. *Thromb Haemost* 2016; 116: 975–986 (study used Truven Marketscan data to compare the risk of major bleeding among newly-anticoagulated non-valvular AF (NVAF) patients initiating on warfarin, rivaroxaban, dabigatran, or apixaban).

[111] *Id.* at 5.

[112] Zambelli-Weiner at 6.

actually consumed because "medication adherence…is not routinely the case."  Strom and Kimmel, Textbook of Pharmacoepidemiology at 366.  This issue is also addressed *supra* in connection with the Danielsson study, Section VI(G)(1)(a).

>    **(c)    Andersen, *et al.*[113]**

A third epidemiologic study, by Andersen, *et al.* reported results for heart defects in two abstracts (one was published), and the lead investigator also presented the study at Motherisk,[114] where the presentation was recorded.  This study, although an abstract, has been relied on by experts in the field outside of this litigation, and has been cited repeatedly in the Zofran medical literature.[115] The investigators reported that first trimester exposure to Zofran was associated with a statistically significant increased (more than doubling) risk of heart defects (aOR=2.0 (CI 95% 1.3– 3.1) generally, that was broken down as follows: an increased risk of atrial septal defects (ASD): aOR = 2.1 (CI 95% 1.3–3.6), ventricular septal defects (VSD): aOR= 2.3 (CI 95% 1.2–4.2) and atrioventricular septal defects (AVSD): aOR =4.8 (CI 95% 1.5–15.1).

GSK contests any consideration of the Andersen study because it was not published.  GSK also claims that Andersen "cover[s] substantially the same exact exposed population" as the

---

[113] Andersen JT, et al, Ondansetron use in early pregnancy and the risk of congenital malformations - a register based nationwide cohort study. Abstract. 2014; Andersen JT, et al, Ondansetron use in early pregnancy and the risk of congenital malformations - a register based nationwide cohort study. [Abstract]. *Pharmacoepidemiol Drug Saf* 2013;22(Suppl 1):13-14.

[114] Andersen JT. Ondansetron use in early pregnancy and the risk of congenital malformations - a register-based nationwide cohort study. Presentation at SickKids, Motherrisk. 2014. Motherisk is a clinical and research program at The Hospital for Sick children in Toronto, Ontario, Canada, established in 1985 as a teratogen information service to provide evidence-based safety information on exposures in pregnancy.  http://www.motherisk.org/women/index.jsp.

[115] Danielsson 2014, JA003560-3565, (Vol. 7), *supra*; Parker SE, et al, JA003906-3915, (Vol. 8), National Birth Defects Prevention Study. Ondansetron for treatment of nausea and vomiting of pregnancy and the risk of specific birth defects. *Obstet Gynecol* 2018 Aug; 132(2):385–394; Carstairs SD., Ondansetron Use in Pregnancy and Birth Defects: A Systematic Review. *Obstet. Gynecol*. 2016; 127(5):878–83, JA003538-3543, (Vol. 7).

Pasternak study.   GSK Br. at 20.   Both arguments should be rejected.   GSK's challenge is not a

*Daubert* issue; it goes to the weight of the evidence.

While the two studies have overlapping data from the same registries, Andersen uses data

from years 1997-2010 while Pasternak uses data from 2004-2011.   There are seven years of data in

Andersen that are not in Pasternak.   The studies also have different results, which would not occur if

the studies were identical.   GSK's argument that information in scientific abstracts should not be

considered, runs counter to First Circuit law and real world science.

As noted above, the Plaintiffs' experts' opinions are supported by substantial peer-reviewed

and published scientific and medical evidence; and the Andersen study "makes the same point" as

the published studies.   The case law permits experts to consider such evidence:

> Secondary sources cited by Dr. O'Donnell lack publication and peer review…, but
> this circumstance does  not make such sources *per se* unacceptable, see *Daubert*, 509
> U.S. at 593, 113 S. Ct. 2786 (explaining that neither  publication nor peer review is
> "a  *sine qua non* of admissibility").   Under ordinary circumstances, an unpublished,
> unreviewed work, standing alone, probably would be insufficient to demonstrate the
> reliability of a scientific technique. But when such an article makes the same point as
> published, peer-reviewed pieces, it tends to strengthen the assessment of reliability.

*Ruiz-Troche*, 161 F. 3d 77, 84.   While data from abstracts may not be afforded the same weight as

peer-reviewed, published studies, ignoring it entirely is without scientific merit.   "Scientific

inference typically requires consideration of numerous findings, which, when considered alone,

may not individually prove the contention." *Ref. Man.* at 19–20, JA003632-3633, (Vol. 7).

As also explained in the Reference Manual (at 20):

> [M]any of the most well-respected and prestigious scientific bodies (such as the
> International Agency for Research on Cancer (IARC), the Institute of Medicine, the
> National Research Council, and the National Institute for Environmental Health
> Sciences) *consider all the relevant available scientific evidence, taken as a whole*, to
> determine which conclusion or hypothesis regarding a causal claim is best supported
> by the body of evidence. *In applying the scientific method, scientists do not review
> each scientific study individually* for whether by itself it reliably supports the causal
> claim being advocated or opposed. (Emphasis added)

99

As noted, the experts in the field who have published in the peer-reviewed literature have relied on and cited to the Andersen abstract.  Without substantive evidence that the Andersen study results are invalid, GSK asks (at pp. 20-21) the Court to make assumptions about the study's quality just because it has not been published.  GSK can only speculate about why the study has not been published.  Dr. Louik testified, "I wouldn't draw conclusions about the validity of the study from the fact that it hasn't been published." Louik Dep., p. 281:5-13, JA002151, (Vol. 4).

GSK states (at p. 20) that "abstracts are incapable of establishing a valid statistical association," and "abstracts generally do not have sufficient information to assess study methodology."  This would be pertinent if the abstract is considered alone and there was no other evidence of causation.  Instead, Plaintiffs and their experts have consistently asserted that the entire body of evidence should be considered, and have not claimed that Andersen should be afforded weight equal to that of a peer-reviewed published study.[116]

GSK claims a lack of information about the Andersen study, but has not provided the Court with all of the information that is available about the study.  As noted by Dr. Louik, who reviewed the Andersen presentation video:

> The video describes the record linkage system used to form the analytic database….
> Dr. Andersen states that the odds ratios …are adjusted for potential confounding by
> maternal age, parity, education, year of conception, maternal smoking, and multiple
> births using multiple logistic regression techniques.  In addition, the video includes
> results of analyses to address possible confounding by indication….thus
> strengthening the likelihood that the observed association with ondansetron is real.

Louik Supp. Rept., JA000673-674, (Vol. 2), (Oct. 16, 2018). Dr. Louik also testified: "Q.

Dr. Andersen doesn't tell us anything about what confounders were assessed, right? A. No,

---

[116] GSK also references (at p. 20) Dr. Sadler's testimony that "one cannot assess the strengths and limitations of a study just based on the information provided in the abstract."  GSK only cites a portion of Dr. Sadler's answer.  Dr. Sadler also testified that "[i]n most cases, … the data would be in …the abstract when we present it… we wouldn't put data in that wasn't accurate…."  Sadler Dep., p. 89:17-25, JA002611, (Vol. 5).

that's not true. In his video he does. Q. Is it your impression that he –A. It's not my impression. It's a fact. He does talk about confounders, and I think I mention them in my supplemental report." Louik Dep., p. 279:10-280:7, JA002151, (Vol. 2).

### (d)    Pasternak, *et al.*

A fourth study, Pasternak, *et al.*[117] (discussed in greater detail in Section VI(3)(a), *infra*) published in the *New England Journal of Medicine*, reported results for "major birth defects" as the primary analysis but, in a supplement, also reported data for specific defects. While the investigators wrote that the study was not powered or designed to assess the risk of specific defects, the supplemental data reflect that for VSD the "crude" hazard ratio was 1.4 (not statistically significant) as calculated by Dr. Louik.  Louik Rept. at 24, JA000657, (Vol. 2). As noted above, epidemiologists do not disregard a study result just because the result is not statistically significant, Kimmel Dep. at 214:23–216:9, JA001838, (Vol. 3), because "absence of statistical significance should not be mistaken for absence of effect," Shaw Dep. at 92:2–93:13, JA002916, (Vol. 5).  The results are consistent with the increased risks found in other studies, which were statistically significant. *See also* Section VI(G), *infra*.

### (e)    Parker, *et al.*

In contrast to the above four studies, in the published Parker study[118] the Parker study did not find an association for septal defects, but the analysis is not so simple.  For both ASD (based on only 50 cases exposed to Zofran) and VSD (based on only 69 cases exposed to Zofran) the upper bound of the 95% confidence interval was greater than 1.0:  The upper bounds were 1.3 and 1.4 for

---

[117]  Pasternak B, et al. Ondansetron in pregnancy and risk of adverse fetal outcomes. *NEJM*, 2013; 368:814–23.

[118]  Parker SE, et al, National Birth Defects Prevention Study. Ondansetron for treatment of nausea and vomiting of pregnancy and the risk of specific birth defects. *Obstet Gynecol* 2018 Aug; 132(2):385–394, JA003916-3950, (Vol. 8).

VSD and 1.3 and 1.2 for ASD.  Therefore, the results were consistent with elevated risks.[119]  Dr. Louik testified that while the Parker results for the BDS arm of the study "don't confirm [prior studies showing an association], [they] …[are] not inconsistent on the VSD [ventricular septal defect] side with previously reported odds ratios because the confidence interval …includes previously reported elevated odds ratios."  Louik Dep., p.  227:4–228:5, JA002138, (Vol. 4); 235:2-8, JA002140.[120]

A confidence interval is a range of values consistent with a study's results.  "[Confidence intervals indicate the range of values within which the true odds ratio is likely to fall." *In re Neurontin*, 612 F. Supp. 2d., at 127; *In re Phenylpropanolamine*, 289 F. Supp. 2d., at 1251, n. 1.  "If a 95% confidence interval is specified, the range encompasses the results we would expect 95% of the time if samples for new studies were repeatedly drawn from the same population." *Ref. Man.* at 580.  GSK's epidemiology expert testified that "[t]he confidence interval gives a range over which… the true result may lie."  Kimmel Dep., p. *220:12-15, JA001839, (Vol. 3)*; *Accord* Shaw Dep., p. 45:6–12, JA002904, (Vol. 5).  When interpreting a study's results, and when assessing consistency with other studies, epidemiologists consider the confidence interval. This is relevant to interpreting the Parker results, but ignored by GSK.  GSK cites to Dr. Buring over twenty times, but omits her testimony that to assess consistency between studies, one should look at the "magnitude of the relative risk … along with the confidence interval." Buring Dep. p., 130: 1-4, JA001446, (Vol. 3).

---

[119]  According to GSK's birth defect epidemiology expert Dr. Shaw: "The upper bound reflects the probability that the -- that that is where the highest … estimate would be observed with the statistical parameters that you placed around it such as 95 percent." Shaw Dep. at 45:25–46:4, JA002904-2905, (Vol. 5).

[120]  In addition, the odds ratio in the BDS arm of the study reflects a small increase in the odds ratio for ventricular septal defects (VSD's). Louik Dep. pp. 231:16-232:2. The 10% increase is something that "many epidemiologists consider […] worth pursuing."  *Id*, JA002139, (Vol.4).

Notably, the Parker study also reported the results for 15 different rare heart defects. *All had confidence intervals above 1.0, and seven of the other heart defects had odds ratios that were elevated.* GSK ignores these results and focuses only on statistical significance, claiming that Parker "found no statistically significant associations with Zofran use." GSK Br. at 17. GSK's interpretation that there are "no statistically significant associations" is misleading: GSK fails to disclose that Table 4 of the published paper reports <u>elevated</u> risks for six of the heart defects, although the results are not statistically significant because there were few Zofran exposures for these rare injuries.[121]

GSK quotes Dr. Louik's testimony, that one "can't rule in an association based on these data." GSK Br. at 17, 22. Dr. Louik's statement that she cannot "rule in" an association based on these data only pertains to the study results in isolation, which is not how an epidemiologist assesses the evidence when there are multiple studies. GSK also fails to mention that Dr. Louik also testified that "[y]ou can only rule out an association when your upper bounds are below 1 and that's not the case in any of these." Louik Dep., p. 248: 5-8, JA002143, (Vol. 4). The upper bounds of these confidence intervals are consistent with the increased risk reported in other studies. Louik Dep. p. 238:14-239:4, JA002141. Dr. Louik testified, "the confidence intervals are all consistent with a whole range of possible values, including 1 and including 2 …and…including 3.2 in one case." (Louik Dep., pp. 246:24 - 247:15, JA002143):

---

[121] Where the P value is less than .05 or the confidence interval for an odds ratio includes 1.0, the result does not meet the conventional definition of statistical significance. Ref. Man. at 577. A study needs to have a large enough sample size (the number of study participants); "by enlarging the sample size …, researchers can … reduce the chance of random error in their results." *Ref. Man.* at 576, JA003651, (Vol. 7).

