# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE : ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION**<br><br>This document relates to: All Actions | MDL No. 1:15-md-2657-FDS<br><br>FILED UNDER SEAL |

## GLAXOSMITHKLINE LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL DR. ZAMBELLI-WEINER TO PRODUCE DOCUMENTS IN COMPLIANCE WITH THE COURT'S PRIOR ORDERS

This is not the first, second, or even third time the parties have been before the Court on issues related to Dr. Zambelli-Weiner. Plaintiffs and Dr. Zambelli-Weiner have repeatedly used the Court's processes to prevent GSK from conducting discovery into issues surrounding Plaintiffs' paid litigation consultant and the Zofran study she conducted, but they have resisted providing the Court with the true facts regarding the financial funding provided by Plaintiffs' counsel for the study. This Court has repeatedly ruled that Dr. Zambelli-Weiner's financial ties to Plaintiffs set her apart from typical third-party scientists; it has denied two prior Motions for Protective Order related to Dr. Zambelli-Weiner's deposition and documents. And the Court was forced to reiterate its rulings again in the middle of Dr. Zambelli-Weiner's deposition when her counsel and Plaintiffs' counsel repeatedly objected to questions as being outside the scope of the deposition and improperly instructed the witness not to answer. The Court went so far as to warn counsel that, if they instructed Dr. Zambelli-Weiner not to answer, they would do so at their peril. Dr. Zambelli-Weiner has yet to heed the Court's guidance. In response to GSK's document requests, Dr. Zambelli-Weiner raises many of the same objections this Court previously considered and overruled, as well as others that have no basis in fact or law. Consistent with the Court's prior

Orders, Dr. Zambelli-Weiner should be compelled to produce documents in response to GSK's document requests.

## I.      FACTUAL BACKGROUND

GSK served a deposition notice and document request on Dr. Zambelli-Weiner last fall, following the publication of a study she authored entitled, "First trimester ondansetron exposure and risk of structural birth defect" ("the Zofran Study"). The Zofran Study was unique in that it included a conflict of interest statement, disclosing that TTi Health Research & Economics (TTi), Dr. Zambelli-Weiner's company, received funds from plaintiff law firms involved in this litigation.

Plaintiffs did not deny that they provided funding to TTi, but they nevertheless moved for a Protective Order, seeking to quash the deposition notice and subpoena served on Dr. Zambelli-Weiner, or in the alternative, to limit any discovery of Dr. Zambelli-Weiner to the issue of her financial relationship with them and proceed by written question. Doc. 1224 at 3. The Court denied Plaintiffs' motion and permitted "a normal deposition within normal limits focused on the financial aspects, that is, what money was paid and how, what communications with counsel, direct or indirect, were made and how that affected the study." Dec. 7, 2018 Tr. at 40-41 (Ex. A).

Next, Dr. Zambelli-Weiner moved for a protective order, seeking to thwart GSK's discovery requests altogether or otherwise limit the scope of any discovery. Doc. 1271. In support, she submitted a sworn affidavit claiming that she had "not been retained as an expert witness by any party in this case" and had "no direct factual information about the litigation." Doc. 1272. Dr. Zambelli-Weiner's claimed lack of knowledge about the Zofran litigation was untrue: she previously presented with Plaintiffs' Lead Counsel Beth Graham and Liaison Counsel Robert Jenner at the Mass Torts Made Perfect Conference. And the subject of the October 2015 presentation was "Zofran Litigation Update":

3 Days in Vegas, representing over 250 Law Firms, covering 20 Mass Torts Topics--800-320-2227



Home    Register    Event Details    News    About Us    Contact    Cart







📅 Thursday, October 15th, 2015

# ZOFRAN LITIGATION UPDATE



The national Zofran Lawsuit concerns the use of the prescription drug Zofran and the growing body of evidence linking this drug to an increased risk of birth defects. The lawsuit alleges that the manufacturer of Zofran knew of this severe side effect, but failed to properly inform the United States government and healthcare providers that Zofran could cause significant potential issues, and that the drug required additional testing and research before it should have been widely marketed and prescribed to patients who had better alternative treatments.

