# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE : ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION<br><br>**This document relates to:**<br>**All Actions** | MDL No. 1:15-md-2657-FDS |

## GLAXOSMITHKLINE LLC'S
## MEMORANDUM IN SUPPORT OF ITS EMERGENCY MOTION TO STRIKE THE
## SUPPLEMENTAL REPORTS OF PLAINTIFFS' GENERAL CAUSATION EXPERTS

## TABLE OF CONTENTS

I.       FACTUAL BACKGROUND ............................................................................................. 2

         A.   Dr. Abdulla ................................................................................................................. 2

         B.   Dr. Danielsson .......................................................................................................... 2

         C.   Dr. Sadler ................................................................................................................... 3

II.      ARGUMENT ................................................................................................................... 4

         A.   The Supplemental Reports Should Be Stricken Because They Add New Opinions
              and Contradict the Experts' Sworn Deposition Testimony. ............................................ 5

         B.   The Reports Should Be Stricken as Untimely and Inappropriate. ............................. 12

III.     CONCLUSION ............................................................................................................... 15

i

# TABLE OF AUTHORITIES

Page

**Cases**

*Albert v. Warner-Lambert Co.*,
No. CIV.A. 99-11700-RGS, 2002 WL 745822 (D. Mass. Apr. 24, 2002)..............................15

*Baratto v. Brushstrokes Fine Art, Inc.*,
701 F. Supp. 2d 1068 (W.D. Wis. 2010) ...............................................................................13

*Chartier v. Brabender Tech., Inc.*,
No. CIV.A. 08-40237-FDS, 2011 WL 4732940 (D. Mass. Oct. 5, 2011)
(Saylor, J.).........................................................................................................................4, 5

*Desimini v. Durkin*,
No. 14-CV-112-JD, 2015 WL 13648076 (D.N.H. Apr. 17, 2015)..........................................12

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010)....................................................................................13

*Inverness Med. Switzerland GMBH v. Acon Labs., Inc.*,
No. CIV.A. 02-12303-PBS, 2005 WL 6246801 (D. Mass. June 24, 2005)........................5, 12

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
No. CIV06-CV-100-JD, 2010 WL 1427549 (D.N.H. Apr. 2, 2010) ........................................5

*Palmer v. Ascaro Inc.*
No. 03-CV-0498, 2007 WL 2254343 (N.D. Okla. Aug. 3, 2007)...........................................13

*Providence Piers, LLC v. SMM New England, Inc.*,
No. 12-532S, 2016 WL 705259 (D.R.I. 2016) ..........................................................................5

*United States v. 14.3 Acres of Land*,
No. 07-cv-886, 2011 WL 2414348 (S.D. Cal. June 10, 2011) ................................................12

*West v. Bell Helicopter Textron, Inc.*,
No. 10-CV-214-JL, 2017 WL 5256307 (D.N.H. Oct. 4, 2017)...............................................15

*Zeolla v. Ford Motor Co.*,
No. CIV.A. 09-40106-FDS, 2013 WL 308968 (D. Mass. Jan. 24, 2013)
(Saylor, J.)....................................................................................................................5, 12, 13

**Statutes**

Fed. R. Civ. P. 26(a)(2)............................................................................................................4, 5

Fed. R. Civ. P. 26(a)(2)(B) .....................................................................................................4, 15

Fed. R. Civ. P. 26(a)(2)(B)(i)........................................................................................................12

Fed. R. Civ. P. 26(a)(2)(B)(ii).......................................................................................................15

Fed. R. Civ. P. 26(a)(2)(E)............................................................................................................15

Fed. R. Civ. P. 26(a)(3)............................................................................................................5, 15

Fed. R. Civ. P. 26(e) ............................................................................................................4, 5, 13

Fed. R. Civ. P. 26(e)(2)..........................................................................................................5, 14

Fed. R. Evid. 702 ....................................................................................................................8, 10

GSK moves to strike the supplemental expert reports of Drs. Abdulla, Sadler, and Danielsson served on March 15, 2019 as untimely and improper. The reports proffer new opinions based on information (i) that was available prior to the experts' depositions (ii) on which the experts have already been deposed, and (iii) about which the experts already provided supplemental expert reports.  Worse, the reports attempt to change the experts' sworn testimony and plug in the gaping holes identified in GSK's *Daubert* motions.

