UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE: ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | MDL No. 1:15-md-2657-FDS |
| This Document Relates To: All Actions |  |  |

PLAINTIFFS' OPPOSITION TO GSK'S EMERGENCY MOTION
TO STRIKE THE SUPPLEMENTAL REPORTS
OF PLAINTIFFS' GENERAL CAUSATION EXPERTS

## I.    INTRODUCTION

The irony of GSK's conduct since the delay of *Daubert* hearings cannot be lost: they have fired off five motions seeking additional expert discovery, while simultaneously seeking to limit testimony by striking supplemental reports containing new, relevant information (as mandated by the Federal Rules). GSK is not interested in true expert discovery designed to elicit testimony that will inform jurors in this case. Rather, it wants two sets of expert discovery rules: one for GSK—under which it seeks (and receives) unlimited discovery—and another for Plaintiffs, under which its experts are silenced by striking properly supplemented reports. GSK's transparent attempt to manipulate the rules should not be countenanced.

Plaintiffs' experts' supplemental reports are clearly proper. As this Court has previously articulated, "if the study is significant for either or both sides and the experts want to react to it, that it makes sense to give them a reasonable opportunity to do that." Tr. of MDL Status Conf. at 11:13–19 (Jan. 16, 2019). Indeed, that is exactly what occurred here. All three papers discussed in Plaintiffs' experts' supplemental reports were published after the experts' original reports—and two of which were published after their deposition

testimony.[1]  The original reports of Drs. Abdulla (JA000001–92) Danielsson (JA000180–286) and Sadler (JA000840–911) were served in July 2018, and the articles discussed were published in August 2018 (Parker Study, JA003906–3915), December 2018 (Huybrechts Study, JA006414–6480) and January 2019 (Zambelli-Weiner Study, JA004179–4205), respectively.

Plaintiffs' experts' supplemental reports do not contradict their prior opinions or testimony.  Nor do they change the authors' methodologies or opinions in any respect.  GSK has inaccurately and incompletely excerpted the experts' prior testimony to try to create a false appearance of inconsistency.  In truth, the experts' supplemental reports are entirely consistent with their prior reports and testimony and simply supplement to address new scientific papers that were published after the experts submitted their original reports.  Accordingly, Plaintiffs request that this Court deny Defendant's Motion pursuant to the Federal Rules.

## II. ARGUMENT

### A. DR. RA-ID ABDULLA

Dr. Abdulla's methodology leading to his opinion that Zofran can cause congenital heart defects has been exactly the same since his original report.  There, he stated:

> As I do in my clinical practice as a pediatric cardiologist and Editor of the journal Pediatric Cardiology I utilized the same multi-faceted approach considering the totality of the evidence in forming my expert opinion that ondansetron is a teratogenic agent which can lead to CHD.  It should be evident from my report and the testimony I provided that epidemiology is but one factor in my approach and all the other steps in the assessment methodology I conducted are scientifically irrefutable.

---

[1] Dr. Sadler was deposed on September 25, 2018, Dr. Danielsson on October 12, 2018, and Dr. Abdulla on October 16, 2018.

Abdulla Suppl. Report at 3 (JA006536). In his most recent report, Dr. Abdulla applied the same methodology, incorporating his consideration of three new published papers:

> In my opinion the epidemiological evidence provides support to the other scientific evidence that first trimester exposure to ondansetron is a cause of congenital heart disease, despite the fact that some studies did not find an association. Having reviewed the 3 more recent studies by Huybrechts, Parker and Zambelli-Wiener discussed above, my opinions and conclusions as stated in my general causation reports and deposition are unchanged.

Abdulla Suppl. Report at 7 (JA006540).

