UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE : ZOFRAN® (ONDANSETRON)
PRODUCTS LIABILITY LITIGATION

MDL NO. 1:15-md-2657-FDS
This document relates to:
All Actions

FILED UNDER SEAL

## GSK'S RESPONSE TO PLAINTIFFS' MOTION TO AMEND ORDER ON *IN CAMERA* PRODUCTION OF DOCUMENTS CONCERNING DR. APRIL ZAMBELLI-WEINER

Plaintiffs' Motion to Amend must be denied. The Court's July 25 Order detailed Plaintiffs' relationship with Dr. April Zambelli-Weiner and identified "at least three false statements" she made under oath to this Court:

- "First, Dr. Zambelli-Weiner swore that she had 'not been retained as an expert witness by any party in this case.' (Docket No. 1272). In fact, she had been a paid consulting expert to plaintiffs since at least December 9, 2014."

- "Second, she swore that she had 'no direct factual information about the litigation.' (*Id.*). That, too, was false. Her work as a consulting expert clearly was focused on this litigation; moreover, she had participated in a presentation on the litigation with plaintiffs' counsel at a conference in Las Vegas called 'Mass Torts Made Perfect' in October 2015."

- "Third, she swore that none of the funds paid by the plaintiff law firms 'were paid to directly fund the study,' but were instead 'paid to my company for unrelated work.' (*Id.*). In fact, her company was paid more than $200,000 for her work on the study."

Order at 4-5 (Dkt. 1612) ("July 25 Order").

Plaintiffs' Motion nowhere disputes that Dr. Zambelli-Weiner made these false statements to the Court. That would be hard to do on this record. Instead, Plaintiffs' Motion adopts a different strategy. Namely, Plaintiffs now seek to distance themselves from the falsehoods that their own retained consultant made to the Court by taking issue with the Court's finding that "[c]ertainly plaintiffs' counsel did nothing at the time to correct the false impression

created by the affidavit." Order at 10 (Dkt. 1612) ("July 25 Order"). As Plaintiffs' Motion tells it, Plaintiffs' counsel "actively and swiftly sought to ensure that any false impression created by Dr. Zambelli-Weiner's original Affidavit was promptly corrected." Pls.' Mtn. at 3-4 (Dkt. No. 1616).

The facts reveal something altogether different and three reasons why Plaintiffs' Motion should be denied. First, after knowing on January 9, 2019, that "inaccuracies" existed, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Memo. in Supp. of PEC's Cross-Mtn. for Protective Order to Preclude Further Discovery Concerning the Weiner/Kirby Independent Scientific Study (filed under seal on Mar. 19, 2019) ("PEC's Cross-Mtn.") at 9. In other words, instead of distancing themselves from the false statements in Dr. Zambelli-Weiner's Affidavits, Plaintiffs fully embraced them. Plaintiffs apparently did so even *after* engaging an ethics expert. Second, Plaintiffs had repeated opportunities for transparency with the Court and GSK upon "immediately observ[ing] several statements in the original Affidavit that were inaccurate," again, even *after* engaging an ethics expert. Pls.' Mtn. at 3-4. Yet, they remained silent. Now, Plaintiffs want a "do-over" on the Court's findings even though they fought tooth and nail over whether Dr. Zambelli-Weiner made truthful statements to the Court. Finally, Plaintiffs' conduct after learning about the multiple false statements in Dr. Zambelli-Weiner's Affidavit fits a long-standing pattern of conduct relating to this witness, which appears to have been intended to conceal from the Court, the defendant, and the public the true relationship between her and the Plaintiffs' Executive Committee (PEC). A detailed timeline of relevant events is attached as Exhibit A.

The opportunity has come and gone for Plaintiffs to claim no responsibility over an eight months-long discovery dispute. Indeed, the Court's recitation of events provided a more gracious

picture to Plaintiffs than the facts warrant. Whatever "behind the scenes" efforts took place, they pale in comparison to Plaintiffs' actual conduct and actions in the litigation itself. If anything, Plaintiffs' Motion merely highlights and continues a troubling pattern of conduct regarding Dr. Zambelli-Weiner and her study.

