UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>All Actions | MDL No. 1:15-md-2657-FDS |

**GLAXOSMITHKLINE LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL DR. ZAMBELLI-WEINER TO PRODUCE DOCUMENTS AND FOR LEAVE FOR SECOND DEPOSITION**

As this Court has previously recognized, Dr. April Zambelli-Weiner's Zofran study is a central piece of plaintiffs' experts' causation opinions in this litigation. (ECF No. 1612 at 2). It is for this reason that GSK has sought critical statistical coding and output analyses from Dr. Zambelli-Weiner to allow for an assessment of her final published results. GSK has been seeking both since January 2, 2019 to no avail. Having exhausted all available options to obtain this data from Dr. Zambelli-Weiner, GSK now seeks this Court's assistance.

The statistical codes sought by GSK had to be entered by Dr. Zambelli-Weiner into the statistical program in order for to her generate the results reported in that study. The output analyses from that program contain the statistical coding and show the results from all the analyses run by Dr. Zambelli-Weiner for her Zofran study. Documents and data about *both* are necessary to allow for an assessment of the final published results, including those for the "medical administration" of Zofran, which purportedly shows an increased risk of cardiac birth defects.

In response to GSK's subpoenas, Dr. Zambelli-Weiner refuses to provide the statistical codes even though she admits that they exist. As for the output analyses, Dr. Zambelli-Weiner claims that they do not exist even though she admitted at her deposition that with the existing

statistical codes, the output analyses can be run and printed out with a click of a button and ***"not very much effort."*** Zambelli-Weiner Dep. at 38-40, (emphasis added), Ex. 1. In other words, Dr. Zambelli-Weiner has possession, custody, and control of the data that GSK seeks.

Dr. Zambelli-Weiner's claim that the data does not exist runs not only contrary to her deposition testimony but also accepted practices about retaining that data for at least five years post-publication and the "Duties of Authors" statement made by the journal that published her Zofran study. Dr. Stephen Kimmel Affidavit ("Kimmel Aff.") ¶¶ 19-20, Ex. 2; "Duties of Authors" statement by Elsevier (publisher of *Reproductive Toxicology*) at 3-4, Ex. 3 (stating that authors submitting a study for publication "may be asked to provide the research data supporting their paper" to the journal for review; "should be prepared to provide public access" to the research data supporting the paper; and "should be prepared to retain such data for a reasonable number of years after publication"). In fact, Dr. Zambelli-Weiner produced *some* responsive documents of the statistical output from her Zofran study following the Court's April 8, 2019 Order granting in part GSK's Motion to Compel. Yet, that production omitted the most critical information sought by GSK as to the output analyses. Without both the missing statistical codes and the output analyses, it is impossible for GSK—or anyone else—to reliably interpret or assess the results reported in her published study. Underscoring the importance of this data, all of Plaintiffs' general causation experts rely on this study to support their opinions that Zofran causes cardiac birth defects and cleft palate.

Given the importance of this data to assess what Dr. Zambelli-Weiner did in her Zofran study and how she did it, GSK requests that the Court order Dr. Zambelli-Weiner to produce all of the statistical coding and analyses, regardless of how those data are stored. There cannot be any burden to doing so given Dr. Zambelli-Weiner's testimony that doing so would involve ***"not very***

*much effort"* since she need only run the program again using the statistical coding she has on her computer servers. Zambelli-Weiner Dep. at 38-40, Ex. 1. GSK submits that Dr. Zambelli-Weiner should be ordered to do so without delay and no later than seven days from the Court's ruling on GSK's Motion.

In addition, GSK seeks leave to take a supplemental deposition of Dr. Zambelli-Weiner. GSK needs a second deposition to understand the more than 1,200 pages of documents that Dr. Zambelli-Weiner failed to produce in advance of her original deposition. These documents reveal a host of information that GSK did not have access to before Dr. Zambelli-Weiner's deposition. In addition, a significant number of documents pertinent to Dr. Zambelli-Weiner's study have been produced since her last deposition by Dr. Russell Kirby, Truven Health Analytics ("Truven"), Plaintiffs, and *Reproductive Toxicology*. These documents refute a number of representations Dr. Zambelli-Weiner made under oath, relating directly to her lack of credibility and bias. Dr. Zambelli-Weiner cannot reasonably object to this request because she made the decision to withhold documents from GSK that the Court has now ruled should have been produced to GSK.

