UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE : ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION | MDL No. 1:15-md-2657-FDS<br><br>This document relates to:<br><br>ALL CASES |

**GLAXOSMITHKLINE LLC'S MEMORANDUM IN SUPPORT OF
ITS MOTION TO COMPEL PLAINTIFFS TO PRODUCE DR. LOUIK
FOR A TARGETED DEPOSITION ON HER SUPPLEMENTAL REPORT**

The parties are now less than three months from presenting their claims and defenses to a jury in *Rodriguez v. GSK*, the first bellwether trial of this MDL. As trial looms, the nature and scope of the opinions of Dr. Carol Louik, Plaintiffs' sole expert epidemiologist, remain unknown, requiring a targeted deposition about the opinions she will offer at trial. Plaintiffs have refused to make Dr. Louik available for a deposition since she analyzed new epidemiologic data on Zofran and cardiac and orofacial cleft defects and provided a supplemental expert report in March 2019. That new epidemiologic data resulted in Dr. Louik amending and changing her opinions about septal defects. Plaintiffs' shifting representations to this Court about Dr. Louik's current opinions make plain that a deposition is warranted to avoid unfair surprise and prejudice to GSK at trial.

In her initial expert report and at deposition, Dr. Louik opined that "to a more likely than not probability . . . ondansetron can cause . . . septal defects." Louik July 12, 2018 Report at 40, Ex. 1; Louik Dep. at 34, Ex. 2. At the April 8, 2019 status conference, Plaintiffs informed the Court that, based on her just served supplemental report, Dr. Louik now will ***"not [be] offering an opinion that Ondansetron more likely than not is a cause of septal defects."*** Apr. 8, 2019 Hr'g Tr. at 68-69 (emphasis added), Ex. 3. At the *Daubert* hearing a few weeks later, GSK discussed how Dr. Louik had withdrawn her opinion about septal defects, the only heart defects about which

she had a causation opinion. *See e.g.*, Apr. 24, 2019 *Daubert* Hr'g Tr. at 2-83-2-83; 2-88-2-89; 2-100-2-101, Ex. 4. In response, Plaintiffs repeatedly challenged GSK's presentation and evidence and claimed, despite Plaintiffs' April 8 representation to the Court, that (1) Dr. Louik "has absolutely not withdrawn her opinion in this litigation"; and (2) this was "plainly untrue." Apr. 26, 2019 *Daubert* Hr'g Tr. at 4-23-4-24, Ex. 5. Plaintiffs' conflicting accounts alone justify a deposition of Dr. Louik on her March 19 supplemental report, if for no other reason but to avoid trial by ambush.

Moreover, Plaintiffs have used Dr. Louik's torturously worded supplemental report as a means of advancing whatever interpretation of her opinions is most convenient at that moment in time. For example:

- In an attempt to marginalize Dr. Louik after the withdrawal of her causation opinion, Plaintiffs claimed that she was "not qualified" to (and did not) consider non-epidemiological data. Apr. 8, 2019 Hr'g Tr. at 69, Ex. 3. This directly conflicts with Dr. Louik's testimony that not only did she consider non-epidemiological data, but that she ***could not have reached a causation opinion*** without doing so. Louik Dep. at 40:11-20, Ex. 2.[1]

- Plaintiffs' counsel insisted that "neutral" epidemiology or "no epidemiology" is "not inconsistent" with a reliable causation opinion, claiming that this was the message of Dr. Louik's supplemental report. Apr. 26, 2019 *Daubert* Hr'g Tr. at 4-38-39 ("the epidemiology is neutral"), Ex. 5; Apr. 25, 2019 *Daubert* Hr'g Tr. at 3-25 ("it is very close to synonymous with a situation where there is zero epidemiology"), Ex. 6. Yet,

---

[1] Louik Dep. at 40:11-20. ("Q. So is it fair to say that without a biologically plausible mechanism you would not conclude that more likely than not Zofran can cause VSDs and isolated cleft palate? A. On the basis of epidemiologic studies -- epidemiologists typically look for biologic plausibility when they find an association, and I don't think I could reach a conclusion without considering biologic plausibility and biologic mechanism.").

