# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE: ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION**<br><br>**This Document Relates To:**<br><br>**All Actions** | MDL No. 1:15-md-2657-FDS |

## GLAXOSMITHKLINE LLC'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO COMPEL DR. ZAMBELLI-WEINER TO PRODUCE DOCUMENTS AND FOR LEAVE FOR SECOND DEPOSITION

Dr. Zambelli-Weiner's Opposition turns a blind eye to her sworn admissions about how she can provide the data sought by GSK with the click of a button; what her own documents and discovery responses say; and unrefuted expert testimony setting out why Dr. Zambelli-Weiner's excuses and claims about the data are not believable. Tellingly, Dr. Zambelli-Weiner fails to put an affidavit before the Court or any factual support for her attorney's arguments about what she has or does not have and why. Her silence on these key issues speaks volumes. In essence, Dr. Zambelli-Weiner hopes that this Court will ignore her sworn testimony about being able to produce the data and the serious concerns surrounding her failure to produce it. Dr. Zambelli-Weiner should not be allowed to hide behind attorney argument to thwart GSK's legitimate, scientific concerns about whether the findings reported in her published study are substantiated by the underlying data. Instead, Dr. Zambelli-Weiner should be ordered to produce the data sought by GSK and sit for another deposition after the data are produced.

## I.   DR. ZAMBELLI-WEINER SHOULD BE COMPELLED TO PRODUCE THE MISSING DATA AND ANALYSES

The Court should not reward Dr. Zambelli-Weiner's conduct in providing incomplete or incorrect information about discoverable documents. The fact that she avoided being candid about the documents in her possession through one motion to compel does not insulate her from her obligations under a properly served subpoena. The Court should order Dr. Zambelli-Weiner to produce the missing data and analyses sought by GSK.

### A.   Dr. Zambelli-Weiner Failed to Respond to GSK's Request for Statistical Coding.

GSK's Motion made clear that GSK moved to compel production of two categories of documents: (i) the statistical coding for the "medical administration" variable (*i.e.,* the investigators' instructions to the statistical program regarding how this variable should be defined) and (ii) the full statistical output (*i.e.*, the program's actual analyses and results). Dr. Zambelli-Weiner's Opposition[1] only addresses the latter request for the output; her Opposition says nothing about GSK's request for the statistical coding. Indeed, Dr. Zambelli-Weiner does not dispute that she has this coding or that this is information critical to interpreting the study's results. Notably, Dr. Zambelli-Weiner's willingness to force GSK to move to compel this data and her decision to not even offer an argument about why it should not be produced speaks directly to how she is willing to try and prevent GSK's access to basic data about the reliability of her study. This tactic also flags for the Court a basic question: what is it about the statistical coding and the output data that Dr. Zambelli-Weiner does not want the Court, GSK, and its experts to see? For these reasons,

---

[1] Non-Party Witness April Zambelli-Weiner, Ph.D.'s Opp'n to GSK's Mot. to Compel Production of Docs. and For Leave for Second Deposition ("Opposition"), Doc. No. 1693 (filed Oct. 17, 2019).

the portion of GSK's motion seeking the statistical coding for the "medical administration" variable must be granted.[2]

### B. Dr. Zambelli-Weiner's Own Testimony and Dr. Kimmel's Affidavit Refute Counsel's Claims That Dr. Zambelli-Weiner Cannot Generate the Statistical Output.

In the face of Dr. Zambelli-Weiner's unequivocal testimony that she can generate the output analyses sought by GSK with "not very much effort" and "with a click of a button," her counsel seeks to re-write what she actually said by claiming that GSK is taking her testimony "out of context." Counsel suggests that when she gave this testimony she was not aware that GSK sought the production of statistical output for the analyses in her Study.[3] This is simply false. Dr. Zambelli-Weiner's testimony that she could generate the output with "not very much effort" *was specifically in the context of questioning related to GSK's request for her Study's statistical output:*

| Counsel's Representations In Opposition | Dr. Zambelli-Weiner's Testimony |
|---|---|
| "[W]hile Dr. Zambelli-Weiner agreed in theory that the Stata software allows a user to generate an output for a particular analyses [sic] with little effort, she did not mean that it would take little effort or time to generate a Stata output for all of the analyses conducted in connection with the Study." | Q. Okay. All right. Now, let's go back to Exhibit 2, which is your Notice of Deposition. And Request 2D, if you would take a look at that, asks for Stata, SAS, or any other statistical software output or printout of the analysis, correct?<br>A. Correct.<br>Q. Okay. And your response to that request was that this printout does not exist.<br>A. That's correct.<br>Q. Do you know how to generate a Stata output?<br>A. Yes.<br>Q. Okay. I mean you can do that with a click of a button; is that right? |

