## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **IN RE: ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION** | MDL no. 1:15-md-2657-FDS<br><br>This document relates to:<br><br>All Actions<br><br>*Leave to file granted on October. 28, 2019* |

## DEFENDANT GLAXOSMITHKLINE LLC'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT BASED ON FEDERAL PREEMPTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

LEGAL STANDARD.....................................................................................................2

ARGUMENT .................................................................................................................4

I.      The Three Japanese Animal Studies Were Immaterial and Cumulative. ...........5

        A.      None of the Zofran Animal Studies Demonstrate Evidence of
                Teratogenicity. ...................................................................................7

        B.      The Japanese Animal Studies Were Not "Suppressed" or "Concealed." .............13

        C.      Plaintiffs' Remaining Arguments Fail. ...............................................14

II.     FDA Considered and Rejected Plaintiffs' Proposed Mechanism of Action.....................19

III.    Plaintiffs Do Not Claim That FDA Lacked AERs.........................................22

        A.      There Is No "Newly Acquired" or "Material" AER Information.........................22

                1.      GSK's initial AER coding ........................................................22

                2.      GSK's 2015 DPA ...................................................................23

        B.      AERs and DPAs Are Insufficient To Support a Label Change. ..........................25

IV.     FDA Was Aware of All Material Information Regarding the Einarson Study.................26

CONCLUSION................................................................................................28

## INTRODUCTION

Plaintiffs' Opposition abandons many of the arguments previously advanced in opposing GSK's earlier summary judgment motion.  As to the arguments that remain, they expressly concede critical facts regarding FDA's awareness; in other cases, they simply ignore the factual record.  In the end, they are left to speculate that, even though FDA knew virtually all the information that they previously argued GSK "hid," it might have viewed that information differently, and thus accepted Plaintiffs' proposed labeling changes, if it had the full data for three Japanese animal studies.  Their arguments thus rise and fall with the animal studies.

Any assessment of the animal studies' materiality must take into account the information that was available to FDA.  Plaintiffs' undue emphasis on three animal studies ignores the 500,000 pages of regulatory data submitted to FDA; human epidemiological data; animal data from parallel studies conducted in the U.K. (which Plaintiffs admit duplicated the combinations of animals and methods of administration as the Japanese studies, *see* Pls.' Resp. to GSK's SOF ¶ 94); literature regarding a hypothetical mechanism of action, and adverse event data.  FDA concluded, after reviewing "the totality of the data," that the evidence did "not support a conclusion that there is an increased risk of fetal adverse outcomes . . . among fetuses exposed to ondansetron."  *See* Addendum 1 (summarizing evidence available to FDA when it rejected Plaintiffs' proposed labeling).  Plaintiffs are left arguing that duplicative studies that provided no ***new*** safety information would have led FDA to a different conclusion.  That argument ignores the reality of FDA's actions in this case.

With respect to the animal studies, Plaintiffs fail to confront the relevant inquiry.  They rest their arguments on the opinion of their expert Dr. Bengt Danielsson that GSK's animal studies— ***including studies disclosed in full to FDA***—reveal evidence of teratogenicity, an opinion that no other doctor or scientist (including the Japanese regulatory authority) has adopted after considering

these published studies.  GSK's experts disagree with Dr. Danielsson's opinion, as do all of the study investigators and the authors of peer-reviewed publications.  Even more importantly, so does FDA.  Plaintiffs cannot defeat preemption by offering an expert who disagrees with FDA's conclusions.  The relevant inquiry is whether there is something materially different about the three Japanese studies that were disclosed by name and title to FDA as compared to the studies for which FDA had all data.  On that point, Plaintiffs have nothing to say.  Dr. Danielsson's opinions are an outlier and are contrary to FDA's conclusions, and this Court should—indeed, must—reject them.

It bears reminder that *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019), effected a fundamental change to the preemption inquiry before this Court.  This Court's preemption analysis must decide, as a matter of law, whether any of the information identified by Plaintiffs is "newly acquired information" under the CBE regulation and whether FDA was fully informed of all material information when it rejected Plaintiffs' proposed warnings.  And, to the extent the Court identifies disputed issues of fact that are "part and parcel" of that legal inquiry, this Court must resolve them itself rather than referring them to the jury for purposes of preemption.  *Id.* at 1680.  When viewed rationally and objectively, the record compels only one conclusion:  Plaintiffs fail to identify any newly acquired information, and none of the information they identify would have been material to FDA's labeling decisions.

## LEGAL STANDARD

Plaintiffs offer almost no analysis of the actual legal standard that guides this Court's decision.  Plaintiffs all but ignore the "first step" of the *Wyeth* test—the existence of "newly acquired information" that would permit a labeling change.  *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019); *see also Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 812 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019) ("To add a warning through the CBE regulation,

GSK needed newly acquired information . . . that would allow it to add a warning about suicide risk in adults.").  Plaintiffs fail to grapple with the most critical part of the regulatory definition of that term.  "Newly acquired information" is

> data, analyses, or other information not previously submitted to [FDA], which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) ***if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA.***

21 C.F.R. § 314.3(b) (emphasis added).  Plaintiffs concede that this is the operative definition. Pls.' Resp. to GSK's SOF ¶ 4, but they offer the Court no argument or evidence that the information that they claim was not before FDA—chiefly, the full data for three Japanese studies— reveals risks of a "different type or greater severity or frequency than" the data that was before FDA.  *See id.*  Their arguments thus fail at the first step of *Wyeth/Albrecht*.

Their arguments also fail the second step of *Wyeth/Albrecht*, which requires a finding of preemption when FDA was fully informed of all ***material*** information when it rejected proposed labeling changes.  *See* GSK Br. 28-29.[1]  Plaintiffs offer no definition of "material."  Implicitly, and without legal analysis, they suggest that information is "material" if it relates to a ***category*** of evidence that FDA generally reviews or has asked for—*i.e.*, animal studies in general.  *E.g.*, Pls.' Opp. 18-19, 22-23.  But that standard makes no sense.  On that theory, no manufacturer could ever prove preemption so long as a plaintiff located any scrap of paper related to relevant information

---

[1] References to "GSK Br." are to the proposed version of GSK's brief that reflects this Court's ruling on the motion to strike.  *See* ECF No. 1681-1.  But each of the points referenced herein are also contained in GSK's original brief, and GSK does not reference any of the three stricken declarations.  Plaintiffs wrongly suggest that GSK's proposed revised brief "manipulate[s] the record." Pls.' Opp. 9 & nn.37-38.  In two instances cited by Plaintiffs, GSK is offering the Court *argument* that does not depend on expert testimony.  *Id.* n.37.  And, in the other instance, Plaintiffs are complaining about a fact that is identified in the Japanese animal reports themselves—that the observed defects were within background rates.  *Id.* n.38.  GSK amply supported that fact in its original brief and statement of material facts without reference to Dr. Wier's declaration.

that the manufacturer failed to give FDA, even if it was entirely duplicative of disclosed evidence. As this Court already acknowledged, information would not be material if it is "cumulative, irrelevant, trivial, or inconclusive," Order on GSK's Preemption MSJ at 35, even if it belongs to a category of information for which FDA typically asks. For example, it would be absurd to argue that FDA was not fully informed of all material information simply because it lacked one animal study that produced no birth defects or fetal harm. Yet that is the implication of Plaintiffs' arguments. That is not the law, and Plaintiffs have not identified any authority for that concept of materiality.

