**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE: ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION** | MDL No. 1:15-md-02657-FDS |

**SUPPLEMENTAL AFFIDAVIT OF APRIL ZAMBELLI-WEINER, PH.D.**
**REGARDING RESPONSES TO DOCUMENT REQUESTS**

I, APRIL ZAMBELLI-WEINER, PH.D, do state and declare under the pains and penalties of perjury:

1.      I am over the age of eighteen and competent to testify to the matters contained in this affidavit.

2.      I am an Epidemiologist with a PhD in Epidemiology and Human Genetics from the Johns Hopkins Bloomberg School of Public Health. I received my Bachelor of Arts in Chemistry and English from Washington & Jefferson College and a Master of Public Health (MPH) in Epidemiology/Community Health from Saint Louis University.

3.      This affidavit is made based on my personal knowledge.

4.      Per the Court's ruling on Defendant GSK's Motion to Compel, I hereby submit the following supplemental statements:

### A.      Statistical "coding" and "output."

5.      GSK has asserted to this court that there are universal requirements for how researchers conduct observational epidemiologic studies and analyses. According to GSK: (1) every single decision, analysis and movement in a study must be associated with some "coding" or "output"; (2) failure to produce said coding and output (in the singular form GSK claims it needs) constitutes unreliability; (3) the totality of the results of a study should be reproducible by the single click of a button; and (4) failure to reproduce the totality of the results of a study with the click of a button constitutes unreliability.

6.      These assertions are patently false and I will provide support to hopefully bring some clarity to these issues.

7.      The Court (and anyone reading this) should be aware of the fact that many analyses can be and in fact are done without the use of sophisticated and costly statistical programs like STATA and SAS.  There is no requirement to use any *particular* statistical program or approach for these types of studies – many of these programs require no code, no input files, and produce no output files.   For example, there are many online statistical calculators, such as medcalc.net[1] that allow users to enter numbers and see results without any statistical coding or output files whatsoever.  The unadjusted odds ratios presented in Table 2 of my study can be reproduced using such a calculator.  There are many studies in reputable peer-reviewed journals that utilize these types of programs for their analyses,[2] including, as an example, a study involving both GSK and

---

[1] https://www.medcalc.net/statisticaltests/odds_ratio.php
[2] See, as example:  Mark, Katrina S., et al. "Risk of complication during surgical abortion in obese women." *American journal of obstetrics and gynecology* 218.2 (2018): 238-e1.

University of Pennsylvania (Dr. Kimmel's affiliation) in which this specific program is utilized.[3] This illustrates the first and most important point: there is no requirement to utilize coding for statistical analysis or to generate or preserve output in any particular format - period.  This is a concept that has been manufactured by GSK for the purposes of this litigation.  Experts can be of the opinion that things should be done a certain way, but that does not make it a requirement and it does not make a study that does not adhere to the same process invalid.  One need only to look to the body of peer-reviewed scientific studies as well as the default standard operating mode for many statistical programs to validate this.  I offer more detail below.

8.     Statistical programs are in some ways like sophisticated calculators. Just like a calculator, a user can enter numbers (data) into a program, provide instructions and get results without ever requiring statistical programs (or "coding") or producing any output other than the results shown on the screen.  Many statistical programs, including STATA, can be operated in an iterative (i.e. real time) environment where instructions are provided by clicking menu options or typing them in and results are displayed in real-time without being saved.

9.     Many web and cloud-based statistical calculators and programs exist, including programs developed and administered by leading government agencies like CDC such as Epi Info, which require no code (as defined by GSK) and may produce no printed or saved output (as defined by GSK) as part of a user's data analysis activities.  Nevertheless, valid results are generated and are frequently reported in manuscripts, as we - and many others - have done and continue to do. [4] Many of these programs have been developed to facilitate research in resource-limited situations.

