**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE: ZOFRAN® (ONDANSETRON) PRODUCTS LIABILITY LITIGATION** | MDL no. 1:15-md-2657-FDS<br><br>This document relates to:<br><br>All Actions<br><br>*Leave to file granted on January 7, 2020* |

**DEFENDANT GLAXOSMITHKLINE LLC'S AMENDED MEMORANDUM IN**
**SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT**
**BASED ON FEDERAL PREEMPTION**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ....................................................................................................3

    A.    Regulatory Background ...........................................................................................3

    B.    Zofran's Labeling ...................................................................................................5

    C.    Plaintiffs' Claims Against GSK .............................................................................6

    D.    FDA's Repeated Rejections of Plaintiffs' Proposed Warnings ..............................7

          1.    *FDA's consideration of GSK's 2011 pregnancy review* .............................7

          2.    *FDA's denial of the Reichmann citizen petition* .........................................8

          3.    *FDA's rejection of Novartis's proposed labeling revision in 2016* .............9

    E.    Information Available to FDA When It Rejected the Proposed Warnings ...........12

          1.    *Epidemiological data* ...............................................................................12

          2.    *Animal data* ..............................................................................................14

          3.    *Mechanism of action* ...............................................................................19

          4.    *Adverse event reports* ...............................................................................20

STANDARD OF REVIEW .....................................................................................................22

ARGUMENT ..........................................................................................................................23

I.    *Wyeth* and *Albrecht* Provide the Legal Framework that Governs Preemption Here. ........23

II.    No "Newly Acquired Information" Permitted a CBE Labeling Change, and FDA Was Fully Informed of All Material Information When It Rejected the Labeling Changes.................................................................................................................27

    A.    None of Plaintiffs' Categories of Information Is "Newly Acquired Information," and None Would Have Been Material to FDA. ..............................30

          1.    *The Japanese animal studies* ...................................................................30

          2.    *Mechanism of action* ...............................................................................38

          3.    *AERs*.........................................................................................................40

          4.    *Einarson study* .........................................................................................47

III.    FDA Acted Within Its Lawfully Delegated Powers in Rejecting Plaintiffs' Proposed Changes to Zofran's Label.................................................................................49

IV.    GSK Could Not Use the CBE Process To Revise the "Use in Specific Populations" Portion of the Labeling.................................................................................51

CONCLUSION.......................................................................................................................51

## INTRODUCTION

This litigation should end now.  Plaintiffs began filing these cases after the publication of a 2014 study by their expert Dr. Danielsson.  They no doubt hoped that Dr. Danielsson's study would prompt FDA to change Zofran's label, and that other studies supporting their case would follow in its wake.  Instead, the opposite happened.  Newer, larger epidemiological studies found no evidence of causation.  And as relevant to preemption, FDA reviewed vast amounts of information, including epidemiological data, animal data, information regarding Dr. Danielsson's proposed mechanism of action, and adverse event reports.

FDA repeatedly concluded that no reasonable evidence of a causal association between Zofran and birth defects exists.  FDA denied a citizen petition requesting that it add a birth defect warning.  And FDA refused to allow Novartis, the current Zofran sponsor, to add such a warning, telling Novartis in no uncertain terms that ***such a warning could mislead the public and prescribing physicians*** even though FDA has known for years that Zofran is commonly used in pregnancy.  Based on that history, this Court recognized that "there is little doubt that the FDA *would have* rejected plaintiffs' proposed warning: it in fact *did* reject it, at least in substance." *See* Mem. & Order on GSK's Mot. for Summ. J. Based on Federal Preemption, Feb. 5, 2019 (ECF No. 1325) ("Order on GSK's Preemption MSJ"), at 3.

Plaintiffs surely wish, as their counsel recently told the Court, that FDA were not "an outpost to resolve the latest issues of science." Ex. 18 (July 10, 2019 Hr'g Tr.) at 26:25-27:1.  But that is wrong.  Federal law requires FDA to demand labeling changes if it "becomes aware of new safety information" that it "believes should be included in the labeling of the drug." 21 U.S.C. § 355(*o*)(4)(A).  And under *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019), and *Wyeth v. Levine*, 555 U.S. 555 (2009), FDA action denying a labeling change is dispositive,

because it means that federal law bars a manufacturer from complying with a purported state-law duty to change the labeling.

This is a textbook case for preemption.  FDA's actions make clear that it believes the warning desired by Plaintiffs will harm, not help, pregnant women, because it would warn them against Zofran use without a scientific basis for the warning.  Given FDA's rejections of the warnings desired by Plaintiffs, GSK could not have used the changes being effected (CBE) process to revise its FDA-approved labeling to comply with a state-law duty to warn.  Compliance with both federal law and Plaintiffs' asserted state-law duties was impossible.

Confronted with these devastating circumstances that presumptively defeat their claims, Plaintiffs previously scrambled to identify any scrap of information, no matter how insignificant, and argued that the information would have made a difference to FDA.  But the developed scientific and regulatory record shows that Plaintiffs are just wrong.  FDA either had the information Plaintiffs point to when it rejected the proposed labeling changes or the information was duplicative of—that is, provided no new material information than—what FDA already had. The information thus would not have permitted a labeling change under the CBE regulation.

This Court denied GSK's prior summary judgment motion only because it concluded that preemption presented genuine issues of material fact for the jury to decide.  The Supreme Court has now held that preemption is a matter of law for courts and has instructed courts to resolve any disputed facts as "part and parcel of the broader legal question." *Albrecht*, 139 S. Ct. at 1680. This Court now must decide itself whether FDA possessed all material information when it rejected the citizen petition and the Novartis proposed labeling changes.  The full record establishes that the answer to that question is yes.

GSK recognizes that birth defects result in hardship for affected children and their families. But, by dismissing these cases on preemption grounds, the Court would simply be reaffirming FDA's dispositive position on the central issue in this case:  the evidence does not support a causal association between Zofran and birth defects, and a warning regarding birth defects would harm public health.  GSK respectfully requests that the Court enter judgment for GSK.

## FACTUAL BACKGROUND

### A.      Regulatory Background

To market a new pharmaceutical product such as Zofran, a drug company (the "sponsor") submits a New Drug Application (NDA) to FDA for review and approval. *See* 21 U.S.C. § 355(a). The sponsor must provide comprehensive information about the drug, including its formulation, the proposed labeling, and scientific data about its safety and efficacy.  § 355(b)(1).  FDA will approve a drug for marketing if, and only if, the NDA demonstrates that the drug: 1) is "safe for use"; 2) "will have the effect it purports or is represented to have"; and 3) is accompanied by labeling that is neither "false [n]or misleading in any particular."  § 355(b)(1)(A), (d).  FDA conducts "a detailed review of the proposed labeling, allowing only information for which there is a scientific basis to be included in the FDA-approved labeling."  73 Fed. Reg. 49,603, 49,604 (Aug. 22, 2008); 21 U.S.C. § 355; 21 C.F.R. § 314.105(c).

"Drug manufacturers generally seek advance permission from the FDA to make substantive changes to their drug labels." *Albrecht*, 139 S. Ct. at 1673.  But, under the CBE process, sponsors can unilaterally amend a label to reflect "newly acquired information" in order to "add or strengthen" a warning for which there is "reasonable evidence of a causal association." 21 C.F.R. §§ 201.57(c)(6)(i); 314.70(c)(6)(iii)(a).  FDA then reviews the amended labeling and will approve it only if it satisfies these criteria. 21 C.F.R. § 201.57(c)(6)(iii)(a); *see also Albrecht*, 139 S. Ct. at 1679.  The CBE process and its requirements are "intended to ensure that scientifically

valid and appropriately worded warnings will be provided in the approved labeling for medical products, and to prevent overwarning, which may deter appropriate use of medical products, or overshadow more important warnings."  73 Fed. Reg. at 49,605-06.

Under the CBE regulation, "newly acquired information" comprises:

[D]ata, analyses, or other information not previously submitted to [FDA], which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA.

21 C.F.R. § 314.3.  The existence of newly acquired information is a firm prerequisite to any CBE label change.  *See Albrecht*, 139 S. Ct. at 1673;  *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 41-42 (1st Cir. 2015).  A sponsor cannot change a drug label to reflect information previously known to FDA.  *See In re Celexa*, 779 F.3d at 48.

A manufacturer invoking the CBE process to change its labeling unilaterally runs the risk that FDA will deem the product "misbranded."  *See* 21 C.F.R. § 314.70(c)(7); 71 Fed. Reg. 3922, 3934 (Jan. 24, 2006).  A drug is misbranded if its "labeling is false or misleading in any particular." 21 U.S.C. § 352(a)(1).  Misbranding is not limited to labeling that fails to warn of a serious hazard; "[e]xaggeration of risk, or inclusion of speculative or hypothetical risks" also constitutes misbranding.  73 Fed. Reg. 2848, 2851 (Jan. 16, 2008).  The FDA's labeling regime is designed "to 'prevent overwarning' so that less important information does not 'overshadow' more important information," which "could discourage appropriate use of a beneficial drug."  *Albrecht*, 139 S. Ct. at 1673 (internal quotation marks omitted).

FDA independently monitors the adequacy of existing labeling.  Federal law requires that FDA promptly demand labeling changes if it "becomes aware of new safety information" that it "determines should be included in the labeling of the drug."  21 U.S.C. § 355(*o*)(3)(c), (*o*)(4)(A).

In other words, when FDA becomes aware of a safety issue with respect to labeling, it must act. Ultimately, whether a safety issue is detected by FDA, a sponsor, or a concerned citizen, the same regulatory standard for a label change applies:  a new warning is necessary "as soon as there is reasonable evidence of an association of a serious hazard with a drug." 21 C.F.R. § 201.80(e); *see also Cerveny v. Aventis Inc.*, 855 F.3d 1091, 1102 (10th Cir. 2017) ("the FDA standard for revising a warning label does not discriminate between proposals submitted by manufacturers and proposals submitted by citizens").

### B.      Zofran's Labeling

FDA first approved ondansetron hydrochloride, marketed as Zofran, in 1991.  FDA approved Zofran for nausea and vomiting associated with chemotherapy and radiation and for postoperative nausea and vomiting.  Zofran works to prevent nausea and vomiting by blocking serotonin from binding to a specific serotonin receptor called 5-HT3.  Ex. 75 (Jiang-Hong Ye et al. (2001)).  Zofran revolutionized the treatment of nausea and vomiting caused by chemotherapy. Ex. 63 (Kidgell et al. (1990)).

FDA has approved a total of five Zofran NDAs:  NDA 20007 – injection (1991); NDA 20103 – Zofran oral tablet (1992); NDA 20403 – premixed injection (1995); NDA 20605 – oral solution (1997); and NDA 20781 – orally disintegrating tablet (1999).  By approving each NDA, FDA found the formulation "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof" and found that the labeling was not "false or misleading in any particular." 21 U.S.C. § 355(d); *see* Ex. 19 (Zofran IV approval and label).

Until June 2015, FDA regulations classified drugs into five categories based on the information available about use during pregnancy—A, B, C, D, or X—and mandated the exact language that must be used in the labeling for each category.  As relevant here, category B signified that "animal reproduction studies [had] failed to demonstrate a risk to the fetus and there are no

5

adequate and well-controlled studies in pregnant women."  21 C.F.R. § 201.57(c)(9)(i)(A)(2)

(2006).[1]  After reviewing the data provided by GSK, FDA determined that pregnancy category B

was the appropriate classification for all five formulations.  *See, e.g.*, Exs. 19 (Zofran IV approval),

22 (Zofran tablets approval).  Between 1992 and 2016 the relevant section of the FDA-approved

labeling for intravenous Zofran has generally stated:

### Pregnancy; Pregnancy Category B

Pregnancy Category B. Reproduction studies have been performed in pregnant rats and rabbits at intravenous doses up to 4 mg/kg per day and have revealed no evidence of impaired fertility or harm to the fetus due to ondansetron. There are, however, no adequate and well-controlled studies in pregnant women. Because animal reproduction studies are not always predictive of human response, this drug should be used during pregnancy only if clearly needed.

*See, e.g.*, Ex. 22; *see also* 21 C.F.R. § 201.80(f)(6)(i)(b) (2006).  At all relevant times, the FDA-

approved labeling for all Zofran formulations contained a fundamentally equivalent pregnancy

category B statement.  *E.g.* Ex. 22; *see also* Exs. 23-25.