The elevated odds ratio in the BDS arm also was consistent with prior findings.  Louik Dep., p. 230:3-10, JA002139, (Vol. 4).[122]  Parker results standing alone do not prove or disprove an association.  However, the results should be considered in the context of the other studies discussed above, and the multiple lines of non-epidemiologic evidence discussed below.

GSK's brief also repeatedly obscures the important difference in epidemiology between an indeterminative finding and a negative finding, which provides statistical reassurance about the lack of an effect.  *See In re PPA*, *supra*, 289 F.Supp.2d at 1243 ("statistical reassurance as to lack of an effect would require an upper bound of a reasonable confidence interval close to the null value" (*quoting* Dr. Kenneth Rothman, author of the textbook *Epidemiology, An Introduction*.))

GSK's brief (at p. 26) next claims that data on Zofran and AVSD are inconsistent and unreplicated, and Plaintiffs' experts' causation opinions as to AVSDs are unreliable and inadmissible, based on the Parker study. The problem with GSK's position is that GSK overlooks that Table 4 of Parker reports an upper bound of the confidence interval for AVSD of 1.7 (70% increase in risk), which does not confirm but is not inconsistent with the elevated and statistically significant results of AVSD in both Andersen (aOR =4.8 (CI 95% 1.5–15.1) and Zambelli-Weiner (aOR = 2.71; 95% CI 1.62–4.52).

### (f)    Huybrechts

The results of the just published Huybrechts 2018 study did not confirm an association between Zofran exposure and cardiac malformations as a group.  Huybrechts 2018 at 2433-34. In the conflicts disclosure section, several investigators reported funding from GSK.

---

[122] Dr. Louik expressed some "concerns" about the results for septal defects in the Parker studies (Louik Dep., p. 241:11-16, JA002141, (Vol. 4)): ("Q. What kind of concerns? What kind of concerns does it raise for you?  A. It raises concerns that would suggest that I need to look at other sources of information on this question before determining that this was a causal association.").

Several issues affect interpreting the results. First, the study did not assess Zofran exposure to ensure that women actually took Zofran, and as noted in connection with both Danielsson and Zambelli-Weiner, *supra*, this form of exposure misclassfications creates a "bias toward null" (understating or obscuring the risk). The investigators acknowledged this problem but reported that they performed sensitivity analyses to mitigate this concern. *Id.*   Second, the study was limited to those with Medicaid insurance, and although the investigators stated that this should not prevent the results from being generalizable, there is data that low income populations are at increased risk of birth defects,[123] which could make it more difficult to assess the role of Zofran.   Third, cardiac defects were only analyzed until three months of age, whereas in the Danielsson 2014 study and the Zambelli-Weiner 2018 study, the researchers followed up until one year of age, and cardiac defects are commonly diagnosed in the latter time frame.[124]

There also is a question about whether the study could have unnecessarily or over-adjusted for potential confounders (the authors call these confounders but there is no evidence that all of them were), thereby obscuring an association.   The authors started with an unadjusted rate of 1.12 (95% CI, 1.04-1.20).   This relative risk was related to VSD's for a relative risk of 1.14 (95% CI:

---

[123] According to the World Health Organization, however, "Low-income may be an indirect determinant of congenital anomalies, with a higher frequency among resource-constrained families . . . . An indirect determinant, this higher risk relates to a possible lack of access to sufficient, nutritious foods by pregnant women, an increased exposure to agents or factors such as infection and alcohol, or poorer access to healthcare and screening."   WHO, Congenital Anomalies, Key Facts (Sept. 7, 2016), *at* https://www.who.int/en/news-room/fact-sheets/detail/congenital-anomalies.

[124] C Patton, E Hey. How effectively can clinical examination pick up congenital heart disease at birth? Arch Dis Child Fetal Neonatal Ed 2006;91:4 F263-F267   ("Of the 14 572 babies cared for in the unit between 1996 and 2003, 176 (1.21%) were found to have a structural heart defect before they were a year old (table 1 1)," and of those, 82 were septal defects).   "Thirteen heart defects have so far come to light among the 14 572 children born between 1996 and 2003 when they were more than 12 months old. VSDs accounted for a third of these late diagnoses."   "Furthermore, because an ASD is usually asymptomatic and has murmurs that are often soft, these defects frequently do not lead to early diagnosis or referral. This is why many of these subjects present in adult life (2-3), so the incidence in childhood usually underestimates the true incidence of the lesion." Hoffman J, Kaplan S. The incidence of congenital heart disease. *J Am Coll Cardiol.*2002;39(12):1890-1900. doi:10.1016/S0735-1097(02)01886-7.

1.04-1.27) and secundum ASD's for a relative risk of 1.37 (95% CI:1.19-1.57.  In the first adjusted analysis (level 1), accounting for confounding by indication and associated factors (nausea and vomiting during pregnancy, hyperemesis gravidarum, and the use of other antiemetics), the results did not substantially change the unadjusted risk estimates.  However, accounting for ALL prespecified *potential* confounding variables (more than 200 mentioned on page 2431 and in the study supplement prepared by the investigators), the result for the "level 2" propensity score adjustment, went down to the null.  Over 200 variables were included in their adjustment model.   It is unclear whether the authors examined the potential relationship of any of these potential confounders to determine how they would be expected to act.  It appears that all 200 variables were included in the model, which, as Xu *et al*.[125] warn could lead to a misleading assessment of risk. Traditionally, the issue of how to select variables as potential confounders is most reliably based on a biological basis where a variable is a confounder only if it is associated both with the exposure and the outcome. *Ref. Man*. at 591.  While the goal is to adjust for confounders, an equal goal is to not "over-adjust" by adjusting for variables that are not meaningful confounders to the relationship that is being studied.  The issue of over-adjustment and unnecessary adjustment is well documented in the epidemiology literature. A seminal paper by Breslow[126] broadly defines "over adjustment" as statistical adjustment by an excessive number of variables or parameters, uninformed by substantive knowledge (e.g., lacking coherence with biologic, clinical, epidemiological, or social knowledge). It can obscure a true effect or create an apparent effect when none exists.

---

[125]  Xu, et al, The Impact of Confounder Selection in Propensity Scores for Rare Events Data - with Applications to
Birth Defects, [abstract]

[126] Breslow N., Design and analysis of case control studies. *Annu Rev Public Health* 1982;3:29–54.

2.    **Multiple Human Epidemiological Studies Published in the Peer-Reviewed Medical Literature Found that Zofran is Associated with Statistically Significant Increased Risks of Cleft Palate.**

Three human epidemiologic studies, each published and peer reviewed, found statistically significant increased risks for first trimester Zofran use and cleft palate. A fourth published and peer-reviewed study reported increased (but not statistically significant) risks for cleft palate and for orofacial clefts generally. One arm of one study did not find an increased risk for cleft palate.

(a)    **Anderka, *et al*.**

Anderka, *et al*.,[127] published in 2011 in *Birth Defects Research* (a peer reviewed journal) reported a more than doubling of risk of cleft palate, aOR= 2.37 (CI 95% 1.18–4.76).   Dr. Carol Louik,  is one of the study investigators and co-authors.  GSK's epidemiology experts Drs. Kimmel and Shaw identified a number of strengths for the Anderka study.   Anderka was based on data collected in the National Birth Defects Prevention Study (NBDPS). GSK's expert Dr. Shaw testified: "[NBDPS is] the largest case-control study on birth defects that's ever been conducted in the United States… this study [was]…well-powered to look at exposures that are relatively rare, and …the analysis was done well."  Shaw Dep. 211:13–212:9, JA002946, (Vol. 5); Kimmel Dep. pp. 232:17–233:15, JA001842, (Vol. 3) ("The identification of …birth defects, is done very well. The reviews are done very well…. They have clinical geneticists who review the cases so that they can make proper criteria of isolated versus multiple defects…  They have a reasonable method of exposure measurement.").

GSK states that the study found a "statistically significant association" for cleft palate, but did not mention that the risk was more than doubled, that it was published and peer-reviewed, or

---

[127]  Anderka M, et al. Medications used to treat nausea and vomiting of pregnancy and the risk of selected birth defects. *Birth Def Res*. 2011; 94:22–30, JA003482-3490, (Vol. 7).

that GSK's epidemiology experts Drs. Kimmel and Shaw identified a number of strengths for the Anderka study, including that the analysis was well done and the data source was robust.

Notwithstanding the above, GSK suggests (at pp. 14-15) that the Anderka study cannot be relied upon and does not provide evidence of an association with cleft palate because the study was "hypothesis generating" and because of "multiple comparisons."  GSK cites to no authority in case law or epidemiology literature that the first study reporting an increased risk cannot be considered as part of the totality of evidence.  The suggestion has no foundation in epidemiology or science.

Regarding "multiple comparisons," GSK quotes (at p. 15) from the published paper where the investigators stated: "Perhaps of most importance is the possibility of chance as an explanation for the statistically significant associations that we observed. There were 70 comparisons made which would suggest that three to four such associations would be expected by chance alone."  GSK cites no case law or epidemiologic literature that a study undertaking multiple comparisons is not reliable. Clearly the peer reviewers were aware of the multiple comparisons (since it is discussed in the published paper) yet found the study sufficiently important and reliable that it was published. GSK's brief fails to mention that numerous experts in the field have relied on the study and cited it in the medical literature over 130 times.[128]

A concern stated by the study investigators is that the number of comparisons is relevant to assessing the role of chance as an explanation for an association.  But the investigators used the word "possibility," and GSK own expert Dr. Shaw testified that despite the multiple comparisons, "I can't say that that finding was probably due to chance. I can't say any…of the comparisons were probably due to chance." Shaw Dep. p. 213:24-214:9, JA002946-2947, (Vol. 5). Several studies found a statistically significant increased risk for cleft palate, and the role of chance must be

---

[128] https://scholar.google.com/scholar?hl=en&as_sdt=0%2C22&q=anderka+ondansetron&oq=anderka

assessed in that context. Louik Dep., p. 66:21-25, JA002098, (Vol. 4), ("Judging whether the association is causal extends beyond the validity of the results of any single study and includes consideration of other epidemiologic data as well as biologic credibility of the hypothesis.").

As noted above, relying on the Anderka study, GSK's expert Dr. Anthony Scialli, when defending another pharmaceutical manufacturer's drug against a claim that its drug caused an orofacial birth defect, stated that Zofran should be included in the differential diagnosis,[129] meaning that he believed that that Zofran was capable of causing orofacial defects.

### (b)     Parker, *et al.*

The second study, Parker, *et al.*,[130] (discussed, *supra* for its findings on heart defects) reported a 60% increase in risk for cleft palate in the NBDPS arm of the study from a different time frame than used in the Anderka study.  The investigators found no increased risk in the BDS arm:

> for cleft palate, the association with ondansetron was elevated in the National Birth Defects Prevention Study but not the Birth Defects Study. Adjusted ORs were 1.6 (95% CI 1.1– 2.3) in the National Birth Defects Prevention Study and 0.5 (95% CI 0.3– 1.0) in the Birth Defects Study.

According to GSK's expert Dr. Shaw, Parker, *et al.* "was large, used two distinct databases, investigated many birth defects groups that were well-ascertained, and controlled for potential confounders, particularly confounding by indication (including nausea severity by eliciting information on prescription antiemetic use other than ondansetron)." Shaw Rept. at 14, JA001027, (Vol. 2).

GSK downplays the association between Zofran exposure and cleft palate found by Parker, *et. al.,* in the NBDPS study.  GSK calls the NBDPS dataset "an update of the Anderka analysis, but

---

[129] *Anderson v. Janssen Pharms., Inc.*, 2013 WL 8476501 (Pa. Com. Pl. 2013), Expert Report and Affidavit of Anthony R. Scialli, M.D. (emphasis added), JA000913-1006, (Vol. 2).