*See* GSK's Opposition to Plaintiffs' Motion to Compel (Doc. 1289).[1]

---

[1] Dr. Zambelli-Weiner's claim that she had not been retained as an expert for any party in the case is also false. On January 29, 2019, Dr. Zambelli-Weiner submitted a "Supplemental Affidavit," which revealed that, contrary to her claims in her original Affidavit, her company, TTi, entered into two consulting arrangements for Plaintiffs' counsel in which she provided consultation and analysis with respect to "scientific studies regarding Zofran" and "Plaintiffs' counsel's investigation of pharmaceutical drugs . . ." *See* Supplemental Affidavit of April Zambelli-Weiner at 1-2 (Ex. B).

When this information came to light, her prior counsel filed an emergency motion to withdraw, citing factual inaccuracies in Dr. Zambelli-Weiner's sworn affidavit and invoking rules of professional conduct regarding perpetrating a fraud on the court. *See* Notice Advising the Court of Factual Inaccuracies in Non-Party April Zambelli-Weiner, Ph.D's Affidavit and Motion for Protective Order (Doc. 1294) and Emergency Motion to Withdraw (Doc. 1293) at 2. Her prior counsel also sent a letter to GSK's counsel, advising that he could no longer represent that all documents responsive to GSK's document requests had been produced. Jan. 18, 2019 Letter from Scott H. Marder to Eva Canaan (Ex. C).

The Court denied Dr. Zambelli-Weiner's Motion for Protective Order on January 18, 2019, ruling:

> The examination of the witness, Dr. April Zambelli-Weiner, ***and the production of any documents by the witness***, shall be limited to issues relevant to this litigation, or reasonably likely to lead to the discovery of relevant information, particularly (***but not necessarily limited to***) issues involving (1) any relationships or financial arrangements she may have had with plaintiffs' counsel and (2) any actual or potential effect such relationships or arrangements may have had on her study of ondansetron exposure and risk. The witness shall not be required to testify, or produce documents, concerning the substance of any research, studies, or other work not reasonably related to ondansetron exposure and risk and shall not be required to provide privileged or confidential information concerning any patients or study participants.

Doc. 1292 (emphasis added).

Notwithstanding this ruling, counsel for GSK was forced to call the Court during Dr. Zambelli-Weiner's deposition on February 1, when her counsel (and Plaintiffs' counsel) repeatedly objected to GSK's questions as outside the scope of the Court's January 18 Order. On the basis of these objections, her counsel instructed Dr. Zambelli-Weiner not to answer. During the February 1 telephone conference, counsel again took issue with the scope of the deposition, arguing, "this is a limited deposition, that it's limited in scope by your order to the two primary

topics involving the relationship that she had with plaintiffs' counsel and the actual or potential effect of such relationships." Feb. 1, 2019 Hr'g Tr. at 7 (Ex. D).

In response, the Court reiterated that Dr. Zambelli-Weiner's deposition is "like any other deposition, is the information discoverable or reasonably likely to lead to relevant information, which is another way of restating the discovery standard." *Id.* at 8. And the Court specifically rejected Plaintiffs' argument that GSK should be limited to a flat denial that her relationship with and payment from Plaintiffs' counsel did not impact her work. Instead, GSK was permitted to explore "how she conducted the study, and not just did the study change, but how was the study designed, is there anything about the study that's unique or different or not in accordance with ordinary professional standards." *Id.* at 9-10. The Court also warned Dr. Zambelli-Weiner's counsel that he would be instructing the witness not to answer at his peril. *Id.* at 14.

Following the Court conference, Dr. Zambelli-Weiner's deposition continued. Dr. Zambelli-Weiner eventually acknowledged ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████. Similarly, in response to document requests issued with her deposition notice, she claimed that she had no "documents concerning any data analyses or results that were not reported in the study." *See* Jan 9, 2019 letter from Scott Marder to Eva Canaan at 2 (Ex. F). Importantly, she agreed that "hyperemesis gravidarum is a very severe condition that must be treated" and that if Zofran posed a lower risk of birth defects than all other antiemetics, that

would be important public health information that should be shared. Feb. 1, 2019 Dep. Tr. at
198:23-201:8 (Ex. E).

As relevant here, prior to Dr. Zambelli-Weiner's February 1 deposition, Dr. Kirby, one of
the co-authors on Dr. Zambelli-Weiner's study, ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ Not one ███████████ made it into the published

Zofran paper. Worse still, the documents produced by Dr. Kirby ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████[2] Importantly, Dr. Zambelli-Weiner confirmed ████

---

[2] FDA. Guidance for Industry and FDA Staff; Best Practices for Conducting and Reporting Pharmacoepidemiologic Safety Studies Using Electronic Healthcare Data. May 2013, at 23, https://www.fda.gov/downloads/drugs/guidances/ucm243537.pdf ("Significant findings in subgroup analyses can be considered hypothesis-generating unless prespecified and adequately powered."). *See also*, Kimmel Supplemental Report (Ex. J) at 4-5.