All three experts now offer "supplemental reports" that contain new opinions and/or substantially change the experts' deposition testimony about the Parker study, which was published on July 10, 2018, months before the expert depositions and *Daubert* briefing and well after all three experts provided supplemental reports stating that they had reviewed the study and that it did not change their opinions.  Similarly, they offer new and conflicting opinions on the Zambelli-Weiner study, despite Plaintiffs' previous representation that there was "[no] difference between the abstract poster and the published study" because "[t]he format of presenting the information is different but the substance is the same."[1]

Plaintiffs served these reports on the eve of the *Daubert* hearing, even though all three reports were signed at least two weeks earlier, further showing the "supplementation" for what it truly is:  gamesmanship, and an improper attempt to save their experts' opinions from a *Daubert* challenge while limiting GSK's ability to respond.  The Supplemental Reports, except to the extent they discuss the Huybrechts study,[2] should be stricken, and the Court should order further depositions of these experts on any non-stricken opinions.

---

[1] December 7, 2018, Hearing Tr. at 17 (Ex. A); Pls. Opp'n to GSK's Motion For Leave To Re-Open Deposition of Dr. Louik at 3 (Doc. No. 1237).

[2] The Huybrechts study was published on December 18, 2018.  Plaintiffs' experts have been deposed on the Huybrechts abstract, but not on the full published study.  GSK does not seek to strike

## I.     FACTUAL BACKGROUND

### A.     Dr. Abdulla

Dr. Abdulla submitted his expert report on July 10, 2018.  His original reference list identified the Zambelli-Weiner abstract.  On the same day, the Parker article was e-published.  It was published in print on August 1, 2018.  On October 24, 2018, two days prior to his deposition, Dr. Abdulla provided an amended References Considered List, which included the published Parker article.  At his deposition on October 26, 2018, Dr. Abdulla was questioned on the Parker article and the Zambelli-Weiner abstract.[3]

Dr. Abdulla submitted an "Additional References Considered" list on November 26, 2018, which included both the Parker article and the Zambelli-Weiner article, which was e-published on October 29, 2018.  The list included a short supplemental opinion stating that "[h]aving considered the additional materials . . . my opinions as stated in my expert report are unchanged."[4]

Dr. Abdulla's Supplemental Report—dated February 27, 2019, but provided to GSK on March 15, 2019—provides new opinions on both studies.

### B.     Dr. Danielsson

Dr. Danielsson's original report, submitted on July 10, 2018, contained one paragraph on the epidemiological studies related to Zofran and birth defects and did not refer to the available Parker and Zambelli-Weiner abstracts, even though he cited another abstract (Andersen) to support his opinion.[5]  On August 27, 2018, Dr. Danielsson submitted a 14-page "Supplemental

---

Plaintiffs' experts' opinions on the Huybrechts study so long as GSK is given an opportunity to depose them on these new opinions.

[3] *E.g.*, Abdulla Dep. 184:19-192:13, 212:7-217:20 (Ex. 21 at JA001233-1235, JA001240-41).

[4] Additional References Considered in Connection with Expert Report of Ra-id Abdulla, M.D., F.A.A.P., F.A.C.C. (Ex. B).

[5] Danielsson Report at 5 (Ex. 4 at JA00187).

and Rebuttal Expert Report" that still did not address the published Parker article or the Zambelli-Weiner abstract.

When Dr. Danielsson was deposed on October 12, 2018, he still had not read the Parker abstract or article.[6]   On November 23, 2018, Dr. Danielsson submitted an "Additional References Considered" list, which included the published Parker and Zambelli-Weiner articles, and stated:  "[h]aving considered this additional material . . . my opinions as stated in my expert report are unchanged."[7]

Dr. Danielsson's Supplemental Report—dated February 28, 2019, but not provided to GSK until March 15, 2019— is about three times longer than the entire discussion of the epidemiology on Zofran and birth defects in Dr. Danielsson's original report.  The Supplemental Report provides new opinions on the Parker and Zambelli-Weiner studies.

### C.   Dr. Sadler

Dr. Sadler's July 2018 original report cited the Zambelli-Weiner abstract.[8]   On September 25, 2018, the morning of his deposition, Dr. Sadler updated his reference list to include the Parker article.  During his deposition, Dr. Sadler testified at length regarding the Parker study and the Zambelli-Weiner abstract.[9]   On December 5, 2018, Dr. Sadler submitted an "Additional References Considered" list, which included the published Parker and Zambelli-Weiner articles. Like Drs. Abdulla and Danielsson, Dr. Sadler stated that "[h]aving considered" these studies, his opinions were "unchanged."[10]

---

[6] To excuse his failure to assess the Parker study, Dr. Danielsson explained that it was published while he was "on holiday."  *See* Danielsson Dep. 121:14-17 (Ex. 24 at JA001508).