GSK's memorandum on page 11 attempts to fabricate a specious inconsistency. *See* GSK Mem. in Supp. at 11. Dr. Abdulla stated on page 4 of his March 2019 supplemental report that, "[o]verall [the Parker] study "did find increased risks for cardiac defects in the NBDPS study cohort which is consistent with the evidence in other studies." Abdulla Suppl. Report at 4 (JA006537). That is a true statement of fact. The study reported increased risks of single ventricle heart defects and hypoplastic left heart defects, for example. Parker, at JA003914 p. 393. GSK argues incorrectly in its memorandum at page 11 that Dr. Abdulla testified about Parker differently. *See* GSK Mem. in Supp. at 11. A review of his actual testimony shows that he did not. In his deposition, Dr. Abdulla's answers were responding to questions about VSDs and ASDs only. By contrast, in his supplemental report, Dr. Abdulla did not limit his discussion to VSDs; he emphasized that the epidemiology study's finding of an increased risk for *any* cardiac defects was consistent with the evidence of increased risk detected in other studies. Abdulla Suppl. Report at 4 (JA006537). This is entirely consistent with his testimony that, viewing the epidemiology as one factor with the benefit of an understanding Zofran's mechanism of injury, that is, "it's altering hemodynamics...it could really lead to *any* congenital heart disease." Abdulla Dep. at 71:16–25 (JA001205) (emphasis added).

GSK also falsely asserts on page 7 of its memorandum that "for the first time" Dr. Abdulla claims that he weighed the validity of positive findings as well as examined potential reasons for negative findings. Dr. Abdulla's original report refutes this assertion. At pages 14–17 of his original report, he carefully reviewed the epidemiology studies that detected an increased risk of cardiac defects among children exposed prenatally to Zofran. Abdulla Report at 14–17 (JA000014–17). In his original report beginning at page 17, he then explained the "negative findings":

> There are also studies (noted below) that did not find an increase in risk between Zofran exposure and congenital cardiac disease. There are a variety of reasons these studies did not find statistical significance or increased risk, including lack of power for specific exposure-outcome analysis and/or the rarity of the defect to detect associations, which in my opinion does not refute the statistically significant and clinically important increase in risk for cardiac malformations demonstrated in the above studies.

Abdulla Report at 17 (JA000017).

Finally, GSK misrepresents Dr. Abdulla's testimony, falsely suggesting that he agreed that a non-statistically significant association "means . . . No increased risk." GSK Mem. in Supp. at 7. GSK replaced his actual testimony with an ellipsis. He did not say it means no increased risk; he said it means the study investigators in one study *did not find* the risk that exists. This accords completely with his statement from his original report that "there are a variety of reasons these studies did not find statistical significance or increased risk." Abdulla Report at 17 (JA000017). Again, none of this is new or different.

### B.  DR. BENGT DANIELSSON

On page 7 of its memorandum, GSK mischaracterizes Dr. Danielsson's ability and willingness to engage with epidemiological evidence. GSK Mem. in Supp. at 7. Dr. Danielsson participated in an epidemiology study of Zofran and birth defects before being

4

engaged as an expert and before any litigation regarding Zofran and birth defects began.  Dr. Danielsson testified:

> I have much more than average than a regular physician expertise in epidemiology. . . . I especially work professional in 30 years with sitting on a committee in Sweden, for example, since 1987 for classification of drugs — drug use in pregnancy.  And then you have to apply epidemiological principles. . . . I know basically what I need to make an assessment. . . . .

Danielsson Dep. at 66:14–67:4 (JA001495).  At his deposition, he explained the significance of several epidemiological concepts, such as statistical significance: "You can't just look at statistical significance because some of them are quite rare and you don't have enough exposed, so you also have to look for biological significance."  Danielsson Dep. at 94 (JA001502).  He explained the epidemiological concept of exposure misclassification: "what's known from clinical practice and that's written also in articles by physicians, that you don't know if the woman take it or not, and that's actually a weakness of epidemiology studies."  Danielsson Dep. at 55:11–15 (JA001492).  Given the limitations of epidemiology, he testified that the "human epidemiologic data likely underrepresents the true association between ondansetron and malformations."  Danielsson Dep. at 153:15–20 (JA001517).