I. **Plaintiffs' Counsel Failed to Correct, and Actually Advocated, Dr. Zambelli-Weiner's False Affidavit.**

Plaintiffs' counsel admit that they "immediately" learned of the Affidavit and its falsehoods on January 9, 2019. It is undisputed that they said nothing to the Court or to GSK about the admitted falsehoods in the next week. They let Dr. Zambelli-Weiner's motion for a protective order seeking to avoid her deposition, scheduled for January 23, sit on the docket uncorrected. They allowed GSK to file a response on January 15, 2019, responding to a motion based on what Plaintiffs knew was a false affidavit. (Dkt. 1289). The parties agreed to a joint agenda for the January status conference that included an update on Dr. Zambelli-Weiner's pending motion for protective order, and still the PEC remained silent to the Court and to GSK.

Then, on January 16, 2019, at the regularly scheduled status conference, the Court indicated that it was prepared to rule on the papers, which informed Plaintiffs' counsel that the Court had read and analyzed the motion based on the false affidavit. Yet Plaintiffs' counsel did not use this opportunity to correct the record; instead, Plaintiffs' counsel, Mr. Millrood, reported merely his understanding that "a reply [was] forthcoming" from Dr. Zambelli-Weiner's counsel. Jan. 16, 2019 Tr. at 7, attached as Ex. B. Mr. Millrood went on to explain: "My understanding, I don't know if you have any further information, I thought he had indicated he planned to [file a reply], but I don't know." *Id.* at 8. In no way did this comment address the affidavit, which counsel knew contained multiple "inaccurate" statements. *See* Pls.' Mtn. at 1.

Two days later, during which no reply brief had actually been filed, and during which no correction was made, GSK's counsel sent an email to the Court inquiring as to when a decision on the motion could be expected. Mr. Millrood and Mr. Jenner were copied on that communication and still said nothing. *See* Correspondence dated Jan. 18, 2019, attached as Ex. C. Based on the papers submitted, the Court denied the motion for protective order by docket text entered at 11:19 a.m. EST. Later that afternoon, Dr. Zambelli-Weiner's counsel moved to withdraw and filed their Notice Advising the Court of Factual Inaccuracies (Dkt. 1294). This was the first time anyone had informed the Court about the misstatements in the affidavit, and it came after the ruling was docketed and not from the PEC, but pursuant to the independent and separate duty of counsel for the witness.

One might assume that at this point the PEC would make some sort of corrective statement. Yet, the next event occurred on January 29, 2019, when Dr. Zambelli-Weiner's new counsel, Mr. Gunderson, provided the parties with a Supplemental Affidavit of April Zambelli-Weiner, Ph.D., which purported to "provide additional factual information to clarify statements made in [her] initial Affidavit." (Dkt. 1389-2.) Dr. Zambelli-Weiner did not acknowledge any factual inaccuracies, nor did she file the supplemental affidavit with the Court. Plaintiffs' counsel again remained silent, despite the fact that they knew (as they now admit) that there were several inaccuracies in the first affidavit such that it required not supplemental or "additional" facts, but corrected facts. Moreover, Dr. Zambelli-Weiner's Supplemental Affidavit continued to assert that the funds she received from Plaintiffs' counsel "did not directly fund the Study," a representation that the Court has found to be false. *See* July 25 Order at 4.

Unfortunately, the service of a supplemental affidavit from the witness who had lied under oath was not the end of problem. Three weeks after learning of the falsehoods in Dr.

Zambelli-Weiner's original Affidavit, Dr. Zambelli-Weiner sat for her first deposition on February 1, 2019. Plaintiffs' counsel attended that deposition and never offered clarification of the "inaccuracies" that Plaintiffs' counsel say they "immediately observed" in Dr. Zambelli-Weiner's original Affidavit. For example, when GSK's counsel questioned Dr. Zambelli-Weiner about her original Affidavit, she testified:



Zambelli-Weiner Dep. at 61-62 (emphasis added), attached as Ex. D. And when Dr. Zambelli-Weiner sat for the second day of her deposition on February 22, 2019, 



*Id.* at 256.