## FACTUAL BACKGROUND

**A. The Statistical Codes and Output Analyses Sought by GSK.**

Dr. Zambelli-Weiner stated in her published article that she used a statistical program called Stata/MP 13.1 to perform her analyses and obtain the results reported. Zambelli-Weiner et al., First trimester ondansetron exposure and risk of structural defects; *Reproductive Toxicology* 83: 14-20 (2019), Ex. 4 at p. 16 ("The statistical analyses were performed using Stata/MP 13.1 ...."). The statistical codes sought by GSK provide the instructions that Dr. Zambelli-Weiner gave to the analytic program to regarding how to analyze the raw data provided by Truven. *See* Kimmel Aff. ¶ 4, Ex. 2. This instructional code is needed to both: (1) turn the raw data into an analytic

dataset—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—, and (2) perform the statistical analyses on the analytic dataset (*e.g.*, comparing the characteristics of participants who use versus do not use ondansetron). *Id*. The results of these analyses and their respective coding are displayed in the statistical "output" from the analysis program. *Id.* ¶ 5. The output typically contains both the actual coding used for the output and the measures of association (*e.g.*, odds ratios and confidence intervals) that are reported as the "results" of a published study. *Id*. Importantly, each part of the statistical code is a foundation or a building block for the subsequent parts, such that the entire code is an intricately-connected organic whole. *Id.* ¶ 6. Based on the statistical coding, the output analyses are determined, including the results showing whether there is an association between Zofran and birth defects. *Id.* ¶¶ 7-10. Thus, it is generally impossible to verify the accuracy/reliability of statistical analyses when portions of the code/output are missing. *Id.* ¶ 11.

The statistical coding and output analyses sought by GSK fall into four categories:



The validity of any statistical analysis is critically dependent on (i) accurate coding to derive the analytic variables, (ii) accurate coding for the statistical comparisons made in the analysis, and (iii) accurate evaluation and transcription of the results from the output. *Id.* ¶12. Thus, it is critically important to have all of this data to be able to ensure the accuracy of the published results and to assess the reliability of the methods from which the results were derived. *Id.* ¶¶ 11-12. For these reasons, one must retain both the statistical code and the analysis output. *Id.* ¶ 12.

**B. GSK's Repeated Efforts to Obtain the Statistical Codes and Output Analyses.**

On January 2, 2019, GSK served a Notice of Deposition Duces Tecum and document request on Dr. Zambelli-Weiner seeking the statistical coding and the output analyses:

> 2.c. The Stata/MP 13.1, SAS or any other statistical software codes/input used in analyzing the data, including any of the preliminary or other analyses that were not reported in the Accepted Manuscript.
>
> 2.d. The entire Stata/MP 13.1, SAS or any other statistical software output/printout of the analyses, including the final analyses and preliminary or other analyses that were not reported in the Accepted Manuscript.

Jan. 2, 2019 Notice of Deposition Duces Tecum, Ex. 5.

In response to GSK's Request No. 2.d, Mr. Marder, Dr. Zambelli-Weiner's prior counsel, stated "none," as to whether Dr. Zambelli-Weiner had any such documents. Jan. 9, 2019 letter from Mr. Marder at 2, Ex. 6. Mr. Marder objected to GSK's Request No. 2.c because he was under the misimpression that GSK sought the software program as opposed to the statisical coding created by Dr. Zambelli-Weiner for that program. *See id.* Shortly thereafter, Mr. Marder withrew from representing Dr. Zambelli-Weiner on January 18, 2019 and stated: "I am withdrawing any assertions in my letter of January 9, 2019, regarding whether Dr. Zambelli-Weiner is in possession of any additional documents responsive to your subpoena or whether all documents in her possession have been produced." Jan. 18, 2019 letter from Mr. Marder, Ex. 7.

5

Following Mr. Marder's withdrawal, GSK served an Amended Notice of Deposition that rescheduled Dr. Zambelli-Weiner's deposition for February 1, 2019 to accommodate her new counsel. *See* Jan. 23, 2019 Amended Notice of Deposition, Ex. 8. The Amended Notice included document requests that were identical to 2.c and 2.d. in the orignal Notice. *Id.* In response Request 2.c, Dr. Zambelli-Weiner's new counsel, Mr. Gunderson, produced 4 pages of documents. In response to Request 2.d, Mr. Gunderson represented "none" when reporting whether Dr. Zambelli-Weiner had any responsive documents. *See* Jan. 25, 2019 letter from Mr. Gunderson, Ex. 9.