Dr. Louik testified that the first step in a causation analysis is a consistent, positive epidemiological association that is not likely to be due to chance, bias, or confounding. Louik Dep. at 55:24-56:4; 98:23-100:16, Ex. 2.[2]

Plaintiffs' counsel cannot be allowed to offer self-serving interpretations of Dr. Louik's purported opinions, while hiding behind her cryptically worded supplemental report. Fairness and due process necessitate granting GSK's motion to depose Dr. Louik about her March 19 supplemental report. For these reasons, the Court should grant GSK's motion and allow a four-hour deposition of Dr. Louik in advance of trial.

## FACTUAL BACKGROUND

Dr. Louik signed her initial expert report on July 12, 2018, when the studies from Drs. Parker, Zambelli-Weiner, and Huybrechts were only available in abstract form. In her initial report, Dr. Louik opined that Zofran "more likely than not" causes septal defects and orofacial defects. Louik July 12, 2018 Report at 40, Ex. 1. At the time that Dr. Louik reached this opinion, she noted that the Huybrechts abstract "did not report risk ratios specifically for septal defects" and that "[i]t would be valuable to know what risks were found for those more specific outcomes." *Id*. at 36. Thus, Dr. Louik's initial report from more than a year ago was a snapshot of the epidemiologic evidence available at the time.

---

[2] Louik Dep. at 55:24-56:4 ("Q. But you agree, Dr. Louik, that in trying to determine if an exposure like Zofran increases the risk of septal defects or cleft palate, you need controlled epidemiological studies? A. Controlled studies, yes, absolutely."); *Id*. at 98:23-99:4 ("Q. Okay. Dr. Louik, now, the first step in any methodology of determining whether an exposure causes a birth defect, right, is determining whether there's a valid -- and I think you've changed, you took out the word "statistical"? A. Correct); *Id*. at 99:17-22 (:Q, And before concluding that there is a valid association, one must conclude that chance, bias, and confounding are not likely explanations for that association, correct? A. That they're not the most likely explanation, yes."); *Id*. at 100:13-17 (Q. And that's precisely why replication and consistency are critical in birth defect epidemiology, right? A. In all epidemiology, I would argue.").

Dr. Louik reviewed the full, published study by Dr. Parker before her deposition on October 18, 2018. At the time of her deposition, Dr. Louik still did not have the benefit of the full, published study by Dr. Huybrechts.

On November 11, 2018, after her deposition, Dr. Louik served a supplemental report about the recently published Zambelli-Weiner study. Louik Nov. 11, 2018 Supp. Report, Ex. 7. That supplemental report consisted of three sentences and contained no analyses of data in the Zambelli-Weiner study. It stated that her "overall opinion regarding the risks of ondansetron are also unchanged." *Id*. Dr. Louik never reviewed any of the discovery related to the Zambelli-Weiner study, including the depositions of Drs. Zambelli-Weiner and Kirby, or any of the over 4,000 pages of document produced in discovery related to that study.

Two months after Dr. Louik's deposition the Huybrechts article became publicly available on December 18, 2018. At that time, the Huybrechts study provided extensive data about whether there was an association between Zofran and septal defects, including the risk ratios that Dr. Louik stated "would be valuable to know." On March 19, 2019—three months after the Huybrects study was published—Plaintiffs served a third supplemental report of Dr. Louik (the "March 19 supplemental report"), Ex. 8. This supplemental report included a "critical review" of the Huybrechts study, including the risk ratios she stated would be so valuable. Dr. Louik also stated in her March 19 supplemental report that the published Huybrechts article "considerably expands the description of the methods that were included in the abstract and presents additional data relating to birth defects overall and specific defects." *Id*. at 1. Dr. Louik also determined that the Huybrechts article "describe[s] in great detail the statistical methods used to control confounding, which reflect the most recent approaches used in studies of this type." *Id*. at 1-2. In addition, Dr. Louik discussed how the published article presented analyses about septal defects that were

4

designed to address questions of confounding, which had not been presented in the abstract. After reviewing the findings of the published Huybrechts study, Dr. Louik acknowledged that this study "represents a major contribution to the epidemiologic literature on ondansetron and birth defects" and stated for the first time that she "cannot infer causality between ondansetron and septal defects from the epidemiological publications alone." *Id*. at 2, 4.