---

[2] *See Iantosca v. Benistar Admin Servs., Inc.*, No. CIV.A. 08-11785-NMG, 2012 WL 220224, at *3 (D. Mass. Jan. 24, 2012) ("BASI's motion [to compel] is ALLOWED because the government did not respond to that portion of BASI's motion to compel in its opposition."); *Upton v. McKerrow*, No. CIV.A.1:94-CV-353MHS, 1996 WL 193807, at *6 (N.D. Ga. Feb. 20, 1996) (granting portion of plaintiff's motion to compel to which defendant did not respond); *Navajo Nation v. Urban Outfitters, Inc.*, No. 12CV0195 LH/LAM, 2014 WL 11511092, at *9 (D.N.M. Nov. 21, 2014) (same).

[3] Opp. at 6 (claiming that this "testimony [was] taken during the first day of her deposition before she was served with the notice for the continued deposition that contained Request No. 3"). In fact, the testimony was elicited specifically in the context of an *identical* request for the Study output.

|  | **A. Sure, absolutely.**<br>Q. Okay. So, why can't you generate it?<br>A. It doesn't exist from the analyses.  That is not our policy to retain output. It is not how we do our studies. The output gets put into the table shells, and that is the end of it.  So, I'm not hired by anyone to go back and recreate my analyses. So, I'm not going to do that.<br>Q. Okay. You have the codes, right?<br>A. Yes. We have the codes.<br>Q. The codes are on your laptop, right?<br>A. I didn't say that. I'm not sure that they are on my laptop.<br>Q. Where are they?<br>A. I believe I said they are on the server --<br>Q. Okay. They are on the server.<br>A. -- to be accurate.<br>**Q. So, how much effort would it take to take the codes and run them through Stata again?**<br>**A. Not, not very much effort, I don't believe.**[4] |
|---|---|

Under very similar circumstances, another court in recent birth defect litigation involving an antidepressant medication ordered the production of the underlying statistical analyses of a study relied on by plaintiffs.[5]  While the study author testified at deposition that she had the analyses, she subsequently reversed course in response to defendant's motion to compel this information, and argued that she did not "have custody, control, or possession of this information."[6]  The court rejected this claim based on the author's earlier sworn testimony, stating that "*I will find as a matter of fact that Dr. Berard has this information.  She must have, if she noted it in her deposition*."[7]  Moreover, the court emphasized this information was critical to its assessment of the study's reliability:

> *How can I assess scientific reliability  if, admittedly, source codes, general equalization tables, things that are more objective than subjective, are, pardon the expression, withheld from my consideration*? . . . Specific access to the SAS

---

[4] Zambelli-Weiner Dep. (Ex. 2) at 38:12-40:2 (emphasis added).
[5] *In re Forest Research Inst. Cases,* Order Granting Defs.' Mot. to Compel Produc. of Docs. Necessary to Verify Validity & Accuracy of Study by Pls.' Expert, Anick Bérard, Ph.D. (N.J. Super. Ct. Law Div. Hudson Cty. Oct. 9, 2015) (Ex. 3).
[6] Hearing Tr., *Capicotti v. Forest Labs* (N.J. Super. Ct. Law Div. Hudson Cty. Oct. 9, 2014) at 26, 33 (Ex. 4).
[7] *Id.* at 58 (emphasis added).

codes will allow one to understand how Dr. Berard manipulated, organized, or analyzed the data in her study. Together with the generalized equations model, this will allow the defendants to assess the accuracy of the adjusted figures that were reported in the study . . . .[8]

The same result is even more warranted in this case where, not only did Dr. Zambelli-Weiner acknowledge that she can generate the output with "not very much effort," but GSK's epidemiologist, Dr. Stephen Kimmel, also confirmed (through an unrebutted affidavit) that it would take only "minutes" to generate the output sought by GSK. Kimmel Aff. ¶¶ 21, 24, (Ex. 2 to GSK's Motion).