## ARGUMENT

Although Plaintiffs abandon many of their prior arguments, they still purport to argue that FDA lacked four categories of information when it rejected the very warnings that Plaintiffs claim were required:

(1) the full data for three animal studies conducted in Japan that yielded results comparable to other studies for which FDA had all data;

(2) a theoretical mechanism of action that was described in an article by Plaintiffs' expert that GSK submitted to FDA;

(3) knowledge that GSK had (allegedly) miscoded certain adverse event reports, which, according to Plaintiffs, led to skewed internal GSK analyses; and

(4) information regarding certain weakness in the Einarson study, a study that FDA itself dismissed as weak.

None of that information is "newly acquired information" under the CBE regulation. And none would have been material to FDA's labeling decisions, because FDA had all the material information on which Plaintiffs rely. GSK has attached as Addendum 2 a chart depicting the four categories of information and the myriad ways in which FDA already had the information.

4

## I.  The Three Japanese Animal Studies Were Immaterial and Cumulative.

The linchpin of Plaintiffs' Opposition is their claim that three Japanese animal studies—studies 100423, 100424, and 100441—contain evidence of teratogenicity that would have led FDA to a different conclusion when it denied the citizen petition in 2015 and Novartis's proposed labeling change in 2016.  Pls.' Opp. 16-28.  It is this Court's duty under *Albrecht* to decide that claim for purposes of preemption.  Plaintiffs principally rest their claim on the opinion of their expert Dr. Danielsson.  ***Dr. Danielsson disagrees with every scientist on record, including at FDA, who has reviewed GSK's studies.  Dr. Danielsson's opinion is a complete outlier.***  Dr. Danielsson, in fact, concedes that none of the Zofran animal studies showed a statistically significant association with the defects at issue in this case, heart defects and orofacial defects. GSK Br. 34 (citing Ex. 7 (Danielsson Dep.) at 161:5-12; Ex. 12 (Sadler Dep.) at 245:21-246:3). Plaintiffs have no good response to that concession.

Critically, Dr. Danielsson opines that three Zofran animal studies that FDA reviewed in full and concluded showed no teratogenicity, Studies 100422, L10873, and R10937, are "substantial" evidence that Zofran is teratogenic.  *See* Ex. 15 (Danielsson Rebuttal Report) at 13; *see also* Ex. 14 (Danielsson Report) at 43, 62 (noting "clear evidence of teratogenicity").  Dr. Danielsson thus disagrees with FDA, which concluded that none of the three studies contained such evidence.[2]  The best evidence of this fact is Plaintiffs' response to GSK's statements of fact, in which they repeatedly assert that FDA's conclusions are "meaningless" because FDA failed to analyze the data in the way that Plaintiffs claim is appropriate.  *See* Addendum 5.  The conflict between Dr. Danielsson and FDA reveals just how inherently suspect (and wrong) Dr.

---

[2] It appears that he also disagrees with Plaintiffs' regulatory expert Dr. Harvey, who admitted that Pregnancy Category B was proper based on the animal data FDA reviewed.  *See* Pls.' Resp. to GSK's SOF ¶ 97.

Danielsson's opinions are about GSK's animal studies.  It also demonstrates that Dr. Danielsson's opinions are nothing more than improper second-guessing of FDA's scientific determinations.

Because FDA reviewed in full the majority of the animal studies that Dr. Danielsson claims showed teratogenicity, the relevant question is whether there is something materially different about the three Japanese studies for which Plaintiffs claim FDA lacked the full study data.  *See* 21 C.F.R. § 314.3(b) (defining "newly acquired evidence" justifying a labeling change as evidence that "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA").  Again, Plaintiffs offer the Court no argument whatsoever on this point. They cannot rebut the evidence demonstrating that FDA's review of the full study data for these three studies would have made no difference because they were "repetitive and provide[d] no new safety information," as GSK correctly told FDA, Ex. 107 at -3819, and because FDA had ample post-marketing human epidemiological data in 2015 when it denied the citizen petition and in 2016 when it rejected Novartis's proposed labeling change, *see* GSK Br. 12-14, 34-35.

At bottom, Plaintiffs invite this Court to overturn FDA's repeated labeling decisions based on the outlier opinion of a paid expert who disagrees with FDA's—and everyone else's— conclusions about GSK's animal studies.  This Court should decline that invitation.[3]

---

[3] At a bare minimum, the Court should not adopt the opinions of Plaintiffs' experts in resolving the "brute facts" relevant to preemption, *Albrecht*, 139 S. Ct. at 1680, without giving GSK the opportunity to probe their credibility in person at a bench trial.  GSK would welcome the opportunity to present its affirmative testimony on these points and to cross-examine Plaintiffs' witnesses.

Additionally, Plaintiffs' arguments underscore the need for this Court to decide the issues presented by the parties' *Daubert* motions before deciding preemption.  Plaintiffs' position is premised entirely on the unreliable speculation of their experts, and on GSK's supposed lack of "admissible" expert testimony.  *See, e.g.*, Pls.' Opp. 2-3, 12, 23-24, 26-28, 31-33, 36, 41.  Until this Court determines the pending *Daubert* motions, it cannot properly decide preemption.

### A.     None of the Zofran Animal Studies Demonstrate Evidence of Teratogenicity.

In support of their claim that the three Japanese studies showed that Zofran can cause birth defects, Plaintiffs entirely rely on the opinion of their expert Dr. Danielsson.  It is undisputed that GSK conducted animal studies with rabbits and rats in both the U.K. and Japan, and that FDA had the full study data for the U.K. studies and one of the Japanese studies, study 100422.  *See* GSK Br. 14-17.  GSK has prepared a chart showing for each animal study, the scientific conclusions of (a) the study investigators and authors of peer-reviewed scientific publications;[4] (b) FDA; (c) GSK's experts Drs. York, Scialli, and Obican; and (d) Dr. Danielsson.  *See* Addendum 4.  As the chart makes plain, ***Dr. Danielsson stands on an island by himself***.  Dr. Danielsson disagrees with everyone else who has reviewed these studies, including FDA.  As set forth above, Dr. Danielsson even opines that three of the four Zofran animal studies FDA reviewed in full are "clear evidence" that Zofran is teratogenic. Ex. 14 (Danielsson Report) at 43-53; *see* Ex. 15 (Danielsson Rebuttal Report) at 13.  Plaintiffs cannot defeat preemption by second-guessing FDA.  *See In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41-42 (1st Cir. 2015); *Dolin*, 901 F.3d at 812; *McGrath v. Bayer Healthcare Pharm., Inc.*, No. 18 CV 2134, 2019 WL 2582530, at *4 (E.D.N.Y. June 24, 2019).