---

[3] Huang, Jia, et al. "Frequent genetic abnormalities of the PI3K/AKT pathway in primary ovarian cancer predict patient outcome." *Genes, Chromosomes and Cancer* 50.8 (2011): 606-618.
[4] For example, see Bernard et al. (2019), a recently published study similar to ours with statistical analyses similar to ours that were executed using an add-on for Microsoft Excel. See Bernard, Nathalie, et al. "Use of antidepressants and anxiolytics in early pregnancy and the risk of preeclampsia and gestational hypertension: a prospective study." *BMC pregnancy and childbirth* 19.1 (2019): 146.

Many researchers around the world do not have the immense resources of GSK or a large, well-funded academic institution like the University of Pennsylvania and are still able to do valid research.

10.     There may be reasons and occasions for saving output in a specified format which can depend upon various factors such as the nature of the study and methods, the purpose of the study, the stakeholders involved, etc.  An example would be an industry-sponsored study that is being undertaken for regulatory purposes, where regulatory requirements are usually much more stringent than guidelines associated with a journal manuscript.  This is one reason why studies conducted or sponsored by industry are often extremely expensive – there is large infrastructure required to support the regulatory requirements.  In organizations that conduct regulatory studies, there are entire groups dedicated to data management and analysis.  My company does not conduct these regulatory studies and we do not operate in this environment under these requirements.  We cannot and do not operate in the same resource environment as an industry giant like GSK, nor are we expected to meet guidelines that apply to regulated pharmaceutical sponsors and regulatory submissions.

11.     Dr. Kimmel is correct when he states that investigators must tell a statistical program what to do, but fails to note that this can be done in many different ways.  Many statistical programs, including STATA, are now menu-driven, meaning a user can choose analysis options from drop-down menus eliminating the need or the ability to write code at all.  In fact, the default mode in STATA, "interactive mode" requires the user to select or enter commands one at a time and to get results one at a time.  The standard mode of operation does not involve "clicking a button" and obtaining a file or printout of all output.  The user can choose to run batches of commands (what GSK is referring to as "code" and "input") through STATA, but it is not the

4

default mode for the program nor is it required.  Writing statistical "code" (sometimes also called programs, algorithms or macros) is often done for convenience, but ***is not required*** by either STATA nor for the journal that published our paper.

12.     Nevertheless, we have produced all of the existing statistical code ("input") underlying the Tables and study results as published in *Reproductive Toxicology*.  See AZW 013-016.  The statistical analyses are very straightforward and any experienced epidemiologist should be able to reproduce them based on the paper alone.  Beyond this, the statistical coding we have produced provides further information on how the statistical analyses that were clearly described in the manuscript were executed in STATA, specifically.  The codes are not required for reproducibility, as an experienced reader of our paper should understand what a "chi-square test" is, what a "t-test" is, and what "logistic regression" is and could easily implement these in their program of choice.

13.     Results from statistical analyses do not – and are not required to – exist in one particular format.  Different statistical programs produce results in different ways.  As I have previously testified, all known existing output has been produced, including output that was exported from STATA as per the instructions and recommendations on the STATA support materials as well as online tutorials from major academic research centers and teaching institutions.  For example, a STATA tutorial for The University of North Carolina, Carolina Population Center, states under the heading *Exporting Stata Results to MS Office*: "[W]e can browse the data, copy, and paste it in to an empty Excel file template we've created with column and row labels, colors, and all the other formatting we want.  We find this to be the easiest

approach."[5] No additional output is needed to either reproduce or evaluate the reliability of the study, nor can it be reproduced with the click of a button.

14. Statistical output in a particular format is not required for reproducibility – results are. The results from the analyses required to publish our paper, which were run in the standard, default mode for STATA and excel were preserved and made available to all readers of the published paper in the six detailed Tables of the manuscript.

**B. Reproducibility.**

15. GSK claims that it is unable to reproduce this study. I note that it is in GSK's interest in this litigation to claim that they cannot do so to discredit the study. This is evidenced by GSK's statement that the primary purpose of taking my deposition was to try "to undermine the study." See Depo., pp. 236-237.