### C.    Plaintiffs' Claims Against GSK

Each of Plaintiffs' claims rests on the theory that Zofran's labeling failed to inform

Plaintiffs, doctors, and/or the public of Zofran's alleged risk to children whose mothers used

Zofran.   *See*  First  Am.  Brand  Master  Compl. ¶¶  187  (negligence);  198  (negligent

misrepresentation); 209 (negligent undertaking ); 217 (negligence per se); 226 (strict liability); 239

(breach  of  express  warranties);  246  (breach  of  implied  warranties);  250  (fraudulent

misrepresentation); and 259 (violation of state consumer protection laws).[2]  Although Plaintiffs

---

[1] As a point of reference, category C signified either that "animal reproduction studies have shown an adverse effect on the fetus, . . . there are no adequate and well-controlled studies in humans, and . . . the benefits from the use of the drug in pregnant women may be acceptable despite its potential risks" or that "there are no animal reproduction studies and no adequate and well-controlled studies in humans."  21 C.F.R. § 201.57(c)(9)(i)(A)(3) (2006).

[2] Plaintiffs' First Amended Generic Use Master Complaint is substantively identical except that it does not include the strict liability or breach of warranty causes of action.

allege that Zofran's labeling was inadequate, they do not identify with precision what warnings they believe should have been provided.  At best, they claim that GSK should have warned that "the safety of ondansetron for use in human pregnancy has not been established," and "the use of ondansetron in pregnancy is not recommended."  *Id.* ¶ 173.  As this Court has recognized, Plaintiffs' desired warnings are "in substance" equivalent to the warnings rejected by FDA discussed below.  Order on GSK's Preemption MSJ at 3.

To the extent Plaintiffs argue that GSK negligently marketed Zofran to treat nausea and vomiting in pregnancy (NVP), those claims cannot be separated from Plaintiffs' overarching claim of failure to warn.  If FDA was fully informed regarding all material science when it rejected the warnings that Plaintiffs desire, then as a matter of law Plaintiffs cannot establish that any marketing for NVP caused their injuries without improperly second-guessing FDA's determination.[3]

## D.    FDA's Repeated Rejections of Plaintiffs' Proposed Warnings

### 1.    FDA's consideration of GSK's 2011 pregnancy review

In December 2010, FDA informed GSK by letter that FDA was aware that pregnant women were taking Zofran for nausea and asked GSK to "review and analyze available published and unpublished literature on the use of ondansetron during pregnancy."  Ex. 26.  FDA requested an "assessment of the strengths and limitations of the data" and told GSK to propose labeling revisions though a Prior Approval Supplement (not a CBE label change) if GSK concluded that changes were necessary to "furnish adequate information for the safe use of this drug."  *Id.*

GSK replied in April 2011 and advised FDA that it did "not believe there is sufficient evidence to warrant a change in [Zofran's labeling]."  Ex. 27.  GSK provided a detailed

---

[3] The negligent-marketing and other related claims also fail for the reasons set forth in GSK's case-specific summary judgment motions, which GSK incorporates herein.  GSK notes that negligent-marketing claims are not uniformly recognized.  *See Markland v. Insys Therapeutics, Inc.*, 758 F. App'x 777, 779 (11th Cir. 2018).

examination of the then-available safety data, including published literature and adverse event reports. *See id.* GSK provided details on 50 infants exposed to Zofran with reported congenital anomalies, including heart defects, musculoskeletal anomalies, and other miscellaneous anomalies such as laryngomalacia. *Id.* at -4314-15. FDA did not subsequently require GSK to make any changes to the Zofran pregnancy labeling, *see* Ex. 28, despite being required to do so if a risk existed, *see* 21 U.S.C. § 355(*o*)(4)(A).

### 2. *FDA's denial of the Reichmann citizen petition*

In 2013, James Reichmann submitted a citizen petition asking FDA to revise the Zofran label. *See* Ex. 29.[4] Mr. Reichmann requested a reclassification of the Zofran pregnancy category from B to category C, D, or X, and an FDA warning that use of Zofran during pregnancy may lead to "adverse maternal and/or fetal outcomes." *Id.*

In October 2015, FDA formally denied the citizen petition in a 20-page letter. Ex. 32 at 2. In denying the petition, FDA considered "information submitted by [GSK] to support approval of the ondansetron NDA," "post-marketing drug and device adverse event data," and scientific literature obtained through public submissions and through FDA's own "targeted searches." *Id.* at 18 n.56. FDA again acknowledged that, while Zofran was not approved for treatment of nausea and vomiting in pregnancy ("NVP"), it was aware that doctors prescribed the drug for this potentially life-threatening condition. *Id.* at 3. FDA concluded:

> Taking into consideration both the data available at the time ondansetron was approved and subsequent human data gathered in the post approval setting, at this time the totality of the data do not support a conclusion that there is an increased risk of fetal adverse outcomes, including birth defects such as cleft palate and cardiac ventricular and/or septal defects, among fetuses exposed to ondansetron.

---

[4] A citizen petition is a request that FDA "issue, amend, or revoke a regulation or order or take or refrain from taking any other form of administrative action," 21 C.F.R. § 10.30(b)(3), including that it change drug labeling, *see, e.g.*, FDA, *FDA approves safety labeling changes for fluoroquinolones* (July 26, 2016), http://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm500325.htm.

*Id.* at 18.  Accordingly, FDA refused to change the pregnancy category, stating: "[W]e believe pregnancy category B was the appropriate risk category for ondansetron when it was assigned[,] and . . . we believe pregnancy category B remains appropriate today."  *Id.*  FDA also rejected the request to notify doctors that use of Zofran during pregnancy is not safe for the fetus.  *Id.* at 19.  Such a notification, FDA explained, "***could be misleading***" because "the available data do not support a conclusion that there are increased safety risks . . . for the fetus."  *Id.* (emphasis added).

### 3.  FDA's rejection of Novartis's proposed labeling revision in 2016

In 2014, FDA issued a rule changing pregnancy warnings for all drugs to a narrative approach, as opposed to predetermined language based on pregnancy categories.  *See* Pregnancy and Lactation Labeling Rule (PLLR), 79 Fed. Reg. 72,064 (Dec. 4, 2014).  The PLLR eliminated the five pregnancy categories and required sponsors to replace the relevant portions of the prior labeling with new subsections that informed healthcare providers in narrative form of the potential risks and benefits of using a prescription drug during pregnancy and lactation.  21 C.F.R. §§ 201.57, 201.80; 79 Fed. Reg. 72,064 (Dec. 4, 2014).

GSK began working on Zofran's labeling in light of the new rule.  Ex. 2 (Rogg Decl.) ¶¶ 5-10.  Novartis, however, acquired Zofran from GSK in 2015 and assumed responsibility for this effort.  *Id.* ¶ 10; *see* Ex. 6 (Behbahani Dep.) at 305:22-307:23.  In September 2015, after a flood of attorney advertisements soliciting Zofran cases,[5] Novartis proposed to FDA the following labeling revisions:

- Beginning the "Risk Summary" subsection (§ 8.1) with the caution:

   It is possible that ZOFRAN can cause harm to the fetus when administered to a pregnant woman. Thus, the use of ZOFRAN in pregnancy is not recommended. If ZOFRAN is used

---

[5] *See* The Silverstein Group, *Zofran Ad Surge Signals Heightened Litigation Interest*, (Mar. 31, 2015), http://www.silversteingroup.net/mass-tort-ad-watch-blog/zofran-ad-surge-signal-heightened-litigation-interest.

during pregnancy, or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential risk to a fetus.  Ex. 33 at -2090.

- In the "Risk Summary" section, including the statement, "Animal studies are not always predictive of human response, therefore, the use of ondansetron in pregnancy is not recommended." *Id.*

- Creating a new subsection (§ 8.3) entitled "Females and males of reproductive potential," stating, in part, "Advise females of reproductive potential that it is possible that ZOFRAN can cause harm to the developing fetus." *Id.* at -2092.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

FDA rejected Novartis's proposed labeling.  *See* Ex. 35.  In response to Novartis's proposal to state that "the use of ondansetron in pregnancy is not recommended," FDA explained that it did "not agree with keeping this statement in labeling based on the available human information." *Id.* at -3945.  FDA also rejected Novartis's "[f]emales and males of reproductive potential" subsection, explaining that "the available human data do not support a clear conclusion on an increased risk of major congenital malformations." *Id.* at -3497.

In December 2015, Novartis submitted a new round of proposed changes questioning FDA's rejections.  Ex. 36.  Novartis cited reported adverse events as sufficient to warrant a statement that "[c]ases of congenital malformations have been reported in infants whose mothers took ondansetron during pregnancy." *Id.* at -3902.  Novartis again suggested adding a warning that "[t]he safety of ondansetron for use in human pregnancy has not been established." *Id.* at

10

-3903.  In light of reported off-label use, Novartis also requested a new "Limitations of Use" section stating that "Zofran has not been studied in pregnant women for the prevention of nausea and vomiting."  *Id.* at -3896.

In its April 2016 revisions to Novartis's proposed labeling, FDA deleted the statements that "[i]t is possible that ZOFRAN can cause harm to the fetus when administered to a pregnant woman" and "use of ondansetron in pregnancy is not recommended."  Ex. 37 at -4502.  FDA also deleted the "[f]emales and males of reproductive potential" subsection.  *Id.* at -4055-56.  FDA further deleted Novartis's proposed language in the Adverse Reactions section, stating that "[t]he Agency disagrees with the addition of cases of congenital malformations as Postmarketing adverse reactions."  *Id.* at -4051.  FDA explained that it "did not conclude that there is basis to believe there is a causal relationship between the congenital malformations and the use of ondansetron.  Therefore, these malformations would not qualify as adverse reactions."  *Id.*  Finally, FDA rejected the suggestion regarding "limitations of use," explaining that such a statement is "not intended to prohibit off-label use."  *Id.* at -4045.  Rather, FDA explained that such a statement is proper only when there is a "known risk that outweighs the therapeutic benefits in a certain clinical situation," a conclusion FDA could not draw for the use of Zofran to treat NVP.  *Id.*

Following FDA's April 2016 revisions, Novartis and FDA engaged in two more rounds of edits before reaching a final, mutually agreed label in September 2016.  *See* Exs. 38, 39.  Over the course of the parties' revision of the labeling, FDA gave detailed explanations of the reasons why the science did not support Novartis's proposed warnings.  It found that there "is no preponderance of the evidence to show that Zofran is ineffective when used for nausea and vomiting in pregnancy" and "no preponderance of the evidence that the benefits [of Zofran] do not outweigh its risks."  Ex. 39 at -4555.  And FDA admonished Novartis that warning about a risk of Zofran use in

pregnancy "***could be misleading in implying that FDA has some concerns about the role of Zofran in a variety of fetal malformations***." *Id.* at -4451 (emphasis added).

The Novartis labeling approved in 2016 advises doctors that the current science does not reliably indicate a potential risk of harm to fetuses exposed to Zofran:  "***[a]vailable data do not reliably inform the association of ZOFRAN and adverse fetal outcomes***." Ex. 40 § 8.1 (emphasis added).  The labeling also informs doctors that animal study data do not show any significant effects on fetal development other than a slight decrease in maternal body weight for rabbits.  *See id.*  It is against the backdrop of this label—and the accepted view of the scientific community that Zofran does not cause birth defects[6]—that Plaintiffs ask this Court to do something that FDA has consistently refused to do.

### E.     Information Available to FDA When It Rejected the Proposed Warnings

FDA had before it a broad array of information when it rejected the Reichmann citizen petition and Novartis's proposed labeling.  It, of course, had GSK's regulatory submissions— which had 500,000 pages of supporting information.  Beyond that, FDA had access to, and considered, significant amounts of epidemiological data; animal data; evidence regarding a possible biological mechanism of action; and adverse events reports.  None of this information supported any reasonable evidence of a causal association between Zofran and birth defects.  Indeed, FDA thought it would be "misleading" to warn pregnant women not to take Zofran.  *See* p. 9, *supra*.

#### 1.     *Epidemiological data*

Epidemiological data is superior to other potential evidence of causal association.  FDA has instructed its reviewers that "[f]ormal epidemiological studies provide the best means of

---

[6] *See* Ex. 12 (Sadler Dep.) at 254:13-18, 255:2-11; Ex. 5 (Abdulla Dep.) at 261:24-262:4.

evaluating whether a gestational exposure adversely affects the developing infant." Ex. 45 (FDA,

*Reviewer Guidance: Evaluating the Risks of Drug Exposure in Human Pregnancies* (Apr. 2005))

at 13. Plaintiffs' experts likewise conceded that epidemiological studies are required to prove

teratogenicity. *See, e.g.*, Ex. 10 (Louik Dep.) at 55:24-56:4; Ex. 12 (Sadler Dep.) at 45:3-21; Ex.