[130]   Parker SE, et al., National Birth Defects Prevention Study. Ondansetron for treatment of nausea and vomiting of pregnancy and the risk of specific birth defects. *Obstet Gynecol* 2018 Aug; 132(2):385–394 (hereinafter, Parker 2018), JA003906-3915, (Vol. 8).

with different years of data collection." GSK Br. at 17.   GSK makes the same point (at p. 29), claiming for the same reason that the Anderka study result for cleft palate was not replicated by the Parker NBDPS results because it was not a separate study.   The flaw in GSK's argument is that by examining "different years of data collection" the two studies examined different populations with a different control group and a different group of exposures.   GSK's incomplete quotes of Dr. Louik (GSK Br. at 28) are less than candid.   In her report, Dr. Louik stated that the Anderka cleft palate results were "subsequently supported in a later analysis of subsequently collected data" (citing Parker). Louik Rept. at 37, JA000649, (Vol. 2).

GSK claims that Anderka's cleft palate results were not replicated, but this is demonstrably false. The BDS result does not invalidate the statistically significant association with elevated risks found in the Parker/NBDPS study, the Anderka study and the Huybrechts study (discussed *infra*) and the confirming result in the Zambelli-Weiner study.   Louik Rept., p. 37, JA000649, (Vol. 2). Using a weight of evidence approach, the evidence clearly supports that Zofran is associated with an increased risk of cleft palate.   Although GSK suggests that one negative study prevents an expert from offering a general causation opinion, Dr. Shaw agreed that it generally takes more than one study to disprove causation. Shaw Dep. p. 116: 23-25, JA002922, (Vol. 5). And because the Parker/ BDS study did not assess exposure based on actual drug use (as was done in the Zambelli-Weiner study) it was biased toward the null by counting women as exposed and at risk even if they never took the drug.

GSK also states that "[t]he Parker authors wrote that the NBDPS finding for cleft palate 'may be the result of chance.'"   GSK's speculation goes to the weight of the evidence; it does not invalidate the statistically significant finding.   As Dr. Sadler testified, the investigators included this note as a "universal disclaimer that's in every one of these [studies]." Sadler Dep., p. 113:6-17,

JA002617, (Vol.5). The investigators are simply "restating reality" because "[a]ny findings may be the result of chance." Louik Dep., p. 254:13-18, JA002145, (Vol. 4).   GSK offers nothing to suggest that this finding is likely to be the result of chance. GSK Br. at 16-18.  "It's a question of how likely [the findings] are to be due to chance…. [W]ith respect to the cleft palate association, …there's less likelihood that it's due to chance given the fact that it has been previously reported." Louik Dep. p. 254:16-22.

### (c)   Huybrechts, *et. al.*

On December 19, 2018, this retrospective cohort study was published in the peer-reviewed *Journal of the American Medical Association*.[131]  Huybrechts reported results on heart defects, discussed *supra*, and also reported a statistically significant 24% increase in the relative risk (RR) of oral clefts associated with Zofran exposure (adjusted RR, 1.24; 95% CI, 1.03-1.48). *Id*. at 2434. The study results were "consistent across a broad range of sensitivity analyses."  *Id*. The researchers defined oral clefts as palate, lip, or lip and palate defects. *Id*. at 2430-31.  Their "study expands on the evidence available to date." *Id*. at 2434

The investigators discussed the study's strengths and limitations. With a large cohort size, examining a cohort of 1,816,414 pregnancies and 88,467 exposures to Zofran from the Medicaid Analytic eXtract database in years 2000-2013, the study was well powered. *Id*. The information on medication exposures was collected prospectively and based on filled and refilled prescriptions for medications, minimizing recall bias. *Id*.  The dataset provided "rich patient-level information" to control for potential confounders. *Id*. at 2434-36.  Huybrechts also compared Zofran-exposed women with those exposed to other antiemetics and produced consistent results. *Id*.

---

[131] Huybrechts, et al. Association of maternal first-trimester ondansetron use with cardiac malformations and oral clefts in offspring.  *JAMA*. 2018;320(23):2429-2437. (Hereinafter Huybrechts 2018)

In addressing the study's limitations, as discussed above, the Huybrechts authors describe a bias towards the null resulting from those in the cohort who filled a prescription without actually consuming it.  *Id.* Regarding residual confounding,  "[a]n attempt was made to refute" this issue "using different strategies," *id.,* which "suppor[t] the validity of [the oral cleft] association." *Id.*

> (d)   **Zambelli-Weiner,** *et al.*

A fourth published and peer reviewed study, Zambelli-Weiner (discussed *supra* at Section VI(G)(1)(b) reported increased risks for orofacial clefts generally and for cleft palate. These results, although elevated, did not meet the conventional definition for statistical significance, which even with over 5000 exposures, was attributed to small sample size. Zambelli-Weiner at p.10. For orofacial clefts, the investigators reported a 32% increase in risk: aOR =1.32 (95% CI 0.75–2.25) and the risk also was elevated for cleft palate, cleft lip, and cleft lip, with or without cleft palate:

- Cleft palate: aOR = 1.46 (95% CI 0.81–2.65).

- Cleft lip: aOR = 1.16 (95% CI 0.48–2.81).

- Cleft lip, with or without cleft palate: aOR = 1.69 (95% CI 0.84–3.40).

> 3.   **No Reliable Conclusions Can Be Drawn About the Absence of Risk of Specific Birth Defects from Studies That Were Neither Designed nor Powered to Assess the Risk of Specific Defects.**

In the text book *Epidemiology in Medicine*, Hennekins and Buring wrote: "[I]f a study is of inadequate sample size, then a finding of no statistically significant association between exposure and disease…may well be uninformative since a true lack of association will be difficult or impossible to distinguish from a true association that cannot be detected statistically because of inadequate power."[132] Therefore, as noted in the *Reference Manual*, "when a study fails to find a statistically significant association, an important question for … a birth defect epidemiologist is

---

[132] Hennekens C, Buring, JE. *Epidemiology in Medicine*. Boston/Toronto: Little, Brown and Company; 1987, at 264–5, JA003806-3807, (Vol. 7).

whether the result tends to exonerate an agent's toxicity or whether it is just inconclusive with respect to that question. The concept of power can be helpful in evaluating whether a study's outcome is exonerative or inconclusive." *Ref. Man.* at 582, JA003657, (Vol. 7).

This raises the question: what conclusions can be drawn from the under-powered Zofran studies about the absence of risk of specific defects like septal heart defects or cleft palate? The answer is that no reliable conclusions can be reached about the absence of risk for specific defects from these underpowered studies.  GSK's expert Dr. Kimmel acknowledged "[i]f a study has insufficient power to detect an effect …the study cannot determine if there is or is not an association."   Kimmel Dep., p. 132:11–133:6, JA001817, (Vol. 3),[133] and GSK expert Dr. Shaw agreed that "studies can have sample sizes that are insufficient to rule out increases in risk … for some types of birth defects."   Shaw Dep., p. 90:24–91:24, JA002916, (Vol. 5).

(a)     Pasternak, *et al.*

The above point is illustrated in a study by Pasternak, *et al.*,[134] published in the *New England Journal of Medicine*. The study focused on "any major birth defect," (and other non-birth defect outcomes) and found that Zofran was not associated with an increased risk of "major birth defects." The Pasternak investigators reported that there were only "1233 infants exposed to ondansetron in the first trimester."   Because specific birth defects are, by definition, rare as compared to "any major birth defect" and thus require a much larger number of infants exposed to Zofran to assess the risk of specific defects, the investigators acknowledged that "our study was not powered to assess the risks of individual defects; this question needs to be addressed in future,

---

[133] Plaintiffs agree with only part of the above statement by Dr. Kimmel. If an underpowered study actually finds an association, the finding is not invalidated or diminished just because the study was underpowered.

[134]  Pasternak B, et al. Ondansetron in pregnancy and risk of adverse fetal outcomes. *NEJM* 2013; 368:814–23, JA003916 – 3950, (Vol. 8).

adequately powered studies." *Id.* at 822.   For this reason, studies like *Pasternak, et al.* cannot be used to draw conclusions about the risk of specific defects.  REDACTED

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

Nevertheless, GSK claims (at p. 15) that Pasternak's results undermine Plaintiffs' causation case,  and GSK's expert epidemiologists' reports draw the conclusion that if there was in fact an increased risk of specific birth defects, the Pasternak study would have found it. GSK and its experts thus contradict lead investigator, Dr. Pasternak, and contradict Dr. Kimmel's textbook at p. 365, as noted *supra*, where he states that a cohort study would require "a far larger sample size" than 20,000 exposures to rule out a doubling of risk. It also contradicts his opinion that if a study is underpowered an epidemiologist "cannot determine if there is or is not an association."  *Compare* Shaw Rept. at 16, JA001029, (Vol. 2) *with* Shaw Rept. at 7, n.2, JA001020, and Kimmel Rept. at 7, JA000435, (Vol. 1).

GSK also quotes Dr. Sadler for agreeing that "the lack of any Zofran exposed babies with cleft palate in Pasternak is not consistent with the hypothesis that Zofran increases the risk of cleft palate."  GSK fails to mention that the Pasternak study had only 1233 women with first trimester exposure to ondansetron, which is fewer than the background rate.  The CDC estimates that cleft palate occurs in 1 out of 1,574 births,[135] therefore no reliable conclusions can be drawn from the fact that there were no cleft palates observed in the Pasternak data, as Pasternak himself pointed out.

In addition, in quoting Dr. Sadler, GSK omits Dr. Sadler's testimony on the same page:

---

[135] CDC, Data & Statistics, *https://www.cdc.gov/ncbddd/birthdefects/data.html* (last visited Nov. 20, 2018), JA006295-6337, (Vol. 12).

"[Y]ou can't just pull one study out at a time and say this one does [show a significant effect] and this one doesn't. You have to look at the bigger picture. And here on the same page that you're telling me there's no significant effect, …we have two studies that do show a significant effect…." Sadler Dep., p. 106:2-9, JA002616, (Vol. 5).[136]

Investigators of several other Zofran studies acknowledged the same "power" limitation in their studies.[137]

**(b) Einarson, *et al.***

Einarson, *et al.*,[138] used a prospective cohort design to study birth defects among Zofran users, but there were only 176 women in that study who took Zofran in the first trimester. The investigators acknowledged that the study had "small sample size" and "thousands of cases would be required to detect rare defects." *Id.* at 942. One of the coathors of the Einarson study has admitted that it "had the statistical power to rule out only a 5-fold increased risk of major

---

[136] Although earlier in this litigation, GSK filed a brief touting a study by Fejzo, *et al.* because that study did not find an increased risk of birth defects with Zofran use, (Doc. # 992 filed 4/20/18) that study also was under-powered and had other major problems. Fejzo M, et al. Ondansetron in pregnancy and risk of adverse fetal outcomes in the United States. *Repro Toxicol* 2016;62:87–91, JA003677-3681, (Vol. 7). According to GSK's birth defects epidemiologist Dr. Shaw, the Fejzo study "… has a number of limitations, including its small size and its non-rigorous methods of identifying subjects for study and eliciting exposure information from them. So, I don't consider that very informative." Shaw Dep., p. 208:22–209:15, JA002945, (Vol. 5).

[137] For example, a study by Colvin, *et al.*, included only 251 pregnant women exposed to Zofran in the first trimester. The study investigators acknowledged that "the study was too small to assess risks of individual birth defects…" Colvin L, et al. Off-label use of ondansetron in pregnancy in Western Australia. *BioMed Res* Intl 2013:909860, at 6, JA003549, (Vol. 7).

In a study by Asker, *et al.*, there were just 21 women exposed to Ondansetron in the first trimester. Asker C, Norstedt Wikner B, Källén B. Use of antiemetic drugs during pregnancy in Sweden. *Eur J Clin Pharmacol* 2005; 61(12):899-906, Table 1, JA003494-3501, (Vol. 7).

In a study by Werler, *et al.*, the authors noted that "despite the large case group, the study lacked statistical power to detect small …associations of rare exposures." Werler MM, et al. Medication use in pregnancy in relation to the risk of isolated clubfoot in offspring. *Am J Epidemiol* 2014;180:86-93, at 92, JA003494-3501, (Vol. 7).