███████████████████████████████████████████████████████

█████████████████████████████████

Shortly after being confronted with the first of these documents, Plaintiffs' counsel and Dr. Zambelli-Weiner's counsel abruptly (and improperly) suspended Dr. Zambelli-Weiner's deposition. Plaintiffs' counsel claimed that GSK should have shared the Kirby documents (which were never requested), and Dr. Zambelli-Weiner's counsel claimed the need for Dr. Zambelli-Weiner to re-acquaint herself with her own documents that she failed to produce (and repeatedly claimed did not exist) in response to GSK's document requests.

At the continuation of her deposition three weeks later, Dr. Zambelli-Weiner claimed,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

Along with the deposition notice for her continued deposition, GSK served additional document requests on Dr. Zambelli-Weiner. Her counsel responded by letter on February 15, 2019, and objected to the vast majority of GSK's document requests, regurgitating many of the issues presented in the prior Motions for Protective Order and during Dr. Zambelli-Weiner's initial deposition. *See* Feb. 15, 2019, Letter from Eric Gunderson (Ex. L).

Finally, on March 1, 2019, Plaintiffs responded to GSK's Second Set of Interrogatories. Plaintiffs now admit: "***Plaintiffs' Leadership Attorneys paid $210,000 as financial support relating to a study that was ultimately completed and published by Zambelli-Weiner A***, et al., First Trimester Ondansetron Exposure and Risk of Structural Birth Defects, 83 Reproductive Toxicology (2019), 14-20." *See* Plaintiffs' Responses to GSK's Second Set of Interrogatories, No. 1 (Ex. M). Plaintiffs' acknowledgment that they paid over two hundred thousand dollars as financial support for the Zofran Study heightens the need for GSK and the Court to obtain the full story regarding the Study. Unfortunately, GSK needs the Court's assistance to compel Dr. Zambelli-Weiner to comply with this Court's prior Orders and produce responsive documents.

## II.   ARGUMENT

Notwithstanding the denial of two Motions for Protective Order seeking to block GSK from taking discovery, Dr. Zambelli-Weiner is again refusing to comply with proper discovery requests. In response to GSK's document requests, Dr. Zambelli-Weiner raises unfounded objections—many of which this court has already rejected. Her objections fall roughly into four categories. *First*, Dr. Zambelli-Weiner erroneously asserts that certain of GSK's requests (Nos. 4, 5, 6, 7, 9, 10, 11, and 12) are "outside the scope of the Court's January 18, 2019 order," in direct contravention to Judge Saylor's multiple rulings. *Second*, Dr. Zambelli-Weiner has improperly withheld documents responsive to certain requests (Nos. 2, 8, 13, and 14) on the basis of the consulting expert privilege. *Third*, Dr. Zambelli-Weiner has improperly invoked the "peer review

privilege" in response to certain requests (Nos. 17 and 18), while also mistakenly claiming the requests are outside the permissible scope of the deposition. *Fourth*, Dr. Zambelli-Weiner has apparently made no reasonable search for documents that are within her possession, custody and control as the owner and CEO of TTi in response to at least one request (No. 1). Each of GSK's document requests seeks information that is "reasonably likely to lead to the discovery of admissible evidence," especially in light of (1) the newly discovered financial relationship between Dr. Zambelli-Weiner and Plaintiffs' counsel, including the financial support Plaintiffs provided for the Zofran Study; (2) ████████████████████████████████████████████ ████████████████████████████████, but which Dr. Zambelli-Weiner chose not to publish or otherwise disclose; and (3) ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. Dr. Zambelli-Weiner should be compelled to fully and completely respond to GSK's document requests.

### A. Dr. Zambelli-Weiner Improperly Refused to Produce Documents on the Basis of a Scope Limitation that Does Not Exist.