[7] Additional References Considered in connection with Expert Report of B. Danielsson (Ex. C).

[8] Sadler Report at 18 (Ex. 15 at JA000857).

[9] Sadler Dep. 105:8-114:10, 95:6-97:9 (Ex. 32 at JA002615-18, JA002613).

[10] Additional References Considered in connection with Expert Report of Thomas W. Sadler, Ph.D. (Ex. D).

Dr. Sadler's Supplemental Report (signed on March 1, 2019, but served two weeks later) provides new opinions on the Parker and Zambelli-Weiner studies.

## II.     ARGUMENT

Under Fed. R. Civ. P. 26(a)(2)(B), a testifying expert must submit a written report that contains "a complete statement of all opinions," the "basis and reasons for" the opinions, and "the facts or data considered by the [expert] in forming" his opinions.  This disclosure exists to ensure that the opposing party knows the expert's opinions and can adequately respond to them. *See Chartier v. Brabender Tech., Inc.*, No. CIV.A. 08-40237-FDS, 2011 WL 4732940, at *7 (D. Mass. Oct. 5, 2011) (Saylor, J.) (citing Fed. R. Civ. P. 26(a)(2) Advisory Committee's Note (1993)).

If a party discovers that its expert provided materially incomplete or incorrect information in his report or during his deposition, the party must supplement or correct that information.  Fed. R. Civ. P. 26(e).  Any additions or changes to information in an expert's report or deposition testimony "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2).  This duty to supplement, however, does not allow a testifying expert to add "new opinions," *Marine Polymer Techs., Inc. v. HemCon, Inc.*, No. CIV06-CV-100-JD, 2010 WL 1427549, at *4 (D.N.H. Apr. 2, 2010)), bolster his opinions with new, previously undisclosed information, *id.*, "fix" analytical or methodological flaws in the expert's original report, *Providence Piers, LLC v. SMM New England, Inc.*, 2016 WL 705259, at *3 (D.R.I. 2016), *report and recommendation adopted*, 2016 WL 727165 (D.R.I. 2016)), or contradict the expert's deposition testimony, *see Chartier*, 2011 WL 4732940, at *7 (D. Mass. 2011) (Saylor, J.).  Opinions that do so should be stricken as untimely expert disclosures or improper supplementation.  *Inverness Med. Switzerland GMBH v. Acon Labs., Inc.*, No. CIV.A. 02-12303-PBS, 2005 WL 6246801, at *1 (D. Mass. June 24, 2005); *Zeolla v.*

4

*Ford Motor Co.*, No. CIV.A. 09-40106-FDS, 2013 WL 308968, at *11 (D. Mass. Jan. 24, 2013) (Saylor, J.) ("If [an expert's] affidavit consists of new opinions, new bases for her opinions, or new findings, then it should rightly be excluded as an impermissible supplementary report.").

### A.    The Supplemental Reports Should Be Stricken Because They Add New Opinions and Contradict the Experts' Sworn Deposition Testimony.

Plaintiffs' three supplemental reports provide new opinions that directly contradict the experts' sworn deposition testimony and attempt to cure methodological deficiencies identified by GSK in its *Daubert* motion challenging Plaintiffs' experts.  This type of "supplementation" is improper and must be stricken.  This Court has specifically held that, when an expert's report contradicts the expert's deposition testimony, without "satisfactorily explain[ing]" the contradiction, the contradictory opinions in the report should be stricken, as permitting the contradictory report would undermine both the integrity of judicial proceedings and the purpose of Fed. R. Civ. P. 26(a)(2)'s disclosure requirements.  *Chartier*, 2011 WL 4732940, at *6-7 (D. Mass. 2011) (Saylor, J.).   The Court went on to explain, "[t]he purpose behind expert disclosures, and particularly expert depositions, would be defeated if an expert were permitted to give varying versions of his opinion, leaving the opponent to guess at which version will be rendered at trial."  *Id.* at *7.