Dr. Danielsson also testified that he did not discuss all of the epidemiology studies in detail because of their limitations in detecting the risk, and he appropriately referred to Dr. Louik for a more detailed discussion of each of the epidemiology studies.  Danielsson Dep. at 395:3–22 (JA001577); 152:17–19 (JA001516); 390:13–15 (JA001572).  He also explained to the Court on Science Day the limitations of epidemiology to detect birth defects, leading to why an integrated assessment of human, animal, mechanistic, and genetic data is methodologically appropriate for assessing causation.  He also testified to this at his deposition: "We know that epidemiologic studies have a lot of deficiencies," and

5

that is why he "also integrated with all type of available data, both mechanistic and animal data, as well as human data." Danielsson Dep. at 145:16–21 (JA001514). At Dr. Danielsson's deposition, he refuted GSK's assertion that he had not evaluated all available data that existed at the time he served his expert report. As he testified to GSK's lawyer, "…what you want to stress is he hasn't evaluated all available data. I had evaluated all available data I had at that time before I sent in my expert report. And that's my final statement regarding this issue, because otherwise you can maybe have another study in preprint or whatever." Danielsson Dep. at 124 (JA001509). Now that additional studies have been published, Dr. Danielsson considered them in his supplemental report, so that his testimony remains true today.

GSK suggests at page 9 of its memorandum that Dr. Danielsson's methodology is a new revelation because his supplemental report uses the phrase "weight of evidence" instead of his prior phrasing, "totality of the evidence" and "integrated assessment of all available data." GSK Mem. in Supp. at 9. A review of Dr. Danielsson's reports, 2018 peer-reviewed publication, science day presentation, and testimony proves GSK's argument false. *See* Danielsson Dep. at 142:23–24 (JA001514) ("you have to weigh the totality"); Danielsson Report July 2017 at 3 (JA000185)("I have evaluated the potential teratogenicity of ondansetron by considering the totality of the available evidence, as recommended in the ICH guidelines on developmental toxicity . . . I have also used criteria for integrated risk assessment based on human and animal data by Shepard (2010) in this report."); Danielsson, Webster & Ritchie 2018, at 237 (JA003588) ("Other studies do not indicate any increased risk [4,5]. In such situations, integration of all relevant data, including results in animal teratology studies with ondansetron and drugs with similar pharmacological properties, together with kinetic and mechanistic information, can

6

provide valuable information in the risk evaluation process."); Danielsson Dep. at 293:10–15 (JA001551)(stating that he "integrated evaluation of all available data, including animal kinetics and possible mechanistic in relation to results in epidemiological studies. I did that because I had everything available. So I think -- of course, it was really obvious that ondansetron causes these defects.").

GSK argues on page 8 of its memorandum that Dr. Danielsson's discussion of Parker contradicts his deposition testimony. GSK Mem. in Supp. at 8. The Parker study did not become available until after Dr. Danielsson's initial expert reports were served. He stated at his deposition, "I haven't seen this until quite recently. I didn't have it when I wrote my expert report…." Danielsson Dep. at 113:12–14 (JA001506). GSK's counsel questioned him about it at deposition, suggesting that the results cast doubt on whether the results from Dr. Danielsson's study are true. Dr. Danielsson replied, "that's epidemiology. I mean you have a lot of association. Some reports strengthen and other reports do not strengthen." Danielsson Dep. at 118:2–4 (JA001508). GSK counsel noted that the adjusted odds ratio of VSD heart defects reported in Parker was 0.9 with a confidence interval of 0.6 to 1.3, and suggested that that does not indicate an association between ondansetron exposure and VSDs. Dr. Danielsson replied, "I can't agree on that. I don't have all the results. I haven't, as I told you, been possible to look at all confounders, how the study is designed, if it's some failures explaining it. . . . I can't agree on anything more." Danielsson Dep. at 120:2–8 (JA001506). GSK incompletely quotes from his testimony suggesting that he agreed that the results were inconsistent, omitting this and other critical testimony that refutes its assertion. GSK's counsel suggested at deposition that Parker's result for VSD is not consistent with an increased risk or any association. Dr. Danielsson did not agree with that at all. Instead, he said, "no, no, no. It's inconsistencies

7

between studies. And I disagree with — I mean, I can't say exactly if it's a good study or a bad study because I haven't had time . . . I can't give any opinion about it." Danielsson Dep. at 123:21–124:4 (JA001509). He repeated the same thing at pages 127–128 of his deposition. Danielsson Dep. at 127:17–128:13 (JA001510).