During neither deposition setting did Plaintiffs' counsel seek to have Dr. Zambelli-Weiner correct the falsehoods in (1) her original Affidavit or (2) her sworn deposition testimony that she provided "accurate" statements in her original Affidavit despite now claiming in their Motion to have worked "behind the scenes" to do so. *See* Pls.' Mtn. at 1.

During the second day of Dr. Zambelli-Weiner's deposition, Plaintiffs' counsel actually elicited testimony from Dr. Zambelli-Weiner about how Plaintiffs' lawyers had "absolutely zero opportunity to have involvement in this study." Zambelli-Weiner Dep. at 494-95. Plaintiffs' counsel did so despite Plaintiffs' counsel's knowledge that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ This is made plain by one of the documents Plaintiffs produced when the Court rejected their claims of privilege. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███ ████████████████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

█████████████ █████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████ Yet, the testimony elicited from Dr. Zambelli-Weiner suggested a different narrative. If Plaintiffs' counsel knew the statements in her Affidavit were inaccurate, at the very least, they should not have perpetuated her false narrative.

Even more disturbing, when seeking a protective order from this Court almost two months after knowing that Dr. Zambell-Weiner's original Affidavit contained falsehoods and after retaining an ethics expert, Plaintiffs argued ████████████████████████████████
██████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

PEC's Cross-Mtn. at 9. ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████



While Plaintiffs' Motion says that counsel were "mindful of statements within the affidavit that were in need of correction" as soon as the affidavit was filed in January, their actual actions tell a far different story.

## II. The Now Claimed "Behind the Scenes" Discussions Did Not Satisfy the PEC's Duty of Candor.

Plaintiffs' counsel's failure to inform the Court or opposing counsel of what they knew to be false sworn statements cannot be justified. After all, they have known the true facts of their relationship with Dr. Zambelli-Weiner all along, and her false statements directly implicated

8

facts the PEC was uniquely positioned to know. They could have and, in fact, should have put the Court or opposing counsel on notice of Dr. Zambelli-Weiner's false statements. They chose not to.[1] The factual record simply fails to support their claim that they acted "swiftly . . . to ensure that any false impression created by Dr. Zambelli-Weiner's original Affidavit was promptly corrected." Pls.' Mtn. at 4.

Even if the Court were to credit the claim that the PEC tried to work with counsel for the witness, it was insufficient to put the burden of correcting the factual record solely on Dr. Zambelli-Weiner's counsel, who by Plaintiffs' account, only learned of the factual inaccuracies sometime after the affidavit was filed on January 9. Dr. Zambelli-Weiner's counsel's task was undoubtedly further complicated by their professional obligations to Dr. Zambelli-Weiner and their subsequent need to withdraw from her representation. The PEC, on the other hand, did not represent Dr. Zambelli-Weiner and faced none of those burdens. The PEC would have been free to speak up at any point in time. However "swiftly" the PEC now claims they were acting, it was obviously not sufficient because the record was not corrected before the Court reviewed the motion *and* entered its ruling.

To be sure, Plaintiffs' counsel had an easy opportunity to say something at the January status conference, even if only to alert the Court that additional *facts* relevant to the motion would be forthcoming. They did nothing except incorrectly suggest that a reply brief (presumably, in further support of the motion) would be forthcoming. This conscious decision to say nothing, even knowing that the Court's decision was imminent, is incompatible with ethical standards shared in virtually every jurisdiction. For example, Comment 2 to Massachusetts's

---

[1] Even now, Plaintiffs' Motion states that while the supplemental affidavit addressed the inaccuracies in the original Affidavit, Plaintiffs recognized that this correction was "perhaps not exactly as the PEC might have worded the statements." Pls.' Mtn. at 3. Yet, they claim it was sufficient. *Id.* This claim speaks directly to the situation created by Plaintiffs' own omissions and silence and begs the question of why they did not follow through on making sure the falsehoods were not thoroughly and completely rectified.