GSK deposed Dr. Zambelli-Weiner on February 1, 2019. Regarding Request No. 2.c, Dr. Zambelli-Weiner acknowledged that she did not produce any codes used to derive the variables form the raw data. Zambelli-Weiner Dep. at 28-29, Ex. 1. With respect to the "medical administration of ondansetron" variable, in particular, she claimed that the coding was done by Truven and that she was not in possession of it. *Id*. at 30-31. Regarding Request No. 2.d, she claimed that she did not retain the output or printout of the statistical analyses, but agreed that the output could be generated with "not very much effort" and with a click of a button. *Id*. at 38:12-40:5. Plaintiffs' counsel halted Dr. Zambelli-Weiner's deposition before it was concluded.

On February 8, 2019, GSK served Dr. Zambelli-Weiner with a Notice of Deposition for her continued deposition and again sought production of the statistical output/printout:

> Request No. 3: The entire Stata/MP13.1, SAS, or any other statistical software output/printout of the analyses, including the final analyses and preliminary or other analyses that were not reported in the Study. To the extent necessary, generate this output/printout from the existing Stata/MP13.1 codes.

*See* Feb. 8, 2019 email from Ms. Canaan, Ex. 10. This request specifically requested that Dr. Zambelli-Weiner generate the output analyses from the existing statistical codes. Her counsel responded by letter on February 15, 2019 and again represented that "***No such documents exist***."

6

Feb. 15, 2019 letter from Mr. Gunderson at 3 (emphasis added), Ex. 11. Dr. Zambelli-Weiner's continued deposition occurred on February 22, 2019.

On April 29, 2019, in response to the Court's Order granting in part GSK's Motion to Compel documents, Dr. Zambelli-Weiner's counsel submitted "supplemental responses" to GSK's document requests. Apr. 29, 2019 letter from Mr. Gunderson to Ms. Hill, Ex. 12. As to Request No. 3, Dr. Zambelli-Weiner stated: "All documents responsive to this request have been produced." *Id.* at 2. She produced approximately 1,200 pages of documents with her "supplemental responses." Among the documents produced were portions of the Stata output analyses that Dr. Zambelli-Weiner and her counsel previously represented did not exist. Contrary to her deposition testimony that she was not in possession of any coding for any variables used in her analyses, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ But the partial production failed to include the vital data set out *infra* at 4.

On May 16, 2019, Truven produced documents related to Dr. Zambelli-Weiner's Zofran study. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Kimmel Aff. ¶ 14, Ex. 2.

In the meet-and-confer process for this Motion, Dr. Zambelli-Weiner admitted that the statistical coding sought by GSK exists. Sept. 10, 2019 email from Mr. Gunderson, Ex. 13. Dr. Zambelli-Weiner, however, claims that all of the output analyses are not available in hard copy or electronic format and she cannot provide anything more because it would be unduly burdensome to require her "to create a document that does not exist." Sept. 3, 2019 letter from Mr. Gunderson at 1, Ex. 14; Sept. 10, 2019 email from Mr. Gunderson, Ex.13.

Dr. Zambelli-Weiner claims that no output analyses are available in hard copy or electronic format because they were "copied and pasted directly into the table shells for the Study

7

manuscript"; that this was done in "real time"; that it was "not her company's practice to print the output or otherwise maintain additional hard copies (or electronic copies) of the output"; and that she "is not in possession of any printed output for the analyses reported in the Study other than what is included in the Study's tables." Sept. 3, 2019 letter from Mr. Gunderson at 1, Ex. 14. Dr. Zambelli-Weiner also represents that the partially produced statistical output related to "preliminary and draft analyses" concerning the "PISCES project" that she claims are unrelated to her Zofran study. *Id.* at 1-2.

During the meet and confer, GSK also requested that Dr. Zambelli-Weiner make herself available for a second deposition in light of the more than 1,500 pages of documents that have been produced since her original deposition,[1] but she refused.

GSK now seeks the Court's assistance in obtaining a full and complete production of documents and a second deposition of Dr. Zambelli-Weiner.