Prior to the *Daubert* hearing, GSK moved for leave to reopen Dr. Louik's deposition in light of her new, changed and/or different opinions related to septal defects. ECF No. 1382.[3] In opposing GSK's request, Plaintiffs' counsel framed the issue as follows: "The question of whether Dr. Louik should appear breaks down to two questions, whether and when. The question of whether, we don't have to reach that today. The issue for today is she needed now for Daubert?" Apr. 8, 2019 Hr'g Tr. at 64, Ex. 3. Plaintiffs' counsel argued that the Court need not order Dr. Louik's deposition before the April 24-26, 2019 *Daubert* hearing and that, if needed, the Court could revisit the separate issue whether she should be deposed before trial. Apr. 8, 2019 Hr'g Tr. at 70 ("The issues for today are do we need her for Daubert? The Court does not need to decide whether her testimony is needed to allow GSK to prepare for trial at this time, ….), Ex. 3. During that argument, Plaintiffs' counsel represented to the Court that based on her March 19 supplemental report Dr. Louik now will "not [be] offering an opinion that Ondansetron more likely than not is a cause of septal defects." Apr. 8, 2019 Hr'g Tr. at 68-69. The Court ultimately agreed

---

[3] The Court had previously denied GSK's request to re-open Dr. Louik's deposition because of publication of the Zambelli-Weiner study: "I am not convinced that based on balancing the burdens and the benefits that reopening the deposition of Dr. Louik is justified. She indicated she relied on the abstract. Now the article has come out. She hasn't changed her opinion. Obviously, there are issues about whether she considered facts X, Y and Z that are in the article but not the abstract, but I think those can be addressed at cross-examination, or, for that matter, if we have live testimony at a Daubert hearing. And I think under the circumstances here, the benefit is not worth the additional burden and cost and other things that come with reopening the deposition, so that motion is denied. Dec. 7, 2018 Hr'g Tr.. at 38-39.

5

with Plaintiffs and declined to require a second deposition "at this time," denying GSK's motion "on the current record":

> I'm going to not require her to submit to another deposition at this time. I'm going to let the Daubert hearings go forward. I may want to hear live testimony from her, depending on how I think that plays out and what I understand and don't understand how attorney argument goes, and, again, we're talking about discovery here.

*Id.* at 71.

At the *Daubert* hearing on April 24-26, 2019, GSK discussed how Dr. Louik had withdrawn her opinion that Zofran causes septal defects. *See e.g.*, Apr. 24, 2019 *Daubert* Hr'g Tr. at 2-83-2-83; 2-88-2-89; 2-100-2-101, Ex. 4. In response, Plaintiffs repeatedly claimed otherwise, arguing that Dr. Louik (1) "has absolutely not withdrawn her opinion in this litigation" and (2) this was "plainly untrue." Apr. 26, 2019 *Daubert* Hr'g Tr. at 4-23-4-24, Ex. 5. During the hearing, Plaintiffs' counsel went so far as to claim that Dr. Louik opined that the "positive [studies] are more consistent with the other lines of evidence," even though that opinion appears nowhere in Dr. Louik's March 19 supplemental report. *Id*. at 39:25-40:1, Ex. 8.