### C. **Dr. Kimmel's Affidavit Remains Unrebutted.**

Given the scientific nature of the information sought by GSK, every factual basis for GSK's motion was supported by the sworn affidavit of Dr. Kimmel. Kimmel Aff. (Ex. 2 to GSK's Motion). Among other things, Dr. Kimmel opined regarding (i) the fact that critical statistical coding and output were missing from Dr. Zambelli-Weiner's document production; (ii) the need to obtain these missing data in order to assess the validity and reliability of the study's methods and results; (iii) the impropriety of Dr. Zambelli-Weiner's purported failure to retain the statistical output and the inconsistency of that claim with the fact that she produced some portions of that very output; and (iv) the ease of generating the output by running the statistical codes through Stata. Yet, Dr. Zambelli-Weiner's Opposition relies solely upon attorney argument, without an affidavit from an expert or even Dr. Zambelli-Weiner herself.[9] Mr. Gunderson's attorney argument cannot rebut the sworn affidavit of Dr. Kimmel. *Invitrogen Corp. v. Clontech Labs.,*

---

[8] *Id.* at 29-30, 57 (emphasis added).

[9] Counsel's claim that Dr. Zambelli-Weiner did not provide an affidavit because GSK had ample opportunity to question her at her deposition (Opposition at 7) is a non-starter. As set forth below and in GSK's moving memorandum, Dr. Zambelli-Weiner's deposition testimony (*e.g.,* Study output can be generated from existing codes "with the click of a button") is irreconcilable with her counsel's claims in Opposition to GSK's motion (*e.g.*, Study output cannot be generated from existing codes). Dr. Zambelli-Weiner's reluctance to provide an affidavit that contradicts her sworn testimony is therefore not surprising.

*Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony."); *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009) ("[T]his position is merely attorney argument lacking evidentiary support.").[10]  That alone provides a basis for granting GSK's motion.

> **D.  The Produced Documents, the Published Study, and Dr. Kimmel's Affidavit Refute Counsel's Claim That the Statistical Output for the Zofran Study Does Not Exist (or Is Contained in the Published Study).**

As explained in GSK's motion, as well as in Dr. Kimmel's original and supplemental affidavit,[11] Mr. Gunderson's claim—that the statistical output for the Zofran study does not exist—is refuted by the documents produced and the published study.  The produced documents show that some portions of that very output do exist contrary to the representations in Dr. Zambelli-Weiner's Opposition.  Kimmel Affid. (Ex. 2 GSK's Motion) ¶22; Kimmel Supp. Affid. (Ex. 1) ¶2.  In response, Dr. Zambelli-Weiner claims that the approximately 350 pages of output that have been produced "were not related to the Zofran study" at all.  As stated in Dr. Kimmel's Supplemental Affidavit, this claim is incorrect: "given the matching analyses and results between the output provided and the published study, as noted on p. 9 of my September affidavit, ***it is clear that there are analyses and results from the published study included in the statistical output that has been produced.***"  Kimmel Supp. Affid. (Ex. 1) ¶2 (emphasis added).  Indeed, one does not have to be an expert to see that ███████████████████████████

---

[10] *See also, Perotin v. Colvin*, 110 F. Supp. 3d 1048, 1055 (D. Colo. 2015) ("[I]t would be inappropriate to substitute the lay opinion of plaintiff's counsel for the vocational expert's expertise, which plaintiff himself acknowledged at the hearing."); *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence."); *Hayer v. Univ. of Med.*, 490 F. App'x 436, 439 (3d Cir. 2012) ("[W]e do not have the benefit of any expert statistical analysis or opinion and counsel's own analysis is no substitute.").

[11] Supplemental Affidavit of Stephen E. Kimmel, MD, MSCE, FACC, FAHA, FISPE, dated October 22, 2019 ("Kimmel Supp. Affid.") (Ex. 1).

██████████████████████████████████████████████████

██████████████████████████████ Kimmel Affid. (Ex. 2 to GSK's Motion) ¶22 (Table 2). Once again, the facts refute the representations made by Dr. Zambelli-Weiner and beg the question: what is it about the statistical coding and the output data that Dr. Zambelli-Weiner does not want the Court, GSK, and its experts to see?