Plaintiffs focus on three Japanese studies that GSK told FDA were duplicative of the other studies.  Addendum 3 to this brief summarizes those studies and shows that they duplicated data already available to FDA.  None would have been material to FDA:

*Study 100423* was a preliminary dose-finding study for Study 100424.  Ex. 117 at -7041. There were *zero* malformations in this study.  *Id*. at -7065.  Plaintiffs appear to suggest that it shows evidence of embryo-fetal death attributable to Zofran, Pls.' Opp. 17, even though in their

---

[4] Translations of those peer-reviewed publications are attached as Exhibits 152-158.

*Daubert* hearing slides they did not mention Study 100423 as supporting evidence of teratogenicity. *See* Pls.' *Daubert* Hr'g Slides, No. 103 (PDF page 63). Dr. Danielsson does not appear to opine that this study showed teratogenicity, although his opinion on this point is unclear. The study investigators disagree with Plaintiffs; they concluded that in Study 100423, "[o]n fetuses, no embryolethal, growth suppressive or teratogenic effects related to administration of [Zofran] were observed in any groups." Ex. 117 at -7040. Additionally, GSK submitted to FDA a rabbit study that showed an increase in embryofetal deaths, L10873, and FDA determined that category B was appropriate notwithstanding those data. *See, e.g.*, Ex. 19. GSK highlighted that fact in its opening brief. *See* GSK Br. 32. In response, Plaintiffs do nothing to distinguish Study 100423 from Study L10873, nor do they address the fact that Dr. Danielsson purports to base his opinion on Study L10873 as well. *See* Ex. 15 (Danielsson Rebuttal Rep.) at 13. Even Plaintiffs' own expert Dr. Thomas Sadler conceded that fetal toxicity is not evidence of teratogenicity. Ex. 146 (Sadler Dep.) at 302:22-303:14.

GSK's experts agree with the study investigators. Dr. Raymond York, Ph.D., reproductive/developmental toxicologist and teratologist, concluded that, "[t]here were no meaningful differences between groups for number of corpora lutea, implants, resorptions, live or dead fetuses, fetal bodyweight, or placental weight," noting that "[t]here were no external malformations observed in any dose group." Ex. 148 (York Report) at 16-17; *see also* Ex. 149 (Scialli Report) at 15.[5]

Furthermore, Study 100423 was only a preliminary dose-finding study for definitive study 100424, with the aim "[t]o establish the dose levels for the reproduction study on [Zofran] in rats

---

[5] Exhibits 148-150 are reports of three of GSK's expert witnesses, Drs. York, Scialli, and Obican. Those experts are willing to declare to their expert reports should the Court deem it necessary.

by Intravenous administration during the period of fetal organogenesis [i.e., Study 100424]." Ex. 117 at -7040. Even the guidelines that Plaintiffs champion recognize that the results of the definitive study "carry more weight than those from alternative assays or preliminary studies." 2017 ICH Guidelines for Detection of Toxicity to Reproduction 25:993-997. FDA considers preliminary studies only insofar as they provide the dosing regimen for the definitive study, not to evaluate teratogenicity. *See, e.g.*, Ex. 58 at -7907. The definitive study, Study 100424, revealed no evidence that Zofran could cause such events. In fact, in his 2018 article, Dr. Danielsson concluded that in Study 100424, "[t]here were no differences between the groups treated with ondansetron and the control group with regards to length of gestation period, implantation sites, birth rates, fetal body weights, pre- or post–implantation loss, *fetal death*." Ex. 151 (Danielsson 2018), at 240 (emphasis added).

*Study 100424* was the definitive Zofran animal study conducted in accordance with the dose level determined in Study 100423. Ex. 118 at -7564. In Study 100424, there were two heart defects (ventricular septal defects, or VSDs) in the treatment group. *Id.* at -7604. **The very same defect occurred in Study 100422, which was provided to FDA in full.** *See* Ex. 116 at -2554; Ex. 59 at -2187. Plaintiffs offer no credible evidence that FDA would have viewed two VSDs in Study 100424 as materially different from one VSD in Study 100422. In fact, spontaneous heart defects were found across many of the other animal studies provided to FDA, none of which FDA deemed evidence of teratogenicity. GSK Br. 33. The study investigators for Study 100424 concluded that the malformations were not related to Zofran because "these incidences had no dose-dependency" and the malformations "were well known to occur spontaneously in rats," citing to background control data. Ex. 118 at -7584 & n.8 (citing Ex. 80).

GSK's experts agree with the study investigators.   Dr. York considered the major malformations in the Zofran animal studies, including Study 100424, noting that they "were observed in all dose groups, including the control animals, in a sporadic manner consistent with background events." Ex. 148 (York Report) at 28.  With respect to Study 100424 in particular, Dr. York acknowledged the two VSDs and opined that "[t]hese findings were not related to the treatment with ondansetron, because there was no dose dependency or statistical significance and these malformations occur spontaneously in rats." *Id.* at 30 (citing Ex. 80).  Dr. Anthony Scialli M.D., obstetrician-gynecologist and reproductive and developmental toxicologist, likewise concluded that the two VSDs "did not represent a statistically significant increase in malformations and was within the expected range of this finding in rats," and thus, "[t]his study did not present a signal of teratogenicity of the ondansetron treatment." Ex. 149 (Scialli Report) at 16.  According to Dr. Scialli, "[t]aking all studies together, the appearance of cardiovascular defects does not suggest a consistent, dose-related response to treatment." *Id.* at 21.

FDA's treatment of VSDs in animal data to evaluate teratogenicity in other drugs provides useful insight into the materiality of the two VSDs in Study 100424.  FDA assigned pregnancy category B to Viagra after reviewing a reproductive toxicity report that showed five VSDs in rabbits in a dose-dependent pattern, even though the high-dose incidence *exceeded* the historical control range. Ex. 88 at 96.[6]  That real-life example disproves Plaintiffs' speculation that the two VSDs in Study 100424 would have been material, especially where, as here, the observed VSDs

---

[6] Plaintiffs attempt to dismiss the relevance of the Viagra data on the ground that Viagra is indicated for use in men, but FDA is aware that Viagra is prescribed off-label for use in women. *See* FDA, The Voice of the Patient: Female Sexual Dysfunction, at 3-4 (June 2015), https://www.fda.gov/downloads/Drugs/NewsEvents/UCM453718.pdf.

did not exceed the historical control range.  That is no doubt why Plaintiffs ignore this point in their brief as well.

_Study 100441_ was a Zofran study conducted in rabbits.  Ex. 120 at -7392.  All experts, even Dr. Danielsson, agree that it did not yield any evidence that Zofran can cause any adverse fetal effects, including birth defects, so it is unclear why Plaintiffs include this study in their arguments. The study investigators did not find any fetal lethal or teratogenic effect in any treatment group, and while there was some evidence of fetal growth retardation and skeletal defects/ossification in the mid- and high-dose groups, they concluded that those was due to maternal toxicity and not directly related to the treatment of Zofran.  Ex. 120 at -7398, 7413-7415.  Even Dr. Danielsson concluded in his report that the effects observed were not directly related to Zofran:

> Oral teratology studies: In the main teratology studies in Japanese White [Study 100441] and in New Zealand rabbits [Study L10649] by oral administration, decreased fetal weights and increases in some skeletal defects and variants, and also ossification delays were observed.  In agreement with consensus opinions expressed in symposia discussing the role of maternal toxicity in teratology studies (Beyer et al., 2011, Danielsson 2013), these manifestations are likely to be related to the observed decreased maternal body weight gain and absolute decreases in body weight, under certain periods in these studies, and not directly related to ondansetron exposure.