16. My Ondansetron Study is absolutely reproducible. Reproducibility generally describes the ability of a researcher to replicate the results of a prior study. One way to do that is to design a different study on a different population to determine if the results are consistent. Another way, would be to repeat the same study-- using the same raw data source, the same methods the same statistical analyses. The use of or availability of statistical coding is not the measure of reproducibility in epidemiology, as GSK would have the Court believe. Reproducing the same study relies upon detailed reporting of the study in the peer-reviewed literature which (1) ensures others can understand the research question, the methodology used, and the study findings; (2) helps the reader to understand study strengths, limitations and potential biases, and (3) facilitates replication.

[5] See https://web.archive.org/web/20180811065900/http://www.cpc.unc.edu/research/tools/data_analysis/statatutorial/misc/exporting_results

17.     As detailed below, my Ondansetron Study as published provides a comprehensive roadmap to a qualified researcher, to allow for reproducing the study and obtaining the same results. The study can be reproduced based solely upon the details provided to the research community in our peer-reviewed manuscript. Reproduction by GSK in this case has been made even easier by the additional information provided to them through the subpoena process, including but not limited to: fourteen hours of deposition questioning of me and Dr. Kirby, the study protocol, our contract with Truven which included detailed listing of medication codes included in our study, study supplemental information handout, and statistical coding underlying analyses presented in the published manuscript.

18.     The entirety of section 2.1 of the paper is devoted to documenting the data source so other researchers can understand the nature of the data and can gain access to the same data, including a citation to more information about the Truven data. Detailed information about the study population that was derived from the database is documented in Section 2.2 "Study Population." These are the key inclusion and exclusion criteria that an investigator would take to Truven to request the data, just like I did, including the years of the study period, the fact that mother-child pairs were excluded if the mother had a prior diagnosis of chromosomal anomalies (including the code that identifies this), among other details. These are all details that tell researchers what we did to the data to arrive at our study population.  In this case, GSK actually has a copy of our contract with Truven which describes in detail what we requested from Truven – although they don't even need that as it is defined in the paper. Section 2.3 provides a detailed description of how drug exposure was defined (NDC codes) as well as providing detail and reference for the exposure window algorithm that was utilized to calculate the key window of exposure during the study.

19.     Any experienced pharmacoepidemiologic researcher should be intimately familiar with NDC codes and understand that NDC codes are highly informative about exposure due to the unique 10-digit number identifying the labeler, product, and trade package size. More specifically, the product portion of the number identifies a specific strength, dosage form, and formulation of a drug for a particular labeler.   Different formulations or different strengths of the same formulation are assigned different product codes.   FDA maintains a publicly available National Drug Code Directory which provides ease of lookup.   For example, below, a quick search for "ondansetron" reveals the code associated with a prescription tablet versus a medically-administered injection.

| Sample screenshot from query of FDA website for two different NDC codes for ondansetron | | | | |
| --- | --- | --- | --- | --- |
| ⊕ ONDANSETRON | 71872-7068-1 | 2 mg/mL | INJECTION | INTRAMUSCULAR; INTRAVENOUS |
| ⊕ ONDANSETRON | 63304-346-30 | 4 mg/1 | TABLET, ORALLY DISINTEGRATING | ORAL |

It is, therefore, quite readily available to anyone which codes are for prescriptions and which are for medical administration of ondansetron. In addition, we already provided these codes to GSK as part of our protocol with Truven, which was produced. See AZW 1064-1073. I therefore do not understand why GSK continues to disingenuously claim that they are unable to figure out which codes are for medical administration, when they already have the information to do so.