7 (Danielsson Dep.) at 60:11-15; Ex. 5 (Abdulla Dep.) at 52:19-22.

FDA analyzed the then-available epidemiological data in its formal denial of the citizen

petition. *See* Ex. 32 at 7-12. It focused its discussion on the following five studies, *id.* at 12 n.36:

1. **Anderka case control study**: The Anderka study analyzed 4,524 cases of birth defects. *Id.* at 7. The study authors reported that exposure to ondansetron was associated with a statistically significant 2.3-fold increase in the risk of cleft palate alone. *Id.* FDA noted a number of limitations to the study, stating that "the limitation of most concern in this study is the possibility of a chance finding." *Id.* at 7-8.

2. **Pasternak retrospective cohort study**: The Pasternak study examined 1,233 pregnancies exposed to ondansetron in the first trimester. *Id.* at 8. It reported no cases of cleft palate. *Id.* at 9. "The authors concluded that ondansetron use in pregnancy did not confer an increased risk of adverse pregnancy or fetal outcomes of interest." *Id.* at 8.

3. **Einarson prospective cohort study**: The Einarson study enrolled 176 women. The authors did not find any statistically significant differences regarding any harm to the fetus for major malformations. FDA observed that "the study was of limited size and statistical power." *Id.* at 9.

4. **Asker retrospective cohort study**: The Asker study examined 45 women who used ondansetron and found no reports of major birth defects. FDA noted that the study was "limited in its small sample size of pregnant women exposed to ondansetron and scant data on timing, dose, and duration of exposure." *Id.* at 10.

5. **Danielsson retrospective cohort study**: The Danielsson study examined 1,349 infants exposed to ondansetron during "early pregnancy." *Id.* at 10-11. The authors reported statistically significant associations with cardiovascular malformations and septal malformations. *Id.* at 11. FDA noted that detailed clinical information was missing. *Id.* It also observed that "[m]inor atrial/septal defects are common, are often subclinical, and may resolve without intervention." *Id.* at 11.

On the basis of this data, FDA found that "the available data are not sufficient to conclude that

there is a safety concern with regard to the use of ondansetron during pregnancy that would warrant

13

changes at this time to the pregnancy risk category." *Id.* at 14.  FDA reiterated this conclusion in rejecting Novartis's proposed revisions.  *See, e.g.*, Ex. 35 at -3947 ("Based on the Agency's review, the available human data do not support a clear conclusion on an increased risk of major congenital malformation."); Ex. 37 at -4056 ("[C]linical evidence do not demonstrate a consistent safety concern that warrants advising against use during pregnancy.").

The current Zofran label—which was approved before the recent Parker and Huybrechts epidemiological studies were published—states that "[p]ublished epidemiological studies on the association between ondansetron and fetal outcomes have reported inconsistent findings and have important methodological limitations hindering interpretation."  Ex. 41 (current Zofran label) § 8.1.  The label also summarizes the Anderka, Pasternak, and Danielsson studies.  *Id.*

### 2.  Animal data

In the 1980s, GSK conducted parallel sets of Zofran studies involving rats and rabbits in the United Kingdom (U.K.) and Japan.  *See, e.g.*, Exs. 115-118, 120-122 (Japan); Exs. 129-133, 135-137 (U.K.).  For all Japanese studies, there is a U.K. study that used the same animal (rats or rabbits) and formulation (oral or IV).  In the U.K., one additional study was conducted using Zofran administered intravenously to rabbits.

In all the U.K. and Japanese studies, a preliminary dose-finding study was first conducted to determine the appropriate dosing regimens for the corresponding final ("definitive") studies.  *See, e.g.*, Exs. 115, 117, 121-122 (Japan, preliminary); Exs. 116, 118, 120 (Japan, definitive); Exs. 129, 132, 133, 137 (U.K., preliminary); Exs. 130-31, 135-36 (U.K., definitive).  As Plaintiffs' expert Dr. Harvey has acknowledged, the studies were conducted in accordance with FDA regulatory guidelines.  Ex. 8 (Harvey Dep.) at 100:13-101:12, 111:23-112:4.

a.      U.K. studies

The four U.K. definitive studies are studies R10590 (rats – oral Zofran), R10937 (rats – intravenous Zofran), L10649 (rabbits – oral Zofran), and L10873 (rabbits – intravenous Zofran). For each study, the investigators found no evidence of harm to the fetus or teratogenicity.  As would be expected, the investigators observed occurrences of malformations and other endpoints. But the study investigators ***and FDA*** concluded that these issues were not related to Zofran; FDA concluded that Zofran "did not induce any teratogenic effect."[7]

- **Study R10590** (Ex. 130):  Malformations, *including cardiovascular defects*, occurred in both the treatment and control groups. Ex. 130 at -0202.  Investigators determined that the malformations were not related to Zofran because there was no dose response.[8]  *Id.* at -0064. A slight retardation in fetal skeletal ossification was reported in all treatment groups but was determined not to be attributable to the treatment.  *Id.* at -0064, -0070.

- **Study R10937** (Ex. 136):  Malformations occurred in all treatment groups.  Ex. 136 at -9802.  The study investigators concluded that Zofran has no "adverse effect upon the course or outcome of pregnancy or upon post-natal survival, growth and development of offspring exposed in utero."  *Id.* at -9788.

- **Study L10649** (Ex. 131):  Malformations, *including cardiovascular defects*, occurred in both the treatment and control groups. Ex. 131 at -0497-501.  The investigators concluded that the malformations were not related to Zofran because they occur spontaneously in rabbits and there was no indication of any consistent adverse response.  *Id.* at -0490. Incomplete or asymmetrical ossification (bone development) was reported in the mid- and high-dose groups but was determined not to be attributable to Zofran.  *Id.*

- **Study L10873** (Ex. 135):  There was a statistically significant increase in fetal deaths observed in the high-dose group, but the investigators concluded that it was associated with maternal bodyweight loss.  Ex. 135 at -0280-281.  Malformations, *including cardiovascular defects*, occurred in the treatment and control groups.  *Id.* at -0361.  The investigators determined that these malformations were not related to Zofran because "there was no evidence of any adverse trend or effect of treatment upon foetal development."  *Id.* at -0280.

---

[7] *See* Ex. 130 at -10064, -10070 (R10590); Ex. 136 at -9785-9788 (R10937); Ex. 131 at -10480 & -10490 (L10649); Ex. 135 at -10275, -10280 (L10873); Ex. 58 (FDA Pharmacology Review NDA 20-007) at -7906 (R10590), -7904 (R10937), -7908 (L10649), & -7905 (L10873).

[8] For true teratogens, researchers expect to see increased teratogenic effect with increasing dosages. *See* Ex. 12 (Sadler Dep.) at 223:9-20.

15

GSK submitted the definitive U.K. studies to FDA with NDA 20007.  FDA reviewed and analyzed the studies and agreed with the investigators that the studies showed no evidence of teratogenicity.  Ex. 58 at -7904-7908.[9]  FDA's conclusion is reflected in Zofran's approved labeling, which stated that "[r]eproduction studies have been performed in pregnant rats and rabbits at daily doses up to 4 mg/kg per day and have revealed no evidence of impaired fertility or harm to the fetus."  *E.g.*, Ex. 19.

### b.    Japanese studies

GSK also sponsored a set of three parallel studies in Japan to meet the requirements for approval in Japan.  GSK disclosed all three Japanese studies by name and number to FDA.  ***Again, all three combinations of animal and Zofran formulation tested in the Japanese studies were also studied in the U.K.***, as the following chart shows:

| Species | Route | U.K. Studies | | Japanese Studies | |
|---------|-------|-------------|------------|-------------|------------|
|         |       | Preliminary | Definitive | Preliminary | Definitive |
| Rats    | Oral  | R10564      | **R10590** | 100421      | **100422** |
| Rats    | IV    | R10874*     | **R10937** | 100423      | **100424** |
| Rabbits | Oral  | L10565      | **L10649** | 881001* 881002 | **100441** |
| Rabbits | IV    | L10867*     | **L10873** |             |            |

\* Non-pregnant animals were used.

*See* Exs. 115 (Study 100421); 116 (Study 100422); 117 (Study 100423); 118 (Study 100424); 120 (Study 100441); 121 (Study 881001); 122 (Study 881002); 123 (Study L10873 Supp.); 129 (Study L10565); 130 (Study R10590); 131 (Study L10649); 132 (Study R10564); 133 (Study L10867); 135 (Study L10873); 136 (Study R10937); 137 (Study L10874).

Japanese study 100422 involved the oral formulation of Zofran in rats.  Ex. 116.  It is the counterpart to U.K. study R10590.  Nippon Glaxo sponsored the study, and outside researchers at

---

[9] GSK also conducted a fertility study in the U.K. involving rats (study **R10615**).  Ex. 134.  That study produced one malformation in the low-dose group.  Ex. 134 at -9408.  GSK also provided this study to FDA in NDA 20-007, and FDA concluded that it did not affect reproductive performance.  Ex. 58 at -7903.

Hashima Research Laboratory conducted the study.  *Id.* at -2502.  According to the investigators, the study produced "significant increases in the incidences of fetuses with skeletal variations in the [low-dose] group and with visceral anomalies in the [high-dose] group."  Ex. 116 at -2534. The investigators observed, however, that "these incidences had no dose-dependency" and were "well known to occur spontaneously in rats."  *Id.*  The outside investigators thus concluded that the drug "was considered to have no teratogenicity."  *Id.*  The investigators cited data that reported the incidence of fetal death and malformations in untreated rats of the same strain, bred in similar years, and purchased from the same company (Morita 1987).[10]  *Id.* at 2534 n.7.  The incidence of malformations in the study was well within the background control range.  *See* Exs. 80, 116. Notably, there was one ventricular septal defect (VSD) (0.6%) in the high-dose group, and Morita 1987 reported the background range for VSDs as 0-3.01%.  *See* Exs. 80 at 168-169; 116 at -2554.[11]

GSK submitted a translated version of Japanese study 100422 to FDA in 1997 in connection with NDA 20871.  Ex. 116.  FDA reviewed study 100422 and concluded that Zofran "*was not teratogenic.*"  Ex. 59 (FDA Pharmacology Review 20-781) at -2187 (emphasis added). FDA compared study 100422 to its U.K. counterpart, Study R10590, concluding that "[t]hese results are comparable to those for a Segment II. oral teratogenic study in female rats that was included in the original submission for NDA 20,007."  Ex. 59 at -2191.

The same outside laboratory also conducted definitive study 100424.  Ex. 118.  Study 100424 examined the effects of IV Zofran on rats; it is the counterpart to U.K. study R10937. Malformations occurred in all groups, including the untreated control group.  *Id.* at -7602-604.  As

---

[10] Ex. 80 (Morita et al. (1987)) at 154-155, 161-162, 168-169, 175-176, 182-183.

[11] The same laboratory conducted the preliminary dosing study for this study, study 100421 (Ex. 115).  That study produced no fetal lethal, growth-delaying, or teratogenic effects related to the treatment of Zofran in any treatment group.  *See* Ex. 115 at -6979, -6991; *see also* Ex. 8 (Harvey Dep.) at 155:24-156:3 (agreeing that the study identified no malformations).

with study 100422, the investigators concluded that the malformations were not related to Zofran because "these incidences had no dose-dependency" and the malformations "were well known to occur spontaneously in rats." Ex. 118 at -7584.  As with study 100422, the investigators cited to the background control data as proof that the malformations were within background rates.  *Id.* at -7584 n.7.  For example, the high-dose group had two VSDs (1%), which was well within the background range for VSDs of 0-3.01%.  *See* Exs. 80 at 168-169; 118 at -7604.[12]

Finally, Nippon Glaxo conducted study 100441 involving the oral formulation of Zofran in rabbits.  Ex. 120.  Study 100441 is the Japanese equivalent of U.K. study L10649.  The study investigators did not find any fetal lethal or teratogenic effect in any treatment group.  *Id.* at -7398, 7413-74145.  The investigators did find some evidence of fetal growth retardation in the mid- and high-dose groups, but they concluded that the retardation was due to maternal toxicity and not directly related to the treatment of Zofran.  *Id.* at 7415.