[138] Einarson A, et al. The safety of ondansetron for nausea and vomiting of pregnancy: a prospective comparative study. *BJOG* 2004; 111:940-3, JA003616-3619, (Vol. 7).

malformations, and not any specific malformation"[139] (*i.e.,* the study was under-powered to detect a less extreme association, such as a doubling or tripling of risk).  Low-powered studies produce more false negatives than high-powered studies.[140]  "False negatives are particularly concerning in research…where demonstrating the absence of an effect is crucial . . . ."[141]

It should be noted, however, that where an underpowered study does find an association between exposure and disease, that finding is not invalidated on account of the study's power. Shaw Dep., p. 159:24–164:17, JA002933-2934, (Vol. 5). Plaintiffs' birth defect epidemiology expert Dr. Carol Louik explained: "[Y]ou don't look at power, …when a study has found an association, you don't go back and say, well, it didn't have enough power to find that association that it found. It found it. It's not a question of power at that point."  Louik Dep., p. 234:10–23, JA002140, (Vol. 4).

## VII.    GSK'S CHALLENGES TO EACH EXPERT ARE UNAVAILING.

### A.    DR. ABDULLA

GSK challenges Dr. Abdulla's causation opinion in several misguided ways.  GSK seeks to impose a requirement, not supported by the law of this Circuit or generally accepted scientific principles, that epidemiology is required to address each specific type of structural heart defect. GSK quibbles in the semantics of his opinions, demands direct evidence of an experiment in a human embryo that would be unethical to perform and is not required, and incorrectly asserts that Dr. Abdulla failed to consider evidence when he did but disagreed with GSK's interpretation of it. Perhaps recognizing the weakness of these arguments, GSK deflects from a focus the merits of lines

---

[139]    Koren, Treating morning sickness in the United States—changes in prescribing are needed. *Am J. OBGYN* 2014; 211 (6): 602-606, JA003839-3843, (Vol. 7), at 604, JA003841.

[140] Button, et al, Power failure: why small sample size undermines the reliability of neuroscience. *Nature Reviews Neuroscience 2013*; 14: 365–376, JA003526-3537, (Vol. 7).

[141] Vadillo, *et al*, Underpowered samples, false negatives, and unconscious learning. *Psychon Bull Rev*. 2016; 23: 87–102, JA004106-4121, (Vol. 8).

of evidence relied on by Dr. Abdullah's by asserting that his ultimate conclusion has not yet been "generally accepted." GSK's arguments can be summarized in five categories.

**First**, GSK argues that epidemiology covering each and every type of heart defect is required to prove that Zofran causes all of them (at p. 71) that epidemiology is required for each specific type of structural heart defect. That is not the law or accepted methodology for assessing birth defects (*see* Section II(D)), and it would be an impossible standard to meet for any teratogen because of the rarity of the specific defects. GSK's invented standard also conflicts with what is known about the nature of Zofran's mechanism of causing injury; namely, the biomechanical force created by altered heart rhythm and blood flow is a form of trauma to the heart. Trauma can injure any portion of the heart. Baldwin Dep. at 167:7–14, JA001342, (Vol. 3). "It could really lead to any congenital heart disease." Abdulla Dep. at 71:23–24, JA001205, (Vol. 3). *See* Line of Evidence 4. Dr. Abdulla considered all available epidemiology in light of the known consequences of bradycardia and arrhythmia in inducing birth defects and offered sound reasons why demanding epidemiological evidence for every single heart defect is unreasonable.[142]

**Second**, GSK mischaracterizes (at p. 73) Dr. Abdulla's opinion as stating that fetal ondansetron exposure *might* cause arrhythmias that might lead to congenital heart or disease. This is

---

[142] Abdulla Dep. at 52: 22 – 53:1, JA001200, (Vol. 3), ("[M]ost of my report is the review of the literature of epidemiology," but these "Are not in exclusion of other factors that I go on and discuss afterwards"). He went on to explain why it is unreasonable to expect epidemiology to address every single heart defect: "So looking at the literature and those that showed association is congenital heart disease in general, and the ones that always would pop up in these kind of circumstances are the more common ones. So the rare congenital heart disease, you need a population that's huge to be able to determine if there is an increased incidence in those." Abdulla Dep., p. 72:13-21, JA001205; *id.* at 74:5-9, JA001206, ("I don't think that there is a particular congenital heart disease that is going to be more prevalent because of the interference with hemodynamics…, that any congenital heart disease can develop"). So, for example, he testified that alterations in hemodynamics can lead to an isolated VSD and any other cardiovascular lesion (defect). Abdulla Dep., p. 252:8-11, JA001250,. He explained that the mechanism by which Zofran can cause septal defects is also critical for proper development of other structures of the heart: "because of the mechanism that I describe in my report, it's altering hemodynamics, the passage of blood flow, the alteration of the normal passage of blood flow or the function of the heart. When it occurs early, it could really lead to any congenital heart disease. I cannot sit here and tell you only septal defects." Abdulla Dep. at 71:18-25, JA001205.

nothing more than a word game by GSK's lawyers because the definition of general causation is that an exposure is capable of causing an injury, not that it necessarily will do so in every case.   Dr. Abdulla has opined to a reasonable degree of medical and scientific certainty that prenatal exposure to ondansetron to Zofran more likely than not can cause congenital heart disease.   Abdulla Dep., p. 252:8-11, JA001250, (Vol. 3).

*Third*, GSK challenges (at p. 75) Dr. Abdulla's conclusion that Zofran can cause septal defects, despite support for it found in multiple epidemiology studies.   GSK incorrectly asserts (at p. 75) that Dr. Abdulla's opinion was based on only one peer-reviewed study.   Plaintiffs have described two peer-reviewed studies and consistent findings in other studies, *see* Line of Evidence 7, and Dr. Abdulla relied on all of them.   GSK contends (at p. 77) that Abdulla did not consider the study by Pasternak (discussed in Line of Evidence 7), and that is not true.   Dr. Abdulla did not assess the risk for congenital heart disease based on the Pasternak study, because Pasternak did not report risk ratios for congenital heart disease but looked for "any major defect." Abdulla Dep. at 144:5-6, JA001223, (Vol. 3).   Dr. Abdulla observed that the Pasternak authors themselves noted the study's inability to assess risk of individual defects.   Abdulla Rept. at 15, JA000015, (Vol. 1).   GSK also asserts (at p. 78) that Dr. Abdulla did not consider the Huybrechts and Parker abstract but that is incorrect, and GSK questioned him about both at his deposition.   Abdulla Dep. at 196, JA001236, (Vol. 3), 204, JA001238.   Dr. Abdulla made clear that his opinion was based on the weight of the evidence, and "no one study will make your case one way or negate your opinion another way." Abdulla Dep. at 201:25 – 202:3, JA001236-1238, (Vol. 3).

*Fourth*, GSK criticizes (at pp. 73-74) Dr. Abdulla's opinion for considering the topic of effects of hemodynamics alterations on human heart development, whether drug induced or not, as support for his opinion that Zofran's effect on hemodynamics can cause cardiovascular defects.

GSK's argument contradicts the ICH S5 (R3), JA006158-6220, (Vol. 12), guidelines directing experts to investigate "all available data on the pharmaceutical *and any related compounds*" and information on "the role of the target in reproduction . . . and plausible mechanism of reproductive toxicity." ICH 2017, at p. 24. *See* also Plaintiffs' Lines of Evidence 4-5; Abdulla Dep., p.  218:21–219:9, JA001242, (Vol. 3).[143]

GSK next unfairly criticizes (at pp. 73-74) Dr. Abdulla's opinion because it is not based on direct experimental evidence showing exposure to ondansetron *in utero* causes fetal cardiac arrhythmias.  GSK's criticism omits that its own expert has admitted that conducting the study necessary to demonstrate that effect would be unethical.   Baldwin Dep. at 185:17–186:7, JA001346-1347, (Vol. 3); *id.* at 194:23–195:4, JA0013449.  GSK's demand such evidence in this case is like demanding evidence of a criminal defendant's precise brainwaves occurring to prove the *mens rea* element of a crime.  It is not required, and plaintiffs' Lines of Evidence 4 and 5 provide ample evidence to prove to a reasonable degree of scientific certainty that Zofran can cause arrhythmia in a human embryo at therapeutic concentrations.

***Fifth***, GSK argues (p. 79) that Dr. Abdulla's opinion has not yet been generally accepted. This argument overlooks that the only published, peer-reviewed scientific paper that looked at all relevant data, integrating human, animal, and mechanism data on Zofran in accordance with the ICH 2017 guidelines, and the two leading textbooks in the world on human development and drugs

---

[143] GSK misplaces reliance on *DeLuca by DeLuca v. Merrell Dow Pharm., Inc.,* 791 F. Supp. 1042, 1054 (D.N.J. 1992), where an expert opined that a drug caused a health outcome because it was "chemically similar to the structure of other drugs associated with the health outcome."   The difference between considering chemical similarity between drugs and a biological effect produced by different drugs is important. Dr. Abdulla did not rely on a chemical similarity; he referred to the ability of heart rhythm disturbance (bradycardia and arrhythmia) to induced birth defects and pointed to other drugs as examples. Evidence that Zofran causes the same effect by the same mechanism demonstrates that plaintiffs' experts' causation opinion is in line with Bradford Hill because it is consistent with other established scientific knowledge. *See* Danielsson, Webster & Ritchie 2018, at p. 244, JA003595, (Vol. 7) (Zofran "induced typical embryonic arrhythmia-related malformations").

in pregnancy all support Dr. Abdulla's opinion that Zofran is capable of causing cardiovascular defects.[144]   In view of the peer-reviewed literature integrating all relevant data on ondansetron and birth defects, this is a case, unlike the *Rosen* case[145] cited by GSK, where law lags science.   And since the recent peer-reviewed literature shining the light on the Japanese studies, GSK still apparently has not provided those studies to the FDA.   Danielsson Dep. at 168:24-25, JA001520, (Vol. 3); 292:16-17, JA001551, ("[FDA's evaluation did not include all what we know today . . . . I don't think FDA evaluated all data . . . [I]t should be perfect if FDA, for example, evaluated preclinical data I submitted . . . to this expert report."); *see also*, *e.g.*, *Milward*, 639 F.3d at 22 (1st Cir. 2011) (undue weight on acceptance crossed line from gatekeeper to trier of fact).

---

[144] *See* Danielsson, Webster & Ritchie 2018 ("Together the presented data provide a plausible mechanism related to hERG channel inhibition for the observed fetal adverse effects and suggest that ondansetron can have teratogenic potential in humans."); *see also* T.W. Sadler, *Langman's Embryology*, (14th Ed 2019), at Ch. 19, Table 9.1 – listing Teratogens Associated with Human Malformations, including Ondansetron for facial clefts and heart defects; "Briggs, et al., *Drugs in Pregnancy and Lactation*,  (11th Ed.) (noting that human data on ondansetron suggest teratogenic risk from use in pregnancy).   GSK's argument also ignores that the average time it has taken the teratology community to determine whether treatment of a pregnant woman posed a teratogenic risk was 27 years for 403 prescription drug treatments approved by the FDA since 1980, and that GSK's conscious choice not to fund studies of Zofran's teratogenic potential contributed to the delay in research on the topic.   Prominent researcher, Jennifer Niebyl, MD, who sought funding to study antiemetic use in pregnancy, stated "***no drug company would touch it with a ten-foot pole*** because they were all worried about the medical-legal risk of being blamed for causing a birth defect." Perspectives on Hyperemesis Gravidarum: Dr. Jennifer Niebyl, *Obstetrics & Gynecology*, An Interview with Dr. Jennifer Niebyl, *at* *https://journals.lww.com/greenjournal/pages/results.aspx?txtkeywords=hyperemesis* (last visited Dec. 26, 2018) (emphasis added).

[145] This case is nothing like *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316 (1996), cited by GSK (at p. 80), where there were absolutely no experimental, statistical or other scientific data from which the causal relation at issue could have been inferred, and the expert opining on causation had done no research on the health effects of the chemical at issue.   The same is true as to *Frischhertz v. SmithKline Beecham Corp.*, 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012), cited by GSK (at p. 80), where the court noted that there was "no data" supporting an association between the drug and the health effect at issue.

### B.    DR. DANIELSSON

GSK throws a "kitchen sink" of purported reasons for excluding Dr. Danielsson's testimony. Dr. Danielsson is the most knowledgeable expert in the world on the teratogenic mechanism at issue in this case so perhaps it is understandable why GSK wants him out of the case.  But as detailed below, GSK's critiques are unavailing, and should be rejected because they go to weight and because they are flawed arguments.

*First*, GSK jabs (at p. 82) at his methodology, falsely asserting that he did not consider certain things that in fact he did.  GSK argues (at p. 85) that Dr. Danielson did not apply an accepted methodology for determining whether a medication can cause birth defects.  The argument ignores that Dr. Danielsson applied Wilson's principles, Shepard's criteria and the internationally accepted ICH S5 (R3) 2017 guidelines, JA006158-6220, (Vol. 12), which he participated in creating, as part of his total weight of evidence review. *See* Danielsson Dep., p. 293:10-17, JA001551, (Vol. 3) (describing his "integrated evaluation of all available data" supporting his opinion "that ondansetron causes these defects.").