Dr. Zambelli-Weiner repeatedly refuses to produce documents on the basis that GSK's requests "seek documents outside the scope of the Court's January 18, 2019 order" that are "not proportional to the needs of the case considering the lack of relevance such information has to discovering what influence, if any, Dr. Zambelli-Weiner's financial arrangements with Plaintiff's [sic] counsel had on [her] Study." *See* Zambelli-Weiner's Response to Request Nos. 4, 5, 6, 7, 9, 10, 11, and 12. She also claims that, as a "third party witness," she should not have to go to the "time, burden, and expense" to respond. *See* Zambelli-Weiner's Response to Request Nos. 4, 5, 6, 7, 9, 10, 11, and 12.

As an initial matter, this Court has already repeatedly ruled that the financial relationship between the Plaintiffs' counsel and Dr. Zambelli-Weiner distinguishes her from an ordinary, disinterested third-party scientist. Indeed, she has now disclosed that she previously served as a consulting expert for Plaintiffs' counsel on two separate occasions regarding "scientific studies regarding Zofran" and "Plaintiffs' counsel's investigation of pharmaceutical drugs . . ." Zambelli-Weiner Supp. Aff. at 1-2 (Ex. B); Feb. 1, 2019 Dep. at 138:5-139:1 (Ex. E). Plaintiffs have now admitted that they paid $210,000 as financial support for the Zofran Study (Ex. M).

More importantly, Dr. Zambelli-Weiner's purported limitation on the scope of GSK's document requests ignores the Court's repeated rulings and guidance. This Court has rejected Plaintiffs' attempts to limit the scope to only the financial relationship between Dr. Zambelli-Weiner and the Plaintiffs' counsel. In its January 18, 2019 Order, the Court ruled:

> The examination of the witness, Dr. April Zambelli-Weiner, **and the production of any documents by the witness,** shall be limited to issues relevant to this litigation, or reasonably likely to lead to the discovery of relevant information, particularly **(but not necessarily limited to)** issues involving (1) any relationships or financial arrangements she may have had with plaintiffs' counsel and (2) any actual or potential effect such relationships or arrangements may have had on her study of ondansetron exposure and risk.

Doc. 1292 (emphasis added). The Court again rejected attempts to limit the scope of Dr. Zambelli-Weiner's deposition on February 1, 2018, stating that her deposition is "like any other deposition, is the information discoverable or reasonably likely to lead to relevant information, which is another way of restating the discovery standard."[3] The Court ruled explicitly that GSK's counsel may explore "how she conducted the study, and not just did the study change, but how was the

---

[3] The only limitation placed upon the scope of GSK's discovery related to "the substance of any research, studies, or other work not reasonably related to ondansetron exposure and risk" and "privileged or confidential information concerning any patients or study participants." GSK's document requests do not seek this information.

study designed, is there anything about the study that's unique or different or not in accordance with ordinary professional standards." And the Court warned counsel that instructing the witness not to answer should be done at counsel's "peril" and may result in sanctions. Dr. Zambelli-Weiner's responses to GSK's document requests ignores this clear guidance.

Each of GSK's document requests falls expressly within the parameters set forth by the Court:

- *Request No 4* seeks documents concerning analyses or data related to Zofran and birth defects that were not reported in the Zofran Study. ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ██ ███████ ████████████████ are clearly relevant to the reliability of the Zofran Study and to the risk of birth defects with Zofran generally.

- *Request No 5* seeks documents and communications between Dr. Zambelli-Weiner (and her employees at TTi) and Truven Health regarding the Zofran Study. These communications relate, *inter alia*, to how the study was designed and how that design may have changed in a result-oriented fashion. ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ Additionally, the requested documents are relevant to Dr. Zambelli-Weiner's recent claim that ███████████ ██████████████████████████.

- *Request No 6* seeks analyses and data related to other antiemetics and birth defects that were analyzed pursuant to the protocol for the Zofran Study. Again, these documents relate to how the Zofran Study was designed and conducted; they are directly connected to the protocol for the Zofran Study.

- *Request No. 7* seeks copies of documents previously produced by Dr. Zambelli-Weiner related to the Zofran Study, which were improperly redacted. Documents about the Zofran Study are clearly within the bounds of permissible discovery based on this Court's prior orders.

---

[4] Supplemental Report of Gary Shaw (Ex. I).
[5] Supplemental Report of Stephen Kimmel at 4-5 (Ex. J).

- ***Request No. 9*** seeks communications between Dr. Zambelli-Weiner and her co-authors, including Dr. Kirby, regarding the Zofran Study, which bear, *inter alia*, on the study design, execution, and reporting, whether it changed, and whether it complied with professional standards.