As GSK noted in its *Daubert* briefing, the original expert reports prepared by Dr. Abdulla, Dr. Danielsson, and Dr. Sadler, contained several critical analytical and methodological flaws and also failed to properly consider the Parker and Zambelli-Weiner studies.  What Plaintiffs now seek with these experts' supplemental reports is a do-over.  They now assert opinions that flatly contradict their original reports or earlier sworn deposition testimony.  For example, regarding the Parker National Birth Defects Prevention Study (NBDPS) and the Parker Birth Defects Study (BDS), Dr. Abdulla testified as follows:

18   Q. And in the NBDPS the odds ratio for VSD
19 is 0.9 with a confidence interval of 0.6 to 1.3;
20 is that correct?
21   A. That's correct.
22   Q. And that means no association was
23 observed, correct?
24   A. Correct.
25   Q. And in the BDS the odds ratio for VSD

1 is 1.1 with a confidence interval of 0.9 to 1.4,
2 correct?
3   A. Yes.
4   Q. And that also means that no association
5 was observed; is that right?
6   A. Yes, ma'am.
7   Q. And for ASD as well neither study found
8 an increased risk, correct?
9   A. Correct.

19   Q. Okay. If we go to page 393, Table 4,
20 they list a number of specific cardiovascular
21 defects or cardiac defects, correct?
22   A. Yes.
23   Q. And they have a list for both the NBDPS
24 and then a list for the BDS, right?
25   A. Yes.

1   Q. And none of those are statistically
2 significant, correct?
3   A. Correct.
4   Q. Okay. And that means they found no
5 increased risk for any of those defects; is that
6 right?
7   A. That's correct.      11

In direct contravention to this sworn testimony, Dr. Abdulla's Supplemental Report[12]

states:

---

[11] Abdulla Dep. 213:18-214:7, 214:19-215:7 (Ex. 21 at JA001240-41) (emphasis added).
[12] Abdulla Suppl. Report at 4 (Ex. E).

> Overall this study did find increased risks for cardiac defects in the NBDPS study cohort which is consistent with the evidence in other studies.

Similarly, contrary to the testimony above that a non-statistically significant association "means . . . no increased risk," Dr. Abdulla's Supplemental Report suggests that the statistically insignificant risk estimates in the Zambelli-Weiner study show an increased risk.[13] Furthermore, the Supplemental Report lays out a new methodological framework for Dr. Abdulla's causation opinions, in an apparent attempt to cure methodological deficiencies identified in GSK's *Daubert* challenge.[14]

Similarly, Dr. Danielsson's Supplemental Report is a complete about-face with respect to his professed willingness and ability to engage with the epidemiological evidence.   In his original report, Dr. Danielsson devoted only one paragraph to a cursory discussion of the epidemiological studies.[15]  Dr. Danielsson testified that "[t]hat's only a brief description since I'm not focused in my report on epidemiology" and "I didn't look at the epidemiology in detail since I focused on mechanics, kinetics, interspecies comparisons . . .."[16]  Dr. Danielsson further testified that "epidemiology was basically covered by Dr. Carol Louik" and "[s]o you have to look at the expert, Dr. Louik, what she says about epidemiology if you want to have details."[17] In sharp contrast to his original report and deposition testimony, Dr. Danielsson's Supplemental

---

[13] *See, e.g.*, *id.* at 5 ("The aOR for HLHS was increased at 2.12 though not statistically significant. . . .").

[14] *Id.* at 1-3, 6-7.  For example, Dr. Abdulla, for the first time, claims that he "weigh[ed] the validity of positive findings as well as examin[ed] potential reasons for negative findings." *Id.* at 6.  He also provides an expanded list of methodological principles he applies in determining the teratogenicity of a medication.  *Compare* Abdulla Report at 3-4 (Ex. 1 at JA000003-4), *with* Abdulla Suppl. Report at 2 (Ex. E).

[15] Danielsson Report at 5-6 (Ex. 4 at JA000187-88).

[16] Danielsson Dep. 68:25-69:1, 116:23-25 (Ex. 24 at JA001495, JA001507).

[17] *Id.* 113:3-4, 152:17-19 (JA001506, JA001516).