### C. DR. THOMAS W. SADLER

Dr. Sadler's opinions and methodology are the same now as they were in his first report. There is no new theory of causation. He reviewed all available human, animal, and mechanistic data and opined that Zofran can cause cardiovascular and orofacial defects. *See* Dr. Sadler Report at 4 (JA000843). He evaluated the epidemiological evidence in his original report at pages 13–17. *See* Dr. Sadler Report at 13–17 (JA000852–856). He identified five epidemiology studies available at the time that linked Zofran exposure to an increase in birth defects. *See* Sadler Report at 14. He also analyzed the epidemiology studies that failed to demonstrate an increased risk, including limitations in study power, design, maternal recall bias, and exposure misclassification. *See* Sadler Report at 16–17; Sadler Dep. at 75:11–17 (JA002608). Dr. Sadler added at his deposition that, "[m]ost of the time epidemiological studies aren't 100 percent consistent across all the different studies that are done." Sadler Dep. at 120:22–25 (JA002619). Accordingly, he added, "my opinion is based on looking at all the evidence, and not just these epidemiological studies and arguing whether the methodology of this one or that one is a problem." Sadler Dep. at 122:2–4 (JA002620).

In response to this, GSK again tries to conjure non-existing inconsistencies in his testimony about epidemiology. For example, GSK asserts that Dr. Sadler said that he cannot assess epidemiological confounders such as recall bias. Dr. Sadler replied, "Well some of the confounders I can. . . It depends, you know, if I can read the study and look at

8

it, I can tell whether [they're] there." Sadler Dep. at 61:22–24 (JA002604). GSK's counsel suggested at deposition that Dr. Sadler could not assess methodological limitations of epidemiological studies. Not only did Dr. Sadler disagree, *see* Sadler Dep. at 62:17–63:1 (JA002605); 66:19–23(JA002606); *see* Sadler Report at 16–17(JA000855–856), his work as former Editor of the journal Teratology demonstrates quite clearly that he can and did.

Dr. Sadler observed an incontrovertible fact that evidence of a healthcare provider's actual administration of Zofran to a pregnant woman is more valid evidence that she was exposed to Zofran than mere evidence that she filled a Zofran prescription from a pharmacy. His observation is based on a paper (Zambelli-Weiner 2019) that was published after his original report and after his deposition. In all events, he observed in his original report the important difference between a filled prescription and medical administration, "which is confirmed use." Sadler Report at 16 (JA000855). Therefore, GSK's assertion that his observation is inconsistent with his prior testimony in response to a vague question about a different document is unfounded.

Similarly, GSK conflates the words "replicated" versus "confirmed" used in two different contexts to try to create an inconsistency. Dr. Sadler opined that Parker confirmed Anderka's findings on cleft palate, and that statement is factually correct. There is nothing new or unfairly prejudicial about that. Finally, Dr. Sadler's supplemental report observed the fact that the recent Huybrechts study by a GSK-funded researcher included no actual proof that any of the women she deemed exposed to Zofran actually ingested Zofran. He said this was a limitation of the study, but he never used the term non-differential misclassification, and his factual observation about the new Huybrechts study is entirely consistent with his distinction between prescription filled and medical administration

9

observed regarding the Zambelli-Weiner abstract that he considered in his first report at page 16. *See* Sadler Report at 16 (JA000855).

### D.　ANALYSIS

GSK relies on a string of cases, each of which is a universe apart from this case, to create an illusory appearance of malfeasance on the part of Plaintiffs or their experts. In *Desimini v. Durkin*, an unpublished opinion cited by GSK, the court stated that supplemental reports are in fact appropriate, but only where they are substantially justified or harmless. No. 14-CV-112-JD, 2015 WL 13648076 at *1 (D.N.H. Apr. 17, 2015). In that case, though, the supplemental report was excluded because there was no new information contemplated by the expert in that case—and thus the supplemental report, which contained new opinions that were not present in the initial report, were made known only after scheduling order deadline and the expert's deposition. *Id.* Further, the party serving the expert report did not attempt to argue that the supplemental report was substantially justified or harmless. *Id.* Based on *those* facts—which stand in vibrant contrast to those here—the court excluded the supplemental report. *Id*.

The next opinion upon which GSK relies is *Inverness Med. Switz. GMHB v. Acon Labs.*, all of five paragraphs long and bereft of any facts which explain the court's order that the second supplemental report be struck because "it contains entirely new theories and was untimely filed… two days before [the expert's] deposition, without good excuse." No. 02–12303–PBS, 2005 WL 6246801, at *1 (D. Mass. 2005). The experts' supplemental reports here, which followed their depositions—as did the publications that provide the basis (and good cause) for their supplementation—contain *no new theories*, as shown above, despite GSK's attempts to mischaracterize them as such.