9

Rules of Professional Conduct 3.3 explains, "This Rule sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process . . . . [T]he lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that a lawyer knows to be false." Mass. SJC Rule 3.3, cmt. 2.

The PEC's inaction is even more troubling in light of their special, Court-appointed role as leadership on behalf of the consolidated plaintiffs in this MDL, specifically tasked with leading discussions with the Court. *See* MDL Order No. 3 at 3 (Dkt. 21). For their efforts, the Court has even permitted Plaintiffs' leadership to take an 11% assessment from any monetary recovery in this MDL. *See* MDL Order No. 23 (Dkt. 696). Courts recognize that lead counsel have "a duty to perform appointed functions in a fair, honest, competent, reasonable, and responsible way." *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-md-2543 (JMF), 2016 WL 1441804, *4 (S.D.N.Y. Apr. 12, 2016); *see also* Manual for Complex Litig., Fourth, § 10.21 ("[C]omplex litigation places greater demands on counsel in their dual roles as advocates and officers of the court. . . . The added demands and burdens of complex litigation place a premium on attorney professionalism, and the judge should encourage counsel to act responsibly.").

In short, the PEC's now claimed "behind the scenes" efforts are too little, too late, and directly at odds with their consistent defense of the false statements.

**III.     Plaintiffs' Misconduct Follows a Long Pattern of Deception Designed to Cloak Their Relationship with Dr. Zambelli-Weiner.**

The silence and staunch defense of Dr. Zambelli-Weiner's Affidavits mirrors a previous pattern of conduct regarding this study and apparent effort to conceal Plaintiffs' financial relationship with Dr. Zambelli-Weiner. Throughout the litigation, Plaintiffs' counsel have made repeated efforts to convince GSK and/or the Court that:

10

- Dr. Zambelli-Weiner was an independent scientist – *she is not*.

- The PEC had no prior knowledge of the Zambelli-Weiner study – *they did*.

- The PEC did absolutely nothing to directly financially support the study or pay anything in support of the study – *they did*.

### A. Creating the false impression that Dr. Zambelli-Weiner was an independent scientist.

When Plaintiffs sought a protective order on November 26, 2018, they characterized Dr. Zambelli-Weiner as a "third-party scientist[]." Pls.' Mtn. for Protective Order at 5 (Dkt. 1224). As the Court has already observed, Plaintiffs did not reveal that Dr. Zambelli-Weiner was a paid consulting expert and did not cite or rely on the protections afforded to consulting experts. *See* July 25 Order at 3. To further this false narrative, Plaintiffs even recited the Court's initial comment that "deposing scientists who are neither testifying experts nor consulting experts but simply scientists in the field . . . is troublesome," implying that Dr. Zambelli-Weiner fit that very description. *See* Pls.' Mtn. at 6 (Dkt. 1224), *quoting* Nov. 14, 2018, Tr. at 14-17.[2] At the December 7, 2018 hearing on that motion, Plaintiffs' counsel repeated their position that "depositions of scientists" would be troublesome. Dec. 7, 2018, Tr. at 23, attached as Ex. F. None of the Plaintiffs' counsel who participated in that hearing disclosed that Dr. Zambelli-Weiner was Plaintiffs' paid consulting expert. Plaintiffs continued this tack even through the title of their next motion for protective order: "PEC's Cross Motion for Protective Order to Preclude Further Discovery Concerning the Weiner/Kirby **Independent Scientific Study**" (filed under seal on Mar. 19, 2019) (emphasis added).

---

[2] Notably, the Court's comment followed Plaintiffs' counsel's suggestion that GSK was seeking depositions of non-expert fact witnesses. Nov. 14, 2018, Tr. at 6-7, attached as Ex. G ("They've issued three subpoenas of fact witnesses, really not of plaintiffs' experts.").