## ARGUMENT

**A. Dr. Zambelli-Weiner Should Be Compelled to Produce the Missing Data and Analyses Without Delay.**

The statistical coding and output analyses sought by GSK fall squarely within the category of documents that this Court previously determined were discoverable. This Court ruled on February 1, 2019 that GSK is entitled to discovery regarding "how she conducted the study, and not just did the study change, but how was the study designed, is there anything about the study that's unique or different or not in accordance with ordinary professional standards." Feb. 1, 2019 Hr'g Tr. at 9-10, Ex. 16. The data and documents sought relate directly to the study design and

---

[1] In addition to the approximately 1,200 pages of documents produced as a result of the Court's April 8, 2019 Order, Dr. Zambelli-Weiner and the PSC produced 321 pages of documents following the Court's July 25, 2019 Memorandum and Order on In Camera Production of Documents Concerning Dr. April Zambelli-Weiner (ECF No. 1612).

whether it was conducted in accordance with professional standards. Dr. Kimmel's Affidavit sets out in detail the critical importance of both the statistical codes and output analyses sought by GSK. Kimmel Aff., Ex. 2. Thus, no question exists that that the data sought by GSK are highly relevant to the reliability of Dr. Zambelli-Weiner's Zofran study and its reported findings.

Dr. Zambelli-Weiner admitted in her deposition that she has the statistical codes on her computer server. Zambelli-Weiner Dep. at 39, Ex. 1. These statistical codes directly inform a host of critical information about how Dr. Zambelli-Weiner conducted and analyzed her published Zofran study. This includes how Dr. Zambelli-Weiner analyzed the "medical administration" analyses that resulted in an increased risk of Zofran and cardiac birth defects and a number of other analyses. Kimmel Aff. ¶ 14, Ex. 2. The statistical coding sought by GSK bears directly on the reliability and accuracy of the published results of her Zofran study. *Id.* ¶¶ 14, 11-12.

Dr. Zambelli-Weiner admitted that not only did she have the statistical codes on her server but that she could generate the output analyses sought by GSK with "not very much effort" by clicking a button:

> Q. Do you know how to generate a Stata output?
>
> A. Yes.
>
> Q. *Okay. I mean you can do that with a click of a button; is that right?*
>
> A. *Sure, absolutely.*
>
> Q. Okay. So, why can't you generate it?
>
> A. It doesn't exist from the analyses. That is not our policy to retain output. It is not how we do our studies. The output gets put into the table shells, and that is the end of it.
>
> So, I'm not hired by anyone to go back and recreate my analyses. So, I'm not going to do that.
>
> Q. *Okay. You have the codes, right?*
>
> A. *Yes. We have the codes.*

> Q. The codes are on your laptop, right?
>
> A. I didn't say that. I'm not sure that they are on my laptop.
>
> Q. Where are they?
>
> A. I believe I said they are on the server --
>
> Q. Okay. They are on the server.
>
> A. -- to be accurate.
>
> Q. *So, how much effort would it take to take the codes and run them through Stata again?*
>
> A. *Not, not very much effort, I don't believe*.

Zambelli-Weiner Dep. at 38-40 (emphasis added), Ex. 1. These admissions explain why GSK's Motion should be granted: Dr. Zambelli-Weiner (a) has the data sought by GSK and (b) can produce those data to GSK very easily.

Dr. Zambelli-Weiner makes three claims to avoid complying with GSK's document requests. First, she claims that she does not have the output analyses in either hard copy or electronic format. Second, she claims that providing the statistical coding and output analyses would be "an immense burden" on her. Finally, she claims that GSK is requiring her to "create" a document. GSK addresses below each argument in turn.

    **1.** *Accepted Practices Belie Dr. Zambelli-Weiner's Claim that She Does Not Have the Data.*

To avoid complying with GSK's document requests, Dr. Zambelli-Weiner claims that she has no output analyses in hard copy or electronic format because after the analyses were performed they were "copied and pasted directly into the table shells for the Study manuscript"; that this was done in "real time"; that it was "not her company's practice to print the output or otherwise maintain additional hard copies (or electronic copies) of the output"; and that she "is not in possession of any printed output for the analyses reported in the Study other than what is included