## ARGUMENT

### I. GSK Must Be Allowed to Question Dr. Louik About Her March 19 Supplemental Report Before Trial.

No basis exists to deny GSK the fundamental right to question Dr. Louik about her current views on the epidemiologic evidence before the first trial starts. Basic due process demands that a party understand the opinions that will be offered by an opposing party's experts at trial. *See High Voltage Beverages, LLC v. Coca-Cola Co.*, No. 3:08cv367, 2010 WL 3788288, at *1 (W.D.N.C. Sept. 22, 2010) (noting that "Due Process would require an opportunity to re-depose the expert and counter the expert's additional opinion [in his supplemental report] with responsive expert opinion"); *Bradley v. Cooper Tire & Rubber Co.*, No. 07-MC-001-JM, 2007 WL 148764, at *1

6

(D.N.H. Jan. 11, 2007) ("Federal Rules of Civil Procedure 26(b)(4)(A) permits a party to depose 'any person who has been identified as an expert whose opinions may be presented at trial'…The purpose of Rule 26(b)(4)(A) is to permit for preparation for cross-examination at trial."). Indeed, courts, including this one, routinely order additional expert testimony when experts offer new or different opinions to ensure fairness and alleviate prejudice. *See, e.g., Barnes v. D.C.*, 289 F.R.D. 1, 13 (D.D.C. 2012) (when supplemental reports were different from original reports "allowing the District to depose the plaintiffs' experts ensures the District a fair opportunity to respond to the plaintiffs' reports"); *Hidalgo v. Cooley Godward Castro Huddleson & Tatum*, No. CIV.A. 302CV1709L, 2004 WL 936859, at *2 (N.D. Tex. Apr. 1, 2004) (overruling magistrate judge's decision not to allow follow up deposition of expert following supplemental report, noting "it is fundamentally unfair and unduly prejudicial not to allow Defendant to redepose [plaintiff's expert] on his new opinions and conclusions which were not included in his original expert report"); *Albert v. Warner–Lambert Co.*, No. 99–11700, 2002 WL 745822, at *1 (D. Mass. Apr. 24, 2002) (allowing a supplemental expert report only where the expert was made available for four hours of additional deposition testimony, noting defendant "justifiably argues prejudice because Brandwein's deposition has been completed and the deadline for further expert discovery has expired").[4] Consistent with these decisions, Magistrate Judge Dein permitted GSK to question

---

[4] *See also, Largan Precision Co. v. Samsung Elecs. Co.*, No. 13-CV-2740 DMS (NLS), 2016 WL 4098901, at *4 (S.D. Cal. Jan. 27, 2016) ("the Court further notes good cause exists for purposes of fairness and efficiency. The Court finds persuasive the case authorities demonstrating that courts have allowed further depositions where a new opinion is disclosed by an expert after a first deposition was taken"); *Allen v. Dairy Farmers of Am., Inc.,* 2013 WL 211303, at *5–6 (D. Vt. Jan. 18, 2013) (prejudice to defendants created by rebuttal report could be alleviated by allowing them to re-depose expert); *Richardson v. Korson*, 905 F. Supp. 2d 193, 200 (D.D.C. 2012) (defendant was prejudiced by last minute filing of supplemental report, and this prejudice could be cured by reopening of discovery and allowing defendant to take deposition of expert); *Illinois Tool Works, Inc. v. MOC Prod. Co.*, No. 09CV1887 JLS MDD, 2012 WL 3561984, at *12 (S.D. Cal. Aug. 17, 2012) ("the Court does not strike Barry's supplemental expert report but will allow MOC to conduct a further deposition of Barry prior to the commencement of trial in order to limit any prejudice to MOC"); *Info-Power Int'l, Inc. v. Coldwater Tech*., Inc., No. 3:07CV0937-P, 2008 WL 5552245, at *5 (N.D. Tex. Dec. 31, 2008) (holding defendant was entitled to re-depose an expert related to new opinions and assertions made in supplemental report to "cure any prejudice" to defendant); *Johnson v. Bd. of Police Comm'rs*, No. 4:06CV605 CDP,