Moreover, counsel's current claims that no Stata output for the study exists (or has been produced) cannot be squared with counsel's supplemental response in April that responsive documents "have been produced."[12]

Furthermore, GSK has recently learned that Dr. Zambelli-Weiner communicated with the European Medicines Agency (EMA), in response to some questions raised by the agency with respect to her study. Ex. 5.[13] ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

Finally, counsel's claim that "the Stata output for the Study is contained in the Study manuscript and supporting tables" is simply false. As explained by Dr. Kimmel, the study results (*e.g.,* odds ratios and confidence intervals) that are typically reported in the study tables are but a *small* portion of the information contained in a statistical output—information critical to an

---

[12] Doc. 1663-12 ("**Request No. 3: Concerning the Study:** The entire Stata/MP13.1, SAS, or any other **statistical software output/printout** of the analyses, including the final analyses and preliminary or other analyses that were not reported in the Study. To the extent necessary, generate this output/printout from the existing Stata/MP13.1 codes. . . . **Supplemental Response: All documents responsive to this request have been produced**." (emphasis added)).

[13] ████████████████████████████████

evaluation of study validity and reliability. Kimmel Supp. Affid. (Ex. 1) ¶4. Again, Mr. Gunderson's argument is unsupported by the facts, as Dr. Kimmel's affidavit explains.

### E. Counsel's Claim That Dr. Zambelli-Weiner Lacked a Professional Obligation to Save the Output Is Meritless.

Mr. Gunderson's bald claims that Dr. Zambelli-Weiner purportedly was not obligated to save the output for her study should not be credited, particularly in light of Dr. Kimmel's sworn statements to the contrary. Indeed, Mr. Gunderson never addresses the International Society of Pharmacoepidemiology guidelines, requiring authors to preserve the output for at least 5 years after publication, discussed in Dr. Kimmel's Affidavit. Kimmel Affid. (Ex. 2 to GSK's Motion) ¶19. Counsel's citation to a Stata manual's directions for "copying output to a word-processor document" misses the point—the fact that portions of output can be "cut and pasted" does not mean that there is no obligation to retain the underlying output (which, as Dr. Kimmel explains, contains a lot more data than the reported results).

The importance of preserving the statistical output was highlighted recently in an episode involving Plaintiffs' own epidemiologist, Dr. Carol Louik. In the Zoloft birth defects MDL, one of the peer-reviewed studies relied on by plaintiffs was co-authored by Dr. Louik. When a question was raised regarding one of the reported confidence intervals in the study, Dr. Louik promptly went back to the statistical output, discovered a "transcription error,"[14] and sent in a correction to the journal (which immediately corrected the article).[15] Dr. Louik did this *eight years* after the

---

[14] Louik June 23, 2015 Email (Ex. 6) ("I reviewed the analytic files that were used in preparing that paper and discovered that in fact there was an error in the results as reported in the paper—we reported an OR of 2.0 with 95% CI 1.2-4.0. The OR was correct, but the correct CI should have been 1.0-4.0. (The error resulted from a simple but unfortunate mistake in transcribing the results.")).

[15] Correction: First-Trimester Use of Selective Serotonin-Reuptake Inhibitors and the Risk of Birth Defects (June 28, 2007; 356:2675-83) (Ex. 7).

study was published (in contrast to Dr. Zambelli-Weiner's claims that she no longer has the statistical output for a study published this year).

> **F.** **Dr. Kimmel's Affidavits Refute Counsel's Unsupported Claims That GSK Does Not Need the Statistical Codes and Output to Assess the Reliability of the Study.**

As Dr. Kimmel made clear in two separate affidavits, GSK cannot assess the methods or results of the Zambelli-Weiner study without the statistical codes and output sought in this Motion. Kimmel Affid. (Ex. 2 to GSK's Motion) ¶¶ 13-18, 25; Kimmel Supp. Affid. (Ex. 1) ¶¶ 4-6, 8. Mr. Gunderson's unsupported assertions to the contrary cannot overcome this expert evidence.