Ex. 14 (Danielsson Report) at 56.  Dr. Sadler likewise testified that delayed ossification is not evidence of teratogenicity.  Ex. 146 (Sadler Dep.) at 277:14-20.

GSK's experts agree.  Dr. Scialli concluded that "[t]hese single-litter findings [of skeletal defects] do not indicate an increase in malformations or selective developmental toxicity," and that "[t]he study report correctly stated that there were 'no findings suggesting teratogenicity.'"  Ex. 149 (Scialli Report) at 18-19 (quoting Ex. 120).  Dr. York considered delayed or incomplete ossification in the Zofran rabbit studies, including Study 100441, and concluded that the observed fetal growth retardation was "either unrelated to the treatment of ondansetron or secondary to

maternal toxicity and of no toxicological significance." Ex. 148 (York Report) at 33. As to Study 100441 in particular, he concluded that the "findings were secondary to maternal toxicity and of no toxicological significance." *Id.* at 30. Similarly, Dr. Sarah Obican, M.D., obstetrician-gynecologist with board certification in maternal-fetal medicine, noted that "[d]ecreased female fetal weight and delayed ossification were observed in Study 100441, but these findings were secondary to maternal toxicity and of no toxicological significance." Ex. 150 (Obican Report) at 17.

Even when the three Japanese studies are viewed together with the other Zofran animal studies, they "d[o] not show any treatment-related malformation or any signal that ondansetron is teratogenic." Ex. 148 (York Report) at 28; *see also* Ex. 149 (Scialli Report) at 8; Ex. 150 (Obican Report) at 16-17. That is because none of the individual studies relied upon by Dr. Danielsson actually showed evidence of teratogenicity, and FDA does not merely tally up the malformations in animal studies to determine an appropriate pregnancy warning. *See* Ex. 46 at 6-7 (FDA guidance defining a "positive signal" as "a biologically meaningful difference in dosed animals *compared to concurrent or historical controls*" (emphasis added)); *see also* Ex. 148 (York Report) at 39 (discussing historical controls); Ex. 149 (Scialli Report) at 23-24 (same).

In sum, GSK conducted seven definitive Zofran embryo-fetal developmental toxicity ("EFD") studies. Ex. 148 (York Report) at 28. Five of those, including one Japanese study, were submitted in full to FDA. GSK Br. 16-18. FDA agreed with the study authors in all five instances and concluded that Zofran "did not induce any teratogenic effect." *See id.* at 15, 32. And those five studies showed the same malformations and were conducted with the same combinations of animals and method of administration as the other three Japanese studies. *Id.* at 32-33. Plaintiffs never provide this Court with any credible basis to distinguish between the fully disclosed studies

and the three on which they rely.  Instead, Dr. Danielsson simply disagrees with FDA's conclusions as to the fully disclosed studies.  *See* Addendum 4.  In doing so, he shows why his opinions on studies 100423, 100424, and 100441 must be viewed with a critical eye and great skepticism.   In the end, even Plaintiffs' experts concede that none of the Zofran animal studies showed a statistically significant association with either heart defects or orofacial defects.  *See* Ex. 12 (Sadler Dep.) at 245:21-246:3; Ex. 7 (Danielsson Dep.) at 161:5-12.  Without statistical significance, the results of the treatment groups cannot be distinguished from chance.  *See* Ex. 12 (Sadler Dep.) at 70:24-71:2; Ex. 5 (Abdulla Dep.) at 60:3-13.  Plaintiffs' experts also concede that while for true teratogens, researchers expect to see increased teratogenic effect with increasing dosages, none of the Zofran animal studies showed a dose-dependent increase in any type of structural malformation. Ex. 12 (Sadler Dep.) at 223:9-20; 248:16-21; Ex. 14 (Danielsson Report) at 3.  That should end the analysis.

## B.  The Japanese Animal Studies Were Not "Suppressed" or "Concealed."

Plaintiffs suggest that the three Japanese studies are "material" simply by virtue of the fact that they are animal studies. Pls.' Opp. 16, 22-23.  That cannot be so, for the reasons discussed above.  *See* pp. 7-13, *supra*.  As this Court previously recognized, "[i]f . . . the allegedly omitted information was cumulative, irrelevant, trivial, or inconclusive, its omission surely was of no consequence."  Order on GSK's Preemption MSJ at 35.  Although Plaintiffs disparage GSK by calling these studies "suppressed" and claiming without evidence that GSK "[c]oncealed" them, Pls.' Opp. 15-16, GSK complied with 21 C.F.R. §§ 312.32 and 312.33 by disclosing the existence of the Japanese studies to FDA in an annual report.  *See* Ex. 107 at -3819-20; *see* 21 C.F.R. § 312.32(c)(1)(iii) (requiring disclosure of "findings" of animal testing only if they "suggest a significant risk in humans exposed to the drug"); *id.* § 312.33(3)(b)(6) (IND annual report requires

"a list of the preclinical studies" and "a summary of the major preclinical findings").[7]  GSK correctly told FDA that the studies "are either repetitive or provide no new significant safety information."  Ex. 107 at -3819; *see* Pls.' Opp. 19 (arguing the opposite).  Dr. Danielsson's opinion is that many of the animal studies show evidence of teratogenicity, not that there is something materially different, or non-repetitive, about the three Japanese studies.

### C.    Plaintiffs Remaining Arguments Fail.

Plaintiffs present five specific arguments regarding the supposed materiality of the three Japanese animal studies.  Pls.' Opp. 21-28.  Each is easily dismissed.

*First*, Plaintiffs argue that the three Japanese animal studies were material because the draft ICH 2017 guidelines (promulgated by the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH)) consider animal studies "relevant."  *Id.* at 22-23.  Plaintiffs summarily state that these guidelines "refute GSK's argument," *id.* at 22, but do not explain why this is the case.  The notion that animal studies are "relevant" is not at odds with the conclusion that the three studies were not *material* under federal law because they did not reveal any new or different risk than the animal studies disclosed to FDA.  *See* GSK Br. 30-35.

The ICH 2017 Guidelines, moreover, recognize that "[h]uman data . . . can greatly influence the overall assessment of human risk of reproductive or developmental toxicity."  2017 ICH, Detection of Toxicity to Reproduction 23:928-24:929.  And while the ICH 2017 guidelines state that "definitive human data *will* supersede animal data," *id.* at 24:929 (emphasis added), the

---

[7] *See also* Ex. 17 (Hixon report) at 36 ("Because data from these studies did not lead to different conclusions regarding safety than the studies that had already been provided to FDA in previous IND and NDA submissions (see discussion above), GSK appropriately determined that the data in these studies did not constitute "new" information relevant to safety.  GSK disclosed the study titles to FDA in an IND Annual Report, consistent with regulatory requirements, and FDA had the authority to request full study reports for those studies." (footnotes omitted)).

guidelines do not define "definitive," *see id.* at 27-30 (Glossary), or assert that *only* "definitive" human data supersedes animal data.   Furthermore, FDA counsels on the cover page of its dissemination of the 2017 ICH guidelines that manufacturers "can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations."[8]

In attempting to diminish the role of human data, Plaintiffs again merely disagree with FDA.  To determine how FDA interprets animal data relative to human data, this Court need look no further than FDA's own statements, including its instruction to reviewers that "[f]ormal epidemiological studies provide the best means of evaluating whether a gestational exposure adversely affects the developing infant," Ex. 45 at 13, and that human data can "supersede" animal data, Ex. 46 at 10; *see also* GSK's Br. 12-13, 34.  With respect to Zofran in particular, FDA emphasized its reliance on human data to deny the labeling changes desired by Plaintiffs.  In denying the citizen petition, FDA referenced the "subsequent human data gathered in the post approval setting," as it concluded that "the totality of the data do not support a conclusion that there is an increased risk of fetal adverse outcomes."  Ex. 32 at 18.  FDA also explained that its disagreement with Novartis was "based on the available *human* information."  Ex. 35 at -3945 (emphasis added).