20.     Section 2.4 of the manuscript details how the outcomes of birth defects were defined, with additional codes related to the outcomes documented in Table S1 of the supplemental material that we provided with our manuscript.     Sections 2.5 ("Covariates") provides a lengthy

description of all of the other variables that were available and how they were handled in our analysis, including a detailed discussion of confounding. Many of our analytic choices, including how confounding was evaluated, were supported by references in the peer-reviewed literature, providing additional resources to interested readers.

21.     Section 2.6 ("Statistical Analysis") details how all of the analyses were conducted that produced the results we present in Tables 1, 2 and 3 as well as in the Supplemental appendix. The statistical methods used in the study are not overly-sophisticated and are familiar and easily understood by a trained epidemiologist.

22.     The published paper contained three "Tables" of results (Tables 1-3), and the Supplementary Appendix, which was also published with the paper at the same time, included three additional Tables (Tables S-1- S-3). These six tables were each labeled and each provided important information about the data, the analysis, and the results. As authors we made deliberate choices to include as much information as possible in our manuscript to facilitate transparency and reproducibility. One example is the inclusion of adjusted analyses in Tables 2 and 3. Our judgment as researchers was that the unadjusted model was the best model to describe our data. However, we knew that other ondansetron studies only included adjusted models. So to facilitate comparison across studies we included adjusted models as well. Supplemental tables or information are not required by the journal. We included three additional supplemental tables in our submission. This was additional information that we as authors chose to provide to help other researchers and readers better understand our study, our choices and to assist in reproduction of the study. For example, we anticipated that some researchers would have concern about the limitation of our dataset related to the inability to control for some potential confounders like smoking. While we do not believe smoking is an important confounder in our study, we provided

9

the analysis to back-up our position in Table S3.

### C.    Reproducing Output with a "Click of a Button."

25.    GSK has stated multiple times that I said that I could with "one click" print out from STATA in a specific format all of the "output" that our team used for the Study. This misstates my testimony, and is not an accurate statement as pertains to the Ondansetron Study. My testimony about this appears at pages 38-39 of the transcript of my February 1, 2019 deposition. The question asked was whether STATA can generate output with the click of a button? To which the answer is clearly "yes" – it is possible for STATA to generate output with the click of a button.  However, the question was not, "Can you reproduce all of your study output with the click of a button?" – to which the answer is "no."  The questions and answers  surrounding the "one click" question make this clear:

> 23 Q. Do you know how to generate a Stata
> 24 output?
> 25 A. Yes.
> 1 Q. Okay. I mean you can do that with a
> 2 click of a button; is that right?
> 3 A. Sure, absolutely.

26.    My testimony was then, and remains today that the results from each step of the analysis executed in STATA for the manuscript as published in *Reproductive Toxicology* were immediately put into the "table shells." Accordingly, the published tables in my study contain the output from our analyses necessary to publish (and reproduce) the study.  There is no separate printout or record of the output in other formats other than what has already been produced, and to my knowledge there never was.

27.    I answered "yes" to the question about "clicking a button" because the question was not about my study specifically, it was about STATA generally and whether STATA output can be generated with a "click of a button."  The question did not distinguish between output based on

a single command or a series of commands, nor did it distinguish between a single or series of commands and the results of all input all at once. Accordingly, my response also did not make those distinctions. A “click of a button” can generate output from STATA, but that output will vary depending on how one utilizes STATA for a particular study and task or set of tasks.

28. All of this is to say that the Study output cannot be reproduced with a “click of a button.” The data analysis for this study required numerous steps and contained numerous data files. Any given table of results will utilize multiple analysis datasets and multiple statistical procedures to complete. These results cannot be reproduced simply by clicking a button and it would require a significant investment of time and resources to do so. Studies such as this take time to complete and the assertion that these study results can be fully and reliably produced with the single click of a button is both a distortion of my original testimony and inconsistent with my years of experience as an epidemiologist.

29. Additionally, there are no requirements that data must be kept in a state where you can reproduce complicated sets of analyses with the single click of a button, there is only the requirement that data be kept, which we have done.