The Japanese studies were published in 1992 and were identified in a free database called Toxnet as of May 1995 through the present.  *E.g.*, Exs. 90, 91.[13]  In December 1993, GSK identified all of the Japanese animal studies by name and number in an annual report to FDA pursuant to 21 C.F.R. § 312.33.  *See* Ex. 107 at -3819-20 (1993 Annual Report).  GSK identified the studies as "[s]tudies performed specifically to satisfy Japanese regulatory requirements."  *Id.* at -3819.  GSK further explained that "[t]hese studies are either repetitive or provide no new significant safety

---

[12] The same laboratory conducted the preliminary dosing study associated with this study, study 100423 (Ex. 117). That study produced no fetal lethal, growth-delaying, or teratogenic effects related to Zofran treatment in any treatment group.  Ex. 117 at -7040; *see also* Ex. Ex. 8 (Harvey Dep.) at 155:24-156:3 (agreeing that the study identified no malformations).

[13] Toxnet, https://toxnet.nlm.nih.gov, is maintained by the National Institutes of Health and "provides free access and easy searching in a cluster of databases covering toxicology, hazardous chemicals, environmental health, and toxic releases, Ex. 71 (Ding, D., et al., 2010).  The relevant Toxnet database, the Development and Reproductive Toxicology Database, is co-funded by FDA's National Center for Toxicology Research.  *See* https://toxnet.nlm.nih.gov/newtoxnet/dart.htm.

information." *Id.* Plaintiffs concede that GSK's identification of the studies by name and number satisfied GSK's reporting requirement under 21 C.F.R. § 312.33. Pls.' Counterstatement of Facts ¶ 4 (filed Aug. 2, 2018); *accord* Ex. 8 (Harvey Dep.) at 149:1-17.

### 3.   *Mechanism of action*

Plaintiffs' expert, Bengt Danielsson, has proffered in a published study a hypothetical mechanism of teratogenicity, by which he posits that ondansetron has the "potential to cause QT prolongation and cardiac arrhythmia," which can interrupt blood and oxygen supply to the embryo. Ex. 68 (Danielsson et al. (2014)) at 137.   Dr. Danielsson has stated that his theory is "hypothetical[]." *Id.* And Plaintiffs' expert Dr. Sadler concedes that no *in vitro* study shows that Zofran can cause fetal arrhythmia. Ex. 12 (Sadler Dep.) at 237:20-238:22. FDA was well aware of Dr. Danielsson's hypothesis when it rejected Plaintiffs' desired warnings.

First, FDA devoted an entire page of analysis to the Danielsson study in its denial of the Reichmann citizen petition. Ex. 32 at 10-11.

Second, GSK cited the study to FDA in an annual report submitted in March 2015. *See* Ex. 95 at -4793.[14]

Third, in connection with the citizen petition, a third party submitted a comment articulating the same alleged mechanism of action:

> Among adults, ondansetron has the potential to cause QT prolongation and cardiac arrhythmias through inhibition of the HERG channel, a cardiac repolarization potassium ion-channel critical for cardiac rhythm regulation. . . . Several QT labelled drugs have displayed dose-dependent teratogenicity, particularly causing ventricular septal defects. Mechanistic studies have demonstrated that teratogenicity is a consequence of drug-induced embryonic cardiac arrhythmias, and reperfusion damage due to interrupted blood and oxygen supply to the embryo. . . . This deleterious effect of 5-HT3 receptor antagonist on cardiac tissue provides

---

[14] Plaintiffs claim that Dr. Danielsson's hypothesis is based on a 1994 study by de Lorenzi and a 2000 study by Kuryshev. Pls.' Preemption Opp'n at 15-16. GSK included both studies in a 2005 submission to FDA. *See* Ex. 103 at -4460.

further support for the potential of ondansetron-induced cardiotoxicity on the developing embryo.

Ex. 30 (Comment from Simerpal Gill (2015)).



Not only was FDA aware of this theory, FDA informed Novartis when it rejected its proposed labeling change that "there is no evidence, nonclinical or *mechanism of action*, that raises concerns for adverse fetal outcomes with Zofran." Ex. 39 at -4451 (emphasis added).

Fifth, FDA considered the implications of QT prolongation because the FDA-approved labeling specifically mentions the possibility for QT prolongation in the person ingesting Zofran (not in the fetus, which is Dr. Danielsson's hypothesis). Ex. 41 § 5.2. FDA specifically referenced this portion of the label in rejecting Mr. Reichmann's citizen petition. *See* Ex. 32 at 16 ("QT prolongation [is] already clearly identified on current ondansetron labeling as [a] potential adverse reaction[] for health care providers to consider before treating any patient with ondansetron, whether pregnant or not.").

### 4.    *Adverse event reports*

FDA also had access to adverse evert reports from GSK and from its own database, and had received analyses of those reports from both GSK and Novartis. An "[a]dverse drug experience" is "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related." 21 C.F.R. § 314.80(a). An adverse event report (AER), sometimes

called a case report, is a description of an adverse drug event experienced by a patient, even if unrelated to the drug. Ex. 42 (FDA, *Guidance for Industry:  Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines* (Draft 2001)) at 5.  Patients, healthcare providers, attorneys (including plaintiffs' attorneys in tort litigation), and others may submit AERs to drug manufacturers and/or directly to FDA.  Ex. 50 (FDA, *Questions and Answers on FDA's Adverse Events Reporting System (FAERS)*) at 1.  Manufacturers must submit AERs for a "serious and unexpected" adverse event—which usually includes birth defects—within 15 days of receipt. 21 C.F.R. § 314.80(a), (c)(1)(i).  Manufacturers must also provide periodic safety reports analyzing all 15-day reports and providing copies of all AERs received during the period. §§ 314.80(c)(2)(ii)(*a*), (*b*).

FDA also maintains its own database, FAERS, which contains AERs that it receives, including from manufacturers.  Ex. 50 (FDA, *Questions and Answers on FDA's Adverse Events Reporting System (FAERS)*) at 1.  Clinical reviewers in FDA's Center for Drug Evaluation and Research evaluate the reports in the FAERS database "to monitor the safety of products after they are approved by FDA."  Ex. 50 (FDA, *Questions and Answers on FDA's Adverse Events Reporting System (FAERS)*) at 1.

FDA had access to substantial information regarding AERs when it rejected the Reichmann citizen petition and Novartis's proposed labeling.  It had access to AERs in its own database, as well as those submitted by GSK in accordance with the reporting requirements outlined above.  In addition, in its 2011 safety report, GSK retrieved 765 Zofran-related reports from its worldwide safety database—50 of which reported a congenital anomaly—and provided a detailed summary of the reported anomalies.  *See* Ex. 27 at -4314-19.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████

Novartis cited the AERs to FDA to support a proposed warning that "[c]ases of congenital malformations have been reported in infants whose mothers took ondansetron during pregnancy." Ex. 36 at -3902.  FDA firmly refused:  "[W]e do not believe there is any basis to suspect drug attribution to [reported] congenital malformation cases for them to qualify as 'adverse reactions.' Only adverse reactions, where there is some basis to believe that the drug plays a role in the adverse outcome, should be included in labeling . . . ."  Ex. 39 at -4450; *see also* Ex. 37 at -4051.  It explained:  "It is not possible to rely on case reports of congenital anomalies to determine drug attribution given that the background incidence of major congenital anomalies is 2-4%."  Ex. 39 at -4450.  And it specifically cautioned against drawing conclusions from reported heart defects: "[C]ardiac malformations is the most common congenital malformation, affecting nearly 1% of births per year in the US.  Given such high prevalence, it is expected that such malformations would be reported with the use of Zofran by chance alone."  *Id.* at -4465.

## STANDARD OF REVIEW

The preemption issue arises in a different procedural context than it did when the Court last considered it.  The Court decided the prior summary judgment motion on the assumption that preemption is a jury question.  On the basis of that assumption, it held that GSK bore the burden to show that "there is no genuine dispute as to any material fact."

That standard no longer applies.  Rather, this Court has before it a legal inquiry akin to what courts do when they construe patent claims under *Markman*.  *Albrecht*, 139 S. Ct. at 1680.  In *Albrecht*, the Supreme Court held that preemption is purely a matter of law for courts.  *See id.* at 1679 ("We do not further define *Wyeth*'s use of the words 'clear evidence' in terms of evidentiary standards . . . because . . . courts should treat the critical question not as a matter of fact for a jury but as a matter of law for the judge to decide.").  As the Court acknowledged, preemption analysis often "involves the use of legal skills to determine whether agency disapproval fits facts that are not in dispute." *Id.* at 1679-80.  The Supreme Court also recognized that courts may sometimes have to resolve "contested brute facts," but it held that those factual questions are "subsumed within an already tightly circumscribed legal analysis" and are "part and parcel of the broader legal question." *Id.* at 1680.

Here, the Court's task in deciding this summary judgment motion is to identify from the record what evidence FDA had when it rejected the proposed labeling changes (including to resolve any factual disputes on this point).  The legal inquiry before the Court then becomes whether any information that was not before FDA permitted a CBE labeling change and would have been material to FDA's rejections.  Because preemption is a question of law, the Court may properly resolve any disputes of fact on the basis of the evidentiary record, rather than holding a bench trial. *See id.*; *see also, e.g.*, *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 643-45 (1st Cir. 2000) (discussing district court's authority to draw factual inferences from the record when sitting as factfinder).

## ARGUMENT

### I.  *Wyeth* and *Albrecht* Provide the Legal Framework that Governs Preemption Here.

*Wyeth* and *Albrecht* control this case.  The underlying question under both cases is "whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from

adding any and all warnings to the drug label that would satisfy state law." *Albrecht*, 139 S. Ct. at 1678. In many situations, federal law prohibits manufacturers from altering their labels without FDA's consent, meaning that a state-law claim that would require a labeling change is preempted. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623-24 (2011). But, in *Wyeth*, the Court observed that the CBE regulation authorizes manufacturers to revise warnings unilaterally to "add or strengthen a contraindication, warning, precaution, or adverse reaction." 555 U.S. at 568 (quoting 21 C.F.R. § 314.70(c)(6)(iii)(A)). Finding that the manufacturer had "newly acquired information" to justify a label change under the CBE regulation, the Court concluded that the manufacturer had failed to show that compliance with federal and state law was impossible. *Id.* at 569-70.

The Court recognized that "FDA retain[ed] authority to reject labeling changes made pursuant to the CBE regulation in its review of the manufacturer's supplemental application." *Id.* at 571. The Court concluded, however, that compliance with federal and state law nonetheless would be possible "absent clear evidence that the FDA would not have approved a change to [the drug's] label." *Id.* The Court found no such evidence in the case. According to the Court, neither FDA nor the manufacturer had devoted "more than passing attention" to whether the labeling should include the warning desired by the plaintiff. *Id.* at 572. And FDA's communications with the manufacturer about the labeling were "intermittent[]," and at no point did the manufacturer supply FDA with an "evaluation or analysis" of the alleged risks. *Id.* at 561, 572-73.

The first step in any *Wyeth* analysis is to ask whether "the CBE regulation allows a brand name manufacturer to make the particular type of change" that the plaintiffs say was required. *In re Celexa*, 779 F.3d 3at 41; *see also, e.g.*, *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 708 (2d Cir. 2019) (requiring, as a "first step," that the plaintiff identify "a labeling deficiency that [Defendants] could have corrected using the CBE regulation" (alteration in original)); *Dolin v.*

*GlaxoSmithKline LLC*, 901 F.3d 803, 812 (7th Cir. 2018) ("To add a warning through the CBE regulation, GSK needed newly acquired information . . . that would allow it to add a warning about suicide risk in adults.").  Thus, for a state law claim to survive preemption, the claim must be based on allegations that the manufacturer should have changed the drug's labeling in a manner permitted by the CBE regulations and that there was "newly acquired information" that justified the allegedly required change.  *See In re Celexa*, 779 F.3d at 41-42 (citing 21 C.F.R. §§ 314.70(c)(6)(iii), 314.3(b)).  Absent such information, a state law failure-to-warn claim impermissibly second-guesses FDA and is preempted.  *See id.* at 43 (affirming dismissal of failure-to-warn claim because plaintiffs did not plead existence of newly acquired information).