GSK criticizes (at p. 86) Dr. Danielson's reliance in part on an unpublished abstract by Andersen to support his opinion that Zofran can cause all types of heart defects.  This issue of reliance on the Andersen abstract in addition to multiple other lines of evidence is addressed above. GSK also fails to note that Dr. Danielsson testified "I …listened to the lecture in Montreal when [Andersen] presented his data …it was very detailed."). Danielsson Dep., p. 59: 3-17, JA001493, (Vol. 3), and he relied on in his own peer-reviewed study, published before this litigation.

*Second*, GSK argues (at p. 88) that Dr. Danielson's opinions are unreliable because his 2018 "litigation opinions," in GSK's view, go beyond certain statements made in 2014 in his published epidemiology study before becoming an expert witness.  GSK quotes a 2014 statement by Dr. Danielson that an increased risk of cardiovascular defects and Zofran "may exist." This is not a

*Daubert* issue; it is a cross-examination issue, but it also is a bogus claim. GSK cherry-picks from the paper, failing to mention that on the first page conclusion of the published paper Dr. Danielsson wrote that "increased risk for a cardiac septum defect *is likely*."[146] (Emphasis added). *See also* Danielsson Dep. at 297:13-22, JA001552, (Vol. 3) ("We had that at that time, before I [had] seen all animal data, looked at kinetics. We thought, yeah, it might be in that way. And then now, when I have analyzed all data and also looked at other human epidemiologic studies, I -- my view nowadays, it's not only a hypothesis as maybe it was [in] [20]14. I think it's likely that ondansetron can cause teratogenicity."); *id.* at 77:18 – 78:22, JA001497-1498.  (at p. 89)

**Third**, GSK incorrectly asserts (at p. 89) that Dr. Danielson never explains the concentration of Zofran he believes is needed to cause birth defects.  GSK again overlooks the evidence.  *See* Supp. Rept. of Dr. Danielsson, Aug. 27, 2018, at p. 3, JA000289, (Vol. 1) ("Altogether, applying the risk evaluation principles outlined in the Redfern 2003 in a correct way results in the conclusion that hERG inhibition and induction of teratogenicity via embryonic cardiac arrhythmia is both biologically meaningful and plausible and a highly likely mechanism *following administration of therapeutic doses of ondansetron in pregnancy*); Danielsson Dep. at 349:20-24, JA001565, (Vol. 3) ("And then -- and they express clearly, it's not only high concentrations, because that's big variation in real life in humans. So ondansetron could cause arrhythmias even at 4 and 8 milligrams"); *id.* at 368:9 – 369:13, JA001570.

**Fourth**, GSK falsely claims (at pp. 89-90) that Dr. Danielson admits that there are no data showing that a fetus is more susceptible to hERG inhibition and arrhythmia from Zofran exposure than adults. This goes to the weight—but is also untrue.  Dr. Danielsson testified that "It's well known that the embryo could resist even longer periods of hypoxia than the adult.  That's why you

---

[146] Danielsson 2014 at 134, JA003560, (Vol. 7).

cause malformations. . . . [A]vailable data indicate that the human embryo . . . reacts with arrhythmia due to reoxygenation and reactive oxygen species . . . and I cited them in my report." Danielsson Dep. p., 320:23, JA001558, (Vol. 3); *id.* at 327:9-16, JA001560; *see also* Danielsson Rept. at 14, JA000196, (Vol. 1), 37, JA000219, Danielsson Supp. Rept., Aug. 27, 2018, at 7-8, JA000293-294, (Vol. 1).

GSK, attacking Dr. Danielsson's conclusion, then points (at p. 90) to GSK's unsupportable estimation of the concentration needed for Zofran to induce arrhythmia in the embryonic heart based on its flawed extrapolation of the Siu 2006 study that is currently the subject of Plaintiffs' Motion to Exclude regarding dose.  Plaintiffs incorporate Line of Evidence 4 above concerning dose, which sets out evidence in peer-reviewed literature showing Zofran's ability to cause bradycardia in the embryonic heart at all therapeutic doses and in all forms of administration. Plaintiff's Line of Evidence 1 shows that the embryo *in utero* is exposed to at least the same free concentration as the pregnant mother and for the same duration at therapeutic doses if not higher.  It is also not accurate to suggest, as GSK does (at pp. 90-91) that the lowest concentration at which arrhythmias occurred in the Zofran WEC study was 12 µM.   The peer-reviewed paper by Danielsson, Webster & Ritchie 2018 shows a 9.4% reduction in heart rate (bradycardia), and the evidence shows that bradycardia is sufficient to induce birth defects.  *See* Line of Evidence 3 above ("Embryonic bradycardia is a known human and animal teratogen."); *see also* Danielsson Dep., p. 358:17-22, JA001568, (Vol. 3) ("[O]ndansetron passes over [to] the embryo [reaching the] same free, pharmacological concentration in fetal tissues as observed in humans" which can cause arrhythmia.).

*Fifth*, GSK mischaracterizes (at p. 91) Dr. Danielsson's general causation opinion as based on a risk assessment and safety standard for drug development and not a causation standard.  Here

too, GSK isolates one of several papers relied on by Dr. Danielson, Redfern 2003, JA004020-4033, (Vol. 8).  Plaintiffs' Line of Evidence 4 lists data from CredibleMeds, GSK's own clinical study published in Zuo 2014, JA004206-4214, (Vol. 8), and the Danielsson, Webster and Ritchie 2018 paper, JA003588-3596, (Vol. 7), all showing that Zofran can cause arrhythmias at concentrations that are lower than that those reported in women of childbearing potential.  Redfern 2003, which includes an admission by GSK, is relevant for causal assessment because it refutes GSK's experts' reliance on a drug's IC50 as a supposed threshold level for causing arrhythmia.  GSK says Redfern 2003 does not discuss birth defects, but it addressed the concentrations below IC50 at which pharmaceutical drugs were demonstrated to cause biological indicators of arrhythmia, and proving that a drug can cause arrhythmia in an embryonic heart proves it can cause birth defects because embryonic arrhythmia is a known cause of the birth defects at issue.  *See* Line of Evidence 3; Danielsson Supp. Rept. at 3, JA00289, (Vol. ) ("These studies show that impaired hERG function in human embryonic heart can result in teratogenicity (likely to be mediated via cardiac arrhythmia) and provide evidence that potent hERG blockers (such as ondansetron) can cause teratogenicity and /embryo lethality in humans.").

A margin between exposure and drug effect, whether viewed prospectively in determining risk or retrospectively in assessing causation, serves as reliable data for drawing either type of conclusion.  That is why both sides' experts refer to margins in their causal assessments. Danielsson Dep. at 315:19 – 316:4, JA001557, (Vol. 3), ("And IC50, for example, with a hERG block, even for some drugs, ***50 times lower concentrations than the IC50 cause cardiac arrhythmia in humans***, in adult humans. And since ondansetron is passing over through the embryo, it's highly likely to the same extent that the concentration in the adult, the same in the embryo, even in the human. ***It's highly likely that those cause arrhythmia at the same safety***

*margin as in the adult* for IC50, for example."); Danielsson Supp. Rept. Aug. 27, 2018 at 2-3, JA000288-289, (Vol. 1) (discussing GSK experts' use of safety margins to assess causation) ("The calculated margins (embryonic exposure in humans versus IC50) by the Glaxo experts (8-23 times; Dr. Baldwin and Dr. Kass, an[d] even lower for Dr. Scialli . . .) actually indicate that it is plausible and highly likely that ondansetron can cause arrhythmia in the human embryo as well as in the adult human").  Because Plaintiffs' experts have reliably opined on general causation, not only risk, the cases cited by GSK (at p. 92) do not apply.[147]

**Seventh**, GSK also improperly contends (at p. 92) that an expert may not base a causation opinion in part on studies involving other medications.  GSK's contention contradicts the ICH S5 (R3) guidelines, which direct experts to investigate "all available data on the pharmaceutical *and any related compounds*."  ICH S5 (R3) at 24, JA006185, (Vol. 12).  Reliance on analogy is an appropriate methodology, and it is only one piece of the puzzle of Dr. Danielson's weight of evidence methodology.  This issue has also been addressed above Plaintiffs' response to challenges to Dr. Abdulla.

Unlike in the *Zoloft* case cited (at p. 92) by GSK, where the expert was deemed to have based her opinion on insufficient evidence specific to the drug at issue, here Dr. Danielsson relies on ample evidence specific to Zofran.  His observation that Zofran's pattern of teratogenic effects and mechanism of teratogenicity are consistent with that seen for other hERG blocking drugs and

---

[147] In *Sutera v. Perrier Grp. of Am. Inc.,* 986 F. Supp. 655, 667 (D. Mass. 1997), an expert opined that there was no safe level of benzene exposure because a regulatory goal for benzene in drinking water was 0 ppb. Unlike here, there was no evidence showing that the level of the chemical at issue was capable of causing the health effect at issue.  Similarly, in *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1455–56 (D.V.I.), an expert opined based solely on a finding in a chick embryo, that while he could not extrapolate directly to a human, that positive result should cause a reasonable person to become suspicious about what could happen in human bodies by the ingestion of that drug. That was not an opinion on causation.  Here, by contrast, Dr. Danielsson has unequivocally opined on causation based upon a detailed integration of multiple lines of evidence in humans and relevant animals.  Danielsson Dep. at 388:20-25, JA001575, (Vol. 3) ("[I]f you assess everything, you should consider ondansetron as a human teratogen.").

other non-drug hERG blocking experiments is a relevant consideration under the internationally accepted guidelines and Bradford Hill.  Similarly, in *Nat'l Bank of Commerce v. Dow Chem. Co.*, 965 F. Supp. 1490, 1526 (E.D. Ark. 1996), the court noted that the expert's opinion was based upon the theory that "substances with chemically similar structures should produce the same effect." Here, Zofran, other potent hERG blocking drugs referenced by Dr. Danielsson, and uterine clamping experiments, have already been demonstrated to produce the same effect – hERG blocking at therapeutic concentrations leading to bradycardia or arrhythmia and an identifiable pattern of birth defects.  Moreover, the fact that some teratogenic hERG blocking drugs are more potent (e.g., almokalant) than Zofran or less potent (e.g., phenytoin) than Zofran is rendered irrelevant by the fact that these teratogenic drugs have each been shown, like Zofran, to cause bradycardia or arrhythmia at concentrations proven to be present in women of childbearing potential.  Danielsson Dep., p. 367:11-15, JA001570, (Vol. 3).

*Finally*, GSK asserts (at pp. 93-94) that the Zofran reproductive toxicity studies cannot support Dr. Danielson's opinions that Zofran can cause fetal arrhythmias and hypoxia because those studies only assessed whether birth defects occurred.  This argument ignores the evidence that Dr. Danielson set forth in his report and his peer-reviewed publication demonstrating bradycardia and arrhythmia in the rat embryo.  *See* Line of Evidence 4.  Moreover, GSK's assertion (at p. 94) that Dr. Danielson cherry picked four of nine animal studies to support his opinion suggests incorrectly that there was no principled basis for highlighting those four studies as the most important for assessing human teratogenicity of Zofran. Contrary to this suggestion, those four studies are the only four studies in which the animals received meaningful exposure.  Danielsson Dep., p. at 167:19 – 168:4, JA001520, (Vol. 3),("it cannot be disputed that the teratology studies where the dose levels modestly exceeded human therapeutic exposure, some dose levels, the three IV studies, two in rats

and one in rabbits, and the Japanese oral study, there was a substantial increase in malformations in ondansetron dosed groups compared to untreated controls (vehicle)."); *Id.* at 287, JA001550 ("It's only for studies [where] you get enough exposure so you could see it [teratogenicity] in an animal model in relation to human therapeutic concentrations); *Id.* at 43:20-25, JA001489 ("[T]he most important factor … in all teratogenicity studies . . . is the exposure in relation to humans."); *Id.* at 164:19-23, JA001519, ("if … the animals and the mother or the embryo is not exposed, the studies are meaningless. You have to have an exposure; otherwise, you can't have teratogenicity"); *Id.* at 167:19 – 168:4, JA001520, and 287, JA001550.