- ***Request No. 10*** seeks communications between Dr. Zambelli-Weiner and Dr. Kirby related to Zofran and birth defects—the subject of the Zofran Study.

- ***Request No. 11*** seeks communications between Dr. Zambelli-Weiner and Dr. Kirby regarding the Zofran Study protocol. These documents are unquestionably discoverable, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████.

- ***Request No. 12*** seeks communications between Dr. Zambelli-Weiner and Dr. Kirby regarding GSK's document requests. To the extent Dr. Zambelli-Weiner instructed Dr. Kirby not to produce certain documents or otherwise suggested that information should be withheld or redacted so that GSK could not discover ████████████████████, those documents bear on whether Dr. Zambelli-Weiner followed professional standards in conducting the Zofran Study.

In sum, Dr. Zambelli-Weiner's claim that these requests are outside the permissible scope of discovery are baseless and plainly contradicted by the Court's prior rulings. Further, she is not a disinterested third party scientist. Instead, she is a former, well-paid, litigation consultant for Plaintiffs' Lead Counsel. The probative value of these documents far outweighs any burden involved in searching her email and files for responsive documents.

### B. Dr. Zambelli-Weiner Has Improperly Withheld Documents Based on the Consulting Expert Privilege.

At the same time that Dr. Zambelli-Weiner asserts that she should not be burdened with discovery requests because she is a "non-party witness," she relies on the consulting expert privilege to shield documents from production. While certain documents in Dr. Zambelli-Weiner's possession may be privileged, those sought by GSK are not.

Request No. 2 seeks communications between Dr. Zambelli-Weiner and her employees at TTi and Plaintiffs' counsel regarding Zofran and birth defects. Dr. Zambelli-Weiner has refused

to produce responsive communications on the basis of the consulting expert privilege. Yet, Dr. Zambelli-Weiner admits that she was a consultant for Plaintiffs' counsel during two distinct time frames: from December 10, 2014 to approximately March 2015 for which she was paid ████; and from March 29, 2017 to approximately November 2017, for which she was paid approximately ████. Zambelli-Weiner Supp. Aff. (Ex. B); Feb. 1, 2019 Tr. at 138:5-139:1 (Ex. E). To the extent that Dr. Zambelli-Weiner or her employees at TTi had communications with Plaintiffs' counsel regarding Zofran and birth defects during the timeframe that she was not engaged as a consulting expert, for instance in October of 2015 when she presented with Plaintiffs' counsel at the Mass Torts Made Perfect Conference, those communications are not privileged and should be produced. *See In re Grassi*, No. 3:12-CV-00344-RCJ, 2013 WL 6623189, at *1 (D. Mass. Dec. 13, 2013), citing favorably, *Rocky Mountain Natural Gas v. Cooper Indus.*, 166 F.R.D. 481, 482 (D. Colo. 1996) (courts allow "a party to engage in discovery with respect to information consultive experts acquired prior to being retained by an opposing party in anticipation of the underlying litigation"); *see also Eliasen v. Hamilton*, 111 F.R.D. 396, 403 (N.D. Ill. 1986) (explaining that "the purpose of [rule 26(b)(4)(B)] is to protect from discovery only those facts and opinions the expert has acquired and developed for the client who hired him in anticipation of litigation or for trial").

Dr. Zambelli-Weiner's improper reliance on the consulting expert privilege is highlighted in her response to Request No. 8, which seeks communications between Dr. Zambelli-Weiner and Plaintiffs' counsel on, or after, November 12, 2018. Dr. Zambelli-Weiner again invoked the consulting expert privilege, even though her consulting relationship with Plaintiffs ended in November 2017, a year before the earliest communications sought by GSK. Dr. Zambelli-Weiner's

reliance on her consulting relationship to withhold documents sought by this request is disingenuous.