Report devotes three pages to a comprehensive discussion of three epidemiological studies, including issues related to bias and cofounding on which Dr. Danielsson previously deferred to Dr. Louik.[18]   Worse, Dr. Danielsson's discussion of the Parker study is a blatant attempt to undercut one of the chief arguments in GSK's *Daubert* challenge to Dr. Danielsson—his failure to reconcile his causation opinion with the results in Parker.[19]

Furthermore, Dr. Danielsson's discussion of the Parker study in his Supplemental Report directly contradicts his prior deposition testimony.  For example, Dr. Danielsson testified that the Parker studies' findings for atrial septal defects ("ASDs") and ventricular septal defects ("VSDs") were inconsistent with (i) a relationship between Zofran and these defects[20] and (ii) the findings in his own epidemiological study:

> Q.  It[ ] [the Parker BDS study's findings on VSDs] is inconsistent with your results, correct?
>
> A.  Yeah.  It looks so . . .
>
> * * *
>
> Q.   And that's [the Parker NBDPS study's finding of no statistically significant increased risk for ASDs] not consistent with an increased risk or any association between --
>
> A.  No, no, no.  It's inconsistencies between studies.[21]

---

[18] *Id.* 72:19-23 (JA001496) ("Q.  Would you defer to Dr. Louik on issues related to assessing chance, bias, and confounding in the epidemiology studies?  A.  Yeah. . . .").

[19] GSK's Mot. to Exclude Pls. General Causation Experts Under Fed. R. Evid. 702 and Mem. in Support at 82-85 (Doc. No. 1304).

[20] Danielsson Dep. 126:5-15 (Ex. 24 at JA001510) (agreeing that the Parker BDS study's findings on VSDs "does not indicate an association between Zofran and ventricular septal defects"); *id.* 127:1-11 (JA001510) (agreeing that the Parker BDS study's findings on ASDs "does not indicate any relationship between exposure to ondansetron and the development of atrial septal defects"); *id.* 127:12-128:7 (JA001510) ("Q.  So the results of these two studies [the Parker studies] in the United States with respect to [VSDs and ASDs] do not support an association between Zofran and the development of septal defects, correct?  A.  As they have written it. . . .").

[21] Danielsson Dep. 120:9-11 (Ex. 24 at JA001508); *id.* 122:23-123:22 (JA001508).

In his Supplemental Report, however, Dr. Danielsson opines that Parker's findings on VSDs and

ASDs are "consistent" with earlier studies and are "in line" with his causation opinion:

> Regarding ventricular septal defects, the upper bound confidence intervals were above 1 in both the A and B studies for both VSD (1.3 and 1.4) and ASD (1.3 and 1.2) in pregnant women exposed to ondansetron. This means that the results were consistent with elevated risks identified in earlier epidemiology studies. Furthermore, more than 15 different types of rare heart defects were detected. All had confidence intervals above 1.0, and seven of them had odds ratios (OR) that were elevated in ondansetron exposed groups compared to women not exposed to ondansetron. These results are consistent with the fact that elevated risk exists with ondansetron exposure.

> The results in the Parker study standing alone can not prove or disprove an association. However, when the study is considered in the context of a weight of evidence approach, including results in other epidemiological studies, results in animal teratology studies, class alerts, mechanistic studies, transgenic animals and other non-epidemiological information, the results are in line with my opinion that ondansenton can induce cardiovascular and orofacial clefts malformations in humans.

[22]

Furthermore, Dr. Danielsson's Supplemental Report attempts to cure the deficiencies in

Dr. Danielsson's opinions identified in the *Daubert* briefing. By way of example, Plaintiffs'

Opposition to GSK's *Daubert* motion claimed that their experts used a "weight of the evidence"

methodology.[23] As explained in GSK's Reply, not only was this not true, but the words "weight

of the evidence" did not appear in any expert report or deposition.[24] Now, to attempt to shore up

his methodology, Dr. Danielsson's Supplemental Report lays out a new "weight of the evidence"

methodology that he purportedly applied.[25] Indeed, Dr. Danielsson's prior expert reports, which

totaled more than 80 pages, never used the words "weight of the evidence." By contrast, the 3-

page Supplemental Report uses those words no less than ***ten*** times.

---

[22] Danielsson Suppl. Report at 3 (Ex. F).

[23] *E.g.*, Pls. Opp'n to GSK's Mot. to Exclude Pls. General Causation Experts Under Fed. R. Evid. 702 at 2, 5, 7 (Doc. No. 1299).