GSK then boldly cites this Court's order in *Zeolla v. Ford Motor Co.*, for the apparent proposition that parties are *never* permitted to submit supplemental expert reports when they seek to "state additional opinions," or that "strengthen" or "deepen" opinions expressed in the original expert report. No. 09–40106–FDS, 2013 WL 308968 at *10 (D. Mass. Jan. 24, 2013). GSK isolates this singular statement, which on its face, of course, cannot be absolutely true when new science develops that impacts expert opinions. GSK leaves all context for this decision out of its brief. The basis of this Court's comment above, though, was that the defendant's expert submitted an affidavit supplementing her opinion, but only in conjunction with the defendant's opposition to the plaintiffs' motion in limine. *Id.* at *10. GSK further leaves out that this Court actually permitted the supplemental information to stand in that case, as this Court observed that the report, "provides further explanation of opinions previously offered in her expert report and at her deposition." *Id.* at *11; *see also id.* ("[I]f the affidavit is simply intended to provide additional insight into Raphael's method of analysis, then it is entirely appropriate for the Court to consider the affidavit."). As is this case here, and again, as shown above, the experts are not generating new opinions—only providing additional insight and explanation into their unchanged opinions while considering new studies that were previously unavailable but were relevant to their opinions (and hence GSK's questioning related to the new publications at their depositions).

GSK attempts to cast the experts' supplemental reports as patching holes in their previous reports by way of citing *United States v. 14.3 Acres of Land*, for the idea that "a party may not rely on Rule (26)(e)(1) as a way to remedy a deficient expert report or as a means of getting in, in effect, a brand new report…." No. 07-cv-886, 2011 WL 2414348, at *4 (S.D. Cal. June 10, 2011). As detailed above, the experts at issue have not even come

close to attempting to remedying "deficiencies" in their original reports. But to further bolster Plaintiffs' arguments, the Court in *14.3 Acres of Land* did exclude experts' supplements—but on the grounds that one expert only supplemented following an adverse ruling striking part of his report, and the other had an entirely new methodology. *Id.* at *6–7.

GSK also compares the facts of this case to *Palmer v. Asarco Inc.*. No. 03-CV-0498-CVE-PJC, 2007 WL 2254343, at *3 (N.D. Okla. Aug. 3, 2007). *Palmer* in no way resembles the issues here. There, the plaintiffs had already missed several scheduling order deadlines to serve the expert's report, but even so were still permitted to file the expert's report from a related litigation. *Id.* Only after that, and only in conjunction with plaintiffs' opposition to a motion to exclude the expert, did the plaintiffs file a supplemental affidavit from the expert. *Id.* The court still debated whether to consider the supplemental information, but found that "there is no doubt that the affidavit contains new opinions, facts, and testing that were not previously disclosed." *Id.* ("Dr. Brown's affidavit is essentially a new expert report with new opinions, and defendants would need to depose Dr. Brown before trial to prepare a meaningful *Daubert* challenge or cross-examine him at trial."). It cannot plausibly be argued that each of the supplemental reports of Plaintiffs' experts here is "essentially a new expert report with new opinions."

*Palmer* and the other cases relied upon by GSK, respectfully, do not come close to resembling the facts here. Further, there is no rule or Court order prohibiting the experts from considering and opining on new data after their reports and testimony. In fact, this Court stated in January 2019 that it wanted to hear from the experts about the new studies:

> THE COURT: All right. My off-the-cuff reaction to that is this: Is that **if the study is significant for either or both sides and the experts want to react to it, that it makes sense to give them a reasonable opportunity to do that**. I, too, would like to keep the case on track, and I think what I'm

inclined to do is to say keep the opposition brief, briefing schedule for Friday, see how it develops.