11

Apparently as part of a plan to create an artificial distance between the PEC and this paid witness, on February 27, 2018, after having already exchanged numerous emails with the witness on a first name basis and multiple versions of the Causation Briefing Document, ███████ ████████████████████████████████████████████████████████████████████████

███████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

████████████████    ██████████████████████████

████████████████████████████████

██████████████████████████████████████████████

███████████████ That makes no sense given that he and his firm had retained Dr. Zambelli-Weiner in late 2014 and paid her thousands of dollars as an expert consultant to review and analyze Zofran and birth defects; he had numerous interactions with her as part of their consulting agreement; lawyers at his firm presented with her at the Mass Torts Made Perfect conference in October 2015 about Zofran and birth defects; and ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ What we do know, however, is that Plaintiffs withheld this communication from

production in response to GSK's August 2018 discovery. GSK only received a copy of the email because Dr. Zambelli-Weiner's first counsel produced it.

### B.   Omitting Plaintiffs' prior knowledge of the Zambelli-Weiner study.

On December 7, 2018, Plaintiffs' counsel represented to the Court:

> Your Honor, as an officer of the Court, I will represent we did not know what that paper was going to say before GSK did. We got it when they got it, when it was published. We did not see it as a draft. We did not get an opportunity to comment on it when it was a draft. **We did not have any input into what it said. Nobody asked our views on how she should design the study, how the investigator should design the study, what they should look for and so forth.**

Dec. 7, 2018, Tr. at 24, Ex. F. However, it is now clear that,



### C.   Misrepresenting Plaintiffs' funding of the Zambelli-Weiner study.

In interrogatory responses served on March 1, 2019, Plaintiffs stated, "In connection with consulting work performed by TTi, Plaintiffs' Leadership Attorneys paid $210,000 as **financial support relating to a study** that was ultimately completed and published by [Dr. Zambelli-Weiner et al.]." *See* PSC's Obj. and Resp. to GSK's 2nd set of Interrog. and 5th Set of Requests for Prod. (Dkt. 1406-7). But when the parties convened for a telephonic status conference on March 5, Plaintiffs' counsel surprisingly disputed Plaintiffs' funding. Despite having signed the PSC's discovery responses just four days prior, Mr. Millrood argued:

> There is no testimony or any evidence that's been produced to GSK by witness or in answers to discovery from plaintiffs' counsel that supports the statement by Ms. Hill that there's direct financial support of the study, which was her statement on the record.
>
> We provided answers to discovery last week where we answered the discovery and stated the amount that was paid to our consultant, and both Dr. Weiner, as well as the plaintiffs both stated under oath and as officers of the court that **we did absolutely nothing to directly financially support the study or pay anything in support of the study.**

Mar. 5, 2019, Tr. at 12, attached as Ex. I. That, of course, is belied by the Plaintiffs' own Interrogatory Response. There is no question that Plaintiffs' counsel funded the Zambelli-Weiner study. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████ Yet, her previous benefactors, Plaintiffs' counsel, actually funded the study.

## CONCLUSION

Plaintiffs' counsel's actions, representations, and steadfast defense of the Zambelli-Weiner Affidavits show the findings in the Court's July 25 Order were ones of Plaintiffs' counsel's own making. On this record, they have only themselves to blame for what happened and why the Court made the statements that it did. No basis exists to amend the Court's July 25 Order, and Plaintiffs' counsel conduct should not be excused. Their Motion should be denied.

Dated: August 13, 2019

                    Respectfully submitted,

                     */s/ Jennifer Stonecipher Hill*
                    Madeleine M. McDonough
                    Jennifer M. Stevenson
                    Jennifer Stonecipher Hill
                    SHOOK, HARDY & BACON L.L.P.
                    2555 Grand Blvd.
                    Kansas City, MO 64108
                    Telephone: (816) 474-6550
                    Facsimile: (816) 421-5547
                    mmcdonough@shb.com
                    jstevenson@shb.com
                    jshill@shb.com
                    *Admitted pro hac vice*

                    Attorneys for Defendant GlaxoSmithKline LLC

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those identified as non-registered participants.

                                            /s/ *Jennifer Stonecipher Hill*
                                            Jennifer Stonecipher Hill