in the Study's tables." Sept. 3, 2019 letter from Mr. Gunderson at 1, Ex. 14. These claims depart significantly from typical and accepted practices in performing epidemiology studies. *See* Kimmel Aff. ¶¶ 19-22, Ex. 2; *see also* "Duties of Authors" statement by Elsevier (publisher of Reproductive Toxicology) (stating that any author accepted for publication agrees that she "may be asked to provide the research data supporting their paper" to the journal for review; she "should be prepared to provide public access" to the research data supporting the paper; and she "should be prepared to retain such data for a reasonable number of years after publication") at 3-4, Ex. 3.[2] These accepted practices reflect that the data sought by GSK should be kept for "at least 5 years" after the publication of Dr. Zambelli-Weiner's Zofran study and that "[a]ll data management and statistical analysis programs and packages used should be documented and archived." Kimmel Aff. ¶¶ 19-20, Ex. 2. "All information that includes the coding to derive study variables, the statistical coding to perform the analyses, and the output of these analyses should be preserved by maintaining these data in either (a) hard copy; (b) electronic format; or (c) both." *Id.* ¶ 21. Incredibly, Dr. Zambelli-Weiner claims that she retained no statistical output data for her Zofran study. That explanation flies in the face of accepted practice and the duties she agreed to abide by with the journal.

Dr. Zambelli-Weiner's explanation also ignores that she actually produced *some* of the output analyses, albeit none of the critical parts. In an effort to explain away this partial production, Dr. Zambelli-Weiner claims that the incomplete output relates to "preliminary and draft analyses" concerning the "PISCES project" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Sept. 3, 2019 letter from Dr. Zambelli-Weiner's counsel, Ex. 14; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] Dr. Zambelli-Weiner admitted that she reviewed these guidelines. Zambelli-Weiner Dep. at 14-22, Ex. 1.

11

Ex. 15. Her own published study refutes this claim because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Kimmel Aff. ¶¶ 22-23, Ex. 2. Dr. Kimmel also explains that he "cannot envision a scenario where a researcher would maintain only a portion of the statistical codes and/or output for a published study." *Id*. ¶ 25. If anything, Dr. Zambelli-Weiner's effort to divorce the partially produced data output about her Zofran study from the published article reflects a larger problem with trusting any representations that she makes about what data she has or does not have on her Zofran study.

The data omitted by Dr. Zambelli-Weiner and sought by GSK are critically important data to understand what Dr. Zambelli-Weiner did and how she arrived at her results. Dr. Zambelli-Weiner's partial production that omits the key data is akin to a novel with all the key facts about the characters and the plot missing because the author says those lines of the story do not exist. Indeed, an assessment of how the underlying data was analyzed and then presented in the published article is the very reason that accepted practice, existing guidelines, and the journal *Reproductive Toxicology* tell authors submitting a study for publication that they should retain their research data. Dr. Zambelli-Weiner cannot reasonably claim that the data or documents no longer exist. As with any statistical program, the investigators had to "input" the raw data and their code (*i.e.*, their instructions on how to analyze that data) in the program to generate the "output" or the results of the statistical analyses. Once "input" into the program, the coding and the raw data remain saved. And as Dr. Zambelli-Weiner admitted, the "output" is obtainable by clicking a button and without much effort.

Ironically, in other litigation in which Dr. Zambelli-Weiner is serving as a plaintiffs' expert, she extolled the virtues of "using proper procedures for the collection, transmission, storage, and analysis of data" by "[a]dhering to the highest scientific standards." Zambelli-

Weiner's Rule 26 Report, *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 3:16-md-02738-FLW-LHG (ECF No. 9740-7) at 10, Ex. 17. There, Dr. Zambelli-Weiner repeatedly emphasized that ***"[t]he reliability of scientific findings cannot be evaluated if research is not reported in a transparent and reproducible manner."*** *Id* (emphasis added). As she put it:

> The evaluation of individual epidemiological studies involves an assessment of the reliability and internal validity of the study. ***Reliability is the concept that results must be repeatable; that is, other researchers should be able to perform the same experiment or analysis, under the same conditions, and generate the same results.***

*Id.* (emphasis added). Now, in this litigation, she takes the position that GSK should be denied access to the key data in her possession, custody, and control that would allow GSK to assess the "reliability and internal validity" of her Zofran study (*i.e.*, learn whether the statistical coding and output analyses actually support the findings of that study). Similarly, in other litigation, Dr. Zambelli-Weiner represented that the "[t]he reliability of scientific findings cannot be evaluated if research is not reported in a transparent and reproducible manner" and a "lack of transparency and reproducibility intrinsically compromises and diminishes the quality of research." *Id*. at 10-11.[3] But in this litigation, Dr. Zambelli-Weiner throws up obstacle after obstacle to prevent GSK from discovering the methods through which she obtained her published results or means to establish a replication of her findings. Dr. Zambelli-Weiner statements in the talc litigation that a lack of transparency and reproducibility fatally compromised a study's results highlight exactly why she must produce the statistical coding and output analyses to GSK.