Plaintiffs' expert Dr. Sadler on his supplemental report, noting that he had not previously been deposed on the opinions in his expert report. May 30, 2019 Hr'g Tr. at 9:16-10:1. And importantly, Plaintiffs allowed GSK to depose Plaintiffs' other expert, Dr. Ra-id Abdulla, about the opinions that Dr. Abdulla offered about the published Huybrechts article and other studies included in his supplemental report that Plaintiffs served at the same time as they served Dr. Louik's March 19 supplemental report. Abdulla May 1, 2019 Dep. at 118-163, Ex. 9; Abdulla Feb. 27, 2019 Supp. Report, Ex. 10 (served on March 15, 2019).[5]

The due process and fairness protections set out in the cited case law are equally at issue here. Not only does Dr. Louik offer new or different opinions in her March 19 supplemental report, but those opinions are critically important and remain a moving target. Indeed, Plaintiffs' counsel's explanations during the *Daubert* hearing rendered her opinions even more incomprehensible.

For starters, Dr. Louik's key opinion on septal defects changed from her initial report to her March 19 supplemental report. In her initial expert report, Dr. Louik opined:

> "The weight of the currently available evidence from epidemiological studies and informed by consideration of the limited non-epidemiological evidence within the framework of my expertise to assess biological plausibility, demonstrates to a more likely than not probability that ondansetron can cause cardiac defects, specifically septal defects…"

---

2008 WL 2437963, at *2 (E.D. Mo. June 13, 2008) (when supplemental report is substantially different from prior expert testimony "[i]n the interests of justice, I would have to reopen discovery and allow defendants to retake Worley's deposition based upon the supplemental report, and then allow defendant additional time to obtain more expert testimony"); *Ice Corp. v. Hamilton Sundstrand Corp.,* No. 05-4135-JAR, 2007 WL 1590845, at *2–3 (D. Kan. May 30, 2007) (when an expert's supplemental report contained new facts and opinions, Court found a second deposition limited to new opinions and facts was warranted); *Sanchez v. Brokop,* No. CV 04-0134 LCS/RLP, 2005 WL 8163846, at *2 (D.N.M. June 24, 2005) (defendant's request for second deposition based on any new opinions is "reasonable and, combined with additional discovery agreed to by the parties fulfills the purpose of Fed. R. Civ. P. 26(e), to prevent prejudice and surprise").

[5] Plaintiffs' counsel consented to Dr. Abdulla being questioned about the published Huybrechts article. Abdulla Dep. at 117:17-19, Ex. 8 ([GSK' counsel]: "You mind if I ask him some questions about Huybrechts? MR. NABERS: The full paper, I guess not.").

Louik July 12, 2018 Expert Report at 40, Ex. 1. This opinion was based on the literature cited in Dr. Louik's report. Louik Dep. at 34:15-19, Ex. 2.

After reviewing additional literature—most critically the Huybrechts studies—Dr. Louik came to a very different assessment in her March 2019 supplemental report. In a complete reversal, she now "cannot infer causality between ondansetron and septal defects from the epidemiological publications alone." Louik Mar. 19, 2019 Supp. Report at 4, Ex. 8. Stated differently, her first opinion was that the epidemiology demonstrates causal association for septal defects. Her second opinion is that the epidemiology *does not* demonstrate a causal association. Even Plaintiffs' counsel recognized this change, when prior to the *Daubert* hearing, counsel explained that, although in Dr. Louik's July report "she gave a causation opinion on both cleft palate and septal defects based on the epidemiology and the consideration of the Bradford Hill factors," based on her supplemental report, she now will "not [be] offering an opinion that Ondansetron more likely than not is a cause of septal defects." Apr. 8, 2019 Hr'g Tr. at 68-69, Ex. 3. This change in her most significant opinion, standing alone, entitles GSK to another deposition of Dr. Louik prior to the *Rodriguez* trial. *See Albert,* 2002 WL 745822 at *1; *Largan*, 2016 WL 4098901, at *4; *Barnes*, 289 F.R.D. at 13.