Moreover, as in the *Capicotti* case cited above, other courts—when faced with evidence of potential litigation bias—have allowed discovery of the underlying statistical analyses and data to permit at least some verification of the study methods and reported results.[16] For example, in the Viagra MDL, the court ordered the production of the statistical analyses and underlying data, for a published, peer-reviewed study that was performed by the plaintiffs' expert and was relied on as evidence of causation. *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 940 (D. Minn. 2009). The defendant discovered numerous coding errors (*e.g.*, unexposed patients coded as exposed, incorrect coding of a potential confounder, incorrect coding for the statistical method that the authors purported to have used). *Id.* at 942-44. Although the plaintiffs contended that other documents that would purportedly validate the coding and the study's findings "have been destroyed," the court rejected this claim. *Id.* at 942. Ultimately, the court concluded that the identified coding mistakes (and resultant errors in the published study), rendered both the study and the expert's opinion (to the extent that it was based on that study) unreliable:

---

[16] *See, e.g., In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 944 (D. Minn. 2009); *In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 122-27 (D.D.C. 2013); *In re Accutane Prods. Liab. Litig.*, No. 8:04–md–2523, 2007 WL 201091, at *2 (M.D. Fla. Jan. 24, 2007).

> ***Peer review and publication mean little if a study is not based on accurate underlying data*. . . . *Even if the McGwin Study as published was conducted according to generally accepted epidemiologic research and did not result from post-litigation research, the fact that the McGwin Study appears to have been based on data that cannot now be documented or supported renders it inadmissibly unreliable.***

*Id.* at 945 (emphasis added). Notably, two years after the court's decision in the Viagra MDL, the journal fully retracted this study.[17]

Similarly, this Court has recognized that the Zambelli-Weiner study "has become a central piece of plaintiffs' experts' causation opinions in this litigation."[18] In part for this reason, as well as due to Dr. Zambelli-Weiner's ties to Plaintiffs' counsel and her "lack of candor or worse,"[19] this Court has already granted GSK's motion to compel "[a]ll DOCUMENTS concerning any analyses or data relating to Zofran and birth defects that *were not reported* in the Study."[20] It is therefore only logical that *the more relevant* documents concerning analyses that *were reported* in the Study should likewise be produced.

## II.     DR. ZAMBELLI-WEINER SHOULD BE ORDERED TO APPEAR FOR AN ADDITIONAL DEPOSITION.

The Court should allow an additional deposition in light of Dr. Zambelli-Weiner's decision to withhold discoverable documents and—in some instances—her false claims under oath that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[21] GSK's *Daubert* motion was pending before the Court when Dr. Zambelli-Weiner was initially deposed (February 1, 2019), and the corresponding *Daubert* hearing was scheduled for the following month (March 2019). Dr. Zambelli-Weiner's

---

[17] https://www.ncbi.nlm.nih.gov/pubmed/16424524 (last accessed Oct. 3, 2019).
[18] Mem. & Order on *In Camera* Production of Docs. Concerning Dr. Zambelli-Weiner, Doc. No. 1612, at 2.
[19] April 8, 2019, Hearing Tr. (Ex. 8) at 49:17.
[20] April 8, 2019 Hearing Tr. (Ex. 8) at 47:23-49:9; Doc. 1663-12.
[21] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

counsel improperly suspended Dr. Zambelli-Weiner's February 1ˢᵗ deposition, based on her purported lack of familiarity with her own documents ███████████████ ███████████.[22] One week before the scheduled continuation of her deposition, her counsel sought to delay it by improperly objecting to GSK's discovery requests and directing that any motion to compel be filed *and ruled on* before that continuation. (Doc 1663-11). Needless to say, there is no precedent for allowing a party to usurp the role of the court in directing when a motion to compel should be filed, much less where doing so would substantially prejudice the other party. Here, GSK should not have had to forego Dr. Zambelli-Weiner's testimony it needed for the upcoming *Daubert* hearing based on Dr. Zambelli-Weiner's improper withholding of relevant documents.

Courts' default position is that when new evidence is produced after a witness's deposition, a further deposition is typically allowed.[23] That default should apply here, particularly because Dr. Zambelli-Weiner and Plaintiffs, not GSK, created the need to re-depose Dr. Zambelli-Weiner. They chose to not produce documents to GSK, the Court has already held that they were wrong to do so, and GSK should not be punished for their failure.[24] Accepting Dr. Zambelli-Weiner's

---

[22] Zambelli-Weiner Dep. (Ex. 2) 136:17-137:15 ███████████████████████████.