*Second*, relying on Dr. Danielsson,[9] Plaintiffs argue that "the only admissible expert evidence" is that the Japanese animal studies "reported an increased incidence of birth defects in

---

[8]  FDA, Guidance Document, S5(R3) Detection of Toxicity to Reproduction (Nov. 2017) https://www.fda.gov/regulatory-information/search-fda-guidance-documents/s5r3-detection-toxicity-reproduction.   FDA further cautioned that the 2017 ICH for detection of toxicity to reproduction is "[n]ot for implementation[,] [c]ontains non-binding recommendations," and "is being distributed for comment purposes only."  *Id.*

[9] Plaintiffs also identify their expert Dr. Sadler, but the only portion of his testimony that Plaintiffs cite is a discussion of animal studies in general.  *See* Pls.' Opp. 24.

the treated animals." Pls.' Opp. 23.[10]   But Dr. Danielsson, whose opinions GSK has moved to

exclude under *Daubert*, is not the only expert to opine on this issue.   *See supra* Part I.A.   GSK's

experts Drs. York, Obican, and Scialli all assessed whether the Zofran animal studies provide

evidence of teratogenicity.   They all agree with the scientists who conducted the studies and

reviewed the results—they do not.   *See* Ex. 148 (York Report) at 28; Ex. 149 (Scialli Report) at 8;

Ex. 150 (Obican Report) at 16-17.   The opinions of GSK's experts are supported by the great

weight of the evidence, including the study investigators' conclusions, the conclusions of peer-

reviewed articles in Japan, and FDA's conclusions as to the parallel studies.   *See* Addendum 4.

Dr. Danielsson's opinions lack any supporting evidence.[11]

   *Third*, Plaintiffs contend that a paper authored by Dr. Danielsson in 2018, while this

litigation was pending, "underscores" the materiality of the Japanese studies.   Pls.' Opp. 24-25.

But Dr. Danielsson's paper merely recites his mechanism-of-action hypothesis, addressed more

fully below.   He posits that the animal data provide a "*plausible* mechanism . . . for the observed

---

[10] Plaintiffs' assertion that "Zofran-induced cardiovascular and orofacial effects were observed in animals and in humans, at similar exposure levels, with the same demonstrated mechanism of action (heart rhythm disturbance) on the same hERG channel present in the animals and human embryos, and with the same effects seen in transgenic studies on animals and studies of other potent hERG blocking drugs," Pls.' Opp. 23, is inscrutable.   To the extent they are referencing the basic fact that Zofran-exposed animal and human fetuses were born with birth defects, that is unsurprising—there is a background rate of birth defects among both animals and humans.   And Plaintiffs do not identify the significance of the unnamed "studies" they reference involving different drugs.

[11] Plaintiffs contend that GSK's experts should be excluded because they "failed to consider the required exposure data," citing Dr. Danielsson's conclusory statement at deposition that "the most important aspect" is "exposure."   Pls.' Opp. 26.   That is baseless.   GSK's Opp. to Pls.' *Daubert* Mot. to Exclude Causation Ops. of Def. Experts (filed Jan. 18, 2019).   GSK's experts did not consider exposure data because such data were not measured in the Zofran animal studies.   Rather, the Zofran animal studies were properly conducted using maternal toxicity for dosing.   *Id.* at 2-3.   Critically, Plaintiffs admit that the studies were conducted in accordance with FDA Guidelines. Pls.' Resp. to GSK's SOF ¶ 93.   FDA accepted five of these studies' results as a basis to evaluate Zofran's teratogenicity.

fetal adverse effects" and "*suggest*[] that ondanseton can have teratogenic *potential* in human." *Id.* at 25 (emphasis added).  That opinion constitutes three layers of speculation and is not reliable evidence of how FDA would have viewed the three animal studies.  In any event, FDA was well-aware of this hypothetical mechanism of action when it denied the citizen petition and rejected Novartis's proposed labeling change, GSK's Br. 19-20, 38-40, even if Dr. Danielsson's article restating his theory had not yet been published.

*Fourth*, Plaintiffs' argue, without evidence, that the Karolinska embryonic stem cell study "heightens" the materiality of the Japanese studies and that "GSK has failed to produce any evidence showing that the FDA ever considered the [] study . . . together (sic) Japanese teratology studies omitted from FDA consideration."  Pls.' Opp. 25-26.  But, as Plaintiffs admit, the Karolinska study—which does not even involve Zofran—merely posits Plaintiffs' hypothetical mechanism of action.  Again, the hypothetical mechanism of action was known to and considered by FDA, as it was expressly identified in a comment to Dr. Reichmann's citizen petition, Ex. 30, and ███████████████████████████████████████████

*Fifth*, Plaintiffs' claim that the Japanese animal studies were material because Plaintiffs' expert Dr. Harvey says so, and because "GSK . . . has no sworn expert testimony" to the contrary. Pls.' Opp. 26-28.  As GSK has previously argued, the Court determines the materiality of evidence for purposes of preemption, and Dr. Harvey's "opinion" invades the province of the Court to determine the legal question of preemption.  *See* GSK's Br. 36-38; *see also* GSK's Mot. to Exclude Dr. Harvey (filed Jan. 11, 2019).  Moreover, as GSK also has previously argued, Dr. Harvey's opinion is speculative and patently unreliable for a number of other reasons, including that:

- Dr. Harvey never read the Japanese animal studies that he now claims were material.  Ex. 8 (Harvey Dep.) at 92:8-93:23.  He incredibly claimed that the "content" of the animal study reports was "not . . . material to [his] regulatory opinion that it should have been submitted to FDA for their review."  *Id.* at 94:10-25.

- Dr. Harvey simply accepts at face value Dr. Danielsson's outlier, unreliable opinion that they show evidence of teratogenicity.  Ex. 144 (Harvey Dep.) at 95:1-4

- Dr. Harvey posited that FDA would have deemed the one VSD observed in Study 100422 material, apparently unaware that GSK had disclosed the data for that study to FDA and that FDA agreed with the study investigators that it did not show teratogenic effect and was consistent with the other studies.  GSK's Mot. to Exclude Dr. Harvey 14-15.  That obviously incorrect opinion is devastating to the credibility of his opinion that the two VSDs in Study 100424 would have been material.