**D. Medical Administration Codes.**

30. GSK’s claims that medical administration coding is “missing” and that they are unable to reproduce the medical administration analyses are simply not true.

31. There are many different codes and types of code that we used in this study. For example, both the outcome variables (i.e., birth defects) and the exposure variables (medical administration of ondansetron or a filled prescription for ondansetron) are defined by codes. Specifically, ICD-9 codes are used to define the presence of a birth defect and different types of birth defects; these codes were included in Table S-1 of the Supplementary Appendix, which was

published in *Reproductive Toxicology* with our paper.   Similarly, National Drug Codes (NDC) and The Healthcare Common Procedure Coding System (HCPCS) codes are used to tell us what type of exposure a woman had.  NDC codes and their definitions are readily available to GSK and any other member of the public on the internet, including a searchable database on FDA's website.[6]

32.      To help provide some context, drugs administered in the hospital setting are billed differently than prescription data.  They are billed using HCPCS codes.  J-codes, for example, are the codes for non-orally administered medication and chemotherapy drugs.  The J-code for ondansetron was specified in our protocol and data request to Truven, which was produced to GSK. See AZW 1060.

33.      In fact, as part of our protocol and data request to Truven, we specified all of the ICD, NDC and HCPCS codes to be included in the dataset, and this was produced to GSK. See AZW 1059-1073.  GSK's counsel therefore has had in their possession for many months the specific codes that tell them how we defined all of the outcomes (birth defects) and all of the exposures in our study.

34.      When GSK asked me on the first day of my deposition if I recalled the specific codes that were used to derive the medical administration variable and I replied that there were "a lot of codes" (p. 38), these are the codes I was referring to. GSK has erroneously relied upon this statement to claim that additional statistical code exists.

35.      In some statistical analyses, intermediate, or flag, variables will be derived from other variables in order make analyses easier.  These intermediate variables can and will differ by analyst preferences in how and why they are created.   For example, in an original dataset there may be a variable called "gender" that lists female or male for each subject.  One analyst may

---

[6] https://www.accessdata.fda.gov/scripts/cder/ndc/index.cfm

choose to analyze the data as-is using the variable "gender". Another analyst may create a new variable called "sex1" that is coded as sex=1 if female, sex=0 if male. There is no new information in the variable sex1 - it is simply the same information presented in a different way for analytic purposes. The name itself does not matter, as the underlying information is the same, nor are these names needed in order to reproduce the study. Just as a researcher who has the information on whether an individual is male or female can conduct any necessary analyses utilizing gender, a researcher with the data on NDC and HCPCS codes for ondansetron can conduct the medical administration analysis without any further information.

36.     When we requested and received the data from Truven we were provided with many flag, or intermediate variables (as described above), as part of the datasets provided to us. This included flag variables related to ondansetron exposure. To the best of my recollection, because of the presence of numerous flag variables, no additional coding was required to analyze medical administration.

37.     Regardless of how we received the data, information on the type of ondansetron exposure was requested from Truven and in the form of NDC codes and HCPCS codes as described above. All identifying codes a researcher would need to reproduce or assess reliability (including those for medical administration) are listed in the manuscript and protocol that we produced to GSK months ago. See AZW 1064-1073.

38.     GSK has presented this rather straight-forward and simple process in a misleading fashion, making it appear more complex than it is in their self-admitted attempt to discredit this study. With the seemingly unlimited resources at GSK's disposal, there is no doubt that they have sophisticated teams of researchers and analysts on staff who can easily replicate our analyses based

on the information that is both published and has been produced. They have chosen not to do so presumably because it is in their interest not to rather than the inability to do so.