Other courts have similarly dismissed cases in which plaintiffs could not plead or muster evidence of "newly acquired information."  *See, e.g.*, *Gibbons*, 919 F.3d at 708 (dismissing claims where there was no basis to conclude that reports of adverse events and studies "presented a different type of risk than those the company had discussed with the FDA, or more severe or more frequent than . . . events that the government already knew about"); *Dolin* at 815-16 (rejecting plaintiff's claims that GSK withheld data from FDA because the evidence "shows that the FDA was aware of the nature of the data it received from GSK" and had all the data contained in an article on which the plaintiff relied); *McGrath v. Bayer Healthcare Pharm., Inc.*, No. 18 CV 2134, 2019 WL 2582530, at *4 (E.D.N.Y. June 24, 2019) (concluding that "scientific minutiae on top of technical jargon" could not save a claim from preemption "if that information ultimately does not plead a plausible causal association").

A manufacturer may also show that, notwithstanding the existence of "newly acquired information" permitting use of the CBE procedure, there exists "clear evidence that the FDA would

not have approved a change" to the labeling.[15]  *Wyeth*, 555 U.S. at 571.  Courts dismiss cases under this prong when FDA considered the precise safety risk at issue and concluded that a labeling change was not justified.  *See, e.g.*, *Dolin*, 901 F.3d at 813-14 (finding clear evidence where the manufacturer repeatedly asked FDA to reconsider its position and each time FDA said no); *Cerveny*, 855 F.3d at 1105 (rejection of citizen petition may constitute clear evidence that FDA would have rejected a manufacturer-initiated change to drug label); *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 873 (7th Cir. 2010) ("The 'clear evidence' in this case is the agency's refusal to require a reference to SJS/TEN on the label of over-the-counter drugs containing ibuprofen, when it had been asked to do so in [a] submission to which the agency was responding."); *Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1280 (W.D. Okla. 2011) (finding preemption where FDA had rejected citizen petitions for drugs within the same SSRI class and concluded there existed no evidence of a causal association between these types of drugs and increased suicidality).

The Supreme Court set out to clarify *Wyeth*'s "clear evidence" test in *Albrecht*.  The Supreme Court rejected the view that the test was intended to incorporate a particular evidentiary burden of proof, such as "preponderance of the evidence" or "clear and convincing evidence." *Albrecht*, 139 S. Ct. at 1679.  Turning to the substance of the test, the Court articulated a two-part test for applying the "clear evidence" standard.  According to the Court,

> In a case like *Wyeth*, showing that federal law prohibited the drug manufacturer from adding a warning that would satisfy state law requires the drug manufacturer to show [1] that it fully informed the FDA of the justifications for the warning required by state law and [2] that the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning.

---

[15] *Albrecht* had no occasion to analyze the threshold requirement that there exist "newly acquired information."  Merck had conceded "that the FDA's CBE regulation would have permitted Merck to try to change the label to add a warning," but claimed that "FDA would have rejected that attempt."  139 S. Ct. at 1675.

*Id.* at 1678.  In the end, the Court emphasized, the overarching inquiry is simply whether "the relevant federal and state laws 'irreconcilably conflic[t].'"  *Id.* at 1679 (alteration in original) (citation omitted).

Both features of *Wyeth*, as clarified by *Albrecht*, compel preemption here.  Plaintiffs' claims are not based on "newly acquired information."  To the contrary, as elaborated below, their claims are based on animal studies *known to FDA* or that duplicated studies *known to FDA*; a hypothetical mechanism of action *known to FDA*; adverse event reports *known to FDA*; and nitpicking of the Einarson study *known to FDA*.  And none of this comes close to "reasonable evidence of a causal association" between Zofran and birth defects.

Moreover, it is hard to imagine clearer evidence that it was impossible for GSK to change its labeling than FDA's official agency actions in this case.  FDA emphatically and repeatedly rejected the very labeling changes that Plaintiffs desire, calling the proposed labeling "misleading."  And it did so with the benefit of all material information.  FDA's rejections of the proposed labeling changes in 2015 and 2016 are irrefutable proof that it was impossible for GSK to change its label at an earlier date; they leave no doubt that the CBE process was not available to GSK to change its labeling.  *See Cerveny*, 855 F.3d at 1101 (finding 2009 FDA decision clear evidence that it would not have approved same warning in 1992); *Rheinfrank v. Abbott Labs., Inc.*, 119 F. Supp. 3d 749, 769 (S.D. Ohio 2015) (holding that, because FDA rejected defendant's proposed label change in 2005, "it likely would have rejected an earlier-submitted CBE seeking to add the same language to the label") *aff'd*, 680 F. App'x 369 (6th Cir. 2017).

## II.    No "Newly Acquired Information" Permitted a CBE Labeling Change, and FDA Was Fully Informed of All Material Information When It Rejected the Labeling Changes.

In response to GSK's prior motion for summary judgment on preemption grounds, Plaintiffs identified four categories of information that they claimed would have changed FDA's

mind:  (1) three Japanese animal studies, (2) Dr. Danielsson's theoretical biological mechanism of action, (3) adverse event data that they claim FDA lacked, and (4) information concerning the Einarson study.   Order on GSK's Preemption MSJ at 16.   This Court must decide two related questions regarding these categories of information:   (1) do they constitute "newly acquired information" as defined by FDA's regulations that would justify a labeling change under the CBE regulation and, even if so, (2) was FDA fully informed of all material information in these categories when it rejected the Reichmann and Novartis labeling changes?

These questions are closely related.  FDA must have been fully informed of the "material information" justifying a label change.  *Albrecht*, 139 S. Ct. at 1678, 1680.  And "the term 'clear evidence' implies that a materiality standard should apply to claims based on alleged false statements and omissions to the FDA."  Order on GSK's Preemption MSJ at 35.  For example, this Court recognized, "[i]f . . . the allegedly omitted information was cumulative, irrelevant, trivial, or inconclusive, its omission surely was of no consequence."  *Id.*  As support for that proposition, the Court cited *Neder v. United States*, 527 U.S. 1 (1999), which defines "material" for purposes of the tax fraud statute as having "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  Order on GSK's Preemption MSJ at 35 (alteration in original).

The decisionmaking body here, of course, is FDA.  And FDA regulations cabin FDA's decisionmaking under the CBE regulation.  At a minimum, then, for information to be "capable of influencing" FDA under that regulation, the information must qualify as "newly acquired information," and it must contain "reasonable evidence of a causal association" between the drug and "clinically significant hazards."  21 C.F.R. § 201.57(c)(6)(i); § 314.70(c)(6)(iii).

The federal government recognized this concept in its amicus brief in *Albrecht*. There, the government explained that "an actual FDA labeling decision might not in itself resolve preemption" if the plaintiff claims there exists "'newly acquired information' that the drug caused a sufficiently serious hazard to have allowed the manufacturer to update its labeling under the CBE process." Brief for the United States, No. 17-290, at 27-28 (citations omitted). In that situation, it explained, "the preemption inquiry would necessarily focus on the information that FDA previously evaluated in light of the governing statutory and regulatory scheme . . . in order to determine whether any arguably new information is materially different from the information that FDA previously determined to be insufficient." *Id.* at 28; *see also Albrecht*, 139 S. Ct. at 1680 (instructing courts to consider "the nature and scope" of the prior FDA determination).

In their July 1 submission, Plaintiffs improperly invoked dictionary definitions to define "material" as "having real importance or great consequences" or "being significant or relevant." Pls.' Supp. Mem. (filed July 1, 2019) at 6 n.4. Those definitions are not and cannot possibly be the standard in this highly regulated context. Information may be "relevant" in a dictionary sense of the word, or even be required in a technical sense, but also duplicate information FDA already had before it or rejected. Such information, which is not "newly acquired information," would not be material to FDA under the CBE regulation. Order on GSK's Preemption MSJ at 35; Brief of United States, *supra*, at 27-28.[16]

---

[16] Plaintiffs' definition also fails on its own terms. The *New Oxford American Dictionary* defines "material" as "significant, influential, or relevant, esp. to the extent of determining a cause or affecting a judgment." *New Oxford American Dictionary* 1078-79 (3d ed. 2010) (emphasis added). Thus, to determine whether information is material, one must know the context (here, a change to a drug's labeling) and the criteria the decisionmaking body applies (here, defined by FDA's regulations). *Webster's* also defines "material" to mean "requiring serious consideration by reason of having a certain or probable bearing on the proper determination of a law case or on the effect of an instrument or on some similar unsettled matter." *Webster's Third New International Dictionary of the English Language Unabridged* 1392 (2002). These definitions make clear, as this Court previously recognized, that materiality must be tied to the decisionmaking process of the decisionmaking body, which in this case is controlled by FDA regulations.

## A.     None of Plaintiffs' Categories of Information Is "Newly Acquired Information," and None Would Have Been Material to FDA.

None of the information identified by Plaintiffs would permit a labeling change under the CBE regulation, and none of it would have been material to FDA.

### 1.     The Japanese animal studies

Plaintiffs claim that GSK improperly hid from FDA "three Japanese studies showing teratogenicity." Pls.' Mem. in Opp'n to GSK's Mot. for Summ. J. Based on Federal Preemption (Pls.' Preemption Opp'n) at 9.  Not so.  In compliance with federal regulations, in 1993 GSK identified the Japanese studies to FDA and told FDA that "[t]hese studies are either repetitive or provide no new significant safety information." Ex. 107 at -3819.  That was entirely accurate. Each of the Japanese studies had a counterpart study conducted in the U.K.  *FDA reviewed the results of the U.K. studies and concluded that they do not show teratogenicity.  FDA also reviewed the results of Japanese study 100422 and concluded that it too did not show evidence of teratogenicity.*  With the exception of Plaintiffs' paid expert, every researcher who has reviewed GSK's animal studies—whether at FDA, at third-party research laboratories, or at GSK—has concluded that they do not show teratogenicity.

To defeat preemption, the Court would have to conclude that the Japanese animal studies are "reasonable evidence of causal association," because only such evidence could permit a labeling change and thus be material under *Albrecht*.  No regulatory authority or medical organization has ever concluded that there is reasonable evidence of a causal association between Zofran and birth defects; this Court would be first to so hold.  That conclusion is impossible on this record.  Plaintiffs invoke the opinion of their expert, Dr. Danielsson, but his opinion contradicts FDA's dispositive conclusions.  They also invoke the opinion of their regulatory expert, Dr. Harvey, that FDA would have viewed three heart defects across two rat studies as

material.  Even were his opinion admissible (it is not), it is irrelevant:  he did not even read the studies, and his speculative opinion contradicts FDA guidance on interpreting animal studies.

> **a.** *GSK properly disclosed the Japanese studies to FDA and accurately told FDA that they "are either repetitive or provide no new significant safety information."*

Plaintiffs' position with respect to the animal studies boils down to argument that GSK misled FDA by referencing Japanese studies 100423, 100424, and 100441 by name and number in its annual report and not providing FDA with the full translated text.  But FDA fully knew all material information regarding GSK's animal studies:  the Japanese studies were "repetitive and provide[d] no new safety information."  Ex. 107 at -3819.

As an initial matter, Plaintiffs do not dispute that GSK's identification of the Japanese studies by name and number complied with regulations.  *See* Pls.' Counterstatement of Facts (filed Aug. 2, 2018) ¶ 4.  Dr. Harvey, Plaintiffs' regulatory expert, admitted that 21 C.F.R. § 312.33 requires sponsors to submit "a list of the preclinical studies (including animal studies) completed or in progress during the past year and a summary of the major preclinical findings."  Ex. 16 (Harvey Rep.) at 21.  That is what GSK did.  FDA, moreover, had access to information about the studies on Toxnet.  S*ee* p. 18, *supra*.

The Japanese studies duplicated studies conducted in U.K. using the same animals (rats and rabbits) and formulations (oral and IV).  ***Every study investigator, both in the U.K. and Japan, concluded that the studies did not show teratogenicity.***  Ex. 12 (Sadler Dep.) at 246:4-9; Ex. 7 (Danielsson Dep.) at 159:11-23.  And, to be clear, the study investigators were not all GSK employees.  The Japanese studies on which Plaintiffs rely most heavily, studies 100422 and 100424, were conducted by an outside laboratory.  Exs. 116, 118.  That laboratory noted that the observed defects were well-known to occur spontaneously in rats and were well within the historical background rates for similar rats.  *See* pp. 15-17, *supra*.  The Japanese regulators must

have agreed as well.  As Plaintiffs' expert Dr. Sadler admitted, not one regulatory agency in the world (including Japan) lists Zofran as a teratogen or as developmentally toxic. Ex. 12 (Sadler Dep.) at 254:13-18.