None of Glaxo's experts evaluated the exposures in the animals compared to the exposures in a woman of childbearing potential and that is the subject of a motion to exclude because the ICH has determined that this exposure analysis is essential to considering teratogenicity.[148] See Danielsson Dep., p. 292, JA001551, (Vol. 3) ("They're clever guys at Glaxo. They know that kinetics exposure is the most important thing. You could at least look at your teratology studies to see if you have fulfilled the most important aspect, exposure."). Dr. Danielson applied the internationally accepted methodology for interpreting the animal study results including consideration of exposure in comparison to concurrent controls, and including comparing the defects to those seen in humans and comparing the defects to those seen when bradycardia or arrhythmia is induced in an embryo whether or not by a drug. It is GSK's experts who did not follow the accepted methodology.

## C.   DR. LEVIN

GSK cites (at p. 99) to *Zoloft* litigation, but fails to note that the judge presiding in that litigation determined that the methodology Dr. Levin used to reach his conclusions about biological

---

[148] GSK suggests (at p. 94, n. 380) that the defects observed in the Zofran treated groups can be explained by chance alone. This argument goes to the weight, not admissibility of Dr. Danielsson's opinion, and is addressed supra at Line of Evidence 2.

plausibility was reliable.  *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 26 F. Supp. 3d 466, 481 (E.D. Pa. 2014).  In addition, here, and unlike in *Zoloft*, the evidence shows that the hERG mechanism of injury is highly conserved across species, including humans, other mammals, as well as non-mammals.  GSK's own expert agrees.  Baldwin Dep. at 159:18–160:2, JA001340, (Vol. 3).  The mechanism evidence relied on by Dr. Levin also supports the positive birth defect epidemiologic findings in humans (Line of Evidence 7), the positive birth defect findings in the animal teratology studies that achieved exposure at and slightly above the human exposure at therapeutic doses (Line of Evidence 2), and the arrhythmia findings in Zofran-exposed humans and the Zofran whole embryo culture study at concentrations seen in women of childbearing potential (Line of Evidence 4).

GSK also challenges (at p. 100) Dr. Levin's testimony because it is based his research in animals, not humans.  As Dr. Levin, testified, however, "for obvious reasons, . . . you can't take apart human embryos to do some of that work."  Critically, however, regarding the importance of hERG channel function to embryonic development "luckily a lot of these things are highly conserved and work similarly across tissues and species and so on. I have seen some data showing that inhibition of hERG significantly depolarizes human cells which makes perfect sense because of the cardiac issues we also know about."  Levin Dep. at 132:8-16, JA001982, (Vol. 4).

### D.    DR. LOUIK

GSK purports to challenge Dr. Louik's methodology (*e.g.*, at p. 37), but actually challenges her conclusions.  GSK essentially disagrees with Dr. Louik's interpretation of the studies and how she weighed the epidemiologic evidence, but this is a dispute about conclusions, not methods. While arguing that Dr. Louik's ultimate judgment is incorrect, GSK lobbies for a new and heightened scientific standard of unanimity of epidemiology, twists words to create a mirage of

inconsistency among the data, and unfairly presents incomplete quotes from Dr. Louik's deposition. GSK creates an illusion of methodological flaws.  Its arguments fail under scrutiny.

Notably, no GSK expert has challenged Dr. Louik's methodology (or that of any other of Plaintiffs' experts).  As noted in *Allen, supra*, denying defendant's *Daubert* motion to exclude plaintiff's causation expert: "the defendant's expert witness did not testify as to any unsoundness in [the expert's] data or methodology." *Allen*, 263 F.R.D. at 60; *Accord Correa v. Cruisers*, 298 F.3d 13, 26 (1st Cir. 2002) ("Acceptance of the methodology by the other party's expert may give additional credence to the reliability of the proffered testimony.").

*First*, GSK challenges Dr. Louik regarding the consistency of the data in studies examining an association between Zofran and orofacial clefts and septal defects, and claims that Dr. Louik did not reconcile her opinion with contrary data. (GSK Br. at 40, 50). In her report, Dr. Louik considered and explained her interpretation of every study, noting its strengths and limitations, and she explained her assessment of the epidemiologic evidence.  Louik Rept. at 22-24, JA000634-636, (Vol. 2), 28-29, JA000640-641, (Vol. 2).   GSK disagrees with Dr. Louik's assessment and interpretation of the studies, and whether they are confirming, consistent, or inconsistent, and then bootstraps that into a methodology challenge.

GSK's proposed standard for challenging Dr. Louik conflicts with several applicable legal and scientific standards.  GSK insists on limiting the evidence to results that are statistically significant, while ignoring that statistical significance is not a legal or scientific requirement, *see* Section II(E).  GSK's view that results are inconsistent "simply because some results are 'statistically significant' and some are not," is a position that Dr. Rothman describes in his textbook as "fallacious." Rothman, *Modern Epidemiology* at 27.

In GSK's heightened and unrealistic view of science, which is central to its challenge to Dr. Louik, consistency is an absolute term and there must be perfect consistency. According to GSK, studies must be in unanimous agreement to support a causal inference.   This is not how scientists view consistency in epidemiology. GSK oversimplifies the concept of consistency, which can be fairly assessed only after all the relevant details of a causal mechanism are understood. *See* Section IV(C)(5).

According to GSK, the studies detecting increased risk of birth defects have limitations rendering them meaningless and should be disregarded, even though it is generally accepted that all studies have limitations and flaws. *Ref. Man*. at 552-53, JA003639-3640, (Vol. 7).   GSK also sees no need to consider the epidemiology together with the other six lines of evidence, which conflicts with Section II(C) (no legal requirement for epidemiology), and the fact that epidemiology is not the only evidence of causation in this case. *In re Neurontin,* 612 F. Supp. 2d at 132 ("Epidemiologic studies, while considered to be 'powerful evidence of causation,' are not required to prove causation in a pharmaceutical personal injury case.")

GSK claims in its footnote 177 that Dr. Louik is "acknowledging that she evaluated consistency without regard to the confidence intervals."   Dr. Louik refuted this claim, stating, "I don't think that's what I'm saying."  Louik Dep., p. 393:15-19, JA002179, (Vol. 4).   Dr. Louik did not ignore confidence intervals; they are detailed in her report's discussion of the individual studies, and they frequently overlap.  As Dr. Louik testified: "There is a whole range of values that can't be ruled out when you look at a confidence interval.  From the lower bound of the confidence interval to the upper bound, those are all consistent…" *Id*. at 111:17-23, JA002109, (Vol. 4). This testimony refutes GSK's complaint that Dr. Louik only considers the upper bounds of a confidence interval. She did not. Dr. Louik's attention to confidence intervals is entirely in line with mainstream

epidemiology, as discussed in GSK expert's *Textbook of Pharmacoepidemiology* at 26 and the *Reference Manual* at 580.

GSK suggests (at p. 41) that only the risk estimate is relevant to assessing the epidemiology, pointing to results for ASD's in the data reported by Parker.  GSK argues that because the risk estimates for ASD in those studies are below 1.0, the study results are inconsistent with other studies where the risk estimate is above 1.0.  But the upper bounds of the confidence intervals reported in Parker are above 1.0 (1.3 and 1.2 for ASD), and therefore consistent with elevated risks. Louik Dep., p. 227:4-228:5, JA002138, (Vol. 4); 235:2-8, JA002140; Section VI(G)(2)(b).  This conclusion is strengthened by consideration of the non-epidemiologic lines of evidence, which Dr. Rothman directs scientists to consider.  That Dr. Louik reviewed, analyzed, and integrated all of the studies in her report is a credit to her methodology, not a weakness.  That she reached a different conclusion from GSK after performing this all-inclusive analysis goes to weight, not methodology.

***Second,*** GSK's next line of attack (at p. 43) is a grab-bag of complaints based on out-of-context quotes from Dr. Louik's deposition.  The criticisms are about the importance of statistical significance, Dr. Louik's "reliance" on her calculation of risk from the Pasternak paper, and Dr. Louik's treatment of multiple comparisons in epidemiologic studies.  GSK begins by quoting from Dr. Buring's deposition regarding the meaning of a result that is not statistically significant.[149] Then, GSK quotes Dr. Louik's responses to an unrelated line of questioning in an attempt to set up a contrast in methodology.  It is an apples and oranges comparison.  Dr. Louik repeatedly explained that just because the confidence interval includes 1.0, does not mean the study result should be disregarded.  Nothing in Dr. Buring's textbook or testimony contradicts it.

---

[149] GSK Br. at 43-44. It should be noted that this, along with all of the opinion testimony elicited by GSK from Dr. Buring should be excluded from consideration in this record.  This Court limited Dr. Buring's deposition to factual inquiries about inclusion of her textbook material in Dr. Louik's report.  GSK should not be permitted to shoehorn opinion testimony in from Dr. Buring.

GSK advocates for a bright-line test whereby any study with a confidence interval that includes "1" (and thus does not meet the .05 cutoff for statistical significance) either contributes no information to a causal assessment or is definitive proof that no association with elevated risk is present in the data. GSK's insistence on a narrow focus considering only statistically significant results was firmly rejected by the First Circuit in *Milward*, 639 F.3d at 23-25. In line with *Milward*, Dr. Louik considered all of the studies, regardless of the results, and evaluated the strengths and weaknesses of each, regardless of the results, in making her evaluation. Dr. Louik's treatment of this subject is well within the bounds drawn by both courts and the scientific community.

***Third***, GSK next attacks Dr. Louik for calculating and including in her analysis a risk estimate for VSD in the Pasternak study. Notably, neither Dr. Kimmel nor Dr. Shaw bothered to perform this calculation but Dr. Kimmel instead calculated an odds ratio for cardiac defects as a whole, and for septal defects, but not for either VSD or ASD. Kimmel Rept. at 27, JA000455, (Vol. 1). Dr. Shaw only calculated an odds ratio for septal defects. Shaw Rept. at 10, JA001023, (Vol. 2).

The calculation performed by Dr. Louik is not a major pillar of her opinion. She described this on p. 24, JA000636, (Vol. 2) of her report as a "quick calculation" and made it clear that the result was a "crude" odds ratio (*i.e.,* she was transparent that the result did not reflect any adjustments for potential confounders). She also made it clear that the 1.4 risk estimate had "a confidence interval that includes 1.0," (*i.e.*, she paid attention to the confidence interval and by pointing out that it included 1.0, she was noting that the result was not statistically significant). The non-significant 1.4 OR for VSD, while consistent with results from other studies, is not a tent-pole result on which her opinion stands or falls, given that three other studies have also provided elevated (and statistically significant) risk estimates for VSD. Moreover, Dr. Louik's opinion on Pasternak is laid out in further detail in her report discussing strengths and weaknesses of that study.

Her placement of the risk for VSD under a column for septal defects in her Table is not representative of a methodological weakness, and appears to have been an isolated simple error, which Dr. Louik acknowledged and corrected at her deposition.  Louik Dep., p. 182:18-22, JA002121, (Vol. 4).  Therefore, GSK's critique goes only to the weight of the evidence.

**Fourth,** GSK next seeks to analogize (at p. 46) to the *Zoloft* Court's exclusion of Dr. Berard quoting a passage that says cherry-picking results "is of heightened concern in this case, where many of Dr. Berard's conclusions and opinions were formulated by identifying trends in odds ratio estimates selected from the published literature, rather than being based upon replicated, statistically significant odds ratio estimates."  This is distinguishable because Dr. Louik's analysis of the VSD association in Zofran relies on more than just "trends."  Dr. Louik identified replicated study results of varying strengths and levels of statistical significance, for cleft palate and septal (heart) defects, namely, Danielsson, Andersen, Zambelli-Weiner abstract, Anderka, Parker, Huybrechts abstract, and Pasternak.  Louik Dep., p. 323:22 – 324:16, JA002162, (Vol. 4).  She acknowledged that the Parker study did not confirm the prior studies but also was not inconsistent because of the confidence intervals being above 1.0. Louik Dep., p.  227:4–228:5, JA002138; 235:2-8, JA002140. Assessing consistency requires more than just looking at odds ratios, and also requires consideration of "all the relevant details of a causal mechanism."[150]  Dr. Louik has carefully assessed each and every study as set forth in her expert report.  This refutes any claim of cherry-picking.

**Fifth**, GSK asserts (at p. 47) that Dr. Louik "does not care how many comparisons are performed in a given study at all."  Specifically, GSK suggests that Dr. Louik should disregard the results of the Danielsson epidemiology study because it does not report how many comparisons were performed in it.  But there is no evidence of any undisclosed comparisons made by the

---

[150] *Modern Epidemiology* (3d ed. 2008) (at 27).