Similarly Dr. Zambelli-Weiner has wrongly relied on her role as a consulting expert in refusing produce the retention and/or consulting agreements between TTi and Plaintiffs' counsel (Request No. 13) and invoices and billing statement regarding consulting services rendered by TTi to Plaintiffs' counsel (Request No. 14). The documents are unquestionably relevant to the financial relationship between Dr. Zambelli-Weiner and Plaintiffs' counsel; they go to the core of that issue. Indeed, the Court has already singled out "consulting relationships," how Dr. Zambelli-Weiner was paid, the timing, and the amounts" as being "fair game" for discovery. Feb. 1, 2019 Hr'g Tr. at 8-9 (Ex. D). Moreover, these documents may clear up confusion between Dr. Zambelli-Weiner's claim that ███████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████████ with Plaintiffs' recent admission that "Plaintiffs' Leadership Attorneys paid $210,000 as financial support relating to a study that was ultimately completed and published by Zambelli-Weiner," *i.e.*, the Zofran Study. (Ex. M). Dr. Zambelli-Weiner's objection improperly seeks to withhold documents notwithstanding this Court's explicit ruling and the clear relevance of these documents.

### C. Dr. Zambelli-Weiner Has Improperly Invoked the Peer Review Privilege.

Relying on a "peer review privilege," Dr. Zambelli-Weiner objects to producing communications she or TTi had with the New England Journal of Medicine (NEJM) concerning the basis for the Journal's rejection of the Zofran Study (Request No. 17). She also invokes the peer review privilege to justify refusing to produce peer-review comments she received from the Journal of Reproductive Toxicology (JRT) concerning the Zofran Study (Request No. 18). A

"peer-review privilege" does not exist in federal law. *Bennett v. Kent Cty. Mem'l Hosp.*, 623 F. Supp. 2d 246, 250 (D.R.I. 2009) ("[N]either federal common law nor federal statutory law recognize a 'peer-review privilege'"….).

Although courts can "apply state privilege law to all state claims" in diversity actions, Dr. Zambelli-Weiner points to no state law recognizing a peer-review privilege under these circumstances. While the operative Massachusetts statute contains a medical peer-review privilege that shields production of "the proceedings, reports and records of a medical peer review committee," Mass. Gen. Laws. ch. 111, § 204(a), a medical peer-review committee is defined as "a committee of a state or local professional society of health care providers … or of a medical staff of a public hospital or licensed hospital." *Id.* at § 1. An academic journal, like the NEJM or JRT, does not satisfy the definition of a medical peer-review committee. Unsurprisingly this Court reached the same conclusion in the Bextra and Celebrex MDL, when it denied an effort by the NEJM and the Massachusetts Medical Society to invoke the peer-review privilege. *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8, 12 n.3 (D. Mass. 2008) ("The Court finds that the privileges cited (*e.g.*, a reporter's privilege, a peer review privilege, and the First Amendment privilege) are not directly applicable….").

As the Court went on to explain in *Bextra*, the First Circuit provides an "analytical framework" for evaluating whether pre-publication academic research should be produced. *Bextra*, 249 F.R.D. at 12 n.3. It is a stretch to call Dr. Zambelli-Weiner's research "academic," given that it was funded by Plaintiffs' lawyers in this litigation. Even so, the First Circuit's confidentiality framework does not support barring discovery of communications with the NEJM or the JRT, or peer-review comments in Dr. Zambelli-Weiner's or TTi's possession, custody, or control. The multi-factor balancing test provides:

Each party comes to this test holding a burden. Initially, the movant must make a prima facie showing that his claim of need and relevance is not frivolous. Upon such a showing, the burden shifts to the objector to demonstrate the basis for withholding the information. The court must then place those factors that relate to the movant's need for the information on one pan of the scales and those that reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan.

*Garcia v. E.J. Amusements of New Hampshire, Inc.*, 89 F. Supp. 3d 211, 214 (D. Mass. 2015)

(citing *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 716 (1st Cir.1998)).

The need for and relevance of the NEJM communications and peer-review comments is not frivolous. Dr. Zambelli-Weiner testified that ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Supplemental Expert Report of

Stephen Kimmel (Ex. J).[6] If peer reviewers raised similar concerns, this goes to the overall

---

[6] *See also, U.S. v. Harkonen,* No. No. C 08–00164, 2010 WL 2985257, at *6 (N.D. Cal. 2010), *aff'd*, 510 F. App'x 633 (9th Cir. 2013). Reliance on such secondary analyses is particularly suspect when, as here, the primary analysis shows no statistically significant increased risk. *In re Prempro*, 738 F. Supp. 2d 887, 891-892 (E.D. Ark. 2010); *see Newman v. Motorola, Inc*., 218 F. Supp. 2d 769, 779 (D. Md. 2002), *aff'd*, 78 F. App'x 292 (4th Cir. 2003) ("[W]hen there is a high number of subgroup comparisons, at least some will show statistical significance by chance alone."); *Boughton v. Cotter Corp.,* 65 F.3d 823, 835 n.20 (10th Cir. 1995) ("Even if the elevated levels of lung cancer for men had been statistically significant, a court might well take account of the statistical "Texas Sharpshooter" fallacy in which a person shoots bullets at the side of a barn, then, after the fact, finds a cluster of holes and draws a circle around it to show how accurate his aim was.").