[24] GSK's Reply In Support of Its Motion To Exclude Pls. General Causation Experts at 2 (Doc. No. 1339) ("Plaintiffs' attempt to rescue their experts opinions by suggesting that they adopted a 'weight of the evidence' methodology must fail. As an initial matter, not one of their experts has used the term 'weight of the evidence' in either deposition or expert report.").

[25] Danielsson Suppl. Report at 1 (Ex. F).

Dr. Sadler also uses his supplemental report as an opportunity to revise and correct his opinions.  For example, he testified that he cannot independently assess epidemiological studies for bias, including recall bias;[26] that he does not understand the "effect that differential versus non-differential misclassification of exposure has on a risk estimate;"[27] that he is not qualified to assess whether Parker replicates the Anderka study's finding for cleft palate;[28] and that he "would not opine as to which definition of exposure [medical administration only, or medical administration and filled prescription combined] in the Zambelli-Weiner abstract will produce more or less reliable results."[29]  Yet in his Supplemental Report, Dr. Sadler completely reverses course:

| Dr. Sadler's Testimony: | Dr. Sadler's Supplemental Report: |
|---|---|
| 8     Q.  So in reviewing the epidemiological 9 literature on Zofran and birth defects, you didn't 10 independently assess things like recall bias or 11 detention bias, correct? 12     A.  Not unless they were noted in the report 13 that I was reading. | Claims that Parker is subject to recall bias.[30] |

---

[26] Sadler Dep. 63:3-7 (Ex. 32 at JA002605) ("Q.  And if it's not identified by a person writing the paper, can you independently assess all the potential biases and confounders in a given study?  A. No.  Q. So in reviewing the epidemiological literature on Zofran and birth defects, you didn't independently assess things like recall bias or detention bias, correct?  A.  Not unless they were noted in the report that I was reading.").

[27] *Id.* 96:16-19 (JA002613).

[28] *Id.* 112:20-25 (JA002617) ("Q.  And as you've told us, Dr. Sadler, you're not qualified to assess whether this finding constitutes -- within the NBDPS data set, constitutes replication of the finding in Anderka?  A. Correct."); *id.* 68:7-11 (JA002606) ("Q.  You can't independently assess whether, based on its design, population, risk estimate, strength of association, one study replicates another?  A.  No.").

[29] Sadler Dep. 96:23-97:2 (Ex. 32 at JA002613).

[30] Sadler Suppl. Report at 2 (Ex. G) ("Thus this data is subject to mother's recollection bias.").

| | |
|---|---|
| 16   Q.  Now, Dr. Sadler, do you understand the<br>17   effect that differential versus non-differential<br>18   misclassification of exposure has on a risk estimate?<br>19       A.  No. | Opines that Huybrechts has non-differential misclassification that biases the risk estimates towards the null.[31] |
| 20       Q.  And as you've told us, Dr. Sadler, you're<br>21   not qualified to assess whether this finding<br>22   constitutes -- within the NBDPS data set, constitutes<br>23   replication of epidemiological replication of the<br>24   finding in Anderka?<br>25       A.  Correct.<br>7        Q.  You can't independently assess whether,<br>8    based on its design, population, risk estimates,<br>9    strength of association, one study replicates another<br>10   study?<br>11       A.  No. | Opines that Parker "confirmed" (*i.e.*, replicated) Anderka's findings on cleft palate.[32] |
| 23       Q.  So I assume you're not going to be<br>24   proffering an opinion at trial as to which definition<br>25   of exposure in the Zambelli-Weiner abstract will<br>1    produce more or less reliable results?<br>2        A.  Right. | Opines that medical administration used by Zambelli-Weiner is the "more valid" exposure definition. [33] |

Consistent with Rule 26(e), courts, including this one, recognize that parties cannot, without good cause, offer supplemental expert reports that "provide[] a substantial change in [the expert's] opinion." *Desimini v. Durkin*, No. 14-CV-112-JD, 2015 WL 13648076, at *1 (D.N.H. Apr. 17, 2015); *see Inverness*, 2005 WL 6246801, at *1 (D. Mass. 2005) ("I strike Dr. Chambers' 'second supplemental report' on the ground it contains entirely new theories and was untimely filed on May 23, 2005, two days before Dr. Chambers' deposition, without good excuse."); *Zeolla*, 2013 WL 308968, at *10-11 (D. Mass. 2013) (Saylor, J.) ("[N]either party will be permitted to submit supplemental expert reports that 'state[ ] additional opinions or rationales

---

[31] *Id.* ("This study defined exposure as prescription filled, with no actual proof of ingestion of ondansetron.  The authors note this as a limitation.  I consider this to be a significant limitation in this study as if the women considered 'exposed' were truly unexposed and never took ondansetron the odds ratios for congenital defects in the exposed population would be biased toward the null.").