Tr. of MDL Status Conf. at 11:13–19 (Jan. 16, 2019) (emphasis added). That is what the authors did. There is no unfair prejudice to GSK. GSK also had an opportunity to serve supplemental reports considering the additional information, and it had two experts do so. GSK will have had almost two months before the *Daubert* oral arguments to develop its arguments in response to the supplemental reports. The opinions of the experts have been the same all along. The methodology of the experts has been the same all along; there is no surprise. GSK's lawyers met each of these expert witnesses face-to-face for seven hours, and the experts stood firm in each of their views and defended their methodologies. GSK does not like their conclusions, but knows full well that that is not a basis for exclusion, so it is seeking to conjure up collateral matters instead of arguing on the merits. More than 80 hours of deposition expert testimony have been taken this case with the expert opinions unchanged. The true motives for GSK's request for additional depositions under these circumstances are undue delay and war chest attrition.[2]

While Plaintiffs' experts' reports are not in fact inconsistent, as demonstrated above, even if GSK's misplaced perceptions were true, inconsistencies between initial and supplemental reports are not a basis to strike supplemental reports, or ignore the initial reports. *See, e.g.*, *Minuteman Int'l, Inc. v. Nilfisk-Advance*, No. 03 C 223, 2004 WL 2533626, at *4 (N.D. Ill. Sept. 28, 2004), *aff'd sub nom. Minuteman Int'l, Inc. v. Nilfisk-Advance A/S*, 140 F. App'x 269 (Fed. Cir. 2005) ("While there may be some

---

[2] In this regard, GSK has already grilled each of Plaintiffs' experts with overly aggressive and unprofessional tactics (e.g., Danielsson Dep. at 62:1–2 (JA001494) "A. I feel the need to explain. Q. Oh for God sake. ") and insulted them personally (e.g., Danielsson Dep. at p. 324:12–13 (JA001577) "Wow. I mean. You're bringing this guy to trial?").

13

inconsistencies between the original and supplemental expert report, this will not result in a wholesale disregard of the original expert report."); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (noting that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the "traditional and appropriate means" of attacking admissible evidence). Moreover, "[t]he extraordinary and disfavored action of striking the supplemental expert report would contravene the purpose of discovery to facilitate decision of a case *on the merits*...." *Landberg v. Universal Trailer Corp. Horse/Livestock Grp.*, No. 106CV2971BBM, 2008 WL 5586402, at *2 (N.D. Ga. June 19, 2008); *see also Papyrus Tech. Corp. v. New York Stock Exch., LLC*, 257 F.R.D. 39, 45 (S.D.N.Y. 2009) ("exclusion of expert evidence is a drastic measure, occurring at the discretion of the trial judge").

Through all of it, Plaintiffs' world-renowned experts have remained consistent in their methodologies and firm in their conclusions—Zofran can cause specific birth defects. GSK, having fallen short in its substantive attacks on the experts' opinions and methodologies, now resorts to a meritless argument for a procedural default when all the experts did was consider new information that became available only after they produced their reports. GSK's request to strike the experts' reports seeks a result that would be not only draconian, but also manifestly erroneous. Plaintiffs respectfully request that GSK's motion be denied.

## IV.    CONCLUSION

For the reasons provided above, Plaintiffs request that this Court deny GSK's Emergency Motion to Strike the Supplemental Reports of Plaintiffs' General Causation Experts.

Respectfully submitted,

*/s/ Robert K. Jenner*
Robert K. Jenner (BBO No. 569381)
JENNER LAW, P.C.
1829 Reisterstown Road, Suite 350
Baltimore, MD 21208
410-413-2155
rjenner@jennerlawfirm.com

Tobias L. Millrood
POGUST MILLROOD LLC
8 Tower Bridge, Suite 940
Conshohocken, PA 19428
610-941-4204
tmillrood@pogustmillrood.com

Kimberly D. Barone Baden
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
843-216-9265
kbarone@motleyrice.com

M. Elizabeth Graham
GRANT & EISENHOFER P.A.
123 S. Justison Street
Wilmington, DE 19801
302-622-7099
egraham@gelaw.com

James D. Gotz
HAUSFELD
One Marina Park Drive, Suite 1410
Boston, MA 02210
617-207-0600
jgotz@hausfeld.com

Dated: April 5, 2019                              *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

    I, Robert K. Jenner, hereby certify that on this 5th day of April, 2019, I electronically filed the foregoing with the Court using the CM/ECF system and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

                                            /s/ *Robert K. Jenner*
                                            Robert K. Jenner