---

[3] As Dr. Zambelli-Weiner stated in her talc litigation expert report: "In all cases, transparency in the methods and results of quantitative syntheses is ***paramount***, as is full justification of any choices made." *Id*. at 11 (emphasis added).

### 2. Dr. Zambelli-Weiner Admitted that No Burden Prevents Production of the Data.

Even if Dr. Zambelli-Weiner did not follow well-accepted practices of preserving the output analyses in hard copy or electronically, her deposition admissions dispel any notion that GSK's requests place a burden on her. *See infra* at 9-10. Moreover, Dr. Kimmel, who is fully familiar with the statistical program used by Dr. Zambelli-Weiner, explains that it would take only "minutes" to generate the output analyses sought by GSK. Kimmel Aff. ¶¶ 2, 21, 24, Ex. 2. Nor is there any associated "expense" of obtaining data or writing code, since Dr. Zambelli-Weiner already has the data, the codes, and the program (Stata). *Id.* at 24.

The "Duties of Authors" statement by *Reproductive Toxicology* further undercuts Dr. Zambelli-Weiner's claim of a burden since it requires that she maintain the data sought by GSK should she choose to publish in that journal. *See* "Duties of Authors" statement by Elsevier (publisher of *Reproductive Toxicology*) at 3-4, Ex. 3. Thus, Dr. Zambelli-Weiner, in choosing this journal knew not only that she had to retain these data, but also that she should be prepared to disclose them in the future. It can come as no surprise and no hardship to her that she needs to provide these data, as that duty goes hand in hand with her article being published in this journal.

In sum, Dr. Zambelli-Weiner's admissions and actions reject her argument that it "would place an immense burden – both time and expense – on [her] to generate all of the statistical analyses in the study again." *See* Sept. 10, 2019 email from Mr. Gunderson, Ex.13.

### 3. GSK Seeks Critically Important Data that Is in Dr. Zambelli-Weiner's Possession, Custody, and Control.

Dr. Zambelli-Weiner cannot hide behind a claim that GSK is asking her to "create" a new document that does not exist. The data held by Dr. Zambelli-Weiner already exists: they are the statistical coding and the Truven data in her possession. All Dr. Zambelli-Weiner has to do is run the statistical coding, as applied to the existing dataset, through the statistical program. That is not

requiring a "new" document to be generated but rather allowing GSK access to existing data that already exists in Dr. Zambelli-Weiner's possession, custody, and control. "While a party should not be required to create completely new documents, that is not the same as requiring a party to query an existing dynamic database for relevant information. Courts regularly require parties to produce reports from dynamic databases, holding that the technical burden... of creating a new dataset for [ ] litigation does not excuse production." *Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-0630, 2013 WL 4426512, at *3 (N.D. Cal. Aug. 14, 2013) (internal quotation omitted); *see also N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 51 (E.D.N.Y. 2018) (same); *Mervyn v. Atlas Van Lines, Inc.*, No. 13 C 3587, 2015 WL 12826474, at *6 (N.D. Ill. Oct. 23, 2015) ("First, as the court noted in the Apple case, requiring a party to query an existing database to produce reports for opposing parties is not the same as requiring the creation of a new document. Thus, the argument that Plaintiff's request is outside the scope of Rule 34 is unfounded. Second, requiring the creation of new code does not necessarily create an undue technical burden."); Fed. R. Civ. P. 34 Adv. Comm. Note (2006 Amendment) ("Electronically stored information may exist in dynamic databases and other forms far different from fixed expression on paper. Rule 34(a) is amended to confirm that discovery of electronically stored information stands on equal footing with discovery of paper documents.").

Nor is GSK's right to access this data different under Rule 45 than Rule 30 given its importance in this litigation. *See Gonzales v. Google, Inc.*, 234 F.R.D. 674, 683 (N.D. Cal. 2006) (requiring production of data under Rule 45 even though production required party to "create new code to format and extract query and URL data from many computer banks, in total requiring up to eight full time days of engineering time"). Dr. Zambelli-Weiner has already clicked the button before to run her analyses. She clicked that button to run the analyses, which provided the data for

the findings in her published article. And she clicked that button to produce some—but not the most critical— data. Dr. Zambelli-Weiner must make a full and complete production of all the statistical codes and output analyses.