If GSK is correct that Dr. Louik can no longer opine that Zofran causes septal defects, it must be allowed to depose Dr. Louik to lock down that admission before trial and to understand how and why she reached this opinion. If Plaintiffs are correct that Dr. Louik has not withdrawn her opinion that Zofran causes septal defects, GSK must be allowed to depose Dr. Louik so that it does not hear that opinion (and the bases for it) for the first time when Dr. Louik takes the stand at trial. And if Dr. Louik's opinion is somewhere in between, GSK must be allowed to know before trial through a deposition where the lines are drawn so that it may adequately prepare for its trial

9

cross-examination of Dr. Louik. Otherwise, Dr. Louik will be free to interpret her report in any way she chooses. And GSK will hear that interpretation for the first time after opening statements and after the trial has begun. In other words, it will be trial by ambush.

The testimony of Dr. Gary Shaw, GSK's birth defect epidemiologist, underscores this point. Although it was evident to Dr. Shaw that Dr. Louik has changed her key opinion, as he explained to the Court at the *Daubert* hearing, even with his experience, he could not make sense of certain statements in her supplemental report:

> Q. [By Plaintiffs' counsel] If Dr. Louik says an overall causal assessment based on considering the totality of the evidence would not be inconsistent with the epidemiological evidence, would you disagree with that statement? I'll put it up here so you can read it. Here's my question. Do you disagree with Dr. Louik's statement there?
>
> A. [By Dr. Shaw] So I'm not sure I disagree or agree. I'm not sure I understand it. The –
>
> Q. Go ahead.
>
> A. I could try to unpack it for you, but I'm literally speculating on what she's trying to convey here. There's a lot of sort of hedging going on in this statement, and I just don't know what the true point is. ***It sounds neutral in one way and it sounds in an advocate kind of way in another. I'm not sure what's being said there.***
>
> \*         \*         \*
>
> You asked me if I agree with everything in her report, and what I'm saying is I'm not ready to -- I can't sit here live and adopt everything that's in her report. That sentence is a key sentence in her report. I still don't know what that means, so for me to say that I agree with everything in her report would be -- I would not be telling the truth as I sit here. I would need to go through each thing and give you an answer. ***Do I think that Dr. Louik has changed from her initial report to what we're seeing in this report? I would say I'm seeing a change***.

Apr. 26, 2019 *Daubert* Hr'g Tr. at 4-87-4-88; 4-90, Ex. 5. At a minimum, there is a change in Dr. Louik's opinions as to septal defects. That change warrants a deposition of Dr. Louik before trial.

10

## II.   Plaintiffs' Counsel Should Not Be Permitted to Substitute Their Own Version of Dr. Louik's Opinions.

Perhaps realizing that Dr. Louik's withdrawal of her opinion on septal defects is detrimental to their case, Plaintiffs' counsel have since attempted to walk back and explain away the opinions in her March 19 supplemental report. These attempts have only strengthened the need for a targeted deposition. GSK must understand Dr. Louik's opinions—not Plaintiffs' counsel's explanation of those opinions—particularly given the shifting explanation. Indeed, prior to the *Daubert* hearing, Plaintiffs represented that Dr. Louik could no longer state that Zofran causes septal defects. However, at the *Daubert* hearing, Plaintiffs' counsel made contradictory statements regarding Dr. Louik's opinions, claiming that her opinion on septal defects was "consistent with" causation. The Court correctly expressed confusion about Plaintiffs' representations:

> MR. BONNIN: GSK has a slide where they say they've got conflicting testimony where our experts do require epidemiology. I'll submit that, even if they do require epidemiology, your Honor, it's here.
>
> THE COURT: I'm not sure I understand. I thought on septal defects, Dr. Louik said basically that the epidemiology was neutral, didn't prove or disprove either way?
>
> MR. BONNIN: That's correct, your Honor.
>
> THE COURT: So how is it -- then is it not contradictory to say, well, it's consistent with a causal relationship? It's also inconsistent with a causal relationship if it's neutral, right? I mean, in other words, isn't that misleading to say it's consistent with a causal relationship if it's simply neutral?
>
> MR. BONNIN: No, I don't believe that that's inconsistent at all, your Honor, and here's the issue. ***Dr. Louik acknowledges that there are statistically significant increased risks represented in some of the studies. Those risks are sufficient to provide consistent epidemiological evidence that would be consistent with the other lines of evidence as they are invoked.***
>
> THE COURT: ***But doesn't your epidemiologist say the opposite, I mean, or say that that's not true?*** I mean, let me try to put it this way. So, a coin is flipped ten times, and five times it's head, and five times it's tails. An epidemiologist would say, well, that doesn't prove anything, that's chance. You can't say the five heads are consistent with the result we want because you can't ignore the five tails, right?

Apr. 26, 2019 *Daubert* Tr. at 38:2-39:5 (emphasis added), Ex. 5.

Similarly, Plaintiffs' counsel claimed that Dr. Louik considered all the epidemiology studies together and determined that more weight could be assigned to the "positive" ones, *i.e.*, the ones supporting Plaintiffs' causation theory based on other so-called "lines of evidence":

> MR. AYALA: Now, we have to consider those epidemiology studies together with all the lines of evidence. When we consider them together, that allows us to assign weight to the positive ones. Why? **Because the positive ones are more consistent with the other lines of evidence.** And because --
>
> THE COURT: **Did she say that? I mean, she's the epidemiologist**.
>
> MR. AYALA: **She does**. The critical point is right here. Look at this paragraph here, your Honor. "Given the current state of the epidemiological evidence pertaining to septal defects, a causal assessment must also be based on considering the non-epidemiologic evidence."

*Id.* at 39:10-40:9.

This opinion appears nowhere in Dr. Louik's March 19 supplemental report. In that report, Dr. Louik neither attempts to weigh the studies nor states that the "positive studies are more consistent" with other lines of evidence. Moreover, Plaintiffs' claim about Dr. Louik's opinion is inconsistent with their claim that Dr. Louik is not even "qualified to assess" the "other six lines of evidence." Apr. 8, 2019, Hr'g Tr. at 69, Ex. 3.

Similarly, in their response to GSK's Motion to Exclude the General Causation Testimony of Drs. Abdulla and Sadler (Doc. 1565), Plaintiffs claimed that Dr. Abdulla was not required to weigh the epidemiological studies because purportedly "Carol Louik already did." ECF No. 1605 at 3. However, again, there is no evidence regarding whether, or how, Dr. Louik weighed the Huybrechts study because this opinion is not in her March 19 supplemental report.

In short, Plaintiffs want to have their cake and eat it too. They ask this Court to accept their self-serving representations regarding Dr. Louik's opinions, even while those representations are continually shifting and inconsistent (*e.g,* she withdrew her causation opinion vs. she did not; she

considered "other lines of evidence" vs. she did not, etc.) and are not supported by her supplemental report. At the same time, they want to preclude GSK from discovering Dr. Louik's actual opinions before trial. This approach is plainly impermissible.

## CONCLUSION

For the foregoing reasons, the Court should grant GSK's Motion and require Dr. Louik to appear for a targeted, four-hour deposition on the opinions in her March 19 supplemental report.

Dated: October 17, 2019

Respectfully submitted,

*/s/ Jennifer M. Stevenson*
Madeleine M. McDonough
Jennifer M. Stevenson
Jennifer Stonecipher Hill
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
mmcdonough@shb.com
jstevenson@shb.com
jshill@shb.com
*Admitted pro hac vice*

*Attorneys for Defendant GlaxoSmithKline LLC*

4822-1260-4840 v4

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was sent electronically to all registered participants as identified on the Notice of Electronic Filing and paper copies will be sent via first class mail to those identified as non-registered participants.

/s/ *Jennifer M. Stevenson*
Jennifer M. Stevenson

4822-1260-4840 v4