[23] *Le v. Diligence*, 312 F.R.D. 245, 246 (D. Mass. 2015) ("Although the decision is discretionary, courts have generally allowed re-opening a deposition where, as here, new information is unearthed only after the initial deposition." (collecting cases)); *Estate of Joann Matouk Romain v. City of Grosse Pointe Farms*, No. 14-12289, 2016 WL 3213410, at *2 (E.D. Mich. June 10, 2016) ("[W]here new information relating to the subject of a deposition comes to light after the witness is deposed, courts typically allow for the witness to be re-deposed." (citations omitted)).

[24] *See Le*, 312 F.R.D. at 246 ("Defendants have provided no reason for the delayed disclosures, and **it is only fair that Plaintiff should not be penalized for their lack of promptness**." (emphasis added)); *see also Robinson v. D.C.*, 75 F. Supp. 3d 190, 196-97 (D.D.C. 2014) (ordering re-deposition of defendant's expert regarding plaintiffs' "late-produced materials" and ordering defendant to pay the associated costs); *Owen v. No Parking Today, Inc.*, 280 F.R.D. 106, 111 (S.D.N.Y. 2011) ("[Plaintiff] was forced to proceed with Thomas's deposition before receiving necessary documents. . . . Therefore, to restore [Plaintiff] to the position he would have been in absent [defendant's] discovery failure, the Court will permit [Plaintiff] to depose Thomas again as to any issues raised by the newly-produced documents. The costs of this deposition shall be borne by the defendant because his wrongful behavior necessitated the extra deposition.").

argument would do just that, while rewarding Dr. Zambelli-Weiner for unjustifiably failing to timely produce responsive documents in her custody and control. The three cases cited by Dr. Zambelli-Weiner are wholly distinguishable. None of these cases involved pending, dispositive motions for which the witness's testimony was needed. And none involved a witness who repeatedly made false statements under oath—including statements regarding the purported non-existence of documents that were later produced.[25] (For example, at the time that GSK proceeded with the continuation of Dr. Zambelli-Weiner's deposition, it was not aware that the study was funded by Plaintiffs, much less that significant portions of her testimony would later prove to be false).

Moreover, accepting Dr. Zambelli-Weiner's argument would incentivize deponents to delay producing documents or assert baseless objections in order to delay their depositions. This would force parties seeking discovery to incur the burden and expense of moving to compel discovery responses and would waste judicial resources on deciding those motions. If this result seems illogical, counterintuitive, and unfair, that is because it is.

For all of these reasons, as well as those set forth in GSK's moving memorandum, GSK's motion to compel should be granted in its entirely.

---

[25] Additionally, two of the cases involved procedural defects barring re-deposition. *Moreno v. SERCO Inc.*, No. 1:15-CV-3382-CC-JKL, 2016 WL 9753775, at *1-2 (N.D. Ga. Oct. 7, 2016) ("[T]he notice of a second deposition was invalid and unenforceable."); *Nellcor Puritan Bennett LLC v. CAS Med. Sys., Inc.*, No. 2:11-CV-15697, 2013 WL 3242960, at *3 (E.D. Mich. June 26, 2013) (plaintiff failed to seek leave of court for second deposition). The third case involved the deposition of a witness when discovery requests were still pending, but not yet due. *See Estate*, 2016 WL 3213410, at *2. Furthermore, the District of Massachusetts has already implicitly rejected Dr. Zambelli-Weiner's interpretation of these cases (namely, that the party seeking the discovery could have prevented the need for a second deposition). *Le*, 312 F.R.D. at 246 (recognizing that a party's failure to produce created the need for a witness's re-deposition).

Dated: October 24, 2019

        Respectfully submitted,

        */s/ Thomas Sheehan*
        Thomas Sheehan
        Eva Canaan
        PHILLIPS LYTLE L.L.P.
        One Canalside
        125 Main Street
        Buffalo, NY 14203-2887
        tsheehan@phillipslytle.com
        ecanaan@phillipslytle.com

        Madeleine M. McDonough
        Jennifer M. Stevenson
        Jennifer Stonecipher Hill
        SHOOK, HARDY & BACON L.L.P.
        2555 Grand Blvd.
        Kansas City, MO 64108
        Telephone: (816) 474-6550
        Facsimile: (816) 421-5547
        mmcdonough@shb.com
        jstevenson@shb.com
        jshill@shb.com
        *Admitted pro hac vice*

        Attorneys for Defendant GlaxoSmithKline LLC

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those identified as non-registered participants.

                         /s/ *Jennifer Stonecipher Hill*
                         Jennifer Stonecipher Hill