For these reasons and those previously set forth, Dr. Harvey's opinion is inadmissible.  And even if admissible, it is the Court's duty under *Albrecht* to determine the credibility of Dr. Harvey's opinions against the entire record in deciding the "brute facts" relevant to preemption.  *Albrecht*, 139 S. Ct. at 1680.

Consistent with GSK's argument that this is an improper subject of expert testimony, GSK need not have an expert tell the Court what its ultimate conclusion should be.  The legal question before the Court is whether the three Japanese studies would have been material to FDA's labeling decision and, relatedly, whether they "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA."  21 C.F.R. § 314.3(b).  Those are scientific inquiries on which Dr. Harvey is not qualified to opine.  *See* Ex. 8 (Harvey Dep.) at 86:21-24 (admitting that he was not offering an opinion as a toxicologist).  As set forth above, GSK's experts agree with the study investigators of the three Japanese studies that they do not reveal any evidence of teratogenicity.  And, because the five Zofran animal studies reviewed by FDA included the same malformations in substantially the same numbers as the three Japanese studies, any "risk" could not be "of a different type or greater severity."  The studies were therefore immaterial and cumulative.

## II.     FDA Considered and Rejected Plaintiffs' Proposed Mechanism of Action.

Plaintiffs' arguments regarding Dr. Danielsson's "hypothetical[]" mechanism of action set forth in his 2014 publication, Ex. 68 at 137, are baseless—if not frivolous.  Plaintiffs concede, as they must, that FDA was "aware of this mechanism of action."  Pls.' Opp. 32; *see* Ex. 146 (Sadler Dep.) at 297:2-6.   Armed with Dr. Danielsson's hypothesis, FDA declared that there was no evidence of mechanism of action.  Ex. 39 at -4451.  Those facts defeat Plaintiffs' claim that this information could have been "material," "newly discovered evidence."  Plaintiffs' argument is another improper attempt to second-guess FDA's decisions.

***Plaintiffs cite three published articles articulating this hypothetical mechanism of action.  Plaintiffs agree that GSK disclosed each and every one of those articles to FDA.***  *See* Pls.' Resp. to GSK's SOF ¶¶ 172, 213.  FDA was aware of Dr. Danielsson's study setting forth the hypothesis no later than March 2015, when GSK cited it in an annual report.  *See* Ex. 95 at -4793.   Additionally, on September 14, 2015, a third-party detailed Danielsson's precise hypothesis in a comment to FDA on the Reichmann citizen petition.  Ex. 30.  ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████When FDA rejected the citizen petition on October 27, 2015, it discussed the Danielsson study at length.  Ex. 32 at 10-11. And when FDA rejected Novartis's proposed labeling change, it expressly concluded that there was "no evidence, nonclinical or mechanism of action, that raises concerns for adverse fetal outcomes with Zofran."  Ex. 39 at -4451.  It is clear that FDA considered and rejected Dr. Danielsson's hypothesis.

Plaintiffs nonetheless contend that GSK failed to "disclose[d] an accurate description" of Dr. Danielsson's hypothesis.  Pls.' Opp. 33.  Apparently, Plaintiffs would like FDA to enact a regulation requiring an NDA holder to disclose to FDA every internal e-mail or document

discussing publicly available studies, even ones, such as the 2002 GSK document cited by Plaintiffs, that involve different drugs. *See id.* at 30-31; *see also* GSK Br. 39-40 (discussing the 2002 GSK document). But they cite no authority for any such requirement. And what more accurate description could exist than Dr. Danielsson's own study publication, which GSK timely disclosed to FDA? FDA's express statements belie Plaintiffs' claim that FDA never considered the hypothesis.

In a last-ditch effort to salvage their argument, Plaintiffs argue that FDA would have looked at this information in a new light if it had other information allegedly not provided, most notably the three Japanese animal studies. Pls.' Opp. 32-33. On this basis, and citing only to Dr. Harvey's expert report, they reason that this makes the mechanism of action information "newly acquired." *Id.* at 32. That is wrong as a legal matter, and Dr. Harvey's improper speculation should be rejected. *See* Fed. R. Evid. 401, 403, 702.

*First*, Plaintiffs do not claim that GSK conducted a new analysis of Dr. Danielsson's hypothesis that rendered it "newly acquired information." To be sure, "newly acquired information" may include "new analyses of previously submitted data (e.g., meta-analyses)." 21 C.F.R. § 314.3(b); *see also Wyeth v. Levine*, 555 U.S. 555, 569 (2009). But Plaintiffs do not claim that *GSK* hid a new analysis of Dr. Danielsson's hypothesis. Rather, their claim is that *FDA* might have viewed Dr. Danielsson's hypothesis "in a different light" in conjunction with other evidence. Pls.' Br. 32. That does not make his hypothesis "newly acquired" under the regulation.

*Second*, Dr. Harvey's opinion about what FDA would have done reflects rank speculation about FDA's state of mind, mental impressions, or thought processes. As courts have recognized, that is impermissible. *See In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009). In *Fosamax*, the court precluded expert testimony, stating that the expert "conceded at the

hearing that her regulatory expertise does not give her the ability to read minds.  Nevertheless, her report is replete with such conjecture.  This is not a proper subject for expert or even lay testimony." *Id.* (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004)) Similarly, in *Kruszka v. Novartis Pharm. Corp.*, 28 F. Supp. 3d 920 (D. Minn. 2014), the court permitted experts to testify about FDA regulatory process, FDA regulations, the defendant's interactions with FDA, and compliance with FDA regulations, but held that testimony about FDA's state of mind is not appropriate expert testimony.  *Id.* at 936-37.

Indeed, "the intent, motives, or states of mind of . . . regulatory agencies and others have no basis in any relevant body of knowledge or expertise."  *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 442 (E.D.N.Y. 2011) (quoting *In re Rezulin*, 309 F. Supp. 2d at 546).  Regulatory experts "may not proffer an opinion relating to what . . . the FDA thought with respect to certain documents or about their motivations."  *Kruszka*, 28 F. Supp. 3d at 931; *see also Lopez v. I-Flow Inc.*, No. CV 08-1063-PHX-SRB, 2011 WL 1897548, at *11 (D. Ariz. Jan. 26, 2011) (regulatory expert excluded in part because she had no knowledge of the state of mind, intent, or motivations of FDA, and such testimony is improper); *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1337 (S.D. Fla. 2010) (opinions fall outside the proper scope of expert testimony that contain improper references to FDA's knowledge and intent, including FDA's "concerns" about an adverse event and "indications" that certain warnings would be insufficient).

Dr. Harvey's speculation involves two levels of conjecture:  first about what FDA thought about Dr. Danielsson's hypothesis, and second how the existence of other information would have impacted FDA's thoughts.  This speculation, dressed up as "opinions," should be disregarded and excluded.

Finally, given Plaintiffs' concession that FDA knew of Dr. Danielsson's hypothetical mechanism of action, their argument on this point rises and falls with their claim that FDA lacked material evidence about the animal studies and would have accepted Dr. Danielsson's hypothesis if it had that information.  Indeed, as Plaintiffs concede, a mechanism of action only could be relevant if there were evidence of Zofran's teratogenicity.  *See* Pls.' Opp. 29.  There is not.  For the reasons above, *see* pp. 7-13, *supra*, no reliable evidence supports their argument that the three Japanese animal studies are material.