**E.      Rebuttal to Dr. Kimmel.**

39.      Studies are routinely able to be reviewed without any codes or output, and this is standard and accepted practice.  Dr. Kimmel implausibly states that he is unable to assess the reliability of my study, notwithstanding the substantial amount of information he already has about the study based on the published paper, the published supplemental appendix, the documents that Dr. Kirby and I produced pursuant to subpoena, the documents obtained by subpoena from Truven and the journal, and the 14 hours of depositions of me and Dr. Kirby. Studies are routinely assessed for reliability based solely on what is published, and this is standard and accepted practice. Requiring, as Dr. Kimmel does, every scrap (both real and imagined) of what he is referring to as code as well as printouts of every single page of output (in the format he requires) for every study he assesses is not standard and acceptable practice, nor is it necessary.

40.      Perhaps most importantly, Dr. Kimmel falsely claims that certain code must exist because he has walked through hypothetical steps that, in his mind, are required to execute the study.  For example, he mentions on page 3 of his September 16, 2019 affidavit that "the investigator would have to identify, for each subject, whether they had received one or more prescriptions for ondansetron. Next, the investigator would have to determine the start and end dates for each prescription in order to determine if the medication exposure occurred any time during pregnancy (also a derived variable) and then in which trimester the exposure occurred (another derived variable)."   The assertion that any of these pieces is missing is absolutely false. The reason there is no "code" for this is because, as specified by our protocol which GSK has had for many months, the data was provided to us with these steps already completed.  A careful

reading of our protocol will show that Truven undertook the creation of these derived variables. His opinion that (1) an investigator has to do this and (2) that code should exist for this is not only false, but he (and GSK) have also had information showing it is false in their possession for some time.

41.     Despite the fact that Dr. Kimmel seems entirely comfortable opining on data that he clearly lacks an understanding of, he confidently and purposefully tries to mislead the Court into believing that epidemiology and research in our field are somehow lacking in reliability if they are not explicitly laid out in excruciating detail.  We don't ask a physician to prove they know how to listen to a heartbeat through a stethoscope; their years of training and experience dictate that as a given.  Similarly we don't ask experienced researchers to prove they know how to execute a t-test, or even a logistic regression model – both analytic approaches that are taught in Epidemiology 101 courses around the world, and are understood by any experienced epidemiologist.  It is simply not information that is needed to evaluate or reproduce a study. And as I will demonstrate below, Dr. Kimmel's opinions expressed in his affidavit are contrary to his own published work.

42.     Dr. Kimmel is also seemingly confused by the documents he has reviewed, which he appears to lack context for as many were beyond the scope of the original study and (original) document request.  As I made clear at my deposition, the Ondansetron study was an offshoot of a larger antiemetic study (not limited to Ondansetron) which we named "PISCES" and which looked at other drugs, prescribing patterns and other areas of interest to public health. Once the original document request was expanded from a request for documents pertaining to the Ondansetron study as published in *Reproductive Toxicology* to the broader category of "any" documents having to do with Zofran, drafts and preliminary analyses related to the larger PISCES project inevitably were

produced along with documents pertaining to the Ondansetron study. The production of documents relating to multiple studies would of course lead to Dr. Kimmel's confusion.

43.     In fact, this is one reason why we directly export results into table shells when it is possible to do so as having many different analyses floating around can be confusing. GSK has characterized this as not saving output, but in reality it is an attempt to get the necessary and correct results in the manuscript table by the most direct method possible without compromising in any way the transparency or reproducibility of the study.   The more versions and copies of output floating around from different studies, the more likely it will lead to errors and confusion. While Dr. Kimmel states that, "it is difficult to see how failure to retain the results of the statistical analyses could help "minimize errors and confusion," in reality he is illustrating that point precisely.  He is also incorrect – as the results are clearly saved and retained in the study tables.

44.     As to Dr. Kimmel's claim that a string of code required to understand how medical administration was determined is "missing" from what has been produced, as I explained above (see Section D "Medical Administration") this is not required and entirely inaccurate.