**GSK, moreover, submitted the U.K. definitive studies and Japanese study 100422 to FDA, and FDA agreed that they did not show evidence of teratogenicity.**  Ex. 58 at -7906 (R10590); -7904 (R10937); -7908 (L10649); & -7905 (L10873); Ex. 59 at -2187 (100422).  It thus concluded that they did not warrant a different pregnancy warning.  GSK could only have changed its label if Japanese studies 100423, 100424, and 100441 are "newly acquired information" revealing "risks of a different type or greater severity or frequency than previously included in submissions to FDA" that constitutes "reasonable evidence of a causal association." 21 C.F.R. § 201.57(c)(6)(i); § 314.3.  They are not.

Each supposed "problem" that Plaintiffs identify in studies 100423, 100424, and 100441 occurred in the other studies as well, and FDA concluded that they were not evidence of teratogenicity:

- **100423:**  Plaintiffs claim that preliminary dose-finding study 100423 found an increase in embryofetal death.  Pls.' Preemption Opp'n at 11.  This is contrary to the findings of the study investigators.  Ex. 117.  Their regulatory expert Dr. Harvey conceded that the study was "clean."  Ex. 8 (Harvey Dep.) at 155:24-161:21.  In any event, GSK submitted to FDA a rabbit study that showed an increase in embryofetal deaths, L10873, and FDA determined that category B was appropriate notwithstanding that finding.  *See, e.g.*, Ex. 19.

- **100424:**  Plaintiffs claim that study 100424 shows an increase in embryofetal death and increased malformations, included VSDs.  Pls.' Preemption Opp'n at 11.  This is contrary to the conclusions of the study investigators.  Ex. 118.  Also, as just mentioned, GSK submitted to FDA a rabbit study that reported an increase in embryofetal deaths, L10873.  GSK also submitted to FDA Japanese study 100422, which reported a VSD and visceral malformations in treated animals.  In both instances, FDA concluded that the studies did not show evidence of teratogenicity.  Exs. 58 at -7905, 59 at -2187.

- **100441:**  Plaintiffs claim that study 100441 shows an increase in skeletal defects and decreased ossification.  Pls.' Preemption Opp'n at 11; *see also* Ex. 14 (Danielsson Rep.) tbl. 13.  GSK submitted to FDA three studies reporting decreased ossification (L10873,

R10590, and L10649), and those studies did not convince FDA that Zofran has treatment-related effects or was teratogenic.  The investigators who conducted study 100441 concluded that the decreased ossification resulted from maternal toxicity and not from exposure to Zofran.  Ex. 120.  Dr. Danielsson agreed.  Ex. 14 (Danielsson Rep.) at 56.

Plaintiffs rely heavily on two VSDs (a heart defect known to occur spontaneously in rates) that occurred in the treatment group in study 100424.  The very same defect, however, occurred in study 100422 that was provided to FDA in full.  *See* Ex. 116 at -2554; Ex. 59 at -2187.  And spontaneous heart defects were found across many of the studies provided to FDA, none of which FDA found to be evidence of teratogenicity.  *See* Exs. 130 at -0202 (Study R10590); 131 at -0497 (Study L10649); 135 at -0361, -0380-426 (Study L10873); 116 at -2554, -2575-579, -2638-641 (Study 100422).  Studies R10590, L10649, L10873, and 100422—all of which were provided to FDA in full—together reported ten heart defects in the treatment groups, with another three in the control groups.  *See* Exs. 130 at -0202 (Study R10590); 131 at -0497 (Study L10649); 135 at -0361, -0380-426 (Study L10873); 116 at -2554, -2575-579, -2638-641 (Study 100422).  These spontaneous defects did not trouble FDA; it concluded that the studies did not show teratogenicity.  Study 100424, which FDA did not have in full, produced another two heart defects in the treatment groups.  *See* Ex. 118 at -7682-685.  Study 100424 and its two spontaneous defects could not have possibly have prompted a labeling change, notwithstanding the findings of the study investigator and all the evidence available to FDA.  No credible evidence supports that speculative conclusion.

This case is analogous to *McGrath*, 2019 WL 2582530.  There, the plaintiff seized on a mouse study finding a connection between the at-issue class of drugs and "significant metabolic disorders and kidney injury."  *Id.* at *5.  The district court held that the mouse study, which had "yet to be replicated, and only demonstrates an adverse reaction in mice," did not constitute reasonable evidence of association that would warrant a label change.  *Id.*  Quoting *Albrecht*, the court stated that the manufacturer's federal duty to revise labeling arises "only 'when the risks of

33

a particular drug become *apparent*,'" and it held that the mouse study did not suffice to make the risk apparent.  *Id.* (quoting 139 S. Ct. at 1677) (emphasis in original).

The case for preemption is even stronger here because here, unlike in *McGrath*, the animal studies did ***not*** find a causal association between Zofran and birth defects.  Although Plaintiffs rely heavily on the two VSDs found in study 100424, Plaintiffs' experts concede that none of the Zofran animal studies showed a statistically significant association with either heart defects or orofacial defects.  *See* Ex. 12 (Sadler Dep.) at 245:21-246:3; Ex. 7 (Danielsson Dep.) at 161:5-12.  Plaintiffs' experts have also admitted that an association that is not statistically significant cannot be distinguished from chance.  Ex. 12 (Sadler Dep.) at 70:24-71:2; Ex. 5 (Abdulla Dep.) at 60:3-13.  In addition, according to Plaintiffs' expert Dr. Sadler, researchers expect to see teratogenic effect with increasing dosages.  Ex. 12 (Sadler Dep.) at 223:9-10.  Yet he admitted that the Zofran animal studies showed no such effect for any birth defect.  *Id.* at 248:16-21.  These concessions bolster what is obvious from the record:  FDA correctly concluded that the U.K. studies and Japanese study 100422 do not show evidence of teratogenicity, and there is nothing about studies 100423, 100424, and 100441 that would have changed FDA's mind.

FDA also reviewed a substantial amount of human epidemiological data when it rejected the citizen petition and Novartis's proposed labeling changes.  FDA has emphasized that human data can "supersede animal data."  Ex. 46 (FDA, *Guidelines for Industry: Reproductive and Developmental Toxicities—Integrating Study Results to Assess Cancers* (Sept. 2011)), at 10; *see also* 79 Fed. Reg. 72,064, 72,080 (Dec. 4, 2014) ("[W]e have determined that human data should precede animal data [in the labeling] because it is the most clinically relevant."); *Lynch v. Merrell-Nat'l Labs., Div. of Richardson-Merrell, Inc.*, 830 F.2d 1190, 1194 (1st Cir. 1987) ("Studies of this sort [animal studies] singly or in combination, do not have the capability of proving causation in

human beings in the absence of any confirmatory epidemiological data.").  Indeed, FDA told Novartis that it was rejecting Novartis's proposed warning discouraging the use of Zofran in pregnancy "*based on the available human information*."  Ex. 35 at -3945 (emphasis added).

Finally on this point, Plaintiffs invoke a comment in a 2014 redlined, draft labeling in which FDA asked for "full details of animal reproduction studies" in connection with potential labeling revisions.  Exs. 92, 93.  FDA's comment was made on top of the existing draft language that summarized the U.K. animal studies.  Ex. 93.  In response, GSK identified and summarized the U.K. studies and specifically noted that the referenced studies were contained in GSK's original NDA.  Ex. 94 at -4712.  For all the reasons set forth, the Japanese studies were not materially different than the U.K. ones.  The record does not support a conclusion that FDA would have changed Zofran's labeling, ignoring the available epidemiological data, if only it had received the full text of the Japanese studies in 2014.  Because the Japanese studies did not "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA," namely the submission of the parallel U.K. data, they are not "[n]ewly acquired information" and cannot support a CBE label change.  *See* 21 C.F.R. § 314.3(b).  And they could not have been material to FDA.

> b.    *Dr. Danielsson's opinion contradicts FDA's conclusions and should be rejected.*

Plaintiffs' expert Dr. Danielsson believes that "the Japanese reproduction studies revealed clear evidence of teratogenicity of ondansetron."  Pls.' Preemption Opp'n at 11.  But Dr. Danielsson's opinions on this issue contradict FDA's own findings.  Dr. Danielsson purports to opine that

> [i]t cannot be disputed that the teratology studies, where the dose levels modestly exceeded human therapeutic exposure (some dose levels and three I.V. studies – two in rats and one in rabbits – and the Japanese oral study – there was a substantial

increase in malformations and ondansetron dosed groups compared to untreated controls.

Ex. 15 (Danielsson Rebuttal Rep.) at 13.  This opinion refers to studies R10937, L10873, 100422, 100424.  But GSK submitted the R10937, L10873, and 100422 studies to FDA.  *See* p. 32, *supra*.  In each case, FDA found no evidence of teratogenicity.  *See id.*  And GSK accurately identified study 100424 to FDA as repetitive of the others.

This Court cannot conclude that preemption is unavailable because FDA got its labeling decisions wrong.  *See, e.g.*, *In re Celexa*, 779 F.3d at 43.  Dr. Danielsson offers no opinion that could distinguish study 100424 from the other three studies that he claims show evidence of teratogenicity.  Nor could he offer such an opinion; as set forth above, that study is materially identical to the others.[17]  Nor is Dr. Danielsson's opinion offered in litigation "newly acquired information" that would have permitted a labeling change, and Plaintiffs cannot defeat preemption by arguing that GSK should have predicted in advance Dr. Danielsson's paid opinion.  *See, e.g.*, *Rheinfrank*, 680 F. App'x at 388 (rejecting "conjectural" argument that if manufacturer had conducted studies, they would have produced "different evidence").

### c.      *Dr. Harvey's "materiality" opinion is speculative.*

Plaintiffs' regulatory expert Dr. Harvey also opines that the Japanese animal studies would have prompted a labeling change.  GSK reiterates that experts cannot permissibly offer what amount to legal opinions on preemption regarding the application of FDA regulations to the evidence and incorporates by reference its *Daubert* motion to exclude Dr. Harvey and associated briefing.  GSK's Daubert Mot. to Exclude Dr. Harvey (filed Jan. 11, 2019); GSK's Mot. for

---

[17] Another of Plaintiffs' experts, Dr. Sadler, similarly contradicted FDA's conclusions in his deposition.  He testified that there was "a dose increase in fetal deaths" in one study.  Ex. 12 (Sadler Dep.) at 246:10-17.  That testimony refers to Study No. L10873.  *See* p. 32, *supra*.  GSK submitted that study in full to FDA, and FDA concluded that it did not show teratogenicity.  *See* p. 32, *supra*.

Recons. (filed Feb. 25, 2019); *see also Delfino v. Medtronic, Inc.*, No. A18-1462, 2019 WL 2415049, at *12 (Minn. Ct. App. June 10, 2019).

To the extent the Court considers Dr. Harvey's opinions at all, they add nothing:

First, Dr. Harvey is not purporting to interpret the studies himself.  Incredibly, ***he did not even read the studies that form the basis of his "opinions*****.**"  Ex. 8 (Harvey Dep.) at 92:8-93:23. He is not offering an opinion as a toxicologist.  *Id.* at 86:21-24.  He opined that the "content" of the animal study reports was "not . . . material to [his] regulatory opinion that it should have been submitted to FDA for their review." *Id.* at 94:10-25.  But their contents are surely important to the preemption inquiry before the Court; if the study results were cumulative of study results before FDA or inconclusive, they could not justify a label change and would have been immaterial.

Dr. Harvey also opines that FDA would have considered the existence of "3 VSDs across 4 of the Japanese animal studies" *(i.e.*, studies 100422 and 100424) to be "evidence of a possible association."  Ex. 16 at 57.  Of course, "possible association" is not the standard for adding a warning under the CBE regulation; the newly acquired evidence must contain "reasonable evidence of a causal association."  *See* 21 C.F.R. § 201.57(c)(6)(i).  Even if he were applying the right standard, his opinion would contradict FDA guidance and the record in this case.  Just as FDA does not draw conclusions about causation of birth defects in humans from AERs (*see* pp. 40-41, *infra*), FDA does not draw conclusions from animal studies by looking at raw numbers of defects.  Rather, FDA has a defined a "positive signal" as "a biologically meaningful difference in dosed animals compared to concurrent or historical controls."  Ex. 46 at 6-7; *see also*, *e.g.*, Ex. 51 (International Council on Harmonization, *Guideline for Industry:   Detection of Toxicity to Reproduction for Medicinal Products* (adopted by FDA in 1994)), at 6.