Danielsson authors, and furthermore GSK could have asked this question of Dr. Danielsson at his deposition, but did not. Dr. Louik should not be precluded from testifying for failing to speculate about a hypothetical weakness in the Danielsson study, especially since GSK's epidemiologist Dr. Shaw also makes no mention in his report of multiple comparisons in the Danielsson study. Shaw Rept. at 10-12, JA001023-1025, (Vol. 2). As for whether her treatment of multiple comparisons in her litigation analysis matches her work in the field, GSK fails to point out that the issue was discussed in the Anderka study, of which Dr. Louik was a co-author. Dr. Louik also notes the multiple comparisons in that study in her expert report, and considers that, along with all of the other strengths and weaknesses of the study. Louik Rept. at 21. Finally, GSK's expert testified that the multiple comparisons did not mean that the findings were likely due to chance. He could only say that chance was a possibility as a result of multiple comparisons. Shaw Dep., p. 213:23-214:9, JA002946-2947, (Vol. 5).

*Sixth*, GSK tries to make much ado about nothing (at p. 38) in noting that Dr. Louik collaborated with Dr. Julie Buring, a Professor of epidemiology at Harvard School of Public Health and a friend of Dr. Louik, who offered to and did assist her with a portion of her report. *Daubert* is intended to address methodological reliability and the methodology described by Dr. Buring and adopted by Dr. Louik in her report is almost definitionally reliable. Dr. Buring explained that the section she provided described basic epidemiologic principles of evaluating causation. Buring Dep., p. 25:7-11, JA001419, (Vol. 3). She further explained that the language she provided to Dr. Louik came directly from a textbook she co-authored, called "*Epidemiology in Medicine*." *Id.*, p. 50:9-17, JA003781, (Vol. 7). The subject matter of the material provided to Dr. Louik is completely unchallenged by GSK. There is no methodological dispute for the Court to adjudicate. In fact,

GSK repeatedly cites material from Dr. Buring's textbook.  GSK Br., footnotes 16, 26, 35, 39, 40-42, 126, 182, 318, 333, 350.

GSK challenges Dr. Louik's credibility about Dr. Buring's contribution to her expert report. Dr. Louik's personal credibility is not proper grounds for *Daubert*.  The circumstances surrounding Dr. Louik's adoption of the "causal assessment 101" section from the textbook and the truthfulness of Dr. Louik's testimony about those events are factual inquiries for the jury. *See Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 628 (1944) ("[C]ross-examination is the best method …for testing trustworthiness of testimony;" *Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 359 (D. Mass. 2008) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ("personal reliability questions …go to…credibility and are for the jury to decide."). *See also In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 4547207, at *5 (E.D. Pa. Aug. 31, 2016).

In any event, Dr. Louik was candid in her responses to questioning.  GSK claims (at p. 38) that "Dr. Louik reiterated – time and again – that it was she who inserted the language."  Her testimony was accurate.  Louik Dep., p. 362:7-19, JA002172, (Vol. 4).  Dr. Louik did add to her draft report the material that Dr. Buring had drafted and sent her.  Then in an errata sheet, Dr. Louik clarified that statement, to indicate that it was Dr. Buring who actually prepared the material from the textbook.[151]  Dr. Louik's issuance of an errata is not the move of someone who intended to mislead the Court.

GSK also argues that what Dr. Louik did, in adopting textbook language with permission and a footnote, is plagiarism.  The testimony contradicts this argument; Dr. Louik and Dr. Buring

---

[151] The deposition exchange at issue was not crystal clear in either the question or the answer. It is certainly possible that when Dr. Louik was asked "…is that when you inserted the language…," Dr. Louik understood the "you" to include herself and Dr. Buring both acting jointly since the context of the questioning at that point was their collaborative effort. GSK Brief, fn. 168.  The other citations for GSK's allegation don't have anything to do with who actually typed the material from the book and who inserted it into the report. Without any support from the transcript, GSK's allegation is meritless.

were clear in their testimony that what happened is not plagiarism.[152]   After establishing  that Dr.

Buring was quite knowledgeable about plagiarism based on her work on a Harvard faculty

committee, *id.*, pp. 26-32,   and despite her clear testimony in the record that there was no

plagiarism, GSK, under the auspices of *Daubert*, seeks a finding that there was.  Such questions are

for cross-examination.[153]   In the event this Court considers the plagiarism claim to be a *Daubert*

issue, Plaintiffs provided an account of the relevant facts in their Dec. 5, 2018 opposition to GSK's

emergency motion to retake Dr. Louik's deposition.  Rather than repeat those facts and arguments

again, Plaintiffs refer this Court and incorporate herein the December 5 brief at pages 5-8 and 12-

15, and the exhibits to that Brief.

###    E.    DR. SADLER

GSK challenges Dr. Sadler's qualifications to consider epidemiology studies and then

attacks the weight of Dr. Sadler's conclusions in scattershot form.  Although Dr. Sadler has based

his opinions on all seven lines of evidence and applied a weight of evidence approach consistent

with the First Circuit's standards, GSK isolates pieces of evidence in the epidemiology and animal

data to attack their weight, relies on inapplicable law from outside this Circuit, mischaracterizes

snippets of Dr. Sadler's testimony, and represents other selective quotes as supportive of a

---

[152] Buring Dep., p. 25:7-11, JA001419, (Vol. 3) ("I said, it's not plagiarism, it is – I gave you permission to use it; if you cited it, it is common, basic epidemiology knowledge; and you attributed it to the textbook."); *Id.* p. 40:1-3Louik Dep., p. 70:11-13, JA002099, (Vol. 4) ("I would not call it plagiarism because I've cited it.  I've cited Hennekens as a reference for my report.").

[153] GSK cites (at pg. 39-40) easily distinguishable cases to support its contention that Dr. Louik should be excluded for using Dr. Buring's text.  In *Raymo,* a vaccine case, the Court found that the offending expert was "deliberately misleading" under oath when, at a hearing, the expert offered an obviously fabricated, detailed account of how he researched and drafted the copied section himself.  *Raymo v. Sec'y of HHS.*, 2014 WL 1092274, at *13 (Fed. Cl. Feb. 24, 2014).  There is no such deception by Dr. Louik here, deliberate or otherwise.  GSK also cites to *Moore v. BASF* as an example of a Court excluding an expert for plagiarizing part of his report.  However, *Moore* is distinguishable because in *Moore,* the expert's "conclusions as to the [required] warnings …were copied verbatim from the report of another expert." *Moore* at 20.  By contrast, Dr. Louik's conclusions as written in her report are all her own. The expert in *Moore* also offered dishonest testimony that the report was his own writing and that he had not consulted any other expert report. *Id.* Once again, there is no such testimony from Dr. Louik in the record.

proposition GSK asserts when a fuller review of the testimony shows they are not.  When Dr. Sadler assigns more or less weight to relevant data than GSK's experts do and offers sound reasons for weighing the evidence, GSK wrongly calls it "cherry picking."  By contrast, GSK's experts attack the weight of every human and animal study reporting birth defects with Zofran pregnancy exposure, but categorically applaud the merit of the studies that did not detect the risk no matter how scientifically unreliable the data.  GSK's arguments are distilled to six categories below.  A review of Dr. Sadler's testimony in proper context with the lines of evidence on which he relied shows that GSK's arguments are unavailing.

*First*, GSK's challenge to Dr. Sadler's qualifications is meritless.  GSK asserts (at p. 53) that Dr. Sadler "disclaimed the necessary experience for a critical assessment of epidemiological literature."  To the contrary, Dr. Sadler testified that he disagreed, and while he was not holding himself out as an epidemiologist, he had the requisite experience to critically assess the epidemiologic evidence.  Dr. Sadler explained that he *did not* agree with the statement that he cannot assess the reliability of epidemiology results, and that he "reads a lot of epidemiology papers" and "can form an opinion based on the results of whether that's a good study or bad study" and whether they are consistent with principles of human embryology, and he did so as editor of *Teratology*.  Sadler, Dep., p. 65:23 – 66:24, JA002605-2606, (Vol. 5).[154]

---

[154] GSK (at p. 54) cites to the exclusion of a Dr. Baldwin, a cardiologist in the Vioxx litigation, who was deemed not qualified to render *case-specific* causation opinions.  That court narrowed its holding to prevent it from being misused in substantially the same way GSK is attempting here.  Dr. Baldwin had no experience with or research concerning the drug or its effects and did not understand the medical literature.  By contrast, Dr. Sadler is offering general causation opinions, and as an embryologist who has studied the very mechanisms at issue here, and he is qualified to explain to a jury the lines of evidence supporting general causation.  In *Vioxx*, the court stated "not every cardiologist will be unable to testify as an expert witness with regard to the specific effect of Vioxx," adding: "The Court's order is limited to Dr. Baldwin, a cardiologist who has little to no experience prescribing Vioxx, diagnosing Vioxx as the cause of a cardiac event, conducting clinical research related to Vioxx, and who failed to demonstrate a clear understanding of the relevant scientific literature."

***Second,*** GSK wrongly accuses Dr. Sadler of not considering all relevant data.  GSK points

(at p. 56) to epidemiology studies that did not report a statistically significant increase between

Zofran and cardiovascular defects and incorrectly states that Dr. Sadler ignored them.  Dr. Sadler

considered these studies and others as part of his weight of evidence review ("I told you, there are

negative studies in there and I put it in there." *See* Sadler, Dep. at 75:11 – 17, JA002608, (Vol. 5).

GSK lists three studies (Pasternak, Parker, and Huybrechts), arguing that Dr. Sadler did not attempt

to explain or reconcile the contrary data found in these studies. GSK fails to note that Dr. Sadler

testified as to both the Huybrechts and Parker studies (both were abstracts only at the time of his

report, and have since been published), that he read both and relies on both but they are not in his

report because he read them after he signed his report. Sadler, Dep. p. 97:13 – 24, JA002613, (Vol.

5) (Huybrechts); Sadler, Dep., p. 107:9 – 108:2, JA002616 (Parker). Regarding the Pasternak study,

Dr. Sadler's report at p. 16 states that he reviewed the study, that it did not find an increased risk,

and he explained this discrepancy based on "the low number of women studied with exposure in the

first trimester in the Pasternak study." Sadler Rept. at 16; Sadler, Dep., p. 99:25 – 101:2, JA002614.

Similarly, GSK argues (at p. 57) that certain epidemiology studies reported no increased

association between Zofran and cleft palate, in contrast to several epidemiology studies that did.

GSK incorrectly asserts (at p. 58) that Dr. Sadler was unable to reconcile the data. He reasonably

assigned greater weight to the positive epidemiology studies because they were replicated and were

consistent with the compelling animal and human data concerning Zofran's effect on the embryonic

heart, and the other lines of evidence.  Assigning different weight to evidence, and reaching a

different conclusion than GSK based on assessing each study in the context of all of the evidence is

not cherry-picking.  GSK's focus on a few studies that did not find an increase in risk in isolation

and not in the context with the totality of evidence *is* cherry-picking. "An expert is free to rely upon

those studies he … believes to be significant and distinguish others he … does not." *See In re Actos (Pioglitazone) Prod. Liab. Litig.*, 2013 WL 6825953, at *11–12 (W.D. La. Dec. 20, 2013).   Dr. Sadler adhered to this standard by giving reasoned explanations for his opinions in a detailed report; the fact the GSK might disagree with his conclusions is for cross-examination, not exclusion.[155]

Given Dr. Sadler's weighing the totality of relevant evidence, GSK misplaces reliance (at p. 61) on Zoloft birth defects litigation.   There, a judge deemed Dr. Sadler's opinions admissible as to the existence of plausible biological mechanisms by which altered concentrations of serotonin in a developing embryo could cause birth defects. *See In re Zoloft Prod. Liab. Litig.*, 176 F. Supp. 3d 483, 488 (E.D. Pa. 2016), aff'd sub nom. 858 F.3d 787 (3d Cir. 2017).   Dr. Sadler's general causation opinion was limited in part, because of what the court considered an insufficient reconciliation of inconsistent epidemiological research with his opinion and in part, because the court determined he insufficiently considered the "dose response principle," i.e., whether causation could occur at therapeutic doses. *See In re Zoloft,* 26 F. Supp. 3d at 477.   Here, Dr. Sadler considered the dose response principle and he reconciled inconsistent epidemiological data, noting for example that several of the negative studies were not powered to detect the risk and that the positive studies were most consistent with ondansetron's hERG inhibition mechanism. *See* Sadler Rept. at 13-18, JA000852-857, (Vol. 2); *see also* Line of Evidence 4.