16

soundness of her Zofran Study. Furthermore, ███████████████████████████
████████████████████████████████████ and Plaintiffs' recent admission that they
paid over $200,000 to support the study, the correspondence with the NEJM and JRT peer
reviewers is critically important. Therefore, the communications between Dr. Zambelli-Weiner
and/ or TTi and NEJM (and JRT) are relevant and not frivolous.

The burden now shifts to Dr. Zambelli-Weiner to demonstrate a legitimate basis for
withholding these communications and comments. She cannot do so. As NEJM explained in
*Bextra*, the journal "imposes no legal restriction on the author limiting the author's disclosure of
the peer review comments shared with him or her." *Bextra*, 249 F.R.D. at 14 n.4. And for the
reasons explained above, the requested documents fall within the permitted scope of discovery.
The Court merely limited GSK's discovery only to the extent it sought "the substance of any
research, studies, or other work not reasonably related to ondansetron exposure and risk" and
"privileged or confidential information concerning any patients or study participants." Dr.
Zambelli-Weiner's Zofran research, as well as comments regarding that research, are self-
evidently "related to ondansetron exposure and risk." Finally, there is no information in these
documents concerning patients or study participants, as the data was de-identified.[7]

_____

[7] Dr. Zambelli-Weiner has also improperly used the peer review comments as a "sword" ███████
████████████, Zambelli-Weiner Dep. Part
II at 340-42 (Ex. K), and thus, cannot use any protection for peer review comments to "shield" them from
discovery. *See, e.g., Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-CV-00047-MSK-MEH, 2010 WL
3923092, at *10 (D. Colo. Oct. 1, 2010) ("A litigant cannot use the work product doctrine as both a sword
and a shield by selectively using the privileged documents to prove a point but then invoking the privilege
to prevent an opponent from challenging the assertion. . . . Where a party injects part of a communication
as evidence, fairness demand that the opposing party be allowed to examine the whole picture . . ." (internal
quotation marks and citations omitted)).

### D. Dr. Zambelli-Weiner Has Failed to Even Undertake a Search for Certain Documents.

In response to yet another request, it is unclear whether Dr. Zambelli-Weiner actually looked for responsive documents within her possession, custody, or control. In Request No. 1, GSK seeks communications between any employee of TTi and Plaintiffs' counsel concerning the Zofran Study. Dr. Zambelli-Weiner has objected, claiming that TTi would be the custodian, not her. Of course, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████, these documents are within her possession, custody, or control. *See In re Flag Telecom Holdings, Ltd. Sec. Litig*., 236 F.R.D. 177, 180 (S.D.N.Y. 2006) (noting that "control" has been construed "broadly"; "If the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have 'control,' even if the documents are actually in the possession of a non-party."). Moreover, Dr. Zambelli-Weiner further responds that she is "not aware" of any responsive communications, but it is unclear whether she has actually performed a reasonable search as required by Rule 45. To the contrary, her claim that TTi has the documents and not her, suggests that she has not looked for responsive documents.

## III.     CONCLUSION

GSK respectfully requests that the Court grant its Motion to Compel and order Dr. Zambelli-Weiner to produce documents responsive to GSK's requests.

Dated: March 8, 2019

Respectfully submitted,
GLAXOSMITHKLINE LLC,
By its attorneys,

/s/ Jennifer M. Stevenson
Madeleine M. McDonough
Jennifer M. Stevenson
Jennifer Stonecipher Hill
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
(816) 474-6550
mmcdonough@shb.com
jstevenson@shb.com
jshill@shb.com
(admitted *pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those identified as non-registered participants.

This document will be sent via email and first class mail to:

Eric Gunderson, Esq.
Davis, Agnor, Rapaport & Skalny
10211 Wincopin Circle, Suite 600
Columbia, MD 21044
egunderson@darslaw.com

*Attorney for Dr. Zambelli-Weiner*

/s/ *Jennifer Stevenson*
Jennifer Stevenson