[32] *Id.* at 3 ("Parker's study confirmed the increased risk for isolated cleft palate in the NBDPS group . . . that had been demonstrated previously in Anderka . . . .").

[33] *Id.* ("Medical administration is proof of ingestion and thus more valid exposure data.").

or seek[ ] to "strengthen" or "deepen" opinions expressed in the original expert report.'" (citation omitted)).  As other courts have recognized, "supplementation is not properly used to remedy defects in an expert's report or testimony after the weaknesses have been revealed."  *United States v. 14.3 Acres of Land*, No. 07-cv-886, 2011 WL 2414348, at *4 (S.D. Cal. June 10, 2011) (citation omitted).  Plaintiffs' efforts to do exactly that must be rejected.

## B.    The Reports Should Be Stricken as Untimely and Inappropriate.

### 1.    *The Parker Study*

The Parker article was e-published on July 10, 2018, and it was published in print on August 1, 2018—well before Plaintiffs' experts' depositions.  Drs. Abdulla and Sadler provided supplemental reference lists—that included the Parker study—prior to their depositions.  Dr. Danielsson provided a supplemental report more than a month after Parker was published, but chose not to mention the Parker study.  All of Plaintiffs' experts were deposed on the Parker study.  After their depositions, in December 2018, all of Plaintiffs' experts provided addendums to their reports stating that they reviewed the Parker study and that it did not change their opinions.

The latest round of "supplementation" on Parker—more than 6 months after the study's publication and after two rounds of previous supplements—is not only a blatant attempt to undermine the arguments in GSK's *Daubert* motions, but is untimely.  This is improper supplementation that must be stricken.

An analogous fact pattern arose in the *Palmer v. Ascarso* case decided by the Northern District of Oklahoma, which this Court cited favorably in *Zeolla*, 2013 WL 308968, at *10 (D. Mass. 2013) (Saylor, J.).  After the *Palmer* defendants moved to exclude the plaintiffs' environmental expert, the expert sought to offer new causation and modeling opinions through a supplemental rebuttal report.  2007 WL 2254343, at *1-2 (N. D. Okla. Aug. 3, 2007).  The court

12

rejected the report, finding that the expert could have performed the same modeling and provided the same causation opinion within the expert disclosure deadlines. *Id.* at \*3-6 (commenting that Rule 26(e) "was designed to prevent exactly this type of late disclosure of expert opinions" and that "[t]o rule otherwise would create a system where preliminary expert reports could be followed by supplementary reports and there would be no finality to expert reports." (internal citation omitted)); *see also*, *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 877 n.7 (E.D. Wis. 2010) ("[T]he duty to supplement a report under Rule 26(e) in no way can be the means to avoid a *Daubert* challenge, as such a tactic violates Rule 26(a)(2)(B)(i)'s requirement that the expert report be a 'complete statement of all opinions the witness will express and allows an expert's testimony to become a moving target.'" (citing *Baratto v. Brushstrokes Fine Art, Inc.,* 701 F. Supp. 2d 1068, 1071 (W.D. Wis. 2010)).  Plaintiffs' experts here could have likewise provided any supplemental opinions on the Parker study well before their depositions or *Daubert* motion practice. Their untimely supplementation contravenes the purposes of Rule 26(e) and must be stricken.

### 2. *The Zambelli-Weiner Study*

It is undisputed that both the Zambelli-Weiner abstract and poster were available prior to Plaintiffs' experts' depositions and that Plaintiffs' experts have been cross-examined on these materials.   After the Zambelli-Weiner study was published, each one of Plaintiffs' experts submitted a supplemental report stating that the publication did not change his/her opinion. Moreover, Plaintiffs have argued that there was absolutely no new information in the published study (as compared to the abstract and poster):

> Now, as we pointed out in our papers, your Honor, the published study does not differ much at all from the abstract. Why? Because this abstract poster that we presented earlier this year was not a typical abridged abstract. As we pointed out in our papers, **it contained all the salient information relating to causation.**  We