To the extent that Dr. Zambelli-Weiner claims that these data no longer exist at all, GSK would request that the Court order Dr. Zambelli-Weiner to submit an affidavit under oath stating that the statistical codes and the output analyses no longer exist and cannot be accessed, including when and why they were destroyed, discarded or not retained; who made the decision to either not retain or to discard this data; and who participated in the discarding of or not retaining them. Such an affidavit is necessary here. Dr. Zambelli-Weiner in prior testimony has disclaimed representations that her own counsel have made to GSK about some of the data at issue. When asked about Request 2c, Dr. Zambelli-Weiner testified that she unaware of the response given and that it was "counsel's response." Zambelli-Weiner Dep. at 24-25, Ex. 1. GSK wants there to be no confusion about what data Dr. Zambelli-Weiner possesses or does not possess about her Zofran study. If she continues to maintain she has produced it all and cannot access the data sought by GSK, she should commit to that representation under oath. This would be consistent with the Court's prior statement that GSK would be entitled to have Dr. Zambelli-Weiner's commitment in writing if she maintained that the data do not exist. *See* Aug. 14, 2019 Hr'g Tr. at 24, Ex. 18.

**B.   Dr. Zambelli-Weiner Should Be Ordered to Appear for an Additional Deposition.**

The productions made by Dr. Zambelli-Weiner and Plaintiffs' counsel after her last deposition require Dr. Zambelli-Weiner to sit for another deposition (after she makes a full production of the statistical coding and analyses sought by GSK in this Motion). While Rule 30(a)(2) requires leave of court to reopen a deposition absent stipulation of the parties, courts have generally allowed a second deposition where new information is unearthed only after the initial

deposition. *See* Fed. R. Civ. P. 30(a)(2); *Le v. Diligence, Inc.*, 312 F.R.D. 245, 246 (D. Mass. 2015) (collecting cases and granting motion to compel second deposition); *Entrata, Inc. v. Yardi Sys., Inc.*, No. 2:15-CV-102 CW, 2018 WL 6171890, at *2 (D. Utah Nov. 26, 2018) (denying motion for protective order seeking to prevent second deposition where more than 1,000 new documents were produced following initial deposition). As one court stated: the "late production of relevant documents that should have been produced sooner is more than enough justification for a renewed deposition to permit [the defendant] to inquire about them." *Wai Feng Trading Co. v. Quick Fitting, Inc.*, No. 13-33S, 2016 WL 4184014, at *4 (D.R.I June 14, 2016). GSK easily meets this standard.

Dr. Zambelli-Weiner and Plaintiffs' counsel have produced more than 1,500 pages of documents since Dr. Zambelli-Weiner's February 22, 2019 deposition, as compared to only about 30 pages of documents before her deposition. The newly produced documents include, *inter alia*, ███████████████████████████████████████████████████████████████████ GSK did not have the benefit of these documents at Dr. Zambelli-Weiner's original or continued deposition in February because Plaintiffs and Dr. Zambelli-Weiner failed to produce them, forcing GSK to file multiple motions to compel.

By improperly withholding documents before her deposition, Dr. Zambelli-Weiner and Plaintiffs have created the situation where GSK needs to depose her again. GSK should be allowed to question Dr. Zambelli-Weiner about the full record of documents produced and how it squares

with her prior statements under oath. To determine otherwise would reward efforts that prevented GSK's legitimate discovery, including the assertion of unfounded objections to prevent GSK from knowing the true nature of Dr. Zambelli-Weiner's study and the extent of her relationship with Plaintiffs' counsel. That would be neither fair nor just.

GSK requests that the Court grant its motion for leave and order Dr. Zambelli to appear for a second deposition for seven (7) hours on the record after GSK receives either the statistical coding and output analyses it seeks or the statement under oath sought by GSK from Dr. Zambelli-Weiner.

Dated: September 26, 2019

Respectfully submitted,

*/s/ Jennifer M. Stevenson*
Madeleine M. McDonough
Jennifer M. Stevenson
Jennifer Stonecipher Hill
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
mmcdonough@shb.com
jstevenson@shb.com
jshill@shb.com
*Admitted pro hac vice*

Attorneys for Defendant GlaxoSmithKline LLC

**CERTIFICATE OF SERVICE**

      I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those identified as non-registered participants.

                               /s/ *Jennifer M. Stevenson*
                               Jennifer M. Stevenson