## III.    Plaintiffs Do Not Claim That FDA Lacked AERs.

Notably, Plaintiffs abandon most of their AER-related arguments.  Except for a handful of events related to post-marketing studies that were not required to be reported, *see* p. 28, *infra*, they no longer claim that GSK failed to provide AERs to FDA, nor do they claim that FDA lacked any particular AERs.  Plaintiffs are thus left to critique GSK's coding of AERs and a disproportionality analysis (DPA) based on the coded AERs.  The record demonstrates, however, that this information did not and would not affect FDA's labeling decision.

### A.    There Is No "Newly Acquired" or "Material" AER Information.

#### 1.    GSK's initial AER coding

Plaintiffs allege that GSK's "inconsistent coding" of particular AERs, as evidenced in a 2005 report summarizing pediatric adverse events, somehow concealed evidence from FDA.  Pls.' Opp. 33.  This is plainly incorrect, for a host of reasons.[12]

*First*, Plaintiffs do not allege that FDA lacked the relevant AERs or the accompanying data.  Rather, Plaintiffs focus on GSK's coding and internal analysis of this subset of Zofran-

---

[12] GSK disputes that it "miscoded" any AERs at issue here.  Nevertheless, as explained below, the alleged miscoding could not have been material.

related AERs.  *Second*, FDA's own AER reporting, tracking, and coding practices would have negated any claimed "miscoding" by GSK.  FDA possessed all the underlying data and descriptive information for each Zofran-related AER, including those FDA received from GSK, Novartis, and others.  As Plaintiffs concede, FDA recoded all the AERs in its database in 2012—before the at-issue labeling decisions—when it transferred data from its old safety database into the new FAERS database.  *See* Pls.' Resp. to GSK's SOF ¶ 163.[13]  Clinical reviewers in FDA's Center for Drug Evaluation and Research evaluate the AERs in FDA's own database "to monitor the safety of products after they are approved by FDA."  Ex. 50 at 1.  *Third*, there is no evidence that GSK's coding of select AERs affected FDA's own analysis of the AER information that FDA considered when it rejected both the Reichmann citizen petition in 2015 and Novartis's proposed labeling in 2016, or that FDA relied on any analysis of AERs conducted by GSK or that GSK's coding affected which AERs GSK and Novartis analyzed in their respective reports to FDA.

## 2.    *GSK's 2015 DPA*

Plaintiffs relatedly claim that FDA received a GSK DPA from Novartis that, as a result of the alleged miscoding, did not include all relevant AERs.  According to Plaintiffs, the DPA left FDA "not fully informed."  Pls.' Opp. 35.  This, too, is incorrect.  Contrary to Plaintiffs' assertion, there is no evidence that either GSK or Novartis provided GSK's internal DPA to FDA.  Plaintiffs appear to misunderstand the record—after FDA agreed in March 2015 that Novartis would assume responsibility for providing the safety report that FDA requested, ██████████████████

████████████████████████████████████████████████

██████████████████████████████.  Plaintiffs state in their Opposition that

---

[13]  *See also* https://www.pharmamedtechbi.com/~/media/Supporting%20Documents/The%20Pin k%20Sheet%20DAILY/2015/November/Antimicrobial%20AC%20FDA%20briefing%2011515. pdf at Appendix G.

23

"Novartis submitted GSK's own DPA to the FDA," but they cite no evidence for that assertion of fact, and there is none.  Further, there is no regulatory requirement that drug manufacturers conduct and provide DPAs, as they are not a required part of signal identification or evaluation.  *See* Ex. 44 at 9.

Even if GSK or Novartis had provided the 2015 DPA to FDA, this analysis would not have misled FDA regarding AERs or safety signals.  A DPA is a statistical analysis performed on AER data to assess the relative frequency of reporting of specific drug-event combinations.  *See* Ex. 61 at 22-23.  A DPA is type of signal-detecting tool—it mines data in an effort to detect how frequently a particular drug-event combination is reported, which in turn might lead to further evaluation. *See* Ex. 2 (Rogg Decl.) ¶ 8.  Plaintiffs admit that a DPA cannot by itself trigger a duty to amend a product's labeling.  *See* Pls.' Resp. to GSK's SOF ¶¶ 168, 177.  By the time GSK prepared the DPA, FDA had all the Zofran-related AERs in its possession, had already investigated the available safety signals, and had concluded on the basis of the epidemiological data that no reasonable evidence of a causal association between Zofran and birth defects exists.  *See* GSK Br. 42.  Receiving a properly coded DPA incorporating data *already in FDA's possession* could not have further "informed" FDA.  Notably, Plaintiffs do not allege, and have not produced any evidence, that a properly coded DPA would have identified evidence of causation.  Nor do they point to any statement that FDA relied on GSK's DPA in its labeling decision.

A  DPA would have been particularly superfluous by the time FDA considered ████████
████████████████████████████████ At most, a properly coded DPA would only have prompted further evaluation. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████  FDA considered not only its own analysis, but also Novartis's detailed submission in rejecting the proposed label change in 2016.  *See* Exs. 37 at -4051; 39 at -4450.  It is wholly implausible that a DPA would have changed FDA's mind.

## B.  AERs and DPAs Are Insufficient To Support a Label Change.

FDA had access to all material information regarding AERs and deemed the Zofran-related AERs insufficient to permit a label change.  FDA has cautioned that AERs are not evidence of causation of birth defects and are inferior to epidemiological data.  In the context of birth defects, FDA warns that an individual AER reporting a birth defect "can never prove causality," as case reports "cannot distinguish coincidence from causation and cannot be used to assess teratogenic risk."  Ex. 45 at 13.  At most, case reports "associating an unusual outcome with a drug exposure might well raise suspicions, . . . but follow-up evaluations are always necessary to assess risk."  *Id.*  Similarly, DPAs are not appropriate for "establishing causal attributions between products and adverse events."  Ex. 44 at 8.  At most DPAs can detect safety signals, *id.*, which are not "reasonable evidence of a causal association" and cannot trigger a label change.  *See* 21 C.F.R. § 201.57(c)(6)(i).

In denying the citizen petition, FDA unequivocally stated that its denial was "[b]ased on [its] review of . . . adverse event reporting information."  Ex. 32 at 20.  FDA reiterated this position when it refused Novartis's proposed label change in 2016:  in light of the "background incidence of major congenital malformations" of "2-4%," FDA stated, "we do not believe there is any basis to suspect drug attribution to [reported] congenital malformation cases for them to qualify as 'adverse reactions.'"  Ex. 39 at -4450; *see also* Ex. 37 at -4051.  Any additional or alternative presentation of AERs *that FDA already had in its possession* would not constitute "newly acquired

information" and would not have revealed "risks of a different type or greater severity or frequency" than those considered—and rejected—by FDA.