45.     In fact, Dr. Kimmel himself published a paper in 2012 similar in scope and methods to mine, entitled "Methylphenidate and Risk of Serious Cardiovascular Events in Adults," published in *The American Journal of Psychiatry.* As in my study, Dr. Kimmel used administrative data to ascertain drug exposure.  The extent of Dr. Kimmel's explanation of how exposure was defined is: "filled a prescription for orally administered methylphenidate."  Dr. Kimmel makes no mention of what codes were used to define exposure.  In addition, Dr. Kimmel looked at different types of exposure to methylphenidate, similar to how we looked at different types of ondansetron exposure.  In his paper he compared risk of immediate versus extended release formulations, similar to how we looked at medical administration vs. prescription.   He does not define in his

paper how immediate versus extended release was defined and certainly does not provide any codes.  So, when Dr. Kimmel states in his affidavit that "without understanding how the exposure was coded it is not possible to interpret the results" – he is directly contradicted by omission of this supposedly vital information from his own manuscript.   This type of information is clearly not critical to assessing the reliability of the study because anyone with any knowledge and experience in performing studies involving drug exposures and outcomes would understand how drug NDC codes work.  A trained (and willing) researcher easily can determine which drug codes apply to extended-release formulations and which apply to immediate release without any additional information from Dr. Kimmel to understand or replicate the analysis they did, just as he doesn't need additional information to evaluate my study. To claim otherwise is misleading the Court.

46.     Furthermore, Dr. Kimmel himself talks about reproducibility in his book (Textbook of Pharmacoepidemiology) as: "A hallmark of science is reproducibility: if a finding is real, one should be able to reproduce it in a different setting. *This could include different geographic settings, different study designs, different populations, etc.*" In this litigation, however, he is applying a different definition. There is nothing stopping Dr. Kimmel from reproducing this study based on his definition of reproducibility that he outlines in his own book.

**F.     Additional Remarks.**

47.     The Ondansetron study is a high quality study that went through a rigorous peer review process in a respected journal. The conference presentation that preceded publication was ranked in the top 10% at the International Society for Pharmacoeconomics and Outcomes Research annual meeting and it was a semi-finalist for best research poster presentation. Since it has been published, the paper has been cited by other experts in the field, remains one of the most

downloaded articles from *Reproductive Toxicology* to this day, and to my knowledge has not been criticized by any published paper or letter to the editor.

48.     This was an important internal project to our team that we were doing for many reasons, including our passion for maternal and child health and professional development and mentoring. This study contributes valid and important information about the independent risk of ondansetron exposure in early pregnancy, and as such should be considered in the body of evidence when discussing pregnancy risks. I'm not aware of any other studies that look at the independent risk of early pregnancy ondansetron exposure through medical administration.

49.     In the context of this litigation, I have done my best to fully comply with the Court's orders.   Despite how I am being portrayed, I have understood my role in this litigation as to offer facts concerning my Study, without regard to how those may impact the respective positions of either party.   That is what I have done and will continue to do.

50.     I hope my explanations have aided the Court in understanding why some things have never existed – and do not need to - contrary to GSK's claims.   But to be clear, I have not destroyed any documents, analyses, results, or data relating to the Study.

51.     Finally, I wish the Court to understand that I have spent many hours preparing this affidavit in the midst of great family stress.   During the time that I was given to prepare this affidavit, my youngest son who was born with a birth defect had to have a partial amputation of his foot.   At the same time, my daughter who was also born with a birth defect was diagnosed with a potentially cancerous lymph node.    I offer this so that the Court understands I have taken considerable time away from the care of my family in my best effort to try to provide transparent and complete answers to any lingering questions regarding my study, as it is my true and honest intent to do so.

[SIGNATURE ON FOLLOWING PAGE]

I SOLEMNLY AFFIRM under the penalties of perjury and upon personal knowledge that the statements herein are true and correct to the best of my knowledge, information and belief.

Dated:  November 26, 2019.

_____
April Zambelli Weiner, Ph.D.