Here, the three VSDs were within the background rates. *See* pp. 16-18, *supra*. Plaintiffs' experts concede that the studies did not produce statistically significant evidence of cardiac malformations. *See* pp. 34-35, *supra*. FDA concluded that the one VSD observed in study 100422 was not evidence of teratogenicity. Ex. 59. It defies reason that FDA would have been swayed by two VSDs within background rates in study 100424—particularly when it noted, in denying the citizen petition, that "minor atrial/septal defects [in humans] are common." Ex. 32 at 11.[18]

Finally, Dr. Harvey expressed the view that, if FDA had received the two additional Japanese studies in full, FDA would have assigned Zofran to pregnancy category C because those studies showed an "adverse effect on the fetus." Ex. 16 at 56. But a category C label would not have been appropriate simply because treated animals were born with birth defects in the studies. Under federal regulations then in force, pregnancy category C was appropriate not when any defect was seen, but only when the studies showed the drug "to be teratogenic (or to have an embryocidal effect or other adverse effect)." 21 C.F.R. § 201.57(c)(9)(i)(A)(3) (2006). As already set forth, none of the study investigators, whether in the U.K. or Japan, found Zofran to have a treatment-related embryocidal adverse effect or to be teratogenic, and FDA agreed. There is no reason to believe FDA would have disagreed with respect to Japanese studies 100424 and 100441.

## 2. *Mechanism of action*

Plaintiffs contend that, had GSK provided FDA with Dr. Danielsson's hypothetical theory of mechanism of action, FDA would have permitted GSK to add a Zofran birth defect warning. The record evidence overwhelmingly refutes that contention. Nothing in the statute or regulations

---

[18] FDA's treatment of Viagra provides a useful comparison. FDA assigned pregnancy category B to Viagra after reviewing a reproductive toxicity report that showed five VSDs in rabbits in a dose-dependent pattern, even though the high-dose incidence *exceeded* the historical control range. Ex. 88 (MDA 20-895 CDER Pharmacology Review). Here, of course, the observed VSDs did not exceed the historical control range. FDA's treatment of Viagra disproves Plaintiffs' speculation that FDA would assign pregnancy category C based solely on three VSDs.

required GSK to inform FDA of someone's hypothesis, and by necessity a hypothesis is not "reasonable evidence of a causal association" and cannot permit a labeling change.  *See also* 73 Fed. Reg. 2848, 2851 ("[L]abeling that includes theoretical hazards not well-grounded in scientific evidence can cause meaningful risk information to lose its significance.").

In any event, the record is conclusive that FDA was aware of Dr. Danielsson's hypothesis and repeatedly found it insufficient to warrant a labeling change.  *See* pp. 19-20, *supra*.  To summarize:

- FDA expressly considered Dr. Danielsson's 2014 study in its denial of the citizen petition. Ex. 32 at 10-11.

- In connection with the citizen petition, a third party submitted a comment that expressly called FDA's attention to this same hypothetical mechanism of action.  Ex. 30.

- ████████████████████████████████████████████████████████

In rejecting Novartis' proposed labeling, FDA wrote that "there is no evidence, nonclinical *or mechanism of action*, that raises concerns for adverse fetal outcomes with Zofran."  Ex. 39 at -4451 (emphasis added).  It could not be clearer that FDA was fully informed of Plaintiffs' mechanism-of-action justification and that, in the face of the entire record, FDA found that it did not constitute "reasonable evidence of a causal association."  *Id.*; *see* 21 C.F.R. § 201.57(c)(6)(i).

In response to GSK's prior motion, Plaintiffs hung their hat on an internal GSK document discussing embryolethality, but that part of the document was discussing a different class of drugs (Class III antiarrhythmics).  Ex. 109 at -5707.  Moreover, GSK *had* a precise view about the issue now before this Court.  The part of the document that discusses the class that includes Zofran states unequivocally that "there is no teratogenic liability associated with antagonism of the 5Ht3

receptor." *Id.* at -5671.  GSK did not need to tell FDA a conclusion that FDA had likewise reached: that Dr. Danielsson's theory did not warrant a label change.

Dr. Harvey does not support Plaintiffs on this issue (even assuming his opinion is admissible).  He states only that GSK did not "provide adequate information on mechanism of action data."  Ex. 16 at 87.  But he does not identify the data to which he is referring.  He does not identify any such data in GSK's possession.  His opinion on this point is devoid of any substance, and his vague assertion cannot reasonably overcome the overwhelming evidence that FDA was fully aware of Plaintiffs' proposed mechanism of action.

### 3. *AERs*

Next, Plaintiffs assert that GSK "buried evidence of birth defect safety signals via misleading adverse event coding and analysis."  Pls.' Preemption Opp'n at 18.  This too is incorrect.  FDA knew about each and every AER that Plaintiffs claim it lacked; the supposedly missed AERs thus are not "newly acquired information."  And FDA has cautioned that AERs are not evidence of causation of birth defects and are inferior to epidemiological data.  The supposedly missing AERs thus would not have been material to FDA.

#### a. *FDA had a vast quantity of information about AERs*

FDA had access to all material information regarding adverse event reports (AERs).  There is no evidence that GSK failed to comply with its regulatory duty to convey to FDA AERs related to birth defects within 15 days of receipt.  *See* p. 21, *supra* (describing regulatory requirements).  FDA thus had the AERs received by GSK, as well as those that FDA received directly and maintained in its FAERS database.  *See* p. 21, *supra* (describing the FAERS database).  FDA also possessed GSK's analysis of Zofran-related AERs from its 2011 submission, as well as Novartis's even more detailed analysis from its 2015 safety report.

The record makes crystal clear that FDA deemed AERs insufficient to permit a label change. In denying the citizen petition, FDA stated that its denial was "[b]ased on [its] review of . . . adverse event reporting information." Ex. 32 at 20. More bluntly, it rejected Novartis's proposal to include a warning about reported adverse events, and told Novartis that it did not believe "there is any basis to suspect drug attribution to [reported] congenital malformation cases for them to qualify as 'adverse reactions.'" Ex. 37 at -4450. It explained, "It is not possible to rely on case reports of congenital anomalies to determine drug attribution given that the background incidence of major congenital anomalies is 2-4%." *Id.*

FDA's caution about the use of AERs is consistent with its longstanding position. In the context of birth defects, FDA warns that an individual AER reporting a birth defect "can never prove causality." Ex. 45 at 13. According to FDA, there is a background rate of birth defects of about 4%, and "every pregnancy has a risk of an abnormal outcome regardless of drug exposure." *Id.* at 4. Thus, case reports "cannot distinguish coincidence from causation and cannot be used to assess teratogenic risk." *Id.* at 13. At most, case reports "associating an unusual outcome with a drug exposure might well raise suspicions, . . . but follow-up evaluations are always necessary to assess risk." *Id.* "Formal epidemiological studies provide the best means of evaluating whether a gestational exposure adversely affects the developing infant." *Id.*

> b.    *Plaintiffs' contentions to the contrary are incorrect.*

Plaintiffs' assertion that GSK "buried evidence" rests on a hodgepodge of nitpicky claims regarding *how* (not whether) GSK reported adverse events. *See* Pls.' Preemption Opp'n at 18. **In each case, however, FDA was aware of the event.** GSK lacked "newly acquired information" that would have permitted a label change under the CBE regulation, and FDA was fully informed of the adverse events when it twice rejected Plaintiffs' proposed warnings. And given FDA's

refusal to base a labeling decision on AERs and the availability of higher-quality epidemiological data, the smattering of AERs on which Plaintiffs rely could not have been material to FDA.

1)      Alleged miscoding

Plaintiffs claim that GSK provided a disproportionality analysis (DPA) to FDA as part of an October 2015 safety report and that the DPA underreported the number of Zofran-related AERs because it did not include all relevant codes that GSK had applied to its AERs.  Pls.' Preemption Opp'n at 19; Ex. 16 at 90 n.550.  A DPA is a statistical analysis performed on AER data to assess the relative frequency of reporting of specific drug-event combinations.  *See* Ex. 61 (GSK, *Global Clinical Safety and Pharmacovigilance, Safety Evaluation and Risk Management, Ondansetron: Use in pregnancy* (Oct. 2015)), at 22-23.  But GSK never provided that DPA to FDA.  Ex. 2 (Rogg Decl.) ¶ 11.  In March 2015 FDA agreed that Novartis would assume responsibility for providing the requested safety report.  *Id.*  ¶ 10.  ███████████████████████████████████ Because GSK's October 2015 DPA was never supplied to FDA, the manner in which GSK compiled the DPA could not have affected FDA's labeling decisions.

In any event, FDA had all the Zofran-related AERs in its possession, even if GSK selected only a subset of the AERs to conduct its internal DPA.  *See* Exs. 50, 60, 101, 103; *see also* Ex. 17 at 48.  And FDA reviewed the adverse event data in denying the Reichmann citizen petition, *see* p. 21, *supra*, long before GSK prepared the allegedly miscoded DPA.  To the extent Plaintiffs intend to suggest that GSK's underlying coding of its AERs somehow misled FDA, that too is incorrect.  FDA possessed all the underlying data and descriptive information for each AER.  And

in 2012, when FDA transferred data from its old safety database into the new FAERS database, it re-coded all the AERs in its database.[19]

In addition, DPAs are not appropriate for "establishing causal attributions between products and adverse events."  Ex. 44 (FDA, *Guidance for Industry, Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment* (2005)), at 8.  At most DPAs can detect a safety signal.  *Id.*; *see* Ex. 2 (Rogg Decl.) ¶¶ 8-9.  Safety signals are not "reasonable evidence of a causal association" and cannot trigger a label change.  21 C.F.R. § 201.57(c)(6)(i).  By the time GSK prepared the DPA, FDA had already investigated the available safety signals and concluded on the basis of the epidemiological data that no reasonable evidence of a causal association between Zofran and birth defects exists.  Receiving a properly coded DPA incorporating data *already in FDA's possession* could not plausibly have changed FDA's mind.

Finally, to the extent Plaintiffs rely on the opinion of Dr. Harvey, Dr. Harvey does not purport to opine that a properly coded DPA would have showed a greater frequency of birth defects among women who used Zofran during pregnancy than did reports previously provided to FDA.  Therefore, the DPA would not constitute newly acquired information necessary for a CBE change.

2)      Paxil-related events

Dr. Harvey claims that GSK failed to list Zofran as the suspect drug in 11 heart murmur cases.  Ex. 16 at 89 & n.529.  One study reports that approximately 50-70% of infants and children are reported to have a heart murmur identified during a routine physical examination.  *See* Ex. 85 at 23 (Wierwille L. (2011)).  If the mass of adverse event reports submitted by Novartis did not sway FDA, it is implausible that 11 heart murmur cases would have been material.

---

[19] *See* https://www.pharmamedtechbi.com/~/media/Supporting%20Documents/The%20Pink%20Sheet%20DAILY/ 2015/November/Antimicrobial%20AC%20FDA%20briefing%2011515.pdf at Appendix G.

Dr. Harvey claims that GSK erred by submitting these reports to FDA as reports related to its drug Paxil.  But in 2009 GSK submitted to FDA a safety report specifically analyzing these eleven reports as part of a periodic safety report for *Zofran*.  *See* Ex. 108 at -6300.  FDA thus was fully aware of these events and their hypothetical connection to Zofran long before it considered the citizen petition or Novartis's proposed labeling changes.  And because FDA had the reports and was aware of their connection to Zofran, the reports are not "newly acquired information"— defined as "information not previously submitted" to FDA—for purposes of the CBE regulation. *See* 21 C.F.R. § 314.3(b).

In any event, GSK's actions fully complied with the law.  GSK received these 11 reports from plaintiffs' attorneys in litigation regarding Paxil.  Ex. 108 at -6300.  The attorneys attributed the cardiac murmurs to Paxil, not Zofran.  Ex. 108 at -6300.  According to FDA draft guidance, when an AER references more than one of a sponsor's products, the AER should be included in only one product's reports to FDA.  Ex. 42 at 22.  The sponsor should include the AER in the reports for the product considered "most suspect" *by the reporter*.  *Id.*.  Here, both Paxil and Zofran were identified to FDA, but the reporters identified Paxil as the "most suspect" drug.

### 3)    Einarson and McCauley reports

Plaintiffs also rely on Dr. Harvey's opinion that GSK failed to provide AERs for 13 cases (of miscarriage, stillbirth, and birth defects) from its safety database to FDA.  Ex. 16 at 90 nn.535-39.  But GSK did bring these cases to FDA's attention, and FDA deemed them insufficient to justify changing the labeling.