***Third*,** GSK misrepresents a snippet of Dr. Sadler's testimony as supportive of GSK's assertions that epidemiology is required to prove that Zofran can cause all cardiovascular defects when it does not.   GSK cites (at pp. 58-59) a statement made by Dr. Sadler that heart defects are not a single entity and should not be lumped together.   However, GSK takes this statement out of context and thereby distorts Dr. Sadler's opinions regarding Zofran and general causation based on

---

[155] GSK (at p. 55) attacks Dr. Sadler's reliance on the Zambelli-Weiner and Andersen studies. Those studies are addressed in Line of Evidence 7.  GSK's argument's as to the studies goes to weight.

Zofran's effect on cardiovascular and orofacial development.  Zofran's effect on heart rhythm disruption provides a common etiology for all structural cardiovascular defects and all orofacial defects deriving from the first pharyngeal/branchial arch. *See* Sadler Rept. at 23. Dr. Sadler testified that where there is a common mechanism, one can reliably conclude that a drug causes multiple cardiovascular defects and multiple orofacial defects.  *See* Sadler, Dep., p. 54:8 – 55:4, JA002603, (Vol. 5); *id.*, p. 59:2-10, JA002604; Sadler Rept. at 12, JA000851, (Vol. 2) ("[O[ndansetron has a clearly defined mechanism of action for causing birth defects that involves producing cardiac arrhythmias resulting in abnormal heart and orofacial development").

**Fourth,** GSK wrongly contends (at pp. 61), citing cases outside this Circuit, that Dr. Sadler's opinion should be excluded for failure to apply the Bradford Hill criteria, as if they were a legal or scientific requirement.  That is not a basis for exclusion. Bradford Hill is one of several sets of causation criteria that may but need not be used, and they are often not used in teratology assessments.[156]  Consistent with the controlling First Circuit standard described in *Milward*, Dr. Sadler applied Wilson's Six Principles of Teratology and a weight of evidence approach, considering all available human and animal data.  *See* Sadler Rept. at 8 – 18, JA000847-857, (Vol. 2).

**Fifth**, GSK challenges (at p. 61) Dr. Sadler's reliance on Zofran animal studies (in vivo and in vitro), but GSK fails to acknowledge critical facts regarding dose, concentration, and exposure in its challenge, which have been addressed in detail in Line of Evidence 2 and in Plaintiff's motions to exclude GSK's experts on this subject.[157]  GSK asserts (at p. 63) that at his deposition Dr. Sadler

---

[156] Friedman 2017, JA003828-3834, (Vol. 7).

[157] To summarize: the only meaningful Zofran animal teratology studies are the ones that achieved exposures meeting or slightly exceeding concentrations reported in women of childbearing potential, and those teratology studies reported a dose-related increase in teratogenic effects. *See* Plaintiffs' Line of Evidence 2. Second, the relevant in vitro data published in peer-reviewed literature demonstrates that Zofran can have

admitted that there was "no in vitro evidence" that Zofran, at human therapeutic dose used to treat NVP can induce fetal arrhythmia, fetal bradycardia, fetal hypoxia, or structural birth defects.  GSK omits Dr. Sadler's testimony that Zofran "[has] been shown to inhibit the cardiac action potential. And it's been shown to cause arrhythmias." Sadler Dep., p. 235:15 – 20, JA002648, (Vol. 4).

GSK similarly suggests (at p. 63) that Dr. Sadler admits there is no *in vivo* evidence of teratogenicity. This is untrue. To support its position GSK notes (at p. 63) that there is no study in which the study investigators concluded that Zofran was teratogenic.  The investigators acknowledged that the animals did experience an increased incidence of birth defects, but credited that finding to chance. None of those investigators are serving as experts in this litigation, and several of the world's leading experts have considered this data and determined that the increased incidence of birth defects among Zofran treated groups constitute strong signs of teratogenicity. Danielsson, Webster & Ritchie 2018, at p. 244, JA003595, (Vol. 7); Sadler Rept. at 24-30, JA000863-869, (Vol. 2).   GSK also points (at p. 63) to statistical significance if it were a requirement, but GSK's approach contradicts the internationally accepted guidelines.  Danielsson Dep., p. 240:2–11, JA001538, (Vol. 3).

***Sixth***, GSK attacks the weight of various types of evidence relied on by Dr. Sadler.  Each of these attacks overlook the evidence discussed or present it incompletely.  For example, GSK says (at p. 63) that there was no dose-dependent increase in any type of structural malformation, but in fact there was an increase in malformations among the high dose groups compared to concurrent controls, and in Glaxo's own words, there was a REDACTED

---

teratogenic effects at concentrations achieved with GSK's recommended therapeutic doses, at all doses and in all forms of administration. Thus, GSK's observation (at p. 63) that there is no in vitro study in which Zofran was shown to produce either cardiac defects or orofacial clefts of any type is misleading, because no in vitro study looked for such effects.  The relevant peer-reviewed study demonstrated bradycardia and arrhythmia in a mammal's embryonic heart using the same mechanism that has been shown to be affected in human embryonic stem cells.  This same bradycardia and arrhythmia ***are known human teratogens***. Therefore, the relevant in vitro data supports teratogenicity. *See* Plaintiffs' Line of Evidence 3 and 4.

REDACTED which is one of the four manifestations of deviant development. *See* ZFN00079162 and Line of Evidence 2.  Then, GSK says (at p. 63) that there is no *in vivo* evidence that Zofran at human therapeutic doses for NVP can cause structural malformations, but the Zofran animal studies referenced in Danielsson, Webster & Ritchie 2018, p. 244, show that Zofran "induced typical embryonic arrhythmia-related malformations," which "occurred at systemic exposures . . . similar to or lower than those in early human pregnancy."  GSK criticized (at p. 65) Dr. Sadler's reliance on other hERG blocking drugs despite the ICH 2017 Guidelines directing scientists to analyze such information.  GSK attacks (at p. 66) Dr. Sadler's reliance on the Teng 2008 study showing that transgenic mice with non-functional hERG channels had defects in the heart and first branchial arch (from which orofacial defects derive), but the ICH 2017 Guidelines direct experts to look at transgenic animals and the role of the target (here, hERG) in reproduction. *See* Line of Evidence 6 and Danielsson, Webster & Ritchie 2018, at p. 244, n. 60, jA003595, (Vol. 7) (citing Teng 2008 for the proposition that the hERG channel is essential to embryonic survival); Danielsson Supp. Rept. at 3.

GSK asserts (at p. 67) that Dr. Sadler inappropriately relies on case reports describing individuals with congenital long QT syndrome as additional evidence that blocking the hERG channel is responsible for observed birth defects.  GSK's assertions are contradicted by Dr. Abdulla's testimony that this connection is generally accepted clinically, *see* Abdulla Dep., p. 27:14 – 25, JA001194, (Vol. 3), as well as the observation in Danielsson, Webster & Ritchie 2018, at p. 244, JA003595, that in humans "mutations in the gene expressing the hERG appear to be associated with structural congenital cardiovascular anomalies." *See also* Danielsson Supp. Rept. at 3, JA000289, (Vol. 1).  Consistent with this observation, studies of bradycardia in in 5-8 week old human embryos report increased embryonic death.  In one study all five embryos that had unusually

decreased heart rates (below 85 beats/minute compared to a normal mean of 100 (at least 15% decrease) died in the first trimester.[158]  In another study, all four human embryos diagnosed with bradycardia below 85 beats/minute in weeks 6-8 of gestation died 1-2 weeks after the diagnosis.[159]

## VIII.   CONCLUSION

There is robust scientific evidence that ondansetron can induce severe cardiac rhythm disturbances in adult humans, children, and in the human embryo, by inhibition of the hERG channel.  This drug effect can cause life threatening cardiac arrhythmia in adult humans when used as recommended in the product labeling, regardless of administration form and dose.  The human embryo, which reaches similar exposures of ondansetron as the mother through placental transfer, also responds with cardiac bradycardia after *in utero* exposure to ondansetron after recommended use of ondansetron.  This mechanism is known to GSK, who admitted it in 2002 relying on Plaintiff's expert Dr. Danielsson's published work, and has been studied extensively.   The teratologic effect of the drug has been demonstrated in animal studies, at concentrations seen in women of childbearing potential. The Zofran animal teratology studies that achieved exposure concentrations at or near concentrations in women of childbearing potential reported a biologically significant increase in malformations and embryonic death, with the same types of defects occurring in animals and in human epidemiologic studies.  Other drugs that have been shown to disrupt heart rhythm by the same potent hERG blocking mechanism, and that have been studied in human pregnancy, are known human teratogens, producing a similar pattern of birth defects as Zofran. Interference with heart rhythm without drugs has the same teratogenic effect, and knocking out the hERG gene in animals does too.

---

[158] Laboda et al., First Trimester Bradycardia, A Sign of Impending Fetal Loss,  J. Ultrasound Med, 1989; 8: 561-63.
[159] Vaccaro, et al,   Arrhythmia in Early Pregnancy: A Predictor of First Trimester Pregnancy Loss, Ultrasound Obstet Gynecol, 1998; 12: 248-51,

The described mechanism is both biologically plausible and indeed the most likely explanation for how Zofran causes cardiovascular and orofacial cleft birth defects.  The several lines of mechanism evidence are consistent with the human epidemiologic evidence.  Despite the limitations of epidemiology to study all specific cardiovascular and orofacial birth defect exposures in humans due in part to their rarity, there are replicated findings that Zofran exposure is associated with statistically significant increased risks of specific cardiovascular and orofacial malformations.

The peer-reviewed medical literature is replete with studies that provide the causation building blocks described in this brief.  On many key causation building blocks GSK's experts agree with Plaintiffs' experts.  Causation is the most likely explanation to explain these multiple lines of evidence.  Coincidence, chance, and bias in the studies are highly unlikely given the consistency and coherence of the totality of the evidence summarized above.

Well-qualified experts considered the weight of available evidence and have concluded to a reasonable degree of medical and scientific certainty that ondansetron is capable of causing cardiovascular defects and orofacial defects, both in animals and in humans, through the common hERG-mediated mechanism of teratogenicity—at all therapeutic doses in all forms of administration.  For these reasons, Plaintiffs' experts meet the *Daubert* standards of the First Circuit, and GSK's motion to exclude or limit their testimony should be denied.

Dated: January 18, 2018

Respectfully submitted,

/s/ Robert K. Jenner
Robert K. Jenner, Esquire (BBO No. 569381)
JENNER LAW P.C.
1829 Reisterstown Road
Suite 350
Baltimore, Maryland  21208
410-413-2155

M. Elizabeth Graham
Thomas V. Ayala
Tudor Farcas
GRANT & EISENHOFER P.A.
123 S. Justison Street
Wilmington, DE  19801
302-662-7063

Kimberly D. Barone Baden
Roger M. Young, Jr.
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
843-216-9265

Tobias L. Millrood
POGUST, BRASLOW & MILLROOD LLC
8 Tower Bridge, Suite 1520
Conshohocken, PA  19428
610-941-4204

James D. Gotz
Steven R. Rotman
HAUSFELD
One Marina Park Drive, Suite 1410
Boston, MA 02210
617-207-0600

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: ZOFRAN (ONDANSETRON) PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) ) |

MDL No. 1:15-md-2657-FDS

THIS DOCUMENT RELATES TO:

ALL CASES

## ORDER

**AND NOW**, this _____ day of _____, 2019 upon consideration of Defendant GlaxoSmithKline LLC's Motion to Exclude Plaintiff's General Causation Experts, it is hereby **ORDERED** that the Motion is **DENIED**.

It further **ORDERED** that Plaintiffs' general causation experts shall be permitted to testify in the form of opinion or otherwise in accordance with Federal Rules of Evidence 702-05 and consistent with their expert disclosures made in accordance with Federal Rule of Civil Procedure 26(a)(2),(e) and deposition testimony.

**BY THE COURT**

_____

**F. Dennis Saylor, IV, U.S. District Judge**

**<u>CERTIFICATE OF SERVICE</u>**

I, Thomas V. Ayala, hereby certify that on this 18th day of January, 2019, I electronically filed the foregoing Response in Opposition to GSK's Motion to Exclude Plaintiffs' General Causation Experts, using the CM/ECF system and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

<u>/s/ *Thomas V. Ayala*</u>
Thomas V. Ayala