> pointed to 15 different pieces of information in the abstract poster in our response brief.  So, of course, we were expecting in GSK's reply that they would somehow point out where **there is a difference between the abstract poster and the published study, and they didn't.  Why?  Because there is none.**[34]

Furthermore, although Plaintiffs' Opposition to GSK's *Daubert* motion suggested that Plaintiffs were waiting until after the completion of discovery related to the Zambelli-Weiner study to supplement their expert reports,[35] there is absolutely no suggestion that Dr. Abdulla, Dr. Danielsson, or Dr. Sadler reviewed this discovery (or that they even know it exists).[36]  If they did review this information, they were required to disclose it,[37] which they have not done.  Thus, given Plaintiffs' position that the published study contains no new information, they can offer no basis for *yet another round* of supplementation on the Zambelli-Weiner study.

For all of these reasons, Plaintiffs' experts' "supplemental reports" fall well outside the bounds of proper supplementation under Rule 26 and should be stricken.

---

[34] December 7, 2018, Hearing Tr. at 17 (Ex. A) (emphasis added); *see* Pls. Op'n to GSK's Motion For Leave To Re-Open Deposition of Dr. Louik at 3 (Doc. No. 1237) ("The Zambelli-Weiner poster and abstract contain substantially more information about the methodology, data, and results than would be contained in a typical abstract, and essentially the same information about methods, data, and results, that is contained in the full published manuscript.  **The format of presenting the information is different but the substance is the same**." (emphasis added)).

[35] Pls. Opp'n to GSK's Motion For Leave To Re-Open Deposition of Dr. Louik at 7 n.6 (Doc. No. 1237) ("[T]wo additional relevant studies were published, one by Dr. Zambelli-Weiner et al (released Jan. 2019) and one by Dr. Huybrechts et al (released Dec. 2018).  As to each of these studies, additional discovery is expected.  Plaintiffs reserve the right for their expert witnesses to consider those studies together with the forthcoming discovery and to supplement their report as appropriate promptly after completion of discovery.").

[36] Dr. Zambelli-Weiner and study coauthor, Dr. Russell Kirby, were deposed in February 2019, and Dr. Kirby produced documents—including unpublished analyses—related to the Zambelli-Weiner study.

[37] Fed. R. Civ. P. 26(a)(2)(B)(ii) ("Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report. . . .  The report must contain . . . the facts or data considered by the witness in forming them . . . ."); Fed. R. Civ. P. 26(a)(2)(E) ("The parties must supplement these disclosures [including the mandatory expert disclosures under Fed. R. Civ. P. 26(a)(2)(B)] when required under Rule 26(e)."); Fed. R. Civ. P. 26(e)(2) ("For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.").

To the extent that any of Plaintiffs' experts' opinions are not stricken, GSK should be permitted to depose Plaintiffs' experts on those non-stricken opinions. *See West v. Bell Helicopter Textron, Inc.*, No. 10-CV-214-JL, 2017 WL 5256307, at \*1 (D.N.H. Oct. 4, 2017) (allowing expert deposition on a supplemental report even after the producing party withdrew that report); *Albert v. Warner-Lambert Co.*, No. CIV.A. 99-11700-RGS, 2002 WL 745822, at \*1 (D. Mass. Apr. 24, 2002) (allowing a plaintiff's expert to supplement his expert report only if the expert was made available for up to four hours of additional direct deposition testimony at the plaintiff's expense).

## III.    CONCLUSION

The Supplemental Reports of Drs. Abdulla, Sadler, and Danielsson should be stricken, except to the extent they discuss the Huybrechts study, and the Court should order further depositions of these experts on any non-stricken opinions, including those related to the Huybrechts study.

Dated:  March 26, 2019

Respectfully submitted,

*/s/ Thomas Sheehan*
Thomas Sheehan
Eva Canaan
PHILLIPS LYTLE  L.L.P.
One Canalside
125 Main Street
Buffalo, NY 14203-2887
tsheehan@phillipslytle.com
ecanaan@phillipslytle.com

Madeleine M. McDonough
Jennifer M. Stevenson
Jennifer Stonecipher Hill
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108

15

Telephone: (816) 474-6550
Facsimile: (816) 421-5547
mmcdonough@shb.com
jstevenson@shb.com
jshill@shb.com
*Admitted pro hac vice*

Attorneys for Defendant GlaxoSmithKline LLC

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those identified as non-registered participants.

*/s/ Thomas Sheehan*

Thomas Sheehan