IV.   **FDA Was Aware of All Material Information Regarding the Einarson Study.**

Finally, Plaintiffs' hodgepodge of arguments about the Einarson study lack any merit. Plaintiffs' claim is that GSK failed to disclose to FDA various flaws with the study.   To be clear, Plaintiffs do not argue that the Einarson study actually produced evidence of teratogenicity and that GSK hid that evidence; no expert testimony supports that proposition.   Rather, they argue only that the study had weaknesses.   GSK addresses each supposed weakness below.   As a threshold matter, however, all of Plaintiffs' arguments suffer from the same problem:   Plaintiffs have no evidence that the Einarson study was material to FDA's labeling decisions.   In fact, as GSK has argued, it was not.   GSK Br. 44-45.   FDA acknowledged the weaknesses in the study in denying the citizen petition, Ex. 32 at 9, and the FDA-approved label cites other human studies but not the Einarson study, *see* Ex. 41 (Zofran label).   Given these facts, the supposed weaknesses identified by Plaintiffs are immaterial.

In any event, each of Plaintiffs' specific arguments lacks merit.   Plaintiffs continue to allege that GSK "hid key weaknesses" in the Einarson study.   Pls.' Opp. 36.   They cite an internal e-mail by a GSK employee describing the limitations of the study.   *Id.* at 38 (quoting Ex. CC).   But they later concede, as they must, that GSK did not hide those facts from FDA.   *See id.* at 40.   There is no question that FDA is aware of the Einarson study's flaws, as FDA recited those flaws in denying the citizen petition.   *See* GSK Br. 45.

Plaintiffs also claim that GSK hid its involvement in the Einarson study.   It did not.   The study publication explicitly notes that it was "supported by an unrestricted grant from GlaxoSmithKline, Mississauga, Canada."   Ex. 73 at 942.   In urging the Court to reach the opposite conclusion, Plaintiffs distort the factual record.   There is no evidence that "GSK sufficiently

intervened such that the study could be published," as they claim. Pls.' Opp. 39. There is no evidence that GSK had "a substantial role" in editing the publication, as they claim. *Id.* The evidence shows only that GSK employees identified flaws in the study and that one employee drafted redline edits to the study. But, and as Plaintiffs admit, those edits were not included in the final publication. Pls.' Resp. to GSK's SOF ¶ 219. There is no evidence that GSK provided any edits to the study authors, a fact that Plaintiffs completely ignore.

Plaintiffs cite no support for the proposition that GSK was obligated to disclose to FDA GSK employees' initial critiques or concerns regarding the initial draft of the study publication. Further, it is implausible that FDA would have come to a different conclusion regarding the *results* or *findings* of the study had FDA only known that GSK employees contemplated edits to this initial draft. In fact, as just set forth, some of the internal GSK critiques that Plaintiffs highlight mirror those later expressed by FDA when it denied the citizen petition.

Plaintiffs further claim that the Einarson publication failed to identify one case of laryngomalacia, which Plaintiffs characterize as a "missing birth defect adverse event." Pls.' Opp. 40. But Plaintiffs admit that GSK provided this report of laryngomalacia to FDA. *See* Pls.' Resp. to GSK's SOF ¶¶ 240-42. In any event, the purpose of the Einarson study was "to determine whether this drug increases the baseline rate of *major* malformations," primarily measuring "[r]ates of *major* malformation." Ex. 73 at 940. Plaintiffs do not assert that laryngomalacia is a "major malformation." It is inconceivable that FDA would have viewed the omission in the study publication of one case of laryngomalacia (of which FDA was already aware) as material.

Finally, Plaintiffs quote Dr. Harvey's opinion that GSK failed to provide periodic or expedited reports for 13 AERs to FDA. *See* Pls.' Opp. 41; Ex. 16 at 90 nn.535-39. But these 13 cases were all obtained from postmarketing studies, a fact that Plaintiffs do not dispute. *See e.g.*,

Ex. 16 at 90; *see also* Exs. 73 (Einarson et al.), 78 (McCauley et al.).  Adverse drug experience reports obtained from postmarketing studies are exempted from both periodic reporting requirements, 21 C.F.R. § 314.80(c)(2)(iii), and from 15-day reports "unless the applicant concludes that there is a reasonable possibility that the drug caused the adverse experience," *id.* § 314.80(e).  In any event, GSK did bring these cases to FDA's attention, and FDA deemed them insufficient to justify changing the labeling.  *See* GSK Br. 44-45.  Plaintiffs do not dispute that fact either.  Instead, they speculate that the AERs may have taken "on a different light" when combined with other safety information.  Pls.' Opp. 41.  That is, again, an attempt to second guess the FDA's comprehensive analysis of all of the available Zofran safety information.

## CONCLUSION

Plaintiffs, through unreliable and improper expert testimony, attempt to (1) second-guess FDA's clear and repeated rejections of the pregnancy warnings Plaintiffs say were necessary and (2) instruct this Court how it should fulfill its obligation under *Albrecht* to determine the meaning and effect of federal law.  Plaintiffs ask this Court to permit them to proceed to trial on the basis of three animal studies that duplicate the information FDA had when it rejected Plaintiffs' proposed labeling change.  Plaintiffs do not dispute that these studies were conducted using the same types of animals and methods of administration as other studies disclosed to FDA.  Nor do Plaintiffs dispute that GSK fully complied with FDA regulations in its Zofran regulatory submissions.  Rather, Plaintiffs ask this Court to construe *Albrecht* to mean that that if a plaintiff can point to any shred of information that FDA did not receive, no preemption lies.  That is not the law, and it would create perverse incentives for manufacturers to flood FDA with paper.  (Had GSK done that, Plaintiffs no doubt would argue that GSK inundated FDA with so much information that FDA could not properly assess the information.)

In *Albrecht*, the Supreme Court obligated judges to decide preemption as a matter of law. The Court recognized that "judges are better suited than are juries to understand and to interpret agency decisions in light of the governing statutory and regulatory context" and to apply "principles of administrative law." 138 S. Ct. at 1680. It is this Court's obligation to "interpret" for itself FDA's actions in this case "in light of the governing" CBE regulation. That ***legal*** inquiry belongs to the Court—not to an expert.

The Supreme Court's determination that preemption is to be decided by courts also reflects the fact that judges, rather than juries, are better suited to make difficult decisions about preemption that can result in dismissal of plaintiffs' claims. While it is difficult to dismiss birth-defect claims, the Court would merely be telling these Plaintiffs the same thing that the FDA told them through the labeling and its previous regulatory actions: the available data do not support a conclusion that the drug causes these injuries and they are the result of congenital abnormalities that unfortunately happen in 2-4% of births, often with unknown or genetic causes. The Court should hold that Plaintiffs' claims are preempted and dismiss these actions.

Dated: October 29, 2019

Respectfully submitted,
GLAXOSMITHKLINE LLC,
By its attorneys,

*/s/ Jennifer Stonecipher Hill*
Madeleine M. McDonough
Jennifer M. Stevenson
Jennifer Stonecipher Hill
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
mmcdonough@shb.com
jstevenson@shb.com
jshill@shb.com
*Admitted pro hac vice*

Lisa S. Blatt
Amy Mason Saharia
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
lblatt@wc.com
asaharia@wc.com
*Admitted pro hac vice*

*Attorneys for Defendant GlaxoSmithKline LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those identified as non-registered participants.

/s/ Jennifer Stonecipher Hill
Jennifer Stonecipher Hill