FDA regulations exempt these 13 cases from GSK's periodic AER reporting.  Adverse drug experience reports obtained from postmarketing studies, however, are exempted from periodic reporting requirements, 21 C.F.R. § 314.80(c)(2)(iii), and they also are exempted from 15-day reports "unless the applicant concludes that there is a reasonable possibility that the drug

caused the adverse experience," § 314.80(e).  GSK obtained the 13 cases from postmarketing studies.  *See, e.g.*, Ex. 16 at 90; *see also* Exs. 73 (Einarson et al.), 78 (McCauley et al.).

GSK, nevertheless, provided FDA with the relevant information.  Some of the events come from the Einarson study.  *See* Exs. 16, 73 (Einarson at al.).  GSK provided FDA with the full Einarson publication shortly after its publication in 2004.  Ex. 101.  That publication described and statistically analyzed the events observed in the study subjects.  *Id.*  GSK further supplied information about the events in periodic safety reports and in its 2011 safety report.  *See* Ex. 60 at -1128; *see also* Ex. 103 (NDA 20-007 Periodic Safety Report (2004-2005)).  ███████████

███████████████████████████████████████████████████████████████

███████████████████████████  And FDA expressly discussed the Einarson study in denying the Reichmann citizen petition.  Ex. 32 at 9.  FDA was well aware of the events that were the subject of that study.

The remaining six events were reported in a 2002 study by L. McCauley et al.  *See* Ex. 78.  GSK cited that study in its 2011 safety report to FDA and described the study's reports of spontaneous abortion and stillbirth.  Ex. 60 at -1124.  ██████████████████████

██████████████████████6.  Again, consistent with its repeated caveats regarding the use of AERs, FDA viewed these events as immaterial to a labeling change.  Plaintiffs have no basis to claim that FDA would have changed its mind if only GSK had submitted individual AERs for the events discussed in the studies.

### 4)   FAERS database

Finally, Dr. Harvey claims that GSK should have conducted queries in FDA's FAERS database and that, if it had done so, it would have identified one case of cleft palate and six congenital heart defects.  Ex. 16 at 91-92.  There is no regulatory requirement for manufacturers to query FDA's database.  As set forth above, FAERS is FDA's *own* AER database, and FDA

clinical reviewers use the reports in the database to monitor the safety of drugs. *See* p. 21, *supra*. FDA was, by necessity, aware of its own data.

Dr. Harvey admits, moreover, that ████████████████████████████████████ ████████████████████████████████. FDA was thus *doubly* informed of the reports. And ████████████████████did not convince FDA to warn of the potential for heart defects; to the contrary, it wrote that "cardiac malformations is the most common congenital malformation, affecting nearly 1% of births per year in the US. Ex. 39 at -4465. "Given such high prevalence, it is expected that such malformations would be reported with the use of Zofran by chance alone." *Id.* This handful of AERs in FDA's own possession was surely immaterial.

*        *        *

In conclusion, Plaintiffs' complaints about GSK's reporting of adverse events amount to the claim that GSK failed to use the proper procedure to disclose to FDA a small number of reports *that FDA knew about*. To the extent Plaintiffs are claiming that GSK's actions violated disclosure requirements, that claim is preempted by *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001); *see, e.g.*, *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1330 (11th Cir. 2017) (finding plaintiff's "failure to report" claim impliedly preempted because it was premised on a failure to fulfill a duty owed to FDA). In any event, it is inconceivable that these reports in FDA's possession—a mere fraction of the many more reports that FDA reviewed when it rejected Novartis's proposed labeling changes—would have materially swayed its labeling decisions. And because the reports were submitted to FDA, they are not "newly acquired information"—let alone information that "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA" and that contains "reasonable evidence of a causal association." 21 C.F.R. §§ 201.57(c)(6)(i), 314.3(b), 314.70(c)(6)(iii)(A); *see, e.g.*, *Gibbons*, 919 F.3d at 708.

46

### 4.     *Einarson study*

Plaintiffs lastly argue that GSK "hid from the FDA key weaknesses in the Einarson study." Pls.' Preemption Opp'n at 20.  FDA reviewed the Einarson study and discussed it in its denial of the Reichmann citizen petition.  Ex. 32 at 9.[20]  Plaintiffs argue, however, that GSK hid (1) the small size and low power of the study; (2) GSK's involvement in the study; and (3) a case of laryngomalacia that Einarson did not include in the study.  Pls.' Preemption Opp'n at 20-24.  But FDA was aware of all that information, and none of it could have been "newly acquired information" under the CBE regulation.

First, the notion that GSK hid the small size and low power of the Einarson study is demonstrably false.  In its rejection of the citizen petition, FDA had this to say about the Einarson study:  "We note, however, that the study was *of limited size and statistical power* (the study had 80% power to detect a 3.5-fold increase in major congenital malformations)."  Ex. 32 at 9 (emphasis added).  FDA did not materially rely on the study.  In concluding that the Anderka and Danielsson studies did not warrant a label change, FDA cited the larger Pasternak study—not Einarson.  *See id.* at 13.  Similarly, the current FDA-approved Zofran labeling identifies the Anderka, Danielsson, and Pasternak studies—not Einarson.  *See* Ex. 41 § 8.1.

Second, GSK did not hide its involvement in the study.  The study itself disclosed GSK's involvement: in the "Acknowledgments" section, the study notes that it was "supported by an unrestricted grant from GlaxoSmithKline, Mississauga, Canada."  Ex. 73 at 942.

Plaintiffs have highlighted evidence suggesting that GSK employees drafted edits to the study manuscript.  *See* Pls.' Preemption Opp'n at 22-23.  But a comparison between GSK's redline

---

[20] Notably, this was before the publication of even larger-scale epidemiological studies—the Parker and Huybrechts studies—that further weigh against an association between Zofran and birth defects.

and the final manuscript confirms that GSK's edits were not included in the paper.  *Compare* Ex. 98 (redline), *with* Ex. 73 (final publication).

In any event, as already discussed, FDA did not deem the small, low-powered Einarson study material.  FDA reviewed the Einarson data in conjunction with the totality of available Zofran pregnancy safety information and concluded that none of it demonstrated "increased risk of fetal adverse outcomes."  Ex. 32 at 18.  It is simply implausible that it would have come to a different conclusion had FDA only known that GSK employees contemplated edits to the study (but did not even provide their edits to the study author or those edits were not included).

Finally, Plaintiffs highlight the Einarson study's failure to include one case of laryngomalacia reported to GSK in connection with the study.  The purpose of the Einarson study was "to determine whether this drug increases the baseline rate of major malformations," primarily measuring "[r]ates of major malformation." Ex. 73 at 940.  Laryngomalacia, a congenital softening of the tissues of the voice box above the vocal chords, is a minor malformation.  *See* Exs. 45 at 7 (defining major and minor birth defects), 72 (Edmondson et al.) at 1 (describing laryngomalacia); *see also, e.g.*, Exs. 54, 55, 57 (birth defect surveillance programs categorizing laryngomalacia as a minor malformation).  The researcher who reported the case to GSK attributed it to "chance." Ex. 100 at -6560.  And, consistent with the study investigators' prior practice and that of other large birth defect studies, *see, e.g.*, Ex. 70 (Diav-Citrin et al.) at 25, the case of laryngomalacia was not reported in the study results as a major malformation.  Still, GSK reported that adverse event to FDA in its April 2011 submission.  *See* Ex. 27 at -4315 ("One neonate with laryngomalacia reported to be unrelated to study medication"); *see also* Ex. 2 (Rogg Decl.) ¶¶ 18-20.

Even supposing laryngomalcia were a major malformation, nothing suggests that this one event would have been material to FDA or in any way altered the study results.  Whether there

were six major malformations in the treatment group, as reported in the study, or seven, as Plaintiffs contend, the results reflects no signal of major teratogenicity. *Id.* More to the point, Plaintiffs' experts have not identified any evidence tying Zofran to laryngomalacia, and no Plaintiff in this MDL even claims that defect. None of the evidence available to FDA suggests a causal association between laryngomalacia and Zofran. Given FDA's dismissal of the weight of AERs in rejecting Novartis's proposed labeling changes, *see* pp. 40-41, *supra*, it is inconceivable that it would have viewed one case of laryngomalacia as material.

## III. FDA Acted Within Its Lawfully Delegated Powers in Rejecting Plaintiffs' Proposed Changes to Zofran's Label

To satisfy the clear evidence test, *Albrecht* requires drug manufacturers to show that FDA's decision not to approve a labeling change was an "agency action[] taken pursuant to the FDA's congressionally delegated authority." 139 S. Ct. at 1679. The Court was "mak[ing] only the obvious point that, whatever the means the FDA uses to exercise its authority, those means must lie within the scope of the authority Congress has lawfully delegated." *Id.* The Court explained that such action includes but is not limited to "formally rejecting a warning label that would have been adequate under state law" and "other agency action carrying the force of law." *Id.*

The record here satisfies the agency action requirement. First, FDA's denial of the citizen petition was official agency action within the scope of its delegated authority. Congress has conferred FDA with authority to determine whether new safety information warrants a label change; FDA may even order a manufacturer to change its label in appropriate circumstances. *See, e.g.*, 21 U.S.C. § 355(*o*)(4). Congress has authorized FDA to issue regulations for the efficient enforcement of the FDCA. § 371(a). FDA exercises its authority to regulate labeling in part by reviewing citizen petitions requesting label changes. 21 C.F.R. § 10.30, governing the submission of citizen petitions, requires FDA formally to "rule upon" each petition, including by denying the

petition.  § 10.30(e)(1), (2)(ii).  Congress has defined the denial of citizen petitions as "final agency action" subject to judicial review.  21 U.S.C. § 355(q)(1)(F); *see also* 21 C.F.R. § 10.30(i).  Given this regulatory framework, FDA's denial of the Reichmann citizen petition was official agency action.  *See also In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108, 1126-27 (S.D. Cal. 2015) (finding that an agency's denial of a citizen petition constituted official agency action and citing cases), *vacated on other grounds*, 721 F. App'x 580 (9th Cir. 2017).

Second, the agency's rejection of Novartis's proposed labeling revisions likewise was official agency action within the scope of Congress' delegated authority.  Again, Congress has authorized FDA to regulate the labeling of drug products, 21 U.S.C. § 355, and to enact regulations to enforce the FDCA, § 371(a).  Pursuant to that authority, FDA promulgated the PLLR "to improve the content and format of prescription drug labeling."  79 Fed. Reg. 72,064, 72,064.  That regulation provided that, "[a]s with all prescription drug labeling, both the manufacturer and FDA reviewers will play a shared role in determining the new labeling content."  *Id.* at 72,073.  And Novartis could only submit its proposed labeling as a PAS and therefore could not implement the changes unless and until FDA approved them.  *See* Ex. 48 (FDA, *Draft Guidance for Industry, Pregnancy, Lactation, and Reproductive Potential: Labeling for Human Prescription Drug and Biological Products--Content and Format* (Dec. 2014)) at 18 (sponsors of medicines subject to the PLLR "are required to submit the new labeling content in the new format as a prior approval labeling supplement," and "[a]pplicants voluntarily revising older labeling would also submit draft labeling as a prior approval labeling supplement").  FDA's approval of Novartis's ultimate labeling—and accompanying rejection of Novartis's proposed revisions—represents official FDA action pursuant to its delegated authority to regulate drug labeling.

**IV.     GSK Could Not Use the CBE Process To Revise the "Use in Specific Populations"
         Portion of the Labeling.**

GSK incorporates by reference its prior arguments that the CBE regulation did not permit
it to revise the "Use in Specific Populations" portion of the labeling.  *See* GSK's Mem. in Support
of Mot. for Summ. J. Based on Fed. Preemption (filed July 2, 2018), at 14-15.  GSK acknowledges
that the Court has already decided this issue as a matter of law, Order on GSK's Preemption MSJ
at 49-51, and GSK incorporates its prior arguments for purposes of preserving this argument.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in favor of GSK.

Dated: October 10, 2019

Respectfully submitted,
GLAXOSMITHKLINE LLC,
By its attorneys,

*/s/ Jennifer Stonecipher Hill*
Madeleine M. McDonough
Jennifer M. Stevenson
Jennifer Stonecipher Hill
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
mmcdonough@shb.com
jstevenson@shb.com
jshill@shb.com
*Admitted pro hac vice*

Lisa S. Blatt
Amy Mason Saharia
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
lblatt@wc.com
asaharia@wc.com
*Pro hac vice applications pending*

Attorneys for Defendant GlaxoSmithKline LLC

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent via first class mail to those identified as non-registered participants.

*/s/ Jennifer Stonecipher Hill*
Jennifer Stonecipher Hill